# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| IN RE EMERGENT BIOSOLUTIONS INC. SECURITIES LITIGATION | Civil No. 8:21-cv-00955-PWG<br><br>CLASS ACTION |
| THIS DOCUMENT RELATES TO:<br><br>All Actions | FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |

## TABLE OF CONTENTS

I.     NATURE OF THE ACTION ................................................................................1

II.    JURISDICTION AND VENUE .........................................................................8

III.   PARTIES ............................................................................................................9

IV.    NON-PARTY CONFIDENTIAL WITNESSES ...............................................11

V.     SUBSTANTIVE ALLEGATIONS ..................................................................14

       A.    The Catastrophic COVID-19 Global Pandemic Sweeps Across The Globe ...............14

       B.    The U.S. Government Initiates Operation Warp Speed................................15

       C.    Emergent's Business & Operations ........................................................17

       D.    Emergent's Contracts To Manufacture COVID-19 Vaccines ...................20

       E.    Undisclosed, Material, Negative Facts ...................................................23

             1.    *Undisclosed Facts And Risks Described By The CWs*...........................23

             2.    *Undisclosed Facts And Risks Described In Inspection Reports* ...........................30

                   a.    Inspection Reports At Other Emergent Facilities ...........................32

                         i.    Inspections At The Winnipeg Facility .....................................32

                               (a) Form 483 #1 .......................................................32

                               (b) Company Response #1........................................33

                               (c) Inspection Report #1 .........................................34

                               (d) Form 483 #2 .......................................................36

                               (e) Company Response #2........................................36

                               (f) Inspection Report #2 .........................................37

                         ii.   Inspections At The Canton Facility .....................................39

                               (a) Form 483 ............................................................39

                               (b) Company Response...........................................40

                               (c) Inspection Report ............................................43

iii. Inspections At The Paca Street, Baltimore, Facility ...............................44

(a) Form 483 ...................................................................................44

(b) Company Response.....................................................................45

(c) Inspection Report #1 .................................................................47

(d) Inspection Report #2 .................................................................48

iv. Inspections At The Lansing Facility .......................................................48

(a) Form 483 ...................................................................................48

(b) Inspection Report ......................................................................50

v. Inspections At The Rockville Facility .....................................................51

(a) Form 483 ...................................................................................51

(b) Company Response.....................................................................52

(c) Inspection Report ......................................................................54

b. Bayview Facility Inspections During The Class Period ..............................55

i. Bayview Inspection From April 9-20, 2020 .............................56

ii. Bayview Inspection From April 12-20, 2021 ...........................63

3. *Undisclosed Facts And Risks Revealed By Investigative Reporting*.....................71

4. *Undisclosed Facts And Risks Uncovered By Congress* .........................................74

F. Materially False and Misleading Statements & Omissions ..........................................79

1. *Business Operations Fraud*..................................................................................79

2. *Reported Results Fraud* .....................................................................................150

3. *Internal Controls Fraud*....................................................................................167

4. *Partial Corrective Disclosures Incrementally Revealed the Frauds*.................171

G. Additional Facts Probative of Scienter .......................................................................186

1. *Defendants' Knowledge or Reckless Disregard of Red Flags Demonstrates Scienter* ....................................................................................................................186

2. *The Individual Defendants Were Financially Motivated To Commit Fraud*......194

3. *The Individual Defendants And Other Insiders Reaped Suspicious Executive Compensation And Bonuses* ...................................................................201

4. *Emergent Raised Funds During The Class Period* ...............................................203

5. *Emergent Reaped Unearned Windfall Government Payments* ............................204

6. *The Fraud Implicated Core Operations* ..............................................................205

7. *The Individual Defendants Signed, Were Quoted In, Or SOX- Certified The Alleged Misstatements* .....................................................................................206

8. *The Fraud Violated Emergent's Corporate Code of Conduct* ............................206

9. *Insider Resignations and Employment Status Changes Support Scienter* ..........208

10. *Ongoing, Expanded Investigations Support Scienter* .........................................209

VI.    NO SAFE HARBOR ...........................................................................................210

VII.   THE CLAIMS ARE TIMELY ............................................................................212

VIII.  LOSS CAUSATION/ECONOMIC LOSS ..........................................................213

IX.    PRESUMPTION OF RELIANCE .......................................................................214

X.     LEAD PLAINTIFFS' CLASS ACTION ALLEGATIONS ................................216

XI.    CLAIMS FOR RELIEF ......................................................................................218

COUNT I ......................................................................................................................218

COUNT II .....................................................................................................................222

XII.   PRAYER FOR RELIEF .....................................................................................223

XIII.  DEMAND FOR TRIAL BY JURY ....................................................................223

1.    Lead Plaintiffs Nova Scotia Health Employees' Pension Plan and City of Fort Lauderdale Police & Firefighter's Retirement System ("Lead Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against Defendants, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through its attorneys, which included a review of Defendants' public statements and publicly available documents, conference calls and announcements, SEC filings, wire and press releases published by and regarding Emergent BioSolutions Inc. ("Emergent"), analysts' reports and advisories and other press coverage about Emergent, Emergent's stock chart, Emergent's corporate website, data obtained through news services such as Bloomberg and Yahoo! Finance, interviews with certain confidential witnesses ("CWs") who were former employees of Emergent, Food & Drug Administration ("FDA") inspection reports obtained (in redacted form) by a Freedom of Information Act ("FOIA") request, FDA Forms 483 and Emergent responses thereto obtained (in redacted form) via the FDA's website, Congressional reports and testimony, internal Emergent documents made public in connection with a Congressional investigation, and information readily obtainable on the Internet.  Lead Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

2.    This is a class action for violations of the federal securities laws brought by Lead Plaintiffs Nova Scotia Health Employees' Pension Plan and City of Fort Lauderdale Police & Firefighter's Retirement System, individually and on behalf of all persons who purchased or otherwise acquired Emergent BioSolutions Inc. common stock between March 10, 2020, and November 4, 2021, inclusive (the "Class Period").  Lead Plaintiffs violations of Sections 10(b) and

1

20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b¬5 promulgated thereunder by the Securities and Exchange Commission ("SEC") (17 C.F.R. § 240.10b-5), against Defendants Emergent, Robert G. Kramer (Emergent's President and CEO), Richard S. Lindahl (its EVP, CFO, and Treasurer), and Syed T. Husain (its SVP and Head of Contract Development and Manufacturing).

3.      When the horrors of COVID-19 first struck, Emergent seemed uniquely positioned to capitalize, given that its Bayview facility had been previously designated as one of just three U.S. facilities with which the U.S. government had contracted to be prepared to ensure a domestic supply of vaccines in a pandemic.  Indeed, Emergent was paid hundreds of millions of dollars just to be ready to initiate such production if a crisis arose.  When it did, in a classic "do well while doing good" setup, Emergent quickly entered into contracts with two pharmaceutical companies which, fueled by Operation Warp Speed funds, had created promising viral-vector vaccine candidates.  The combined value of Emergent's U.S. government, J&J, and AstraZeneca contracts exceeded *$1 billion*.  The U.S. government, alone, was set to pay Emergent $27 million a month just to reserve some of the manufacturing suites at the Bayview facility.  Emergent began manufacturing of bulk drug substance for AstraZeneca in Bayview facility Area 3 in August 2020 and for Johnson & Johnson ("J&J") in Bayview facility Areas 1 and 2 in November 2020.

4.      Unbeknownst to investors, Emergent and its facilities, including the Bayview facility, bore longstanding, serious, undisclosed deficiencies in facilities, equipment, personnel, training, and processes that materially increased the risks of catastrophic errors that would derail the COVID-19 vaccine manufacturing process.  These serious deficiencies are evidenced by the CW statements of numerous former employees of Emergent, investigative journalist reports, the findings of two Congressional committees, two dozen FDA inspection reports dating back to 2017,

and inspection reports by J&J, AstraZeneca, and even Emergent's internal personnel. Significantly, these voluminous sources document a ***persistent and pervasive contamination risk*** that was ignored and never remediated, coupled with unsanitary facilities and equipment, woefully deficient personnel training, and a failure to adequately investigate and remedy known issues.

5.    Contrary to this concealed information, Defendants' public misstatements created a false and misleading impression for investors that Emergent was poised to safe many lives while transforming into an earnings juggernaut.  On an April 30, 2020 earnings call, Defendant Kramer said, "***We have proven manufacturing capabilities in place*** and, ***in concert with the U.S. government, have built the ability to quickly advance early stage candidates through development to commercial-scale manufacturing***."  A May 8, 2020 response to the FDA said, "***As of 08 May 2020, all employees/ contingent workers performing activities, are confirmed to be trained on the task they are performing***."  A July 6, 2020 Press Release touted the Bayview facility as having "***unique capabilities across four independent suites to produce at clinical scale to get candidates rapidly into the clinic***, while at the same time scaling up to enable large-scale manufacturing to up to 4000L to prepare for production of commercial volumes to meet customer demand" and having "***capacity to produce tens to hundreds of millions of doses of vaccine on an annual basis***."  During a February 18, 2021 earnings call, Defendant Kramer said, "***Biologics Manufacturing is an exacting process that requires specialized equipment, disciplined processes and a highly trained staff…service providers must have durable, scalable and compliant manufacturing infrastructures***.  ***Emergent has been able to thrive in this environment***."

6.    While the market was misled, Defendants engaged in extensive, highly-suspicious self-enrichment, benefitting from the artificial elevation in Emergent's securities values due to the alleged fraud.  Defendants Kramer and Lindahl netted $11.5 million combined from insider

transactions during the Class Period, the bulk of which occurred in January and February 2021. They also garnered lavish, highly-suspicious executive compensation, including huge bonuses, overly generous pay increases, and lavish stock option / stock unit awards.  Emergent also closed a large offering during the Class Period before the fraud was revealed.

7.      In March 2021, just four months into the manufacturing of J&J bulk drug substance at the Bayview facility and only shortly after the majority of suspicious the insider sales and bonuses pled herein, a batch sent to J&J's laboratory in the Netherlands failed routine quality control testing, prompting an "immediate" manufacturing investigation.  According to the FDA, on March 16, 2021, J&J notified Emergent that a specific bulk drug substance batch was contaminated with a material used in the bulk drug substance for AstraZeneca.  By April 5, 2021, Emergent submitted a report to FDA stating bioreactor media used in the J&J manufacturing program had been contaminated by waste material being disposed from the AstraZeneca suite at the Bayview facility.  The U.S. government quickly terminated further manufacturing of the AstraZeneca COVID-19 vaccine at the Bayview facility to eliminate the risk of further contamination, and the FDA conducted a full-scale, for-cause inspection of the Bayview facility. Given the concealed deplorable state of the facilities, equipment, personnel, training, and processes at the Bayview facility, Defendants knew or recklessly disregarded both that the risks of catastrophic error in the COVID-19 manufacturing process had always been higher than publicly described to investors and that once a serious problem arose, there was no quick or easy fix shy of a massive overhaul that would materially impede or eliminate Emergent's ability to timely perform as required under its COVID-19 vaccine contracts.

8.      Yet, Defendants continued their fraud, expressing confidence that the Bayview facility's problems were correctable and that it would be brought timely into compliance so that

4

COVID-19 vaccine manufacturing could resume, while downplaying the contamination incident, the massive disruptions to Emergent's operations, the scope and duration of necessary remedial upgrades at the Bayview facility given its longstanding and pervasive problems, and the grave risks that Emergent could not timely perform under its COVID-19 vaccine contracts and that those contracts would be terminated.  An April 1, 2021 press release said the "*Bayview facility has been designed and validated to meet all current Good Manufacturing Practices*," "*there are rigorous quality checks throughout [Emergent's] vaccine manufacturing processes,*" those "*quality control systems worked as designed,*" and "*[d]iscarding a batch of bulk drug substance…does occasionally happen during vaccine manufacturing*."  It added, "*We continue to manufacture in support of our customers and the U.S. government, and we remain confident in our ability to meet the FDA requirements*."  In an April 14, 2021 op-ed, Defendant Kramer said, "*Our Bayview facility* in Baltimore exists and *is now ready to produce 1 billion vaccines a year to fight COVID-19.*"  Emergent's April 30, 2021 response to the FDA stated, "*Emergent is confident that potential routes of contamination and cross-contamination have been evaluated and appropriate actions to address such routes are being implemented*."  On May 19, 2021, Defendant Kramer testified under oath before Congress, "*We have made significant progress against all of those commitments. We are very close to completing them, and I would expect we will be in a position to resume production within a matter of days.*"

9.     However, a series of partial corrective disclosures incrementally revealed Defendants' fraud and removed artificial inflation from its stock price – despite their ongoing misstatements and omissions that muted the impacts.

10.     The first flurry occurred in late March and April 2021.  On March 31, 2021, *The New York Times* reported that in February 2021, Emergent employees at the Bayview facility had

mix up the ingredients for J&J and AstraZeneca COVID-19 vaccine drug substance batches, thereby contaminating up to 15 million vaccine dose-equivalents of the J&J vaccine, prompting regular actions, the freezing of other batches, and J&J to assert more control over the Bayview facility. On April 1, 2021, the *Associated Press* reported that documents obtained by a FOIA request revealed a history of FDA citations for contamination and training deficiencies and failure to follow appropriate protocols and procedures at its facilities going back to 2017. On April 3, 2021, *The New York Times* reported that J&J was assuming control of the Bayview facility, which would no longer produce AstraZeneca vaccine. On April 9, 2021, Emergent disclosed that at FDA's request, it was halting manufacturing of any new vaccine material at the Bayview facility and was quarantining all previously produced material. On April 21, 2021, the FDA published a detailed report outlining a litany of decontamination, sterilization, sanitization, cleaning, waste transport and disposal, maintenance, process, personnel, and training failures between January and April 2021 and confirmed that Emergent was halting all new production at the Bayview facility. On April 29 and 30, 2021, Defendant Kramer and Emergent confirmed the cross-contamination of the J&J production suite with the AstraZeneca virus, and Defendant Lindahl disclosed impacts in the form of lowered projected revenues and earnings. On April 30, 2021, Emergent filed a 52-page response to the FDA's report which, among other things, confirmed the cross-contamination and how quickly it was known and conceded that trying to manufacture drug substance for two COVID-19 vaccines at once revealed flaws in its cross-contamination control procedures. At this juncture, Defendant Husain left the company to "pursue another opportunity," while Emergent's EVP for Manufacturing and Technical Operations took "a personal leave of absence."

11. The news only worsened. On June 11, 2021, *The New York Times* reported that the FDA said 60 million doses of J&J vaccine produced from the Bayview facility would be discarded

and another 10 million would get a warning.  On June 18, 2021, *The New York Times* reported that the Bayview facility's problems were so serious that over 100 million doses of both the J&J and AstraZeneca vaccines were held in limbo pending FDA review.  On November 4, 2021, Defendants made a series of disclosures revealing, among other things, that HHS had terminated its $650 million contract with Emergent, which lowered the realized value of the contract by $180 million to $470 million, and that Emergent was reversing $86 million in Q3 2021 revenue and lowering its backlog by $171 million.  The same day, Defendant Kramer wrote an op-ed disclosing that the Bayview facility had never received the work and funding needed to build and maintain the Bayview facility at the level necessary to have satisfied Emergent's COVID-19 vaccine manufacturing obligations.  Contemporaneously, Emergent announced that its Head of Global Quality was leaving to "pursue another career opportunity."

12.    Each of the foregoing disclosures was accompanied by a sharp decline in Emergent's stock price, on high trading volume, causing the Lead Plaintiffs and the Class members to suffer damages.

13.    It is beyond dispute that Defendants bear "full responsibility" for the underlying vaccine contamination debacle.  In his November 2021 op-ed, Defendant Kramer wrote that Emergent "***full responsibility for this*** incident."  Earlier, in testimony to the Congressional Select Subcommittee on the Coronavirus Crisis in May 2021, Defendant Kramer conceded that "***contamination with another adenoviral substance…is a serious issue***," "***[t]he contamination incident that led to the shutdown of new vaccine production at Bayview was very serious and completely unacceptable***," and "***[a]s CEO, I take full responsibility for that***."  Emergent's Executive Chairman Fuad El-Hibri likewise testified: "***Let me be clear.  The cross-contamination incident is unacceptable, period***."

7

14. Also unacceptable was the large-scale deception that Defendants visited upon Emergent shareholders, concealing material, negative information from them while enriching themselves through insider transactions at fraud-inflated stock prices. As a result of Defendants' wrongful acts and omissions as alleged herein, and the precipitous decline in the market value of Emergent's securities, Lead Plaintiffs and the other Class members have suffered significant losses and damages, for which this action seeks recovery.

## II.    JURISDICTION AND VENUE

15. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

16. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

17. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa). A substantial portion of the acts in furtherance of the alleged fraud, including the preparation and dissemination of materially false and misleading information and the effects of the fraud, have occurred in this Judicial District. In addition, Emergent's headquarters are located in this District at 400 Professional Drive, Suite 400, Gaithersburg, Maryland 20879.

18. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

19.     Lead Plaintiff Nova Scotia Health Employees' Pension Plan purchased Emergent common stock (as set forth in the accompanying amended certification submitted herewith) at artificially inflated prices during the Class Period and suffered damages as a result of the misconduct alleged herein.

20.     Lead Plaintiff City of Fort Lauderdale Police & Firefighter's Retirement System purchased Emergent common stock (as set forth in the accompanying amended certification submitted herewith) at artificially inflated prices during the Class Period and suffered damages as a result of the misconduct alleged herein.

21.     Defendant Emergent BioSolutions Inc. is a Maryland corporation with its headquarters located at 400 Professional Drive, Suite 400, Gaithersburg, Maryland 20879. Emergent's common stock is traded on the New York Stock Exchange ("NYSE") under the symbol "EBS."

22.     Defendant Robert G. Kramer was, at all relevant times, the President and CEO of Emergent, and was a member of Emergent's Board of Directors.  According to Defendant Kramer's bio on Emergent's corporate website, he was appointed to serve as Emergent's CEO and Director effective April 2019, has served as its President since March 2018, and previously served in the capacities of Chief Operating Officer (March 2018 – March 2019), EVP and CFO (September 2012 – March 2018), interim EVP, Corporate Services Division (2012), interim Head of the Biosciences Division (2011), and, prior to his first, brief retirement in 2010, various executive positions from 1999 – 2010 including CFO and President of Emergent Biodefense Operations Lansing.

23.     Defendant Richard S. Lindahl was, at all relevant times, Executive Vice President, CFO, and Treasurer of Emergent.  According to Defendant Lindahl's bio on Emergent's corporate

website, he was appointed to serve as EVP, CFO, and Treasurer in March 2018, and prior to that, had over two decades of financial leadership experience, including serving as CFO of CEB, Inc. (May 2009 – April 2017) and SVP and Treasurer of Sprint Nextel Corporation (2006 – 2008).

24.    Defendant Syed T. Husain, at all relevant times until his resignation from Emergent as discussed *infra*, served as Emergent's SVP and Head of Contract Development and Manufacturing business unit. Prior to his tenure at Emergent, Defendant Husain's professional experience including working for five years at Alcami Corporation as its Chief Commercial Officer (2015-2019) and its VP and Head of API Business Unit (2014-2015) and for five years at Lonza as its Head of Chemical Development & Manufacturing Business Unit (2013-2014), Head of Sales & Business Development, Chemical Development & Manufacturing (2010-2013), and Manager, Associate Director and Director, Sales & Business Development (2005-2010).

25.    Defendants Kramer, Lindahl, and Husain are sometimes collectively referred to herein as the "Individual Defendants."  The Individual Defendants, throughout the Class Period, because of their positions with Emergent, possessed the power and authority to control the contents of Emergent's SEC filings, press releases and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant, while serving as a senior executive of Emergent, was provided with copies of Emergent's SEC filings and press releases alleged herein to have been false or misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public, and that the positive representations which were being made were then materially false and/or misleading.

26.     Defendant Emergent and the Individual Defendants are referred to herein, collectively, as the "Defendants."

IV.     **NON-PARTY CONFIDENTIAL WITNESSES**

27.     Below are the descriptions of the Confidential Witnesses whose statements are among the factual bases for this pleading.

28.     CW1 worked at Emergent from April 2020 to December 2020 as a Senior Project Manager based at the corporate headquarters.  In that capacity, CW1 reported to Rick Welch, VP Development Services, CDMO Business Unit, who in turn, reported to Defendant Husain, SVP and Head of the CDMO Business Unit.  CW1 was responsible for overseeing the management of the Novavax, Vaxart, and CureVac COVID-19 vaccine projects and helped create a system to track and manage the multiple contracts Emergent was signing.  As senior member of the project management team, CW1 sat in on the bi-monthly project management meetings, led by Defendant Husain and Welch, during which all COVID-19 projects were discussed.

29.     CW2 worked at Emergent in Operational Excellence from December 2018 to December 2021. CW2 started as a Senior Program Manager Operational Excellence (Dec. 2018 – Jan. 2021), then was promoted to Director, Operational Excellence (Jan. 2021 – Dec 2021).  CW2 was based at Emergent's Bayview and Rockville facilities. CW2 reported to Victor Cascella, Senior Director – Global Operational Excellence.  At the beginning of CW2's tenure, Cascella reported to Sean Kirk, EVP of Manufacturing and Technical Operations, who reported to Defendant Kramer. Later, Cascella reported to Dino Muzzin, SVP Manufacturing Operations. CW2's responsibilities involved helping employee teams at the Emergent facilities improve their processes, improve efficiency, meet customer demands, meet site performance goals, and training. CW2 worked with employee teams at the facilities "to see where problems were, how can we work with the team to make improvements and overcome challenges."

30.     CW3 worked at Emergent from November 2020 to November 2021 as a Quality Assurance Analyst at the Bayview facility.  In that capacity, CW3 reported to Nathan Leary, Quality Assurance Manager, who reported to Judy McCorry, Director of Quality Assurance, who, in turn, reported to Mary Oates, Senior Vice President Global Quality.  After Leary and McCorry left Emergent, CW3 reported to Brad Tippett, who reported to McCorry's replacement.  CW3 was responsible for reviewing batch production records for each batch of vaccine before they were finalized into a BPR report to ensure that the information contained in the records were correct and that everything that happened on the floor was showing in the records.

31.     CW4 was a Quality Control Microbiology Analyst II at the Bayview facility from July 2019 to July 2020. CW4 reported to Amanda McClure, QC Micro Specialist II, and Michelle Forti, QC Specialist Microbiology Supervisor. McClure and Forti reported to the Director of Quality, who CW4 recalled only by her first name, Michelle.  CW4 was part of the Quality Control team responsible for testing the manufacturing facilities for microbiological environmental contaminants such as mold and bacteria. CW4's team ran three different types of tests: air samples for mold, surface samples for bacteria, and air samples for other microbiological material other than mold. CW4's job also involved analyzing the results of the environmental testing.

32.     CW5 worked at Emergent from August 2020 to January 2021 as a Project Analyst based at the corporate headquarters.  In that capacity, CW5 reported to CW1 and Rick Welch, Vice President Development Services, CDMO Business Unit, who worked directly with Defendant Husain and Defendant Kramer.  CW5 was responsible for taking notes during internal meetings and weekly meetings Emergent had with clients, including AstraZeneca, to discuss progress on projects.  CW5 also established project plans.

33.    CW6 was a QC Microbiology Specialist, Data Review Supervisor at the Bayview facility from October 2020 to May 2021. CW6 initially reported to Michele Huggins. After Huggins left, CW6 reported to Matthew Borrowman, Senior QC Manager. CW6 also reported to Michelle Forti, QC Manager. CW6 supervised two teams of six QC Microbiology data analysts who were reviewing testing data for microbiological contaminants in the Bayview manufacturing facility and the COVID-19 vaccine product. They were reviewing the testing data as part of the sign-off process for releasing lots of the manufactured vaccine to Emergent's customers.

34.    CW7 worked at Emergent from March 2020 to October 2020 as Lead QX Biological Laboratory Support Technician at the Bayview facility.  In that capacity, CW7 reported to CW8, Quality Control Supervisor.  CW8 reported to Michele Huggins, Director of Quality Control.  CW7 worked in the sample processing lab, where CW7 and CW7's co-workers broke down bulk COVID-19 vaccine product made at the facility into smaller vials. The vials were subsequently analyzed by other employees. CW7 worked on all three vaccines made at Bayview: Novavax, J&J, and AstraZeneca. CW7 also helped with keeping inventory of laboratory supplies.

35.    CW8 was a Quality Control Supervisor at the Bayview facility from June 2020 to December 2020. CW8 reported to Michele Huggins, Director of Quality Control, who, in turn, reported to Sue Crowe, Senior Director of Quality. CW8 was the quality control supervisor over the sample flow process for the COVID-19 vaccine products at Bayview. Each COVID-19 client of Bayview had a set schedule for when samples of the manufactured product was to be pulled from the manufacturing process and shipped elsewhere or tested. When the samples were pulled by manufacturing staff, the samples were brought to the sample receiving room, where it was received by members of CW8's quality control team. CW8's job was to ensure the flow of samples was handled correctly and timely.

36.    CW9 worked at Emergent from July 2020 to early October 2021 as a Manufacturing Assistant and then as a Bioprocess Associate at the Bayview facility.  In that capacity, CW9 reported to Rachel Schultz, Upstream Supervisor, and Jason Jenkins, Senior Manager Upstream Manufacturing, and then CW9 reported to Usman Hafeez, Supervisor Manufacturing.  In both capacities, CW9 was responsible for working on the vaccine manufacturing floor in different stages of the upstream part of the process, including mixing media solutions, and adding in virus and cells to bioreactors.

37.    CW10 was a Quality Control Analyst II – Microbiology from April 2020 to May 2021 at the Bayview facility.  CW10 was initially hired as a contract employee, but CW10 became a full-time employee of the company in September 2020. CW10's job was to do scheduled and on-demand quality control tests for microorganisms in the environment and on the equipment throughout the manufacturing facility at the Bayview site. The tests required CW10 to go into the different manufacturing suites and into the different clean rooms, gowning areas, locker rooms, and storage areas.

## V.    SUBSTANTIVE ALLEGATIONS

### A.    The Catastrophic COVID-19 Global Pandemic Sweeps Across The Globe

38.    In late 2019, a novel coronavirus called SARS-COV-2 emerged in Wuhan, China, and caused the first cases of coronavirus disease, a/k/a COVID-19 – a new virus against which humanity lacked any prior immunity from past infection.  In January 2020, the U.S. confirmed its first case of COVID-19, and shortly thereafter, the World Health Organization ("WHO") confirmed human-to-human spread of the virus.  In February 2020, the U.S. Centers for Disease Control ("CDC") held a television briefing in which it braced the U.S. for eventual community spread of COVID-19 and stated that the "disruption to everyday life may be severe."  At the same time, countries around the globe began issuing emergency measures or "lockdowns" to stop the

fast-spreading virus and the spiking numbers of hospitalizations and deaths resulting from COVID-19.  On March 11, 2020, the WHO declared COVID-19 a global pandemic.

39.     Shortly after, then-President Trump declared a nationwide emergency, and the U.S. began shutting down to prevent the spread of COVID-19.  Schools, offices, places of worship, theaters, restaurants – everything "non-essential" – closed.  Ventilators and high-quality masks were in short supply, and public health officials pleaded with the population to help "flatten the curve" before the health care system became overrun and collapsed.  For high-risk and vulnerable people, or those who lived with or cared for them, the stakes were especially high.

40.     Within March 2020, the U.S. would skyrocket from less than 20 cases per day to over 20,000 cases per day, to surpass 200,000 total cases in March 2020 alone.  By the end of April 2020, the case count would exceed one million total U.S. cases – and rapidly rising.  The U.S. death rate was particularly concerning.  At the beginning of March 2020, there had been just three U.S. deaths due to COVID-19.  By the end of the March, the total was nearly 5,000 in the U.S., and by the end of April 2020, the number had soared to over 65,000 deceased Americans. Hospitals were at capacity and scenes of mounting bodies being loaded into refrigerator trucks were the daily reality in major cities like New York.

41.     The world was desperate for treatments and solutions.  Masks, distancing, sanitizing, and isolation were methods to slow COVID-19, but safe and effective vaccines were seen as the key to ending the pandemic.

B.     The U.S. Government Initiates Operation Warp Speed

42.     In May 2020, the Trump Administration announced Operation Warp Speed, a public-private partnership between the U.S. Department of Health and Human Services ("HHS"), CDC, FDA, National Institutes of Health, the Biomedical Advanced Research and Development Authority ("BARDA"), and other federal agencies, the U.S. Department of Defense, and private

pharmaceutical companies aimed at accelerating the development, manufacturing, and distribution of COVID-19 vaccines, therapeutics, and diagnostics.  The U.S. government ultimately spent roughly $18 billion total on Operation Warp Speed.  By August 2020, eight pharmaceutical companies (J&J, AstraZeneca, Moderna, Novavax, Sanofi, GlaxoSmithKline, Merck, and the International Aids Vaccine Initiative (IAVI)) were selected for an initial $11 billion in funding to expedite development of their vaccine candidates.  Other companies opted to avoid Warp Speed monies and instead accepted funding from other sources, *e.g.*, BioNtech and Pfizer received Research & Development funds from the German government and only took Warp Speed funds in payment for post-approval deliveries of vaccine doses.

43.     Flush with funding, these companies took differing paths toward a potential vaccine.  Moderna and BioNtech / Pfizer developed mRNA vaccines that function by delivering messenger RNA into human cells instructing them to build a harmless piece of the spike protein that is found on the novel coronavirus surface, which prompts an adaptive immune response by activating other immune cells to fight off what they believe to be an infection, thereby teaching the body to identify and destroy the virus once exposed.  While the mRNA vaccines were seen as a marvel of science after decades of research, they had practical downsides, including the need to be stored in extremely cold temperatures and administered in two doses spaced weeks apart.

44.     Other companies like J&J and AstraZeneca developed so-called live viral vector vaccines, which also teach cells to create spike proteins to trigger an immune response but do so by placing spike protein DNA inside of a modified version of a different, harmless virus that serves as a vector, or carrier, to deliver instructions to the body's immune system.[1]  These more traditional

---

[1]     Emergent's statements, *e.g.*, the 4/30/2021 Emergent FDA 483 Response discussed *infra*, sometimes say "Janssen" as versus J&J, either in references to a corporate entity or to the COVID vaccine (*e.g.*, the Janssen vaccine).  The FDA granted an emergency use authorization for the Janssen COVID-19 vaccine, listing as its manufacturer "Janssen Biotech, Inc. a Janssen Pharmaceutical Company of Johnson & Johnson."  Whenever used herein, Janssen

vaccines, while having a lower efficacy rate than their mRNA counterparts, were viewed as crucial for the sort of global vaccination campaign necessary to build worldwide immunity to a highly contagious novel coronavirus because they can be shipped and stored at standard refrigeration temperatures and can be administered in a single shot.

### C.    **Emergent's Business & Operations**

45.    Founded in 1998 and headquartered in Gaithersburg, Maryland, Emergent (NYSE: EBS) is a global life sciences company with over 1,800 employees and 19 locations in the U.S. and Europe that claims to provide preparedness and response solutions addressing accidental, deliberate, and naturally occurring public health threats.  Its seven manufacturing and development facilities in the U.S. are located in Maryland, Massachusetts, Michigan, California, and Mississippi.  It has six segments focusing on six public health threat categories: the Contract Development and Manufacturing (CDMO) segment at issue, as well as segments covering Chemical, Biological Radiological, Nuclear and Explosives (CBRNE); Emerging Infectious Diseases (EID); Travel Health; Emerging Health Crises; and Acute/Emergency Care.

46.    Emergent generates revenue from its portfolio of ten marketed products and product candidates, two product candidates procured under special circumstances by certain government agencies, research and development pipeline consisting of pre-clinical and clinical stage product candidates, and – relevant to this lawsuit – CDMO services to the pharmaceutical and biotechnology industry, including some of the COVID-19 vaccine makers within the Operation Warp Speed program.  The U.S. government is Emergent's largest customer.

47.    Emergent's CDMO business unit provides development services, drug substance manufacturing, and drug product manufacturing and packaging, including fill / finish activities

---

should be understood to mean J&J.

that are typically the final step in the manufacturing process where vials are filled and packaging for distribution is finished.  These services, which Emergent refers to as "molecule-to-market" offerings, employ five technology platforms (mammalian, microbial, viral, plasma, and gene therapy) in nine development and manufacturing facilities.  These services are provided to other biopharmaceutical companies, government agencies, and non-government organizations.

48.     Central to Emergent's CDMO business is its manufacturing facility located in the Bayview neighborhood of Baltimore, Maryland (the "Bayview facility"), pictured below, which is directly at issue.  Acquired by Emergent in 2009, the Bayview facility has served as a contract testing laboratory, performing analysis pursuant to established specifications and quality agreements on drug substance and drug product samples received from external sources and manufacturing sites.  The Bayview facility has both microbiology and biochemistry laboratories, and it performs research and development (R&D) analyses.



Photo credit: *Washington Business Journal*



Photo credit: Jim Lo Scalzo/EPA-EFE/Shutterstock (via the *Washington Post*)

49.     The Bayview facility underwent reconstruction efforts in 2011 and in 2018 to add manufacturing and pilot plant areas. Emergent touts it as one of just three facilities built with U.S. taxpayer support and federally designated as Centers for Innovation in Advanced Development and Manufacturing ("CIADM"), which serve to provide advanced development and manufacturing of medical countermeasures to support the U.S. government's national security and public health emergency needs. Indeed, to ensure a domestic supply of vaccines in a pandemic, the HHS awarded Emergent a $163 million U.S. government contract on June 6, 2012, to ready the Bayview facility for mass production in a crisis.

50.     When the COVID-19 pandemic struck in early 2020, it seemed that the Bayview facility's time had arrived. Emergent was selected to be the sole domestic manufacturer of the bulk drug substance for both the J&J and AstraZeneca COVID-19 vaccines, with substantial support from the U.S. government given the desperate need to inoculate people against the highly

contagious, lethal novel coronavirus then-spreading across the U.S. and the globe.  It was expected that the Bayview facility would play a key role in the U.S. rollout of vaccines both domestically and internationally.

        **D.**      **Emergent's Contracts To Manufacture COVID-19 Vaccines**

51.      In 2020, Emergent's main growth engine was its CDMO segment, which enabled it to reach several massive manufacturing agreements and to position the Bayview facility as one of the most important COVID-19 vaccine manufacturing facilities in the world.

52.      On April 23, 2020, Emergent announced that it had entered into an agreement with J&J, initially valued at $135 million, to provide drug substance manufacturing services for its COVID-19 vaccine (Ad26.COV2.S) and reserve large-scale manufacturing capacity for J&J, as part of Operation Warp Speed.  Negotiations continued on a long-term commercial supply agreement for large-scale drug substance manufacturing anticipated to begin in 2021.  Later, on July 6, 2020, Emergent announced that its initial agreement to provide CDMO services for J&J's lead COVID-19 vaccine candidate had been expanded to a five-year deal.  Under the agreement, valued at $480 million for the first two years, Emergent would provide CDMO services to produce large-scale drug substance manufacturing for the first two years at Emergent's Bayview facility and for the remaining three years beginning in 2023, provide a flexible capacity deployment model to support annual dose requirements.

53.      On May 30, 2020, BARDA issued Emergent a task order valued at approximately $628 million to deploy its CDMO services and ensure capacity reservation and expansion for manufacturing of third-party COVID-19 vaccines, as part of Operation Warp Speed.  The task order was issued under Emergent's 2012 contract with BARDA that established Emergent's Bayview facility as a CIADM for pandemic preparedness.  The contract provides, in relevant part, that "[Emergent] shall maintain the reserved capacities in a state of readiness to perform current

good manufacturing practices (cGMP) manufacturing activities…for the entirety of the period of performance."[2]  On April 4, 2021, Emergent announced that it received a contract modification to increase the original task order by $23 million to be used for purchase of biologics manufacturing equipment specific to J&J's COVID-19 vaccine for the potential expansion of manufacturing of that bulk drug substance into a third suite of Emergent's Baltimore Bayview facility.

54.    On June 11, 2020, Emergent announced that it had signed an agreement with AstraZeneca, valued at approximately $87 million, to provide CDMO services and secure large-scale manufacturing capacity at the Bayview facility for AstraZeneca's COVID-19 vaccine candidate (AZD1222), as part of Operation Warp Speed.  On July 27, 2020, Emergent announced that in addition to the $87 million contract, it would enter into another deal with AstraZeneca to provide CDMO services to support production of its COVID-19 vaccine candidate.  Under this deal, valued at approximately $174 million through 2021, Emergent was to provide CDMO services to produce large-scale drug substance manufacturing at Emergent's Bayview facility, beginning in 2020, at a scale for commercial supply, and the parties could enter into additional commercial manufacturing commitments as the candidate progressed over three years through Emergent's flexible capacity deployment model.

55.    Emergent began manufacturing of AstraZeneca bulk drug substance in August 2020 within Area 3 of the Bayview facility and of J&J bulk drug substance in November 2020 in Areas 1 and 2 of the Bayview facility.  Defendant Kramer later testified before Congress that each "batch" of J&J bulk drug substance manufactured by Emergent translates into roughly 10 - 15 million doses of J&J COVID-19 vaccine that J&J would manufacture, while each "batch" of AstraZeneca bulk drug substance translates into roughly 2.5 - 3 million AstraZeneca COVID-19

---

[2]    Herein, as drawn from underlying source material, good manufacturing practices are sometimes referred to as "GMP" or "cGMP."

vaccine doses that AstraZeneca would manufacture.  Per quality control requirements, among other testing done on manufactured batches, J&J vaccine batches were sent to a J&J laboratory for quality control testing before any distribution for use in people.

56.    Emergent's revenues and earnings soared during the Class Period, driven primarily by these large contracts for CDMO services provided by the Bayview facility.  Emergent's 2020 total revenues exceeded $1.5 billion in 2020, an increase of nearly $450 million from 2019.  Nearly all of the increase flowed from its CDMO unit, which saw its segment revenues jump by 550%+, from $80 million in 2019 to $450.5 million in 2020 due to these COVID-19 vaccine contracts for CDMO services at the Bayview facility, as shown in Emergent's Form 10-K for 2020:



57.     Thus, heading into the Class Period, the market was keenly focused on Defendants' public statements regarding Emergent's CMDO segment and its financial performance, the operations of the Bayview facility, and the progress made under the J&J, AstraZeneca, and U.S. government contracts.  Indeed, analysts covering Emergent repeatedly discussed these contracts and Emergent's CDMO segment as key drivers of both positive news (*see* §V.F.1., *infra*) and negative news (*see* §V.F.4., *infra*).

### E.    Undisclosed, Material, Negative Facts

58.     Unbeknownst to investors, the Bayview facility was beset by physical, operational, procedural, equipment, staffing, and training deficiencies – known to Defendants and Emergent's senior management – that significantly increased the risks of product contamination and the risks that Emergent would be unable to successfully satisfy its huge contracts with J&J, AstraZeneca, and the U.S. government.  Only after Defendants had engaged in substantial self-enrichment, though insider trading at fraud-inflated stock prices and lavish, unearned bonuses and executive compensation increases, were the underlying negative facts and trends incrementally revealed, amidst Defendants' ongoing fraud, gutting Emergent's stock price.

### 1.    *Undisclosed Facts And Risks Described By The CWs*

59.     The CWs collectively illustrate, through first-hand accounts, the myriad deficiencies that plagued the Bayview facility and created the persistent risks of contamination of COVID vaccine drug product.  Their statements corroborate, and are corroborated by, the FDA reports, investigative journalism, and Congressional findings set forth below.

60.     According to CW1, Em***ergent did not have the necessary personnel, equipment, and functional capability to handle the work it took on in 2020*** and that Emergent was not using project planning tools to track projects.  CW1 stated "none of that was ready in April 2020, no, absolutely not" and "the CDMO was just being formed, they were not up and running, nope –

that's why I was brought in."  According to CW1, ***Defendant Husain was intimately involved in overseeing progress on all of the COVID-19 projects*** and "*whatever he said, kind went - nothing happened without his direction*."  CW1 stated that because of these deficiencies, every COVID-19 project faced significant delays and missed deadlines yet Defendant Husain continued to push for additional contracts with new customers by presenting to potential customers in the summer and fall of 2020 about Emergent's capability to take on even more development and manufacturing work.  CW1 and other project managers discussed these delays in highly attended bi-monthly project management meetings ***led by Defendant Husain*** and Welch. CW1 stated that there were "always" problems at the Bayview site.  ***CW1 stated that CW1 and other project managers informed Defendant Husain and Welch about mold problems at the Bayview facility*** and then discussions about facility problems were kept to a smaller circle of employees.  CW1 stated that project managers at Bayview working on the COVID-19 projects were constantly turning over through ***termination for speaking up about problems*** and ***resigned due to frustration and overwork***.  According to CW1, Welch had an explosive temper, cursed at, and humiliated employees with reprimands on video conference calls when employees told him about problems on the projects.

61.    CW2 worked at Emergent in Operational Excellence from December 2018 to December 2021. Per CW2, after the March 2021 FDA inspection, Emergent had to improve its Standard Operating Procedures at the Bayview facility to ensure the two vaccines' paths did not cross at the site. CW2 said that after the March 2021 FDA inspection and the resulting destruction of 15 million J&J doses, Emergent conducted a "***thorough investigation***" and included "***all the departments, all hands on deck***."

24

62.     CW3 stated that ***Emergent tried to fix problems relating to vaccine contamination before the FDA arrived for an inspection***, *but* "*they weren't able to fix all the issues beforehand*." CW3 stated that there was a massive hiring effort when CW3 started at Emergent, but the pace at which the company was trying to move created what CW3 thought was ***chaos at the Bayview facility***. According to CW3, even with the fast-paced hiring effort, ***vaccine manufacturing remained short-staffed and provided inadequate training***. CW3 stated that ***lack of adequate employee training led to errors and deviations from standard operating procedures, which increased significantly***. CW3 said "for them to keep pushing the product and not training the people, that was the biggest mistake for this company – they are more about the product than properly training employees, but this is human lives you're playing with."

63.     CW4 was a Quality Control Microbiology Analyst II at the Bayview facility from July 2019 to July 2020. CW4 stated that ***the manufacturing suite known as "Area 4" at Bayview was not qualified for mass production when Emergent BioSolutions announced the contracts with J&J and AstraZeneca***. CW 4 said that Area 4 "wasn't meant for production, but once we got all that production (vaccine work), we were fast tracking it with PPQ and qualifying the area for mass production." CW4 also stated that ***Emergent did not have enough quality control employees on the microbiology team to handle all the work required for COVID-19 contracts***. ***CW4 said that the site had a "mold outbreak" and that Area 2 and Area 3 had positive mold tests sometimes***. CW said that the root cause for the outbreak was identified as ***HEPA filters not working properly in the HVAC system***.

64.     CW5 said that "there were ***constant conversations about something going wrong in the lab***" at the Bayview facility "***every single week***" and that "it really seemed like people working in there were frequently making some sort of mistake." CW5 said that ***Rick Welch had***

*frequent meetings with Defendant Husain and Welch about the vaccine projects*.  According to CW5, when reports about problems at the Bayview facility came in, Welch often became very angry and cursed and blamed others for the problems.  CW5 said that *during the weekly meetings with vaccine clients to discuss progress of work, deadlines, and the like, Emergent representatives, including Defendant Husain, did not convey to clients the full extent of problems occurring at the Bayview facility*.  CW5 said that *Welch did not want CW5 to take detailed notes, including who said what about certain action items, and Welch reviewed the notes before they could be released to anyone*.  CW5 said that *sometimes after submitting notes for review, they came back revised with certain parts missing*.  CW5 said that CW1 had to create SOPs for processes as simple as keeping track of meeting notes.  CW5 said that *Welch fired CW1 shortly after CW1 and Welch had a discussion about what was happening at the Bayview site and that Welch shortly after got rid of CW5 and everyone closely associated with CW1*.

65.    CW6 was a QC Microbiology Specialist, Data Review Supervisor at the Bayview facility from October 2020 to May 2021. CW6 identified *problems in the testing data on which CW6 could not sign off*.  CW6 found *incomplete records, invalid testing data, and forms that were filled out incorrectly*.  "*It was utter chaos*," CW6 said of the records.  "*Some were mislabeled, some just gone, some didn't have the data in them, didn't have all calibration data, some in wrong department category*."  *When CW6 refused to sign-off on the data for the lot release, CW6 was pressured by CW6's manager*, usually Matthew Borrowman, Senior QC Manager, *to sign off despite CW6's concerns*. Sometimes, Michelle Forti *also pressured CW6 to sign-off on data despite CW6's concerns*.  In reviewing testing data, *CW6 found an assay Emergent used to test for mold at the Bayview facility was flawed, making the test results invalid – but management wanted to use the test data in batch records anyway*. CW6 also said that *data*

*for FDA-required endotoxin tests of the manufacturing facility and the vaccine product were sometimes incomplete in batch records*. CW6 stated that *management at Emergent did not appear to want to address contamination problems* wholistically at Bayview, preferring to use "band-aid" fixes that did not solve the larger problems. CW6 also stated that the *QC Microbiology team was severely understaffed, under-equipped, and undertrained*. Per CW6, *the number of contamination alerts increased during CW6's tenure*.

66.    According to CW7, *manufacturing employees responsible for the COVID-19 vaccines at the Bayview facility were not following standard operating procedures in regard to labeling packages*.  CW7 stated that the *new lab technicians at the Bayview facility in September 2020 processed AstraZeneca vaccine samples without properly cleaning the lab equipment beforehand, which was a deviation from standard operating procedures*. CW7 stated that *during the September 2020 FDA inspection, the company was unable to find a specimen of COVID-19 vaccine that the agency requested because the inventory was not done properly*. According to CW7, a Quality Control Supervisor did not physically account for vaccine products that came to the lab and, instead, asked lab employees take and send pictures of the products that came in, which was a violation of a standard operation procedure.

Pictures of a lab at Bayview





Photo credit:  Michael Robinson Chavez/*The Washington Post*, via Getty Images

Photo credit:  Jerry Jackson / Baltimore Sun

67.     CW8 was a Quality Control Supervisor at the Bayview facility from June 2020 to December 2020. ***CW8 said that the sample receiving room did not have enough freezer and refrigerator space to store product samples for multiple different client vaccines***. CW8 stated that due to the lack of freezer and refrigerator space in the sample room, samples were broken and lost more often than average. CW8 also said that when ***AstraZeneca representatives*** toured the Bayview manufacturing facility, they ***noted that the sample receiving room was too small for the amount of people working in the room***. CW8 stated that the deficiencies in the sample receiving room were reported to Neil Verma who was head of project management over the vaccines at Bayview. CW8 also said that ***the Bayview site did not have the office space to accommodate the staff needed to manufacture multiple vaccines***. CW8 stated that Emergent was misleading about its ability to handle manufacturing of multiple vaccines at once.

68.     CW9 worked at Emergent from July 2020 to early October 2021 as a Manufacturing Assistant and then as a Bioprocess Associate at the Bayview facility.  CW9 stated that there was ***little to no training for new employees***, mainly in their early 20s ***with little to no pharmaceutical or manufacturing experience***, at the Bayview site, and that there was not even a training department.  According to CW9, "training was a huge issue."  CW9 said that ***when Bayview was shut down after the FDA visit, Emergent told everyone that they would be trained from scratch, and all the SOPs would be updated***, yet "***absolutely none of that happened during the shutdown – not a single thing***."  CW9 said that ***employees were constantly complaining to management about the lack of training, staff, and equipment***.  According to CW9, Jason Jenkins and Rachel Schultz created a document for employees to report their complaints in writing, which was shared via Microsoft OneNote.  CW9 stated that the ***manufacturing department was severely***

*understaffed and underequipped* and that management was well aware of it.  "*It was not a secret*." CW9 said that to complete the tasks required, manufacturing *employees worked long shifts* and CW9 worked many 90-hoour weeks and 13-plus-hour shifts.  According to CW9, Bayview had a *serious mold problem* – "*every inch of that building* - and *Emergent hid, at least some of it, from the FDA inspectors*.  CW9 stated that *right before the FDA came to inspect the site, supervisor Schultz wrapped tubing around the mold so FDA inspectors could not see the mold from the outside*.  CW9 stated that the cross-contamination of the J&J vaccine with the AstraZeneca vaccine was only one of the *many contaminations that occurred at the Bayview site*.  CW9 *estimated that one of every five batches of the J&J vaccine was contaminated* in some way.  CW9 said that managers sometimes covered up the real cause of batch contamination.  CW9 said that when a manufacturing employee identified a contaminated batch of vaccine, it was reported to the senior manager.  CW9 stated that *after contamination investigations were complete*, *an email was sent to the entire manufacturing staff about the results* and that *the email went at least as high as the head of manufacturing and possibly the head of quality*.  According to CW9, *batches of vaccine had to be thrown out because batch records were incomplete, improperly done and/or inaccurate*.  CW9 stated that *Bayview did not have the capacity to handle the volume of hazardous trash produced by COVID-19 vaccine manufacturing*.  CW9 stated that right before the FDA came to inspect the Bayview facility *in early 2021, Mike Maurer, the Head of Manufacturing at Bayview, had employees, at 7am every Wednesday, carry bags of hazardous waste waiting to be sterilized through sterile areas of the facility to large hazardous waste containers, and that it would be very difficult for management to not know* that this was happening every time each day.  CW9 stated that CW9 came to realize that "*we were not designed at all to handle this job*."

69.     CW10 learned from a co-worker that one of the four manufacturing suites at Bayview was designed as a "pilot program" area – not as a space for commercial scale manufacturing. According to CW10, ***"Area 4," to be used for the manufacturing of COVID-19 vaccines was not designed for large scale commercial manufacturing***.  According to CW10, ***Area 4 had repeated and serious problems with mold***.  CW10 ***sent many emails to management alerting them that the QC department was understaffed to do the job properly***. CW10 also ***sent emails to management trying to get the mold problems in the manufacturing suite declared a higher priority for remediation***. CW10 stated that ***despite the mold problem, the manufacturing suite did not always keep a biocide cleaner in the area***. When CW10 heard Emergent announce the AstraZeneca contract in June 2020, CW10 was shocked and dismayed, wondering how the work could get done because there were ***not enough employees*** to handle the existing level of work at the time. According to CW10, ***Quality Control staff was not given detailed information about FDA violations that needed to be addressed***. "***Nobody discussed the FDA findings***," CW10 said. "When the FDA findings got picked up in the *New York Times* and *Washington Post*, it was the most detail I ever heard."

## 2.     *Undisclosed Facts And Risks Described In Inspection Reports*

70.     The issues described by the CWs were longstanding and pervasive throughout Emergent's facilities, as evidenced by a long record of FDA inspection reports finding serious issues within Emergent's 19 facilities, including the Bayview facility.

71.     As described by the FDA in its 4/21/2021 Press Release (discussed *infra*), "The FDA's inspections are thorough, and these assessments review the quality of manufacturing procedures, including records, staff training, facility operations, drug production and testing and the systems in place to ensure product quality."  Some, but not all, inspections result in the issuance of an FDA closeout report on Form 483.  According to the FAQ page on the FDA's website:

An FDA Form 483 is issued to firm management at the conclusion of an inspection when an investigator(s) has observed any conditions that in their judgment may constitute violations of the Food Drug and Cosmetic (FD&C) Act and related Acts. FDA investigators are trained to ensure that *each observation noted on the FDA Form 483 is* clear, specific and significant.  Observations are *made when* in the investigator's judgment, *conditions or practices observed would indicate that any food, drug, device, or cosmetic has been adulterated or is being prepared, packed, or held under conditions whereby it may become adulterated or rendered injurious to health*. …

The FDA Form 483 notifies the company's management of objectionable conditions.  At the conclusion of an inspection, the FDA Form 483 is presented and discussed with the company's senior management.  Companies are encouraged to respond to the FDA Form 483 in writing with their corrective action plan and then implement that corrective action plan expeditiously.

The FDA's website clarifies that the Form 483 closeout report is *not* intended to be "an all-inclusive list of every possible deviation from law and regulation."  Instead, "There may be other objectionable conditions that exist at the firm that are not cited on the FDA Form 483.  … *Companies are responsible to take corrective action to address the cited objectionable conditions and any related non-cited objectionable conditions that might exist*."

72.     Significantly, while an investigated company and its leadership are presented with the full text of any FDA report, with the ability to have follow up discussions and exchange of written materials and responses, to anyone *outside* the company, FDA Forms 483 (if / when published) and FDA inspection reports (if obtained via FOIA requests) are presented in *heavily redacted form*, meaning that the company maintains an informational advantage over the public.[3]

---

[3]     Discovery of *unredacted* copies of FDA inspection reports, Forms 483, and Emergent's written responses, as well as related documents and communications, will strongly support the allegations and claims pled herein. Among other things, the FDA reports (including those pled herein) contain valuable exhibits, which are often not obtainable via FOIA requests and not posted on the FDA's website, that list the target company's personnel who participated in the inspections and/or that list the senior management team, including their roles and responsibilities.

### a.      Inspection Reports At Other Emergent Facilities

73.      Lead Plaintiffs' counsel, through a FOIA request, gained access to FDA inspection reports spanning May 2017 through April 2020.  These reports conveyed a litany of issues with facilities, equipment, staffing, and training across Emergent's operations.

### i.      Inspections At The Winnipeg Facility

74.      The FDA inspected Emergent's Winnipeg, Manitoba, facility from May 8-16, 2017, resulting in the issuance of a Form 483, a response by Emergent, and an Establishment Inspection Report.  The FDA inspected Emergent's Winnipeg facility again on September 5-6, and 9-13, 2019, resulting in the issuance of another Form 483, response by Emergent, and Establishment Inspection Report.

### (a)      Form 483 #1

75.      Following its May 8-16, 2017, inspection, the FDA served a Form 483 report on the Company dated May 16, 2017 (the "5/16/2017 FDA 483 Report").  In it, the FDA noted concerns regarding, among other things: (i) deficient air handling systems that maintain air quality in aseptic processing, including that the HEPA filters experienced failures during the last three years (on 11/26/2015, 6/22/2016, and 12/5/2016); (ii) *deficient controls to prevent the inclusion of foreign materials as intrinsic particle investigations found animal hair (one vial on June 5, 2015) and other particulates such as degraded organic material, stainless steel and steel corrosion (19 vials filled January 23, 2015) and glass (three vials on March 3, 2015)*; (iii) failure to conduct trend analyses, including for death and serious adverse events; and (iv) inadequate microbial specifications established during process validations.

**(b)** **Company Response #1**

76.    Emergent served the FDA with a written response to the Form 483 observations dated June 6, 2017 (the "6/6/2017 Emergent FDA 483 Response"). In it, Emergent addressed the FDA's articulated concerns and committed to addressing them as follows:

(a)    For concern (i) (deficient air handling systems), Emergent stated that HEPA filter failures were a "high priority" and that it had made "significant" improvements to the air handling systems, finding that based on its investigations, there was minimal to no impact to products, media fills and lots produced between June 2015 and December 2016.  Emergent also asserted that control of certain processing areas had been maintained.  Moreover, Emergent identified and implemented corrective and preventative actions based on its root cause analysis.  Emergent stated that interim data indicated the HEPA filters were operating in a state of control, and that it had put in place a schedule for HEPA cleaning and proactively replaced HEPA filters before reaching end of life to minimize the chance of failure by December 2016.

(b)    For concern (ii) (***deficient controls to prevent inclusion of foreign materials***), ***Emergent stated that it recognized the need to prevent the inclusion of foreign particulates*** and had established a control strategy that was implemented in February 2017 which indicated that the corrective actions were reducing the overall particulates defects and defect rates seen at product inspection.  Emergent also stated that it had established procedures to monitor the effectiveness of, and drive continuous improvements to, the aseptic controls, including routine trending and reporting of inspection results and requiring a deviation investigation report for all extrinsic particulates.  Emergent also responded to the specific deviations the FDA noted in its observation.

(c)    Regarding concern (iii) (***failure to conduct trend analyses***), Emergent stated that it recognized "procedures for the conduct of trend analysis, risk benefit safety assessments, and product quality lot reviews should be clear and adhered to" and updated numerous SOPs to clarify

when a product lot review should be done by QA staff and to require them to become part of routine meetings and part of a central log.

(d)    Regarding concern (iii) (inadequate microbial specifications established during process validations), *Emergent identified four key areas as requiring ongoing analysis: utilities, facilities, process, and process cleaning. Emergent identified a process gap in the "process cleaning" area, attributed to Emergent's having no mechanism for re-evaluating process cleaning limits and therefore process capability analysis was not performed and process limits were not modified accordingly. Emergent stated that it was committed to re-evaluation of process cleaning limits on a routine basis*, as defined by internal procedures, to ensure that changes in routine variation were identified and acted upon in a timely manner, assuring that processes remain in a state of continued control; it also stated that by July 12, 2017, Emergent would revise its SOP to add a requirement to perform review of process cleaning data and subsequent re-evaluation of existing defined cleaning limits using the most current data representative of current process capabilities, and that by August 30 and November 20, 2017, Emergent would re-evaluate process cleaning limits for certain materials.

### (c)    Inspection Report #1

77.    The FDA thereafter served a report on the Company dated July 18, 2017 (the "7/18/2017 FDA Inspection Report").  In it, the FDA raised concerns observed during the inspection that appeared in the Form 483 report.

78.    With respect to Form 483 item (i) (deficient air handling systems), the 7/18/2017 FDA Inspection Report noted that *Emergent conducted an evaluation of product inspection and defect rates, using October 2014 as the starting point and the evaluation showed, inter alia, that it was reasonable that 80% of the defects could be several sources associated with the process including cleanroom attire and materials used to wrap equipment during sterilization*, and the

data demonstrated a particulate reduction and included projects initiated to reduce the level of poly and paper contaminations. Additionally, the report noted that Emergent stated that the particulate excursions were considered isolated incidents. *The FDA nevertheless issued the Form 483 for this item, to which Emergent voiced no objection*.

79.     The FDA also summarized its prior inspections of the facility from July 9-18, 2014, listing prior-articulated concerns regarding failure to conduct investigations into unexplained discrepancies; failure to establish and/or follow appropriate written procedures, including validation designed to prevent microbiological contamination of products purporting to be sterile; *presence of "black mold-like material" and "white growth-like material"*; inadequate media simulation studies; *no studies to determine how many times gowns could be cleaned/sterilized and no traceability for the number of times that garments were sterilized; no expiration date for gowning qualification; no evaluation of risk of contamination from air holes in the goggles worn by filling operators; deficient visual inspections; no requirements to initiate a deviation inspection when certain limits are exceeded; deviation investigation-related procedures were not always followed*; *QA personnel performing over-inspection were not required to re-qualify; vial defects in set used to train and qualify employees were easily detectable and did not challenge an inspector's ability to detect defective vials during routine manufacturing*; and deficiencies in the environmental monitoring program.

80.     The 7/18/2017 FDA Inspection Report also noted that a *cleaning re-qualification study that concluded in 2013 with certain recommendations revealed that, as of the inspection in 2014, Emergent still had not changed the cleaning instructions; equipment was not maintained in a good state of repair; facility design was inadequate and did not provide protection against the ingress of microbes; deficiencies noted during routine maintenance of*

*manufacturing equipment were not reported and/or corrections were not implemented; the current cleaning process was not supported by Emergent's disinfectant study*; re-qualification for the temperature of a cooler was inadequate in that Emergent placed all data loggers within the open air of the cooler and there was no assessment of the temperature in solid containers; there were no probes placed within any solid container; *there was inadequate control over the facility in that there was no current requirement for staff to document when a leak from equipment or utility piping occurred and no requirement that staff clean up the leak or document what was used to clean the leak*; and raw material was assigned an expiration date without verification of the assigned shelf life and labeling issued for use in product labeling operations was not strictly controlled. *For each Form 483 item, the 7/18/2017 FDA Inspection Report noted that Emergent voiced no objections during the final closeout meeting*.

(d)    **Form 483 #2**

81.    Following its September 5-6 and 9-13, 2019, inspection, the FDA served a Form 483 report on the Company dated September 13, 2019 (the "9/13/2019 FDA 483 Report"). In it, *the FDA noted concerns that procedures designed to prevent microbiological contamination of drug products purporting to be sterile were not followed*. Specifically, on September 6, 2019, a Lead Manufacturing Assistant was observed grasping the outside of his sterile boot covers to unfold the vinyl boot soles during the gowning process, contrary to Emergent's procedures that require employees to only place their sterile, gloved hands inside the sterile boot covers and to only grasp the vinyl boot sole from inside the sterile boot cover in order to unfold the boot cover sole.

(e)    **Company Response #2**

82.    Emergent served the FDA with a written response to the Form 483 observations dated October 4, 2019 (the "10/4/2019 Emergent FDA 483 Response"). In it, Emergent addressed

36

the FDA's articulated concerns and committed to addressing them as follows: *Emergent stated that it recognized the need for effective personnel and gowning controls to prevent microbial ingress into the aseptic filling area at the Emergent Winnipeg site and acknowledged that the removal of the boot was a deviation from its SOP. Filling operators were interviewed to determine their understanding of the gowning procedure and the operator in question did not recall the specific instruction about unfolding the boot and indicated that the SOP is not available while gowning*. Emergent determined that the process for gowning could be improved by providing the instructions within the gowning area, as an easy-to-see reference. Emergent did determine that there was not an impact to product because the fill set-up operations did not proceed to filling operations due to an *unrelated equipment malfunction*. Emergent noted that a trend was generated from data obtained from filling operations *for a period of January 1, 2018, to September 8, 2019, in which the operator in question had participated in filling operations either as a set-up operator and/or a filling operator and the data showed, among other things: two instances where the operator exceeded an action limit on his gown sample; contamination found on his mask, chest, left forearm and back*; and no adverse trend for the operator in question indicating an issue relating to his gowning or practices. As corrective actions, an awareness training was conducted by Emergent on 9/9/2019 for all qualified filling operators on the gowning procedure and instructions were posted within the gowning area as laminated placards.

### (f)     Inspection Report #2

83.     The FDA thereafter served a report on the Company dated November 7, 2019 (the "11/7/2019 FDA Inspection Report"). In it, *the FDA raised concerns observed during the inspection that appeared in the Form 483 report that procedures designed to prevent microbiological contamination of drug products purporting to be sterile were not followed*. Specifically, on 9/6/2019 a Lead Manufacturing Assistant was observed grasping the outside of

his sterile boot covers to unfold the vinyl boot soles during the gowning process contrary to Emergent's procedures that require employees to only place their sterile, gloved hands inside the sterile boot covers and to only grasp the vinyl boot sole from inside the sterile boot cover in order to unfold the boot cover sole. The 11/7/2019 FDA Inspection Report stated that *the FDA investigator observed that this was not the appropriate gowning technique* as is spelled out in Emergent's procedures and that, in response, Emergent had opened an Incorrect Gowning Step by Filling Operator Deviation Report, retrained three operators, and committed to posting the gowning instructions on laminated placards within the gowning area to remind operators of each step in the gowning process. *For the Form 483 item, the 11/7/2019 FDA Inspection Report noted that Emergent voiced no objections during the final closeout meeting*.

84.    In addition to the Form 483 observation, *the FDA investigator discussed with Emergent management its observation that Lead Manufacturing Assistants wiped down the outer packaging for sterile boots, hoods, coveralls, goggles and gloves with sterile product prior to placing the packages on the dividing bench inside the gowning room, to which Emergent stated it understood the concerns* and would determine the most appropriate method to correct the issue. The FDA also summarized its prior inspections of the facility from May 8-16, 2017, listing prior-articulated concerns. The 11/7/2019 FDA Inspection Report noted that during the current inspection, the prior June 6, 2017, Form 483 items (i) and (iii) were confirmed to be corrected and items (ii) and (iv) were not directly assessed.

85.    The 11/7/2019 FDA Inspection Report also noted that *an inspection that took place at the facility in January 2015 resulted in the issuance of a two-item Form 483 detailing that procedures designed to prevent microbiological contamination of drug products purporting to be sterile did not include validation of the sterilization process, and aseptic processing areas*

38

*were deficient insofar as there was no system for cleaning and disinfecting the room and equipment to produce aseptic conditions*.

### ii. Inspections At The Canton Facility

86.     The FDA inspected Emergent's Canton, Massachusetts, facility from December 12-15 and 19-21, 2017, resulting in the issuance of a Form 483, a response by Emergent, and an Establishment Inspection Report.

### (a)     Form 483

87.     Following the December 12-15 and 19-21, 2017, inspection, the FDA served a Form 483 report on the Company dated December 21, 2017 (the "12/21/2017 FDA 483 Report"). In it, the FDA noted concerns regarding, among other things: (i) *improper submission and inaccuracy of biological product deviation reports ("BPDRs"), including a failure to submit a BPDR for a lot in which a cracked vial was found*; (ii) *failure to implement corrective actions for low-level mold and yeast isolates*; (iii) *facility deficiencies in manufacturing rooms such as gaps between utility piping and the ceiling, broken light fixtures, and peeling paint*; (iv) *incomplete investigations, such as declining to investigate the source of residue found at a tank outlet and failing to investigate the contamination of flasks;* (v) *untimely and incomplete corrective and preventive actions, such as failing to train an employee who had submitted a BPDR late and failing to replace with different technology a leveling probe that had been deemed inadequate*; (vi) failure to provide updated package inserts to the CDC; (vii) untimely quarterly and annual trend reports; (viii) *failure to establish dirty hold times for equipment*; and (ix) *deficient documentation of equipment preventative maintenance*.

**(b)**    **Company Response**

88.    Emergent served the FDA with a written response dated January 16, 2018 (the "1/16/2018 Emergent FDA 483 Response"). In it, Emergent addressed the FDA's articulated concerns and committed to addressing them as follows:

(a)    Regarding concern (i) (***improper submission and inaccuracy of BPDRs***), ***Emergent noted that it understood the requirement for and the importance of timely and accurate reporting of BPDRs to the agency***. ***Emergent promised to provide training*** on and clarification of the roles and expectations for personnel who use BPDR-reporting processes and require Site Quality Head review and approval of all BPDRs in collaboration with Regulatory Affairs. Emergent also stated that it would revise the Intra-Company Quality Agreement to outline the requirements for collaborative review and investigation of all critical product deviations and BPDRs to ensure timely and accurate reporting.

(b)    Regarding concern (ii) (***failure to implement corrective actions for low-level mold and yeast isolates***), Emergent stated that it acknowledged and understood the importance of "investigat[ing] and remediat[ing] Environmental Monitoring excursions and negative trends which may impact the production environment." ***Emergent acknowledged the recovery of low-level yeasts and molds*** and committed to reviewing the current action limits and environmental monitoring ("EM") data, including further investigation and root cause analysis, to establish any needed corrective and prevent measures to ensure an effective and robust EM. Emergent stated it would revise its Environmental Surveillance Program following a comprehensive assessment of the program, methodology, and criteria for completing timely investigations, revise the Environmental Monitoring Program for Production and Banking Areas to identify trends and track the potential movement of environmental isolates, and train personnel on changes to the EM program.

40

(c)     Regarding concern (iii) (*facility deficiencies in manufacturing rooms*), *Emergent acknowledged the importance of maintaining the facility in a constant good state of repair*. Emergent stated it would revise the preventive maintenance inspection task list to provide more detail for specific fit and finish requirements, inspect process execution and include Manufacturing and Quality representatives, increase inspection frequency from quarterly to monthly, and develop inspection training to provide consistency with standards.

(d)     Regarding concern (iv) (*incomplete investigations*), *Emergent recognized the importance of ensuring that investigations are comprehensive and complete to ensure root cause is identified and effective corrective actions can be implemented*. *Emergent committed to providing in-person training on conducting investigation and root cause analysis*, provided to the Quality team by January 31, 2018, and to remaining participants in the deviation process by March 31, 2018.  Regarding the contamination of flasks, *Emergent acknowledged it understood the importance of the investigative elements noted in determining a root cause and committed to improving its investigations* by notifying the microbiology department when a contamination is identified so it can collaborate on the investigation; requiring that all contamination events in the Quality Check ("QC") labs be investigated and documented; requiring reagents, plates, and testing materials be kept until an investigation is complete; and assessing the need for additional sampling as part of the investigation for contamination events. *Emergent also stated that all department analysts would be trained on these changes once the SOP revisions were complete*.

(e)     Regarding concern (v) (*untimely and incomplete corrective and preventive actions*), *Emergent recognized the gaps in its corrective and preventive action ("CAPA") program*. It then committed to developing and approving an Open and Overdue Corrective and Preventive Action (CAPA) Closure Action Plan which would further define roles and

responsibilities of CAPA-related functions and timelines to ensure that activities are completed by established dates, and key performance indicators that prompt and define further assessment or action to be taken.

(f)    Regarding concern (vi) (failure to provide updated package inserts to the CDC), Emergent stated that it understood the importance of providing the current effective version of package inserts to clinicians. It stated that it had posted its most recent approved version on the internet, and provided a memo to the CDC in January 2018 which included the most recent package insert and medication guide in .pdf format. Emergent committed to proposing an update by May 31, 2018, to the Quality Technical Agreement specifying Emergent's and the CDC's respective responsibilities with respect to package inserts, and update to the Product Label Control and Accountability procedure to include a requirement that a .pdf of the Medication Guidance and/or package insert be provided to the CDC at each revision and that the CDC confirm receipt of the notification.

(g)    Regarding concern (vii) (*untimely quarterly and annual trend reports*), *Emergent acknowledged the importance of timely review of EM trending data*. Emergent stated that these data were reviewed at Quality Management meetings but that the reports' approvals had been delayed. Emergent stated that the reports for water and compressed gas had been completed and approved as of January 11, 2018, and that the EM report would be completed and approved by January 31, 2018, with the trend report completed by February 28, 2018. To improve oversight of the trend report, Emergent committed to revising the Quality Management Review Control List to include follow-up and review of progress on trend reports and in-person training of all department analysts regarding policy changes;

(h)     Regarding concern (viii) (***failure to establish dirty hold times for equipment***), Emergent acknowledged the requirement for dirty hold times ("DHTs") to be established as part of the cleaning validation program. Emergent noted that such DHTs had been established for some equipment. Emergent also stated that once cleaning procedures for remaining equipment had been validated, the DHTs would be established and summarized in the corresponding Cleaning Validation reports by October 31, 2018.

(i)     Regarding concern (ix) (***deficient documentation of equipment preventive maintenance***), ***Emergent noted that it understood the importance of maintaining detailed records of maintenance performed and consistent execution on GMP systems***. To improve GMP preventive maintenance, Emergent agreed to provide additional detail on maintenance scope, parts required to complete activities, and steps and actions to be performed and reviewed to improve preventive maintenance. Emergent also agreed to revise relevant documents and forms to include instructions to inspect equipment during installation, provide in-person training on inspection of equipment prior to use, and revise preventive maintenance ("PM") task lists to include instructions to inspect equipment during annual PM.

### (c)     Inspection Report

89.     Following its inspection, the FDA issued a report dated April 23, 2018 (the "4/23/2018 FDA Inspection Report"). In it, the FDA raised concerns observed during the inspection regarding the issues described above. The FDA noted a previous inspection that had occurred from November 16-20, 2015.  At the conclusion of that inspection a seven-item Form 483 had been issued with the following concerns: validation for the bioburden testing was deficient; ***corrective and preventive actions implemented to prevent recurring clarification filtration leaks were ineffective***; failure to maintain an electronic backup file of electronic data; procedures were not followed to assure correct labels are used in production records; ***equipment***

43

*cleaning was not validated*; *surface inactivation studies do not support some of the manufacturing practices*; and *procedures are not followed for the cleaning of ancillary equipment for viral manufacturing areas and handling during manufacturing processes*.

### iii.    Inspections At The Paca Street, Baltimore, Facility

90.    The FDA inspected Emergent's South Paca Street, Baltimore, Maryland, facility from June 4-13, 2018, resulting in the issuance of a Form 483, a response by Emergent, and an Establishment Inspection Report. The FDA inspected the South Paca Street facility again from May 7-10, 2019, resulting in the issuance of an Establishment Inspection Report.

### (a)    Form 483

91.    Following the June 4-13, 2018, inspection, the FDA served a Form 483 report on the Company dated June 13, 2018 (the "6/13/2018 FDA 483 Report"). In it, the FDA noted concerns regarding, among other things: (i*) failure to maintain the manufacturing process in a state of control, given "sporadic and variable vial reject rates" and "on average 3-4 customer complaints for broken vials per year"*; (ii) *failure to record deviations from written production and process control procedures*; (iii) *failure to follow procedures designed to prevent microbiological contamination of drug products purporting to be sterile*; (iv) *failure to provide adequate space in buildings and coolers to allow for the orderly placement of materials to prevent mix-ups between materials that are in-process, quarantined, and released*; (v) *failure to implement investigations or corrective actions for the 39 mold recoveries from 2016 and 67 mold recoveries from 2017*; (vi) *failure to maintain buildings used in manufacturing, packaging, and holding of drug products in good states of repair*, such as failing to fully seal overhead bay doors and *failing to address dark discolored residue on the back side of a utility panel*; and (vii) *repeated failures to provide requested records in a complete and timely manner*.

### (b)    Company Response

92.    Emergent served the FDA with a written response dated July 13, 2018 (the "7/13/2018 Emergent FDA 483 Response"). In it, Emergent addressed the FDA's articulated concerns and committed to addressing them as follows:

(a)    Regarding concern (i) (*failure to maintain the manufacturing process in a state of control*), *Emergent recognized the concerns raised regarding cracked vials and committed to re-opening the investigation, including re-evaluating further corrective measures. Emergent committed to increasing investigation and communications regarding cracked vial rates, developing a package of work to fully investigate and mitigate the vial breakage issue, including evaluation of reduction of fill volume, assessing the relevant systems, improving the relevant cycles, and holding a Type C meeting with the FDA to be held in the fourth quarter of 2018 to discuss proposed remediation actions and timelines*.

(b)    Regarding concern (ii) (*failure to record deviations from written production and process control procedures), Emergent committed to training inspection personnel* to look for residual product on external vials, and revising as necessary directions on packaging records to ensure directions are explicit to inspection personnel. Emergent also stated that it would review the filling process and awareness training with Cleanroom Technicians and Microbiologists.

(c)    Regarding concern (iii) (*failure to follow procedures designed to prevent microbiological contamination of drug products purporting to be sterile*), *Emergent stated that awareness training on the relevant SOPs was provided to cleanroom technicians and microbiologists in June 2018. Emergent also stated that it would reinforce training* regarding aseptic technique and the need to keep hands and arms out of the area directly over open vials. Emergent said it would evaluate a redesign of the forceps used to remove vials. Finally, Emergent

stated that it would conduct a Risk Assessment to discuss the rationale for the current process regarding how long vials are in certain locations.

(d)     Regarding concern (iv) (*failure to provide adequate space in buildings and coolers*), *Emergent acknowledged that there was not adequate warehouse space*, but stated that no mix-ups had occurred. Emergent stated that it would lease additional room temperature warehouse space and would expand cold storage at the current location. Emergent stated that it had leased additional room temperature warehouse space in Baltimore, and that space was currently being renovated to allow for moving of some personnel and raw materials could be relocated there.

(e)     Regarding concern (v) (*failure to implement investigations or corrective actions for the 39 mold recoveries from 2016 and 67 mold recoveries from 2017*), *Emergent noted that "[m]old is a concern anytime it is found in a pharmaceutical manufacturing location and Emergent takes the presence of a mold very seriously in any manufacturing space or support area."  Emergent noted that the mold recoveries had been investigated and that there had been no other mold recoveries in the relevant locations from 2015 to present. Emergent stated that all mold recoveries had been identified, tracked, and plotted against a facility map to assist in determining route of entry, source and path of transmission.  Emergent promised to continue to monitor and address all mold recoveries. It also stated that it had implemented a glove requirement.  Emergent committed to further changing policy to address personnel and material flow in the raw material sampling rooms that will be monitored for beneficial effect on both mold and bacterial recoveries*.

(f)     Regarding concern (vi) (*failure to maintain buildings used in manufacturing, packaging, and holding of drug products in good states of repair*), Emergent stated that it had

purchased and installed new seals for the overhead bay door, but noted that the permanent solution would have to be the replacement of parts of the door. Emergent stated it had placed a work order to open and clean the relevant panel, and that silicon caulk had been applied around the gauges and the panel.  However, Emergent determined that the entire panel would need to be removed and replaced with appropriate wall materials during the December 2018 planned shutdown.

(g)    Regarding concern (vii) (***repeated failures to provide requested records in a complete and timely manner***), Emergent acknowledged a "misunderstanding" regarding the requests and how to retrieve them.  Emergent claimed that some of the information was not readily available and off-site given that information was requested back to 2009.  Emergent committed to revising its SOP to clarify that lists of all Quality System documents would be made readily available to the FDA. Emergent also committed to improving its record retrieval system. For example, Emergent stated it would create a process so that document requests could be broken down by Center for Biologics Evaluation and Research ("CBER")-regulated products for specific timeframes requested by the FDA. Finally, Emergent committed to implementing Regulatory Inspection Readiness training for relevant personnel.

### (c)    Inspection Report #1

93.    Following its inspection, the FDA issued a report dated August 16, 2018 (the "8/16/2018 FDA Inspection Report"). In it, the FDA raised concerns observed during the FDA inspection, as listed above in the Form 483 summary. The FDA also summarized its prior inspections of the facility in January 2017, December 2016, May 2013, and October 2009, listing prior-articulated concerns regarding ***lack of compliance with: procedures designed to prevent microbial contamination of drug products***; lack of preventive maintenance records for certain equipment used for sterile filtration; ***failure to follow the test method for bioburden***; ***failure to include initials or signature of a second person to show that original laboratory records had***

*been reviewed for accuracy, completeness, and compliance with established standards*; *issues with process validation, contamination control, cleaning of equipment, and process time limits*; failure to record relabeling operations in batch records; failure to validate the relabeling process of certain vials; failure to include time-related information in the vial relabeling procedure; failure to conduct environmental monitoring during certain operations; *lack of criteria for investigating certain rejected materials;* and failure to include in the SOP criteria documenting out-of-specification ("OOS") fill weights on batch reconciliation sheets. The 8/16/2018 FDA Inspection Report noted that the corrective actions from these previous inspections were not reviewed during this inspection.

### (d)    Inspection Report #2

94.    Following its May 7-10, 2019, inspection, the FDA issued a report dated May 22, 2019 (the "5/22/2019 FDA Inspection Report"). In it, the FDA raised concerns observed during the inspection regarding the need to: (i) label all equipment with calibration and maintenance dates; (ii) *implement procedures to address broken security ties on bins of unlabeled, filled vials*; and (iii) design a procedure to prevent the untimely entry of any material into the material management system.

### iv.    Inspections At The Lansing Facility

95.    The FDA inspected Emergent's Lansing, Michigan, facility on September 20-27, 2018, resulting in the issuance of a Form 483, and an Establishment Inspection Report.

### (a)    Form 483

96.    Following its September 20-27, 2018, inspection, the FDA served Form 483 report on the Company dated September 27, 2018 (the "9/27/2018 FDA 483 Report"). In it, the FDA noted *concerns regarding responsibilities and procedures applicable to the quality control unit not being in writing and fully followed*. Specifically, (a) the Lansing facility had a Quality

Agreement with the Camden sister facility responsible for filling product vials which required that Camden permit Emergent to perform standard compliance audits, yet the 2017 Annual Product Quality Review indicated that audits were not required for Emergent facilities and ***the Company had an unwritten policy of not conducting routine compliance audits of the Camden facility***; (b) Emergent's Lansing facility did not receive written verification that observations of a September 2015 audit of the Camden facility had been corrected until Lansing received a memo dated September 25, 2018, but the audit observations could not be verified during the next audit because of the unwritten policy of not conducting routine compliance audits of the Camden facility; (c) Emergent conducted audits of two other fillers in 2017 and 2018 and although a "quick site visit" was scheduled as a result of the 2018 audit, no follow-up audit was scheduled; (d) Quality Agreements for all three contract fillers require that product-related observations stemming from regulatory inspections be sent to Emergent, yet the SOP did not require a documented analysis of regulatory observations; (e) Quality Agreements for all three contract fillers required all major or critical deviations be reported, yet the SOP did not reference analysis of such deviations so that for-cause audits could be considered, as necessary, to address immediate concerns; (f) ***a Quality Agreement with Camden required that major changes must document and include impact assessment and documentation of pre-and post-validation or qualification requirements, yet major deviations regarding product residue on finished vials that resulted in corrective action did not provide for an impact assessment or address the need for validation or qualification activities***; (g) the SOP required use of an Approved Supplier Listing yet the Emergent Camden facility was not indicated on the Approved Supplier Listing; (h) there was no assurance that work orders were being reviewed by the Quality unit; (i) organisms were detected in a filtrate sample post sterile filtration to the harvest tank and although Emergent was conducting an investigation

by sending the questionable filters to the manufacturer for investigation and the investigation thus far had not implicated the filters, no consideration was given to quarantining or containment of the affected filter batches until a final disposition of the filters could be made; (j) the SOP did not fully define effectiveness checks such that they could be appropriately applied, including, for example, a change control which addressed a manufacturer's material change of filters, and although no issues were noted regarding the change, an effectiveness check was required; and (k) for a deviation indicating discovery of damage to a tank harvest valve, the potential for particulates was assessed as part of the impact assessment as required by the SOP for certain size particles, but no impact assessment was done for particles of a smaller size.

### (b)    Inspection Report

97.    The FDA thereafter served a report on the Company dated October 19, 2018 (the "10/19/2018 FDA Inspection Report").  In it, the FDA raised concerns observed during the inspection that appeared in the Form 483 report described above. ***For the Form 483 item, the 10/19/2018 FDA Inspection Report noted that Emergent voiced no objections during the final closeout meeting***.

98.    In addition, the 10/19/2018 FDA Inspection Report noted that the FDA inspector brought to Emergent's attention certain other issues not listed in the Form 483. To address these issues, ***the investigator advised Emergent to police and upkeep the manufacturing areas***, avoid syringe/needle reuse for animal injections, and adhere to policies and laws regarding the number and use of animals.

99.    The FDA also summarized its prior inspections of the facility from April 12-19, 2016, which resulted in the issuance of a Form 483 regarding the following problems: ***a nonconformance event record, regarding a finding of mold recovered during the formulation process, did not factor in sterility results for bulk samples or a final container sterility sample***

50

*prior to closure*; a cumulative threshold reject limit had not been established for the 100% inspection operations for finished vaccine lots, and individual reject percentages were defined but not classified/grouped as critical, major, or minor; *criteria for when to do a second inspection or reinspection of filled, finished vaccine containers after the 100% visual inspection reject limit was exceeded, was currently not established*; no active and/or passive air monitoring for viable organisms was done for a cart on which sublot bottles were placed; there was no investigation of manufacturing operations after the laboratory had been ruled out as contributing to an OOS result; and *a procedure did not include a requirement as to whether vaccine vials could be used at ambient or refrigerated conditions*.

### v.   Inspections At The Rockville Facility

100.   The FDA inspected Emergent's Rockville, Maryland, facility on February 11-16, 2019, resulting in the issuance of a Form 483, a response by Emergent, and an Establishment Inspection Report.

### (a)   Form 483

101.   Following its February 11-16, 2019, inspection, the FDA served a Form 483 report on the Company dated February 16, 2019 (the "2/16/2019 FDA 483 Report"). In it, the FDA noted concerns that: (i) *procedures designed to prevent microbiological contamination of drug products purporting to be sterile were not adequately established and followed*; (ii) deviations from written production and process control procedures were not justified; and (iii) *Emergent had not implemented any investigations or corrective actions for the mold recoveries which continued to occur within the facility since 2017 and 2018*.

102.   Regarding concern (i) specifically, the FDA raised the following issues: (a) *the gowning attire worn by operators to clean the isolators used to fill a live viral vaccine was insufficient to prevent particulates and microbial contamination, operators were required to*

*open doors of each isolator and manually clean inside after a product fill, and hair was found on two occasions*; (b) the doors of each isolator remained open after cleaning and prior to loading of equipment and the subsequent cycle, which was *an insufficient procedure for preventing particulate and microbial contamination of the isolator*; (c) there was incomplete documentation for the rejection of filled vials for aseptic process simulations and incomplete accountability for vials through all process steps; and (d) the isolator's pouch with its contents were not challenged with a biological indicator during validation to confirm sterilization.

103.    Regarding concern (ii) specifically, the FDA raised the following concerns: (a) *the visual inspection for a live viral vaccine lot failed because four of the vials inspected failed appearance as they had a yellowish tint on the bottom layer of the cake*, testing determined that vials with darker yellow discoloration failed the specification and vials with lighter discoloration passed, the vaccine was reinspected after initial inspection and vials were removed for yellow discoloration, and, as of the date of the Form 483, no vials with any level of discoloration were placed on stability; and (b) *manual visual inspection was performed on all vials of the vaccine in question prior to labeling and as part of the process, vials with particulates and product defects were removed if observed but they were not investigated to determine the source and they normally do not identify particulates observed inside the vials unless a defect threshold was met*.

**(b)    Company Response**

104.    Emergent served the FDA with a written response to the Form 483 observations dated March 8, 2019 (the "3/8/2019 Emergent FDA 483 Response"). In it, Emergent addressed the FDA's articulated concerns and committed to addressing them as follows:

(a)    Regarding concern (i) (*procedures designed to prevent microbiological contamination of drug products purporting to be sterile were not adequately established and followed*), *Emergent stated that the following actions had been or would be taken to enhance*

*assurance of sterile filling operations: gowning requirements in the relevant areas and during cleaning of the isolators were revised*; the Rockville facility SOP was revised to require personnel to wear a coverall and face mask over current gowning and a second pair of sterile gloves; a new SOP was created to specify standardized cleaning of the isolators, which included instructions to close isolator doors following completion of the cleaning steps; a new SOP outlined the requirements for performance and evaluation of media simulation studies for the site's aseptic filling operations, including segregation of vials that were eligible for rejection and those that were to continue through to incubation; Emergent committed to revisiting the SOP to capture both the quantities and sub-classification of rejects from filling through visual inspection to document the reason for rejection by March 31, 2020; Emergent committed to performing a verification study to ensure adequacy and item sterilization for the pouch that contains scale weights and to prescribe placement of biological indicators within the pouch at worst-case locations in addition to routine biological indicator placement locations within the isolator by December 31, 2019.

(b)  Regarding concern (ii) (*deviations from written production and process control procedures were not justified*), *Emergent stated that the Rockville facility had an effective visual inspection program to cull out vials with discoloration, but it was committed to completing an evaluation to determine whether there were any corrective actions that could prevent yellow cake during fill/finish activities and implementing recommendations determined from the assessment by December 31, 2019*; Emergent would revise its SOP for Deviation Reporting and Investigation to include instructions to consider the need for placing samples on stability as part of determining the potential long-term effects of identified defects on product quality by April 30, 2019; *Emergent stated that it was committed to identifying particulate observed in its products and would act to understand their source and prevent their presence and therefore would send*

*samples to a secondary site for testing, revising its SOP to provide guidelines to send vials segregated during visual inspection for identification of observed particles by December 31, 2019*, and creating a process for characterization of particles observed during visual inspection which could include purchase of required instrumentation for particle analysis and creation of procedure(s) for the process by December 31, 2019;

(c)    Regarding concern (iii) (*failure to implement any investigations or corrective actions for the mold recoveries which continued to occur within the facility since 2017 and 2018), Emergent stated that it "takes the presence of a mold very seriously in any manufacturing space or support area" and under the Rockville facility's SOP, mold recovered above the alert limit was identified and a notification sent to site management for awareness*, but *Emergent stated it would revise the practice to require identification of all recovered mold, regardless of whether the alert limit was exceeded, and recoveries would be tracked and plotted against a facility map to assist in determining route of entry, source, and path of transmission with a target completion date of April 30, 2019*. Emergent stated that it completed revisions to its SOP to reflect changes to gowning requirements and decontamination of materials and equipment. *Emergent also stated it would revise its SOP to state that certain mold recoveries would be included in trend reports and appropriate actions to address any trends would be identified by April 30, 2019.  Finally, Emergent committed to revising its SOP to include information regarding mold recoveries during monthly management reviews, performing an appropriate investigation, and taking corrective actions upon identification by April 30, 2019*.

### (c)    Inspection Report

105.    The FDA thereafter served a report on the Company dated April 1, 2019 (the "4/1/2019 FDA Inspection Report").  In it, the FDA raised concerns observed during the inspection that appeared in the Form 483 report regarding the issues described above.  *For each Form 483*

*item, the 4/1/2019 FDA Inspection Report noted that Emergent voiced no objections during the final closeout meeting*.

106.    In addition to the items observed in the Form 483, the 4/1/2019 FDA Inspection Report noted additional issues for which the FDA issued advice. Specifically, the FDA advised Emergent: ensure proper use of weights during daily verification of scales; address study failures at the conclusion of studies; *align disinfectant study with cleaning practices*; seal light fixtures in controlled studies; and document all efforts and actions when opening deviations.

107.    The FDA also summarized its prior inspections of the facility from March 13-22, 2017, listing prior-articulated concerns resulting in a three-item Form 483. Among these concerns were: (a) *a timeframe to address a failed disinfection study was exceeded and not addressed, and the design and execution of that study was found to be erroneous despite Quality Management's approval of it*; (b) a deviation did not address the rationale used by a laboratory for not completing container closure integrity testing; and (c) no information could be provided to show an evaluation of extractables/leachables used in filling operations.

**b.    Bayview Facility Inspections During The Class Period**

108.    These reports, Forms 483, and responses put the Defendants on notice, well before the Class Period, of the myriad failures at Emergent's facilities that required changes in equipment, facilities, staffing, and training.  The urgency to make those changes and to establish compliant, functional facilities grew when the novel coronavirus pandemic began and Emergent was awarded $1.5 billion in high-stakes contracts to serve as the manufacturer for desperately needed vaccines.

109.    Yet, during the Class Period, the FDA conducted *multiple* inspections of the *Bayview facility* at issue, generating reports that expressly put the Defendants on notice of the widespread, non-public problems that had been impacting that facility.

### i.    Bayview Inspection From April 9-20, 2020

110.    One such report, obtained (without exhibits) by Lead Plaintiffs' counsel through a FOIA request, was a 27-page "Establishment Inspection Report" of the Bayview facility written by Investigator Marcellinus D. Dordunoo, memorializing findings from an April 9 – 20, 2020 inspection (the "4/20/2020 FDA Inspection Report"), with inspections actually having occurred on April 9, 10, 14-17, and 20, 2020, as part of a "preapproval (PAI) inspection of a Control Testing Laboratory…initiated as a mission critical assignment" concerning an anthrax drug.[4]  The report was based on the on-site inspections, review of over 50 listed exhibits obtained from the company, and discussions with Emergent's "senior management" and specific, designated facility personnel.

(a)    Joseph A. Rogalewicz, Site Quality Head, identified himself as Emergent's "most responsible person" at the Bayview location.  Mr. Dordunoo told Mr. Rogalewicz that he was conducting a preapproval inspection (PAI), but that "[d]ue to good manufacturing practice (GMP) deficiencies noted during the performance of the PAI, the scope of the inspection was expanded to include GMP coverage," which he informed Mr. Rogalewicz about on April 14, 2020.  The report listed three other individuals present for each day of the inspection: Quality Assurance Manager Judith McCorry, Manager - QC Biochemistry Leonard Trappanese, Sr., and a Specialist II – Compliance / Quality Systems whose name was redacted.

(b)    The 4/20/2020 FDA Inspection Report made clear that the **highest levels of Emergent's senior management were not only aware of the report and the inspection conclusions,** but **actively participated in all stages of the inspection itself**.  It stated, "During the

---

[4]    The 4/20/2020 FDA Inspection Report lists extensive internal Emergent documents reviewed in connection with the underlying inspection.  Discovery of these documents would support the allegations and claims pled herein.

opening meeting, daily closure meetings, and at the inspectional closeout meeting, multiple senior members of the Firm's management team were in attendance via one-way videoconference."[5]

(d)     The inspection assessed "the readiness of the various analytical methods to support commercial manufacturing, conformance of the analytical methodology to the methodology specified in the application, and data integrity."  The 4/20/2020 FDA Inspection Report noted that "**_multiple deficiencies with data integrity and general cGMP practices were observed_**," prompting expansion of the inspection.  The documentation reviewed included five documented deviations from protocols and standard operating procedures in the work related to the anthrax drug opened between July 2019 and January 2020 (one still pending), three corrective and preventative actions (CAPAs) opened between October 2019 and April 2020 (all still pending), and three change controls opened between May 2019 and November 2019 (two still pending).

(e)     The inspection reviewed "methods, specifications, analytical raw data and test results."  The report noted, "With regard to overall data integrity, **_the firm was aware and provided documentation identifying software, firmware and hardware that_** in the state present at the time of the inspection, **_were assessed to contain gaps, specific to the integrity of analytical data acquired_**," as set forth in a "Data Integrity Assessments Summary Report" provided to the FDA.[6]  The FDA "requested information regarding the current status of validation efforts to correct the data integrity deficiencies identified in the summary reports" and was given a "System Status for

---

[5]     The 4/20/2020 FDA Inspection Report states that its exhibits, which were not obtained in response to counsel's FOIA request, include "a list of people who were present at the opening and closing meetings, along with a list of the firm's personnel who provided clarifications or explanations during the inspection" (Exhibit 12) and a list of "the firm's management team" including "the roles, responsibilities and qualifications of each of the management team's members" (Exhibit 13).

[6]     This Data Integrity Assessments Summary Report was Exhibit 10 to the 4/20/2020 FDA Inspection Report, but not provided in the FDA's response to a FOIA request.

Data Integrity Updated for [*Redacted*]."[7]   The report made clear that "[a]t the time of this inspection, various tasks planned in the… system validation efforts **had not been started**."

(f)      The 4/20/2020 FDA Inspection Report indicated a Form 483 was presented to Mr. Rogalewicz and Emergent regarding five observed issues:

> During the inspectional closeout meeting, a multi-part 5-item FORM FDA 483, Inspectional Observations, was issued for, 1) appropriate controls are not exercised over computers or related systems to assure that changes in master production and control records or other records are instituted only by authorized personnel; 2) established specifications, test procedures and laboratory control mechanisms are not followed and documented at the time of performance; 3) the responsibilities and procedures applicable to the quality control unit are not in writing and fully followed; 4) employees are not given training in the particular operations they perform as part of their function and current good manufacturing practices; 5) separate or defined areas to prevent contamination or mix-ups are deficient regarding operations related to the holding of rejected components before disposition.

(g)      Observation 1:  "***Appropriate controls are not exercised over computer or related systems to assure that changes in master production and control records or other records are instituted only by authorized personnel***."  The 4/20/2020 FDA Inspection Report highlighted three impacted areas.  First, the Quality Unit "***failed to ensure that electronically held data*** generated during analytical testing of Drug Substance, Drug Product, and stability samples ***was protected from deletion or manipulation***, ***and/or reviewed for accuracy and completeness***, "***failed to review audit trails*** of various Data Acquisition Software platforms, in support of generated analytical results," and "[a]t the time of this inspection, ***no investigations had been performed*** to assess the impact of the data deletions, modifications or the failure to review system audit trails on drug substance and drug product analyzed until approximately December 2019."  The report stated, citing internal company documents, that "[a]n audit trail review identified ***202 deletions*** and ***543***

---

[7]        This System Status for Data Integrity Updated for [*Redacted*] was Exhibit 11 to the 4/20/2020 FDA Inspection Report, but not provided in the FDA's response to a FOIA request.  The 4/20/2020 FDA Inspection Report, within the text of the copy obtained via a FOIA request, redacted out the last word in the title of the report.

*reprocessed files*," yet, *per the firm's management team*, "*[n]o investigation* of the deletions or reprocessed files, or assessment of the impact to reported drug substance and drug product analysis *was performed*." It confirmed that "review of the firm's own data integrity assessments, demonstrated that *the firm was aware of these issues, and had not performed any investigations* relative to each system and each data integrity concern." As noted in the report, the inspector "*explained to the firm's management team* during the inspection and again during the closeout meeting, that *identification of data integrity deficiencies is expected of a quality system*, however, *the additional step of assessing impact is critical* in supporting data generated during the time where the system(s) were non-integral" and that "*each event should have been investigated at the time of detection to assess analytical impact*." Second, "*Analytical Balances* used in the analysis of drug substance and drug product, sample receipt, and sample preparation, *have no mechanism* by which *to prevent users from changing the date and time* present on printed records." The report noted that the inspector "asked the firm's management team if any of the analytical balances had protections enabled against change of the date/time. The firm's management team responded that they did not." This exchange prompted management to activate those protections on April 17, 2020. Third, the Windows operating system in use on computers "do[es] not fully prevent users from changing the system date and time," which the inspector found were "able to be modified." The report concludes, "*During the inspection and again during the closeout meeting, I explained to the firm's management team that all data acquired during, and used in the acquisition of data, must be protected from modification, in any way, in order to assure that the data is integral.*" It noted that Mr. Rogalewicz "stated he *understood the observation*."

(h)     Observation 2:   "*Established specifications, test procedures and laboratory control mechanisms are not followed and documented at the time of performance*." The

4/20/2020 FDA Inspection Report again highlighted three impacted areas. First, citing numerous examples dating back to November 2019 and verbal confirmation from management, it stated, "***Sample Identification numbers are inconsistent and*** were observed to be ***manually corrected***, multiple days after data acquisition. ***No investigation was performed***, ***nor was any documented justification provided*** for the changes…." It added, "I asked if the practice was pursuant to a written procedure, the firm's management team responded that ***there was no written procedure***…" Second, "***Deviations from test methods are not investigated and are manually corrected***, ***days after performance***, ***with no supporting data or documented justification*** for the changes." The report states that firm management confirmed that data changes were made, multiple days after work was performed, "***based on the analyst's recollection***," without any supporting documentation. Third, the report detailed deficiencies regarding "Documentation of Stability Sample Analyses" during work involving sample appearance, color, and turbidity analyses, including the storage and decontamination of samples in between analytical steps. It "observed ***deficiencies in concurrent documentation*** and ***deficiencies regarding changes to information, which*** require justification or investigation, [but] ***were not*** summarily ***justified or investigated***." It concluded, "During the inspection and again during the closeout meeting, I explained to the firm's management team that ***changes to analytical data must be justified or otherwise investigated***" and that "the ***test methods lack sufficient detail***, in order ***to prevent potential contamination of samples***." It notes that Mr. Rogalewicz "stated he ***understood the observation***."

(i)    Observation 3: "***The responsibilities and procedures applicable to the quality control unit are not in writing and fully followed***." First, the report faulted the procedure (SOP042317) for "QC Investigations and Invalid Events" because it "does not preclude the analyst who performed the analysis which generated an invalid event from performing an independent

investigation" – in other words, checking themselves.  Thus, "sample retest, per the written procedure, is possible prior to a documented secondary review and approval of the accuracy and completeness of the invalid event investigation."  Indeed, "***35 of 42 invalid events since January 21, 2020 were investigated by the same analyst who performed the original analysis***."  Second, "***Data generated from laboratory analyses is not reviewed*** in a ***timely*** manner ***or in accordance to the written procedure***" (SOP000299) for "Review of Quality Control (QC) Data," and ***violations occurred*** "***without justification or investigation***."  It concluded, "During the inspection and again during the closeout meeting, I explained to the firm's management team that "the ***written procedures*** and ***test methods*** at times ***lack detail***, while at other times, even with sufficient detail, ***are not followed***."  It notes that Mr. Rogalewicz "stated he ***understood the observation***."

(j)     Observation 4:  "***Employees are not given training in the particular operations they perform as part of their function and current good manufacturing practices***."  The FDA investigator observed violations with standard operating procedures (SOP002191 regarding "Solution Preparation") and found that multiple "people who participate in analysis or perform actions in the firm's analytical laboratories are…not identified on the employee signature log, preventing traceability to their relative training and qualifications" and "no assessment has been made to the impact on analysis performed, or impacted, by personnel who do not have documented evidence of training on the firm's written procedures or test methods."  It concluded, "During the inspection and again during the closeout meeting, I explained to the firm's management team that "***documentation and actions performed must be traceable*** to the person who documented or perform[ed] the action" because "***without such documentation it is unknown if the analysts were adequately trained*** to perform various analytical methods."  It notes that Mr. Rogalewicz "stated he ***understood the observation***."

(k)    Observation 5: "***Separate or defined areas to prevent contamination or mix-ups are deficient regarding operations related to the holding of rejected components before disposition***."  The investigator "observed items in the reject cage which were not labeled with reject labels," without any non-conforming material reports, in violation of a standard operating procedure (SOP001965 regarding "Non-conforming Material Process").  It concluded, "During the inspection and again during the closeout meeting, I explained to the firm's management team that the "***written procedure for non-conforming material is not followed***" and that "***material that is non-conforming should have traceability to the rationale*** for non-conformance and ***should be labeled, segregated, and disposed of***, in a ***timely*** manner."  It notes that Mr. Rogalewicz "stated he ***understood the observation***."

(l)    The 4/20/2020 FDA Inspection Report also memorialized the "General Discussion with Management" during the close out meeting on April 20, 2020 between the investigator and "the firm's management team."[8]  At the meeting, the inspector gave the Form FDA 483 report, discussed *infra*, to Mr. Rogalewicz and the other attendees.  The investigator also discussed seven verbal observations "with the firm's management team," including (i) "Stability testing for [anthrax drug] Raxibacumab is not documented concurrently / according to the written procedure and analytical test method," such that "final results" are reported prior to the actual calculations of final reportable results using a validated spreadsheet; (ii) "[*Redacted*] Plate Reader verification has no timeframe specification for validity"; (iii) all users of the firm's "[*Redacted*] Analysis System" had instrument administrator rights, per an incorrect written procedure; (iv) a discussion with Senior Manager – Quality Assurance Leonard Trappanese about inaccurate "failure / invalid events" and lack of assessment of the equipment or analysts during an investigation; (v) the firm's

---

[8]    The attendees list for the April 20, 2020 meeting (Exhibit 12) was not obtained through the FOIA request.

management team permitting two change controls related to the anthrax drug to remain "open" for 6+ months without approval; (vi) deficient electrode storage; and (vii) failure to use a "HOLD" procedure and written "HOLD" labels despite a standard operating procedure and labels on site.

111.    The FDA thereafter posted on its website a heavily redacted version of the ensuing 6-page report on Form FDA 483 (the "4/20/2020 FDA 483 Report"), summarizing its findings during inspections of the ***Bayview facility*** from April 9 – 20, 2020.  It set forth the same five Observations as the 4/20/2020 FDA Inspection Report, with significantly less detail, much of it obscured by the redactions.  The Company's response (the 5/8/2020 Emergent FDA 483 Response, as defined below), signed by Mr. Rogalewicz, is discussed in §V.F.1., *infra*.

### ii.    Bayview Inspection From April 12-20, 2021

112.    Later in the Class Period, when negative news began to emerge regarding Emergent's work on COVID-19 vaccines, the FDA published another heavily redacted, 13-page report on Form FDA 483 (the "4/21/2021 FDA 483 Report") on its website summarizing its findings during inspections of the ***Bayview facility*** from April 12 – 20, 2021, which included review of data, video, and other materials going back as far as ***January 2021***.  This report was ***consistent*** with the undisclosed negative trends described by the CWs and evidenced in earlier FDA inspection reports at Emergent facilities, as described *supra*.  Specifically, the 4/21/2021 FDA 483 Report detailed ***nine*** categorical observations of material deficiencies at the Bayview facility, where the J&J vaccine batches were contaminated.

(a)    Observation 1: "***Failure to conduct thorough investigations into unexplained discrepancies***."  The FDA faulted Emergent for failing to investigate the causes of the cross-contamination between the J&J and AstraZeneca vaccines, including the actions of certain personnel, the equipment used to store vaccine raw materials, the sufficiency of cleaning techniques, the potential cross-contamination of other batches, the technique used to abort a fill

recipe and initiate a new one and the sufficiency of training for staff charged with doing so, and the impacts of maintenance work on the nearby J&J bulk drug substance batch.

(b)     Observation 2: "***The building used for the manufacture of the [J&J] viral vaccine drug substance and the [AstraZeneca] viral vaccine drug substance is not maintained in a clean and sanitary condition***." The FDA faulted Emergent for failing to properly decontaminate waste, for transporting waste through and possibly contaminating the warehouse, failing to properly clean the manufacturing rooms and corridors, failing to repair issues (damaged floors, rough surfaces, peeling paint, and damaged wall boards) that interfere with cleaning and sanitization, and performing the filling of the J&J vaccine drug substance batch in a room with potentially contaminating issues (paint flecks, peeling paint, wall and floor residues).

(c)     Observation 3: "***The building used for the manufacture of the [J&J] and [AstraZeneca] vaccine drug substance is not of suitable size, design, and location to facilitate cleaning, maintenance, and proper operations***." The FDA faulted the number and size of decontamination equipment available to handle waste generated during the J&J and AstraZeneca drug substance work and said that no assessment was done on the building's capacity to decontaminate waste. The FDA also listed repeated days (January 27, February 3-4, and April 12-14, 2021) with observed overcrowding in the warehouse and the spaces used to manufacture the COVID vaccines and noted that certain doorways were too small, causing employees to drag containers on the floor rather than use a pallet jack to transport them.

(d)     Observation 4: "***Written production and process control procedures to prevent cross-contamination are not followed in the execution of production and process control functions and are not documented at the time of performance***." The FDA noted that video evidence from January 27 and February 3, 2021, showed employees in the area used to

manufacture the J&J vaccine bulk drug substance failing to follow required procedures regarding handling non-disinfected and non-decontaminated medical waste by, among other things, carrying unsealed bags of medical waste from the manufacturing area and contacting containers of staged manufacturing materials, walls, and barriers in the corridor; dragging used materials containers and unsealed bags of medical waste across the floor of the warehouse corridor and throwing unsealed bags into the corridor service elevator; and contaminating the warehouse area where raw materials were staged for manufacturing by compacting unsealed bags of medical waste with their gloved hands and removing outer protective garments onto floor and placing them into open garbage containers there. The FDA also noted that video footage from February 4 and April 12, 2021, showed employees violating multiple procedures in mishandling the raw materials intended for use in the J&J bulk drug substance manufacturing area by dragging untreated containers of raw materials across the warehouse corridor. The FDA further noted that daily video footage, security badge access logs, and shower logs between January 19 and February 21, 2021, showed dozens of employees violating multiple procedures by failing to properly de-gown, shower, and gown in between entering and performing various functions in the separate manufacturing areas storing drug substance for J&J and AstraZeneca. The FDA further noted through direct observation and video footage from January 27 through April 12, 2021, that employees violated procedures concerning gowning zones within the warehouse, the materials airlock for the area where the J&J bulk drug substance is manufactured, and other designated rooms by wearing the same protective gowns and booties in the warehouse and its corridor as they wore while conducting activities in the materials airlock and other designated rooms and by removing gloves, booties, and protective gowns after handing special medical waste and putting them into waste containers located in the warehouse with staged raw materials present.

65

(e)    Observation 5:  "***The components, product containers and/or closures were not handled and/or stored in a manner to prevent contamination.  Specifically, Product [sic] components, containers, and closures involved in manufacturing operations, quality control sampling, weigh and dispense operations are not handled and stored to prevent cross contamination of viral bulk drug substances created for [J&J] and [AstraZeneca]***."  The FDA noted that ***J&J notified Emergent on March 16, 2021*** that a specific bulk drug substance batch was contaminated with a material used in the bulk drug substance for AstraZeneca.  The FDA reviewed security camera footage and identified numerous prior protocol violations: (i) on January 27 and February 3, 2021, employees dragged used materials containers and unsealed bags of medical waste from a manufacturing area across the floor of a warehouse corridor and carried unsealed bags of medical waste from a manufacturing area that contacted staged manufacturing materials, walls, and barriers in a warehouse corridor; (ii) on February 2, 2021, employees compacted unsealed bags of medical waste from a different manufacturing area and removed outer protective garments onto the warehouse floor and placed them in open garbage containers in the warehouse were raw materials were staged for J&J manufacturing; (iii) on January 27 and April 20, 2021, an employee put material bucket containers on a table in the service elevator accessing a manufacturing area amongst unsealed medical waste and then into a manufacturing room without first decontaminating or disinfecting them; (iv) on February 4 and April 12, 2021, employees dragged untreated containers of raw materials across the floor of the warehouse corridor; (v) on April 12, 2021, material bucket containers with cracked or opened closures were in the raw materials staging area of the warehouse stated for J&J manufacturing; and on April 14, 2021, employees failed to remove or sanitize their gloves before opening containers and scooping out materials for manufacturing batches.

(f)     Observation 6:  "***Written procedures designed to assure that the drug substances manufactured in the facility have the  identity, strength, quality, and purity they purport or are represented to possess are inadequate***."   The FDA noted numerous procedures deficiencies, including: (i) the decontamination procedure for waste generated during manufacture of the J&J and AstraZeneca viral vaccine drug substance does not describe how bags containing the waste should be decontaminated before transport through the warehouse where raw materials are received and staged; (ii) the procedure for periodic monitoring of decontamination effectiveness does not include requirements to ensure that waste is properly placed and decontaminated before transport through the warehouse where raw materials are received and staged; (iii) the procedure for cleaning and decontamination of items used to store and transport raw materials does not include a requirement for removal of residue that could be introduced into the manufacturing and formulation area for viral vaccine drug substance; and (iv) failure to update the procedure for the movement of contaminated waste, thereby permitting employees to dispose of such waste without taking necessary advance steps.

(g)     Observation 7:  "***Employees were not trained in the particular operation that they performed and/or in CGMP's related to their job function.  Specifically, the firm has failed to adequately train personnel involved in manufacturing operations, quality control sampling, weight and dispense, and engineering operations to prevent cross contamination of bulk drug substances created for [J&J] and [AstraZeneca]***."   The FDA used video footage review and/or direct observation to conclude that: (i) personnel crossed between the rooms where J&J and AstraZeneca bulk drug substance processing was occurring without adhering to gowning procedures; (ii) personnel failed to adhere to materials and waste handling procedures by dragging non-disinfected and non-decontaminated medical waste from manufacturing areas across the

corridor floors in the warehouse and elsewhere; (iii) manufacturing personnel failed to adhere to materials and waste handling procedures by colliding non-disinfected and non-decontaminated medical waste with walls, barriers, doors, and staged raw material containers; and (iv) sampling operations personnel failed to adhere to materials and waste handling procedures by dragging raw material containers used in manufacturing areas across corridors.

(h)    Observation 8: "***Equipment used is not of adequate size to facilitate operations for its intended use or for cleaning and maintenance***." The FDA observed overcrowded lab rooms with a variety of storage, cleaning, and maintenance deficiencies, including a backlog dating back to February 22, 2021 of environmental monitoring, raw material, and microbial limit testing that was to be sent for microbial identification, necessitating a clean-out on April 12, 2021.

(i)    Observation 9: "***Equipment and/or utensils are not cleaned and maintained at appropriate intervals to prevent contamination that would alter the safety, identity, strength, quality or purity of the drug substance***." The FDA observed that certain items used to hold raw materials were not required by Emergent's written procedures to be cleaned after each use, and visual inspection revealed observed residues on surfaces in an area suite and rouging on metal screws in items in the hallway used to transport material into the work area.

113.    The Company's response (the "4/30/2021 Emergent FDA 483 Response"), signed by Dino Muzzin, SVP Manufacturing and Interim General Manager, Emergent Manufacturing Operations Baltimore, LLC, is discussed in §V.F.1. and §V.E.4., *infra*. Its contents were originally not publicly available, as stated in the 5/19/2021 Congressional Memo (defined and discussed in §V.F.4., *infra*).

114.    Significantly, when Defendant Kramer was asked under oath during his 5/19/2021 Congressional Testimony (defined and discussed in §V.E.4., *infra*.) whether he disputed some of

the findings of the 4/21/2021 FDA 483 Report, specifically the Observation 2 findings regarding

the failure to maintain a "clean and sanitary condition" at Bayview, he testified that he ***did not***

***dispute*** the FDA's conclusions:

| | |
|---|---|
| Question: | Mr. Kramer, in May 2020, Emergent was contracted to receive $628 million to reserve and prepare its Bayview facility to produce vaccine. Correct? |
| Kramer: | That is correct. |
| Question: | And under the terms of that contract, Emergent was required to maintain its facility, quote, ''***in a state of readiness to perform current good manufacturing practices***.'' You don't dispute that, right? |
| Kramer: | That is correct. |
| Question: | And a month after the contract was awarded, Janssen Pharmaceuticals performed an audit that found, quote/unquote, ''mold issues at the Bayview facility.''  FDA, in April 2021, found that the building used for manufacturing vaccine, quote, ''***is not maintained in a clean and sanitary condition***.'' You don't dispute that. Correct? |
| Kramer: | ***I believe that is correct, yes***. |
| Question: | And FDA found paint peeling on the floors and walls. You don't dispute that either, right? |
| Kramer: | ***I believe that is correct, yes***. |
| Question: | And you don't deny that the FDA found brown residue and black residue on plant walls. Correct? |
| Kramer: | I am not aware of that particular finding. |
| Question: | Yes. It is on page 3. I have got to tell you, Mr. Kramer, my son, my teenage son's room gives your facility a run for its money in terms of its cleanliness. And, you know, on 27 page 8 of this FDA report, which I have right here, it says Emergent, quote, ''has ***failed to adequately train personnel involved in manufacturing operations***, ***quality control sampling***, and ***engineering operations to prevent cross-contamination of both drug substances***.'' You don't deny that that FDA found that, right? |
| Kramer: | ***That is correct***. |

69

> Question:     So, it is no surprise that late last year Emergent had to toss out five batches of AstraZeneca vaccine, amounting to roughly 10 to 15 million doses of vaccine, and then yet again, as you testified this morning, you had to throw out, discard, destroy, bulk drug substance amounting to 15 million doses of J&J vaccine.

115.    Likewise, during his 5/19/2021 Congressional Testimony he also validated under oath the FDA's findings regarding inadequate training at the Bayview facility, which was Observation 7 of the 4/21/2021 FDA 483 Report, then expressed a lack of understanding when asked what Emergent actually did to fix the problem.

> Question:     Mr. Kramer, Emergent last year was warned multiple times regarding persistent staffing problems at its Bayview plant in Baltimore. Specifically, in April 2020, the FDA warned in an inspection report, that, and I quote, ''Employees are not given training in the particular operations they perform as part of their function.'' Exactly a year to date later, FDA cited Emergent for *exactly the same thing*. Is this correct, Mr. Kramer?

> Kramer:       *Those observations by the FDA are correct, Congresswoman*. We take them very seriously. We have put in place a number of corrective actions to increase our training——

> Question:     OK. Mr. Kramer, so you are stating that is correct, that the report was correct. Today, the select subcommittee released an audit report drafted by the lead manufacturing advisor for the former Operation Warp Speed, who found that Emergent had, and I quote, ''*significant personnel risks*.'' He wrote, and I quote, ''*The staffing plans presented seem inadequate*,'' and also *noted the need for extensive training*. Is that correct? Yes or no.

> Kramer:       I haven't seen that report, but *I believe that is correct and accurate*. I think what is important to recognize is last year at this time, as we started up the process of working with both AstraZeneca and J&J, we incurred a significant staffing challenge, increasing from 100 employees to 400 employees last year. That is always a challenge.

> Question:     Well, Mr. Kramer, I would like to know, and the members of the select subcommittee would like to know that under your watch, what assessments were in place to guarantee that staffing plans were adequate for the unprecedented crisis at hand?

> Kramer:       I am not sure I understand the question, Congresswoman.

116.    The foregoing issues were pervasive throughout the Bayview facility and identified by FDA through routine inspection techniques readily available to Defendants throughout the

Class Period, such as on-site observation, visual physical / surface inspection, review of task logs, review of security clearance logs, and review of surveillance and video footage. Significantly, the majority of issues that FDA observed occurred in January and early February 2021, before or during the time when the Individual Defendants engaged in significant insider transactions and secured lavish bonuses and executive compensation increases, as described in §§V.G.2.-3., *infra*.

### 3.    *Undisclosed Facts And Risks Revealed By Investigative Reporting*

117.    After Emergent announced in early April 2021 the need to destroy roughly 15 million doses worth of J&J vaccine drug substance due to cross-contamination with AstraZeneca vaccine materials, as discussed in §V.F.4., *infra*, and while another 62 million J&J doses required examination for potential contamination, *The New York Times* detailed its investigation into issues at the Bayview facility (which it referred to as the Baltimore facility). Citing its review of "[p]reviously undisclosed internal documents and interviews with current and former federal officials and former company employees,"[9] it reported that Emergent had "*a corporate culture that often ignored or deflected missteps*," a government sponsor in *BARDA* "that *acted more as a partner than a policeman*," and "*a factory operation that was ill-equipped to take on such a mammoth manufacturing task*." It cited four former Emergent officials as having "*described an environment where top Emergent leadership tolerated and even encouraged the flouting of federal standards for manufacturing* and marketing *products*." It said one former official said that as Emergent scrambled to meet heavy vaccine production demands, a senior manufacturing supervisor responded to quality error reports by asking, "Do you want me to make drugs or fix issues. I don't have time to do both."

---

[9]    Discovery of the internal Emergent documents reviewed by *The New York Times* for this report would support the allegations and claims pled herein.

118.    Citing "[a]udits and investigations – including ones conducted in 2020 by Johnson & Johnson, AstraZeneca, two federal agencies, and Emergent's own quality evaluators," it further reported that "*Emergent had not followed some basic industry standards at the Baltimore plant, and identified repeated shortcomings in efforts to disinfect and prevent contamination*."  It cited federal officials and outside experts who opined that "*the pattern of lapses suggested deeper quality issues*."  An AstraZeneca audit document "*specifically highlighted the risks of viral cross-contamination*."  J&J auditors said "monitoring reports for bacteria and other contaminants *were filed four to six months late*," while AstraZeneca's auditors said that Emergent personnel relied on "historical averages" and other *loosened monitoring criteria* but still failed tests.  *The New York Times* reported that the audits "flagged a *persistent problem with mold in areas required to be kept clean*, *poor disinfection of some plant equipment leading to growth of bacteria*, the *repeated approval of raw materials that had not been fully tested*, and *inadequate training of some employees*."  A BARDA audit listed the "*risks of microbial contamination as 'critical*,'" which is the most serious designation for risks posing an immediate and significant risk, yet found that Emergent had just *one employee* coordinating materials testing.  *The New York Times* reported that in a July 2020 audit, *Emergent's own auditors* said that the *flow of workers and materials through the plant was not adequately controlled* "*to prevent mix-ups or contamination*" and that *errors* "*are not investigated to determine the root cause* or are *not investigated adequately*" and "are *terminated without cause*," citing as an example Emergent's workers conducting "*essentially no investigation*," beyond checking the wheels of one cart, into mold repeatedly discovered inside the room for growing cell cultures, which could be contaminated by airborne spores.  An Emergent audit in August 2020 found that a manager "*knowingly deviated*" from standards and "*approved four raw materials used to produce AstraZeneca's vaccine without first fully testing them*," a

72

type of shortcut that internal logs showed occurring twice weekly in October 2020.   A former company official told *The New York Times* that "plant supervisors often cited pressures from Operation Warp Speed as a justification for glossing over violations of manufacturing guidelines."

119.   *The New York Times* also reported on the extent of the COVID-19 vaccine contamination issue at the Bayview facility.  It reported, "***Between early October [2020] and January [2021], Emergent discarded five lots of AstraZeneca vaccine — each the equivalent of two million to three million doses — because of contamination or suspected contamination, according to internal logs, a government official and a former company supervisor***."  It cited internal logs and a former company official in reporting that Emergent ***discarded one AstraZeneca batch in early October 2020 due to suspected contamination*** and ***discarded four AstraZeneca batches in December 2020*** that were "***spoiled by bacterial contamination of equipment***."  It cited internal logs as showing that ***in November 2020***, ***a batch of J&J was discarded*** "***after workers 'hooked up' the wrong gas line and accidentally 'suffocated' the cells where the virus for the vaccine is grown***."  It said records show that ***in December 2020***, "***workers making AstraZeneca's vaccine deviated from manufacturing standards on average more than three times a day***" and "***one-fifth of the deviations were classified as major***."

120.   *The New York Times* also reported that top HHS officials were first notified of the J&J contamination of 15 million doses shortly before 6:20 p.m. on March 25, 2021 via an email with the subject line "Developing Situation_Emergent Bayview" and text that read "Viral cross-contamination confirmed in the control cells for JANNSSEN GMP Lot #8."  It reported that the contamination occurred "***sometime in February***" 2021, but the error was not discovered until J&J conducted its final pre-release testing of the actual vaccine doses.

### 4. *Undisclosed Facts And Risks Uncovered By Congress*

121. Congressional committees investigating Emergent's conduct at issue herein served

June 2021 letters requesting documents from J&J and AstraZeneca, citing, *inter alia*, the *New York*

*Times* reporting and listing Emergent's contamination problems, including

- In October 2020, Emergent destroyed two to three million doses of AstraZeneca's vaccine due to suspected contamination;

- In November 2020, Emergent discarded a batch of Johnson & Johnson vaccine after workers "hooked up" the wrong gas line and accidentally "suffocated" the cells where the virus for the vaccine is grown;

- In December 2020, Emergent destroyed another 8 to 12 million doses of AstraZeneca vaccine due to bacterial contamination of equipment; and

- In February 2021, Emergent contaminated millions of doses of Johnson & Johnson's coronavirus vaccine with ingredients from AstraZeneca's vaccine and was forced to destroy up to 15 million tainted doses of Johnson & Johnson's vaccine immediately, and 60 million more after additional testing.

122. Their investigation remains ongoing, but on May 19, 2021, the House of

Representatives Committee on Oversight and Reform and its Select Subcommittee on the

Coronovirus Crisis issued a Memorandum ("5/19/2021 Congressional Memo") with ***preliminary***

findings, which was based in part on extensive review of Emergent corporate documents obtained

in response to an April 2021 letter request and on written and oral testimony by Defendant Kramer

and Emergent's Executive Chairman on May 19, 2021.

123. The 5/19/2021 Congressional Memo expresses Congress's ongoing concern:

"***[T]he company's troubling history raises questions regarding whether Emergent will ever be***

***able to comply fully with FDA standards and produce safe and effective vaccines***." It found that

"***Emergent's systemic failure led to the destruction of millions of vaccine doses***." It stated, "***In***

***2020, Emergent was warned multiple times that serious manufacturing problems and deficient***

***controls at the Bayview facility could lead to contamination***. These warnings came in ***internal***

*inspections* as well as ***inspections and audits by FDA, Johnson & Johnson, and AstraZeneca*** [which]…***found that Emergent's Bayview facility had persistent problems with mold, poor disinfection of plant equipment, and inadequate training of employees***." The 4/20/2020 FDA Inspection Report was cited as one of the underlying inspection reports.

124. The 5/19/2021 Congressional Memo continues, "New evidence obtained by the Committees shows that ***Emergent was aware of the problems and failed to take sufficient action*** [which]… ***led to the contamination of millions of vaccine doses in separate incidents in October 2020, December 2020, and February 2021***." It adds, "Emergent's response to FDA's April 20, 2021, inspection report, a previously undisclosed document, shows that ***the company admitted to some of the failures and committed to remediation***." The new evidence included:

(a) A 7-page private report dated June 17, 2020 (the "6/17/2020 Warp Speed Report") by Carlo de Notaristefani, the lead manufacturing advisor for Operation Warp Speed, [10] "identified multiple 'risks' at the Bayview facility, including the following excerpts:

- "***Most of the large scale existing equipment is not suitable for the new processes, and will be either removed or mothballed***…. The supporting infrastructure is very limited, and will need substantial remediation and expansion to allow manufacturing to proceed at the planned rate";

- "***Personnel risk – significant: The staffing plans presented seem inadequate*** to the level of current activities required for full scale production of 3 programs. In addition, ***recent FDA and customer audits has [sic] highlighted the need for extensive training of personnel, and strengthening of the quality function***"; and

- "***Compliance risk – significant***: Emergent ***Bayview*** has been focused on R&D [research and development] activities for the last 8+ years, and ***will have to strengthen the change control process, systems audit trails, and***

---

[10]    The 6/17/2020 Warp Speed Report was included as Exhibit 18 to the 5/19/2021 Congressional Memo bearing Bates numbers EmerCly_0000001 through EmerCly_0000007. It states, "This report is based on company provided information, a review session with the BARDA team of SMEs who have interacted with the company so far, and a site visit to the Emergent Bayview and Camden facilities performed by CdN, T. Belski and A. Donabedian on June 4, 2020." Discovery into the "company provided information" that Emergent gave to investigators, as well as any investigation materials or notes, would support the allegations and claims pled herein.

*quality oversight to address audit observations and ensure products licensure. This will require significant resources and commitment*."

(b)    A 13-page report dated July 24, 2020, and addressed to Emergent Director of Quality Assurance Judith Adair McCorry (the "7/24/2020 Janssen Audit Report") detailed an *audit by J&J subsidiary Janssen Pharmaceuticals* from June 9-18, 2020 (including virtual tours on June 9-10, 2020), which found that *the Bayview facility had a "deficient" contamination control strategy* and that *Emergent's "quality systems may have weaknesses or gaps that require CAPA [Corrective and Preventative Actions]*."[11]  Among the concerns it detailed were the following:

- "*The site virus contamination control strategy is deficient*," noting that "*There is not a formal Bayview contamination control strategy* for the site";

- "*The disinfectant program used in the facility is deficient*," and *Emergent failed to follow basic industry standards for disinfecting the plant*;

- There were "*mold issues* associated with the facility shutdown / startup" and "*inadequate gowning / wipe down procedures for materials coming from the warehouse* to weigh and dispense";

- There is "*no process*" *for the hand-over of cell banks and viral seed banks from the warehouse to manufacturing*.

(c)    The 5/19/2021 Congressional Memo said that the "previously undisclosed" 4/30/2021 Emergent FDA 483 Response "*provides new insight regarding the events that led up*

---

[11]    The 7/24/2020 Janssen Audit Report was included as Exhibit 19 to the 5/19/2021 Congressional Memo bearing Bates numbers EBSI-HCOR-0014442 through EBSI-HCOR-0014454.  It states, "Document review of posted procedures/ logs / flow diagrams / trend reports occurred over the following week" and includes a multi-page list of documents categorized from #1.1 through #10.1, including but not limited to SOPs, complaints, deviations, OOS/OOT, and Training documents.  It asked Emergent for "responses by 21-Aug-2020."  It also listed the 15 Emergent personnel who participated in the audit: (1) Chad Anderson, Downstream MFG, (2) Cathy Collins, QA, (3) Michele Huggins, QC, (4) Cezary Karczewski, QA, (5) Ken Kellner, Facilities, (6) Scott Kelly, MFG / Tech, (7) Amanda McClure, Micro, (8) Judith McCorry, QA, (9) Steven Miller, Engineering / Facilities, (10) Lakita Patterson, Warehouse, (11) Joe Rogalewski, QA, (12) Leonard Trappanese, Biochem, (13) Dan Zdobinski, QA, (14) Jason Jenkins, Upstream MFG, and (15) Amanda Ilioff, Upstream MFG.  The allegations and claims pled herein would be supported by discovery of the supporting documents underlying the 7/24/2020 Janssen Audit Report; the specifically listed Emergent documents #1.1 - #10.1 that Janssen reviewed; Emergent's response(s) to the 7/24/2020 Janssen Audit Report and any supporting documents, whether or not provided to Janssen / J&J; and the pertinent documents of the 15 listed Emergent custodians.

*to the discovery and investigation of vaccine contamination in January and February 2021*" and

"outlines steps that Emergent is taking to address *the persistent manufacturing problems that have plagued the [Bayview] facility since at least April 2020*." Citing the 4/30/2021 Emergent FDA 483 Response, the 5/19/2021 Congressional Memo adds, "*Emergent admits to several failures at the Bayview plant*," including:

- *Emergent admitted* that the "*sudden scale-up to full-scale manufacturing activities for two different Covid-19 vaccine drug substances*" *contributed to* "a *dramatic increase in storage and staging demands*" and "*strained the capacity*" of *Emergent's equipment* as the facility "operated at full capacity for the first time";

- *Emergent acknowledged FDA's finding that Emergent employees were not adequately trained*. Emergent stated that it is "using the pause in new manufacturing to provide comprehensive training to facility personnel, to ensure that, upon resumption of operation, site personnel will be prepared to execute their roles in a consistently GMP-compliant manner";

- *Emergent committed that all new batches of Johnson & Johnson vaccine manufactured at the Bayview facility will be tested*—by both an independent third party and Johnson & Johnson—to ensure that the doses are safe, *until Emergent is able to fully remediate* the problems at its Bayview facility.

125.    The 5/19/2021 Congressional Memo also noted that the 4/30/2021 Emergent FDA 483 Response "*provides detail on the discovery of the most recent contamination, when stakeholders were notified, and Emergent's investigation*," as stated by Emergent, as follows:

- *March 5, 2021*: <u>*Johnson & Johnson*</u> *discovers possible contamination of vaccine doses during quality control testing*. This batch was manufactured by Emergent *between January 19 and February 21, 2021*, and then sent to Johnson & Johnson for quality control testing;

- *March 11 and 15, 2021*: *Additional testing confirms the presence of a viral vector not used in the manufacturing of Johnson & Johnson's vaccine*, *indicating possible cross-contamination with the AstraZeneca vaccine*. Manufacturing both AstraZeneca and Johnson & Johnson in the same facility raised the risk of cross-contamination.

- *March 16, 2021*: *Johnson & Johnson alerts Emergent*.  Johnson & Johnson notifies Emergent of the batch's test results and preliminary identification of the contaminant.

- *March 17, 2021*: *Emergent initiates a manufacturing investigation*. According to Emergent, the affected batch was not sent for further processing.

- *March 24, 2021*: *Emergent and Johnson & Johnson approve the investigation plan*. Emergent's testing of the batch indicated the presence of a viral vector similar to the AstraZeneca vector.

- *March 25, 2021*:  *Emergent notified Johnson & Johnson of the investigation results*.

- *March 31, 2021*: *Public reporting reveals <u>for the first time</u> that up to 15 million doses of Johnson & Johnson's vaccine have been contaminated at Emergent's Bayview facility*.

- *April 3, 2021*: *The Biden Administration places Johnson & Johnson in charge of Bayview facility*.  According to Emergent's response to FDA, Johnson & Johnson will now provide "24/7 oversight of all production areas in addition to the suites in which their vaccine is manufactured." Johnson & Johnson will also provide "full oversight of change controls, qualifications, and process items, including final approval."

- *April 5, 2021*:  *Emergent provides investigation report to FDA regarding the contamination of the Johnson & Johnson vaccines*. The analysis determined that *the most probable cause for the contamination* of the batch *was contact with waste moving out of the area where the AstraZeneca vaccine was manufactured*.

- *April 11, 2021*: *The Biden Administration asks Emergent to stop manufacturing AstraZeneca vaccine*. Emergent permanently stopped manufacturing of the AstraZeneca vaccine.

- *April 12 to April 20, 2021*:  *FDA conducts inspection of Bayview facility*. On April 16, 2021, *FDA asks Emergent to stop manufacturing any new material at the facility, and to quarantine all existing vaccine substance*. In its initial response to the Form 483, Emergent refers to this as a "voluntary shutdown period."  On April 20, 2021, FDA issued a scathing inspection report of the Bayview facility.

- *May 18, 2021*: *Manufacturing at Bayview facility remains on hold*.

126.    All of the concealed, non-public facts and circumstances set forth in this §V.E.
stand in stark contrast to Defendants' Class Period statements and render them materially false and
misleading and actionable under the claims pled herein.

**F.    Materially False and Misleading Statements & Omissions**

127.    The Class Period begins on March 10, 2020, the day that Defendants began touting
Emergent's COVID-19 vaccine manufacturing capabilities, contrary to known but concealed
negative information about its facilities, equipment, personnel, training, and processes, including
the facts alleged in §V.E., *supra*.  Just a day later, the World Health Organization would declare
COVID-19 a global pandemic, and the same week, much of the U.S. entered a lockdown.

128.    During the Class Period, Defendants made materially false and misleading
statements and omissions that can be organized into three primary threads of the alleged fraud: (i)
Business Operations Fraud; (ii) the Reported Results Fraud; and (iii) the Internal Controls Fraud.

**1.    *Business Operations Fraud***

129.    On March 10, 2020, Emergent issued a press release (the "3/10/2020 Press
Release") announcing an agreement with Novovax, Inc., whereby "Emergent will collaborate with
Novovax, utilizing its molecule-to-market contract development and manufacturing (CMDO)
services to support bringing into the clinic Novovax's novel experimental vaccine candidate to
protect against coronavirus disease (COVID-19)."  It explained that "Emergent will produce the
COVID-19 experimental vaccine candidate, which is based on the proprietary recombinant
protection nanoparticle technology platform of Novovax and proprietary Matrix-M™ adjuvant to
enhance immune responses."  It added that Emergent had already begun work, anticipating that
the vaccine candidate would be used in a Phase 1 clinical study within four months, and had
"mobilized its integrated clinical and commercial development and manufacturing network," with
development services and manufacturing services spread over three facilities.  It stated, "***Drug***

*substance will be produced at the Baltimore/Bayview location*, which is designated by the U.S. Department of Health and Human Services (HHS) as a Center for Innovation in Advanced Development and Manufacturing (CIADM)." Defendant Husain was quoted as saying, "Emergent is proud to *demonstrate its ability to rapidly deploy capabilities, capacities, and expertise as part of our molecule-to-market CDMO offering* to support the development and commercialization of essential medicines." Defendant Kramer was quoted as saying, "We are pleased with *our Novavax collaboration*, which *reflects Emergent's commitment to advancing potential solutions to combat coronavirus disease. As we provide our CDMO services, backed by our established track record as a trusted partner to governments, industry, and non-government organizations, we leverage our long history in vaccines and therapeutics development and manufacturing*, as well as our broad capabilities focused on medical countermeasures for emerging infectious diseases. The increasing threat of COVID-19 requires a comprehensive response and *we continue to evaluate various vaccine, therapeutic, and CDMO approaches to enable us to marshal resources to make a meaningful impact on this global public health emergency*."

130. The misrepresentations and omissions in the 3/10/2020 Press Release, as alleged in the preceding paragraph, were materially false and misleading because, *inter alia*, of the reasons alleged in ¶219, *infra*.

131. On April 23, 2020, Emergent issued a press release (the "4/23/2020 Press Release), which was filed with the SEC on April 24, 2020 as Exhibit 99 to Form 8-K signed by Defendant Lindahl (the "4/24/2020 Form 8-K"), announcing that it had entered into an agreement with J&J to manufacture J&J's COVID-19 vaccine candidate at Emergent's Bayview facility. Under the deal, initially valued at $135 million, Emergent agreed to deploy its CDMO services to provide drug substance manufacturing services and reserve large-scale manufacturing capacity for J&J.

The 4/23/2020 Press Release further stated that negotiations were ongoing on a long-term commercial supply agreement for large-scale drug substance manufacturing anticipated to begin in 2021.  It touted the Bayview facility as a "*CIADM designed for rapid manufacturing of vaccines and* treatments *in large quantities during public health emergencies*," with "*unique capabilities across four independent suites* to produce at clinical scale to get candidates rapidly into the clinic, while at the same time scaling up *to enable large-scale manufacturing* to up to 4000L to prepare for production of commercial volumes to meet customer demand." It claimed, "*The CIADM the capacity to produce tens to hundreds of millions of doses of vaccine on an annual basis, based upon the platform technology being used*."  Defendant Kramer was quoted as stating, "When mission-driven organizations *combine talents and capabilities*, potential *solutions to serious issues like COVID-19 become more within reach* to benefit patients." Defendant Husain was quoted as saying, Emergent "*will leverage [its] talents, capabilities, and capacities up to 300 million doses to advance this much-needed vaccine candidate and ensure ongoing commercial supply through our CDMO services*."

132.    The misrepresentations and omissions in the 4/23/2020 Press Release, as alleged in the preceding paragraph, were materially false and misleading because, *inter alia*, of the reasons alleged in ¶219, *infra*.

133.    Analysts were quick to express excitement over Emergent's growing importance within the U.S. public-private COVID-19 response.  For instance:

(a)    In its April 23, 2020 analyst report, Cantor Fitzgerald noted Emergent's $135 million agreement with J&J, raised its price target on Emergent's stock from $66.57 to $75, and said it "will continue to drive the company toward the 2024 revenue goal of $2B." The report added: "*We continue to believe EBS deserves to trade at a premium multiple to its peers*, and

even more so post COVID-19. We believe that, while EBS has a number of significant opportunities with COVID-19, it will be a long-term winner from an almost-certain increased focus on public health threats in a post COVID-19 world. *We believe the fact that a company such as JNJ would partner with EBS further supports our view*."

(b)    In its April 24, 2020 analyst report, Wells Fargo Securities said regarding Emergent's $135 million agreement with J&J: "*[W]e see this news as validating EBS as a partner for COVID19*, and *highlights the value of EBS' CDMO business which we have seen as an underappreciated part of the story*. While details of the $135MM value have not been disclosed and we look for additional color next week on the earnings call, *we expect the stock to react favorably to this announcement*[.]"

(c)    In its April 24, 2020 analyst report, Guggenheim stated, "*JNJ represents EBS' largest ever CDMO agreement and is tangible evidence of business momentum.* Although EBS did not quantify the potential contribution from those agreements, *JNJ alone will more than double EBS' current CDMO revenue base (~$80M in 2019)* and validates the company's strategy to become one of the leaders in molecule-to-market biologics development and manufacturing services (a ~$20B global addressable market)."

(d)    In its April 24, 2020 analyst report, Cowen raised the price target on Emergent's stock from $66.57 to $67 stating that the J&J contract "*is likely to far exceed the size of 2 previous agreements with other potential vaccine manufacturers*" (including the Novovax deal announced in March) and that "[b]ased on JNJ's guided development timeline, we would anticipate incremental revenue in 3Q20 with a more significant contribution in 4Q and into 2021."

134.    Emergent announced its Q1 2020 quarterly results in a series of public statements on April 30, 2020 and May 1, 2020, which discussed Emergent's CDMO agreement with J&J.

(a)     On April 30, 2020, Emergent issued an after-hours earnings press release (the "4/30/2020 Earnings Release"), which was filed with the SEC on April 30, 2020 as Exhibit 99.1 to both Form 8-K signed by Defendant Lindahl (the "4/30/2020 Form 8-K") and amended Form 8-K signed by Defendant Lindahl (the "5/1/2020 Form 8-K/A), announcing its financial and operating results for the three months ended March 31, 2020.  The 4/30/20 Earnings Release continued to tout the J&J deal, providing details including that the CDMO was "valued at $135 million," Emergent was going to be the "U.S. manufacturing partner of Johnson & Johnson's lead vaccine candidate for COVID-19," and "[n]egotiations continue on a long-term commercial supply agreement for large-scale drug substance manufacturing anticipated to begin in 2021."  Defendant Kramer is quoted as stating, "Emergent is *uniquely positioned to respond to the* unprecedented challenges of the *COVID-19 pandemic*" and "*We are deploying our decades of experience in vaccines* and therapeutics development *and manufacturing, our well-established platform technologies,* and our *significant* development and *manufacturing capabilities*."  The 4/30/2020 Earnings Release reaffirmed full year 2020 financial forecast.

(b)     Also on April 30, 2020, Emergent held an earnings call with analysts and investors in conjunction with its first quarter 2020 financial results (the "4/30/2020 Earnings Call"), on which Defendants Kramer, Lindahl, and Husain spoke.  During prepared remarks, Defendant Kramer highlighted Emergent's "*expertise in vaccines*…and in *contract development and manufacturing*," "*team [that] remains focused on execution*," and "*expanding manufacturing capabilities*."  He added, "*Emergent is uniquely positioned in this environment*" with "*decades of experience in vaccines…and manufacturing*."  He said, "*[W]e're taking our history of working hand-in-hand with the U.S. government to* be able to *develop and manufacture critical vaccines* and therapeutics, *and applying those skills to help* our fellow innovators, such as *J&J,*

83

Novavax, and Vaxart, to ***accelerate the development of their COVID-19 candidates and be in a position to manufacture them in significant quantities***." He added, "***[W]e're leveraging our long history of manufacturing our own*** therapeutics and ***vaccines to develop two COVID-19 product candidates***…." He boasted, "***We have proven manufacturing capabilities in place*** and, ***in concert with the U.S. government, have built the ability to quickly advance early stage candidates through development to commercial-scale manufacturing***." Kramer added that "near-term pressures…are being offset by the ***increased demand for our development and manufacturing capabilities in the CDMO business unit*** [and] [a]s a result, ***we're maintaining our full guidance for 2020***." In prepared remarks, Defendant Lindahl stated that Emergent's "recently announced collaboration agreements are providing solid tailwinds in our CDMO business" and therefore "***expect a greater revenue contribution from CDMO than previously thought***." In his prepared remarks, Defendant Husain touted "Emergent's ***state-of-the-art infrastructure, proven track record, and expertise in*** development and ***manufacturing***" that meant "Emergent has been able to ***rapidly respond and deploy capability, capacity, and expertise in response to the COVID-19 pandemic***." He cited as a "pillar" of Emergent's success, "***our best-in-class biologics technology platforms across…viral…therapies***." He said, "The CDMO business continues to be an integral part of our overall Emergent offering, and it expects to contribute accordingly." He touted Emergent's agreement with J&J, "valued at approximately $135 million, to provide drug substance manufacturing services and to reserve certain large-scale capacity anticipated to start manufacturing in 2021" and stated that Emergent has ***"large scale manufacturing readiness, with a validated process for Johnson & Johnson, supported by our operational capacity of up to 300 million doses annually***." He highlighted Emergent's "***ability to serve the needs of…large pharma and …the U.S. government…, leveraging our unparalleled***

*experience, track record, and state-of-the-art infrastructure*."  In response to an analyst question regarding current capacity in the CDMO business, Husain specifically referenced the Bayview facility capacity stating, "*[o]ur drug substance site in Baltimore*…is designed with *four independent suites to support rapid clinical material as well as large-scale manufacturing*."

(c)     The 4/30/2020 Form 8-K also attached as Exhibit 99.2 slides that were presented in connection with Emergent's first quarter 2020 Earnings Call titled, "1Q20 Quarterly Supplement" (the "4/30/2020 Earnings Call Slides"), which highlighted "CDMO COVID-19 partnerships," including the *J&J* "*Agreement to be the manufacturer of drug substance*, [which] *enables readiness and reservation of certain capacity to provide large-scale manufacturing* in 2021" with a "Long-term commercial supply agreement in negotiation."  The 4/30/2020 Earnings Call Slides stated that 2020 full year guidance was reaffirmed.

(d)     On May 1, 2020, Emergent filed a Form 10-Q with the SEC for the first quarter of 2020 (the "Q1 2020 10-Q"), signed and SOX-certified by Defendants Kramer and Lindahl.[12]  It touted Emergent's "*Highlights and Business Accomplishments for 2020*" which included signing the $135 million CDMO agreement "*to be U.S. manufacturing partner of Johnson & Johnson for its lead vaccine candidate for COVID-19*."

135.     The misrepresentations and omissions in the 4/30/2020 Earnings Release, 4/30/2020 Earnings Call, 4/30/2020 Earnings Call Slides, and Q1 2020 10-Q, as alleged in the preceding paragraph, were materially false and misleading because, *inter alia*, of the reasons alleged in ¶219, *infra*.

136.     On May 8, 2020, Emergent transmitted its 16-page letter to the FDA (the "5/8/2020 Emergent FDA 483 Response") responding to 4/20/2020 FDA 483 Report (discussed in §V.E.2.,

---

[12]     As used herein, "SOX" refers to the Sarbanes-Oxley Act of 2002, which, among other things, imposed requirements on executives to personally certify certain corporate filings made with the SEC.

*supra*) and signed by Mr. Rogalewicz as Sr. Director, Quality, Emergent Manufacturing Operations Baltimore, which was posted in redacted form on the FDA's website.[13]  On information and belief, given that the 4/20/2020 FDA Inspection Report and the 4/20/2020 FDA 483 Report referenced the FDA investigator's active engagement with Emergent's "senior management" both during and after the inspection, including as regards the 4/20/2020 FDA 483 Report itself (as discussed in §V.E.2., *supra*), the 5/8/2020 Emergent FDA 483 Response was authorized by Defendants Kramer, Lindahl, and Husain.  The 5/8/2020 Emergent FDA 483 Response stated, "We acknowledge the observations from this recent inspection and, as part of our ongoing efforts to maintain the highest standards of quality, ***have taken immediate, holistic and comprehensive measures to address the deficiencies noted***."  It then set forth specific responses to each of the Observations in the 4/20/2020 FDA 483 Report.

(a)    <u>Response to Observation 1</u> ("Appropriate controls are not exercised over computer or related systems to assure that changes in master production and control records or other records are instituted only by authorized personnel.").  The 5/8/2020 Emergent FDA 483 Response stated, "***Emergent is committed to improving control of data generated and stored by electronic systems***."  It added, "***The execution of PLN04023, Data Integrity Site Assessment Project Master Plan, is currently in progress***…. ***Controls are in place and in use to ensure data integrity for all data generated to support commercial product***…***testing*** by the Quality Control Laboratory. ***Interim controls have been established to ensure data integrity for QC instruments that have yet to be mapped to folders on a secure network***…."  Regarding commercial products, it said "***[a] comprehensive assessment was completed to evaluate the integrity of all data generated***" on multiple computerized systems "and included the execution of instrument and system audit trail

---

[13]    Discovery into the unredacted version of the 5/8/2020 Emergent FDA 483 Response, supporting documents, and related communications would support the allegations and claims pled herein.

reviews to confirm integrity of the data," after which "*[t]he assessment did not identify any instances of data deletions*," "[r]etroactive review of audit trails was performed," and "*[t]here were no observations made that would have affected the legitimacy of the data*."  For non-commercial products, it said an audit trail review identified deleted files, but that "*[n]o testing data files were deleted*."  It added:

> CAPA# 1100002231 was initiated *to assess data integrity for data generated to support drug substance, and drug product testing* for other products previously tested at our Bayview facility…

> Protocol PRO48450 was generated…*to evaluate the integrity and validity of the data for all drug substances and products manufactured under GMP conditions* and tested prior to 01 October 2019…

> As a preventative action SPO000299, *Review of Quality Control (QC) Data*, was *revised to include instructions and requirements for the review of audit trails, for the data generated by electronic computerized systems*…[and]…became effective on 23 January 2020….

> *Computerized systems supporting* [*redacted*] *DP* [drug product] *testing have been mapped…and confirmed* through the respective test methods (TMD) *to secure network data storage folders* and *user access verified* to ensure that *only users with the appropriate permissions can delete, modify, rename, or move stored data* and *according to approved procedures*….

> *All remaining QC computerized systems will be evaluated* per CAPA# 1100002248 *to ensure instruments are mapped to folders on the secure network* and that *only users with proper permissions can delete, modify, rename, or move stored data files*.

> *SOP001708*, Development of Validation Protocols and Final Reports, *was revised*…effective 11 February 2020…*to include secure network data storage mapping and user group access as part of its requirements for new computerized systems*"

> "*To ensure computerized system integrity, CAPA# 1100002246 was opened*. *SOP043816*, Performance Monitoring of Computerized Systems, *has been created*…*to include the requirement of periodic review of all applicable computerized systems*.

87

It added, "*[W]e have since secured all analytical balances* in the quality control laboratories *to prevent users from changing date and time* present on printed records.  As a preventive action, CAPA# 1100002247 was opened.  SOP000508, Calibration of Weight Indicating Instruments, was revised to include requirements for new analytical balances to be secured, prior to the initial equipment calibration, to prevent users from changing time and date."  It also said, "[A]ll existing computers in the quality control laboratories were secured to prevent users from changing the time zone" and "new computers will also secure the time-zone function."

(b)    Response to Observation 2 ("Established specifications, test procedures and laboratory control mechanisms are not followed and documented at the time of performance.").  The 5/8/2020 Emergent FDA 483 Response stated that Emergent's "*Quality unit views data integrity as an important component of our responsibility to ensure the quality of products* and *any deficiency to the integrity of the data is of critical importance*."  It stated that the "[*redacted*] drug product release and stability data was evaluated for adherence to ALCOA principles" – *i.e.*, attributable, legible, contemporaneous, original, and accurate – and listed the steps taken, including "counseling sessions" "with the Quality Control staff" and "all laboratory personnel" to ensure compliance with standard operating procedures, before concluding that "*the test data adheres to ALCOA principles* and *the reported data is considered accurate and valid*."  It added, "*To ensure future corrections to data are properly documented and include supporting justification* for change, *SOP000299, Review of Quality Control Data*, *was revised* to include detail on how corrections to data are to be performed" so that "the SOP *requires all raw data corrections to reference documentation supporting the correction or change*" and "*[a]ll laboratory personnel were trained* on the updated procedure as part of *counseling sessions*."  After conceding that data integrity for certain incubation temperatures in the anthrax drug work had lacked supporting

documentation and could not be confirmed, thus invalidating certain results, a heavily redacted section of the 5/8/2020 Emergent FDA 483 Response said that the lot purity "*was demonstrated to meet specification*," there were "*no missed timepoints or data invalidated*" for the other drug product lots, and thus, "*no impact to the demonstrated stability of [the] drug product*."  Last, regarding visual inspection of drug products, the 5/8/2020 Emergent FDA 483 Response found that "*there is no apparent impact*" to the data, but *the method was revised* "*to ensure integrity of the sample is always maintained*."

      (c)    <u>Response to Observation 3</u> ("The responsibilities and procedures applicable to the quality control unit are not in writing and fully followed.")  The 5/8/2020 Emergent FDA 483 Response stated:

> ***SOP042317***, *Documentation and Investigation of Invalid Events in Quality Control Laboratories*, … was ***modified to preclude the analyst who generated the invalid event from investigating*** the event. The verbal approval option for retesting was removed and now states, "***written approval must be obtained from a supervisor or designee*** prior to repeat testing". In addition, Form FRM044390, *Invalid Event Documentation and Investigation Form*, … was revised to include a confirmation indicating the test record and invalid assay laboratory investigation was ***evaluated and approved by an independent reviewer*** not responsible for the invalid event ***prior to initiating a re-assay and/or retest***. As of 08May2020, ***all QC personnel have completed training*** on the updated versions of SOP042317 and notified of the updated revision of Form FRM044390.

It added, "***Emergent recognizes the importance of timely data review and will continue to improve our cycle time for review***."  It described (in redacted text) ***purported enhancements to SOP000299***, *Review of Quality Control (QC) Data*, meant ***to improve quality control data review*** and ***quality assurance data review***.  It added that "***[a]ny data reviewed outside of [the] targeted review period will require documented justification***," "***[c]orrective action will be taken to assure adherence to the review timing requirements***," and to insure compliance, "performance against

this metric will be measured as part of Quality Management Review" and "[a]s of 08May2020, ***all QC personnel have completed training*** on the updated version of SOP000299."

(d)    <u>Response to Observation 4</u> ("Employees are not given training in the particular operations they perform as part of their function and current good manufacturing practices."  The FDA investigator observed violations with standard operating procedures (SOP002191 regarding "Solution Preparation").  The 5/8/2020 Emergent FDA 483 Response described a broad Training Program applicable to ***all*** operations at the Bayview facility, stating:[14]

> ***Emergent is dedicated to ensuring our employees remain current on training requirements and that these requirements are met prior to execution of GxP tasks****. **Our Training Program defines** the **requirements for all training activities supporting GxP operations required to maintain employee qualification and compliance***. **This program is applicable to <u>all permanent employees and contingent workers,</u>** (temporary employees, consultants, contractors, vendors), **involved in** support of ***the development***, <u>***manufacture***</u>, ***testing and distribution of <u>all products produced at the Emergent Bayview site</u>****. **Department Managers are responsible for ensuring** that ***all direct reports have the training, education and experience necessary to perform their assigned functions/duties*** and ***duties/responsibilities are aligned with assigned training curriculum***. ***Employees/contingent workers are responsible for completing training requirements*** in a ***timely*** fashion and ***prior to performing the applicable operation/function****. **Per SOP001653**, *Training Program*, **all employees/contingent workers** are ***required to have training completed prior to performing a task or procedure***. <u>***As of 08 May 2020, all employees/ contingent workers performing activities, are confirmed to be trained on the task they are performing***</u>. This program utilizes both paper and electronic systems to document, monitor and assess training compliance. A revision to SOP001653 (v 14.0), *Training Program*, expanded the use of Emergent's [*redacted*] to include all contingent workers (as defined above) where previously applicable consultant, contractor and vendor training records were all paper based. Training completion in [*redacted*] is documented electronically and authenticated via a network username and password. Training metrics obtained from [*redacted*] are reported to the site [*redacted*] and a [*redacted*] review is subsequently performed as part of the Quality Management Review.

---

[14]    The 5/8/2020 Emergent FDA 483 Response uses the term "GxP," which is widely accepted to describe a wide range of compliance-related quality guidelines and regulations application to the pharmaceutical industry, where the "G" stands for "good," the "P" stands for "practice," and the "x" is a placeholder for all areas, *e.g.* GMP (Good Manufacturing Practices), GLP (Good Laboratory Practices), GCP (Good Clinical Practices), etc.  Thus, any references to "GxP" personnel or tasks, etc. encompass the Bayview personnel and tasks at issue in this lawsuit.

It added, "***Emergent Bayview's Good Documentation Practices (GDP) procedure is part of our Training Program and is maintained in line with current GMP and regulatory standards and is periodically reviewed as per internal procedures***."  It explained, "***SOP041954, Good Documentation Practices – Bayview***, was recently revised and made effective on 30 December 2019," which "***instructs all employees and contingent workers to ensure a current signature sample is on file***" by completing or updating the applicable form "***prior to signing or initializing any Emergent Controlled Document***."  Stating that the missing signature issue "was not specific to personnel in the analytical laboratories only," the 5/8/2020 Emergent FDA 483 Response said that "***[m]issing signature registration forms have been obtained for all active employees/contingent workers performing GxP work***."  It explained that "the impact to GMP data and documentation" from outstanding signature registrations was caused both by SOP / form deficiencies and "Human" error "as the employees/contingent workers and Department Managers did not respond to the…notifications for overdue assignments."  Beyond SOP / form upgrades and a new hire onboarding packet, the 5/8/2020 Emergent FDA 483 Response said that "[t]he ***training department will run a report of overdue learnings*** [*redacted*], ***which will be provided to Department Heads and escalated to the Bayview Leadership Team if unresolved*** by the [*redacted*]."  It added, "***All employees and contingent workers performing GxP work*** for the site ***will be counseled to ensure they understand the requirements and how to meet the requirements***" and that "***[a] majority of the training has been completed***" with a set (redacted) date to complete the rest.

(e)    <u>Response to Observation 5</u> ("Separate or defined areas to prevent contamination or mix-ups are deficient regarding operations related to the holding of rejected components before disposition.").  The 5/8/2020 Emergent FDA 483 Response made clear that a specific deficiency

was identified and remedied.  It described the problem: "Upon investigation, it was dete1mined

that the deviation is a ***result of a failure in the method***. Method was determined to be a root cause

because SOP001965 'Non-Conforming Material Process', does not provide a timeframe to initiate

a NCMR. Furthermore, it does not provide a clear process to notify QA [Quality Assurance] of the

non-conforming material to allow for proper labeling."  It then laid out the solution, *i.e.*, revisions

to multiple standard operating procedures (SOPs) designed to avoid repeat issues, including: (i)

***revisions to SOP001965*** to ***require*** employees to "***Immediately contact Quality Assurance to***

***properly label the material***"; to "Within [*redacted* time frame] ***initiate creation of the NCMR***

[Non-Conforming Material Report] ***upon observance or notification of a non-conformance of***

***materials***, ***which do not meet specifications or in-process limits***; "***Transfer the storage location***

***of the non-conforming material to the Reject / QA Hold cage***"; and "***Perform periodic reviews***

of the Reject / QA Hold storage location"; (ii) replacing an "obsolete" SOP that was identified as

a "failure in the method" and "root cause" of the deviation, with ***SOP043593***, *Receiving and*

*Distributing Purchased Materials*, which was "updated to include ***a section to specifically outline***

***the transfer of material to an appropriate bin location based on storage conditions*** and that the

storage conditions are ***defined on the material specification for Quality Managed Materials***" and

"to include ***steps to use the End of Day report to verify materials are stored in the correct location***

***and under the proper storage conditions***"; (iii) ***SOP000279***, *Inspection and Disposition of*

*Incoming Raw Materials and Components*, was "***revised to clarify labeling requirements for***

***nonconforming or potentially nonconforming material while pending investigations are in-***

***process***" and such "***[i]nvestigations…must be completed before the material is dispositioned***";

(iv) ***SOP043817***, *Material and Product Status Labeling*, was "***made effective to define the***

***material labels within the facility***"; (v) ***SOP027884***, *Quality Hold and Reject Procedure for*

*Product and Intermediates*, was revised to "include **reference** to **SOP043817 for labeling nonconforming or potentially nonconforming product with a QA Hold label** while pending further disposition"; and (vi) **Notification 10161056** was created "**to establish a** [*redacted*] PM to perform a [*redacted*] **review of the Reject / QA Hold storage location**… [that] will be **both physical and electronic systematical to ensure materials are properly labeled and stored as they await disposition**… **[and] have been properly disposed upon completion of the NCMR investigation and the associated material disposition**."

137.    The misrepresentations and omissions in the 5/8/2020 Emergent FDA 483 Response as alleged in the preceding paragraph, were materially false and misleading because, *inter alia*, of the reasons alleged in ¶219, *infra*.

138.    On May 12, 2020, Emergent presented at the Bank of America Securities 2020 Health Care Conference during which Emergent presented slides posted to its website (the "5/12/2020 Conference Slides"), which highlighted "**Tailwinds in CDMO business**," including the CDMO services agreement with J&J to manufacture its COVID-19 drug candidate at Emergent's Bayview facility, "enable[ing] readiness and reservation of certain capacity to provide large-scale manufacturing in 2021" and "Long-term commercial supply agreement in negotiation." The 5/12/2020 Conference Slides stated that 2020 full year guidance was reaffirmed.

139.    The misrepresentations and omissions in the 5/12/2020 Conference Slides as alleged in the preceding paragraph, were materially false and misleading because, *inter alia*, of the reasons alleged in ¶219, *infra*.

140.    On June 1, 2020, Emergent issued a press release (the "6/1/2020 Press Release), which was filed with the SEC on June 1, 2020 as Exhibit 99 to Form 8-K signed by Defendant Lindahl (the "6/1/2020 Form 8-K"), announcing that on May 30, 2020, BARDA issued Emergent

a task order valued at approximately $628 million to deploy its CDMO services and ensure capacity reservation and expansion for manufacturing of third-party COVID-19 vaccines, as part of Operation Warp Speed Program.  The task order was being issued under Emergent's June 5, 2012 contract with BARDA that established Emergent's Bayview facility as a CIADM for pandemic preparedness.  The 6/1/2020 Press Release touted the Bayview facility's *"capacity to produce tens to hundreds of millions of doses of vaccine on an annual basis*." Defendant Kramer was quoted as stating, *"Our longstanding record of delivering safe and effective medical countermeasures for public health positions us to continue to help at this critical moment by advancing COVID-19 vaccine programs of our fellow innovators in the industry."*  Defendant Husain was quoted as stating, "*This innovative solution paves the way for pharmaceutical and biotechnology innovators with leading COVID-19 vaccine candidates to have an established U.S. development and manufacturing supply chain*.  *This investment in increased capacity and capabilities will serve the industry's expanding clinical and commercial pipelines more broadly, ultimately benefiting more patients globally*."

141.    The misrepresentations and omissions in the 6/1/2020 Press Release, as alleged in the preceding paragraph, were materially false and misleading because, *inter alia*, of the reasons alleged in ¶219, *infra*.

142.    Once again, analysts expressed excitement, issuing a flurry of reports that increased their price targets on Emergent's stock:

(a)    In its June 1, 2020 analyst report, Wells Fargo Securities stated "[t]his morning (6/1), Emergent (EBS) announced it received a task order (valued at ~$628MM) under its existing 2012 contract with BARDA to deploy its CDMO capacity to support the U.S. Governments

efforts to accelerate delivery of potential COVID19 vaccines. ***We expect the stock to be up today on this announcement***."

(b)     In its June 1, 2020 analyst report, Guggenheim ***raised the price target on Emergent's stock from $81 to $101***, stating, "EBS announced a ***significant contract win for their CDMO business*** in a $628M BARDA task order to support US-based manufacturing for COVID-19 vaccine candidates.  This ***landmark private-public partnership is tangible evidence, in our view, of EBS' CDMO capability*** and adds to the growing list of partners (JNJ, NVAX, and VXRT). Importantly, ***we view EBS' CDMO business unit as growing and durable***" and "[w]e add ~$543M of revenues to our CDMO business unit through 2021."

(c)     In its June 1, 2020 analyst report, Chardan stated that Emergent announced "a new agreement with U.S. Department of Health & Human Services (HHS) to provide manufacturing support the U.S. government's efforts to accelerate delivery of Covid-19 vaccines" and "***this development is just another example of one of Emergent's key strengths, its longstanding relationships with the relevant government agencies: ASPR, BARDA, FDA, CDC***, etc."

(d)     In its June 1, 2020 analyst report, Cantor Fitzgerald ***raised its price target on Emergent's stock*** from $83.49 to $86, stating that Emergent announced that it "has been issued a task order under its current partnership with the U.S. government to provide molecule to market CDMO services to the U.S. government which reserves manufacturing capacity for the COVID-19 Warp Speed Program" valued at $628 million.  It added, "***given the today's announcement we believe there is very likely to be an upwards revision to guidance on the 2Q20 call***," that Emergent "***deserves to trade at a premium to its peers***," and that "***we expect upward earnings revisions and multiple expansions to drive the stock higher***."

143.    On June 11, 2020, Emergent issued a press release (the "6/11/2020 Press Release), which was filed with the SEC on June 11, 2020 as Exhibit 99 to Form 8-K signed by Defendant Lindahl (the "6/11/2020 Form 8-K"), announcing that it had signed another agreement – valued at approximately $87 million – to provide CDMO services and secure large-scale manufacturing capacity performed at the Bayview facility to support AstraZeneca's COVID-19 vaccine candidate, one of the vaccine candidates supported by Operation Warp Speed.  The 6/11/2020 Press Release touted ***Emergent's Bayview facility as having "unique capabilities across four independent suites to produce at clinical scale to get candidates rapidly into the clinic, while at the same time scaling up to enable large-scale manufacturing to up to 4000L to prepare for production of commercial volumes to meet customer demand***" and having "***capacity to produce tens to hundreds of millions of doses of vaccine on an annual basis***."  Defendant Kramer was quoted as stating, "***Emergent is playing a critical role in increasing the world's chances of having a safe and effective COVID-19 vaccine***" and that "***[w]ith this agreement, we bring to our facilities two of the five leading candidates being developed with U.S. government funding.***"  Defendant Husain was also quoted as stating, "***Emergent is uniquely equipped to take on the integral role of development and manufacturing partner to companies like AstraZeneca with lead vaccine candidates for COVID-19***" and that "***[w]e have spent decades establishing a strong, integrated CDMO network that allows us to dependably and consistently produce life-saving medicines for our company and for others worldwide***."

144.    The misrepresentations and omissions in the 6/11/2020 Press Release, as alleged in the preceding paragraph, were materially false and misleading because, *inter alia*, of the reasons alleged in ¶219, *infra*.

145.    Once again, Defendants public statements had their intended effect, driving analyst enthusiasm for Emergent.  For instance:

(a)    In its June 11, 2020 analyst report, Guggenheim stated that Emergent announced an $87 million contract with AstraZeneca stating, "*we believe the breadth of EBS' (still evolving) partner list and CDMO capabilities positions the business well for sustained growth post 2021*" and that "*the AstraZeneca partnership adds further momentum to the CDMO business that has ramped over the past 6 months (totaling ~$850M in secured contracts), a portion which we think is likely to extend beyond 2021*."

(b)    In its June 12, 2020 analyst report, Cantor Fitzgerald discussed Emergent's partnership with Johnson & Johnson and AstraZeneca and *raised its price target on Emergent's stock from $68.11 to $85*, stating, "*we believe investors have been given a rare second opportunity to own a company with the highest probability from benefiting from a COVID-19 vaccine*" and "*[a]s investors appreciate the durability and revenue potential of Emergent's portfolio, we expect upward earnings revisions and multiple expansion to drive the stock higher*."

146.    On June 24, 2020, Emergent presented at the IDEAS Northeast Investor Conference 2020 during which Emergent presented slides posted to its website (the "6/24/2020 Conference Slides"), which highlighted "*Tailwinds in CDMO business*," including: the CDMO services agreement with J&J to be the US manufacturer of its COVID-19 drug substance at Emergent's Bayview facility which "*enables readiness and reservation of certain capacity to provide large-scale manufacturing in 2021*" and provide "*Capacity up to 300M doses annually*," and that there was a "*Long term commercial supply agreement under negotiation*;" and the CDMO services agreement with AstraZeneca to be the US supplier of drug substance at the Bayview facility with

"*large-scale capacity reservation through 2020*" and a "*Supply agreement under negotiation*." The 6/24/2020 Conference Slides touted the "*$628 Task Order under existing CIADM contract for rapid production of leading COVID-19 vaccine candidates.*" The 6/24/20 Conference Slides also stated that 2020 full year guidance was reaffirmed.

147.    The misrepresentations and omissions in the 6/24/2020 Conference Slides as alleged in the preceding paragraph, were materially false and misleading because, *inter alia*, of the reasons alleged in ¶219, *infra*.

148.    On July 6, 2020, Emergent issued a press release (the "7/6/2020 Press Release), which was filed with the SEC on July 6, 2020 as Exhibit 99 to Form 8-K signed by Defendant Lindahl (the "7/6/2020 Form 8-K"), announcing that its initial agreement to provide CDMO services for J&J's lead COVID-19 vaccine candidate had been expanded to a five-year deal.  Under the agreement, valued at $480 million for the first two years, Emergent would provide CDMO services to produce large-scale drug substance manufacturing for the first two years at Emergent's Bayview facility and for the remaining three years beginning in 2023, provide a flexible capacity deployment model to support annual dose requirements.   Defendant Kramer highlighted Emergent's "*manufacturing strength to address the COVID-19 pandemic*."  Defendant Husain similarly highlighted Emergent's "leading CDMO services" stating, "*[w]e have the expertise and capabilities to meet the long-term needs of our customers and provide ongoing commercial manufacturing to benefit patients*."  Like previous announcements, the 7/6/2020 Press Release touted *Emergent's Bayview facility as having "unique capabilities across four independent suites to produce at clinical scale to get candidates rapidly into the clinic, while at the same time scaling up to enable large-scale manufacturing to up to 4000L to prepare for production of*

*commercial volumes to meet customer demand*" and having "*capacity to produce tens to hundreds of millions of doses of vaccine on an annual basis*."

149.    The misrepresentations and omissions in the 7/6/2020 Press Release, as alleged in the preceding paragraph, were materially false and misleading because, *inter alia*, of the reasons alleged in ¶219, *infra*.

150.    Analyst enthusiasm was once again strong and focused on the predictable stream of revenues represented by Emergent's COVID-9 contracts.  For instance:

(a)    In its July 6, 2020 analyst report, Cantor Fitzgerald *raised its price target* on Emergent's stock from $84.08 to $85 stating, "*[s]ince the beginning of the COVID-19 pandemic, EBS has signed the two agreements with JNJ, as well as a contract with the U.S. government valued at ~$628MM . . . given the wins in the CDMO business, related to COVID-19, we believe there is very likely to be an upwards revision to guidance on the 2Q20 call*[.]"

(b)    In its 7/6/2020 Cowen Equity Research Report, Cowen reported that its "*[d]iscussions with [Emergent] indicate that the vast of [sic] majority of the $480MM would still be received even if JNJ's vaccine does not receive regulatory approval as the revenue is tied to reserving the facility*."

(c)    Similarly, in its 7/6/2020 Wells Fargo Securities Equity Research Report, Wells Fargo reported that during discussions with Emergent, Emergent stated that the "'*vast majority*' of the ~$480MM value is not dependent on the vaccine being successful*."

151.    On July 6, 2020, CBS Baltimore issued a news report about vaccine development and manufacturing in Maryland titled, "Maryland Biotech Companies at Forefront of COVID-19 Vaccine Research" ("7/6/2020 CBS Report"), during which Defendant Husain, in an interview, touted the importance Emergent's Maryland facilities were playing in the manufacture of COVID-

19 vaccines.  Defendant Husain stated, "***Maryland itself is playing a significant role where we're directly contributing from a development and manufacturing standpoint towards these vaccines***."  Husain further stated, "But there's certainly a lot of potential and a lot of activity that's happening in Maryland."

152.     The misrepresentations and omissions in the 7/6/2020 CBS Report, as alleged in the preceding paragraph, were materially false and misleading because, *inter alia*, of the reasons alleged in ¶219, *infra*.

153.     On July 8, 2020,  Fox 5 News issued a news report about vaccine development and manufacturing in Maryland titled, "Search for COVID Vaccine is Boosting Maryland Economy" ("7/8/2020 Fox 5 News Report").  In it, Defendant Husain touted the "***significant" number of Emergent employees in its Maryland facilities*** like Bayview stating, "***We're certainly adding to our workforce and adding a significant number of colleagues to join Emergent***."

154.     The misrepresentations and omissions in the 7/8/2020 Fox 5 News Report, as alleged in the preceding paragraph, were materially false and misleading because, *inter alia*, of the reasons alleged in ¶219, *infra*.

155.     On July 27, 2020, Emergent issued a press release (the "7/27/2020 Press Release), which was filed with the SEC on July 27, 2020 as Exhibit 99 to Form 8-K signed by Defendant Lindahl (the "7/27/2020 Form 8-K"), announcing yet another deal with AstraZeneca to provide CDMO services to support production of its COVID-19 vaccine candidate.  Under this deal, valued at approximately $174 million through 2021, Emergent was to provide CDMO services to produce large-scale drug substance manufacturing at Emergent's Bayview facility, beginning in 2020, at a scale for commercial supply, and the parties could enter into additional commercial manufacturing commitments as the candidate progressed over three years through Emergent's flexible capacity

deployment model. This agreement would follow and be in addition to the previous approximately $87 million agreement announced in Emergent's 6/11/2020 Press Release. In the 7/27/2020 Press Release, Defendant Husain stated, "***Emergent stands ready alongside leading innovators to rapidly deploy our CDMO services to help meet the substantial demand for a vaccine*** – anchored on our foundational expertise in development and manufacturing and propelled by our commitment to our mission – to protect and enhance life." The 7/27/2020 Press Release continued to tout ***Emergent's Bayview facility as having "unique capabilities across four independent suites to produce at clinical scale to get candidates rapidly into the clinic, while at the same time scaling up to enable large-scale manufacturing to up to 4000L to prepare for production of commercial volumes to meet customer demand***" and having "***capacity to produce tens to hundreds of millions of doses of vaccine on an annual basis***."

156.    The misrepresentations and omissions in the 7/27/2020 Press Release, as alleged in the preceding paragraph, were materially false and misleading because, *inter alia*, of the reasons alleged in ¶219, *infra*.

157.    Emergent announced its Q2 2020 quarterly results in a series of public statements on July 30, 2020 and July 31, 2020, which discussed the increasing number of Emergent's CDMO services agreements.

(a)    On July 30, 2020, Emergent issued an earnings press release (the "7/30/2020 Earnings Release"), which was filed with the SEC on July 31, 2020 as Exhibit 99 to Form 8-K signed by Defendant Lindahl (the "7/31/2020 Form 8-K"), announcing its financial and operating results for the three and six months ended June 30, 2020, and revised upward its full year 2020 guidance. The 7/30/20 Earnings Release touted the ***"increased impact of CDMO business"*** on Emergent's current quarter and year-to-date performance including in its list of "***recent business***

*accomplishments*": the $628 million task order awarded by the HHS under Operation Warp Speed; the five-year large-scale drug substance manufacturing agreement for J&J's lead COVID-19 vaccine candidate, valued at approximately $480 for the first two years that followed the initial agreement (valued at approximately $135 million) to provide CDMO services; the three-year large-scale drug substance manufacturing agreement for AstraZeneca's COVID-19 vaccine candidate, valued at approximately $174 million that followed the initial agreement (valued at approximately $87 million) to provide CDMO services. Defendant Kramer was quoted as stating, "*[w]hile we mobilize to meet the threat presented by COVID-19, we are also successfully delivering on our long-term strategy*" and that Emergent is "*prepared [] to do both these things well*."

(b)    Also on July 30, 2020, Emergent held an earnings call with analysts and investors in conjunction with its second quarter 2020 financial results (the "7/30/2020 Earnings Call), on which Defendants Kramer, Lindahl, and Husain spoke. During prepared remarks, Defendant Kramer touted Emergent's CDMO business and "*ability to manufacture on a large-scale*," stating "*Emergent is uniquely prepared to answer the call for [the] COVID-19 pandemic*" with Emergent's "*proven manufacturing capabilities in place.*" In particular, he touted Emergent's agreements with J&J, AstraZeneca, and the U.S. government as part of Operation Warp Speed. In his prepared remarks, Defendant Lindahl also touted Emergent's "*landmark public private CDMO partnership with BARDA in support of the US government's Operation Warp Speed program*" which contributed to the "*substantial growth in CDMO services*" and revenues more than tripling in the quarter versus the prior year. Defendant Lindahl also stated that there is a "*transformation occurring in our CDMO business unit to provide long-term sustainable growth*

*as evidenced by our ability to secure $1.5 billion in long-term contracts across our target markets of pharma, biotech and the US government*."

(c)    On July 31, 2020, Emergent filed a Form 10-Q with the SEC for the second quarter of 2020 (the "Q2 2020 10-Q"), signed and SOX-certified by Defendants Kramer and Lindahl.  It touted Emergent's "***Highlights and Business Accomplishments for 2020***" which included: the $628 million task order awarded by the HHS under Operation Warp Speed; the five-year large-scale drug substance manufacturing agreement for J&J's lead COVID-19 vaccine candidate, valued at approximately $480 for the first two years that followed the initial agreement (valued at approximately $135 million) to provide CDMO services; and the three-year large-scale drug substance manufacturing agreement for AstraZeneca's COVID-19 vaccine candidate, valued at approximately $174 million that followed the initial agreement (valued at approximately $87 million) to provide CDMO services all in Emergent's Bayview site.  The Q3 2020 10-Q touted that "[t]he  also stated that CDMO business revenues are based on "***established development and manufacturing infrastructure, technology platforms and expertise***" and touted that it provides CDMO services for "***large pharmaceutical and biotechnology industry and government agencies/non-governmental organizations***."

158.    The misrepresentations and omissions in the 7/30/2020 Earnings Release, 7/30/2020 Earnings Call, and Q2 2020 10-Q, as alleged in the preceding paragraph, were materially false and misleading because, *inter alia*, of the reasons alleged in ¶219, *infra*.

159.    Once again, analysts were excited by Defendants' public statements.  For instance:

(a)    In its July 31, 2020 analyst report, Guggenheim ***raised the price target*** on Emergent's stock from $105 to $110 stating, "***[w]ith the recent COVID partnerships totaling approximately $1.5B, EBS' CDMO business has seen significant acceleration and generated***

*2Q revenues of $72.6M, up $54M from the prior year*." Guggenheim also stated that Emergent "points to the 5-year contract with JNJ that allows for three years of flexible capacity (beginning in 2023 with value to be assigned next year) as evidence of CDMO's revenue durability."

(b)    In its July 31, 2020 analyst report, Chardan *raised its price target on Emergent's stock from $86 to $112*, stating that Emergent "*has been able to leverage its core strengths to enter into new manufacturing contracts to support other companies' SARS-CoV-2 vaccine development initiatives*. Hence, *we expect the Company to post significant revenue over the next six quarters totaling nearly $3 billion*."

(c)    In its January 31, 2021 analyst report, Guggenheim *raised the price target on Emergent's stock from $97.23 to $115*, stating, "*we believe EBS remains undervalued given the long-term CDMO opportunity as they continue to build their pipeline*." Guggenheim also said that Emergent's JNJ and AZN results "may underscore the durability of the CDMO business as some contracts (including JNJ and AZN) have options for additional manufacturing commitments through Emergent's flexible capacity deployment model."

160.    On August 12, 2020, Emergent presented at the 2020 Intellisight Conference during which Emergent presented slides posted to its website (the "8/12/2020 Conference Slides"), which touted the "New CDMO Wins Across Government and Non-Government Customers Representing > $1.5B of contracted revenue signed within the last 4 months" including Emergent's drug substance contracts with J&J (valued at $480 for the first two years that followed the initial agreement which was valued at $135 million), AstraZeneca (valued at $174 million that followed the initial agreement which was valued at $87 million), and the expanded existing partnership with the U.S. government under Operation Warp Speed (valued at $628 million) to manufacture COVID-19 vaccine candidates at the Bayview facility.  The 8/12/2020 Conference Slides also

touted that the 2020 financial guidance had a "significant upward revision" with the CDMO revision from the previous $125M-$145M in revenues to $440M-$460M in revenues being particularly highlighted.

161.    The misrepresentations and omissions in the 8/12/2020 Conference Slides, as alleged in the preceding paragraph, were materially false and misleading because, *inter alia*, of the reasons alleged in ¶219, *infra*.

162.    On August 26, 2020, Emergent presented at the 2020 NASEM Symposium: COVID-19 and Vaccines, Therapeutics, and Treatments during which Emergent presented slides posted to its website (the "8/26/2020 Conference Slides"), which touted its COVID-19 vaccine development and manufacturing stating that it was "***Engaged in high-profile development & manufacturing agreements [including] Five CDMO agreements, including only public-private CDMO partnership in history [and] First COVID commercial supply agreement in industry***." The slides also highlighted the contracts Emergent had with J&J, AstraZeneca, and with the US Government through its Operation Warp Speed program to manufacture COVID-19 vaccines.

163.    The misrepresentations and omissions in the 8/26/2020 Conference Slides, as alleged in the preceding paragraph, were materially false and misleading because, *inter alia*, of the reasons alleged in ¶219, *infra*.

164.    On September 14, 2020, the Emergent presented at the Morgan Stanley Global Healthcare Conference (the "9/14/2020 Conference"). Defendant Lindahl, in explaining why both J&J and AstraZeneca chose Emergent to manufacture their respective vaccine candidates, stated:

> [Q]uite simply, it's the history we have of ***high-quality manufacturing of delivering on complex problems of the fact that we had capacity available in the -- primarily in the Bayview facility that we have, which was designed expressly for the purpose in partnership with the government of dealing with an emergency just like COVID***. It was actually -- the emergency that was contemplated was a pandemic flu situation, but there are ***4 separate manufacturing suites that are very***

*flexible, and each one can handle a different set of applications and be set up to move very rapidly, and that's exactly what we're doing right now.* So it's really that history we have plus the capacity we had available that gave both of those companies the confidence that we were the right partner for them in this situation.

165.    The misrepresentations and omissions in the 9/14/2020 Conference, as alleged in the preceding paragraph, were materially false and misleading because, *inter alia*, of the reasons alleged in ¶219, *infra*.

166.    On October 5, 2020, Emergent presented at the 1st Annual Guggenheim Vaccines and Infectious Disease Day (the "10/5/2020 Conference), during which Defendant Husain spoke. At the 10/5/2020 Conference, Emergent touted that Emergent's "*unique offering and fundamental capabilities allows them flexibility to do vaccine manufacturing for a diverse set of candidates*."

167.    The misrepresentations and omissions in the 10/5/2020 Conference, as alleged in the preceding paragraph, were materially false and misleading because, *inter alia*, of the reasons alleged in ¶219, *infra*.

168.    Emergent announced its Q3 2020 quarterly results in a series of public statements on November 5, 2020 and November 6, 2020, which discussed Emergent's growth in CDMO services.

(a)    On November 5, 2020, Emergent issued an earnings press release (the "11/5/2020 Earnings Release"), which was filed with the SEC on November 5, 2020 as Exhibit 99 to Form 8-K signed by Defendant Lindahl (the "11/5/2020 Form 8-K"), announcing its financial and operating results for the three and nine months ended September 30, 2020 and updating its full year 2020 guidance.  In it, Defendant Kramer touted Emergent's "*solid business*," and "*demonstrable strengths in [] manufacturing*."  Defendant Kramer is quoted as stating, "The strength of our core business and the *accelerated growth of our contract development and*

*manufacturing unit validate our strategy* to pursue leadership positions across the public health threat market."

(b)     Also on November 5, 2020, Emergent held an earnings call with analysts and investors in conjunction with its third quarter 2020 financial results (the "11/5/2020 Earnings Call"), on which Defendants Kramer, Lindahl, and Husain spoke.  In prepared remarks, Defendant Kramer stated that Emergent "*continue[d] to experience strength in [its] core business including…substantial growth in the CDMO business,*" that it "*will continue to invest in the [CDMO] business unit and [it] facilities to increase [its] capabilities to meet the long-term expected demand and growth in this area*" and that "*CDMO business is well positioned for significant long-term growth*."  Defendant Lindahl also touted the "significant growth in CDMO services" stating that increased revenues "*results reflect the continuing contribution from the approximately $1.5 billion of contract value related to COVID-19 secured since March, most notably our landmark public-private CDMO partnership with BARDA in support of the U.S. government's Operation Warp Speed program, as well as the tech transfer and commercial supply agreements with Johnson & Johnson and AstraZeneca*."  In prepared remarks, Defendant Husain "*emphasize[d] the durability and sustainability of [Emergent's] CDMO business*" stating that Emergent has "*an extremely successful track record of development and manufacturing abilities*."  Defendant Husain also touted Emergent's "*enterprise team of more than 1,400 technical and quality compliance professionals, a vital key to [Emergent's] success*."  In response to an analyst inquiry regarding Emergent's ability to handle multiple COVID-19 vaccine clients, Defendant Husain responded that Emergent's facilities are "*designed to handle multiple products . . . the drug substance facility in Baltimore, which is known as our Bayview facility, so right now, that is predicated on multiple products being in there*."

(c)      Emergent published slides in connection with its third quarter 2020 Earnings Call titled, "3Q20 Investor Update" (the "11/5/2020 Earnings Call Slides") that was posted to its website, which touted CDMO "Business Unit Highlights" including "Signed approximately $1.5B in contracts in response to COVID-19." The slides further touted Emergent's CDMO services stating, "***CDMO holds a unique position in the landscape***," "Emergent combines the best of both worlds: ***the customer focus and capacity of a pure play CDMO***," and Emergent "***[has] the technology and facilities to bring products all the way from concept to market***." The slides also highlighted that 2020 financial guidance was updated with the CDMO revision from the previous $440M-$460M in revenues to $450M-$470M. The slides touted "***Emergent's CDMO formula for growth***" which included an "***Enterprise team of more than 1400 technical and quality compliance professionals***."

(d)      On November 6, 2020, Emergent filed a Form 10-Q with the SEC for the third quarter of 2020 (the "Q3 2020 10-Q"), signed and SOX-certified by Defendants Kramer and Lindahl. It touted Emergent's "***Highlights and Business Accomplishments for 2020***" which included: the $628 million task order awarded by the HHS under Operation Warp Speed; the five-year large-scale drug substance manufacturing agreement for J&J's lead COVID-19 vaccine candidate, valued at approximately $480 for the first two years that followed the initial agreement, valued at approximately $135 million to provide CDMO services; and the three-year large-scale drug substance manufacturing agreement for AstraZeneca's COVID-19 vaccine candidate, valued at approximately $174 million that followed the initial agreement, valued at approximately $87 million to provide CDMO services all in Emergent's Bayview site. The Q3 2020 10-Q touted that "that CDMO business revenues are based on ***"established development and manufacturing infrastructure, technology platforms and expertise***" and touted that it provides CDMO services

108

for "*large pharmaceutical and biotechnology industry and government agencies/non-governmental organizations*."

169.   The misrepresentations and omissions in the 11/5/2020 Earnings Release, 11/5/2020 Earnings Call, 11/5/2020 Earnings Call Slides and Q3 2020 10-Q, as alleged in the preceding paragraph, were materially false and misleading because, *inter alia*, of the reasons alleged in ¶219, *infra*.

170.   On November 18, 2020, Emergent presented at the 2020 Southwest IDEAS Investor Conference during which Emergent presented slides posted to its website (the "11/18/2020 Conference Slides"), which touted the "*New CDMO Wins Across Government and Non-Government Customers Representing > $1.5B of contracted revenue signed since March 2020*" including Emergent's drug substance contracts with J&J (valued at $480 for the first two years that followed the initial agreement which was valued at $135 million), AstraZeneca (valued at $174 million that followed the initial agreement which was valued at $87 million), and the expanded existing partnership with the U.S. government under Operation Warp Speed (valued at $628 million) to manufacture COVID-19 vaccine candidates at the Bayview facility.   The 11/18/2020 Conference Slides also highlighted that 2020 financial guidance was updated with the CDMO revision from the previous $440M-$460M in revenues to $450M-$470M.

171.   The misrepresentations and omissions in the 11/18/2020 Conference Slides, as alleged in the preceding paragraph, were materially false and misleading because, *inter alia*, of the reasons alleged in ¶219, *infra*.

172.   On December 10, 2020, Emergent presented a webinar entitled, "15th Annual Singular Research Best of the Uncovered Webinar" during which Emergent presented slides posted to its website (the "12/10/2020 Conference Slides"), touting Emergent's CDMO services

stating, "**CDMO holds a unique position in the landscape**," "Emergent combines the best of both worlds: **the customer focus and capacity of a pure play CDMO**," and Emergent "**[has] the technology and facilities to bring products all the way from concept to market**." The slides further stated that Emergent was "Engaged in high-profile development & manufacturing agreements [including] 6 CDMO agreements, including only public-private CDMO partnership in history; 3 of the 5 candidates are sponsored by [Operation Warp Speed including] Johnson & Johnson, AstraZeneca; [and] First COVID commercial supply agreement in industry with Johnson & Johnson" at Emergent's Bayview facility. The slides highlighted that "> $1.5B of contracted revenue signed since March 2020" including Emergent's drug substance contracts with J&J (valued at $480 for the first two years that followed the initial agreement which was valued at $135 million), AstraZeneca (valued at $174 million that followed the initial agreement which was valued at $87 million), and the expanded existing partnership with the U.S. government under Operation Warp Speed (valued at $628 million) to manufacture COVID-19 vaccine candidates.

173. The misrepresentations and omissions in the 12/10/2020 Conference Slides, as alleged in the preceding paragraph, were materially false and misleading because, *inter alia*, of the reasons alleged in ¶219, *infra*.

174. On January 10, 2021, Emergent issued a press release (the "1/10/2020 Press Release), which was filed with the SEC on January 11, 2021 as Exhibit 99.1 to Form 8-K signed by Defendant Lindahl (the "1/11/2021 Form 8-K"), announcing 2021 financial forecast preliminary 2020 results. In it, Defendant Kramer touted, **"Emergent team's unwavering commitment [which] produced incredible results," Emergent "rapidly respond[ing] to [its] customers' needs," and Emergent's "development and manufacturing expertise."**

175. The 1/11/2021 Form 8-K also attached as Exhibit 99.2 slides that Emergent presented at the 39th Annual J.P. Morgan Healthcare Conference titled, "Emergent BioSolutions Corporate Update" (the "1/11/2021 J.P. Morgan Conference Slides"). The slides portrayed Emergent as a company with steadily increasing revenues and adjusted EBITDA, including through preliminary 2020 financial results and 2021 forecasts, stating Emergent was "*poised for continued growth.*" The slides further stated that Emergent's "*CDMO holds a unique position in the landscape*," "Emergent combines the best of both worlds: the *customer focus and capacity of a pure play CDMO*," and Emergent "*[has] the technology and facilities to bring products all the way from concept to market*." The slides touted "Emergent's CDMO formula for growth" which included an "*Enterprise team of more than 1400 technical and quality compliance professionals*."

176. The misrepresentations and omissions in the 1/10/2021 Press Release and 1/11/2021 J.P. Morgan Conference Slides, as alleged in the preceding paragraphs, were materially false and misleading because, *inter alia*, of the reasons alleged in ¶219, *infra*.

177. On January 12, 2021, Wells Fargo had a virtual meeting with Emergent (the "1/12/2021 Wells Fargo Meeting") during which Defendant Kramer touted that "*depending on how the rollout of COVID-19 vaccines progresses over the next year, it is possible that Emergent will continue to support vaccine manufacturing throughout 2022.*"

178. The misrepresentations and omissions in the 1/12/2021 Wells Fargo Meeting, as alleged in the preceding paragraphs, were materially false and misleading because, *inter alia*, of the reasons alleged in ¶219, *infra*.

179.    Emergent announced its Q4 2020 quarterly and full year 2020 results in a series of public statements on February 18, 2021 and February 19, 2021, which discussed Emergent's strategy, including the growth in its CDMO services.

(a)    On February 18, 2021, Emergent issued an earnings press release (the "2/18/2021 Earnings Release"), which was filed with the SEC on February 18, 2021 as Exhibit 99 to Form 8-K signed by Defendant Lindahl (the "2/18/2021 Form 8-K"), announcing its financial and operating results for the fourth quarter and year ended December 31, 2020 and reaffirming its full year 2021 guidance.  In it, Defendant Kramer is quoted as stating, "***Emergent's financial and operational performance in 2020 reflects the impact we are making in addressing the growing public health threat landscape and meeting our mission to protect and enhance the lives of patients***."  Defendant Kramer further stated, "***We look forward to continuing to execute on our strategy with…contract development and manufacturing service***," and that, among other things, "***public-private partnership opportunities position us to remain leaders in the marker and create long-term shareholder value.***"

(b)    Also on February 18, 2021, Emergent held an earnings call with analysts and investors in conjunction with its fourth quarter 2020 and full year 2020 financial results (the "2/18/2021 Earnings Call), on which Defendants Kramer, Lindahl, and Husain spoke.  During the 2/18/2021 Earnings Call, Defendant Kramer touted that Emergent was "***playing a critical role*** in the fight against COVID-19 with the ***development and manufacturing*** of clinical and commercial materials across our three CDMO service pillars for a variety of customers, most notably Johnson & Johnson, AstraZeneca . . . ."  Defendant Kramer stated, "***Biologics Manufacturing is an exacting process that requires specialized equipment, disciplined processes and a highly trained staff…service providers must have durable, scalable and compliant manufacturing***

*infrastructures*.  *Emergent has been able to thrive in this environment*."  In prepared remarks, Defendant Lindahl stated that "significant growth in CDMO services [and] revenue…reflect the continuing contribution from the approximately $1.5 billion of initial contract value related to COVID-19 secured last year, most notably our landmark Public Private CDMO partnership with BARDA in support of vaccine manufacturing, as well as the tech transfer and commercial supply agreements with Johnson & Johnson and AstraZeneca."  In response to analyst inquiry, Defendant Kramer stated, "*[s]pecific to J&J, you know what they said in terms of their short-term goal is to provide as many as 100 million doses to the U.S. government in the first half of 2021 and we're right on schedule to support that*."

(c)    Emergent published slides in connection with its fourth quarter and full year 2020 Earnings Call titled, "4Q and FY2020 Investor Update" (the "2/18/2021 Earnings Call Slides") that was posted to its website, which touted Emergent's "Exceptional financial results in 2020" and that it was "*Poised for continued growth in 2021*" and "*expect[ed] CDMO to be significant contributor to future growth and expansion*."  The slides also stated that "*owning & controlling manufacturing [was] a strategic imperative*."

(d)    On February 19, 2021, Emergent filed a Form 10-K with the SEC for the fourth quarter of 2020 and full year 2020 (the "2020 10-K"), signed and SOX-certified by Defendants Kramer and Lindahl.  The 2020 10-K touted Emergent's "*Core Business*" which included its "*growing CDMO services*" that it referred to as "*quality development and manufacturing services*."  It also stated that Emergent's *CDMO business unit and business revenues were based on* "*established development and manufacturing infrastructure, technology platforms and expertise, as well as continuing capital expenditure projects to expand our capabilities*" and that "*[d]uring 2020, [its] revenues have increased due largely to the contribution of CDMO*

*arrangements with industry and government customers to combat the COVID-19 pandemic*." The 2020 10-K also touted Emergent's government relationships in its profitability model, stating "*we will continue to leverage our specialized government relations and contracting operations to negotiate long-term, profitable procurement* and development agreements that enable us to protect and enhance lives around the world and that *help ensure sustainability of our business*." The 2020 10-K highlighted Emergent's three "largest CDMO arrangements awarded during 2020" - all COVID-19 vaccine manufacturing agreements - and referenced them as "*Highlights and Business Accomplishments for 2020*" which included: the $628 million task order awarded by the HHS under Operation Warp Speed; the five-year large-scale drug substance manufacturing agreement for J&J's lead COVID-19 vaccine candidate, valued at approximately $480 for the first two years that followed the initial agreement, valued at approximately $135 million to provide CDMO services; and the three-year large-scale drug substance manufacturing agreement for AstraZeneca's COVID-19 vaccine candidate, valued at approximately $174 million that followed the initial agreement, valued at approximately $87 million to provide CDMO services.

180.    The misrepresentations and omissions in the 2/18/2021 Earnings Release, 2/18/2021 Earnings Call, 2/18/2021 Earnings Call Slides and 2020 10-K, as alleged in the preceding paragraph, were materially false and misleading because, *inter alia*, of the reasons alleged in ¶219, *infra*.

181.    On March 1, 2021, Forbes published an article, titled, "Little-Known Publicly Traded Company Given Massive Deal to Manufacture One-Shot Covid-19 Vaccine," reporting that the FDA authorized J&J's COVID-19 vaccine for emergency use (the "3/1/2021 Forbes Article").  In it, Defendant Kramer touted Emergent's Bayview facility and its ability to produce the J&J vaccine pursuant to Emergent's contract with J&J for CDMO services calling it an

"*advanced development and manufacturing facility*" and stating that Emergent is "*uniquely qualified and positioned*."

182.    The misrepresentations and omissions in the 3/1/2021 Forbes Article, as alleged in the preceding paragraph, were materially false and misleading because, *inter alia*, of the reasons alleged in ¶219, *infra*.

183.    Also on March 1, 2021, Emergent presented at the J.P. Morgan Global Leveraged Finance and High Yield Conference during which Emergent presented slides that were posted to its website (the "3/1/2021 Conference Slides"), which touted that Emergent's 9 CDMO services add "growth opportunities" and stated that its CDMO services COVID-19 partnerships include drug substance services out of its Bayview facilities with J&J, AstraZeneca, and partnership with the U.S. government under Operation Warp Speed.

184.    The misrepresentations and omissions in the 3/1/2021 Conference Slides, as alleged in the preceding paragraph, were materially false and misleading because, *inter alia*, of the reasons alleged in ¶219, *infra*.

185.    In an interview on March 3, 2021 for CNBC's Mad Money posted on CNBC's website on March 4, 2021 under the title "Emergent BioSolutions Says It Can Make 1 billion COVID Vaccine Doses Annually" (the "3/3/2021 CNBC Interview"), Defendant Kramer touted Emergent's Bayview facility infrastructure in being able to produce 100 million doses of J&J's COVID-19 vaccine stating, "*we're now at the point where we have this infrastructure in place and we're producing on a daily basis, 24/7, both AZ and the J&J products and we are operating at a level where our capacity is well in excess of 1 billion doses annually for those products.*" Defendant Kramer also stated, "*because of the large-scale infrastructure we put in place, we*

*were able to take on J&J and AstraZeneca's products…and be able to scale it at a very significant level*."

186.    The misrepresentations and omissions in the 3/3/2021 CNBC Interview, as alleged in the preceding paragraph, were materially false and misleading because, *inter alia*, of the reasons alleged in ¶219, *infra*.

187.    On April 1, 2021, Emergent issued a press release (the "4/1/2021 Press Release), which was filed with the SEC on April 1, 2021 as Exhibit 99 to Form 8-K signed by Defendant Lindahl (the "4/1/2021 Form 8-K").  In response to news reporting from *The New York Times* and other sources that 15 million doses of COVID-19 vaccine had to be disposed of because of cross-contamination of the J&J and AstraZeneca COVID-19 vaccines at the Bayview facility and that Emergent had safety citations prior to the COVID-19 vaccine errors at Bayview, Emergent stopped short of admitting cross-contamination occurred and instead announced in the 4/1/2021 Press Release only that "*a single batch of drug substance was identified that did not meet specifications and our rigorous quality standards*." and that Emergent "*isolated this batch and it will be disposed of properly*."  Defendants continued to assure investors that "*safety and quality are [Emergent's] top priorities*," the "*Bayview facility has been designed and validated to meet all current Good Manufacturing Practices*," "*there are rigorous quality checks throughout [Emergent's] vaccine manufacturing processes*" that those "*quality control systems worked as designed,*" and "*[d]iscarding a batch of bulk drug substance…does occasionally happen during vaccine manufacturing*."  In the 4/1/2021 Press Release, Defendants further assured investors that "*[w]e continue to manufacture in support of our customers and the U.S. government, and we remain confident in our ability to meet the FDA requirements*."

188.    The misrepresentations and omissions in the 4/1/2021 Press Release, as alleged in the preceding paragraph, were materially false and misleading because, *inter alia*, of the reasons alleged in ¶219, *infra*.

189.    Also on April 1, 2021, Defendant Kramer was interviewed on CNBC's Closing Bell for an article entitled, "Emergent BioSolutions CEO on the Vaccine Factory Mix-up" (the "4/1/2021 CNBC Interview"), during which, he denied that there was a mix-up of the J&J and AstraZeneca vaccines at the Bayview facility, despite the host noting that multiple news sources were reporting otherwise.

> Tyrell: …  But, how did something like this happen? Are there really adequate quality controls in place there at the facility?  You know a lot of folks we talk with say it's really not something that should happen – that an ingredient from one vaccine should be contaminating another vaccine in the plant.
>
> Kramer: And just to be clear, Meg, ***it isn't the case or wasn't the case where an ingredient from one vaccine contaminated or impacted the other.  It was more simply the fact that a one production run, one batch of product was determined to be inconsistent with our quality specifications of Emergent and J&J and subsequently, that batch was pulled aside and will not be processed further.***
>
> Tyrell: So, there wasn't a mix-up with the AstraZeneca vaccine is what you're saying because there's reporting from NBC, the New York Times, Washington Post citing senior administration officials saying that there was basically a contamination with the AstraZeneca vaccine of the J&J vaccine.  That's not what happened?
>
> Kramer: ***So, it was again, an out of specification result for one batch of product. And to put it in proper context, Meg, for your viewers, this was one of many other batches of product that has been successfully manufactured in accordance with our and J&J's product specifications.  And, again, it's unfortunate that it happened, but it's one of many batches that had been successfully manufactured***.

During the interview, Defendant Kramer touted the manufacturing capabilities at Bayview, stating,

Emergent ***"stood up a dedicated, durable manufacturing process for the J&J product as well as for AstraZeneca" and "[made] sure that we have durable quality systems in place***."  Defendant

Kramer also assured investors that there would be *"eventual EUA approval for [the] Bayview facility for J&J."*

190.    The misrepresentations and omissions in the 4/1/2021 CNBC Interview, as alleged in the preceding paragraph, were materially false and misleading because, *inter alia*, of the reasons alleged in ¶219, *infra*.

191.    On April 4, 2021, Emergent issued a press release (the "4/4/2021 Press Release), which was filed with the SEC on April 5, 2021, as Exhibit 99 to Form 8-K signed by Defendant Lindahl (the "4/5/2021 Form 8-K").  In response to an announcement by J&J that it would take full control of the production of its COVID-19 vaccine at Bayview and announcements by AstraZeneca and federal health officials that production of AstraZeneca's COVID-19 vaccine would be relocated with help from Biden Administration so that the facility could focus only on J&J's vaccine, Emergent assured investors in the 4/4/2021 Press Release that "*Emergent continues to own the facility and perform its contracts consistent with its obligations to all of its customers and in compliance with the regulatory standards promulgated by the FDA and all other applicable regulatory authorities*."  Emergent further assured investors that the "*rampdown of manufacturing for AstraZeneca's COVID-19 vaccine bulk drug substance" was "mutually agreed*."    Emergent also stated that it "*continues to be on track with its manufacturing agreements related to COVID-19 vaccines and confirmed that there are no changes to its financial guidance for 2021*."  The 4/4/2021 Press Release further assured investors stating that Emergent "*received a contract modification to increase the original task order by $23 million from BARDA [which] will be used for the purchase of biologics manufacturing equipment specific to Johnson & Johnson's COVID-19 vaccine for the potential expansion of manufacturing of that bulk drug substance into a third suite of Emergent's Baltimore Bayview*

*facility*."  Defendant Kramer is quoted as stating, "*[t]his unique public-private partnership has been a key element in our ability to quickly scale up to produce COVID-19 vaccines at a current rate of more than one billion dose-equivalents annually*."

192.    The misrepresentations and omissions in the 4/4/2021 Press Release, as alleged in the preceding paragraph, were materially false and misleading because, *inter alia*, of the reasons alleged in ¶219, *infra*.

193.    Investors and analysts picked up the disconnect between media reports of contamination at the Bayview facility and Emergent's account of vaccine production at the facility. For example, on April 5, 2021, a Guggenheim analyst report noted Defendant Kramer's 4/1/2021 CNBC Interview statements and the disconnect between the statements and media reports of contamination and chalked it up to the situation being highly politicized and nevertheless, viewed Emergent's overall CDMO business as still on track for positive long-term growth.  Also on April 5, 2021, J.P. Morgan analysts issued a report (the "4/5/2021 J.P. Morgan Analyst Report") in which they stated that they had discussions with Emergent about the ingredient contamination cited in media reports, and Emergent stated that the media reports are a "'mischaracterization' of the situation."

194.    The misrepresentations and omissions in the 4/5/2021 J.P. Morgan Analyst Report, as alleged in the preceding paragraph, were materially false and misleading because, *inter alia*, of the reasons alleged in ¶219, *infra*.

195.    On April 14, 2021, Defendant Kramer wrote an op-ed for the *Baltimore Sun* titled "'Confrontational' coverage of vaccine maker puts a target on 'people doing good'" (the "4/14/2021 Kramer Op-Ed").  Kramer struck a defiant and defensive tone, lauding his own "high tolerance" for the demands of being a CEO, "like spending endless hours trying to explain

complicated manufacturing processes to reporters who just learned we existed…[o]r battling back the misinformation that is used to find fault with the people who are the spine of our nation's world-leading response to this pandemic," before claiming that "people in our country, or at least some in our media, tend to put a target on the backs of people doing good," that "the attention grew confrontational," and that "it pains me to watch how this negative attention affects our workforce."  He continued, "***Our Bayview facility*** in Baltimore exists and ***is now ready to produce 1 billion vaccines a year to fight COVID-19*** precisely because of the collaboration with the Obama White House following the H1N1 pandemic.  ***No other company can say that***."  He wrote, "So far, our collaboration with President Biden and his team has been exceptional.  We share the same goal of getting the highest number of vaccine doses ***safely manufactured*** in the shortest amount of time and then administered to the highest amount of people."  Addressing the contamination of J&J doses, as discussed in §V.F.4. *infra*, Kramer wrote, "We recently had a ***setback*** that was not something we ever like to see.  During ***our rigorous quality control process***, ***we found*** a batch of Johnson & Johnson vaccines ***that did not meet specification***.  In ***typical pharmaceutical manufacturing***, ***this does occasionally happen***."  He added, "There's also an attack on ***our quality systems and how they are regulated***.  The FDA demands ***continuous improvements*** of all pharmaceutical manufacturers, and this makes our country's drug manufacturing systems the best in the world.  ***We're no exception***.  ***The FDA has been tracking our progress every step of the way as we have ramped up COVID-19 vaccine manufacturing*** with unprecedented speed."

196.    The misrepresentations and omissions in the 4/14/2021 Kramer Op-Ed, as alleged in the preceding paragraph, were materially false and misleading because, *inter alia*, of the reasons alleged in ¶219, *infra*.

197.    On April 21, 2021, Emergent issued a press release (the "4/21/2021 Press Release),

which was filed with the SEC on April 21, 2021, as Exhibit 99 to Form 8-K signed by Defendant

Lindahl (the "4/21/2021 Form 8-K"), in connection with the FDA's inspection of the Bayview

facility and the issuance of Form FDA 483.  The 4/21/2021 Press Release stated "[t]he FDA's

feedback will help us continue to improve and strengthen the supply chain for Johnson &

Johnson's COVID-19 vaccine.  While we are never satisfied to see ***shortcomings in our***

***manufacturing facilities or process***, ***they are correctable and we will take swift action to remedy***

***them***."  The 4/21/2021 Press Release further stated ***that Emergent's workforce in Baltimore***

***worked "24/7 to ensure vaccines will be produced with the highest quality and be quickly***

***available***."

198.    The misrepresentations and omissions in the 4/21/2021 Press Release, as alleged in

the preceding paragraph, were materially false and misleading because, *inter alia*, of the reasons

alleged in ¶219, *infra*.

199.    Emergent announced its Q1 2021 quarterly results in a series of public statements

on April 29, 2021, and April 30, 2021.

(a)    On April 29, 2021, Emergent issued an earnings press release (the "4/29/2021

Earnings Release"), which was filed with the SEC on April 29, 2021, as Exhibit 99.1 to Form 8-

K signed by Defendant Lindahl (the "4/29/2021 Form 8-K"), announcing its financial and

operating results for the three months ended March 31, 2021.  While the 4/29/2021 Earnings

Release stated that revised considerations for the revised financial forecast for 2021 included that

CDMO services revenues were reduced primarily due to the hold of certain COVID-19 vaccine

bulk drug substance lots and commitment not to initiate new manufacturing at Bayview pending

further review by the FDA, the 4/29/2021 Earnings Release touted the ***increased Q1 2021 revenue***

*from CDMO as compared to Q1 2020 which was "largely due to the public-private partnership with BARDA to support the USG's efforts to address the COVID-19 pandemic*," and that there would be "*ongoing investments in capacity and capability expansions in support of [Emergent's] CDMO services business and product portfolio."* Defendant Kramer specifically touted "the strength of [Emergent's] strategy" and that "We are proud to be resuming production of COVID-19 vaccine batches following additional reviews and collaboration with the FDA and our manufacturing partner."

(b) Also on April 29, 2021, Emergent held an earnings call with analysts and investors in conjunction with its first quarter 2021 financial results (the "4/29/2021 Earnings Call), on which Defendants Kramer and Lindahl spoke. During the 4/29/2021 Earnings Call, Defendant Kramer discussed the cross-contamination at Bayview, the hold of COVID-19 vaccine bulk drug substance lots pending further review by the FDA and stated that "[f]or things that we should have done differently, my leadership team and I bear full accountability." Nevertheless, Defendant Kramer stated, "*Emergent has been steadfastly committed to quality*." Defendant Kramer also assured analysts and investors that Emergent was committed to resolving the issues at Bayview identified by the FDA stating, "*you have my commitment that we're going to do everything we can to resolve these issues quickly and as safely as possible*," *Bayview was "capable of producing hundreds of millions of COVID-19 vaccines*," and he was "*hopeful that [Emergent] can soon return to producing the tens of millions of doses per month*." In prepared remarks, Defendant Lindahl attributed "significant growth in CDMO services" and increased revenues primarily to the "*continuing contribution from the services [Emergent was] providing to [its] government and innovator partners in response to the COVID-19 pandemic*."

(c)    The 4/29/2021 Form 8-K also attached as Exhibit 99.2 slides that were presented in connection with Emergent's first quarter 2021 Earnings Call titled, "1Q21 Investor Update" (the "4/29/2021 Earnings Call Slides"), in which Defendants purportedly took "full responsibility" for the cross-contamination at the Bayview site, yet continued to falsely reassure investors that Emergent had always been committed to quality and that issues with CDMO services for COVID-19 vaccine production at Bayview would be resolved.  The slides stated, "*[s]ince our founding, we have had a steadfast commitment to quality*," *Emergent "rapidly scale[d] up Bayview capacity*," *Emergent is "committed to resolving all issues safely and quickly*," *Emergent "worked transparently with our government partners and fellow innovators*," and Emergent *was "taking immediate step to improve [its] operations.*"  The 4/29/2021 Earnings Call Slides stated that key considerations for the revised financial forecast for 2021 included that CDMO services revenues were reduced primarily due to the hold of certain COVID-19 vaccine bulk drug substance lots and commitment not to initiate new manufacturing at Bayview pending further review by the FDA, yet in it, Defendants assured investors that there would be "*ongoing investments in capacity and capability expansions in support of [Emergent's] CDMO services business and product portfolio,*" *Emergent had "dedicated employees,*" *and Emergent "remaine[ed] confident in future growth.*"

(d)    On April 30, 2021, Emergent filed a Form 10-Q with the SEC for the first quarter of 2021 (the "Q1 2021 10-Q"), signed and SOX-certified by Defendants Kramer and Lindahl.  It touted that Emergent provides CDMO services for large pharmaceutical and biotechnology organizations as well as the US government and non-governmental organizations.  The Q1 2021 10-Q further stated that Emergent's *CDMO business unit and business revenues were based on* "*established development and manufacturing infrastructure, technology platforms and*

*expertise.*"  The Q1 2021 10-Q touted the *increase in contract development and manufacturing services for the first quarter was "due to the public-private partnership with BARDA and arrangements with innovators to address the COVID-19 pandemic*."

200.    The misrepresentations and omissions in the 4/29/2021 Earnings Release, 4/29/2021 Earnings Call, 4/29/2021 Earnings Call Slides and Q1 2021 10-Q, as alleged in the preceding paragraph, were materially false and misleading because, *inter alia*, of the reasons alleged in ¶219, *infra*.

201.    On April 30, 2021, Emergent made a 52-page submission to the FDA (the "4/30/2021 Emergent FDA 483 Response"), consisting of a five-page letter and an attached 47-page response, which together responded to the 4/21/2021 FDA 483 Report (discussed in §V.E.2., *supra*) and were posted in redacted form on the FDA's website.[15]  On information and belief, for the reasons stated regarding the 5/8/2020 Emergent FDA 483 Response (discussed *supra*) and the additional reasons that the 4/21/2021 FDA 483 Report concerned vital topics related to contamination of the J&J vaccine at the Bayview facility that jeopardized $1.5 billion in total contracts with J&J, AstraZeneca, and Emergent's largest customer, the U.S. government, the 4/30/2021 Emergent FDA 483 Response was authorized by Defendants Kramer, Lindahl, and Husain.  The 4/30/2021 Emergent FDA 483 Response outlined Emergent's purported actions to address Bayview facility issues and its responses to the FDA's nine Observations set forth in the 4/21/2021 FDA 483 Report.[16]

---

[15]    The exact timing of the public posting of the full (redacted) 4/30/2021 Emergent FDA 483 Response is not clear, but on information and belief, it occurred after April 30, 2021 (the date of the response itself) and possibly after May 19, 2021 (the date of the 5/19/2021 Congressional Memo that summarized parts of its contents), because the 5/19/2021 Congressional Memo said, *inter alia*, "Emergent's response to FDA's April 20, 2021, inspection report, *a previously undisclosed document*, shows that the company admitted to some of the failures and committed to remediation" and "The Committees *received a copy* of Emergent's April 30, 2021, response to FDA"

[16]    Discovery into the unredacted version of the 4/30/2021 Emergent FDA 483 Response, supporting documents, and related communications would support the allegations and claims pled herein.  Among other things, it described in §V.F.4., *infra*, it contained disclosures regarding the contamination of the J&J vaccine batch and its investigatory

(a)     The letter, signed by Dino Muzzin, SVP Manufacturing and Interim General Manager, Emergent Manufacturing Operations Baltimore, LLC, stated, "***Emergent…knows that it must do everything within its power to ensure appropriate controls are in place to assure product quality***.   ***We're doing just that***."   It stated, "Emergent is establishing a Quality Enhancement Plan" (QEP) and said it would "***Implement enhanced contamination controls at the Bayview facility*** prior to initiating new production…[that] are based on a ***comprehensive assessment of the site operations***," "***Institute effective interim controls***, including Emergent corporate quality, [J&J], and independent third-party oversight and monitoring, ***to ensure compliance*** while longer-term improvements are developed and implemented," and "***Guide the development and execution of continuous improvement initiatives*** to ensure sustainable compliance."   It added, "***Emergent believes that the implementation of the activities described below fully addresses the 483 observations and ensures that adequate controls are in place to support resumption of new manufacturing at the Bayview facility***…."   It stated that Emergent had stopped manufacturing COVID-19 vaccine drug substance for AstraZeneca and decommissioned the Bayview facility suite previously used for AstraZeneca, "thereby ***eliminating the risk of cross-contamination*** during production going forward."   It also touted a list of ***QEP enhancements*** – redacted from the copy of the letter posted on the FDA website – that "***will further address potential routes of contamination from other sources***."   It also touted ***heavy collaboration with J&J***, with personnel from both companies working together, including subject matter experts (SMEs) to lead workstreams, program leaders to review remediation activities and escalate issues as needed, and a Steering Committee of quality and operations leadership to add "accountability and oversight."   It also touted the QEP's "Sustainable Compliance Plan, detailing

---

steps that prompted the FDA's inspection of the Bayview facility and its issuance of the 4/21/2021 FDA 483 Report.

ongoing actions to maintain a robust culture of quality at the Bayview facility" "through consistent evaluation and improvement of quality activities" and "consistent adoption of industry best practices in the company's manufacturing and quality operations," as well as the hiring of several senior quality assurance professionals.  It concludes, "The QEP targets *efficient, effective, verifiable measures* that will provide *confidence* in Emergent's drug substance and lays the foundation for continuous improvement. *Emergent is confident that the QEP and associated corrective and preventive actions* (CAPA), described in detail in the attached 483 response, will assure that the Bayview facility is *<u>continuously operated</u> in a state of control*.

(b)    The 4/30/2021 Emergent FDA 483 Response set forth its proposed Quality Enhancement Plan (QEP) and expressed confidence that it would meet U.S. government standards and permit Emergent to resume J&J COVID-19 vaccine manufacturing.  It stated, "Emergent's *Bayview facility <u>stands ready</u> to produce drug substance* for more than [*redacted*] urgently needed COVID-19 vaccines a year…" and "Emergent *is committed to doing so in a way that meets Emergent's and FDA's quality and compliance expectations*."  It said, Emergent has initiated a series of immediate actions to address the inspectional observations, enhance operations at the Bayview facility, and minimize the potential for contamination or cross-contamination going forward.  *These actions*, developed and implemented with the support of J&J, *address FDA's concerns, as documented on the [Form] 483, and will provide assurance of the quality of the Bayview facility's drug substance*."  It added, "Emergent is working around the clock with J&J subject matter experts and third-party cGMP consultants to implement the actions required. *Emergent is confident that these actions will minimize the chances of contamination in the Bayview facility in a way that meets or exceed industry standard*."  It said, "*Emergent believes that* the *implementation of these [QEP] actions ensures that the Bayview facility is <u>continuously</u>*

*operating* *in* *state* *of* *control* and *supports* *the* *authorization* *of* *the* *Bayview* *facility* *to* *manufacture drug substance for the J&J vaccine* under J&J's existing EUA."

(c)    <u>Response to Observation 1</u> ("Failure to conduct thorough investigations into unexplained discrepancies.").  The 4/30/2021 Emergent FDA 483 Response states, "***Emergent understands the importance of thoroughly investigating deviations, including identifying attributable root causes, where possible***."  It touted the purported strength of existing procedures, SOP000261, *Deviation Investigation Process*, and SOP001881, *Root Cause Analysis*, claiming they "require[ ] that any unexplained discrepancies is ***thoroughly investigated***, ***root cause(s) determined***, where possible, and ***effective corrective and preventive action (CAPA) implemented***"; "require[ ] QA to perform the initial assessment of event details to determine the deviation criticality" and "***major or critical" deviations must be investigated in a root cause analysis*** and "***critical" deviations are "escalated to the Site Head of Quality***"; and that subject matter experts trained in these SOPS perform Bayview facility investigations with QA oversight and approval.  It highlighted other procedures purportedly initiated at the Bayview facility before the J&J contamination, like SOP044111, *Global GMP Deviation Management Procedure*, and SOP044112, *Investigation and Root Cause Analysis Procedure for GMP Deviations*, which provide "***detailed instructions***" for investigations that can only be done by "***qualified investigators***" with "***Emergent corporate quality-developed training***."  It also cited a new "global procedure relating to GxP CAPA management: SOP044131, *CAPA Management Procedure*…[that]…will ***enhance processes for implementing and ensuring effectiveness of CAPAs*** across the company."  It said the Bayview facility would receive instructor-led training on these procedures by a [*redacted*] date certain, and "***Emergent is confident that these procedures and accompanying training will strengthen site investigation practices, including root cause***

*analysis*." It added that all new J&J drug substance batches would undergo third-party certification and that a variety of (heavily redacted) "contamination prevention controls" would be implemented regarding tasks such as raw materials handling, viral stock handling, and gowning. It stated, "By expanding the scope of the quality investigation, ***Emergent is confident that potential routes of contamination and cross-contamination have been evaluated*** and ***appropriate actions to address such routes are being implemented***. ***Emergent is confident that these actions further reduce any potential risk of contamination at the Bayview facility***."

(d)    <u>Response to Observation 2</u> ("The building used for the manufacture of the client [*redacted*] viral vaccine drug substance and client [*redacted*] viral vaccine drug substance is not maintained in a clean and sanitary condition.") As the 4/30/2021 Emergent FDA 483 Response concedes, "***Viral containment is of paramount importance***." It adds, "***Emergent understands the importance of keeping manufacturing areas in clean and sanitary conditions and maintaining the Bayview facility in a good state of repair***." It said that "Emergent notes that ***the facility maintenance program is designed to ensure that drug substances are manufactured in a clean and sanitary environment***," highlighting that "***the Bayview facility has established procedures***" like SOP000392, *Cleaning Program for* [*redacted*], and SOP044245, *Warehouse Cleaning Procedure*. It states that in addition to "***significant enhancements***" to these procedures, Emergent "performed ***facility walkthroughs*** to identify ways in which waste flow can be enhanced, ***facility modifications*** to improve the flow of waste, ***training*** on proper waste handling, ***increased documentation*** for each step in the waste handling process, and ***second-person verification*** for each step in the waste handling process." It added, "Emergent is further strengthening the facility maintenance program by ***revising SOP027886***, *Quality on the Floor Program*, to include ***routine checks throughout the facility***," including the warehouse and QC

laboratory, **with repairs tracked** through a logbook **and verified** by site QA, and "**site leadership will perform routine checks** to ensure accountability and oversight."  Also, "[A]s part of the QEP, **Emergent is upgrading the physical facility and site maintenance and cleaning practices and procedures**," including "**enhanced cleaning procedures**" that will be "**routinely monitored** through increased oversight, including by Emergent QA, J&J SMEs, and [*redacted*]."  It concluded, "**Emergent is confident that the facility is maintained in an adequate state of control and does not present a risk of product contamination**."

(e)    <u>Response to Observation 3</u> ("The building used for the manufacture of the client [*redacted*] viral vaccine drug substance and client [*redacted*] viral vaccine drug substance is not of suitable size, design, and location to facilitate cleaning, maintenance, and proper operations."). The 4/30/2021 Emergent FDA 483 Response stated, "The Emergent **Bayview facility is designed to have adequate space** for the orderly placement of equipment and materials **to prevent mix-ups** between different components, drug product containers, closures, labeling, in-process materials, or drug products, and **to prevent contamination**."  It said that "the company **will strengthen the Bayview facility's biowaste handling process**," governed by existing "SOP044335, *Removal of Special Medical Waste from Manufacturing Areas*," which "requires waste to be bagged and removed without decontamination" and personnel to "follow a defined exit pathway to remove the waste from the facility" and perform cleaning "immediately following waste removal."

(f)    <u>Response to Observation 4</u> ("*Written production and process control procedures to prevent cross-contamination are not followed in the execution of production and process control functions and are not documented at the time of performance.*').  The 4/30/2021 Emergent FDA 483 Response stated, "**Emergent understands the importance of following and documenting adherence to written production and process control procedures to prevent cross-contamination**

*in the execution of production and process control functions*." It added, citing the company's existing procedures, "*Emergent has established robust requirements relating to the flow of personnel and personnel gowning practices to prevent contamination and cross-contamination*." It touted "a number of *procedural, training, and process flow enhancements to prevent contamination*," including "[i]dentifying, confirming, and strengthening the process and waste flows across the facility" under revised SOP001516, "defin[ing] and enforce[ing] gowning and de-gowning requirements," permitting pallets and dollies and thus "avoiding contact with floor surfaces" under Change Control 2100006389, and giving "training to operators across the facility." It added that effectiveness of the enhancements would be "continuously monitored through Emergent's enhanced QA on the floor program and through the company's implementation of third-party oversight" and "periodic effectiveness checks." It concluded, "*Emergent is confident that these actions will prevent recurrence of the observations*" in the Form 483.

(g)     Response to Observation 5 ("*The components, product containers and/or closures were not handled and/or stored in a manner to prevent contamination.*"). The 4/30/2021 Emergent FDA 483 Response stated, "*Emergent recognizes the importance of handling and storing components, product containers, and closures in a manner to prevent contamination*." Beyond decommissioning the AstraZeneca vaccine production work, it also touted "a comprehensive assessment of the Bayview facility's material handling practices" and "*revised flows that ensure that waste does not cross paths with materials or personnel involved in manufacturing operations*." It said, "Emergent will *evaluate materials in the Bayview facility* according to an approved protocol *to determine if they must be discarded* based on risk of exposure to contamination, *or* if they *can be cleaned and decontaminated*." It added, "At the operator level, Emergent has also initiated several actions to strengthen material handling practices at the Bayview

facility," including "*role-specific training* modules to ensure that operators engaged in similar critical manufacturing activities—e.g., raw material handling—have received appropriate training to perform such activity." It said, "Emergent will *implement enhanced Quality Assurance* on the floor *and third-party oversight* to *continuously monitor* the effectiveness of the implemented enhancements." It concluded, "*Emergent is confident that this enhanced training program will prevent recurrence of the observations*" in the Form 483.

(h)    Response to Observation 6 ("*Written procedures designed to assure that the drug substances manufactured in the facility have the identity, strength, quality, and purity they purport or are represented to possess are inadequate.*"). The 4/30/2021 Emergent FDA 483 Response stated, "*Emergent understands the need for establishing and following robust written procedures designed to assure that the drug substances manufactured in the facility have the identity, strength, quality, and purity they purport or are represented to possess.*" It said, "Due to the nature of the drug substance manufacturing activities performed at the Bayview facility, such written procedures include *a robust cross-contamination risk mitigation plan* that describes the flow of processes, people, and materials into and out of the facility and defines the risk mitigation steps required to reduce the risk of cross-contamination at each step" and "an alternative biowaste removal process." It said that given the Form 493 observations, "Emergent is *strengthening the Bayview facility's waste management and decontamination procedures*," including SOP000388, *Operation of the Decontamination*, FRM042531, *Decontamination [redacted] Testing Form*, BOP040102, Decontamination [redacted] *Testing Program*, and SOP044335, *Removal of Special Medical Waste from Manufacturing Areas*, including by describing how waste must be placed, stored, decontaminated, and removed from the facility, with "second person verification" of each step and compliance "monitored through Emergent's

enhanced quality oversight program, including Emergent QA on the floor and third-party oversight."

(i)     Response to Observation 7 ("*Employees were not trained in the particular operation that they performed and/or in CGMPs related to their job function*.").  The 4/30/2021 Emergent FDA 483 Response stated, "***Emergent understands the critical importance of having appropriate training for GMP personnel and of ensuring that operators are trained on the necessity of fully understanding and adhering to established procedures***."  It said, "Emergent will ***enhance training opportunities*** and requirements for site personnel, with a focus on ***ensuring employees' understanding of contamination containment***" and would "provide ***comprehensive training to facility personnel***, to ensure that, upon resumption of operation, site personnel will be prepared to execute their roles in a consistently GMP-compliant manner."  It added, "Emergent will develop ***role-based training*** curricula, again created and approved by SMEs, and train cohorts of cross-functional employees who require knowledge of that curriculum" to be overseen by third parties.  To address the FDA's Form 483 observations, Emergent will conduct "***training on GMP principles, microbial contamination prevention, and viral containment***" and "specialized additional training specific to the issues identified in the 483 and will include examples from the April 2021 inspection. ***Education on viral containment*** will be included in annual training for site personnel."

(j)     Response to Observation 8 ("*Equipment used is not of adequate size to facilitate operations for its intended use or for cleaning and maintenance.*").  The 4/30/2021 Emergent FDA 483 Response stated, "***Emergent fully recognizes the importance of ensuring that equipment is of adequate size to facilitate operations for its intended use or for cleaning and maintenance***."  The heavily redacted response referenced equipment purchases under Change Control 210006400

and Change Control 2100006142 to increase storage capacity, and a revision to SOP000336, *Operation and Cleaning of* [*redacted*].  It concluded, "***Emergent is confident***" that those steps "and the revision of SOP000336 will address the overcrowding issues" noted in the Form 483.

(k)    Response to Observation 9 ("*Equipment and/or utensils are not cleaned and maintained at appropriate intervals to prevent contamination that would alter the safety, identity, strength, quality or purity of the drug substance.*").  The 4/30/2021 Emergent FDA 483 Response stated, "***Emergent recognizes the importance of cleaning and maintaining equipment and utensils at appropriate intervals to prevent contamination that could alter the safety, identity, strength, quality or purity of a drug substance***.'  It said that SOP001518, which governed maintenance, inspecting, cleaning, and disposal of equipment and utensils, would be enhanced to require visual inspections documented in logbooks, "monitored through Emergent's enhanced quality oversight program, including Q! on the floor and third-party oversight."  It concluded, "***Emergent is confident that the CAPAs described above will strengthen the site's cleaning and contamination mitigation program and will prevent recurrence of the inspectional observation***" in the Form 483.

202.    The misrepresentations and omissions in the 4/30/2021 Emergent FDA 483 Response, as alleged in the preceding paragraph, were materially false and misleading because, *inter alia*, of the reasons alleged in ¶219, *infra*.

203.    On May 12, 2021, Emergent issued a press release (the "5/12/2021 Press Release"), which was filed with the SEC on May 12, 2021 as Exhibit 99 to Form 8-K signed by Defendant Lindahl (the "5/12/2021 Form 8-K"), announcing that Emergent responded to the FDA's observations related to its Bayview facility inspection with a comprehensive quality enhancement plan and assured investors that Emergent "***started making improvements and [was] fully***

*committed to making the necessary short- and long-term enhancements to meet or exceed FDA's standards,"* and that Emergent was working with J&J on the path forward to release drug substance currently under evaluation and to resume production.

204.    The misrepresentations and omissions in the 5/12/2021 Press Release, as alleged in the preceding paragraph, were materially false and misleading because, *inter alia*, of the reasons alleged in ¶219, *infra*.

205.    On May 19, 2021, Defendant Kramer appeared before the U.S. House of Representatives Select Subcommittee on the Coronavirus Crisis and gave testimony in three parts (altogether, the "5/19/2021 Congressional Testimony"): (a) prepared written testimony, (b) live testimony via videoconference as seen in the image below, and (c) questions for the record responses.  He testified as follows.



Photo credit:  Susan Walsh / AP

(a)    After taking "full responsibility" for the shutdown of manufacturing at the Bayview facility due to the J&J vaccine contamination, Defendant Kramer's prepared written testimony sought to minimize and downplay the scope and extent of contamination issues at the Bayview facility, thereby creating the misleading impression that only a limited quantity of J&J vaccine would be affected, by stating that "in March 2021, a ***single batch*** of Johnson & Johnson's COVID-19 vaccine candidate ***failed routine quality control testing***," that "***testing*** was also conducted ***on other batches*** that were in process, which ***did not detect the presence of the AstraZeneca virus***," and "***there was no indication that the AstraZeneca manufacturing would have been subject to contamination***" such that closure of the AstraZeneca area was merely precautionary.  He repeated, "***The contamination incident that led to the shutdown of new vaccine production at Bayview was very serious and completely unacceptable***" but "***isolated to a single batch***."  He also reassured, "***We are taking aggressive corrective action to assure FDA, the U.S. Government as a whole, and the American people*** that ***we are able to resume operations*** and ***to help meet the demand for COVID-19 vaccine*** across the country and around the world."  Beyond halting AstraZeneca production, he touted a ***Quality Enhancement Plan (QEP)*** that "***includes immediate actions and interim controls that will assure the safety and quality of drug substance manufactured at the Bayview facility*** while longer term improvements are implemented."  He said the ***QEP enhancements*** "also ***address potential routes of contamination***," *e.g.*, additional cleaning, disinfection and repairs throughout Bayview; enhanced segregation of personnel, material and waste flows; enhanced material handling practices; improved waste handling practices and procedures; expanded training and skill development for personnel; and strengthened oversight by Emergent Quality Assurance, J&J, and an outside firm.  He added, "Emergent recognizes the need for effective and timely implementation of these improvements, and ***we are***

135

*working expeditiously and collaboratively to execute the remediation process*."  He also touted new quality assurance hires and the QEP's "Sustainable Compliance Plan," with "ongoing actions to maintain a robust culture of quality at the Bayview facility," adding, "We understand that sustainable compliance is achieved through consistent evaluation and improvement of quality activities.  *Emergent expects nothing less than the consistent adoption of industry best practices in the company's manufacturing and quality operation*."  His prepared testimony concluded, "I understand that we are here today to answer for, and to explain the circumstances that led to, the cross-contamination incident.  I apologize for the failure in our controls that led to the contamination, and I give you my personal assurance that *I and my leadership team will take every step that is needed to resume production safely*."

(b)     During his oral testimony under questioning by Congress members, Defendant Kramer gave a series of false or misleading answers regarding the contamination issues at the Bayview facility, both historically and concerning the J&J drug substance batch, as well as the company's ability to promptly remedy them and resume operations.

(i)     He was asked who identified the J&J batch contamination ("[O]n the cross-contamination, was it you all who identified this?  Was it FDA?") and whether any contaminated doses left the Bayview facility and, despite the contamination having been identified in an overseas J&J laboratory, answered, "*[T]he contamination event was identified through our quality control procedures and checks and balances*" and "*Importantly, … our internal quality control procedures identified the out of specification and the contamination.  None of that material left our control.  The production lot was quarantined, set aside, and never left our facility*."  A Congressman pressed him for more accurate information, in this remarkable exchange:

Question:     I am a little bit confused about the statement that you just made under oath, that it was your internal QA checks that first caught the

136

contamination. So, where exactly was the laboratory which first detected the contaminated batch?

| | |
|---|---|
| Kramer: | ***I think I recognized that our quality control systems*** --- |
| Question: | Answer the question. Where was the laboratory that caught the contamination? Was it your internal QA laboratory…or was it that of your customer? |
| Kramer: | ***That particular assay and the location of the work that detected the contamination was the J&J facility in Leiden***. |
| Question: | ***In the Netherlands***. ***So, why did you refer to that as your internal QA checks that detected the contamination***? |
| Kramer: | ***Part of our robust quality controls and quality systems include a number of assays that we have done***. In this particular case --- |
| Question: | ***But, they did not detect the contamination. Correct? It was detected by your customer seeing a defective batch being delivered***. |
| Kramer: | ***That assay that was conducted by J&J was part of our quality control system***. So yes, it was detected by J&J, but that test was part of our internal quality control procedures. |
| Question: | Ok. I am highly confused about how you refer to your internal procedures as those of simply your customers making sure that you have delivered a product that conforms to specs. |

    (ii)    Defendant Kramer was also asked about his advance knowledge of the cross-contamination risk at the Bayview facility and testified:

| | |
|---|---|
| Question: | Mr. Kramer, on a recent call with investors you admitted that, quote, "***Cross-contamination is a well-known risk when producing drug substance from multiple viral products in a single plant***." So, Mr. Kramer, ***is it fair to say that you were aware of this risk before your company proceeded to ruin millions of coronavirus vaccines through cross-contamination***? |
| Kramer: | ***[I]t is a well-known risk that if the precautions are not taken there is a likelihood of a cross-contamination***. We took that risk seriously, ***we took all appropriate precautions to prevent that from happening***, and, unfortunately, ***one incident*** did result in a cross-contamination. |

    (iii)    Thereafter, Defendant Kramer was pressed further regarding the notice provided by the many prior inspections of the Bayview facility, testifying as follows:

| | |
|---|---|
| Question: | Mr. Kramer, here is what I don't get. ***On six different occasions*** there were inspections and audits, ***in the spring and summer of 2020***, that ended with ***warnings to Emergent*** that you need to take |

> ***urgent action*** to ***improve conditions*** at the facility, ***to retrain*** the staff in order ***to prevent cross-contamination***, and yet still there was cross-contamination, and millions of vaccine shots ended up being destroyed. Is that right?

Kramer:    ***[W]e were aware with the number of audits***, and we treat all of that audit information seriously. We ways respond with corrective actions to those audits and take all possible precautions from it happening again.  As we described, unfortunately there was the one contamination, the cross-contamination issue that occurred earlier this year, and we are doing everything we can to remediate and to prevent that from happening again.

Question:    Can you explain in more detail how that happened, if you had been responding to these multiple warnings?

Kramer:    I am not sure I understand the question

Question:    How did the cross-contamination take place?

Kramer:    ***The cross-contamination occurred as a result of material that was leaving the AstraZeneca suite following a production cycle and production run***. ***And as it was being exited out of our facility it came in the general vicinity of some media that was being prepared for the initiation of a J&J run***. So, we don't know exactly the virus of the AstraZeneca product was transferred into the media, but somehow it was. It is our determination, based on that root cause investigation, that that is how the virus was in the J&J product.

(iv)    In this context, after being questioned about longstanding, persistent contamination issues at the Bayview facility, where at that point manufacturing remained halted pending further investigation and remediation, Defendant Kramer was asked to provide a timeline, under oath, as to when production of the vitally needed J&J vaccine drug substance would resume.  He testified:

Question:    Well, may I ask, when do you plan, or what are your expectations about resuming production?

Kramer:    Sir, as we articulated to the FDA in our response to the 483 plan and observations, there were a number of steps that we suggested be implemented before we would resume production. ***We have made significant progress against all of those commitments***. ***We are very close to completing them***, and ***I would expect we will be in a position to resume production <u>within a matter of days</u>***.

(c)     Defendant Kramer also provided a Response to Questions for the Record, which provided written responses to specific written questions by Congress members concerning his testimony.  His answers deflected blame for the contamination.  Regarding AstraZeneca, he said, "It was understood by all parties involved that starting the manufacturing of the bulk drug substance while the manufacturing processes were still being refined would likely result in batches of the drug bulk substance not meeting all specifications and therefore not being suitable for use in vaccines.  Indeed, *this approach was taken at the direction of AstraZeneca and Operation Warp Speed*."  He added, "At the time the process was transferred to Bayview, it was not even clear what manufacturing scale would be used. After manufacturing began, there were dozens of changes to the manufacturing process in a 60-day period. … *[T]he accelerated development and production plan did increase the likelihood that issues would arise with respect to production batches of drug bulk substance and that some would need to be discarded*."  He also pushed back on the FDA's finding that inadequate employee training levels contributed to the contamination problem, stating, "*Emergent does not believe its employees were inadequately trained*."

206.    The misrepresentations and omissions in the 5/19/2021 Congressional Testimony, as alleged in the preceding paragraph, were materially false and misleading because, *inter alia*, of the reasons alleged in ¶219, *infra*.

207.    On May 27, 2021, Emergent presented at the Singular Research Spring Select Conference during which Emergent presented slides (the "5/27/2021 Conference Slides"), that were posted to its website, which touted Emergent's CDMO services.  The slides stated "*CDMO occupies a unique position in the biologics manufacturing services landscape*," "Emergent combines the best of both worlds: the customer focus and capacity of a pure play CDMO," and Emergent "*[has] the technology and facilities to bring products all the way from concept to*

*market*."  The slides further touted that Emergent's 9 CDMO services add "growth opportunities" and stated that its CDMO services COVID-19 partnerships include drug substance services out of its Bayview facilities with J&J, AstraZeneca, and partnership with the U.S. government under Operation Warp Speed.  The 5/27/2021 Conference Slides also stated that unchanged from its previous forecast was that there were "**ongoing investments in capacity and capability expansions in support of the Company's CDMO services**."

208.    The misrepresentations and omissions in the 5/27/2021 Conference Slides, as alleged in the preceding paragraph, were materially false and misleading because, *inter alia*, of the reasons alleged in ¶219, *infra*.

209.    On June 11, 2021, Emergent issued a press release (the "6/11/2021 Press Release"), which served to counter news reports that the FDA was requiring the destruction of 60 million J&J vaccine doses from the Bayview facility due to contamination.  The 6/11/2021 Press Release "today announced that ***two batches of COVID-19 vaccine manufactured*** by Emergent Biosolutions ***at its*** Baltimore ***Bayview facility were determined to be suitable for use*** by the U.S. Food & Drug Administration (FDA) ***and have been authorized*** as part of Johnson & Johnson's Emergency Use Authorization (EUA)."  It added, "Emergent is ***actively addressing issues identified by the FDA at its Bayview facility*** and ***plans to resume manufacturing of the Johnson & Johnson COVID-19 vaccine drug substance after Emergent, Johnson & Johnson, and FDA are confident that the steps taken have remedied shortcomings***."  It quoted Defendant Kramer as stating, "We are pleased that these initial doses of the Johnson & Johnson COVID-19 vaccine will be able to protect millions of people from this deadly disease.  We look forward to ***working with the FDA and Johnson & Johnson toward the release of additional batches*** and ***resuming production at our Bayview facility***."

140

210.    The misrepresentations and omissions in the 6/11/2021 Press Release, as alleged in the preceding paragraph, were materially false and misleading because, *inter alia*, of the reasons alleged in ¶219, *infra*.

211.    On June 16, 2021, Emergent presented at the IDEAS East Coast Conference during which Emergent presented slides (the "6/16/2021 Conference Slides"), that were posted to its website, which continued to tout Emergent's CDMO services.  The slides stated "***CDMO occupies a unique position in the biologics manufacturing services landscape***," "Emergent combines the best of both worlds: ***the customer focus and capacity of a pure play CDMO***," and ***Emergent "[has] the technology and facilities to bring products all the way from concept to market***."  The slides further touted that Emergent's 9 CDMO services add "growth opportunities" and stated that its CDMO services COVID-19 partnerships include drug substance services out of its Bayview facilities with J&J, AstraZeneca, and partnership with the U.S. government under Operation Warp Speed.  The 5/27/2021 Conference Slides also stated that unchanged from its previous forecast was that there were "***ongoing investments in capacity and capability expansions in support of the Company's CDMO services***."

212.    The misrepresentations and omissions in the 6/16/2021 Conference Slides, as alleged in the preceding paragraph, were materially false and misleading because, *inter alia*, of the reasons alleged in ¶219, *infra*.

213.    Emergent announced its Q2 2021 quarterly results and that it would resume production of J&J COVID-19 vaccine at its Bayview facility in a series of public statements on July 29, 2021.

(a)    On July 29, 2021, Emergent issued an earnings press release (the "7/29/2021 Earnings Release"), which was filed with the SEC on July 29, 2021, as Exhibit 99.1 to Form 8-K

signed by Defendant Lindahl (the "7/29/2021 Form 8-K"), announcing its financial and operating results for the three and six months ended June 30, 2021.  The 7/29/2021 Earnings Release touted as a "recent business accomplishment" that the FDA permitted Emergent that it could resume production of J&J's COVID-19 vaccine bulk drug substance at Emergent's Bayview manufacturing facility.  Defendant Kramer touted the "***relentless determination of [the] Emergent team***."  The 7/29/2021 Earnings Release touted the ***increased Q2 2021 revenue from CDMO as compared to Q2 2020 which was "due to the public-private partnership with BARDA and arrangements with pharma/biotech innovators to address the COVID-19 pandemic***."  The 7/29/2021 Earnings Release reaffirmed Emergent's full year 2021 forecast for CDMO services revenues due in part to "***successful manufacturing of Johnson & Johnson's COVID-19 vaccine bulk drug substance"*** and Emergent resuming J&J COVID-19 vaccine production at the Bayview facility, as well as continuing capital expenditures reflecting ongoing investments in capacity and capability expansions in support of [Emergent's] CDMO services business and product portfolio.

(b)       Also on July 29, 2021, Emergent held an earnings call with analysts and investors in conjunction with its second quarter 2021 financial results (the "4/29/2021 Earnings Call), on which Defendants Kramer and Lindahl spoke.  During prepared remarks, Defendant Kramer touted the progress at the Bayview site, which included "***facility improvements and capability building" as well as "quality, compliance and operations***."  Defendant Kramer touted Emergent's CDMO business and manufacturing capacity stating, the "***CDMO business remains strong***," and that "***Emergent is uniquely prepared*** to answer the call for [the] COVID-19 pandemic" with ***Emergent's "proven manufacturing capabilities in place***."  In prepared remarks, Defendant Lindahl stated that "***[d]espite recent challenges, we have continued to execute across all aspects of the business [including] CDMO***."

142

(c)    The 7/29/2021 Form 8-K also attached as Exhibit 99.2 slides that were presented in connection with Emergent's second quarter 2021 Earnings Call titled, "2Q21 Investor Update" (the "7/29/2021 Earnings Call Slides"), in which Defendants reassured investors that Emergent's "***CDMO business unit remains strong***," and touted that production of J&J's COVID-19 vaccine resumed at the Bayview facility. The slides stated "***[o]ur business remains durable, resilient and poised for growth; we are on track with our 2024 strategy***," and that there were "ongoing investments in capacity and capability expansions in support of the Company's CDMO services." The 7/29/2021 Earnings Call Slides stated that Emergent's full year 2021 forecast for CDMO services revenues were reaffirmed and that the "CDMO revenue range reflects ***successful manufacturing of J&J's COVID-19 vaccine at Bayview***."

(d)    Also on July 29, 2021, Emergent issued a press release (the "7/29/2021 Press Release"), which was filed with the SEC on July 29, 2021, as Exhibit 99.3 to the 7/29/2021 Form 8-K, announcing that the FDA was allowing Emergent's Bayview manufacturing facility to resume production of J&J's COVID-19 vaccine bulk drug substance.  The 7/29/2021 Press Release stated that since Bayview's production pause, Emergent had been working closely with the FDA and J&J to address quality concerns and was ***"committing extensive resources"* to bring operations up to FDA's standards**.    Defendant Kramer further reassured investors about continuation of manufacturing at Bayview stating, "[t]he American people should have high expectations of the partners its government chooses to help prepare them for disaster…[w]e have fallen short of those lofty ambitions over the past few months but resumption of manufacturing is a key milestone."

(e)    On July 30, 2021, Emergent filed a Form 10-Q with the SEC for the second quarter of 2021 (the "Q2 2021 10-Q"), signed and SOX-certified by Defendants Kramer and Lindahl.  The Q2 2021 10-Q stated that CDMO business revenues are based on ***"established development and***

*manufacturing infrastructure, technology platforms and expertise*" and touted that Emergent provides CDMO services for "*large pharmaceutical and biotechnology industry and government agencies/non-governmental organizations*."  The Q2 2021 10-Q touted the *increase in CDMO for the first three and six months ended June 30, 2021, was "due to the public-private partnership with BARDA and arrangements with innovators to address the COVID-19 pandemic*."

214.    The misrepresentations and omissions in the 7/29/2021 Earnings Release, 7/29/2021 Earnings Call, 7/29/2021 Earnings Call Slides, 7/29/2021 Press Release, and Q2 2021 10-Q, as alleged in the preceding paragraph, were materially false and misleading because, *inter alia*, of the reasons alleged in ¶219, *infra*.

215.    On August 25, 2021, Emergent presented at the IDEAS Midwest Conference during which Emergent presented slides (the "8/25/2021 Conference Slides"), that were posted to its website, touting Emergent's CDMO services and resumption of production of J&J's COVID-19 vaccine bulk drug substance.  The slides stated, "Emergent combines the best of both worlds: *the customer focus and capacity of a pure play CDMO*," and Emergent "*[has] the technology and facilities to bring products all the way from concept to market*."  The slides further touted Emergent's 9 CDMO services and stated that the "CDMO business unit remains strong," and "*[o]ur business remains durable, resilient and poised for growth*."  The 8/25/2021 Conference Slides also stated that unchanged from its previous forecast was that "CDMO services revenue reflects the successful manufacturing of Johnson & Johnson's COVID-19 vaccine bulk drug substance at the Company's Bayview facility," and that there were "*ongoing investments in capacity and capability expansions in support of the Company's CDMO services*."

144

216.    The misrepresentations and omissions in the 8/25/2021 Conference Slides, as alleged in the preceding paragraph, were materially false and misleading because, *inter alia*, of the reasons alleged in ¶219, *infra*.

217.    On September 14, 2021, Emergent presented at the Baird's 2021 Global Healthcare Conference during which Emergent presented slides (the "9/14/2021 Conference Slides"), that were posted to its website, touting Emergent's CDMO services.  The slides stated, "Emergent combines the best of both worlds*: the customer focus and capacity of a pure play CDMO*," and Emergent "*[has] the technology and facilities to bring products all the way from concept to market*."  The slides further touted Emergent's 9 CDMO services and stated that the "CDMO business has attractive growth opportunities."  The 9/14/2021 Conference Slides also stated that unchanged from its previous forecast was that "CDMO services revenue reflects the successful manufacturing of Johnson & Johnson's COVID-19 vaccine bulk drug substance at the Company's Bayview facility," and that there were "*ongoing investments in capacity and capability expansions in support of the Company's CDMO services*."

218.    The misrepresentations and omissions in the 9/14/2021 Conference Slides, as alleged in the preceding paragraph, were materially false and misleading because, *inter alia*, of the reasons alleged in ¶219, *infra*.

219.    The misrepresentations and omissions alleged in the preceding ¶¶129-218 were materially false and misleading because, *inter alia*, of the following reasons, some of which predated the Class Period and the rest of which arose as it unfolded. Holistically, they create *a clear and persistent pattern of serious deficiencies and grave contamination risk that existed at the Bayview facility at all relevant times*, regardless of whether any single fact pled below had yet arisen at precisely the time of a specific misstatement pled above, because a sufficient number of

the facts pled below existed throughout the *entire* Class Period, with more and more facts arising over time that corroborated and augmented the earlier ones.

(a)    As described in §V.E.1. *supra*, statements by the CWs, former employees with relevant first-hand knowledge, Emergent's Bayview facility had widespread problems, including mold and potential contamination risk, with facilities, equipment, processes and procedures, personnel, and training that posed significant risks well before the Class Period. Their statements corroborate, and are corroborated by, the contacts of the investigative journalist reporting, Congressional findings, and reports by the FDA and other government bodies, J&J, AstraZeneca, and even Emergent investigators discussed herein. Additional details provided by the CWs include that Defendant Husain was informed about the mold (per CW1) and an "all hands on deck" investigation occurred after the March 2021 FDA inspection (per CW2), employees unsuccessfully tried to fix contamination or hide mold before FDA investigators arrived (per CW3, CW9), the number of contamination alerts increased during the Class Period (per CW6), employees could not find a COVID-19 vaccine sample that the FDA requested during the September 2020 inspection because it was mislabeled (per CW7), the sample storage area was too small (per CW8), bags of unsterilized hazardous waste were carried through the sterile areas of the facility every Wednesday at 7:00 a.m. (per CW9), employees were terminated for raising concerns per (CW1, CW5), Bayview Area 4 was not qualified for mass production of vaccine drug substance (per CW4, CW10), employees were pressured to give sign-off to incorrect documents and data (per CW6), the Bayview facility was "chaos" (per CW3, CW6), Defendant Husain and other executives did not convey the full extent of the problems at Bayview in meetings with clients (per CW5), the VP of Development Services in the CDMO Business Unit tried to prevent notetaking or note sharing

from meetings (per CW5), and enhanced training and SOPs that Emergent promised to do during the manufacturing shutdown was not done (per CW9, CW10).

(b)     As detailed in §V.E.2. *supra* and §V.F.4. *infra*, both before and during the Class Period, the FDA repeatedly notified Emergent as to the scope and extent of the problems pervading its locations – including Bayview – through a litany of inspections, inspection reports, and Forms 483, as well as active engagement with Emergent's on-site personnel and "***senior management***," written responses by Emergent to the Forms 483, and remedial measures purportedly undertaken. These reports create a record of clear, persistent, well-documented deficiencies in facilities, equipment, processes and procedures, personnel, and training across Emergent's U.S. footprint. Notably, serious, recurrent risks are identified and documented regarding ***contamination risks*** resulting from inadequate sanitization, insufficient decontamination, facilities and equipment shortcomings, deficient or disregarded procedures that violated GMP, poorly trained personnel, and a failure to investigate known problems or violations – risks that led to the April 2021 destruction of J&J drug substance equivalent to 15 million vaccine doses due to contamination during the manufacturing process at the Bayview facility.  By this point in the Class Period, this voluminous record of investigation reports / responses by FDA and others included, *inter alia*: 5/16/2017 FDA 483 Report, 6/6/2017 Emergent FDA 483 Response, 7/18/2017 FDA Inspection Report, 12/21/2017 FDA 483 Report, 1/16/2018 Emergent FDA 483 Response, 4/23/2018 FDA Inspection Report, 6/13/2018 FDA 483 Report, 7/13/2018 Emergent FDA 483 Response, 8/16/2018 FDA Inspection Report, 9/27/2018 FDA 483 Report, 10/19/2018 FDA Inspection Report, 2/16/2019 FDA 483 Report, 3/8/2019 Emergent FDA 483 Response, 4/1/2019 FDA Inspection Report, 5/22/2019 FDA Inspection Report, 9/13/2019 FDA 483 Report, 10/4/2019 Emergent FDA 483 Response, 11/7/2019 FDA Inspection Report, 4/20/2020 FDA Inspection

147

Report, 4/20/2020 FDA 483 Report, Congressional Materials: 6/17/2020 Warp Speed Report, 7/24/2020 Janssen Audit Report, 4/21/2021 FDA 483 Report, 4/30/2021 Emergent FDA 483 Response. Significantly, as alleged in §V.E.2.b.ii. and §V.G.1., Defendant Kramer testified that he did not dispute the FDA's findings and that he personally read "most" of the FDA's reports.

(c)    As alleged in §V.E.3. *supra* and §V.F.4. *infra*, investigative reporting further detailed the deficiencies at Emergent's Bayview facility, based on audits and investigations not only by the FDA, but also by J&J, AstraZeneca, BARDA, and Emergent's own quality investigators. *The New York Times* first revealed that human error caused the cross-contamination of the J&J vaccine drug substance with AstraZeneca material and that it was J&J – not Emergent – who identified the contamination issue. The *AP* cited documents obtained by FOIA to describe the litany of FDA citations leveled on the Bayview facility, including deficient and ignored anti-contamination procedures despite visual risks, a lack of compliance audits, failure to eliminate mold and residues on equipment and surfaces, and a failure to pursue investigations into hundreds of reprocessed or deleted data files, deviations from test methods, and unsupported manual adjustments to testing data. *The New York Times* investigation, which included review of internal documents, revealed a "corporate culture that often ignored or deflected missteps" where "top Emergent leadership tolerated and even encouraged the flouting of federal standards for manufacturing," leading to "critical" risks of viral and microbial contamination. It found that Emergent failed to follow basic industry standards, failed to maintain clean and sanitary facilities, inadequately trained personnel, failed to investigate problems, and failed to address repeated disinfection and contamination prevention shortcomings – such that a "pattern of lapses suggested deeper quality issues." As *The New York Times* reported, by this point in the Class Period, ***one AstraZeneca drug substance lot*** (equivalent to two to three million vaccine doses) ***was discarded***

in early October 2020 due to ***contamination or suspected contamination***, ***one batch of J&J drug substance was discarded*** in November 2020 after workers ***suffocated*** the cells growing the virus for the vaccine by hooking up the wrong gas line, ***four AstraZeneca drug substance batches*** (equivalent to eight to twelve million vaccine doses) ***were discarded*** in December 2020 due to being "spoiled by ***bacterial contamination*** of equipment," and the ***contamination*** of 15 million dose equivalents of J&J drug substance had occurred in early February 2021 and been reported to HHS by March 25, 2021 (part of over 60 million J&J dose-equivalents that would be discarded due to deficient manufacturing at the Bayview facility from the same time period).

(d)     As alleged in §V.E.4. *supra*, two Congressional committees, after review of documents from Emergent, J&J, and AstraZeneca, testimony from Emergent's Executive Chairman and Defendant Kramer, and inspection reports by FDA and Operation Ward Speed investigators, found that Emergent was warned "multiple times" in 2020 that serious manufacturing problems and deficient controls at the Bayview facility could lead to ***contamination*** – persistent mold, inadequate and poorly disinfected equipment, inadequate personnel training, deficient quality functions, substandard procedures, and deficient contamination control strategy at the Bayview facility. The committees found that Emergent was aware of the problems and admitted many of them, but failed to take sufficient remedial action, leading to recurrent contamination incidents, which by this point in the Class Period, included ***one AstraZeneca drug substance lot*** (equivalent to two to three million vaccine doses) ***discarded*** in early October 2020 due to ***suspected contamination***, ***one batch of J&J drug substance discarded*** in November 2020 after workers ***suffocated*** the cells growing the virus for the vaccine by hooking up the wrong gas line, ***four AstraZeneca drug substance batches*** (equivalent to eight to twelve million vaccine doses) ***discarded*** in December 2020 due to ***bacterial contamination*** of equipment, 15 million

dose-equivalents of J&J drug substance *contaminated* with AstraZeneca vaccine materials between January 19 and February 21, 2021 and discovered by March 5, 2021, with 60 million more dose-equivalents under review for potential contamination.

(f)    As alleged in §V.F.4. and §V.G.1. infra, Defendants also later conceded facts demonstrating that their earlier misstatements and omissions were materially false and misleading. Defendant Kramer admitted in his 11/4/2021 Kramer Op-Ed that the Bayview facility *never* had the level of investment required to maintain its readiness.  In his 5/19/2021 Congressional Testimony, later Defendant Kramer *admitted* knowledge of the 7/24/2020 Janssen Audit Report's findings that the Bayview facility had contamination issues and no plan to remedy the deficiencies. Defendant Kramer admitted during the 4/29/2021 Earnings Call that the J&J contamination, which occurred back in January or February 2021, happened because of a failure of controls and ignored anti-contamination procedures. In the 4/30/2021 CNBC Report, an Emergent spokesperson conceded the falsity of Defendant Kramer's statement in the 4/1/2021 CNBC Interview ("It isn't the case or wasn't the case where an ingredient from one vaccine contaminated or impacted the other").  The 4/30/2021 Emergent FDA 483 Response admitted that the AstraZeneca vaccine material was likely the source of contamination of the discarded J&J vaccine drug substance batch, that Defendants knew of the contamination "immediately" after it was detected, that Emergent's cross-contamination control procedures could not handle "the rapid ramp-up of full-scale manufacturing activities for two live virus Covid-19 vaccine drug substances," and that a broad array of reforms were needed.

### 2.    *Reported Results Fraud*

220.    Emergent made a series of filings and public statements reporting revenues, net income, and earnings without disclosing that they were being generated and artificially inflated through improper practices, unreported operational setbacks, and undisclosed negative trends.

These misstatements violated, *inter alia*, Regulation S-K, Item 303, 17 C.F.R. §229.303(a)(3)(i)-(ii) and (b)(2).  The "Reported Results Fraud" included the following misstatements.

221.    Emergent announced its Q1 2020 financial results in a series of releases and filings made on April 30, 2020, and May 1, 2020 including the following:

(a)    On April 30, 2020, Emergent issued the 4/30/2020 Earnings Release, which was filed with the SEC as an exhibit to both the 4/30/2020 8-K and 5/1/2020 8-K/A signed by Defendant Lindahl, announcing its financial and operating results for the quarter ended March 31, 2020.  In it, Emergent reported Q1 2020 quarterly net loss of $12.5 million, ($0.24 per diluted share) and adjusted EBITDA of $15.3 million on total revenue of $192.50 million, as compared to a Q1 2019 net loss of $26 million on revenues of $190.6 million and EBITDA of $8.4 million in 2019.  Contributing to these results was Q1 2020 revenue from contract development and manufacturing operations (CDMO) of $21.7 million, an increase of $5.8 million or 36% as compared to 2019, reflecting, in part, "***increased demand across development services***,"  a trend that included Emergent's having "[s]igned a contract development and manufacturing (CDMO) agreement, valued at $135 million, to be U.S. manufacturing partner of Johnson & Johnson's lead vaccine candidate for COVID-19" with "[n]egotiations [that] continue on a long-term commercial supply agreement for large-scale drug substance manufacturing anticipated to begin in 2021." Based on the foregoing, the 4/30/2020 Earnings Release forecast Q2 2020 revenues of $270-$300 million and reaffirmed full-year 2020 forecasts of $1.175-$1.275 billion in revenues, $160-$210 million in adjusted net income, and $300-$360 million in adjusted EBITDA, including contract development and manufacturing revenue of $125-$145 million.

(b)    On May 1, 2020, Emergent filed the Q2 2020 10-Q signed and SOX-certified by Defendants Kramer and Lindahl.  The Q2 2020 10-Q reported the same financial and

operating results as were reported in the 7/30/2020 Earnings Release. It reported Q1 2020 quarterly net loss of $12.5 million, or $0.24 per diluted share, on total revenue of $192.50 million, which included revenue from contract development and manufacturing operations of $21.7 million, an increase of $5.8 million or 36% as compared to 2019. In addition, its Management's Discussion and Analysis of Financial Condition and Results of Operations (MD&A) section stated, "The increase in contract manufacturing revenue for the three months ended March 31, 2020, is largely due to increased volumes at our Camden and Winnipeg facilities partially offset by decreases at our Bayview facility." It also touted its CDMO "***Highlights and Business Accomplishments for 2020***" stating, "On April 23, 2020, announced an agreement, valued at $135 million, to be U.S. manufacturing partner of Johnson & Johnson for its lead vaccine candidate for COVID-19."

(c)     Accompanying the Q1 2020 10-Q were SOX certifications filed by the Individual Defendants with the SEC. Defendants Kramer and Lindahl executed a Section 906 Certification, dated April 30, 2020, attesting that "[t]he Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and [t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." They also executed a Section 302 Certification dated April 30, 2020, as quoted and discussed in the Internal Controls Fraud section herein.

222.    Emergent announced its Q2 2020 financial results in a series of releases and filings made on July 30, 2020, and July 31, 2020 including the following:

(a)     On July 30, 2020, Emergent issued the 7/30/2020 Earnings Release, which was filed with the SEC as an exhibit to the 7/31/2020 8-K signed by Defendant Lindahl, announcing its financial and operating results for the three and six months ended June 30, 2020.

In it, Emergent reported Q2 2020 net income for the three and six months ended June 30, 2020 of 92.7 million ($1.73 per diluted share) and $80.2 million ($1.51 per diluted share) respectively, and Q2 2020 adjusted EBITDA of $156.1 million on total revenue of $394.7 million and year-to-date adjusted EBITDA of $171.4 million on total revenue of $587.2 million, as compared to a net loss of $9.5 million on revenues of $243.2 million and EBITDA of $29.4 million for the three months ended June 30, 2019 and net loss of $35.6 million on revenues of $433.9 million and EBITDA of $37.6 million for the six years ended June 30, 2019.  Contributing to these results was revenue for the three months ended June 30, 2020 from contract development and manufacturing operations of $72.6 million, an increase of $53.9 million as compared to 2019 and for the six months ended June 30, 2020 of $94.3 million, an increase of $59.7 million or 173% as compared to 2019 reflecting, in part, "recently announced arrangements across development services…specifically our landmark public-private CDMO partnership with BARDA in support of the U.S. government's Operation Warp Speed Program."  Underlying and contributing to these results was Emergent's announcement of "*Q2 2020 and other recent business accomplishments*" included that Emergent was "Awarded landmark public-private contract development and manufacturing (CDMO) partnership task order by the U.S. Department of Health and Human Services (HHS) under Operation Warp Speed valued at approximately $628 million for production of leading pharmaceutical and biotechnology innovators' COVID-19 vaccine candidates through 2021 and viral drug product capacity expansion at [Emergent's] Rockville, Maryland facility;" "Signed five-year large-scale drug substance manufacturing agreement for Johnson & Johnson's lead COVID-19 vaccine candidate beginning in 2021, valued at approximately $480 for the first two years [that] follow[ed] initial agreement, valued at approximately $135 million to provide CDMO services and secure large-scale manufacturing capacity;" and "Signed three-year large-scale drug substance

manufacturing agreement for AstraZeneca's COVID-19 vaccine candidate, valued at approximately $174 million through 2021 [that] follow[ed] the initial agreement, valued at approximately $87 million to provide CDMO services and secure large-scale manufacturing capacity." Based on the foregoing, the 7/30/2020 Earnings Release forecast Q3 2020 revenues of $420-$450 million and revised full-year 2020 forecasts up to $1.5-$1.6 billion in revenues, $340-$390 million in adjusted net income, and $535-$600 million in adjusted EBITDA, including contract development and manufacturing revenue of $440-$460 million.

(b)     On July 31, 2020, Emergent filed the Q2 2020 10-Q signed and SOX-certified by Defendants Kramer and Lindahl. The Q2 2020 10-Q reported the same financial and operating results as were reported in the 7/30/2020 Earnings Release. It reported Q2 2020 net income for the three and six months ended June 30, 2020 of 92.7 million ($1.73 per diluted share) and $80.2 million ($1.51 per diluted share) respectively, on total revenue of $587.2 million, as compared to a Q2 2019 net loss of $9.5 million on revenues of $243.2 million and year-to-date 2019 net loss of $35.6 million on revenues of $433.9 million, which included revenue from contract development and manufacturing operations of $72.6 million, an increase of $53.9 million as compared to 2019 and for the six months ended June 30, 2020 of $94.3 million, an increase of $59.7 million as compared to 2019. In addition, its MD&A section stated, "***The increase in contract manufacturing revenue for the three and six months ended June 30, 2020 is largely due to the expansion of our customer and project base, specifically the contribution of our recently announced arrangements with BARDA in support of the USG's Operation Warp Speed Program***." It also touted its CDMO "***Highlights and Business Accomplishments for 2020***" stating, "On April 23, 2020, announced an agreement, valued at $135 million, to be the U.S. manufacturing partner of Johnson & Johnson's lead COVID-19 vaccine candidate," "On June 1,

2020, announced an agreement to join the USG's Warp Speed Program in public-private CDMO partnership for COVID-19 vaccine development and manufacturing [with] contract value of $628 million," On June 11, 2020, announced an agreement to be the U.S. manufacturing partner for AstraZeneca's COVID-19 vaccine candidate to provide large-scale manufacturing capacity through 2020 [with] contract value of $87 million," "On July 2, 2020, [Emergent] further announced signing a large scale drug substance manufacturing agreement for Johnson & Johnson's lead COVID-19 vaccine candidate for up to five years beginning in 2021 [with] the first two years [] valued at approximately $480 million," "On July 27, 2020, [Emergent] further announced the signing of a large-scale drug substance manufacturing agreement for AstraZeneca's COVID-19 vaccine candidate, valued at approximately $174 million through 2021."

(c)    Accompanying the Q2 2020 10-Q were SOX certifications filed by the Individual Defendants with the SEC.  Defendants Kramer and Lindahl executed a Section 906 Certification, dated July 31, 2020, attesting that "[t]he Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and [t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."  They also executed a Section 302 Certification dated July 31, 2020, as quoted and discussed in the Internal Controls Fraud section herein.

223.    Emergent announced its Q3 financial results in a series of releases and filings made on November 5, 2020, and November 6, 2020 including the following:

(a)    On November 5, 2020, Emergent issued the 11/5/2020 Earnings Release, which was filed with the SEC as an exhibit to the 11/5/2020 8-K signed by Defendant Lindahl, announcing its financial and operating results for the three and nine months ended September 30, 2020.  In it, Emergent reported Q3 2020 net income for the three and nine months ended September

30, 2020 of $39.5 million ($0.73 per diluted share) and $119.7 million ($2.23 per diluted share) respectively, and Q3 2020 adjusted EBITDA of $168.1 million on total revenue of $385.2 million and year-to-date adjusted EBITDA of $339.5 million on total revenue of $972.4 million, as compared to net income of $43.2 million on revenues of $311.8 million and EBITDA of $106.4 million for the three months ended September 30, 2019 and net income of $7.6 million on revenues of $745.7 million and EBITDA of 145.4 million for the nine years ended September 30, 2019. Contributing to these results for the three months ended September 30, 2020, was revenue from CDMO of $157.1 million, an increase of $137.1 million as compared to 2019 and for the nine months ended September 30, 2020, revenue of $251.4 million, an increase of $196.8 million reflecting, in part, "the contribution of arrangements across development, drug substance manufacturing, and drug product manufacturing." Underlying and contributing to these results was Emergent's announcement of "*Q3 2020 business accomplishments*" included that Emergent "Secured approximately $60 million in new business and existing project extensions across development services, drug substance manufacturing, and drug product manufacturing towards the [Emergent's] CDMO portfolio." Based on the foregoing, the 11/5/2020 Earnings Release revised full-year 2020 forecasts up to $1.520-$1.580 billion in revenues, $375-$405 million in adjusted net income, and $575-$615 million in adjusted EBITDA, including CDMO revenue of $450-$470 million.

(b)     On November 5, 2020, Emergent filed the Q3 2020 10-Q signed and SOX-certified by Defendants Kramer and Lindahl. The Q3 2020 reported net income for the three and nine months ended September 30, 2020, of $39.5 million ($0.73 per diluted share) on total revenue of $385.2 million and $119.7 million ($2.23 per diluted share) total revenue of $972.4 million respectively, as compared to net income of $43.2 million on revenues of $311.8 million for the

three months ended September 30, 2019 and net income of $7.6 million on revenues of $745.7 million for the nine years ended September 30, 2019.  In addition, its MD&A section stated, "The increase in contract manufacturing revenue for the three and six months ended June 30, 2020, is largely due to the expansion of our customer and project base, specifically the contribution of our recently announced arrangements with BARDA in support of the USG's Operation Warp Speed Program."  It also touted its CDMO "***Highlights and Business Accomplishments for 2020***" stating, "On April 23, 2020, announced an initial agreement, valued at $135 million, to be the U.S. manufacturing partner of Johnson & Johnson's lead COVID-19 vaccine candidate," "On June 1, 2020, announced an agreement to join the USG's Warp Speed Program in public-private CDMO partnership for COVID-19 vaccine development and manufacturing [with] contract value of $628 million," On June 11, 2020, announced an agreement to be the U.S. manufacturing partner for AstraZeneca's COVID-19 vaccine candidate to provide large-scale manufacturing capacity through 2020 [with] contract value of $87 million," "On July 2, 2020, further announced signing a large scale drug substance manufacturing agreement for Johnson & Johnson's lead COVID-19 vaccine candidate for up to five years beginning in 2021 [with] the first two years [] valued at approximately $480 million," "On July 27, 2020, further announced the signing of a large-scale drug substance manufacturing agreement for AstraZeneca's COVID-19 vaccine candidate, valued at approximately $174 million through 2021."

(c)    Accompanying the Q3 2020 10-Q were SOX certifications filed by the Individual Defendants with the SEC.  Defendants Kramer and Lindahl executed a Section 906 Certification, dated November 5, 2020, attesting that "[t]he Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and [t]he information contained in the Report fairly presents, in all material respects, the financial condition

and results of operations of the Company." They also executed a Section 302 Certification dated November 5, 2020, as quoted and discussed in the Internal Controls Fraud section herein.

224.    Emergent announced its Q4 2020 quarterly and full year 2020 results on February 18, 2021, and February 19, 2021 including the following:

(a)    On February 18, 2021, Emergent issued the 2/18/2021 Earnings Release, which was filed with the SEC as an exhibit to the 2/18/2020 8-K signed by Defendant Lindahl, announcing its financial and operating results for the quarter and year ended December 31, 2020. In it, Emergent reported Q4 2020 net income for the fourth quarter and year ended December 31, 2020 of $185.4 million ($3.44 per diluted share) and $305.1 million ($5.67 per diluted share) respectively, and Q4 2020 adjusted EBITDA of $290.9 million on total revenue of $583.0 million and full year 2020 adjusted EBITDA of $630.4 million on total revenue of $1,555.4 million, as compared to net income of $46.9 million on revenues of $360.4 million and EBITDA of $134.3 million for the fourth quarter ended December 31, 2019 and net income of $54.5 million on revenues of $1,106.0 million and EBITDA of 279.7 million for the full year 2019. Contributing to these results for the three months ended December 31, 2020 was revenue from CDMO of $199.1 million, an increase of $173.6 million as compared to Q4 2019 and for full year 2020, revenue of $1,555.4 million, an increase of 41% over 2019 reflecting, in part, "an increase in contract development and manufacturing services revenues drug substance manufacturing, and drug product manufacturing." An additional metric Emergent reported, CDMO backlog, defined as estimated remaining contract value as of the indicated period pursuant to signed contracts, which is expected to be realized over the next one to three years, was $1.34 billion at December 31, 2020, reflecting the impact of additional services on existing contracts and newly awarded contracts of $53.3 million during the quarter offset by revenue recognized to date on contracted amounts.

Underlying and contributing to these results was Emergent's announcement of "***Q4 and recent business accomplishments***" involving CDMO services agreements. Based on the foregoing, the 2/18/2021 Earnings Release reaffirmed 2021 forecasts to $1.950-$2.050 billion in revenues, $475-$525 million in adjusted net income, and $750-$810 million in adjusted EBITDA, including contract development and manufacturing revenue of $925-$965 million.

(b)    On February 19, 2021, Emergent filed the 2020 10-K signed and SOX-certified by Defendants Kramer and Lindahl. The 2020 10-K reported the same financial and operation results as the 2/17/2021 Earnings Release. The 2020 10-K reported net income for the year ended December 31, 2020 of $305.1 million ($5.67 per diluted share) on total revenue of $1.555.4 billion, as compared to net income of $54.5 million ($1.04 per diluted share) on total revenue of $1.106.0 billion for the year ended December 31, 2019. In addition, its MD&A section stated, "The increase in CDMO services revenue for the year ended December 31, 2020 is due to the Company's public-private partnership with BARDA in support of the USG's efforts to address the COVID-19 pandemic and arrangements with AstraZeneca and Johnson & Johnson." It also touted its CDMO "***Highlights and Business Accomplishments for 2020***" stating, "On April 23, 2020, announced an initial agreement, valued at $135 million, to be the U.S. manufacturing partner of Johnson & Johnson's lead COVID-19 vaccine candidate," "On June 1, 2020, announced an agreement to join the USG's Warp Speed Program in public-private CDMO partnership for COVID-19 vaccine development and manufacturing [with] contract value of $628 million," On June 11, 2020, announced an agreement to be the U.S. manufacturing partner for AstraZeneca's COVID-19 vaccine candidate to provide large-scale manufacturing capacity through 2020 [with] contract value of $87 million," "On July 2, 2020, further announced signing a large scale drug substance manufacturing agreement for Johnson & Johnson's lead COVID-19 vaccine candidate

for up to five years beginning in 2021 [with] the first two years [] valued at approximately $480 million," "On July 27, 2020, further announced the signing of a large-scale drug substance manufacturing agreement for AstraZeneca's COVID-19 vaccine candidate, valued at approximately $174 million through 2021."

(c)    Accompanying the 2020 10-K were SOX certifications filed by the Individual Defendants with the SEC.  Defendants Kramer and Lindahl executed a Section 906 Certification, dated February 18, 2021, attesting that "[t]he Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and [t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."  They also executed a Section 302 Certification dated February 18, 2021, as quoted and discussed in the Internal Controls Fraud section herein

225.    Emergent announced its Q1 2021 financial results in a series of releases and filings made on April 29, 2021, and April 30, 2021 including the following:

(a)    On April 29, 2021, Emergent issued the 4/29/2021 Earnings Release, which was filed with the SEC as an exhibit to the 4/29/2021 8-K signed by Defendant Lindahl, announcing its financial and operating results for the quarter ended March 31, 2021.  In it, Emergent reported Q1 2021 quarterly net income of $69.7 million, ($1.28 per diluted share) and adjusted EBITDA of $123.5 million on total revenue of $343.0 million, as compared to a Q1 2020 net loss of $12.5 million on revenues of $192.5 million and EBITDA of $15.3 million in 2020. Contributing to these results was Q1 2021 revenue from CDMO of $183.8 million, an increase of $162.1 million as compared to Q1 2020, reflecting, in part, "the public-private partnership with [BARDA] to support the USG's efforts to address the COVID-19 pandemic and CDMO services in support of commercial innovators."  Additionally, CDMO backlog remained at around $1.34

billion at March 31, 2021, with a negligible increase as compared to the beginning backlog on December 31, 2020, primarily due to the CDMO revenue realized in Q1 2021 of $183.8 million, offset by nearly the same amount of new business generation during the quarter.  Underlying and contributing to these results was Emergent's announcement that while there was a "hold of certain COVID-19 vaccine bulk drug substance lots and commitment not to initiate new manufacturing at Bayview pending further review by the [FDA]" Emergent had "***ongoing investments in capacity and capability expansions in support of [Emergent's] CDMO services business and product portfolio.***"  Based on the foregoing, the 4/29/2021 Earnings Release forecast Q2 2021 revenues of $370-$430 million and revised full-year 2021 forecasts to $1.700-$1.900 billion in revenues, $395-$470 million in adjusted net income, and $620-$720 million in adjusted EBITDA, including contract development and manufacturing revenue of $765-$875 million.

(b)     On April 30, 2021, Emergent filed the Q2 2021 10-Q signed and SOX-certified by Defendants Kramer and Lindahl.  The Q2 2021 10-Q reported the same financial and operating results as were reported in the 4/29/2021 Earnings Release.  It reported Q1 2021 quarterly net income of $69.7 million, ($1.28 per diluted share) on total revenue of $343.0 million, as compared to a Q1 2020 net loss of $12.5 million on revenues of $192.5 million in 2020.  In addition, its Management's Discussion and Analysis of Financial Condition and Results of Operations (MD&A) section stated, "The increase in contract development and manufacturing services revenue for the three months ended March 31, 2021 is due to the public-private partnership with BARDA and arrangements with innovators to address the COVID-19 pandemic."

(c)     Accompanying the Q1 2021 10-Q were SOX certifications filed by the Individual Defendants with the SEC.  Defendants Kramer and Lindahl executed a Section 906 Certification, dated April 29, 2021, attesting that "[t]he Report fully complies with the

requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and [t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." They also executed a Section 302 Certification dated April 29, 2021, as quoted and discussed in the Internal Controls Fraud section herein

226.    Emergent announced its Q2 2021 financial results in a series of releases and filings made on July 29, 2021 and July 30, 2021 including the following:

(a)    On July 29, 2021, Emergent issued the 7/29/2021 Earnings Release, which was filed with the SEC as an exhibit to the 7/29/2021 8-K signed by Defendant Lindahl, announcing its financial and operating results for the three and six months ended June 30, 2021. In it, Emergent reported Q2 2021 net income for the three and six months ended June 30, 2021 of 4.6 million ($0.09 per diluted share) and $74.3 million ($1.37 per diluted share) respectively, and Q2 2021 adjusted EBITDA of $49.5 million on total revenue of $397.5 million and year-to-date adjusted EBITDA of $173.0 million on total revenue of $740.5 million, as compared to net income of $92.7 million on revenues of $394.7 million and EBITDA of $156.1 million for the three months ended June 30, 2020 and net income of $80.2 million on revenues of $587.2 million and EBITDA of $171.4 million for the six months ended June 30, 2020. Contributing to these results was revenue for the three months ended June 30, 2021 from CDMO of $190.9 million, an increase of $118.3 million as compared to 2020 reflecting, in part, "public-private partnership with [BARDA] and arrangements with pharma/biotech innovators to address the COVID-19 pandemic…arrangements…entered into during the second and third quarters of 2020." Additionally, CDMO backlog decreased to $245.8 million to $1.10 billion at June 30, 2021 as compared to the beginning backlog of $1.34 billion at March 31, 2021, primarily due to the CDMO revenue realized in Q2 2021 of $190.9 million, $108.1 million of negative contract modifications

and other adjustments offset by $53.2 million of positive new business generation during the quarter.  Underlying and contributing to these results was Emergent's announcement of "Q2 2021 and other recent business accomplishments" which included "FDA has informed the Company that it can resume production of Johnson & Johnson's COVID-19 vaccine bulk substance at the Company's Bayview manufacturing facility."  Based on the foregoing, the 7/29/2021 Earnings Release forecast Q3 2021 revenues of $400-$500 million and reaffirmed full-year 2021 forecasts of $1.700-$1.900 billion in revenues, $395-$470 million in adjusted net income, and $620-$720 million in adjusted EBITDA, including contract development and manufacturing revenue of $765-$875 million.  .

    (b)  On July 30, 2021, Emergent filed the Q2 2021 10-Q signed and SOX-certified by Defendants Kramer and Lindahl.  The Q2 2021 10-Q reported the same financial and operating results as were reported in the 7/29/2021 Earnings Release.  It reported Q2 2021 net income for the three and six months ended June 30, 2021 of 4.6 million ($0.09 per diluted share) on total revenue of $397.5 million and $74.3 million ($1.37 per diluted share) on total revenue of $740.5 million respectively, compared to net income of $92.7 million on revenues of $394.7 million for the three months ended June 30, 2020 and net income of $80.2 million on revenues of $587.2 million for the six months ended June 30, 2020, which included revenue from contract development and manufacturing operations of 190.9 million, an increase of $118.3 million as compared to 2020 and for the six months ended June 30, 2020 of $374.7 million, an increase of $280.4 million as compared to 2020.  In addition, its MD&A section stated, "The increase in contract manufacturing revenue for the three and six months ended June 30, 2021 is due to the public-private partnership with BARDA and arrangements with innovators to address the COVID-19 pandemic [which] where entered into during the second and third quarters of 2020."

(c)      Accompanying the Q2 2021 10-Q were SOX certifications filed by the Individual Defendants with the SEC.  Defendants Kramer and Lindahl executed a Section 906 Certification, dated July 29, 2021, attesting that "[t]he Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and [t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."  They also executed a Section 302 Certification dated July 29, 2021, as quoted and discussed in the Internal Controls Fraud section herein

227.    On September 30, 2021, Emergent filed a letter with the SEC (9/30/2021 SEC Letter), which was signed by Defendant Lindahl, responding to comments and requests in an SEC letter to Emergent relating to its 2020 10-K and Q1 2021 10-Q.  In response to the SEC's question regarding how Emergent considered compliance with the disclosure requirement under Item 303 of Regulation S-K, Emergent stated, "***[t]he Company considered Item 303 of Regulation S-K in the preparation of its Form 10-K and Form 10-Q, concluding that nearly all of the increase in CDMO services revenue was related to the Company's COVID-19 related arrangements***."

228.    The foregoing statements in ¶¶220-227 were materially false and misleading because they reported financial metrics and results like net income, net loss, loss per share, EBIDTA, and revenues from contract and manufacturing operations without disclosing that these results were generated through improper practices, unreported operational setbacks, and undisclosed negative trends, as alleged herein, including those detailed by the CW accounts pled in §V.E.1.; reports by the FDA and other government entities, J&J, and even Emergent's own auditors as pled in §V.E.2. and §V.F.4.; investigative reporting as pled in §V.E.3. and §V.F.4.; Congressional testimony, supporting documents, and a Congressional memo as pled in §V.E.4.; and Defendants' own admissions and concessions, as pled in §V.F.4. and §V.G.1.  Those sections,

along with the "Partial Corrective Disclosures Incrementally Revealed The Frauds" section, §V.F.4. *infra*, illustrate *inter alia*, that the pervasive, longstanding deficiencies in the Bayview facilities, equipment, policies and procedures, personnel, and training, combined with the failure to investigate and to take appropriate effective remedial actions, led to the underlying trend of a significant and unabating risk of contamination or cross-contamination of either the J&J COVID vaccine drug substance or the AstraZeneca COVID vaccine drug substance or both.

229.    Moreover, Defendants concealed the gravity and risks of the negative trends underlying Emergent's reported results until well after those risks had materialized.  Specifically:

(a)    As pled in §V.F.4. *infra*, on the 11/4/2021 Earnings Call, Defendant Kramer disclosed that HHS had ended its CIADM partnership with Emergent and terminated all open task orders, including the one related to COVID-19.  In doing so, he blamed a trend that was in place **_before and throughout_** the entire Class Period – that "**_execution of the CIADM program and the necessary operational investments by all administrations fell short of what was needed to maintain capability in case of an emergency_**."

(b)    As alleged in §V.G.5. *infra*, Emergent had been continuing to reap $27 million per month in reservation fees from the U.S. government even after it was **_unable_** to perform any COVID vaccine drug substance manufacturing services, pushing its total to $271 million paid under the agreement and unjustly enriching the company.

(c)    As pled in §V.F.4. *infra*, on the 11/4/2021 Earnings Call, Kramer also disclosed the significant, costly steps Emergent was having to undertake to remedy the extensive, longstanding, unaddressed problems at its Bayview facility – another undisclosed trend as evidenced by the FDA inspection reports pled herein in §V.E.2. and §V.F.4. *supra*.  He said, "**_Over the last five months, we've invested millions of dollars to overhaul cleaning procedures, upgrade our facilities,_**

*implement additional quality control and oversight practices, and make significant improvements to the processes for batch record keeping, personnel training, data integrity and lab testing*."

(d)　　Also on the 11/4/2021 Earnings Call, as pled in §V.F.4. *infra*, Defendants revealed additional negative trends in Emergent's previously reported results.  Defendant Lindahl said, "[A]s part of this agreement to close out the arrangement, ***the value of the BARDA task order was reduced by $180 million***," so that consequently, "***we have tightened the range of our total revenues, which lowered the midpoint by $50 million***."  He said that because the U.S. government had not fully paid amounts due under the task order – a negative trend that had been accruing for months – "***as of September 30, we reversed $86 million of revenue and removed accounts receivable balances related to uncollected amounts under the BARDA task order***," which he said was "principally" the cause of "total revenues of $329 million below the prior year period." Regarding the uncollected payments, Defendant Kramer admitted that it was "clearly an unusual circumstance" for the U.S. government to have not "paid within a very short period of time."

(e)　　On the 11/4/2021 Earnings Call, as pled in §V.F.4. *infra*, Defendant Lindahl also conceded that certain "***trends***," including "***lower capacity utilization for drug substance production at Bayview*** while it is solely dedicated to J&J's COVID-19 vaccine candidate," "the ***additional investments we are making at Bayview*** in support of our quality enhancement plan," and "***increased operating costs at our Bayview facility***," were "***applying pressure to margins***" within the CDMO services segment, which reported 10% lower gross margin than the prior period. He added that the "***rolling backlog***" was ***9% lower*** than the prior quarter "***reflecting the impact of the BARDA task order termination***."

230.    As such, for all these reasons, the misstatements and omissions in ¶¶220-227 were materially false or misleading, including without limitation because they violated Regulation S-K, Item 303, 17 C.F.R. §229.303(a)(3)(i)-(ii) and (b)(2).

### 3.    *Internal Controls Fraud*

231.    During the Class Period, Defendants also made a series of public statements and filings regarding Emergent's internal controls that were materially false and misleading. Specifically, Defendants Kramer and Lindahl signed and SOX certified quarterly and annual reports by Defendant Emergent, and in doing so, made materially false and misleading statements and omissions.

232.    Emergent's 2020 10-K, filed with the SEC on February 19, 2021, was signed and SOX certified by Defendants Kramer and Lindahl and stated that the financial information contained in the 2020 10-K was accurate and disclosed any material changes to Emergent's internal control over financial reporting. Specifically, Defendants Kramer and Lindahl certified:

I, [Robert G. Kramer and Richard S. Lindahl], certify that:

1.    I have reviewed this Annual Report on Form 10-K of Emergent BioSolutions Inc.;

2.    ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;***

3.    ***Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;***

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a.    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision,

167

to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c.    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    *The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):*

a.    *All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and*

b.    *Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.*

233.    On May 1, 2020, Emergent filed the Q1 2020 10-Q, with SOX certifications signed by Defendants Kramer and Lindahl certifying that the financial information contained in Emergent's Q1 2020 10-Q was accurate and disclosed any material changes to Emergent's internal control over financial reporting.  Specifically, Defendants Kramer and Lindahl certified:

I, [Robert G. Kramer and Richard S. Lindahl], certify that:

1.  I have reviewed this Quarterly Report on Form 10-Q of Emergent BioSolutions Inc.;

2.  ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;***

3.  ***Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;***

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and;

    d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  ***The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):***

a. ***All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and***

b. ***Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.***

234.    Defendants Kramer and Lindahl signed identical SOX certifications as those accompanying Emergent's Q1 2020 10Q alleged above, certifying that the financial information contained in Emergent's Q2 2020 10Q, filed with the SEC on July 31, 2020, its Q3 2020 10-Q, filed with the SEC on November 6, 2020, its Q1 2021 10-Q, filed with the SEC on April 30, 2021, its Q2 2021 10-Q, filed with the SEC on July 30, 2021, were accurate and disclosed any material changes to Emergent's internal control over financial reporting during those reporting periods.

235.    The foregoing statements in ¶¶231-234 were materially false and misleading because, as pled herein, *inter alia*: (a) the SEC filings in which there were made did, in fact, contain untrue statements of a material fact and omitted to state material facts necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered and (b) the fraud alleged herein involved management and other employees with a significant role in Emergent's internal controls over financial reporting, and yet, it was not disclosed to Emergent's auditors or to the audit committee of Emergent's Board of Directors.  Moreover, Defendant Kramer **conceded** that a failure of Emergent's internal controls led to the facts and circumstances at issue, when he testified before Congress on May 19, 2021: "I understand that we are here today to answer for, and to explain the circumstances that led to, the cross-contamination incident.  ***I apologize for the failure in our***

170

_controls_ _that led to the contamination_, and I give you my personal assurance that I and my leadership team will take every step that is needed to resume production safely."

### 4. *Partial Corrective Disclosures Incrementally Revealed the Frauds*

236.    Interspersed with the foregoing misstatements were a series of partial corrective disclosures that incrementally revealed aspects of the three threads of Defendants' fraud and caused the artificial inflation to be removed from Emergent's stock price.

237.    On March 31, 2021, after the close of the markets, *The New York Times* published an article reporting on the accidental contamination of COVID-19 vaccines developed by J&J and AstraZeneca at Emergent's Bayview facility.  The article stated that in **late February 2021,** through "human error," Emergent employee(s) at the Bayview facility **mixed up ingredients of the J&J and AstraZeneca COVID-19 vaccines,** which are biologically different and not interchangeable, thereby **contaminating up to 15 million doses of J&J's vaccine**, **forcing regulators to delay authorization of the facility's production lines**, and **delaying future U.S. shipments of up to 24 million J&J vaccine doses** from the Bayview facility while the FDA investigates.  It further noted that Emergent's wrongful mixing of J&J and AstraZeneca ingredients and resulting widespread vaccine contamination went **undiscovered** for **days** until **J&J's quality control checks** uncovered it and reported it to federal regulators, **raising questions about Emergent's training and supervision of employees in the production process.**  Consequently, **J&J** has **moved to strengthen its control** over Emergent's work to avoid additional quality lapses. The article called these events a "major embarrassment" for both J&J and Emergent.

238.    The next morning, April 1, 2021, the *Associated Press*, noting Emergent's importance to J&J's planned delivery of 100 million U.S. COVID vaccine doses by the end of May 2021, reported that Emergent "**has a string of citations from U.S. health officials for quality control problems**."  The *AP* reviewed documents obtained by a FOIA request covering inspections

at Emergent facilities since 2017[17] and reported that the "***Food and Drug Administration repeatedly has cited Emergent for problems such as poorly trained employees, cracked vials and problems managing mold and other contamination around one of its facilities***." It reported that when the J&J contract was signed in April 2020, FDA records indicated that the Bayview facility was not scaled for making millions of COVID vaccine doses, was only a contract testing laboratory that "did not manufacture products for distribution," and needed technology and personnel upgrades before it could begin making COVID vaccine "drug substance" material via a two-month process during which biological cells are grown. It reported that FDA's inspections of the Bayview facility revealed serious issues. In April 2020, as the J&J contract was announced, FDA inspected the Bayview facility's anthrax treatment testing (as described above in §V.E.2., *supra*) and found a series of quality control problems, in including ***failing to train employees*** "in the particular operations they perform as part of their function and current good manufacturing practices," "***failing to ensure that electronic data*** generated through testing of drug ingredients '***was protected from deletion or manipulation***,'" ***failing to*** "***follow proper testing and lab procedures***," and "***carelessness in the handling of rejected materials***." FDA's lead investigator, Marcellinus Dordunoo, faulted Emergent for failing to investigate "data integrity concerns," after finding that ***202 deletions*** and ***543 reprocessed files in testing data*** were ***never investigated*** to determine how they occurred or potential ramifications and that "***deviations from test methods are not investigated***, and are ***manually corrected days after*** performance, ***with no supporting data or documented justification***." FDA also found that rejected materials were in a "reject cage" without appropriate labels and that "separate or defined areas to prevent contamination or mix-ups are deficient." The *AP* also reported a long list of prior FDA inspections at Emergent facilities that

---

[17] Lead Plaintiffs' counsel reviewed documents obtained by a similar FOIA request, which are summarized in §V.E.2., *supra*.

found similar problems, including an "unwritten policy of not conducting routine compliance audits" (September 2018 Camden inspection); "[p]rocedures designed to prevent microbial contamination of drug products purporting to be sterile are not adequately established and followed," staff violated sterility safeguards by holding their hands "directly over open vials" being filled with vaccine, and repeated complaints for residue on multiple lots of vaccine vials (June 2018 Camden inspection); and failure to correct "continued low level mold and yeast isolates" (December 2017 Massachusetts inspection).

239.   On this news, Emergent's stock price substantially declined, on extremely high trading volume, from a close of $92.91 per share on March 31, 2021, to $80.46 per share at the close of trading on April 1, 2021—a drop of $12.45, or 13.4%, per share.  The partial corrective stock price decline was muted by Emergent's false and misleading statements in its 4/1/2021 Press Release discussed *supra*, by Emergent spokesman Matt Hartwig's rebuttal in the *AP* report touting Emergent's "rigorous quality checks" and minimizing the issues as "[d]iscarding a batch of bulk drug substance, while disappointing, does occasionally happen during vaccine manufacturing, which is a complex and multi-step biological process," and by the *AP*'s reporting that J&J was putting more of its own manufacturing and quality experts inside the Bayview facility to supervise production of its COVID vaccine.

240.   Analysts reacted negatively to this news, while believing Defendants' spin that the problem was a mere error and not necessarily a sign of something broader or systemic.  For instance, in its April 1, 2021 analyst report, Cowen ***reduced the price target on Emergent's stock from $92.91 to $86***, stating, "15M doses of JNJ's (Jennings, Outperform, $164.35) COVID-19 vaccine had to be disposed of due to *a manufacturing error* at EBS's plant in Baltimore." Cowen added: "Regardless of whether this event has financial implications for current contracts, ***we expect***

*it may create a headwind to further CDMO revenue* as the CDMO business becomes more competitive over time."

241.    On Saturday, April 3, 2021, *The New York Times*, citing senior federal health officials, reported that, in the wake of the Bayview facility's having "mixed up ingredients" of the J&J and AstraZeneca COVID vaccines, the Biden administration had made the "extraordinary move" of putting *J&J* "*in charge*" *of Emergent's* "*troubled*" *Bayview facility* and "*moved to stop the plant from making another vaccine, developed by AstraZeneca*."  It cited two senior federal health officials as saying that "*[b]y moving the AstraZeneca vaccine out . . . the plant can be solely devoted to the [J&J] single-dose vaccine and avoid future mishaps*."  The same officials told *The New York Times* that the U.S. Department of Health and Human Services had directed *J&J to install a new leadership team to oversee all production and manufacturing aspects at the Bayview facility*.  The article quoted a J&J statement that it was "assuming full responsibility" for the COVID vaccine made at Emergent's Bayview facility.  It added that J&J would bring in Merck to help manage the Bayview facility.  It cited federal officials who said it would take weeks to figure out whether other sequestered batches of the J&J vaccine made at the Bayview facility were contaminated or could be released and who expressed concern that Emergent's mix-up would erode public confidence in COVID vaccines.  *The New York Times* called the ingredient mix-up and resulting federal handover of the Bayview facility's operations to J&J "*a significant setback and a public relations debacle for Emergent*."

242.    On this news, on the next trading day (after the market closure on Good Friday, April 2, 2021), Emergent's stock price fell an additional $1.84 per share, or roughly 2.3%, on elevated trading volume, from a close of $80.46 per share on April 1, 2021, to close at $78.62 per share on Monday, April 5, 2021.  The partial corrective stock price decline was muted by

Emergent's false and misleading statements in its 4/4/2021 Press Release and 4/5/2021 Form 8-K as discussed *supra*, and by an Emergent spokesman's comment in the *New York Times* report reassuring the market that Emergent would continue making AstraZeneca bulk drug substance until it received a contract modification from the federal government.

243.    On April 19, 2021, Emergent filed a Form 8-K with the SEC (the "4/19/2021 Form 8-K"), which was signed by Defendant Lindahl, disclosing, "On April 12, 2021, the FDA initiated an inspection of the Bayview facility in Baltimore, Maryland.  On April 16, 2021, ***at the request of the FDA, Emergent agreed not to initiate the manufacturing of any new material at its Bayview facility*** and ***to quarantine existing material manufactured at the Bayview facility*** pending completion of the [FDA's] inspection and remediation of any resulting findings."

244.    On this news, the price of Emergent common stock declined an additional $9.77 per share, or roughly 12.6%, on elevated trading volume, from a close of $77.64 per share on Friday, April 16, 2021, to close at $67.87 per share on Monday, April 19, 2021.

245.    On April 21, 2021, the FDA published the 13-page 4/21/2021 FDA 483 Report on its website summarizing its findings from inspections of the Bayview facility from April 12-20, 2021.  As described in §V.E.2. *supra*, the report listed ***nine*** observations that faulted Emergent for a variety of decontamination, sterilization, sanitization, cleaning, waste transport and disposal, maintenance, process, personnel, and training failures spanning January 2021 through April 2021 that ground its COVID vaccine manufacturing work to a halt.  The FDA's press release issued that day (the "4/21/2021 FDA Press Release") explained the state of play:

> [T]he FDA recently completed an inspection of Emergent Biosolutions, a proposed manufacturing facility for the Johnson & Johnson COVID-19 Vaccine. …  The FDA's inspections are thorough, and these assessments review the quality of manufacturing procedures, including records, staff training, facility operations, drug production and testing and the systems in place to ensure product quality.  During an inspection of Emergent Biosolutions that ended Tuesday, the FDA cited

a number of observations concerning whether the facility's processes met our requirements and standards. These observations are outlined in our inspection closeout report, also known as a "FDA Form 483."

The FDA's observations are intended to identify certain conditions observed during an inspection that have the potential to lead to quality issues during the manufacturing of a product. Once we observe such conditions, we can then work with a company to help identify a path forward to remedy the issues. …

In the case of Emergent Biosolutions, *we are working with the company to address the conditions identified. At the agency's request, Emergent Biosolutions has agreed to pause new production while it works with the FDA to resolve potential quality issues*. For *the vaccines already manufactured*, the products *will undergo additional testing and will be thoroughly evaluated to ensure their quality before any potential distribution. We will not allow the release of any product until we feel confident that it meets our expectations for quality*.

246. However, the same day, Emergent filed the 4/21/2021 Form 8-K attaching the 4/21/2021 Press Release, which contained materially false and misleading statements spinning the FDA's findings as alleged *supra*, including, *inter alia*, statements that the FDA had provided "specific feedback" about the Bayview facility, that its doing so was "normal" after an inspection, that any issues were "correctable," that Emergent was taking "swift action" to address them, and that it was "exceedingly proud of [its] heroic workforce in Baltimore."

247. On this news, Emergent's stock price declined an additional $2.88 per share, or 4.4%, on elevated volume, from a close of $66 per share on April 21, 2021, to close at $63.12 per share on April 22, 2021. Defendants' issuance of the 4/21/2021 Form 8-K and 4/21/2021 Press Release was intended to and did spin the 4/21/2021 FDA Report, delay the market's digestion of FDA's findings, and mute the extent of the partial corrective stock decline.

248. Analysts nevertheless reacted negatively to this news. For instance:

(a)    In its April 21, 2021 analyst report, J.P. Morgan *reduced the price target on Emergent's stock from $99 to $65*, stating that *FDA's observations at Emergent's Bayview facility "include improper handling of materials to avoid contamination, insufficient sanitation,*

176

*inadequate quality control procedures, lack of proper training for employees, and failure to maintain accurate records, among others*." J.P. Morgan added: "*given the range of missteps found and the unfavorable attention directed toward this key CDMO site, we see today's announcement underscoring the risk to the company's ability to win other CDMO business, or at a minimum the market's perception of that ability*."

(b)     In its April 22, 2021 analyst report, Cowen *reduced the price target on Emergent's stock from $86 to $67,* stating, "*[t]he FDA released Form 483 detailing 9 observations of deficiency from a recent inspection at EBS's Bayview facility. We see this as yet another headwind to future CDMO revenue given the ongoing negative news flow. The negative news flow associated with this FDA inspection and Congressional hearing will likely make it difficult to win new CDMO business*."

249.    On April 29, 2021, during the after-hours 4/29/2021 Earnings Call, Defendant Kramer admitted, "We had implemented lawyers of disinfection and other protocols to lessen the inherent risk of cross-contamination. *We believe that the batch was likely contaminated when one or more of these precautions did not function as anticipated resulting in the transmission of the AstraZeneca virus to the Johnson & Johnson production suite*." Defendant Lindahl discussed impacts from Emergent's contaminated vaccine debacle, in lowered projections for CDMO services revenue, total revenue, adjusted EBITDA, and adjusted net income, adding, "***The primary driver of these changes is our revised outlook for CDMO services revenue. The forecasted range of expected CDMO services revenues has been reduced primarily due to the hold of certain COVID-19 vaccine bulk drug substance lots, as well as our commitment not to initiate new manufacturing at Bayview, pending further review by the FDA.*** Even assuming FDA concurrence to reinitiate new manufacturing and/or release of lots, we expect a delay in the

timing of expected revenue." Responding to an analyst question, he added, "[W]e are anticipating that revenue would shift into 2022 to the degree that it's not recognized this year. I should say that the key variable right now relates to next steps at Bayview." Defendant Kramer also announced that Defendant Husain "will be leaving Emergent to pursue another opportunity" and that Sean Kirk, EVP of Manufacturing and Technical Operations, was "taking a personal leave of absence."

250.    On April 30, 2021, CNBC's Closing Bell news program entitled, "Emergent BioSolutions CEO Walks Back Denial Regarding Cross-contamination" (the "4/30/2021 CNBC Report"), reported that Defendant Kramer walked back his earlier denial on the CNBC broadcast about cross-contamination at the Bayview plant juxtaposing Defendant Kramer's earlier statement during the 4/1/2021 CNBC Interview ("*It isn't the case or wasn't the case where an ingredient from one vaccine contaminated or impacted the other*") with his statement during the April 29, 2021 Earnings Call, "*The batch was likely contaminated when one or more of these precautions did not function as anticipated resulting in the transmission of the AstraZeneca virus to the Johnson & Johnson production suite*." Program reporter Meg Tirrell added, "I got in touch with Emergent last night to ask what changed in the last month or so, and they said, '*Nothing changed. Mr. Kramer simply misspoke on your program.*'"

251.    Also on April 30, 2021, Emergent submitted to the FDA its 52-page 4/30/2021 Emergent FDA 483 Response (discussed in §V.F.1. *supra*), which was posted (in heavily redacted form) on the FDA's website and which, *inter alia*, disclosed details of the J&J bulk drug substance *contamination*, the *possible sources* (plural), *how quickly* Defendants knew of it, and *how many remedial steps* Defendants proposed to take. It described the "out-of-specification" (OOS) test result for a J&J drug substance batch manufactured at the Bayview facility, saying that Emergent "*immediately* initiated laboratory investigations determine[ed] that the OOS results were not due

to laboratory error and were valid OOS results," adding that "additional investigational testing on the impacted control cell test sample confirmed the presence of a [*redacted*]," and concluding, "***These results indicated a possible contamination*** with another [*redacted*]." The explanatory text, though redacted, made clear that the AstraZeneca vaccine was the source of contamination:

> At the time of the deviation, drug substance manufacturing for the [*redacted*] vaccine was in operation in manufacturing Area [*redacted*], and [*redacted*] drug substance manufacturing was operating in Area [*redacted*], which is independent and separated from Areas [*redacted*]. However, ***the manufacturing of drug substance of both vaccine candidates in the same facility raised the possibility that the contaminant was the [redacted] vector***.

It added that Emergent "***immediately***" initiated a "***manufacturing investigation***," opened a ***deviation***, and "conducted ***a root cause analysis*** that included review of Batch [*redacted*], in-process testing results and data, finished product data, and a review of the manufacturing campaign timeline with a focus on activities impacting Batch [*redacted*]." An "impact assessment" and "extended comparability assessment" indicated that just one batch was "exhibiting ***viral contamination***." It said an "***investigation report*** was issued and ***provided to the FDA on [redacted]***" – redacting the date – and "The root cause analysis determined that the [*redacted*]" – redacting its findings. However, the investigation report was clearly submitted to the FDA ***by no later than April 11, 2011***, because, the letter continues, "***Subsequent*** to the receipt of the investigation report on [*redacted*], FDA conducted an inspection of the Bayview facility ***from April 12 to April 20, 2021***," resulting in the FDA's issuance of the Form 483 to which Emergent was responding.[18] It said "[U]pon receipt of the [Form] 483, ***Emergent, along with J&J, performed an in-depth analysis of potential sources of contamination and cross-contamination across the Bayview facility***," including a "detailed map identifying every activity performed in the

---

[18]    Defendant Kramer later testified to Congress on May 19, 2021, "An investigation report was provided to FDA on April 5, 2021."

facility relating to the manufacture of…bulk drug substance…to identify mechanisms by which a contaminant could be introduced and the corresponding controls that must be in place…."  The QEP (Quality Enhancement Plan) proposed in the response was "based on a comprehensive review of *potential sources of contamination at the Bayview facility*, and includes actions to address the most probable root cause identified in deviation 3100012112 as well as *other potential sources of contamination*, including those identified in the [Form] 483 observations."  It also conceded, "*Emergent also recognizes that the rapid ramp-up of full-scale manufacturing activities for two live virus Covid-19 vaccine drug substances revealed several areas for further strengthening with respect to the Bayview facility's cross-contamination control procedures*."  The bulk of the 52-page 4/30/2021 Emergent FDA 483 Response outlined the myriad remedial steps it claimed were necessary and still underway to address the multitude of serious concerns raised by the FDA's inspection and in the 4/21/2021 FDA 483 Report, including as discussed in §V.F.1., *supra*.

252.    On this news, which was muted by Defendants' false and misleading statements within Emergent's 4/29/2021 Earnings Call and in the 4/30/2021 Emergent FDA 483 Response, as discussed in §V.F.1. *supra*, Emergent's stock price declined an additional $2.17 per share, or 3.4%, on high volume, from a close of $63.15 per share on April 29, 2021, to close at $60.98 per share on April 30, 2021.

253.    Analysts reacted negatively.  For instance, in its April 30, 2021 analyst report, Chardan *reduced its price target on Emergent's stock from $112 to $92*, stating, "*[i]ssues at Bayview add uncertainty to CDMO revenue growth*. Making *a critical mistake on a high profile manufacturing project* will lead to that. For now, we know that *the $174 mm associated with the drug substance manufacturing contract for AstraZeneca's (AZ, Unrated) Covid-19 vaccine candidate in 2021, will be significantly pared back, and the option to extend for additional years*

*is gone*. ***Manufacturing of drug substance for J&J Covid-19 vaccine at its Bayview facility is on pause pending remediation of the 483 observations from the FDA inspection of the facility last week***." Chardan added: "For now, we have lowered our CDMO revenue estimate for 2021 from $952 mm to $774 mm, and for 2022 from $542 mm to $373 mm."

254.    On June 11, 2021, *The New York Times* reported that the ***FDA said that 60 million doses of J&J's COVID-19 vaccine produced at the Bayview factory could not be used and would be discarded*** and 10 million J&J doses from the factory could be distributed ***but only with a warning that regulators cannot guarantee that Emergent followed proper manufacturing practices.*** The *New York Times* also reported that the FDA has not yet decided whether Emergent can reopen the Bayview factory. *The Hill* cited *The New York Times* report and quoted Peter Marks, Director of the FDA's Center for Biologics Evaluation and Research, as stating, "These actions followed an extensive review of records, including the production history of the facility and the testing performed to evaluate the quality of the product."

255.    On this news, Emergent's stock price declined $1.97 per share, or 3%, on elevated trading volume, from a close of $65.48 per share on June 10, 2021, to $63.51 per share at the close of trading on June 11, 2021.  The partial corrective stock price decline was muted by Emergent's positive statement released in response to these news reports, in which it stated, "We look forward to continuing to work with the FDA and Johnson & Johnson toward the release [of] additional doses and resuming production at our Bayview facility" and by the false and misleading statements in the 6/11/2021 Press Release, as alleged *supra*.

256.    On June 18, 2021, *The New York Times* reported the Bayview facility's problems were so serious that more than 100 million doses of both the J&J and AstraZeneca vaccines remained in limbo, as the FDA was "poring over records of virtually every batch that Emergent

produced to determine if doses are safe." It added that the FDA had permitted release of 25 million J&J doses, but no decision had been made regarding any AstraZeneca doses, which jeopardized a U.S. pledge to share 80 million doses of COVID vaccine to countries in need – a donation that was to have included as many as 60 million AstraZeneca doses.

257.    On this news, Emergent's stock price declined an additional $2.57 per share, or 4.1%, on exceptionally high volume, from a close of $63.12 per share on June 17, 2021, to close at $60.55 per share on June 18, 2021.

258.    On November 4, 2021, after hours, Defendants Emergent, Kramer, and Lindahl made a series of disclosures that further partially corrected the alleged fraud, as follows:

(a)    Emergent filed with the SEC after the close of the markets a Form 8-K signed by Defendant Lindahl (the "11/4/2021 Earnings Form 8-K"), which attached as Exhibit 99.1 an after-hours earnings press release (the "11/4/2021 Earnings Release") and as Exhibit 99.2 slides title "3Q21 Investor Update" for presentation during an analyst call (the "11/4/2021 Earnings Call Slides"). The 11/4/2021 Earnings Release, under the header "Q3 2021 And Other Recent Business, stated, "Announced a mutual agreement with *the U.S. Department of Health and Human Services* (HHS) *to terminate* the Company's 2012 *Center for Innovation in Advanced Development and Manufacturing (CIADM) contract* to establish a public-private partnership for pandemic preparedness, *along with all associated task orders, including the 2020 task order to reserve capacity and expand manufacturing for third-party COVID-19 vaccine and therapeutic candidates*." It later stated, "*In November 2021*, the Company and *BARDA* mutually *terminated this arrangement ending the public-private partnership with BARDA*." It also quantified the devastating impact on Emergent's reported results and future prospects due to losing the lucrative government COVID vaccine contract as follows: (a) the total value Emergent would realize from

the now-cancelled contract shrunk from $650.8 million to $470.9 million, *a reduction of nearly $180 million*;  (b) Emergent recorded a *reversal of $86 million in revenue* during Q3 2021 based on the lack of cash collections under the agreement in recent months; and (c) the "Impact of CIADM termination and other modifications" was a *$171.1 million reduction* to Emergent's "CDMO Backlog Rollforward."  The 11/4/2021 Earnings Call Slides also quantified the "BARDA Task Order Reduction" at *$180 million*, and it reduced 2021 forecasts for CDMO Services (from $765-$875 million to $600-$650 million) and adjusted EBITDA (from $620-$720 million to $500-$550 million), adjusted net income (from $395-470 million to $315-$350 million), and adjusted gross margin (from 61%-63% to 54%-56%).

(b)    Emergent filed a second after-hours Form 8-K (the "11/4/2021 Contract Form 8-K"), signed by Defendant Lindahl, which reiterated that Emergent and the U.S. government had entered into a modification that terminated their contract, including the May 30, 2020 task order to reserved and expand manufacturing of third-party COVID-19 vaccines.  It also stated that the total contract value to be realized under the task order had reduced from $650.8 million to $470.9 million, and the total base contract value realized was reduced from $163.2 million to $140.5 million.  It added, "*Other than customary post-termination activities, Emergent and Barda have no ongoing obligations related to these contracts*."

(c)    That night, Emergent held its Q3 20221 earnings call (the "11/4/2021 Earnings Call").  Defendant Kramer said in prepared remarks, "[T]oday we're announcing that the Department of Health and Human Services and Emergent have mutually agreed to *end our partnership in the CIADM program*. The agreement will *close out all open obligations and task orders issued under CIADM base contract including the task order related to COVID-19 response*."  He added that "*execution of the CIADM program and the necessary operational*

*investments by all administrations fell short of what was needed to maintain capability in case of an emergency*."  Defendant Kramer disclosed that Emergent's Head of Global Quality was leaving the company.  He also disclosed the significant, costly steps Emergent was having to undertake to remedy the extensive, longstanding problems at its Bayview facility, stating, "***Over the last five months, we've invested millions of dollars to overhaul cleaning procedures, upgrade our facilities, implement additional quality control and oversight practices, and make significant improvements to the processes for batch record keeping, personnel training, data integrity and lab testing***."  He added, "We took the added step to ***bring in a recognized independent consultancy***, ***who is expert in quality control and who are now reviewing and performing certifications prior to release of any batches***."  In prepared remarks, Defendant Lindahl said, "[A]s part of this agreement to close out the arrangement, ***the value of the BARDA task order was reduced by $180 million***," so that consequently, "***we have tightened the range of our total revenues, which lowered the midpoint by $50 million***."  He said that because the U.S. government had not fully paid amounts due under the task order, "***as of September 30, we reversed $86 million of revenue and removed accounts receivable balances related to uncollected amounts under the BARDA task order***," which he said was "principally" the cause of "total revenues of $329 million below the prior year period."  Regarding the uncollected payments, Defendant Kramer admitted that it was "clearly an unusual circumstance" for the U.S. government to have not "paid within a very short period of time."  Defendant Lindahl conceded that certain "***trends***," including "***lower capacity utilization for drug substance production at Bayview***** while it is solely dedicated to J&J's COVID-19 vaccine candidate," "the ***additional investments we are making at Bayview*** in support of our quality enhancement plan," and "***increased operating costs at our Bayview facility***," were "***applying pressure to margins***" within the CDMO services segment, which reported 10% lower

gross margin than the prior period. He added that the "*rolling backlog*" was *9% lower* than the prior quarter "*reflecting the impact of the BARDA task order termination*."

(d)     Defendant Kramer published another op-ed for the *Baltimore Sun* titled "Here's why we're ending our pandemic manufacturing partnership with the U.S. government" (the "11/4/2021 Kramer Op-Ed"). In it, Kramer claimed that the U.S. government had agreed to Emergent's request that their 9-year pandemic manufacturing contract come to an end. He wrote, "The original intent of this partnership was to create a facility that could produce 50 million dose-equivalents of influenza vaccine drug substance in four months in the event of a pandemic." However, he faulted the U.S. government for purported long-term neglect and lack of investment, claiming, "Facility expansion was only a first step. To build and maintain a state of readiness, *continued investment is necessary*. *The government maintained that they would provide us with the necessary drug development work to build and maintain those capabilities*. *That didn't happen*." He then gave his version of why the COVID-19 debacle occurred:

> Fast forward to the emergence of COVID-19. The federal government sought domestic manufacturing capacity as pharmaceutical companies began trials on dozens of vaccine candidates. Despite the eight years and over $200 million of additional Emergent investment, *our Bayview facility* was still developing clinical-stage drug substance material, *with fewer than 100 employees*, and *had never been tested by the government for influenza, much less a new virus*. Ultimately, *Emergent would hire and train more than 300 new employees and deploy never-before-tested processes and technologies* to manufacture not one, but two, novel coronavirus vaccine candidates.
>
> We had already committed to Johnson & Johnson to manufacture their vaccine candidate when the U.S. government, through the Center for Innovation in Advanced Development and Manufacturing (CIADM) program, reserved the remaining capacity at Bayview to be used at their discretion. They directed us to work with AstraZeneca. No one at the time knew which vaccine candidates would succeed. So, even though the U.S. government, *we* and our partners *understood the risks of producing two viral-vector vaccines in the same facility*, we took on the challenge.

185

Then, in March of this year, a single batch of *J&J vaccine was cross contaminated with the AstraZeneca vaccine.  Emergent has taken full responsibility for this incident and addressed the conditions that caused it*.  …  *[M]ore batches [are] still under review*.

259.    On this news, Emergent's stock price sharply declined an additional $19.50 per share, on massive volume, from a close of $52.61 per share on November 4, 2021, to close at $33.11 per share on November 5, 2021, a precipitous decline of over 37%.

### G.    Additional Facts Probative of Scienter

260.    A strong inference of Defendants' scienter is evidenced through a holistic examination of the facts and circumstances.

#### 1.    *Defendants' Knowledge or Reckless Disregard of Red Flags Demonstrates Scienter*

261.    For many of the same reasons why Defendants' alleged misstatements and omissions were materially false or misleading when made, there is also a strong inference that they were made with the requisite scienter.  Those reasons, include, *inter alia*, the following:

(a)    As described in §V.E.1. *supra*, statements by the CWs, former employees with relevant first-hand knowledge, Emergent's locations – including Bayview – had widespread problems with facilities, equipment, processes and procedures, personnel, and training that posed significant risks well before the Class Period.  The CWs shed particular light on Defendant Husain's state of mind.  CW1 said that *Defendant Husain was intimately involved in overseeing progress on all of the COVID-19 projects* and "*whatever he said, kind went - nothing happened without his direction*."  CW1 stated that because of the Bayview facility's deficiencies, every COVID-19 project faced significant delays and missed deadlines, yet Defendant Husain continued to push for additional contracts with new customers by presenting to potential customers in the summer and fall of 2020 about Emergent's capability to take on even more development and manufacturing work.  CW1 and other project managers discussed these delays in highly attended

bi-monthly project management meetings *led by Defendant Husain* and Rick Welch. CW1 stated that *CW1 and other project managers informed Defendant Husain and Welch about mold problems at the Bayview facility*. CW5 described *frequent meetings about the vaccine projects attended by Defendant Husain* and Rick Welch, VP Development Services, CDMO Business Unit. CW5 said that *during the weekly meetings with vaccine clients to discuss progress of work and deadlines, Emergent representatives, including Defendant Husain, did not convey to clients the full extent of problems at the Bayview facility*. CW5 said that *Welch did not want CW5 to take detailed notes, including who said what about certain action items*, and *reviewed the notes before they could be released to anyone*. CW5 said that *sometimes after submitting notes for review, they came back revised with certain parts missing*.

(b)     As detailed in §V.E.2. and §V.F.4. *supra*, both before and during the Class Period, the FDA repeatedly notified Emergent as to the scope and extent of the problems pervading its locations – including Bayview – through a litany of inspections, inspection reports, and Forms 483, as well as active engagement with Emergent's on-site personnel and "*senior management*," written responses by Emergent to the Forms 483, and remedial measures purportedly undertaken. These reports create a record of clear, persistent, well-documented deficiencies in facilities, equipment, processes and procedures, personnel, and training across Emergent's U.S. footprint. Notably, serious, recurrent risks are identified and documented regarding *contamination risks* resulting from inadequate sanitization, insufficient decontamination, facilities and equipment shortcomings, deficient or disregarded procedures that violated GMP, poorly trained personnel, and a failure to investigate known problems or violations – risks that led to the April 2021 destruction of J&J drug substance equivalent to 15 million vaccine doses due to contamination during the manufacturing process at the Bayview facility. By this point in the Class Period, this

voluminous record of investigation reports / responses by FDA and others included, *inter alia*: 5/16/2017 FDA 483 Report, 6/6/2017 Emergent FDA 483 Response, 7/18/2017 FDA Inspection Report, 12/21/2017 FDA 483 Report, 1/16/2018 Emergent FDA 483 Response, 4/23/2018 FDA Inspection Report, 6/13/2018 FDA 483 Report, 7/13/2018 Emergent FDA 483 Response, 8/16/2018 FDA Inspection Report, 9/27/2018 FDA 483 Report, 10/19/2018 FDA Inspection Report, 2/16/2019 FDA 483 Report, 3/8/2019 Emergent FDA 483 Response, 4/1/2019 FDA Inspection Report, 5/22/2019 FDA Inspection Report, 9/13/2019 FDA 483 Report, 10/4/2019 Emergent FDA 483 Response, 11/7/2019 FDA Inspection Report, 4/20/2020 FDA Inspection Report, 4/20/2020 FDA 483 Report, Congressional Materials: 6/17/2020 Warp Speed Report, 7/24/2020 Janssen Audit Report, 4/21/2021 FDA 483 Report, 4/30/2021 Emergent FDA 483 Response.  Significantly, as alleged in §V.E.2.b.ii. and §V.G.1., Defendant Kramer testified that he did not dispute the FDA's findings and that he personally read "most" of the FDA's reports.

(c)    As alleged in §V.E.3. and §V.F.4. *supra*, investigative reporting further detailed the deficiencies at Emergent's Bayview facility, based on audits and investigations not only by the FDA, but also by J&J, AstraZeneca, BARDA, and Emergent's own quality investigators.  *The New York Times* first revealed that human error caused the cross-contamination of the J&J vaccine drug substance with AstraZeneca material and that it was J&J – not Emergent – who identified the contamination issue.  The *AP* cited documents obtained by FOIA to describe the litany of FDA citations leveled on the Bayview facility, including deficient and ignored anti-contamination procedures despite visual risks, a lack of compliance audits, failure to eliminate mold and residues on equipment and surfaces, and a failure to pursue investigations into hundreds of reprocessed or deleted data files, deviations from test methods, and unsupported manual adjustments to testing data.  *The New York Times* investigation, which included review of internal documents, revealed

a "corporate culture that often ignored or deflected missteps" where "top Emergent leadership tolerated and even encouraged the flouting of federal standards for manufacturing," leading to "critical" risks of viral and microbial contamination.  It found that Emergent failed to follow basic industry standards, failed to maintain clean and sanitary facilities, inadequately trained personnel, failed to investigate problems, and failed to address repeated disinfection and contamination prevention shortcomings – such that a "pattern of lapses suggested deeper quality issues."  As *The New York Times* reported, by this point in the Class Period, ***one AstraZeneca drug substance lot*** (equivalent to two to three million vaccine doses) ***was discarded*** in early October 2020 due to ***contamination or suspected contamination***, ***one batch of J&J drug substance was discarded*** in November 2020 after workers ***suffocated*** the cells growing the virus for the vaccine by hooking up the wrong gas line, ***four AstraZeneca drug substance batches*** (equivalent to eight to twelve million vaccine doses) ***were discarded*** in December 2020 due to being "spoiled by ***bacterial contamination*** of equipment," and the ***contamination*** of 15 million dose equivalents of J&J drug substance had occurred in early February 2021 and been reported to HHS by March 25, 2021 (part of over 60 million J&J dose-equivalents that would be discarded due to deficient manufacturing at the Bayview facility from the same time period).

(d)     As alleged in §V.E.4. *supra*, two Congressional committees, after review of documents from Emergent, J&J, and AstraZeneca, testimony from Emergent's Executive Chairman and Defendant Kramer, and inspection reports by FDA and Operation Ward Speed investigators, found that Emergent was warned "multiple times" in 2020 that serious manufacturing problems and deficient controls at the Bayview facility could lead to ***contamination*** – persistent mold, inadequate and poorly disinfected equipment, inadequate personnel training, deficient quality functions, substandard procedures, and deficient contamination control strategy

at the Bayview facility. The committees found that Emergent was aware of the problems and admitted many of them, but failed to take sufficient remedial action, leading to recurrent contamination incidents, which by this point in the Class Period, included **one AstraZeneca drug substance lot** (equivalent to two to three million vaccine doses) **discarded** in early October 2020 due to **suspected contamination**, **one batch of J&J drug substance discarded** in November 2020 after workers **suffocated** the cells growing the virus for the vaccine by hooking up the wrong gas line, **four AstraZeneca drug substance batches** (equivalent to eight to twelve million vaccine doses) **discarded** in December 2020 due to **bacterial contamination** of equipment, 15 million dose-equivalents of J&J drug substance **contaminated** with AstraZeneca vaccine materials between January 19 and February 21, 2021 and discovered by March 5, 2021, with 60 million more dose-equivalents under review for potential contamination.

(f)    As alleged in §V.F.4. *supra* and §G.1. *infra*, Defendants also later conceded facts demonstrating that their earlier misstatements and omissions were materially false and misleading. Defendant Kramer admitted in his 11/4/2021 Kramer Op-Ed that the Bayview facility **never** had the level of investment required to maintain its readiness. Defendant Kramer admitted during the 4/29/2021 Earnings Call that the J&J contamination, which occurred back in January or February 2021, happened because of a failure of controls and ignored anti-contamination procedures. In the 4/30/2021 CNBC Report, an Emergent spokesperson conceded the falsity of Defendant Kramer's statement in the 4/1/2021 CNBC Interview ("It isn't the case or wasn't the case where an ingredient from one vaccine contaminated or impacted the other"). The 4/30/2021 Emergent FDA 483 Response admitted that the AstraZeneca vaccine material was likely the source of contamination of the discarded J&J vaccine drug substance batch, that Defendants knew of the contamination "immediately" after it was detected, that Emergent's cross-contamination control procedures could

not handle "the rapid ramp-up of full-scale manufacturing activities for two live virus Covid-19 vaccine drug substances," and that a broad array of reforms were needed.

262.    Beyond the foregoing, Defendant Kramer visited the Bayview facility during the Class Period and knew it well enough to give tours to the Governor of Maryland, Larry Hogan, and his staff.  For instance, *The New York Times* published this photo – with a credit to the Office of Governor Hogan – with the caption, "Mr. Kramer, right, giving a tour at the lab in Baltimore where Emergent makes COVID-19 vaccines."



Photo credit: Joe Andrucyk / Office of Governor Larry Hogan, via *The New York Times*

263.    In his Congressional testimony on May 19, 2021, concerning Emergent's suspension of COVID-19 manufacturing after the J&J contamination at the Bayview facility, Defendant Kramer conceded: "***The contamination incident that led to the shutdown of new vaccine production at Bayview was very serious and completely unacceptable***" and "***As CEO, I***

*take full responsibility for that*."  Significantly, his testimony also conceded FDA's articulated timeline of events, which had reported that J&J notified Emergent on *March 16, 2021*, that a specific batch of its bulk drug substance was contaminated with a material used in the bulk drug substance for AstraZeneca.  Kramer testified that the J&J vaccine batch "failed routine quality control testing" "in *March 2021*" and that a manufacturing investigation began "*immediately*" and "determined that bioreactor media used for the Johnson & Johnson program was in the vicinity of material being disposed from the AstraZeneca suite, and it is believed that was the point of contamination."  His Response to Questions for the Record said that the manufacturing investigation began on *March 17, 2021*, and he pegged *March 24, 2021*, as the date on which "investigational testing by Emergent identified the presence in the batch of a vial vector consistent with the AstraZeneca viral vector."  It added, "Mr. Kramer recalls being informed of that development on *either March 24 or March 25, 2021*, and also recalls being informed *earlier* that a sample from a batch had failed an out-of-specification test."  He confirmed the *New York Times* article reporting cross-contamination on March 31, 2021 prompted Emergent's *April 1, 2021* press release.  He also testified that "the Investigation and Impact Assessment report containing the initial findings from the investigation was submitted by Janssen to the FDA *on April 5, 2021.*"

264.    Defendant Kramer also *conceded* knowledge of the antecedent inspections and audits of the Bayview facility that identified serious deficiencies and contamination risks.  In his oral testimony, he *admitted* knowledge of the contamination issues uncovered in J&J's June 2020 inspection of the Bayview facility as presented in the 7/24/2020 Janssen Audit Report (as discussed in §V.E.4., *supra* and V.G.1., *infra*), when he testified:

> Question:    ***Were you aware in June 2020 of these inspection findings from Johnson & Johnson that there was contamination and there was no plan for the deficiencies that they saw***?  Were you aware, in June 2020, of these inspection findings, Mr. Kramer?

Kramer:  *I was aware of the report*.

265.    Defendant Kramer's testimony, both oral and written, also **conceded** that he understood the risks of contamination more broadly.  He testified:

Question:    Mr. Kramer, on a recent call with investors you admitted that, quote, "**Cross-contamination is a well-known risk when producing drug substance from multiple viral products in a single plant**."  So, Mr. Kramer, **is it fair to say that you were aware of this risk before your company proceeded to ruin millions of coronavirus vaccines through cross-contamination**?

Kramer:    **[I]t is a well-known risk that if the precautions are not taken there is a <u>likelihood</u> of a cross-contamination**.

In his Response to Questions for the Record, he further testified more broadly, *inter alia*, that "**Mr. Kramer was aware that** vendors, such as **Janssen and AstraZeneca, conducted audits** from time to time and that the **FDA and other regulators conducted inspections** as well," that "**he was aware that the company carried out risk assessments of Bayview** and other facilities when needed," that **information** contained **in** "**reports of inspections, audits, and risk assessments**" "is **provided to senior management** when appropriate," that "**issues** raised during these normal course activities **were elevated to Mr. Kramer when deemed appropriate**," that "**[o]n a routine basis**, **the observations and findings from audits, inspections, and risk assessments are reviewed both internally and with those who issued the relevant reports**."  He added that "identification of areas for improvement is a **critically important** output of the process of conducting inspections and audits" and "such findings are **recorded in the company's systems to make sure that they are monitored** and **responded to appropriately and in a timely manner**."

266.    Significantly, Defendant Kramer also admitted under oath that **he reads** "**the majority**" **of FDA inspection reports** done on Emergent's facilities – not summaries or digests of the reports, but the reports themselves.

| Question: | In June 2020, not the government but your customer vaccine manufacturer, J&J, through its subsidiary, Janssen, performed its own audit of Emergent's facilities, and it found that there were, quote, ''mold issues associated with the facility shutdown/startup.'' And then 10 months later, when the FDA came in for an inspection, they found that the building used for manufacture of vaccine, quote, ''is not maintained in a clean and sanitary condition,'' unquote, and that there was, quote, ''brown residue was observed on the wall.'' So, Mr. Kramer, do you have a knowledge of what this brown residue was? |
|---|---|
| Kramer: | I am not aware of the brown residue material. |
| Question: | So, you generally don't read the FDA inspection reports. Is that correct? |
| Kramer: | *I do read the majority of the FDA inspection reports*. I just don't recall this particular reference. |

267.     The 11/4/2021 Kramer Op-Ed also **conceded**, "*[W]e…understood the risks of producing two viral-vector vaccines in the same facility*."

268.     The foregoing allegations, read holistically, establish a strong inference of Defendants' knowledge of or their deliberate recklessness to undisclosed facts and circumstances that rendered their public statements and omissions at issue materially false or misleading, and thus support a strong inference of their scienter in making those misstatements and omissions, as alleged herein.

## 2.     *The Individual Defendants Were Financially Motivated To Commit Fraud*

269.     The strong inference of Defendants' scienter is further evidenced by the insider transactions reported by Defendants Kramer and Lindahl during the Class Period, involving Emergent common stock, stock options, Restricted Stock Units ("RSUs"),[19] and Performance-

---

[19]     In Emergent's 2006 Stock Incentive Plan, RSUs were defined as follows:
        7.          Restricted Stock; Restricted Stock Units
        General.    The Board may grant Awards entitling recipients to acquire shares of Common Stock ("Restricted Stock"), subject to the right of the Company to repurchase all or part of such shares at their issue price or other stated or formula price from the recipient in the event that conditions specified by the Board in the applicable Award are not satisfied prior to the end of the applicable

Based Stock Units ("PSUs").[20]  As the only two Defendants who were reporting persons required to file SEC Form 4 during the Class Period, the fact that they both profited from transactions as prices allegedly inflated by the fraud pled herein supports a strong inference of scienter.[21]

<u>Defendant Kramer's Insider Transactions During The Class Period</u>

270.    Defendant Kramer entered the Class Period with balances of 75,674 shares of Emergent common stock and the right to acquire 148,284 additional shares at costs substantially below-market by way of stock options or at no-cost by way of RSUs.[22]   Defendant Kramer's transactions during the Class Period were as follows:

| Common Stock & Stock Option Transactions | | | | |
|---|---|---|---|---|
| **Transaction Date** | **Emergent Purchases/ Sales** | **Shares** | **Price** | **Funds Spent / Gained** |
| 01/15/2021 | Exercise of Option | 19,026 | $25.6200 | ($487,446) |
| 01/20/2021 | Exercise of Option | 2,232 | $26.4500 | ($59,036) |
| 01/21/2021 | Exercise of Option | 21,900 | $26.4500 | ($579,255) |
| 02/08/2021 | Exercise of Option | 32,397 | $30.8600 | ($999,771) |
| 02/08/2021 | Exercise of Option | 13,000 | $30.6300 | ($398,190) |
| | | | | |
| **Sub-Total Options Exercised** | | **88,555** | **Cost** | **($2,523,699)** |
| | | | | |

---

[20] restriction period or periods established by the Board for such Award. Instead of granting Awards for Restricted Stock, the Board may grant Awards *entitling the recipient to receive shares of Common Stock to be delivered at the time such shares of Common Stock vest* ("Restricted Stock Units") (Restricted Stock and Restricted Stock Units are each referred to herein as a "Restricted Stock Award").

[20] In Emergent's 2018-2020 Performance-Based Stock Unit Award Agreement, PSUs were defined as follows:

In consideration of services rendered to the Company by the Participant, the Company has granted to the Participant, subject to the terms and conditions set forth herein and in the Company's Fourth Amended and Restated 2006 Stock Incentive Plan (the "Plan"), an award of performance-based stock units (individually, a "PSU" and collectively, the "PSUs"), in an amount equal to the maximum number of shares issuable under this Agreement (as described on Schedule 1 to this Agreement). *The PSUs entitle the Participant to receive, upon and subject to the vesting of the PSUs* (as described in Section 2 below), *one share of common stock, $0.001 par value per share, of the Company (the "Common Stock") for each PSU that vests*. The shares of Common Stock that are issuable upon vesting of the PSUs are referred to herein as the "Shares."

[21] Defendant Husain never filed a Form 3 and is not understood to have been a reporting person during the Class Period.  As such, he did not file SEC Form 4, his insider transactions were not publicly disclosed, and his undisclosed trading patterns cannot be used by either side to support or oppose an inference of scienter at the pleading stage before discovery.

[22] For both Defendant Kramer and Defendant Lindahl, their Form 4 filings with the SEC do not make clear the scope and extent of their pre-Class-Period holdings of PSUs.

| 01/15/2021 | 10b5-1 Stock Sale | (19,026) | | $106.0080 | $2,016,908 |
|---|---|---|---|---|---|
| 01/20/2021 | 10b5-1 Stock Sale | (2,232) | | $110.0000 | $245,520 |
| 01/21/2021 | 10b5-1 Stock Sale | (21,900) | | $110.0300 | $2,409,657 |
| 02/08/2021 | 10b5-1 Stock Sale | (45,397) | | $120.0300 | $5,449,002 |
| | **Sub-Total 10b5-1 Sales** | **(88,555)** | | **Proceeds** | **$10,121,087** |
| 05/08/2020 | Stock Sale | (95) | | $79.2500 | $7,529 |
| 02/09/2021 | Stock Sale | (3,870) | | $123.4500 | $477,752 |
| 02/09/2021 | Stock Sale | (423) | | $123.4500 | $52,219 |
| 02/24/2021 | Stock Sale | (2,425) | | $93.4900 | $226,713 |
| 02/26/2021 | Stock Sale | (2,576) | | $97.1500 | $250,258 |
| 05/08/2021 | Stock Sale | (94) | | $61.6200 | $5,792 |
| | **Sub-Total Sales** | **(9,483)** | | **Proceeds** | **$1,020,264** |

| RSU & PSU Transactions | | | | | |
|---|---|---|---|---|---|
| **Transaction Date** | **Unit Grants / Exercises** | **Units** | **Vesting Date** | **Price** | **Funds Spent / Gained** |
| 02/24/2021 | Exercise of RSU | 14,975 | 02/24/2021 | $0 | $0 |
| **Sub-Total Exercises of RSUs** | | **14,975** | | **Cost** | **($0)** |
| 02/09/2021 | Exercise of PSUs | 2,958 | 02/09/2021 | $0 | $0 |
| 02/09/2021 | Exercise of PSUs | 323 | 02/09/2021 | $0 | $0 |
| 02/24/2021 | Exercise of PSUs | 14,975 | 02/24/2021 | $0 | $0 |
| **Sub-Total Exercises of PSUs** | | **18,256** | | **Cost** | **($0)** |

| **Totals** | **Shares Purchased** | **0** | **Transaction Costs** | **$0** |
|---|---|---|---|---|
| | **RSU Shares Gained** | **+14,975** | **Transaction Costs** | **$0** |
| | **PSU Shares Gained** | **+18,256** | **Transaction Costs** | **$0** |
| | **Option Shares Gained** | **+88,555** | **Transaction Costs** | **($2,523,699)** |
| | **Shares Sold** | **-98,038** | **Transaction Proceeds** | **$11,141,351** |
| | | | **Net Gain to Defendant Kramer** | **+$8,617,652** |

<u>Defendant Lindahl's Insider Transactions During The Class Period</u>

271.   Defendant Lindahl entered the Class Period with balances of 2,506 shares of Emergent common stock and the right to acquire 22,167 additional shares at costs substantially below-market by way of stock options or at no-cost by way of RSUs. Defendant Lindahl's transactions during the Class Period were as follows:

| Common Stock & Stock Option Transactions | | | | |
|---|---|---|---|---|
| **Transaction Date** | **Emergent Purchases/ Sales** | **Shares** | **Price** | **Funds Spent / Gained** |
| 05/08/2020 | Sale | (728) | $79.2500 | $57,694 |
| 02/09/2021 | Sale | (2,522) | $123.4500 | $311,341 |
| 02/24/2021 | Sale | (1,010) | $93.4900 | $94,425 |
| 02/26/2021 | Sale | (819) | $97.1500 | $79,566 |
| 05/08/2021 | Sale | (1,054) | $61.6200 | $64,947 |
| | | | | |
| | **Sub-Total Sales** | **(6,133)** | **Proceeds** | **$607,973** |

| RSU & PSU Transactions | | | | | |
|---|---|---|---|---|---|
| **Transaction Date** | **Unit Grants / Exercises** | **Shares** | **Vesting Date** | **Price** | **Funds Spent / Gained** |
| 02/24/2021 | Exercise of RSU | 4,011 | 02/24/2021 | $0 | $0 |
| | | | | | |
| | **Sub-Total Exercises of RSUs** | **4,011** | | **Cost** | **($0)** |
| | | | | | |
| 02/09/2021 | Exercise of PSU | 2,495 | 02/09/2021 | $0 | $0 |
| 02/24/2021 | Exercise of PSU | 4,012 | 02/24/2021 | $0 | $0 |
| | | | | | |
| | **Sub-Total Exercises of PSUs** | **6,507** | | **Cost** | **($0)** |

| Totals | | | | |
|---|---|---|---|---|
| | **Shares Purchased** | **0** | **Transaction Costs** | **$0** |
| | **RSU Shares Gained** | **4,011** | **Transaction Costs** | **$0** |
| **Totals** | **PSU Shares Gained** | **6,507** | **Transaction Costs** | **$0** |
| | **Shares Sold** | **-6,133** | **Transaction Proceeds** | **+$607,973** |
| | | | **Net Gain to Defendant Lindahl** | **+$607,973** |

272.   These transactions were suspicious in amount, a fact that further supports the scienter inference.  Defendant Kramer's $8,617,652 in net gains from insider transactions (from

$11,141,351 in gross insider sale proceeds), compared suspiciously against his 2020 base salary of $875,014 and 2021 base salary of $1,000,000.  Furthermore, Kramer's $11.1 million in sale proceeds is approximately *31 times* larger than the $344,444 sale proceeds received during the comparable pre-Class Period.  Lindahl's $607,973 in insider transaction gains compared suspiciously against his 2020 base salary of $550,014 and 2021 base salary of $575,000 also is suspicious. Indeed, Lindahl's sales proceeds of $607,973 are over *8 times* larger than the $72,590 sale proceeds received during the comparable pre-Class Period.

273.    These transactions were also suspicious in timing vis-à-vis the alleged fraudulent misstatements and the alleged partial corrective disclosures, as alleged herein, a fact that further supports the scienter inference.

274.    Moreover, the fact that much of Defendant Kramer's trading occurred within a 10b5-1 plan supports, rather than undercuts, the scienter inference, because he *revised* that plan *during* the Class Period on November 13, 2020 – at the height of the alleged fraud – with the intention and benefit of *increasing* sales and profiting from the artificial inflation in Emergent's stock price due to the ongoing fraud, while knowing that the truth could soon be revealed about the Bayview facility's contamination problems and the resulting destruction of J&J and AstraZeneca vaccine drug substance batches.  Prior to that revision, Defendant Kramer's last sale within his 10b5-1 plan was in April 2016.  Shortly after that revision, Defendant Kramer sold 88,555 shares in a three-week period in January – February 2021, at prices ranging between 77% and 87.2% of the stock's Class Period trading high.

275.    Defendant Kramer's January / February 2021 trades were called out in a *Washington Post* article published April 25, 2021 and titled "CEO of vaccine maker Emergent sold $10 million in stock before company ruined Johnson & Johnson doses."  It noted that

Kramer's January / February 2021 sales, largely from options with expiration dates *years* later (between March 2022 and February 2024), were his first material sales since April 2016, after never selling more than $161,000 / year during 2016 - 2021.  It added that had those sales occurred in April 2021, they would have netted Kramer ***half*** as much ($5.5 million instead of $10 million), because Emergent's stock plummeted 50%+ (from ~$125 to ~$62 / share), due to revelations of poor financial results on February 19, 2021, the 15 million ruined J&J doses revealed in March 2021, AstraZeneca's ceasing vaccine production at the Bayview facility, and Emergent's temporary halting of new production.

276.    Two days later, on April 27, 2021, Senator Elizabeth Warren wrote a letter to SEC Chair Gary Gensler asking for an investigation into Kramer's $10 January / February 2021 stock sales and "pandemic profiteering."  Senator Warren challenged Kramer's use of his 10b5-1 plan, stating, "[A]s I wrote to the SEC earlier this year, 'new evidence indicates that executives – especially those in the healthcare industry – are abusing these plans to obtain huge windfalls at the expense of ordinary investors.  These abuses, and the plans' lack of transparency, damage investors and risk undermining public confidence.'  Mr. Kramer's use of this plan appears to be an example of the abuses that prompted my concerns."  She cited several examples of undisclosed, adverse facts – reported by the *New York Times* and *Washington Post* in April 2021 – from which "Kramer had ample knowledge of potential concerns about Emergent's production problems well before his stock sales, and before he adopted his trading plan in November 2020," including the discarding of a batch of AstraZeneca's COVID vaccine in October 2020, an FDA inspector discovering Bayview facility violations including inadequate training and failures to follow testing procedures in April 2020, and the July 2020 filing of a confidential arbitration demand by another vaccine

manufacturer seeking $19 million in damages from Emergent for supplying drugs outside of specification to study participants.

277.    Lead Plaintiffs are pursuing FOIA requests to learn the status of any SEC investigations into Defendant Kramer's insider transactions or the other facts and circumstances at issue.[23]  The existence of any such investigation further supports the inference of scienter, and discovery into the investigation and any document productions by the Defendants to the SEC would buttress the allegations herein and be grounds for potential further amendment.

278.    Significantly, during his 5/19/2021 Congressional Testimony, Defendant Kramer was presented with a scathing assessment of his 2020 performance compared to his bonuses and executive compensation and given an opportunity to answer for himself, defend either his performance or his compensation or both, or otherwise mount any defense.  His only response was to say that he would not give the money back despite Emergent's abysmal performance and disastrous mishandling of the J&J and AstraZeneca COVID vaccine drug substance.

> Question:    So, [given the Bayview facility conditions] it is no surprise that late last year Emergent had to toss out five batches of AstraZeneca vaccine, amounting to roughly 10 to 15 million doses of vaccine, and then yet again, … you had to throw out, discard, destroy, bulk drug substance amounting to 15 million doses of J&J vaccine. Now let me point you to the scorecard for what you folks actually achieved.  In 2020, you received a contract for about $648 million—that is two or three contracts. You personally were paid $5.6 million in 2020, and the number of usable doses delivered to the American people was a grand total of, you guessed it, zero. Zero. A spectacular failure. And yet, in a February 2021 meeting of the compensation committee of Emergent's board of directors, I will show you what was presented to them. They said you, quote/unquote, ''significantly exceeded expectations for 2020.''  I have got to tell you, Mr. Kramer, if you look at this chart right here, given the fact that no usable doses made it into anyone's arms, you did not significantly exceed the American people's expectations.  Interestingly, that same

---

[23]    The watchdog group American Oversight served a similar FOIA request in July 2021.  The SEC sent a response, commonly known as a "Glomar" letter, on July 29, 2021, where it stated, "We can neither confirm nor deny the existence of any records responsive to your request."

presentation recommends that you get a bump from $5.6 million in 2020 to $7.8 million in 2021. That is this year. You earned $3.7 million in 2019, so you experienced a 51 percent increase in your compensation, amounting to almost a $2 million increase. Sir, given that you take full responsibility for what happened in 2020, that you apologized to this committee today, sir, would you commit to turning over your $1.9 million bonus to the taxpayers of America?

Kramer:        ***Congressman, I will not make that commitment, no***.

Question:     I didn't think so, sir.

### 3.     *The Individual Defendants And Other Insiders Reaped Suspicious Executive Compensation And Bonuses*

279.    On February 9, 2021, while the alleged fraud was raging, Emergent's Board of Directors' Compensation Committee ("Compensation Committee") met – with Defendants Kramer and Lindahl in attendance – to award executive bonuses based on 2020 performance and to set executive compensation rates for 2021. As reported by the 5/19/2021 Congressional Memo, ***none*** of the performance evaluations that day referenced the Bayview facility's problems ***at all***. Instead, Emergent's executives were improperly and unjustifiably lauded for their "exceptional leadership" and "exemplary" performance.

280.    As memorialized in Memoranda from Daniel Woubishet, Emergent's Associate General Counsel and Assistant Secretary, to the Compensation Committee dated January 20, 2021, February 19, 2021, and December 22, 2021,[24] which were cited in the 5/19/2021 Congressional Memo, Defendant Kramer was improperly found to have "significantly exceed[ed]" 2020 performance expectations and to have "[l]ed [the] Executive Management Team to delivery exemplary overall 2020 corporate performance," and consequently, was unjustly awarded a highly

---

[24]    Mr. Woubishet's Memoranda were produced to the Congressional Committees bearing Bates stamps EBSI_HCOR-0001340-411 (January 20, 201), EBSI_HCOR_0001412-502 (February 19, 2021), and EBSI_HCOR-0001252-339 (December 22, 2021) and were made publicly available. Lead Plaintiffs' counsel reviewed these documents in preparing this pleading.

suspicious *$1.225 million cash bonus – 1.4 times his base salary* – in recognition of his 2020 performance, which augmented the *$4.1 million* in suspicious stock awards and options he was awarded earlier in the year, and received a highly suspicious 2021 executive compensation package totaling *$7.8 million*, consisting of a *$1 million salary* (a *14% raise*), a *target bonus of 120% of base salary*, and *$5.6 million in stock awards and options* to be *issued in February 2021*.

281.    Similarly, as set forth in Mr. Woubishet's Memoranda, Defendant Lindahl after improperly being graded as "Exceeds" relative to his 2020 performance expectations, was unjustly awarded a highly suspicious *$462,000 bonus* (*84% of his base salary*) and was given a highly suspicious 2021 executive compensation package totaling *$2.42 million*, consisting of a *$575,000 salary* (a *4.5% raise*), a *target bonus of 60% of base salary*, and *1.5 million in stock awards and options*.

282.    Such extravagant bonuses, stock awards, and executive compensation packages – wholly divorced from the negative realities of Emergent's performance, the dysfunctional condition of its Bayview facility and staff, and Emergent's resulting inability to execute on its contracts with J&J, AstraZeneca, and the U.S government – extended throughout the company's upper management to other corporate insiders.  For example, as memorialized in Mr. Woubishet's Memoranda: (a) Sean Kirk, Emergent's EVP for Manufacturing and Technical Operations, who oversaw development and manufacturing operations at Emergent's manufacturing sites including the Bayview facility, was touted for his "exceptional role in executing on key manufacturing strategy throughout the year" and "exceptional performance and contribution to [Emergent's] stellar financial performance" and was awarded a $320,600 cash bonus, a $100,000 "special bonus award" for "significant CDMO expansion related to COVID-19" and "his exceptional performance in 2020," and $1.2 million in 2021 stock awards and options; (b) Fuad El-Hibri, Emergent's

Executive Chairman, was granted a $3.7 million compensation package, including a $1.135 million salary (a 4.5% raise) and $2.6 million in stock awards – after reaping tens of millions of dollars in insider trading gains during the Class Period; and (c) Adam Havey, Emergent's EVP, Business Operations, was rated as "Exceeds" relative to his 2020 performance expectations and given a $445,000 bonus and $1.4 million in 2021 stock awards and options.

283. Incredibly, the compensation decisions were ***expressly based*** on Emergent's purportedly *positive* performance – a pretextual rationale divorced from reality. For instance, the February 9, 2021 Woubishet Memo justified the bonus payments as follows: "Bonus awards based on the company's 2020 performance were paid in early 2021 at 140% of target for our named executive officers. The company's performance in 2020 significantly exceeded the performance goals set by the compensation committee relative to our overall performance measures."

284. These massive payouts to Defendants Kramer and Lindahl, as well as other corporate insiders, wholly untethered to the significant risks posed by the serious, undisclosed problems at Emergent's Bayview facility, strongly support an inference of scienter.

### 4.    *Emergent Raised Funds During The Class Period*

285. During the Class Period, Emergent announced its intention to raise hundreds of millions of dollars in funds while its stock was trading at prices elevated by the fraud alleged herein. Specifically, in an August 7, 2020 Form 8-K and press release, Emergent announced that it completed its offering of $450 million aggregate principal amount of 3.875% Senior Unsecured Notes due 2028. This transaction, which occurred during the fraudulent period alleged herein, evidences Emergent's corporate scienter because it was highly motivated to complete its offering at the highest possible price.

##### 5.    *Emergent Reaped Unearned Windfall Government Payments*

286.    Emergent's contract with the U.S. government[25] called for payments of up to $542 million (or 83% of the contract consideration) to reserve its facilities and equipment for COVID vaccine manufacturing at Bayview and COVID vaccine packaging at Emergent's Camden and Rockville facilities. The contract specified, "[Emergent] shall maintain the reserved capacities in a state of readiness to perform current good manufacturing practices (cGMP) manufacturing activities…for the entirety of the period of performance" – something Emergent utterly failed to do, as described *supra*.

287.    However, despite its performance failures at the Bayview facility, the contract called for Emergent to be paid even if no vaccine batches were produced in any given month. Thus, Emergent collected *$271 million* total ($27 million monthly) in reservation fees from the U.S. government through May 12, 2021, despite being *unable* to fulfill its vital COVID vaccine manufacturing obligations.  Thus, even *after* the FDA halted all manufacturing at the Bayview facility on April 16, 2021, Emergent continued to reap unjust payments.

288.    Emergent's unjust acceptance of U.S. government funds when it was unable to fulfill the vitally important COVID vaccine manufacturing role for which it had been hired further adds to the inference of corporate scienter, particularly when viewed alongside the lavish executive compensation and bonuses reaped by Defendants Kramer and Lindahl and other insiders.

---

[25]    Emergent's contract with the U.S. government, Contract No. HHSO1002012000041, Order No. 75A50120F33007 (dated May 24, 2020), was produced to the Congressional Committee bearing Bates stamps EBSI_HCOR-0001860-70, as was the antecedent Authorization to Proceed which the U.S. government gave Emergent to permit it to immediately begin performance on May 12, 2020, which was produced with Bates stamps EBSI_HCOR-0001838-47), and a later Amendment/Modification No. P00006, Order. No. 75A50120F33007 (dated March 23, 2021) produced with Bates stamps EBSI_HCOR-0001852-57.  Also produced to Congress were the additional $30 million U.S. government contract awarded July 23, 2020 to reserve two additional manufacturing suites at Bayview during October – December 2020, which was produced with Bates stamps EBSI_HCOR-0001936-50, and a later amendment that reduced the award to $20 million, Amendment/Modification No. P00002, Order. No. 75A50120F33008 (dated November 17, 2020), which was produced with Bates stamps EBSI_HCOR-0001933-35.  These documents have been made publicly available as part of the Congressional investigation and report. Lead Plaintiffs' counsel reviewed these documents in preparing this pleading.

### 6.    *The Fraud Implicated Core Operations*

289.    The fraud alleged herein implicates Emergent's core operations.  As discussed *supra*, Emergent's CDMO services were part of its "core business" and according to Emergent's SEC filings and investor presentations during the Class Period, accounted for a considerable portion of its revenues, income, and projected growth.   Emergent's Bayview facility was one of just two facilities built with taxpayer support and federally designated as a CIADM as part of the Operation Warp Speed, pursuant to which Emergent was awarded a "landmark" contract to deploy CDMO services for manufacturing COVID-19 vaccine.  Indeed, Defendants extensively discussed Emergent's CDMO services and/or the Bayview facility in its SEC filings and during every Earning Call throughout the Class Period.  Together, the J&J, AstraZeneca, and U.S. government contracts for COVID manufacturing services at the Bayview facility were valued at ***$1.5 billion***, and the hundreds of millions of dollars in reservation fees paid under the U.S. government contract was identified by Defendant Lindahl during the 7/30/2020 Earnings Call as one of the "primary drivers" of the company's increased gross profit margin in 2020, which in turn, was the stated justification for the lavish bonuses and enhanced executive compensation paid to Defendants Kramer and Lindahl and other insiders as discussed *supra*.

290.    In light of these facts, it is inconceivable that the Individual Defendants and executive management did not know the facts and circumstances of the fraud as alleged herein. Moreover, such knowledge is imputable to Defendants, given the implication of core operations, the Defendants' roles and status within Emergent, and the facts regarding the funneling of information to them and their personal involvement in the key events and circumstances at issue, as alleged herein, including without limitation by information revealed by the CW statements; the FDA inspection reports and Forms 483 and company responses thereto; the investigative reports

in the *New York Times* and other outlets, and the subjects, testimony, and findings of the May 2021 Congressional hearings, as discussed in §§V.E.1.-4., *supra*.

### 7.    *The Individual Defendants Signed, Were Quoted In, Or SOX-Certified The Alleged Misstatements*

291.    As the individuals who signed, were quoted in, or orally made the alleged false and misleading statements described herein, Defendants Kramer, Lindahl, and Husain were under an obligation to familiarize themselves with the subject matter of those public statements and to speak truthfully.  As alleged herein, they violated such duties.

292.    As the individuals who SOX certified SEC filings as described *supra*, Defendants Kramer and Lindahl were obligated to inquire and investigate, familiarize themselves with the subject matter of their SOX certifications, and reassure themselves that the certifications were accurate and that they were speaking truthfully in making them.  As alleged herein, they violated such duties.

### 8.    *The Fraud Violated Emergent's Corporate Code of Conduct*

293.    Emergent's Code of Business Conduct and Ethics ("Code of Conduct"), published on its website throughout the Class Period, barred all of the misconduct detailed herein, including the concealment of the undisclosed negative facts discussed in §V.E. *supra*, as revealed by the CW statements; the FDA inspection reports and Forms 483 and company responses thereto; the investigative reports in the *New York Times* and other outlets, and the subjects, testimony, and findings of the May 2021 Congressional hearing; and the insider selling and unjust self-enrichment by the Individual Defendants, Emergent, and other corporate insiders as set forth in §§V.G.2.-5.

294.    Emergent's Code of Conduct makes clear that it is binding upon all employees and failure to comply could lead to severe civil and criminal penalties stating,

Our Code applies to all of us, from our Board of Directors, to each and every Emergent employee, and in many cases to consultants, contractors and other third parties who we engage.

We are all responsible for reading understanding and following this Code, all applicable Emergent policies and the law. We also have a duty to speak up and make sure that we ask questions and report any concerns that we might have.

Failure to comply with these requirements may result in disciplinary action, including termination. Furthermore, violating any of the many laws and regulations that apply to our business can lead to severe civil and criminal penalties, including fines and possible incarceration.

295.    The Code of Conduct also makes clear that all statements and communications must be truthful – a mandate that expressly addressed and precluded the materially false and misleading statements pled herein. Specifically, a section titled "We Focus on Truthful Speech" states "[w]henever we speak publicly or directly engage with external stakeholders, we do so in compliance with our internal policies and all applicable laws," while a section titled, "We Communicate Responsibly" states "[w]e always provide accurate and truthful public statements in a timely manner."

296.    The Code of Conduct also makes clear that Emergent's relationships with the U.S. Government are important and that employees "must act with transparency, accuracy and care when navigating these relationships." It further states:

When working with governments or government officials, we make sure that all the information we provide is truthful, accurate and complete. It is our responsibility to know all the specifications and requirements for any government work and to comply with them completely, including any reporting and disclosure requirements. We must maintain records, such as time-keeping reports, that are required by the regulations.

297.    Emergent's Code of Conduct also emphasizes that quality control is of "utmost importance" stating:

We are committed to meeting the highest levels of quality and maintaining compliance with all currently established standards including Good Laboratory

Practice, Good Clinical Practice, Good Manufacturing Practice and Good Pharmacovigilance Practice.

298.    Emergent's Code of Conduct also prohibits employees from trading on inside information, stating:

> We never use any material, non-public information to buy or sell securities.  We also do not provide such information to others, or tip others, so that we may trade on the information.  It is illegal to use or provide such information, and we must not abuse our role at Emergent to profit in such a manner.

299.    The Code of Conduct, generally, also expressly states the obvious – that all employees must follow "all applicable regulations and laws."  This provision encompasses the U.S. federal securities that Defendants violated, as alleged herein.

300.    The forgoing provisions of Emergent's Code of Conduct barred Defendants' misconduct alleged herein, including their oversight and operation of the Bayview facility in such condition as to render it incapable of meeting its contractual obligations to the U.S. government and private companies like J&J and AstraZeneca, their materially false and misleading public statements, and their self-enrichment through insider trading and unjustified bonuses and executive compensation increases.  Defendants' violation of this express corporate policy, which was in force and binding throughout the Class Period, further buttresses the inference of their scienter.

### 9.    *Insider Resignations and Suspicious Employment Status Changes Support Scienter*

301.    Defendants' scienter is further evidenced by the suspiciously timed removal, resignation, or departure of key executives during or shortly after the Class Period.

302.    On the 4/29/2021 Earnings Call, Defendant Kramer announced that Defendant Husain was leaving Emergent "to pursue another opportunity."  Defendant Husain's unexplained departure – shortly after the *New York Times* and *Washington Post* reports, during the course of

Congress's investigation, but before the 5/19/2021 Congressional Memo was released – was suspect in timing and strongly supports a strong inference of scienter.

303.    On the same 4/29/2021 Earnings Call, Defendant Kramer also announced that Sean Kirk, Emergent's EVP for Manufacturing and Technical Operations, who oversaw development, manufacturing, and quality assurance at the Bayview facility, was departing to "tak[e] a personal leave of absence."    His unexplained departure, shortly after being improperly awarded lavish executive compensation as discussed *supra* and shortly before the 5/19/2021 Congressional Memo questioning his compensation and that of the Individual Defendants was issued – was likewise suspicious in timing and supports the inference of scienter.

304.    On the 11/4/2021 Earnings Call, Defendant Kramer announced that Mary Oates, Emergent's Head of Global Quality, had decided to leave the company "to pursue a new career opportunity."  This vague explanation was offered during the same earnings call that announced termination of the U.S. government contract.   This timing is suspicious and supports the inference of scienter.

305.    Scienter is also supported by suspicious employment changes of other employees due to retaliation by corporate insiders.  CW5 described Rick Welch, VP Development Services of Emergent's CDMO Business Unit who directly reported to Defendant Husain, as having attended frequent meetings with CW5 Defendant Husain about the vaccine projects, that Welch did not want CW5 to take detailed notes and sometimes removed parts of the notes CW5 had taken, and having fired CW1 shortly after CW1 had a conversation with Welch about what was happening at the Bayview site.

### 10.    *Ongoing, Expanded Investigations Support Scienter*

306.    Emergent remains under investigation by the Congressional Select Subcommittee on the Coronavirus Crisis and Committee on Oversight and Reform.  On June 23, 2021, after

Emergent's and Kramer's testimony as discussed herein, these committees announced that they were expanding their ongoing investigation and had sent letters seeking documents from J&J and AstraZeneca, as discussed in §V.E.4., *supra*.  The announcement noted, "Emergent's coronavirus vaccine manufacturing deals with AstraZeneca and Johnson & Johnson – which combined with federal contracts are reportedly worth up to $1.5 billion – went forward despite multiple audits and inspections citing deficient controls at Emergent's Bayview facility that could lead to contamination."  It noted, "More than 85 million total doses have been destroyed and an additional 60 million doses are being held back to determine if they are safe."

307.    On December 17, 2021, the Select Subcommittee on the Coronavirus Crisis issued a year-end staff report entitled "More Effective, More Efficient, More Equitable: Overseeing an Improving & Ongoing Pandemic Response."  After summarizing the prior investigative steps and preliminary findings, the report stated, "Emergent wasted hundreds of millions of taxpayer dollars and was unable to meet the urgent needs of the country during the pandemic.  ***The Committees will continue to investigate Emergent's troubling conduct*** and monitor the company's efforts to produce and distribute safe and effective coronavirus vaccines under its remaining agreement with Johnson & Johnson."

308.    Congress's expansion and continued pursuit of its ongoing investigation, even after Emergent, its Executive Chairman, and Defendant Kramer gave written and oral testimony, further supports the inference of scienter.

## VI.    NO SAFE HARBOR

309.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Most, if not all, of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent any statements were labelled as forward-looking, they

included statements of then-historical or then-present fact and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Any purported cautionary language warned only of theoretical future risks at times when those risks had already ripened due to Emergent's then-ongoing misconduct as alleged herein. Moreover, the purported cautionary language failed to adjust over time, using the same theoretical tone even after concrete changes of circumstance.

310. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable, because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Emergent who knew that those statements were false when made.

311. For all these same reasons, the bespeaks caution likewise does not apply to shield Defendants from liability.

312. In addition, to the extent Defendants' statements are determined to be ones of opinion, they were materially false and misleading because (i) they were either not believed by the Defendants and were objectively false and (ii) because Emergent's shareholders expected not just that Defendants believed the opinion (however irrationally), but that it fairly aligned with the information in their possession at the time. However, Defendants' statements did not fairly align with the information in their possession at the time such statements were made, and they omitted material facts about Defendants' knowledge of the true state of the facts, including, *inter alia*, the true facts concerning the Bayview facility, its physical and operational deficiencies, and the true risks and financial impacts on Emergent. Specifically, it was known or knowable at the time of Defendants' statements outlined herein that the Bayview facility had serious physical and

operational deficiencies as revealed, *inter alia*, by the CW statements and investigative reports pled herein, to such an extent that its ability to satisfy the requirements of Emergent's contracts with J&J, AstraZeneca, and the U.S. government were impossibly compromised. Those true facts were known to Defendants or recklessly disregarded by them and conflicted with what a reasonable investor would take from Defendants' statements.

## VII.   THE CLAIMS ARE TIMELY

313.   The claims set forth herein were timely filed.

314.   The market was not arguably aware until April 1, 2021 at the earliest, that credible allegations existed to the effect that Emergent misrepresented and failed to disclose facts material facts about its business and operations, particularly as regards the Bayview facility.

315.   It was also not until April 1, 2021 that Lead Plaintiffs were first presented with any credible evidence that Defendants had made materially false and misleading statements to investors during the Class Period. In the absence of publicly available information prior to then suggesting that Emergent's pronouncements in its SEC filings and other public statements during the Class Period were materially false and/or misleading, Lead Plaintiffs were not under any duty to inquire as to the truthfulness of Emergent's public statements. Therefore, Lead Plaintiffs' duty in that regard arose no earlier than April 1, 2021.

316.   Prior to April 1, 2021, Lead Plaintiffs and Class members could not have been on any inquiry notice of possible claims under the Securities Exchange Act. Even assuming this early date for inquiry notice, Lead Plaintiffs' Securities Exchange Act claims against Defendants were brought within two years. Therefore, Lead Plaintiffs have complied with the requirements of 28 U.S.C. §1658(b).

## VIII.   LOSS CAUSATION/ECONOMIC LOSS

317.    The market for Emergent shares was open, well-developed, and efficient at all relevant times.  During the Class Period, as detailed herein, Defendants engaged in a course of conduct and a scheme to deceive the market that artificially inflated Emergent shares and operated as a fraud or deceit on Class Period purchasers of Emergent shares by misrepresenting the material facts set forth herein.  As detailed above, when Defendants' prior misrepresentations became known to the public through a series of partial corrective disclosures, the price of Emergent shares fell precipitously, as the prior artificial inflation came out.  As a result of their purchases of Emergent share during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

318.    Defendants' alleged unlawful conduct caused the losses incurred by Lead Plaintiff and the Class. The market for Emergent's common stock was open, well developed, and efficient at all relevant times. Throughout the Class Period, Emergent's common stock traded at artificially inflated prices as a direct result of Defendants' materially misleading statements and omissions of material fact, which were widely disseminated to the securities market, investment analysts, and the investing public. Lead Plaintiff and other Class members purchased or otherwise acquired Emergent common stock relying upon the integrity of the market price for Emergent's common stock and market information relating to Emergent and have been damaged thereby.

319.    During the Class Period, Defendants presented a misleading picture of Emergent's financial condition, revenues, growth, performance, and business prospects, including without limitation the contributions arising from the Bayview facility operations and the contracts with J&J, AstraZeneca, and the U.S. government.  Defendants' false and misleading statements had the intended effect and caused Emergent shares to trade at artificially inflated prices throughout the Class Period and until the truth was revealed to the market.

213

320.    As detailed herein, the price of Emergent shares sharply dropped, on high volume, in response to each of the following partially corrective disclosures, alleged herein: (a) Emergent's press release and SEC filing on April 1, 2021, (b) its press release on April 19, 2021, (c) the news reports on April 22, 2021, (d) Emergent's press release and SEC filing on April 30, 2021, (e) news reports on June 18, 2021, and (f) Emergent's after-hours SEC filing on November 4, 2021.  Each of the related stock drops partially removed inflation from the price of Emergent shares, causing real economic loss to investors who had purchased Emergent shares during the Class Period.

321.    These declines were a direct and proximate result of the nature and extent of Defendants' fraud being revealed to investors and the market.  The timing and magnitude of the price declines in Emergent shares negate any inference that the loss suffered by Lead Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic factors, or Emergent-specific facts unrelated to Defendants' fraudulent conduct.

322.    The economic loss, *i.e.*, damages, suffered by Lead Plaintiffs and other Class members was a direct and proximate result of Defendants' fraudulent scheme to artificially inflate Emergent's share price and the subsequent significant declines in the value of Emergent shares when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## IX.    PRESUMPTION OF RELIANCE

323.    At all times, the market for Emergent shares was an efficient market, supporting a presumption of reliance under the fraud-on-the-market doctrine, for the following reasons, among others:

(a)    Emergent met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market, under the ticker symbol "EBS";

(b)    Emergent had approximately 53.3 million shares outstanding as of February 12, 2021, such that its stock was liquid.  During the Class Period, numerous shares of

Emergent stock were traded on a daily basis, with moderate to heavy volume, demonstrating an active and broad market for Emergent stock and permitting a strong presumption of an efficient market;

> (c)     As a regulated issuer, Emergent filed periodic public reports with the SEC;

> (d)     Emergent regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

> (e)     Emergent was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period; and

> (f)     Unexpected material news about Emergent was rapidly reflected and incorporated into Emergent's stock price during the Class Period.

324.    As a result of the foregoing, the market for Emergent stock promptly digested current information regarding Emergent from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of Emergent stock during the Class Period suffered similar injury through their purchase of Emergent stock at artificially inflated prices and a presumption of reliance applies.

325.    Alternatively, Lead Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## X.    LEAD PLAINTIFFS' CLASS ACTION ALLEGATIONS

326.    Lead Plaintiffs bring this federal securities action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class (the "Class") of all persons and entities, other than Defendants, their family members and their affiliates, and any entities in which they owned a controlling interest, who purchased or otherwise acquired the common stock of Emergent (NYSE:EBS) between March 10, 2020 and November 4, 2021, both dates inclusive (the "Class Period"), seeking to pursue remedies against Defendants Emergent, Kramer, Lindahl, and Husain for violations of the federal securities laws under Exchange Act §§10(b) and 20(a) and SEC Rule 10b-5.

327.    Excluded from the Class are Defendants herein, the officers and directors of Emergent at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

328.    The Class members are so numerous that joinder of all members is impracticable. Throughout the Class Period, Emergent stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Lead Plaintiffs at this time and can be ascertained only through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Emergent or its transfer agent and may be notified of the pendency of this action by mail, with Class members not so identified being notified through publication notice, using forms of notice similar to that customarily used in securities class actions.

329.    Lead Plaintiffs' claims are typical of the claims of the Class members, as all Class members are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

330.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.  Lead Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

331.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Emergent, including without limitation as regarded the Bayview facility and Emergent's contracts with J&J, AstraZeneca, and the U.S. government;

- whether the Individual Defendants caused Emergent to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Emergent stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

332.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

333.    As alleged herein, Lead Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine inasmuch as Defendants made public misrepresentations or failed to disclose material facts during the Class Period; the misrepresentations and omissions were material and would tend to induce a reasonable investor to misjudge the value of Emergent's common stock; and Lead Plaintiffs and the Class members purchased or otherwise acquired Emergent common stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were fully disclosed, without knowledge of the omitted or misrepresented facts.

## XI.    CLAIMS FOR RELIEF

### COUNT I

### (Against All Defendants For Violation Of Exchange Act Section 10(b) and Rule 10b-5 Promulgated Thereunder)

334.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

335.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

336.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Lead Plaintiffs and the other Class members; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such schemes were intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and

other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Emergent securities; and (iii) cause Lead Plaintiffs and the other Class members to purchase or otherwise acquire Emergent common stock and options at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

337.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases, teleconferences with analysts and investors, and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Emergent securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Emergent's finances and business prospects, including without limitation as regarded the Bayview facility and Emergent's contracts with J&J, AstraZeneca, and the U.S. government.

338.    Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein, including by virtue of their positions at Emergent, and intended thereby to deceive Lead Plaintiffs and the other Class members, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

339.    Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Emergent securities.

340.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  Defendants' first-hand knowledge is alleged herein.  Moreover, as the senior managers and/or directors of Emergent, who among other things oversaw the Bayview facility's operations and Emergent's execution of and work under the contracts with J&J, AstraZeneca, and the U.S. government, the Individual Defendants had knowledge of the details of Emergent's operations, business, and internal affairs, including without limitation those regarding the Bayview facility and those contracts.

341.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Emergent.  As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Emergent's businesses, operations, financial condition, and prospects, including without limitation as regarded the Bayview facility and Emergent's contracts with J&J, AstraZeneca, and the U.S. government. As a result of the dissemination of the false and misleading reports, releases and public statements alleged herein, the market price of Emergent securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Emergent's business, operations, and financial condition concealed by Defendants, including without limitation those regarding the Bayview facility and Emergent's contracts with J&J, AstraZeneca, and the U.S. government, Lead Plaintiffs and the other Class members purchased or otherwise acquired Emergent's common stock

at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

342.    During the Class Period, Emergent securities were traded on an active and efficient market.  Lead Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Emergent common stock at prices artificially inflated by Defendants' wrongful conduct.  Had Lead Plaintiffs and the other Class members known the truth, they would not have purchased or otherwise acquired said shares, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Lead Plaintiffs and the Class, the true value of Emergent stock was substantially lower than the prices paid by Lead Plaintiffs and the other Class members.  The market price of Emergent securities declined sharply upon public disclosures of the fraud alleged herein, to the injury of Lead Plaintiffs and Class members.

343.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

344.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other Class members suffered damages in connection with their respective purchases, acquisitions, and sales of Emergent's common stock during the Class Period, upon the disclosures that Emergent had been disseminating materially false or misleading misstatements and omissions to the investing public.

## COUNT II

### (Against the Individual Defendants For Violation of
### Section 20(a) of the Exchange Act)

345.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

346.    During the Class Period, the Individual Defendants participated in the operation and management of Emergent, and conducted and participated, directly and indirectly, in the conduct of Emergent's business affairs.  Because of their senior positions, they knew the adverse non-public information about Emergent's business, operations, finances, and prospects, including without limitation the adverse non-public information about the Bayview facility and Emergent's contracts with J&J, AstraZeneca, and the U.S. government.

347.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Emergent's business, operations, financial condition, results of operations, and prospects, including without limitation as regarded the Bayview facility and Emergent's contracts with J&J, AstraZeneca, and the U.S. government, and to correct promptly any public statements issued by Emergent which had become materially false or misleading.

348.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, SEC filings, and other public statements that Emergent disseminated in the marketplace during the Class Period concerning its business, operations, financial condition, results of operations, and prospects, including without limitation as regarded the Bayview facility and Emergent's contracts with J&J, AstraZeneca, and the U.S. government.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Emergent to engage in the wrongful acts complained

of herein. The Individual Defendants, therefore, were "controlling persons" of Emergent within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged herein that artificially inflated the market price of Emergent stock.

349.    Each of the Individual Defendants, therefore, acted as a controlling person of Emergent. By reason of their senior management positions and/or being directors of Emergent, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Emergent to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations and business of Emergent and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiffs and the other Class members.

350.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Emergent.

## XII.   PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiffs hereby demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Fed. R. Civ. P. 23 and certifying Lead Plaintiffs as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Lead Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Lead Plaintiffs and the other Class members prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## XIII.  DEMAND FOR TRIAL BY JURY

Lead Plaintiffs hereby demand a trial by jury.

Dated:  March 19, 2022                    Respectfully submitted,

**POMERANTZ LLP**

By: /s/*Matthew L. Tuccillo*
Jeremy A. Lieberman (admitted *pro hac vice*)
Matthew L. Tuccillo (admitted *pro hac vice*)
J. Alexander Hood II (admitted *pro hac vice*)
Jennifer Banner Sobers (admitted *pro hac vice*)
Dolgora Dorzhieva (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
mltuccillo@pomlaw.com
ahood@pomlaw.com
jbsobers@pomlaw.com
ddorzhieva@pomlaw.com

**POMERANTZ LLP**
Jennifer Pafiti (admitted *pro hac vice*)
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Lead Counsel for Lead Plaintiffs*

**COHEN MILSTEIN SELLERS & TOLL
PLLC**

By: /s/*Steven J. Toll*
Steven J. Toll (Md. Bar No. 15824)
Daniel S. Sommers (Md. Bar No. 15822)
S. Douglas Bunch
(*pro hac vice* applications forthcoming)
1100 New York Avenue N.W.
Suite 500, East Tower
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
stoll@cohenmilstein.com
dsommers@cohenmilstein.com
dbunch@cohenmilstein.com

*Liaison Counsel for Lead Plaintiffs*

224

**KLAUSNER, KAUFMAN, JENSEN & LEVINSON**

Robert D. Klausner (*pro hac vice* applications forthcoming)
Stuart Kaufman (*pro hac vice* applications forthcoming)
7080 NW 4th Street
Plantation, Florida 33317
Telephone: (954) 916-1202
Facsimile: (954) 916-1232
bob@robertdklausner.com
stu@robertdklausner.com

*Additional Counsel for City of Fort Lauderdale Police & Firefighters' Retirement System*

225