**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

IN RE EMERGENT BIOSOLUTIONS INC.
SECURITIES LITIGATION

THIS DOCUMENT RELATES TO:
All Actions

Civil No. 8:21-cv-00955-PWG

CLASS ACTION

**<u>MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS</u>**

# **TABLE OF CONTENTS**

Page

INTRODUCTION ...................................................................................................1

BACKGROUND ....................................................................................................3

ARGUMENT ..........................................................................................................5

I.      The Complaint Engages in Impermissible Puzzle Pleading .........................6

II.     The Complaint Fails to Plead Falsity..........................................................7

        A.      The Allegations Concerning "Business Operations" Do Not State a Claim ..........7

                1.      Statements Before the Contamination Incident Are Not Actionable..........8

                2.      Statements Following the Contamination Incident are Not Actionable ....25

        B.      The Allegations Concerning Financials and Projections Do Not State a Claim....27

        C.      The Allegations Concerning SOX Certifications Do Not State a Claim ..............29

III.    The Complaint Fails to Plead Scienter........................................................30

        A.      The Allegations Concerning "Red Flags" Are Insufficient ................................31

        B.      The Defendants Did Not Admit Scienter................................................33

        C.      The Allegations Concerning Motive Are Insufficient ........................................35

                1.      Stock Trading.................................................................35

                2.      Executive Compensation ................................................36

                3.      Capital Raising Efforts....................................................37

                4.      The Complaint's Other Scattershot Allegations are Insufficient..............38

IV.     The Complaint Fails to State a Claim Under Section 20(a)...........................39

CONCLUSION.....................................................................................................39

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Abuhamdan v. Blythe, Inc.*,
  9 F. Supp. 3d 175 (D. Conn. 2014)......................................................................12

*In re Aratana Therapeutics Inc. Sec. Litig.*,
  315 F. Supp. 3d 737 (S.D.N.Y. 2018)..................................................................28

*In re Bank of Am. Corp., Sec., Deriv., & ERISA Litig.*,
  757 F. Supp. 2d 260 (S.D.N.Y. 2010)....................................................................9

*In re BISYS Sec. Litig.*,
  397 F. Supp. 2d 430 (S.D.N.Y. 2005)..................................................................39

*In re Braskem S.A. Sec. Litig.*,
  246 F. Supp. 3d 731 (S.D.N.Y. 2017)..................................................................29

*In re Career Educ. Corp. Sec. Litig.*,
  No. 03 C 8884, 2006 WL 999988 (N.D. Ill. Mar. 28, 2006) ........................... *passim*

*City of Brockton Ret. Sys. v. Avon Prods., Inc.*,
  No. 11 Civ. 4665 (PGG), 2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014) ..............23

*City of Pontiac Gen. Emps. Ret. Sys. v. Schweitzer-Mauduit Int'l, Inc.*,
  806 F. Supp. 2d 1267 (N.D. Ga. 2011) ...................................................................6

*In re Conventry Healthcare, Inc. Sec. Litig.*,
  No. 08:09-CV-2337-AW, 2011 WL 1230998 (D. Md. Mar. 30, 2011) .................31

*Cozzarelli v. Inspire Pharms. Inc.*,
  549 F.3d 618 (4th Cir. 2008) ........................................................................ *passim*

*Crutchfield v. Match Grp., Inc.*,
  529 F. Supp. 3d 570 (N.D. Tex. 2021) .................................................................38

*In re DRDGOLD Ltd. Sec. Litig.*,
  472 F. Supp. 2d 562 (S.D.N.Y. 2007)..................................................................39

*In re FBR Inc. Sec. Litig.*,
  544 F. Supp. 2d 346 (S.D.N.Y. 2008)..................................................................30

*Finger v. Pearson PLC*,
  No. 17 Civ. 1422 (RJS), 2019 WL 10632904 (S.D.N.Y. Sept. 16, 2019)...............9

*In re First Am. Fin. Corp.*,
  CV 20-9781 DSF (Ex), 2021 WL 4807648 (C.D. Cal. Sept. 22, 2021) ................................25

*Garfield v. NDC Health Corp.*,
  466 F.3d 1255 (11th Cir. 2006) .......................................................................................38

*In re GeoPharma, Inc. Sec. Litig.*,
  399 F. Supp. 2d 432 (S.D.N.Y. 2005)..............................................................................34

*In re GeoPharma, Inc. Sec. Litig.*,
  411 F. Supp. 2d 434 (S.D.N.Y. 2006)..............................................................................32

*Gillis v. ORX Pharma Ltd.*,
  No. 15 Civ. 4868 (PAE), 2016 WL 3685095 (S.D.N.Y. July 6, 2016) ...................................30

*In re Human Genome Scis. Inc. Sec. Litig.*,
  933 F. Supp. 2d 751 (D. Md. 2013) ....................................................................................9

*Kasilingam v. Tilray, Inc.*,
  No. 20-cv-03549 (PAC), 2021 WL 4429788 (S.D.N.Y. Sept. 27, 2021) ....................... *passim*

*KBC Asset Mgmt. NV v. DXC Tech. Co.*,
  19 F.4th 601 (4th Cir. 2021) ....................................................................................31, 36

*In re Keryx Biopharmaceuticals, Inc., Sec. Litig.*,
  13 Civ. 1307 (KBF), 2014 WL 585658 (S.D.N.Y. Feb. 14, 2014)........................................36

*In re Keyspan Corp. Sec. Litig.*,
  383 F. Supp. 2d 358 (E.D.N.Y. 2003) .............................................................................232

*Lerner v. Northwest Biotherapeutics*,
  273 F. Supp. 3d 573 (D. Md. 2017) ....................................................................................9

*Lipow v. New1 UEPS Techs., Inc.*,
  131 F. Supp. 3d 144 (S.D.N.Y. 2015)..............................................................................39

*Local No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharm., Inc.*,
  No. 15-2250, 2016 WL 5682548 (1st Cir. Oct. 3, 2016)......................................................30

*Longman v. Food Lion, Inc.*,
  197 F.3d 675 (4th Cir. 1999) .....................................................................................26, 27

*Marcu v. Cheetah Mobile Inc.*,
  No. 18-CV-11184 (JMF), 2020 WL 4016645 (S.D.N.Y. July 16, 2020) ..................................9

*In re Marriott Int'l Inc. Customer Data Sec. Breach Litig.*,
  543 F. Supp. 3d 96 (D. Md. 2021) .............................................................................. *passim*

*McClain v. Iradimed Corp.*,
    111 F. Supp. 3d 1293 (S.D. Fla. 2015) ...................................................22

*In re Mindbody, Inc. Sec. Litig.*,
    489 F. Supp. 3d 188 (S.D.N.Y. 2020).............................................13, 14

*Nadoff v. Duane Reade, Inc.*,
    107 F. App'x 250 (2d Cir. 2004) .............................................................28

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)..................................................................................27

*In re Optionable Sec. Litig.*,
    577 F. Supp. 2d 681 (S.D.N.Y. 2008)......................................................23

*Ottman v. Hanger Orthopedic Grp., Inc.*,
    353 F.3d 338 (4th Cir. 2003) .............................................................6, 37

*In re PetroChina Co. Ltd. Sec. Litig.*,
    120 F. Supp. 3d 340 (S.D.N.Y. 2015)......................................................29

*In re PETsMART, Inc. Sec. Litig.*,
    61 F. Supp. 2d 982 (D. Ariz. 1999) ...........................................................6

*In re Progress Energy, Inc. Sec. Litig.*,
    371 F. Supp. 2d 548 (S.D.N.Y. 2005)......................................................10

*Proter v. Medifast, Inc.*,
    No. GLR-11-720, 2013 WL 1316034 (D. Md. Mar. 28, 2013)................35

*Pub. Emps. Ret. Assn. of Colo. v. Deloitte & Touche LLP*,
    551 F.3d 305, 313 (4th Cir. 2009) .............................................................6

*Raab v. Gen. Physics Corp.*,
    4 F.3d 286 (4th Cir. 1993) .......................................................................22

*Ret. Sys. of City of Baton Rouge & Par. of E. Baton Rouge v. MacroGenics, Inc.*,
    No. GJH-19-2713, 2021 WL 4459218 (D. Md. Sept. 29, 2021) .............34

*Rice as Tr. of Richard E. & Melinda Rice Revocable Family Tr. 5/9/90 v.*
    *Intercept Pharms., Inc.*,
    No. 21-CV-0036 (LJL), 2022 WL 837114 (S.D.N.Y. Mar. 21, 2022)....22

*Rok v. Identiv, Inc.*,
    No. 15-cv-5775-CRB, 2017 WL 35496 (N.D. Cal. Jan. 4, 2017) ...........38

*In re Sanofi Sec. Litig.*,
    155 F. Supp. 3d 386 (S.D.N.Y 2016).......................................................28

*In re Sanofi Sec. Litig.*,
    87 F. Supp. 3d 510 (S.D.N.Y. 2015)........................................................................12

*Schaeffer v. Nabriva Therapeutics plc*,
    2020 WL 7701463 (S.D.N.Y. Apr. 28, 2020)..........................................................22

*Schwab v. E\*Trade Fin. Corp.*,
    285 F. Supp. 3d 745 (S.D.N.Y. 2018)....................................................................31

*In re Seadrill Ltd. Sec. Litig.*,
    No. 14 Civ. 9642 (LGS), 2016 WL 3461311 (S.D.N.Y. June 20, 2016)................10

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994)..................................................................................36

*In re Sierra Wireless, Inc. Sec. Litig.*,
    482 F. Supp. 2d 365 (S.D.N.Y. 2007).............................................................13, 28

*Teachers' Ret. Sys. Of Louisiana v. Hunter*,
    477 F.3d 162 (4th Cir. 2007) ...................................................................................6

*In re Under Armour Sec. Litig.*,
    342 F. Supp. 3d 658 (D. Md. 2018)...............................................................14, 38

*In re USEC Sec. Litig.*,
    190 F. Supp. 2d 808 (D. Md. 2002).........................................................................9

*In re Vertex Pharms., Inc. Sec. Litig.*,
    357 F. Supp. 2d 343 (D. Mass. 2005)....................................................................14

*Yates v. Mun. Mortg. & Equity, LLC*,
    744 F.3d 874 (4th Cir. 2014) .......................................................................1, 36, 38

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) .............................................................................37, 38

**Federal Statutes**

5 U.S.C. § 78u–5...................................................................................................................28

Emergent BioSolutions Inc. ("Emergent" or the "Company"), Robert G. Kramer, Sr., Richard S. Lindahl, and Syed T. Husain (the "Individual Defendants," and together with Emergent, the "Defendants") submit this memorandum in support of their motion to dismiss the First Amended Complaint (the "Complaint" or "¶ __").  Also submitted herewith is the Declaration of Timothy J. Perla, which attaches all documents cited herein (cited as "Ex.").[1]

## INTRODUCTION

Emergent is a Maryland-based life sciences company dedicated to providing solutions to public health threats.  When COVID-19 spread across the world in early 2020, Emergent had one of the few facilities in the country (called Bayview) that could quickly be outfitted to manufacture drug substance for vaccines.  So, working alongside the government and drug manufacturers, Emergent ramped up Bayview and successfully produced drug substance for 100 million vaccine doses.  Unfortunately, in early 2021, a batch of Johnson & Johnson vaccine was contaminated with AstraZeneca components.  The issue, while regrettable, does not render Defendants' prior public statements fraudulent.

This case is a textbook example of an attempt to reverse-engineer a securities fraud case from an unfortunate business development.  Using little more than hindsight from the contamination incident, Plaintiffs look back at various generic statements that Defendants made before the incident and, despite very robust risk disclosures, concoct the narrative that Defendants somehow concealed a "grave risk" that Bayview was unfit all along to produce vaccine drug substance.  The Court should not hesitate to dismiss the Complaint.

---

[1] Defendants request that this Court take judicial notice of the various documents cited in the Declaration, each of which is a public document referenced in the Complaint and incorporated by reference thereto.  *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 881 (4th Cir. 2014).

*First*, the Complaint presents a classic example of impermissible "puzzle pleading." If Plaintiffs could legitimately claim fraud, they would not struggle to identify the statements that they claim were false nor the reasons why. Yet, the Complaint obscures both the allegations as to what is false (by cutting and pasting pages on end from Company filings) and as to why (by devoting *one* paragraph of the Complaint to generic allegations about why many statements over years were allegedly false). Rule 9(b) and the Private Securities Litigation Reform Act do not permit this approach, which without more mandates dismissal.

*Second,* the Complaint does not identify any allegedly false statement made before the contamination incident. Most of the statements that Plaintiffs challenge have nothing to do with contamination; they are unassailably true statements about Emergent's capabilities and business partnerships. Moreover, Emergent fully and repeatedly disclosed the risk of contamination.

*Third*, the Complaint also does not identify an instance following the disclosure of the incident in which Defendants misled investors. The record reflects Defendants' repeated disclosures and updates to investors as the Company investigated the incident and interacted with the Food and Drug Administration (FDA). Even if, as alleged in the Complaint, the CEO inadvertently misspoke about the nature of the contamination during one live interview, the issue was addressed, and it is implausible that he was trying to mislead (or did actually mislead) anyone given that the details of the incident were already public.

*Fourth*, the Complaint grasps at straws alleging that the Company's financials were false. Plaintiffs do not contend that any reported numerical results were false, just that Emergent supposedly should have gone on to describe operational difficulties alongside the numbers. However, the law is clear that accurately disclosed financials are not securities fraud, period.

Plaintiffs fare even worse complaining about the Company's forecasts of future results, which are prototypical forward-looking statements protected from liability.

*Fifth*, the Complaint mixes unrelated concepts by alleging incorrectly that the contamination incident renders certain Sarbanes-Oxley certifications false. The certifications attest to the sufficiency of *financial controls*, whereas contamination was an *operational* issue.

*Finally*, Plaintiffs' allegations of scienter are implausible and do not approach the compelling inference standard required for liability. The Complaint leads with a specious allegation that two executives dumped stock, when in fact they *increased their holdings*. The Complaint then relies on so-called confidential witnesses who largely do not claim to have interacted with the Defendants and otherwise do not offer relevant particularized facts, and on news reports that do not disclose sources. Courts have long rejected these types of allegations as insufficient to show fraudulent intent.

## BACKGROUND

Emergent has a Contract Development and Manufacturing ("CDMO") segment that provides services to the government and biopharmaceutical companies, including manufacturing bulk drug substance. ¶¶ 46-47.[2] Emergent operates in many locations, including Bayview. ¶¶ 46, 48. In 2012, the Biomedical Advanced Research and Development Authority ("BARDA") contracted with Emergent to designate Bayview as a Center for Innovation in Advanced Development and Manufacturing ("CIADM") intended to support U.S. manufacturing requirements in response to national health security threats. ¶ 49.

---

[2] As required for a motion to dismiss pursuant to Rule 12(b)(6), Defendants take as true the facts as alleged in the Amended Complaint for the limited purpose of the instant Motion. Defendants dispute numerous allegations in the Amended Complaint and do not accept any allegations as true for any other purpose at this time.

In March 2020, COVID-19 spread throughout the world.  ¶ 38.  Biopharmaceutical companies developed vaccines in partnership with the U.S. government.  ¶¶ 42-44.  The government and biopharmaceutical companies called upon Bayview to manufacture bulk drug substance for COVID-19 vaccines.  Throughout the spring and summer of 2020, Emergent announced agreements with BARDA, Johnson & Johnson ("J&J"), and AstraZeneca to reserve manufacturing capacity and manufacture drug substance.  ¶¶ 52-54.  Emergent began manufacturing vaccine drug substance in August 2020.  ¶ 55.  The Company successfully manufactured substance for 100 million doses of COVID-19 vaccines.  Ex. 1 at 4 (Nov. 4, 2021 Op-Ed).

In January or February 2021, a single batch of J&J vaccine drug substance inadvertently became contaminated with a component of the AstraZeneca vaccine.  ¶ 125.  J&J discovered the possible contamination on March 5, 2021 and notified Emergent on March 16, 2021.  *Id.* Emergent determined that the most probable cause was that a batch of J&J vaccine drug substance came into contact with waste moving out of the area where Emergent manufactured the AstraZeneca vaccine drug substance.  *Id.*  Emergent notified J&J of the results of its initial investigation on March 25, 2021.  *Id.*  On March 31, 2021, the *New York Times* published an article about the contamination incident.  ¶¶ 125, 237.  The next day, Emergent confirmed that a single batch of J&J drug substance did not meet specifications and would be destroyed.  ¶ 187.

On April 4, 2021, Emergent announced that it would stop manufacturing AstraZeneca vaccine drug substance to focus on manufacturing J&J vaccine drug substance.  ¶ 191.  On April 19, 2021, Emergent announced that, at the request of the U.S. Food and Drug Administration ("FDA"), Emergent agreed not to manufacture new drug substance at Bayview pending an FDA inspection.  ¶ 243.  On April 21, 2021, FDA issued its conclusions, and on April 30, 2021,

Emergent acknowledged FDA's observations and proposed a remediation plan.  ¶¶ 245, 251.  In June 2021, after FDA determined that some of the batches of drug substance that had been isolated were suitable for use, Emergent released them and destroyed other batches that could not be used.  ¶¶ 209, 254, 256.  On July 29, 2021, Emergent announced that FDA was allowing Bayview to resume production of J&J vaccine drug substance.  ¶ 213.  On November 4, 2021, Emergent announced that it had agreed to terminate the 2012 CIADM contract.  ¶ 258.

On April 19, 2021, Plaintiffs sued.  Hoping to convert the contamination incident into a securities fraud claim, the Complaint challenges nearly every one of Defendants' public statements after March 10, 2020, the date Emergent announced an unrelated agreement to support an experimental COVID-19 vaccine candidate.  ¶¶ 127-259.  That effort fails.

## ARGUMENT

To state a Section 10(b) claim, a plaintiff must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance on the misrepresentation or omission; (5) economic loss; and (6) loss causation.  *In re Marriott Int'l Inc. Customer Data Sec. Breach Litig.*, 543 F. Supp. 3d 96, 110 (D. Md. 2021).  Rule 9(b) applies.  *Id.* at 109.  In addition, the complaint must comply with the Private Securities Litigation Reform Act of 1995 ("PSLRA").  *Id.*  "For each alleged material misrepresentation or omission, 'the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information or belief, the complaint shall state with particularity all facts on which that belief is formed.'"  *Id.* (quoting PSLRA).  As to the scienter element, the inference "must be more than merely 'reasonable' or 'permissible'— it must be cogent and compelling, thus strong in light of other explanations."  *Id.* at 142 (quoting

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)).  If an "inference that defendants acted innocently, or even negligently, [is] more compelling than the inference that they acted with the requisite scienter," dismissal follows.  *Pub. Emps.' Ret. Ass'n of Colo. v. Deloitte & Touche LLP*, 551 F.3d 305, 313 (4th Cir. 2009).  Typically, scienter is alleged by facts showing that defendants had motive and opportunity to commit fraud or facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, although the Fourth Circuit has not restricted its inquiry to specific categories of facts, but rather examines whether all facts collectively establish a strong inference of scienter.  *See Ottman v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 344-45 (4th Cir. 2003) ("[W]hile particular facts demonstrating a motive and opportunity to commit fraud (or lack of such facts) may be relevant to the scienter inquiry, the weight accorded to those facts should depend on the circumstances of each case.").

## I.     THE COMPLAINT ENGAGES IN IMPERMISSIBLE PUZZLE PLEADING

As a threshold matter, the Court should dismiss the Complaint because it engages in puzzle pleading, which occurs when a complaint catalogs challenged statements using "lengthy block quotes," and then pairs them with a "conclusory list of deficiencies," without specifying why any given statement was misleading.  *City of Pontiac Gen. Emps. Ret. Sys. v. Schweitzer-Mauduit Int'l, Inc.*, 806 F. Supp. 2d 1267, 1293 (N.D. Ga. 2011).  The PSLRA disallows puzzle pleading—neither the Court nor Defendants "should . . . have to play connect-the-dots in order to identify the facts and trends upon which plaintiffs base their claim."  *In re PETsMART, Inc. Sec. Litig.*, 61 F. Supp. 2d 982, 991 (D. Ariz. 1999); *see also In re Marriott Int'l, Inc.*, 543 F. Supp. 3d at 112 ("Plaintiff copy and pastes" same set of allegations regarding falsity and "an examination of the statements shows that Plaintiff's cookie-cutter approach misses the mark."); *Teachers' Ret. Sys. Of Louisiana v. Hunter*, 477 F.3d 162, 174–75 (4th Cir. 2007) (same).

Instead of identifying each statement alleged to be misleading, the Complaint reproduces large blocks of text from SEC filings, press releases, and other sources.  The Complaint emphasizes certain portions of these quotations, but haphazardly so, and without lending any clarity.  Throughout the Complaint, Plaintiffs emphasize anodyne language from challenged statements that they do not even attempt to demonstrate is false or misleading.  *See, e.g.*, ¶¶ 153 ("We're certainly adding to our workforce and adding a significant number of colleagues to join Emergent."), 175 ("Enterprise team of more than 1400 technical and quality compliance professionals.").  In addition, the Complaint fails to allege *why* each statement is misleading.  For most of the challenged statements, the Complaint cross-references a single six-page paragraph.  ¶ 219.  The paragraph, which is self-evidently not tethered to any challenged statement much less *all* of them, then muddies the waters further by stating illogically that Plaintiffs are challenging statements made *before* the time when the underlying facts allegedly supporting falsity arose.  *Id.* (claiming allegations apply "regardless of whether any single fact pled below had yet arisen at precisely the time of a specific misstatement pled above").  The Court should not condone such deliberate obfuscation.  The PSLRA requires Plaintiffs to state plainly that which is allegedly false and why.  Plaintiffs' failure to do so requires dismissal.  *In re Marriott Int'l, Inc.*, 543 F. Supp. 3d at 112.

## II.   THE COMPLAINT FAILS TO PLEAD FALSITY

The Complaint divides the challenged statements into three buckets: "business operations," financial results, and SOX certifications.  None articulates an actionable claim.

### A.      The Allegations Concerning "Business Operations" Do Not State a Claim

The Complaint labels most of the challenged statements as "business operations fraud." ¶¶ 129-218.  Within that category are statements, both before and after the contamination incident, touching on a range of subjects including (i) CDMO capabilities and vaccine-related

partnerships;[3] (ii) responses to FDA inspections;[4] (iii) the contamination incident;[5] and (iv) remediation.[6]  The Complaint asserts that these statements were false or misleading based on a muddle of allegations that supposedly "create a clear and persistent pattern of serious deficiencies and grave contamination risk that existed at the Bayview facility at all relevant times."  ¶ 219.  None of this, however, states a claim.  To see this most clearly, it is useful to consider separately the periods before and after the incident.

### 1.  Statements Before the Contamination Incident Are Not Actionable

#### a)  The Challenged Statements Were True, and Do Not Concern Contamination Risk

Although the contamination incident occurred in early 2021, Plaintiffs (in a transparent attempt to inflate damages) contend that Defendants made false statements as early as March 10, 2020.  ¶ 2.  Plaintiffs do not allege, and could not plausibly allege, that any Defendant knew at that time that, in the future, COVID-19 vaccines would be developed, Emergent would contract to manufacture drug substance for them, and that notwithstanding the successful manufacture of 100 million doses, a contamination incident would then occur.  It is therefore unsurprising that, for the period before the contamination incident, the Complaint does not challenge statements about contamination risk.  Instead, Plaintiffs challenge statements about generic subjects such as Company capabilities and partnerships.  None of these statements is false.

*First,* none of the challenged statements bears a sufficient relation to the risk that materialized to have required Defendants *sua sponte* to raise the issue.  "Disclosure is required . .

---

[3] ¶¶ 129, 131, 138, 140, 143, 146, 148, 151, 155, 157, 160, 162, 164, 166, 168, 170, 172, 174, 175, 177, 179, 181, 183, 185, 191, 195, 199, 207, 211, 213, 215, 217, 221-26.
[4] ¶¶ 136, 202.
[5] ¶¶ 187, 189, 191, 195, 197, 205.
[6] ¶¶ 136, 195, 201, 203, 205, 209, 211.  Inexplicably, the Complaint asserts that Emergent's May 2020 response to an FDA Form 483 was false or misleading (¶¶ 136-37) and cites the same response as evidence that other statements were false or misleading, ¶ 219(b).

. only when necessary 'to make statements made, in the light of the circumstances under which they were made, not misleading.'"  *Lerner v. Northwest Biotherapeutics*, 273 F. Supp. 3d 573, 588 (D. Md. 2017) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)). General statements about a company's capabilities do not imply that no errors will occur during execution, so as to require the company to disclose all such potential sources of impediment.[7]

*Second,* Defendants' statements about Emergent's manufacturing capabilities[8] are not capable of objective verification and therefore are immaterial puffery that courts routinely find too vague to permit reasonable investor reliance.  *See In re Bank of Am. Corp., Sec., Deriv., & ERISA Litig.*, 757 F. Supp. 2d 260, 314 (S.D.N.Y. 2010) (statements regarding being "uniquely positioned to win market share" with "'significantly enhanced' capabilities" are puffery); *In re USEC Sec. Litig.*, 190 F. Supp. 2d 808, 822 (D. Md. 2002) (statement defendant was "world leader" in industry was puffery); *see also In re Marriott In'tl, Inc.*, 543 F. Supp. 3d at 136

---

[7] *Marcu v. Cheetah Mobile Inc.*, No. 18-CV-11184 (JMF), 2020 WL 4016645, at *4 (S.D.N.Y. July 16, 2020) (general statements about company's products and their popularity did not suggest anything about how products generate revenue to require disclosure of alleged fraudulent scheme); *Finger v. Pearson PLC*, No. 17 Civ. 1422 (RJS), 2019 WL 10632904, at *11 (S.D.N.Y. Sept. 16, 2019) (statements about interest in product not rendered misleading by failure to disclose technical issues or inadequate customer service); *In re Human Genome Scis. Inc. Sec. Litig.*, 933 F. Supp. 2d 751, 761 (D. Md. 2013) (disclosures that did not mention details of study results not rendered misleading by omission of disclosure regarding suicides during the study).
[8] *E.g.*, ¶¶ 129 ("Emergent is proud to demonstrate its ability to rapidly deploy capabilities, capacities, and expertise as part of our molecule-to-market CDMO offering to support the development and commercialization of essential medicines."), 131 ("It touted the Bayview facility as a 'CIADM designed for rapid manufacturing of vaccines and treatments in large quantities during public health emergencies,' with 'unique capabilities across four independent suites to produce at clinical scale to get candidates rapidly into the clinic, while at the same time scaling up to enable large-scale manufacturing to up to 4000L to prepare for production of commercial volumes to meet customer demand.'"), 140 ("Our longstanding record of delivering safe and effective medical countermeasures for public health positions us to continue to help at this critical moment by advancing COVID-19 vaccine programs of our fellow innovators in the industry.").

(finding statements that are not "specific and verifiable" and do not assign a quality to subject that does not exist are inactionable puffery).

### b) Defendants Disclosed the Risks Related to Contamination and Manufacturing COVID-19 Vaccine Drug Substance

Even if Defendants' general statements carried some duty to disclose risks related to contamination and manufacturing COVID-19 vaccine drug substance, Emergent disclosed those risks repeatedly and adequately.  *In re Progress Energy, Inc. Sec. Litig.*, 371 F. Supp. 2d 548, 552 (S.D.N.Y. 2005) ("[I]t is indisputable that there can be no omission where the allegedly omitted facts are disclosed."); *see also In re Seadrill Ltd. Sec. Litig.*, No. 14 Civ. 9642 (LGS), 2016 WL 3461311, at *9 (S.D.N.Y. June 20, 2016) (disclosure of "very uncertainties that Plaintiffs allege were undisclosed" renders challenged statements inactionable).

Emergent filings (including the ones containing challenged statements) detailed the risks of contamination and other manufacturing problems, including that they could result in manufacturing shutdowns or regulatory action:

> Manufacturing biologic products, especially in large quantities is complex.  The products must be made consistently and in compliance with a clearly defined manufacturing process.  Problems during manufacturing may arise for a variety of reasons, including . . . failure to follow specific protocols and procedures.  In addition, slight deviations anywhere in the manufacturing process, including . . . contamination including from particulates among other things . . . may result in lot failure or manufacturing shut-downs, delays in the release of lots, production recalls, spoilage or regulatory action. . . . From time to time, we may experience deviations in the manufacturing process that may take significant time and resources to resolve and, if unresolved, may affect manufacturing output and could cause us to fail to satisfy customer orders or contractual commitments, lead to a termination of one or more of our contracts, . . . result in litigation or regulatory action against us, including warning letters and other restrictions on the . . . manufacturing of a product, or cause the FDA to cease releasing product until the deviations are explained and corrected, any of which could be costly to us, damage our reputation and negatively impact our business.[9]

---

[9] Ex. 2 (Q1 2020 10-Q) at 49; Ex. 3 (Q2 2020 10-Q) at 50; Ex. 4 (Q3 2020 10-Q) at 53-54; Ex. 5 (2020 10-K) at 39; Ex. 6 (Q1 2021 10-Q) at 50-51; Ex. 7 (Q2 2021 10-Q) at 51.

Defendants also disclosed that government regulators had issued observations following inspection of Emergent's manufacturing facilities, some of those observations were significant, Emergent was in the process of implementing corrective actions, and the government would make other inspectional observations in the future:

> Government regulators enforce cGMP and other requirements through periodic unannounced inspections of manufacturing facilities. . . .  Following several of these inspections, regulatory authorities have issued inspectional observations, some of which were significant, but all of which are being, or have been, addressed through corrective actions.  If, in connection with any future inspection, regulatory authorities find that we are not in substantial compliance with all applicable requirements, or if they are not satisfied with the corrective actions we take, our regulators may undertake enforcement action against us, which may include warning letters and other communications . . . [and] restrictions on the marketing or manufacture of a product . . . .[10]

Defendants highlighted the specific heightened risks associated with developing COVID-19 drug substance, including the risk that Emergent may never be able to produce any significant quantity of vaccine drug substance or any at all:

> [W]e are also providing contract development and manufacturing services for the development and/or manufacture of three vaccine product candidates for customers. . . . Even if these product candidates are safe and/or effective and receive approval or authorization by a health regulatory authority, the manufacturing process for these programs are under development and will be complex.  As a result, there can be no assurance that we will be able to produce any significant quantity of these products or a timely basis or at all.[11]

Finally, to the extent challenged statements did not expressly reiterate the risk warnings, the disclosures pointed investors to the relevant filings.[12]  This is a well-established means of

---

[10] Ex. 2 at 46; Ex. 3 at 48; Ex. 4 at 51; Ex. 5 at 36-37; Ex. 6 at 48; Ex. 7 at 48-49.

[11] Ex. 2 at 54; Ex. 3 at 55; Ex. 4 at 58-59; Ex. 5 at 28; Ex. 6 at 39 (same and additionally disclosing that Emergent would not manufacture drug substance pending completion of the remediation of FDA's Form 483 findings); Ex. 7 at 40.

[12] Ex. 8 (Mar. 10, 2020 Press Release) at 1 ("There are a number of important factors that could cause the company's actual results to differ materially from those indicated by such forward-looking statements, including the success of the planned development program; the timing of and ability to obtain and maintain regulatory approvals for the product candidate; and our commercialization, marketing and manufacturing capabilities.  The foregoing sets forth many,

alerting investors to risks.  *See, e.g.*, *Abuhamdan v. Blythe, Inc.*, 9 F. Supp. 3d 175, 198 (D.

Conn. 2014) (finding allegedly omitted risk inactionable where disclosed in both SEC filings and

press releases referring SEC filings); *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 547 (S.D.N.Y.

2015) ("Although the complete disclosures were important when made in the first instance, a

reasonable investor would not expect repetition at every opportunity.  And the securities laws do

not require such regurgitation; that approach would bury the shareholders in an avalanche of

trivial information.") (citation omitted).

In sum, Defendants disclosed the risks related to contamination and manufacturing of

COVID-19 vaccine drug substance.  Therefore, Plaintiffs cannot claim a false or misleading

statement based on omission of those risks.

### c) Plaintiffs' Assertions Concerning the Severity of the Risk are Unfounded and Irrelevant

---

but not all, of the factors that could cause actual results to differ from our expectations in any
forward-looking statement. Investors should consider this cautionary statement, as well as the
risk factors identified in our periodic reports filed with the SEC, when evaluating our forward-
looking statements."); Ex. 9 (Apr. 23, 2020 Press Release) at 2; Ex. 10 (Apr. 30, 2020 Earning
Release) at 4-5; Ex. 11 (Apr. 30, 2020 Earnings Call Presentation) at 2; Ex. 12 (May 12, 2020
BofA Conference Presentation) at 2; Ex. 13 (June 1, 2020 Press Release) at 2; Ex. 14 (June 11,
2020 Press Release) at 2; Ex. 15 (June 24, 2020 IDEAS Conference Presentation) at 2; Ex. 16
(July 6, 2020 Press Release) at 2; Ex. 17 (July 27, 2020 Press Release) at 2; Ex. 18 (July 30,
2020 Earnings Release) at 7-8; Ex. 19 (July 30, 2020 Earnings Call Presentation) at 2; Ex. 20
(Aug. 12, 2020 Intellisight Conference Presentation) at 2; Ex. 21 (Aug. 26, 2020 NASEM
Conference Presentation) at 2; Ex. 22 (Nov. 5, 2020 Earnings Release) at 8; Ex. 23 (Nov. 5, 2020
Earnings Call Presentation) at 3; Ex. 24 (Nov. 18, 2020 IDEAS Conference Presentation) at 2;
Ex. 25 (Dec. 10, 2020 Singular Research Webinar Presentation) at 2; Ex. 26 (Jan. 10, 2021
Earnings Release) at 4; Ex. 27 (Jan. 11, 2021 J.P. Morgan Conference Presentation) at 2; Ex. 28
(Feb. 18, 2021 Earnings Release) at 7-8; Ex. 29 (Feb. 18, 2021 Earnings Presentation) at 3; Ex.
30 (Mar. 1, 2021 J.P. Morgan Presentation) at 2; Ex. 31 (Apr. 1, 2021 Press Release) at 1; Ex. 32
(Apr. 4, 2021 Press Release) at 2; Ex. 33 (Apr. 21, 2021 Press Release) at 1; Ex. 34 (Apr. 29,
2021 Earnings Release) at 6-7; Ex. 35 (Apr. 29, 2021 Earnings Presentation) at 3; Ex. 36 (May
27, 2021 Singular Research Conference Presentation) at 2; Ex. 37 (June 11, 2021 Press Release)
at 1; Ex. 38 (June 16, 2021 IDEAS Conference Presentation) at 2; Ex. 39 (July 29, 2021 Press
Release) at 1; Ex. 40 (July 29, 2021 Earnings Release) at 7; Ex. 41 (July 29, 2021 Earnings
Presentation) at 3; Ex. 42 (Aug. 25-26, 2021 IDEAS Conference Presentation) at 2; Ex. 43 (Sept.
14, 2021 Baird Conference Presentation) at 2.

The Complaint devotes numerous pages to discussion of confidential witnesses, FDA communications, news reports, and congressional proceedings, apparently hoping to establish that the risk of contamination or other manufacturing problems was "grave" and "severe," and that Emergent did not adequately disclose this.  As a threshold dispositive matter, none of that is relevant because, as discussed above, Emergent clearly and repeatedly disclosed the risks related to contamination and manufacturing COVID-19 vaccine drug substance.  The disclosures do not downplay the risk or cast it as remote; they identify the risk and describe it in neutral terms.  The Company was not required to depart from neutrality and instead disparage prospects.  *See In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 367 (S.D.N.Y. 2007) ("The securities laws neither require corporate officers to adopt a crabbed, defeatist view of the company's business prospects nor permit dissatisfied shareholders to assert serious allegations of fraud based on the perfect hindsight afforded by the passage of time.").  Thus, even if Plaintiffs could establish that the risks at issue were severe (or any other preferred adjective), that would not impugn the sufficiency of the disclosure.  In any event, the Complaint's allegations concerning the level of risk flow from unreliable sources that courts routinely do not credit, do not support Plaintiffs' self-serving characterization, or address other issues that are simply irrelevant.

### i.  Confidential Witnesses

Non-particularized, vague, or conclusory confidential witness allegations fail to meet pleading standards.  *See Kasilingam v. Tilray, Inc.*, No. 20-cv-03549 (PAC), 2021 WL 4429788, at *9 (S.D.N.Y. Sept. 27, 2021) ("'[C]ourts have generally been hostile to non-particular allegations from [confidential witnesses'] included in a complaint where such allegations are conclusory, vague, or otherwise 'insufficiently particularized.'") (quoting *ODS Capital LLC v. JA Solar Holdings Co., Ltd.*, No. 18-cv-12083 (ALC), 2020 WL 7028639, at *9 (S.D.N.Y. Nov. 30, 2020)); *In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 204-05 (S.D.N.Y. 2020)

(rejecting allegations of "CWs whose knowledge is limited and whose allegations are vague and conclusory").  Further, witness statements that do not allege when facts occurred cannot show that a challenged statement was false or misleading.  *See In re Marriott, Int'l, Inc.*, 543 F. Supp. 3d at 139 (allegations that statement was false or misleading may not be based on hindsight); *In re Under Armour Sec. Litig.*, 342 F. Supp. 3d 658, 608 (D. Md. 2018) (same); *see also In re Career Educ. Corp. Sec. Litig.*, No. 03 C 8884, 2006 WL 999988, at *5 (N.D. Ill. Mar. 28, 2006) (rejecting numerous undated witness allegations); *In re Vertex Pharms., Inc. Sec. Litig.*, 357 F. Supp. 2d 343, 353-54 (D. Mass. 2005) (same).  The Complaint's witness allegations fail on both counts and many are also irrelevant:

**CW1.**  CW1 allegedly worked as a Senior Project Manager in Emergent's corporate headquarters from April 2020 to December 2020.  ¶ 28.  CW1 first claims that Emergent did not have necessary personnel, equipment, and functional capability to handle the work it took on by April 2020.  ¶ 60.  But this fails to establish an undisclosed risk, because Emergent disclosed that its manufacturing process was in development, *see, e.g.*, Ex. 2 at 54 ("[T]he manufacturing process for these programs are under development and will be complex.  As a result, there can be no assurance that we will be able to produce any significant quantity of these products or a timely basis or at all.").  Further, CW1 does not allege that Emergent remained unprepared by the time that it started manufacturing vaccine drug substance, and indeed admits that Emergent was actively working toward establishing the capabilities it needed.  ¶ 60 ("[T]hat's why I was brought in.").

CW1 also claims that the COVID-19 projects experienced delays and missed deadlines but that Mr. Husain "continued to push for additional contracts."  *Id.*  This allegation is irrelevant because it does not connect any of these supposed delays to any alleged undisclosed risk.  CW1

-14-

proceeds to assert that "there were 'always' problems at the Bayview," *id.*, but does not say what those problems were or when they arose.  CW1 goes on to describe "mold problems," but does not state when these problems occurred or that they were not corrected.[13]  CW1 continues, alleging that employees were terminated "for speaking up about problems" and resigned because of frustration and overwork, but does not specify what problems the employees spoke up about or connect the resignations to any alleged undisclosed risk.

CW2.  CW2 allegedly worked in Operational Excellence from December 2018 to December 2021.  ¶ 29.  CW2 alleges that, after FDA's inspection in March 2021, Emergent was required to improve its Standard Operating Procedures at Bayview to ensure that the J&J and AstraZeneca vaccines did not cross paths at the site.  ¶ 61.  FDA's conclusion that the procedures should be improved was reached after the contamination incident, however.  *In re Marriott, Int'l, Inc.*, 543 F. Supp. 3d at 139 (alleging fraud by hindsight is impermissible).  CW2 also alleges that after the destruction of J&J vaccine drug substance, Emergent "conducted a 'thorough investigation.'"  ¶ 61.  CW2 does not say what the investigation revealed, however.  Regardless, any conclusions would have been reached only in hindsight.

CW3.  CW3 allegedly worked as a Quality Assurance Analyst at Bayview from November 2020 to November 2021.  ¶ 30.  CW3 alleges that Emergent "tried to fix problems relating to vaccine contamination" before an FDA inspection but "they weren't able to fix all the issues beforehand."  ¶ 62.  CW3 fails to allege, however, what these problems were, when they arose, that they were not fixed after the inspection, or that the risk posed by them was greater

---

[13] The Complaint repeatedly references such mold issues, but never alleges that they caused the contamination incident.  To the contrary, the Complaint alleges that the contamination incident was caused by cross-contamination of AstraZeneca vaccine ingredients with J&J vaccine ingredients, ¶ 250, and that the most probable cause was "contact with waste moving out of the area where the AstraZeneca vaccine was manufactured," ¶ 125, not mold.

than was disclosed.  CW3 next alleges that CW3 hired many employees, that this led to "chaos" at Bayview, that manufacturing remained short-staffed and provided inadequate training, and that this "led to errors and deviations from standard operating procedures, which increased significantly." *Id.*  These allegations are all conclusory, do not identify any specific issues connected to alleged undisclosed risks, and in any event, none includes a date. *In re Career Educ. Corp. Sec. Litig.*, 2006 WL 999988, at *5; *Kasilingam*, 2021 WL 4429788, at *9.

**CW4.**  CW4 allegedly worked as a Quality Control Microbiology Analyst II at Bayview from July 2019 to July 2020. ¶ 31.  CW4 alleges that a suite at Bayview was not qualified for mass production when Emergent announced contracts with J&J and AstraZeneca.  ¶ 63. However, Defendants disclosed that Emergent's manufacturing process was under development (Ex. 2 at 54), CW4 does not allege that the suite was not qualified when Emergent began production, and CW4 no longer worked at Emergent when production began.  ¶ 55.  Indeed, CW4 states that after the contracts were entered, "we were fast tracking it with [process performance qualification] and qualifying the area for mass production."  ¶ 63.  CW4 also alleges that Emergent did not have enough quality control employees on the microbiology team. *Id.*  This allegation is undated and other allegations concerning Emergent's "massive hiring effort" (¶ 62) undermine it.  Finally, CW4 alleges that Bayview had issues with mold.  *Id.*  This allegation is also undated and CW4 does not allege that the mold problems went unaddressed— indeed CW4 proceeds to describe the identification of a "root cause," suggesting that Emergent took efforts to remediate.

**CW5.**  CW5 allegedly worked as a Project Analyst at Emergent's corporate headquarters from August 2020 to January 2021.  ¶ 32.  CW5 first vaguely alleges that "there were constant conversations about something going wrong in the lab" and that it "seemed" like there were

frequent mistakes, that Mr. Welch and Mr. Husain met frequently, and that when reports of problems at Bayview arose, Mr. Welch became very angry.  ¶ 64.  CW5 fails to allege what any of these problems were or when they occurred, much less how they connected to any alleged undisclosed risk.  *In re Career Educ. Corp. Sec. Litig.*, 2006 WL 999988, at *5 (rejecting undated witness allegations).  Next, CW5 vaguely asserts that during meetings with clients, Mr. Husain did not convey to clients "the full extent of problems at Bayview."  CW5 again fails to allege what the problems were, or the context of the meetings explaining why Mr. Husain would have been expected to convey this information.  ¶ 64.  CW5 proceeds to allege that Mr. Welch revised certain of CW5's notes, fired CW1 shortly after a conversation about "what was happening at the Bayview site," and then fired CW5 and "everyone closely associated with CW1."  *Id.*  CW5 does not state what was deleted from his notes, however, or what Mr. Welch (a non-defendant) was told about Bayview.

    **CW6.**  CW6 allegedly worked as QC Microbiology Specialist, Data Review Supervisor at Bayview from October 2020 to May 2021.  ¶ 33.  CW6 alleges that problems arose with testing data and incomplete records and that when CW6 refused to sign off on data for a "lot release," CW6 was pressured to sign off by certain of CW6's managers (none of whom is a defendant).  ¶ 65.  CW6 fails to allege when these issues arose, what CW6's concerns were, or that they had anything to do with any alleged undisclosed risk.  Next, CW6 alleges that an assay used to test for mold was flawed, but management wanted to use the test data anyway.  *Id.*  CW6 does not say when this supposed issue occurred, what about the assay was allegedly flawed, or what impact the assay had on any operational issue.  CW6 continues that certain endotoxin tests

were "sometimes incomplete," *id.*, without stating when this occurred or how these tests related to any alleged undisclosed risk.

CW6 proceeds to allege that "management at Emergent did not appear to want to address contamination problems wholistically at Bayview, preferring to use 'band-aid' fixes that did not solve larger problems."  This allegation is impermissibly conclusory, however.  *Kasilingam*, 2021 WL 4429788, at *9.  Moreover, CW6's allegation is only an opinion, ¶ 65 ("did not appear"), and CW6 does not allege facts to support it.  CW6 next alleges that the QC Microbiology team was "understaffed, under-equipped, and undertrained," but provides no details for this opinion and does not state when CW6 reached it.  *Id.*  Finally, CW6 alleges that "the number of contamination alerts increased during CW6's tenure."  *Id.*  CW6 fails to allege the significance of these contamination alerts, when they occurred, or otherwise provide any context from which one could draw a conclusion about any alleged undisclosed risk.

**CW7.**  CW7 allegedly worked as Lead QX Biological Laboratory Support Technician at Bayview from March 2020 to October 2020.  ¶ 34.  CW7 alleges that manufacturing employees at Bayview did not follow standard operating procedures with respect to labeling and recounts an instance in September 2020 in which a lab technician did not follow procedures for cleaning equipment.  ¶ 66.  CW7 fails to allege when the former occurred and that either of these issues were not identified or corrected.  CW7 goes on to allege that during a September 2020 FDA inspection, a specimen of COVID-19 vaccine could not be found because it was not inventoried properly.  *Id.*  CW7 does not allege that this was not identified or corrected—and presumably because it occurred during an FDA inspection, it was both identified and corrected.  Similarly, CW7 recounts an instance in which an employee asked other employees to send pictures of

products to account for them in violation of procedure, without stating whether this issue was corrected or that it posed any risk.

**CW8.**  CW8 allegedly worked as a Quality Control Supervisor at Bayview from June 2020 to December 2020.  ¶ 35.  CW8 alleges that the refrigerator space in the sample receiving room and other office space at Bayview were not sufficiently large, and that with respect to the former, "samples were broken and lost more often than average."  *Id.* ¶ 67.  CW8's allegations as to the size of the spaces are conclusory, however, and CW8 does not allege how this contributed to contamination or other manufacturing risk.  CW8 provides no context as to what an "average" number of broken or lost samples is or how CW8 determined that average, and in any event, CW8 fails to allege that the number of instances at Bayview was meaningfully above such an average.  CW8 also asserts that "Emergent was misleading about its ability to handle manufacturing of multiple vaccines at once."  *Id.*  But this conclusion does not say who Emergent misled or how or when.  *Kasilingam*, 2021 WL 4429788, at *9.

**CW9.**  CW9 allegedly worked as a Manufacturing Assistant and then Bioprocess Associate at Bayview from July 2020 to October 2021.  ¶ 36.  CW9 alleges broadly that employees at Bayview were not adequately trained and lacked experience.  ¶ 68.  CW9 provides no details in support of this conclusion, however.  Further, CW9 does not state when CW9 reached this conclusion and it appears to have been after "Bayview was shut down," *id.* ("CW9 said that when Bayview was shut down after the FDA visit, Emergent told everyone that they would be trained from scratch, and all SOPs would be updated"), which is impermissible hindsight.  *In re Marriott, Int'l, Inc.*, 543 F. Supp. 3d at 139.  CW9 also alleges that Emergent

did not provide training or update procedures during the shutdown (¶ 68) but fails to allege that Emergent did not later provide training or that it failed to comply with its remediation plan.

CW9 next alleges that employees complained about training, staff, and equipment, and that the manufacturing department was understaffed and underequipped. *Id.* CW9 does not allege, however, when CW9 reached this conclusion, when or to whom the complaints were lodged, or that they went unaddressed. CW9 alleges issues with mold and that "at least some of it" was concealed from FDA, *id.*, but CW9 does not allege that Emergent failed to address mold—indeed, CW4 alleges that Emergent identified the root cause (¶ 64)—and CW9 does not connect the allegation to any alleged undisclosed risk. CW9 further alleges that the contamination incident was "one of the many contaminations that occurred" at Bayview and estimates that "one of every five batches of the J&J vaccine was contaminated in some way." *Id.* CW9 does not state, however, when these contamination incidents occurred, their severity, or when they were identified. *In re Career Educ. Corp. Sec. Litig.*, 2006 WL 999988, at *5. Further, far from establishing a grave risk of contamination, CW9 alleges that Emergent conducted contamination investigations following these incidents (¶ 68), presumably to identify and remediate any gaps in process that led to them. CW9 alleges that batches of vaccine were destroyed because records were incomplete or inaccurate (*id.*) but fails to connect these recordkeeping allegations to an undisclosed risk of contamination, and indeed, the destruction of the batches was presumably to avoid that very risk. CW9 asserts that "right before the FDA came to inspect the Bayview facility in early 2021," the Head of Manufacturing at Bayview instructed employees to "carry bags of hazardous waste waiting to be sterilized through sterile areas of the facility." *Id.* CW9 does not allege that this occurrence resulted in the contamination incident at issue, however, and CW9's statement that it transpired "right before the FDA came to

inspect," suggests that it occurred after.  Finally, CW9's allegation that CW9 "came to realize 'we were not designed at all to handle this job'" (¶ 68), is conclusory, and CW9 does not state when CW9 reached the conclusion.  *In re Marriott, Int'l, Inc.*, 543 F. Supp. 3d at 139.

**CW10.**  CW10 allegedly worked as a Quality Control Analyst II – Microbiology from April 2020 to May 2021 at Bayview.  CW10 first alleges that one manufacturing suite at Bayview was designed as a "pilot program" area.  ¶ 69.  CW10 fails to allege, however, that this meant that it could not be used for commercial scale manufacturing or that Emergent attempted to use it for that purpose.  CW10 next alleges "serious problems with mold," *id.*, but again does not allege when the supposed problems occurred or that they went unaddressed—indeed, CW10 proceeds to allege that CW10 sent emails asking to make mold a "higher priority" for remediation, suggesting that the issue had been identified for remediation.  CW10 proceeds to allege that the QC department was understaffed, *id.*, but the allegation is conclusory and not dated.  *In re Career Educ. Corp. Sec. Litig.*, 2006 WL 999988, at *5.  CW10 alleges that when Emergent announced the AstraZeneca contract, CW10 was "shocked and dismayed, wondering how the work could get done because there were not enough employees to handle the existing level of work at the time."  CW10's personal opinion is irrelevant, and CW10 does not allege that Emergent did not thereafter hire additional employees.  *Kasilingam*, 2021 WL 4429788, at *9.  Finally, CW10 alleges that QC staff were not given detailed information about FDA "violations that needed to be addressed," but CW10 does not state when these supposed violations occurred or that they were not being addressed by someone other than CW10.

### ii.  FDA Communications

The quotations from reports of FDA inspections of Emergent facilities and Emergent's responses thereto are similarly to no avail.  ¶¶ 70-116.  First, most of the inspections were of facilities other than Bayview, and the Complaint does not plead any facts to suggest that issues at

those facilities had any capacity to affect Bayview.[14]  Those inspections of other facilities also took place years before Bayview began manufacturing COVID-19 vaccine drug substance.

As to the only pre-contamination report related to Bayview, the Complaint fails to plead that the issues that FDA identified were anything other than routine or that they were not correctable.[15]  As courts have held, "FDA inspections are . . .  routine aspects of business for entities subject to its regulations," *McClain v. Iradimed Corp.*, 111 F. Supp. 3d 1293, 1302-03 (S.D. Fla. 2015) (collecting cases), and FDA explicitly states that Form 483 findings are preliminary and that recipients may submit corrective plans.[16]  For this reason, courts consider Form 483s "interim FDA feedback" and have concluded that "there is no standalone duty to disclose [their] existence."  *Schaeffer v. Nabriva Therapeutics plc*, 19 Civ. 4183 (VM), 2020 WL 7701463, at *9 (S.D.N.Y. Apr. 28, 2020).  The post-contamination incident inspection of Bayview fails adequately to demonstrate a prior undisclosed risk because its conclusions were reached in hindsight.  *In re Marriott, Int'l, Inc.*, 543 F. Supp. 3d at 139.[17]

---

[14] ¶¶ 74-85 (Winnipeg, Canada), 86-94 (Canton, MA), 95-99 (Lansing, MI), 100-07 (Rockville, MD).  The inspections were also all well before Emergent began to manufacture COVID-19 vaccine drug, with latest inspection occurring in September 2019.

[15] The FDA also publicly released its April 2020 Form 483.  ¶ 111.  Defendants were under no duty to disclose information that "has been made credibly available to the market by other sources."  *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289 (4th Cir. 1993) (citation omitted).

[16] *See* Ex. 44 (April 2021 Form 483) ("This Document lists observations made by the FDA representative(s) during the inspection of your facility.  They are inspectional observations, and do not represent a final agency determination regarding your compliance.").

[17] The post-contamination incident FDA report also does not support the allegation that post-contamination incident statements were false or misleading, because FDA made its report public and Emergent immediately thereafter published it to investors.  Ex. 33; *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003) ("Where allegedly undisclosed material information is in fact readily accessible in the public domain . . . a defendant may not be held liable for failing to disclose this information."); *Raab*, 4 F.3d at 289 (same); *see also Rice as Tr. of Richard E. & Melinda Rice Revocable Family Tr. 5/9/90 v. Intercept Pharms., Inc.*, No. 21-CV-0036 (LJL), 2022 WL 837114, at *10 (S.D.N.Y. Mar. 21, 2022) (non-disclosure of serious adverse events inactionable where data was available in public FDA database).

### iii.  Newspaper Article

The Complaint's reliance on after-the-fact conclusions from a *New York Times* article amounts to impermissible pleading of fraud by hindsight.  *In re Marriott, Int'l, Inc.*, 543 F. Supp. 3d at 139.  Further, other than with respect to conclusions drawn from the FDA correspondence discussed above, *see supra* at 21-22, and audit reports addressed further below, *see infra* at 24-25, the article does not cite the basis for its conjecture.  ¶ 117 (citing review of "undisclosed internal documents" and interviews with unnamed "former federal officials and former company employees" with unspecified roles).[18]  Plaintiffs cannot skirt the reliability requirements for confidential witnesses simply because their statements appear in the media.  *See City of Brockton Ret. Sys. v. Avon Prods., Inc.*, No. 11 Civ. 4665 (PGG), 2014 WL 4832321, at *23 (S.D.N.Y. Sept. 29, 2014) (rejecting allegations from article where "description of the source provides no basis for the Court to evaluate its reliability").  In addition, "[c]onclusory allegations of wrongdoing are no more sufficient if they come from a newspaper article than from plaintiff's counsel . . . ." *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 690 (S.D.N.Y. 2008) (citation omitted).  The inferences from the article upon which the Complaint relies are just that.  *See, e.g.*, ¶¶ 117 ("[I]t reported that Emergent had 'a corporate culture that often ignored or deflected missteps'"), 118 ("Emergent had not followed some basic industry standards at the Baltimore plant, and identified repeated shortcomings in efforts to disinfect and prevent contamination.").  Finally, the article's reporting on other batches that Emergent discarded prior to the contamination incident (¶ 119) does not indicate that discarding some number of batches is unusual or that the type of contamination associated with these batches had anything to do with the cross-contamination that would later occur.[19]

### iv.  Preliminary Congressional Findings

The hindsight conclusions reached preliminarily by Congressional staff fail to support the Complaint's theory for the same reason as the *New York Times* reporting.  *In re Marriott, Int'l, Inc.*, 543 F. Supp. 3d at 139.  The Complaint purports to identify "new evidence" cited in the memorandum to support its allegations: (1) certain of the same FDA communications addressed above, (2) a June 17, 2020 report issued by BARDA (the "Warp Speed Report"), and (3) a July 24, 2020 report issued by J&J (the "Janssen Report").  The FDA communications fail for the reasons discussed above.  *See supra* at 21-22.

Neither the Warp Speed nor Janssen Report is any better, and if anything, they support a conclusion opposite from that which the Complaint urges.  The Warp Speed Report documents conclusions made by BARDA after visiting Bayview for the purposes of "assess[ing] the company organization and facilities['] readiness to accept transfer in of the Jannsen, AZ and Novavax vaccine candidates, and start manufacturing drug substance and drug product according to the current very aggressive schedule."  Ex. 45 at 1 (Warp Speed Report).  The report concluded that all identified risks "can be addressed successfully within the timelines of OWS, enabling successful manufacturing of the products," "management is visibly committed to this project," and "[r]isks can be mitigated with incremental support to the quality organization, and appropriate planning to ensure training is performed."  *Id.* at 1-2, 7.

---

[18] *The New York Times*'s summaries of a July 2020 Emergent audit and an AstraZeneca audit (¶ 118), which the Complaint does not further discuss, fail to support the allegations for the same reason as the results of the other audits—the Complaint fails to allege that the issues were not correctable or that Emergent did not remediate them.  The Emergent audit, if anything, reflects the Company's diligence in identifying and correcting potential risks.

[19] Indeed, one of the batches was discarded for reasons that did not relate to contamination, ¶ 219(d) (batch discarded because of "hooking up the wrong gas line"), and Emergent's destruction of out-of-specification batches, if anything, indicates that its quality control processes were working as intended.

The Janssen Report was prepared as part of its external audit program in advance of production of vaccine drug substance at Bayview to determine whether to qualify Bayview for production.  Ex. 46 (Janssen Report).  The audit identified no critical observations, two major observations, and five minor observations.  *Id.* at 7.  The major observations related to the timeliness of certain environmental and utility monitoring trend reports and Emergent's use of a particular disinfectant.  *See id.* at 10-11.  As a result of the audit, J&J designated Bayview as Conditionally Qualified and explained that following an on-site audit, the audit record would be changed from Conditionally Qualified to Qualified.  *See id.* at 7.  The Complaint nowhere alleges that the on-site audit yielded any different conclusions or that Emergent failed to address them.

Far from establishing a grave risk of contamination or other manufacturing risk, both reports identified correctable issues in advance of production of COVID-19 vaccine drug substance so that Emergent could timely address them.  It is implausible that BARDA or Janssen would proceed with production if they knew that contamination was a severe risk.

### 2. Statements Following the Contamination Incident are Not Actionable

After news of the contamination incident broke on March 31, 2021, the challenged statements focus largely on the incident and remediation.   None describes a false statement.

Many of the challenged post-contamination incident statements concerning remediation are immaterial puffery.  *Compare, e.g.,* ¶¶ 197 ("While we are never satisfied to see shortcomings in our manufacturing facilities or process, they are correctable and we will take swift action to remedy them."), 203 (statement that Emergent "started making improvements and [was] fully committed to making the necessary short- and long-term enhancements to meet or exceed FDA's standards"), *with In re First Am. Fin. Corp.*, CV 20-9781 DSF (Ex), 2021 WL 4807648, at *9 (C.D. Cal. Sept. 22, 2021) (statement that defendant was "committed to

safeguarding customer information" was puffery because commitment is "not a word of certainty, even when viewed in context") (citation omitted).

Further, Defendants' statements about what happened in the incident did not mislead investors. First, the Complaint's comment that Emergent's April 1, 2021 press release "stopped short of admitting cross-contamination" (¶ 187) does not render the statement false or misleading. The press release disclosed that a batch of drug substance did not meet specifications and would be destroyed. Ex. 31. That was true, and the fact that cross-contamination caused the result does not contradict the release or render it misleading.

Next, the Complaint's allegation that Mr. Kramer "denied that there was a mix-up of the J&J and AstraZeneca vaccines" during an April 1, 2021 interview (¶ 189) fails because, given that the host stated that the cause was cross-contamination and that other media outlets had already reported the same, anything Mr. Kramer may have said was immaterial.[20] The Complaint cannot plead that Mr. Kramer's statement altered the total mix of information. *See Longman v. Food Lion, Inc.*, 197 F.3d 675, 684 (4th Cir. 1999) ("Plaintiffs' securities fraud claim cannot succeed because, despite the fact that [defendant] denied the charges, the nature of the [claims] were in fact well known to the market before the [media publicity], and therefore . . . omissions were not material.").[21]

---

[20] The Complaint also alleges that during the interview, Mr. Kramer "assured investors that there would be 'eventual EUA approval for [the] Bayview facility for J&J." ¶ 189. Mr. Kramer made no such assurance, only stating that Emergent was committed to doing what it could to support eventual approval. *Emergent Biosolutions CEO on the vaccine factory mix-up*, CNBC (Apr. 1, 2021) https://www.cnbc.com/video/2021/04/01/emergent-biosolutions-ceo-on-the-vaccine-factory-mix-up.html ("All I can say is we remain confident and committed to do whatever we can to collaboratively work through this process and support the eventual EUA approval for our Bayview facility for J&J.").

[21] Emergent clarified Mr. Kramer's statement. ¶ 250. The Complaint alleges that this clarification was a partially corrective disclosure, but the analyst report that the Complaint cites in support makes absolutely no mention of Mr. Kramer's interview, undermining the notion that

Finally, the Complaint takes issue with Mr. Kramer's statement during his Congressional testimony that it was "our internal quality control procedures [that] identified the out of specification and the contamination," ¶ 205, because the assay that detected the contamination was conducted in a J&J facility.  But the Complaint fails to allege that the assay performed in that facility was not in fact part of Emergent's quality control procedures.  Regardless, in response to further questioning, Mr. Kramer made clear that the assay was conducted by J&J as part of Emergent's procedures such that no investor could have possibly been misled by his initial response.  *Longman*, 197 F.3d at 684.[22]  Mr. Kramer's statement during his testimony that he would "expect" that Emergent would be in a position to resume production "within a matter of days" (¶ 205 (b)(iv)) is an inactionable opinion.  *See In re Marriott Int'l, Inc.*, 543 F. Supp. 3d at 119-20; *see also Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 184 (2015).  The Complaint does not allege that Mr. Kramer did not believe his estimate, that it contains an embedded statement of fact, or that an omission rendered it misleading, and indeed, FDA permitted Emergent to resume production shortly after the testimony.  *Compare* ¶ 205 (testimony on May 19, 2021) *with* ¶ 213(a) (July 29, 2021 announcement that production would resume).

B.   **The Allegations Concerning Financials and Projections Do Not State a Claim**

Next, within a bucket that Plaintiffs refer to as "reported results fraud," the Complaint challenges reports of: (i) revenues, net income, and earnings, and (ii) forecasted revenues.  ¶¶

---

the statement was material or that the clarification caused any loss to investors.  *See* Ex. 47 (Apr. 30, 2021 Chardan Report).

[22] The Complaint also appears to take issue with an analyst report reflecting that Emergent management described media reports about an "ingredient mix-up" as a "'mischaracterization' of the situation."  ¶ 193.  But describing the contamination incident as an "ingredient mix-up" is a mischaracterization of what happened, and the Complaint does not plead otherwise.  ¶ 125 (most likely cause was contact with waste moving out of the area where the AstraZeneca vaccine was manufactured).

220-227.  To the former, the Complaint does not allege that the financial results were false, but rather asserts that they were misleading because of a supposed failure to disclose "improper practices, unreported operational setbacks, and undisclosed negative trends."  ¶¶ 220, 228. However, "[a]ccurate statements about past performance are self evidently not actionable under the securities laws."  *Nadoff v. Duane Reade, Inc*., 107 F. App'x 250, 252 (2d Cir. 2004).  "[T]he allegation that a corporation properly reported income that is alleged to have been, in part, improperly obtained is insufficient to impose Section 10(b) liability."  *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 404 (S.D.N.Y 2016) (citation omitted).  And here, Plaintiffs do not even claim any part of reported revenues were earned unlawfully or improperly.  Further, the securities laws impose no duty to self-disparage.  *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d at 367.

Emergent's forecasts are forward-looking statements protected by the PSLRA.  5 U.S.C. § 78u–5(c).  "Forward-looking statements are defined as those that contain, among other things, a projection of revenues, income, [or] earnings."  *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 755 (S.D.N.Y. 2018) (citation omitted).  "The PSLRA precludes liability for statements if they are identified as forward looking statements and are (1) accompanied by meaningful cautionary language or (2) immaterial."  *In re Marriott Int'l, Inc.*, 543 F. Supp. 3d at 121 (citation omitted).  Here, Emergent identified financial projections as forward-looking and cautioned investors "not to place undue reliance on any forward-looking statement."  Exs. 10, 18, 22, 26, 28, 34, 40.  The releases pointed to risk factors, including the continued success of the company's "manufacturing capabilities," and incorporated by reference the risk factors listed in its SEC filings, which (as discussed *supra*) warned of the risks presented by potential contamination and other similar problems in manufacturing.  *Id.*  Following the Company's

execution of its COVID vaccine-related contracts, its releases further disclosed that future projections were dependent on "our ability to perform under our contracts with the U.S. government and our CDMO clients." *See, e.g.*, Ex. 22 at 8; Ex. 28 at 8.  After the discovery of the incident, the Company's earnings releases included as a risk factor "our ability to meet our commitments to continued quality and manufacturing compliance at our Baltimore Bayview facility and the potential impact on our ability to continue production of bulk drug substance for Johnson & Johnson's COVID-19 vaccine at the facility."  Ex. 40 at 7.

C.    **The Allegations Concerning SOX Certifications Do Not State a Claim**

Last, the Complaint asserts that certifications under SOX §§ 302 and 906 were false or misleading due to the purportedly undisclosed risk of contamination and other manufacturing risks and alleged internal controls failures resulting in the incident.  ¶¶ 231-35.  But the SOX certifications attest to the sufficiency of the Company's internal control *over financial reporting*—not operational controls or other controls.  ¶ 235; *see In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 758 (S.D.N.Y. 2017).  In that regard, Mr. Kramer's so-called "concession" before Congress (¶ 235) is irrelevant; it concerned a failure in *operational* controls.  *See id.* (discussing "failure in our controls that led to the contamination"); *In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 359 (S.D.N.Y. 2015) (certification of financial controls not rendered false by failure of other unrelated controls, such as those related to bribery).

The Complaint's fallback argument that Messrs. Kramer and Lindahl's SOX certifications were false insofar as they did not disclose any fraud to the audit committee fares no better.  As set forth *supra*, the Complaint fails plausibly to allege any fraud on the part of either Mr. Kramer, Mr. Lindahl, or any other member of "management and other employees with a significant role in Emergent's internal controls over financial reporting" that would give rise to a duty to report.  ¶ 235.  Further, the Complaint is devoid about what was disclosed (or not) to

Emergent's Audit Committee.  *See In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 363 (S.D.N.Y. 2008) (dismissing similar claim where complaint did not plead with particularity that fraud was not reported to auditors or audit committee).

## III.    THE COMPLAINT FAILS TO PLEAD SCIENTER

The Complaint must particularize facts giving rise to a "strong inference" of scienter.  *In re Marriott Int'l Inc.*, 543 F. Supp. 3d at 110 (citing 15 U.S.C. § 78u-4(b)(2)).  The Complaint's overall scienter theory—that Defendants orchestrated a fraud whereby they invested immense time, effort, and money in what they secretly knew would be a futile effort to manufacture COVID-19 vaccine drug substance—makes no sense.  Courts have routinely rejected similar theories of scienter.  *See, e.g.*, *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 627 (4th Cir. 2008) ("It is improbable that [defendant] would stake its existence on a drug and a clinical trial that the company thought was doomed to failure."); *Gillis v. ORX Pharma Ltd.*, No. 15 Civ. 4868 (PAE), 2016 WL 3685095, at *30 (S.D.N.Y. July 6, 2016) (investment in clinical studies known to be "doomed to fail" is not a plausible state of mind and does not support an inference of scienter); *see also Local No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharm., Inc.,* No. 15-2250, 2016 WL 5682548, at *4 (1st Cir. Oct. 3, 2016) (same).  This is particularly so given that Defendants repeatedly disclosed the risks related to contamination and manufacturing COVID-19 vaccine drug substance before the contamination incident, and kept investors regularly updated concerning developments after the contamination incident.  Repeated disclosures of the very risk alleged to have been omitted weigh strongly against any inference that "Individual Defendants were intentional or severely reckless in leading investors to believe the opposite."  *In re Marriott Int'l, Inc.*, 543 F. Supp. 3d at 153.  The fair inference is instead that Defendants worked in good faith to manufacture vaccine drug substance in response to a pandemic, disclosed the risks,

suffered an unfortunate contamination incident, and worked to address it.  None of Plaintiffs' allegations undermines this reality.

A.      **The Allegations Concerning "Red Flags" Are Insufficient**

The Complaint fails adequately to plead that Defendants were aware of "red flags" that demonstrate scienter.  ¶¶ 260-61.  The Complaint relies on the confidential witnesses, but the allegations are deficient.  "[N]one of the confidential witness allegations are regarding Defendants deceiving investors," or "what any Individual Defendant actually knew . . . or the falsity of any statements."  *In re Marriott In'l*, 543 F. Supp. 3d at 145.  Nor does any confidential witness allege the sort of direct contact with Individual Defendants necessary to establish that they could reliably testify as to Individual Defendants' knowledge.  *See KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 609 (4th Cir. 2021) ("This general lack of direct contact with Defendants weakens the inference of scienter . . . ."); *In re Conventry Healthcare, Inc. Sec. Litig.*, No. 08:09-CV-2337-AW, 2011 WL 1230998, at *6 (D. Md. Mar. 30, 2011) (same).

In particular, the Complaint singles out only CW1 and CW5 as purportedly supporting scienter.  ¶ 261(a).  CW1's statements about Mr. Husain's involvement in overseeing the COVID-19 vaccine projects are vague and amount to little more than an unacceptable claim of scienter-by-status.  *Schwab v. E*Trade Fin. Corp.*, 285 F. Supp. 3d 745, 757 (S.D.N.Y. 2018) (allegation that executive "must have known" of alleged fraud by nature of position within company is insufficient).  CW1's statement that Mr. Husain attended meetings at which production delays were discussed and that he was aware of "mold problems" (¶ 261(a)) is also deficient because the Complaint nowhere alleges that the production delays or mold had any relation to the contamination incident, and indeed the Complaint alleges to the contrary, or that

Mr. Husain understood the issues to be uncorrectable.[23]  CW5's vague contention that Mr. Husain did not convey to "clients" the "full extent" of problems also fails to support an inference of scienter because CW5 nowhere alleges that Mr. Husain was aware of any particular problem that ought to have been conveyed, or anything connecting the "problems" to any alleged undisclosed risk, or anything about the time or other context of the client meetings suggesting Mr. Husain should have communicated problems.  Both CW1's and CW5's allegations fail to establish scienter for the additional reason that neither identifies when any of the meetings occurred.  This defect is fatal.  *In re Career Educ. Corp. Sec. Litig.*, 2006 WL 999988, at *5.

The FDA inspection reports and Emergent's responses before the contamination incident (¶ 261(b)) fail to support scienter in the first instance because they do not establish the risk asserted by the Complaint.  *See supra* at 21-22.  In addition, the Forms 483 and Emergent's responses thereto also fail to support a cogent theory of scienter because versions of each were available to the public and it is not plausible that Defendants would attempt fraud by omitting to disclose information that was already public, particularly where Defendants directed investors to the post-contamination incident report.  *In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 446-47 (S.D.N.Y. 2006) ("[T]he tenuous plausibility of the alleged scheme substantially weakens the overall strength of plaintiffs' scienter allegations.").

The after-the-fact media reporting (¶ 261(c)) and Congressional inquiries (¶ 261(d)) cited in the Complaint do not say anything about Defendants' knowledge other than that Defendants were aware of the communications with FDA.  This fails to support scienter for the reasons

---

[23] CW5's statements about Rick Welch criticizing and revising CW5's notes of meetings with "vaccine clients," ¶ 261(a), are a red herring.  The Complaint does not allege that CW5's notes had anything to do with any of the challenged statements.  Further, Mr. Welch is not an Individual Defendant, and the Complaint does not allege that any Individual Defendant was aware of Mr. Welch's instructions to CW5.

above.  *See supra* at 22-25.  The *New York Times*'s conclusion that "top Emergent leadership tolerated and even encouraged the flouting of federal standards for manufacturing" (¶ 261(c)) does not establish scienter because it is based on anonymous sources without any indication as to their roles.  *See supra* at 22-24 (addressing article).

      B.      **The Defendants Did Not Admit Scienter**

      The Complaint also tries unsuccessfully to contort various statements by Defendants into admissions of scienter.  ¶¶ 261(f), 262-67.  Mr. Kramer's statement in his November 4, 2021 Op-Ed that the "government maintained that they would provide [Emergent] with the necessary drug development work to build and maintain [Emergent's readiness] capabilities" and that this "didn't happen" (¶ 261(d)) was an after-the-fact conclusion about the government's investment, not a concession that Mr. Kramer knew all along that a risk was greater than disclosed or that contamination would occur.  Mr. Kramer proceeded to explain that Emergent invested over $200 million in Bayview and that, when the government sought domestic manufacturing capacity, Emergent began to hire and train more than 300 new employees.  *See* Ex. 1.  Far from reflecting that Mr. Kramer believed failure was inevitable, his actions more plausibly suggest that he believed that Emergent would succeed.  *Cozzarelli*, 549 F.3d at 627 ("It is improbable that [defendant] would stake its existence on a drug and a clinical trial that the company thought was doomed to failure.").  And indeed, as Mr. Kramer further explained, approximately 100 million people had been vaccinated using vaccine drug substance made at Bayview.  *See* Ex. 1 at 3.

      Mr. Kramer's statement during an April 1, 2021 interview with CNBC that "[i]t isn't the case where an ingredient from one vaccine contaminated or impacted the other" (¶ 261(f)) also does not show scienter.  Plaintiffs do not contradict Emergent's explanation that "Mr. Kramer simply misspoke," ¶ 250, or offer any facts suggesting that a sinister inference is at least as compelling as an innocent one.  Indeed, it is implausible that Mr. Kramer intended to mislead,

particularly given that the New York Times had already publicly reported that the cause of the

incident was cross-contamination.  ¶ 237.  Further, the FDA shortly thereafter discussed the

cause, Ex. 44, Emergent directed investors to FDA's report, Ex. 33, and Mr. Kramer would later

state that cross-contamination caused the incident, ¶ 249.  *Emps.' Ret. Sys. of City of Baton*

*Rouge & Par. of E. Baton Rouge v. MacroGenics, Inc.*, No. GJH-19-2713, 2021 WL 4459218, at

*15 (D. Md. Sept. 29, 2021) (finding "implausible" that Defendants would hide information only

to release truth "a few months [later] by their own choice"); *In re GeoPharma, Inc. Sec. Litig.*,

399 F. Supp. 2d 432, 452 (S.D.N.Y. 2005) (finding scienter implausible where defendant was

alleged to have contradicted public information).  The far more compelling inference is that Mr.

Kramer misspoke during the live interview when attempting to correct the CNBC reporter's

repeated incorrect suggestion that Emergent confused the ingredients of the J&J and AstraZeneca

drug substances, which was not how the cross-contamination occurred.[24]

    The Complaint's other supposed admissions of scienter fare little better.  Mr. Kramer's

statements acknowledging that he reviewed FDA communications, ¶¶ 264, 266, say nothing

about what inferences he drew from them and fail to establish scienter for the same reasons as

the FDA communications themselves.  *See supra* at 21-22.  Mr. Kramer's acknowledgment that

Emergent was aware that manufacturing multiple different drug substances in a single facility

created a risk of cross-contamination, ¶¶ 265, 267, fails because Emergent disclosed the risk of

contamination, *see supra* at 10-12 (discussing disclosure of risk factors).  *In re Marriott In'tl*,

*Inc.*, 543, F. Supp. 3d at 153 (repeated disclosure of risk "weighs against an inference of scienter

---

[24] *Emergent Biosolutions CEO on the vaccine factory mix-up*, CNBC (Apr. 1, 2021),
https://www.cnbc.com/video/2021/04/01/emergent-biosolutions-ceo-on-the-vaccine-factory-mix-up.html ("The headlines are suggesting that somehow at Emergent there was a mix-up between
the ingredients of the AstraZeneca vaccine and the J&J vaccine."); ("So there wasn't a mix-up
with the AstraZeneca vaccine is what you're saying?").

that the Individual Defendants were intentional or severely reckless in leading investors to believe the opposite").  The fact that Mr. Kramer gave a tour of Bayview cannot support scienter because Mr. Kramer's basic familiarity with the facility shows nothing more than scienter-by-status.  *See MacroGenics, Inc.*, 2021 WL 4459218, at *15 ("[C]orporate executives' access to information and internal affairs is not enough to demonstrate scienter under the PSLRA.").  Finally, Mr. Kramer's statement during an April 29, 2021 earnings call that the contamination incident was caused by a failure of controls, ¶ 261(f), was made after the contamination incident and the Complaint nowhere alleges that Mr. Kramer was aware of the controls deficiency any earlier.

## C.   The Allegations Concerning Motive Are Insufficient

### 1.   Stock Trading

The Complaint asserts that Messrs. Kramer's and Lindahl's stock sales demonstrate scienter.  ¶¶ 269-278.  However, "trading can imply scienter only if the timing and amount of a defendant's trading were unusual or suspicious."  *Hunter*, 477 F.3d at 184 (citation omitted).  Merely reciting the volume of sales is insufficient.  *Id.*

Here, the trading is not suspicious.  Messrs. Kramer and Lindahl both *increased* their holdings over the class period.[25]  *See Cozzarelli*, 549 F.3d at 628 ("[T]he total holdings of each defendant increased while Study 109 was ongoing, hardly suggesting that the defendants sought to dump their shares at an inflated price."); *Proter v. Medifast, Inc.*, No. GLR-11-720, 2013 WL 1316034, at *20 (D. Md. Mar. 28, 2013) (same).  In addition, Mr. Lindahl's trades constituted

---

[25] *See* Ex. 48 at 1 (Jan. 19, 2021 Form 4) (Mr. Kramer owned 139,210 shares prior to his first trade on January 15, 2021); Ex. 49 at 1 (Feb. 26, 2021 Form 4) (Mr. Kramer owned 163,147 shares after his last trade on February 26, 2021); Ex. 50 at 1 (May 12, 2020 Form 4) (Mr. Lindahl owned 32,534 shares prior to his first trade on May 8, 2020); Ex. 51 at 1 (May 11, 2021 Form 4) (Mr. Lindahl owned 36,919 shares after his last trade on May 8, 2021).

only approximately 17% of his holdings.  *See Proter*, 2013 WL 1316034, at *21 n.20 (collecting cases discussing similar or greater sales percentages that did not raise strong inferences of scienter).  These are not the actions of executives who know or suspect that fraud has inflated a stock price.

Moreover, the vast majority of Mr. Kramer's trades were made pursuant to a 10b5-1 plan (¶ 270 (chart of Mr. Kramer's trades showing that roughly 90 percent of the proceeds were the result of sales made pursuant to 10b5-1 plan)), and the remainder were automatically triggered upon option grants to cover taxes.[26]  Courts have long acknowledged that this undermines any inference of scienter.  *KBC Asset Mgmt. NV*, 19 F.4th at 611 (stating trades made pursuant to 10b5-1 plan "weakens any inference of fraudulent purpose") (citation omitted); *Yates*, 744 F.3d at 891 (same); *see also In re Keryx Biopharmaceuticals, Inc., Sec. Litig.*, 13 Civ. 1307 (KBF), 2014 WL 585658, at *13 (S.D.N.Y. Feb. 14, 2014) (sales to cover tax obligations are not indicative of fraud).  Recognizing this, the Complaint asserts that Mr. Kramer's November 13, 2020 entry into a 10b5-1 plan was itself suspicious.  ¶ 274.  As explained throughout, the Complaint does not identify any specific adverse nonpublic information of which Mr. Kramer was aware on November 13, 2020, nor does the insinuation that he revised his plan to dump stock make sense given that his overall holdings increased.  Regardless, the existence of the plan weakens the inference of scienter.  *Yates*, 744 F.3d at 891 (10b5-1 plan entered into during class period "does mitigate any inference of improper motive" surrounding sales).

### 2. Executive Compensation

Plaintiffs next resort to the familiar refrain that because executives received performance compensation, they had a motive to commit fraud.  ¶¶ 279-284.  But an executive's generalized

---

[26] *See* Ex. 49 at n.3.

motive to obtain job benefits is insufficient to plead scienter.  *Ottmann*, 353 F.3d at 352; *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) (allegations that executives made statements to "protect their executive positions and the compensation and prestige they enjoy[ed] thereby" insufficient to demonstrate scienter because court "assume[s] that the defendant is acting in his or her informed economic self-interest").  Motivations to increase compensation are common to every corporate official and therefore "add little to an inference of fraud." *Cozzarelli*, 549 F.3d at 627.

Moreover, the bare assertion that executive-level bonuses are "based in part" on financial performance are inadequate to plead scienter.  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1004-05 (9th Cir. 2009).  Here, the Complaint pleads, at most, that decisions regarding Mr. Kramer's and Mr. Lindahl's compensation were based in part on Emergent's positive performance in 2020, during which time Emergent was successfully manufacturing bulk vaccine drug product pursuant to its strategic partnerships.  ¶ 283.  The cross-contamination incident did not occur until early 2021, and the February 9, 2021 meeting at which the Compensation Committee made these decisions occurred before the Company was notified of the contamination.  ¶ 279.  The notion that Mr. Kramer and Mr. Lindahl were compensated at least in part for contracts awarded and work successfully performed in 2020, and before any knowledge of an operational error, does not raise an inference of scienter, particularly given that the Complaint fails to allege the compensation decisions were out of line with previous awards. *Zucco*, 552 F.3d at 1004 (finding allegations insufficient without demonstrating compensation was "intimately . . . tied" to financial performance or out of line with prior practice).

### 3.  Capital Raising Efforts

The Complaint's allegations regarding Emergent's August 2020 debt offering and government contracts (¶¶ 285-88) fail because a company's need to raise capital is a general

corporate motive that does not support an inference of scienter.  *Cozzarelli*, 549 F.3d at 627.  "If [the Court] inferred scienter from every bullish statement by a pharmaceutical company that was trying to raise funds, we would choke off the lifeblood of innovation in medicine by fueling frivolous litigation—exactly what Congress sought to avoid by enacting the PSLRA."  *Id.*

### 4.   The Complaint's Other Scattershot Allegations are Insufficient

The Complaint's core operations allegations (¶¶ 289-90) fail because allegations that misleading statements and omissions related to a core business, without more, are not sufficient to support a strong inference of scienter.  *In re Under Armour Sec. Litig.*, 342 F. Supp. 3d at 692; *Yates*, 744 F.3d at 890 (rejecting theory without "additional detailed allegations establishing the defendants' actual exposure to the accounting problem").  The Complaint offers no such additional support, instead pleading "it is inconceivable that the Individual Defendants and executive management did not know the facts and circumstances of the fraud alleged herein."  ¶ 290.  This is plainly insufficient.

The Complaint's assertion that signors of SOX certifications must have been aware of fraud (¶¶ 291-92) is contrary to law and ultimately circular.  "Sarbanes–Oxley certifications are not sufficient, without more, to raise a strong inference of scienter" and do not make "otherwise insufficient allegations more compelling by their presence in the same complaint."  *Zucco*, 552 F.3d at 1003–04; *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006) (same).

The code of conduct allegations (¶¶ 293-300) fail because the existence of commitments to ethical behavior are common to all companies and not probative of scienter—"if alleging the violation of a broadly worded ethics code was sufficient to allege scienter, it would eviscerat[e] the pleading requirements for scienter set forth in the PSLRA."  *Rok v. Identiv, Inc.*, No. 15-cv-5775-CRB, 2017 WL 35496, at *15 (N.D. Cal. Jan. 4, 2017) (citation omitted); *Crutchfield v. Match Grp., Inc.*, 529 F. Supp. 3d 570, 599 n.19 (N.D. Tex. 2021) (same).

The employee resignation allegations (¶¶ 301-05) fail because the Complaint does not link these resignations to fraud and "there are any number of reasons that an executive might resign, most of which are not related to fraud."  *See In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 446-47 (S.D.N.Y. 2005).  Further, Emergent explained that the employees left to pursue other opportunities or were a "personal leave of absence."  ¶¶ 302-04.  The Complaint "make[s] no attempt to challenge these non-fraud related explanations for the resignations.  Accordingly, absent any alleged facts linking the . . . resignations and the alleged fraud, the resignations . . . do not support an inference of conscious misbehavior or recklessness."  *In re BISYS Sec. Litig.*, 397 F. Supp. 2d, at 446-47; *In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 575 (S.D.N.Y. 2007) (same).  The termination of CW1 fails to support scienter because the Complaint does not allege that CW1 or Mr. Welch made any challenged statement or that CW1's vague conversation with Mr. Welch "about what was happening at the Bayview site" had anything to do with fraud.

The allegations concerning the SEC and Congressional investigations (¶¶ 306-08) fail to support scienter because they are only investigations, and the Complaint does not plead that either reached a finding suggesting securities fraud.  *See Lipow v. New1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 167 (S.D.N.Y. 2015) ("Similarly, the government investigations cannot bolster allegations of scienter that do not exist, and, as currently plead, the government investigations are just that, investigations.").

## IV. THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 20(A)

The Complaint fails to state a claim under Section 20(a), given the absence of underlying violations of Section 10(b) or Rule10b-5.  *See In re Marriott Int'l, Inc.*, 543 F. Supp. 3d at 156.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint with prejudice.

Dated:  May 19, 2022                    Respectfully submitted,

                                        _/s/_William M. Krulak, Jr._____ _____

                                        **MILES & STOCKBRIDGE P.C.**

                                        William M. Krulak, Jr. (Fed. Bar No. 26452)
                                        Ariana K. DeJan-Lenoir (Fed. Bar No. 20522)
                                        100 Light Street
                                        Baltimore, Maryland 21202
                                        (410) 385-3448
                                        wkrulak@milesstockbridge.com
                                        adejanlenoir@milesstockbridge.com

                                        *Attorneys for Defendants*
                                        By /s/ *Michael G. Bongiorno*_____

                                        **WILMER CUTLER PICKERING HALE AND
                                        DORR LLP**

                                        Michael G. Bongiorno (NY Bar No. 4347316)*
                                        7 World Trade Center
                                        250 Greenwich Street
                                        New York, NY 10007
                                        Michael.Bongiorno@wilmerhale.com
                                        Phone: (212) 230-8800
                                        Facsimile: (212) 230-8888

                                        Timothy J. Perla (MA Bar No. 660447)*
                                        Arjun K. Jaikumar (MA Bar No. 691311)*
                                        Kim A. Crowley (MA Bar No. 707072)*
                                        60 State Street
                                        Boston, MA 02109
                                        Phone: (617) 526-6000
                                        Facsimile: (617) 526-5000

                                        *\* Pro hac vice*