# Exhibit 2

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**
## Form 10-Q

(Mark One)

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended **March 31, 2020**

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from to**

**Commission file number: 001-33137**

## EMERGENT BIOSOLUTIONS INC.
*(Exact Name of Registrant as Specified in Its Charter)*

| **Delaware** | **14-1902018** |
|---|---|
| *(State or Other Jurisdiction of Incorporation or Organization)* | *(I.R.S. Employer Identification No.)* |

**400 Professional Drive Suite 400**

**Gaithersburg,   Maryland   20879**

*(Address and zip code of Principal Executive Offices)*

**(240) 631-3200**

*(Registrant's Telephone Number, Including Area Code)*

**Securities registered pursuant to Section 12(b) of the Act**

| *Title of each class* | *Trading Symbol(s)* | *Name of each exchange on which registered* |
|---|---|---|
| Common Stock, Par Value $0.001 per share | EBS | New York Stock Exchange |

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. ☒ Yes ☐ No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). ☒ Yes ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act. (Check one):

| Large accelerated filer | ☒ | Accelerated filer | ☐ |
|---|---|---|---|
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
|  |  | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

As of April 24, 2020, the registrant had 52,427,756 shares of common stock outstanding.

**1**

**Emergent BioSolutions Inc.**
**Index to Form 10-Q**

**Part I. Financial Information**                                                                                 **Page No.**

Item 1.          Financial Statements                                                                              5

                 Condensed Consolidated Balance Sheets                                                             5

                 Condensed Consolidated Statements of Operations                                                  6

                 Condensed Consolidated Statements of Comprehensive Income                                        7

                 Condensed Consolidated Statements of Cash Flows                                                  8

                 Condensed Consolidated Statements of Changes in Stockholders' Equity                             9

                 Notes to Condensed Consolidated Financial Statements                                             10

Item 2.          Management's Discussion and Analysis of Financial Condition and Results of Operations            22

Item 3.          Quantitative and Qualitative Disclosures About Market Risk                                       31

Item 4.          Controls and Procedures                                                                          32


**Part II. Other Information**

Item 1.          Legal Proceedings                                                                                32

Item 1A.         Risk Factors                                                                                     33

Item 2.          Unregistered Sales of Equity Securities and Use of Proceeds                                      64

Item 3.          Defaults Upon Senior Securities                                                                  64

Item 4.          Mine Safety Disclosures                                                                          64

Item 5.          Other Information                                                                                64

Item 6.          Exhibits                                                                                         64


                 Signatures                                                                                       66

2

## EMERGENT BIOSOLUTIONS INC.

**PART I. FINANCIAL INFORMATION**

**SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS**

This quarterly report on Form 10-Q and the documents we incorporate by reference include forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. All statements, other than statements of historical fact, including statements regarding the future earnings and performance of Emergent BioSolutions Inc. or any of our businesses, our strategy, future operations, future financial position, future revenues, projected costs, prospects, plans and objectives of management and the expected impact of the COVID-19 pandemic, are forward-looking statements. We generally identify forward-looking statements by using words like "will," "believes," "expects," "anticipates," "intends," "plans," "forecasts," "estimates" and similar expressions in conjunction with, among other things, discussions of financial performance or financial condition, growth strategy, product sales, manufacturing capabilities, product development, regulatory approvals or expenditures. These forward-looking statements are based on our current intentions, beliefs and expectations regarding future events. We cannot guarantee that any forward-looking statement will be accurate. You should realize that if underlying assumptions prove inaccurate or unknown risks or uncertainties materialize, actual results could differ materially from our expectations. You are, therefore, cautioned not to place undue reliance on any forward-looking statement. Any forward-looking statement speaks only as of the date on which such statement is made, and, except as required by law, we do not undertake to update any forward-looking statement to reflect new information, events or circumstances.

There are a number of important factors that could cause our actual results to differ materially from those indicated by such forward-looking statements, including, among others:

▪ the impact of global economic conditions and public health crises and epidemics, such as the novel strain of coronavirus (SARS-CoV-2) causing COVID-19 disease, on our markets, operations and employees as well as those of our customers and suppliers;

▪ the availability of U.S. government (USG) funding for procurement of our products;

▪ our ability to perform under our contracts with the USG including the timing of and specifications relating to deliveries;

▪ the continued exercise of discretion by the Biomedical Advanced Research and Development Authority (BARDA) to procure additional doses of AV7909 (anthrax vaccine adsorbed with adjuvant) prior to approval by the U.S. Food and Drug Administration (FDA);

▪ the exercise of all options under our recently executed contract for the procurement of ACAM2000® (Smallpox (Vaccinia) Vaccine, Live);

▪ our ability to secure licensure of AV7909 from the FDA within the anticipated timeframe, if at all;

▪ our ability to secure follow-on procurement contracts for our public health threat (PHT) products that are under procurement contracts that have expired or will be expiring;

▪ our ability and the ability of our collaborators to enforce patents related to NARCAN Nasal Spray against potential generic entrants;

▪ our ability to identify and acquire companies, businesses, products or product candidates that satisfy our selection criteria;

▪ our ability and the ability of our contractors and suppliers to maintain compliance with current good manufacturing practices and other regulatory obligations;

▪ our ability to comply with the operating and financial covenants required by our Senior Secured Credit Facilities;

▪ our ability to obtain and maintain regulatory approvals for our product candidates and the timing of any such approvals;

▪ the procurement of products by USG entities under regulatory exemptions prior to approval by the FDA and corresponding procurement by government entities outside of the United States under regulatory exemptions prior to approval by the corresponding regulatory authorities in the applicable country;

▪ the success of our commercialization, marketing and manufacturing capabilities and strategy; and

▪ the accuracy of our estimates regarding future revenues, expenses, capital requirements and needs for additional financing.

The foregoing sets forth many, but not all, of the factors that could cause actual results to differ from our expectations in any forward-looking statement. New factors emerge from time to time and it is not possible for management to predict all such factors, nor can it assess the impact of any such factor on the business or the extent to which any factor, or combination of factors, may cause results to differ materially from those contained in any forward-looking statement. You should consider this cautionary statement, the risk factors identified in the section entitled "Risk Factors" in this quarterly

3

## EMERGENT BIOSOLUTIONS INC.

report on Form 10-Q and the risk factors identified in our other periodic reports filed with the Securities and Exchange Commission (SEC) when evaluating our forward-looking statements.

### NOTE REGARDING COMPANY REFERENCES

References in this report to "Emergent," the "Company," "we," "us," and "our" refer to Emergent BioSolutions Inc. and its consolidated subsidiaries.

### NOTE REGARDING TRADENAMES

BioThrax® (Anthrax Vaccine Adsorbed), RSDL® (Reactive Skin Decontamination Lotion Kit), BAT® (Botulism Antitoxin Heptavalent (A,B,C,D,E,F,G)-(Equine)), Anthrasil® (Anthrax Immune Globulin Intravenous (Human)), VIGIV (Vaccinia Immune Globulin Intravenous (Human)), Trobigard® (atropine sulfate, obidoxime chloride), ACAM2000® (Smallpox (Vaccinia) Vaccine, Live), Vivotif® (Typhoid Vaccine Live Oral Ty21a), Vaxchora® (Cholera Vaccine, Live, Oral), NARCAN® (naloxone HCI) Nasal Spray and any and all Emergent brands, products, services and feature names, logos and slogans are trademarks or registered trademarks of Emergent or its subsidiaries in the United States or other countries. All other brands, products, services and feature names or trademarks are the property of their respective owners.

4

specifications is difficult, particularly where the period of performance is over several years. Our failure to anticipate technical problems, estimate costs accurately or control costs during performance of a fixed price contract could reduce the profitability of such a contract or cause a loss, which could harm our operating results and materially reduce our net income.

*Unfavorable provisions in government contracts, some of which may be customary, may subject our business to material limitations, restrictions and uncertainties and may have a material adverse impact on our business, financial condition, operating results and cash flows.*

Government contracts customarily contain provisions that give the USG substantial rights and remedies, many of which are not typically found in commercial contracts, including provisions that allow the USG to:

- terminate existing contracts, in whole or in part, for any reason or no reason;

- unilaterally reduce or modify contracts or subcontracts, including by imposing equitable price adjustments;

- cancel multi-year contracts and related orders, if funds for contract performance for any subsequent year become unavailable;

- decline, in whole or in part, to exercise an option to purchase product under a procurement contract or to fund additional development under a development contract;

- decline to renew a procurement contract;

- claim rights to facilities or to products, including intellectual property, developed under the contract;

- require repayment of contract funds spent on construction of facilities in the event of contract default;

- take actions that result in a longer development timeline than expected;

- direct the course of a development program in a manner not chosen by the government contractor;

- suspend or debar the contractor from doing business with the government or a specific government agency;

- pursue civil or criminal remedies under acts such as the False Claims Act and False Statements Act; and

- control or prohibit the export of products.

Generally, government contracts contain provisions permitting unilateral termination or modification, in whole or in part, at the USG's convenience. Under general principles of government contracting law, if the USG terminates a contract for convenience, the government contractor may recover only its incurred or committed costs, settlement expenses and profit on work completed prior to the termination. If the USG terminates a contract for default, the government contractor is entitled to recover costs incurred and associated profits on accepted items only and may be liable for excess costs incurred by the government in procuring undelivered items from another source. All of our contracts, both development and procurement, with the USG, are terminable at the USG's convenience with these potential consequences.

In addition, our USG contracts grant the USG the right to use technologies developed by us under the government contract or the right to share data related to our technologies, for or on behalf of the USG. Under our USG contracts, we might not be able to prohibit third parties, including our competitors, from accessing such technology or data, including intellectual property, in providing products and services to the USG.

### REGULATORY AND COMPLIANCE RISKS

*Our long-term success depends, in part, upon our ability to develop, receive regulatory approval for and commercialize product candidates we develop or acquire and, if we are not successful, our business, financial condition, operating results and cash flows may suffer.*

Our product candidates and the activities associated with them are subject to extensive FDA regulation and oversight, as well as oversight by other regulatory agencies in the United States and by comparable authorities in other countries. This includes, but is not limited to, laws and regulations governing product development, including testing, manufacturing, record keeping, storage and approval, as well as advertising and promotion. In limited circumstances, governments may procure products that have not obtained regulatory approval. In all other circumstances, failure to obtain regulatory approval for a product candidate will prevent us from selling and commercializing the product candidate.

In the United States, to obtain approval from the FDA to market any of our future drug, biologic, or vaccine products, we will be required to submit a new drug application (NDA) or biologics license application (BLA) to the FDA. Ordinarily, the FDA requires a company to support an NDA or BLA with substantial evidence of the product candidate's effectiveness,

37

**EMERGENT BIOSOLUTIONS INC.**

safety, purity and potency in treating the targeted indication based on data derived from adequate and well-controlled clinical trials, including Phase 3 trials conducted in patients with the disease or condition being targeted.

However, many of our MCM product candidates, for example, may take advantage of a different regulatory approval pathway under the FDA's "Animal Rule." The Animal Rule provides a regulatory pathway for drug and biologic products targeting indications for which human efficacy studies are not feasible or would be unethical. Instead, efficacy must be demonstrated, in part, by utilizing animal models rather than testing in humans. We cannot guarantee that the FDA will permit us to proceed with licensure of any of our PHT MCM candidates under the Animal Rule. Even if we are able to proceed pursuant to the Animal Rule, it can be a very long process, and the FDA may decide that our data are insufficient to support approval and require additional preclinical, clinical or other studies, refuse to approve our products, or place restrictions on our ability to commercialize those products. Furthermore, products approved under the Animal Rule are subject to certain additional post-marketing requirements. For example, to the extent feasible and ethical, manufacturers of products approved pursuant to the Animal Rule must conduct post-marketing studies, such as field studies, to verify and describe the product candidate's clinical benefit and to assess its safety when used as indicated. We cannot guarantee that we will be able to meet this regulatory requirement even if one or more of our product candidates are approved under the Animal Rule.

The process of obtaining these regulatory approvals is expensive, often takes many years if approval is obtained at all, and can vary substantially based upon the type, complexity and novelty of the product candidate involved. Changes in the regulatory approval process during the development period, changes in or the enactment of additional statutes or regulations, or changes in the regulatory review process generally may cause delays in the approval or rejection of an application. There is a high rate of failure inherent in this process, and potential products that appear promising at early stages of development may fail for a number of reasons, and positive results from preclinical studies may not be predictive of similar results in human clinical trials. Similarly, promising results from earlier clinical trials of a product candidate may not be replicated in later clinical trials.

There are many other difficulties and uncertainties inherent in pharmaceutical research and development that could significantly delay or otherwise materially delay our ability to develop future product candidates. These include, but are not limited to:

- Conditions imposed by regulators, ethics committees, or IRBs for preclinical testing and clinical trials relating to the scope or design of our clinical trials;

- Restrictions placed upon, or other difficulties with respect to, clinical trials and clinical trial sites, such as clinical holds or suspension or termination of clinical trials due to, among other things, potential safety or ethical concerns or noncompliance with regulatory requirements;

- Delayed or reduced enrollment in clinical trials, or high discontinuation rates;

- Failure by third-party contractors, contract research organizations (CROs), clinical investigators, clinical laboratories, or suppliers to comply with regulatory requirements or meet their contractual obligations in a timely manner;

- Greater than anticipated cost of or time required to complete our clinical trials; and

- Insufficient product supply or inadequate product quality.

Failure to successfully develop future product candidates for any of these or other reasons may materially adversely affect our business, financial condition, operating results and cash flows.

Once an NDA or BLA is submitted, the FDA has substantial discretion in the approval process and may refuse to accept any application or may decide that our data are insufficient to support approval and require additional preclinical, clinical or other studies. In addition, varying interpretations of the data obtained from preclinical and clinical testing could delay, limit or prevent regulatory approval of a product candidate.

Unapproved and investigational products are also subject to FDA's laws and regulations governing advertising and promotion, which prohibit the promotion of both unapproved products and unapproved uses of approved products. There is some risk that the FDA could conclude that our communications relating to unapproved products or unapproved uses of approved products constitute the promotion of an unapproved product or product use in violation of FDA laws and regulations. There is also a risk that a regulatory authority in another country could take a similar position under that country's laws and regulations and conclude that we have violated the laws and regulations related to product development, approval, or promotion in that country. Therefore, there is a risk that we could be subject to

38

**EMERGENT BIOSOLUTIONS INC.**

enforcement actions if found to be in violation of such laws or regulations.

*Even if we or our collaborators obtain marketing approvals for our product candidates, the terms of approvals and ongoing regulation of our products may limit how we manufacture and market our products, which could materially impair our ability to generate revenue.*

Once approval has been granted, an approved product and its manufacturer and marketer remain subject to ongoing review and extensive regulation.

We and our collaborators must therefore comply with requirements concerning advertising and promotion for any of our product candidates for which we obtain marketing approval. Promotional communications with respect to FDA-regulated products are subject to a variety of legal and regulatory restrictions and must be consistent with the information in the product's approved labeling. Thus, we will not be able to promote any products we develop for indications or uses for which they are not approved.

In addition, manufacturers of approved products and those manufacturers' facilities are required to comply with extensive FDA requirements, including ensuring that quality control and manufacturing procedures conform to cGMPs, which include requirements relating to quality control and quality assurance as well as the corresponding maintenance of records and documentation and reporting requirements. We and our collaborators and our contract manufacturers could be subject to periodic unannounced inspections by the FDA to monitor and ensure compliance with cGMPs.

Accordingly, were we to receive marketing approval for one or more of our product candidates, we would continue to expend time, money and effort in all areas of regulatory compliance, including manufacturing, production, product surveillance and quality control.

If we and our collaborators are not able to comply with post-approval regulatory requirements, we could have the marketing approvals for our products withdrawn by regulatory authorities and our ability to market any products could be limited, which could adversely affect our ability to achieve or sustain profitability. Further, the cost of compliance with post-approval regulations may have a negative effect on our operating results and financial condition.

*Any product candidate for which we or our collaborators obtain marketing approval could be subject to restrictions or withdrawal from the market and we may be subject to substantial penalties if we fail to comply with regulatory requirements or if we experience unanticipated problems with our product candidates, when and if any of them are approved.*

Any product candidate for which we or our collaborators obtain marketing approval, along with the manufacturing processes, post-approval clinical data, labeling, advertising and promotional activities for such product, will be subject to continual requirements of and review by the FDA and other regulatory authorities. These requirements include submissions of safety and other post-marketing information and reports, registration and listing requirements, cGMP requirements relating to quality control and manufacturing, quality assurance and corresponding maintenance of records and documents, and requirements regarding the distribution of samples to physicians and recordkeeping. Even if marketing approval of a product candidate is granted, the approval may be subject to limitations on the indicated uses for which the product may be marketed or to the conditions of approval, or contain requirements for costly post-marketing testing and surveillance to monitor the safety or efficacy of the medicine, including the requirement to implement a risk evaluation and mitigation strategy.

Certain of our products are subject to postmarketing requirements (PMRs), which we are required to conduct, and postmarketing commitments (PMCs), which we have agreed to conduct. The FDA has the authority to take action against sponsors who fail to meet the obligations of a PMR, including civil monetary penalties and/or misbranding charges.

The FDA and other agencies, including the U.S. Department of Justice (DOJ) and the HHS Office of Inspector General (OIG), closely regulate and monitor the pre-approval and post-approval marketing and promotion of products to ensure that they are marketed and distributed only for the approved indications and in accordance with the provisions of the approved labeling. The FDA, DOJ, and OIG impose stringent restrictions on manufacturers' communications regarding unapproved products and unapproved uses of approved products and if we market unapproved products or market our approved products for unapproved indications, we may be subject to enforcement action for marketing of unapproved products or unapproved uses of approved products. Violations of the Federal Food, Drug, and Cosmetic Act (FDCA) and other statutes, including the False Claims Act, relating to the promotion and advertising of prescription products may lead to investigations and enforcement actions alleging violations of federal and state health care fraud and abuse laws, as well as state consumer protection laws.

In addition, later discovery of previously unknown adverse events or other problems with our products, manufacturing partners or manufacturing processes, or failure to comply with regulatory requirements, may yield various results, including:

39

**EMERGENT BIOSOLUTIONS INC.**

- restrictions on such products, manufacturing partners or manufacturing processes;

- restrictions on the labeling or marketing of a product;

- restrictions on distribution or use of a product;

- requirements to conduct post-marketing studies or clinical trials;

- warning letters or untitled letters;

- withdrawal of the products from the market;

- refusal to approve pending applications or supplements to approved applications that we submit;

- recall of products;

- damage to relationships with collaborators;

- unfavorable press coverage and damage to our reputation;

- fines, restitution or disgorgement of profits or revenues;

- suspension or withdrawal of marketing approvals;

- refusal to permit the import or export of our products;

- product seizure;

- injunctions or the imposition of civil or criminal penalties; and

- litigation involving patients using our products.

Non-compliance with EU requirements regarding safety monitoring or pharmacovigilance, and with requirements related to the development of products for the pediatric population, can also result in significant financial penalties. Similarly, failure to comply with the EU and other legal and regulatory requirements regarding the protection of personal information can also lead to significant penalties and sanctions. Non-compliance with similar requirements in other jurisdictions can also result in enforcement actions and significant penalties.

*Current and future legislation may increase the difficulty and cost for us and any collaborators to obtain marketing approval of and commercialize our product candidates and affect the prices we, or they, may obtain.*

In the United States and foreign jurisdictions, there have been a number of legislative and regulatory changes and proposed changes regarding the health care system that could prevent or delay marketing

approval of our product candidates, restrict or regulate post-approval activities and affect our ability to profitably sell any product candidates for which we obtain marketing approval. We expect that current laws, as well as other health care reform measures that may be adopted in the future, may result in more rigorous coverage criteria and in additional downward pressure on the price that we, or any collaborators, may receive for any approved products.

The Patient Protection and Affordable Care Act, as amended by the Health Care and Education Affordability Reconciliation Act (collectively, the ACA), passed in 2010, contains the following provisions of potential importance to our business and our product candidates:

- an annual, non-deductible fee on any entity that manufactures or imports specified branded prescription products and biologic agents;

- an increase in the statutory minimum rebates a manufacturer must pay under the Medicaid Drug Rebate Program;

- a new methodology by which rebates owed by manufacturers under the Medicaid Drug Rebate Program are calculated for products that are inhaled, infused, instilled, implanted or injected;

- expansion of health care fraud and abuse laws, including the civil False Claims Act and the federal Anti-Kickback Statute, new government investigative powers and enhanced penalties for noncompliance;

- a new Medicare Part D coverage gap discount program, in which manufacturers must agree to offer 50% point-of-sale discounts off negotiated prices of applicable brand products to eligible beneficiaries during their coverage gap period, as a condition for the manufacturer's outpatient products to be covered under Medicare Part D;

- extension of manufacturers' Medicaid rebate liability to individuals enrolled in Medicaid managed care organizations;

- expansion of eligibility criteria for Medicaid programs;

- expansion of the entities eligible for discounts under the Public Health Service pharmaceutical pricing program;

- new requirements to report certain financial arrangements with physicians and teaching hospitals;

**EMERGENT BIOSOLUTIONS INC.**

- a new requirement to annually report product samples that manufacturers and distributors provide to physicians;

- a new Patient-Centered Outcomes Research Institute to oversee, identify priorities in, and conduct comparative clinical effectiveness research, along with funding for such research;

- a new Independent Payment Advisory Board (IPAB), which has authority to recommend certain changes to the Medicare program to reduce expenditures by the program that could result in reduced payments for prescription products; and

- established the Center for Medicare and Medicaid Innovation within the Centers for Medicare & Medicaid Services (CMS) to test innovative payment and service delivery models.

In addition, other legislative changes have been proposed and adopted since the ACA was enacted. In August 2011, the Budget Control Act of 2011, among other things, created measures for spending reductions by Congress. A Joint Select Committee on Deficit Reduction, tasked with recommending a targeted deficit reduction of at least $1.2 trillion for the years 2013 through 2021, was unable to reach required goals, thereby triggering the legislation's automatic reduction to several government programs. These changes included aggregate reductions to Medicare payments to providers of up to 2% per fiscal year, which went into effect in April 2013 and will remain in effect through 2024 unless additional Congressional action is taken. The American Taxpayer Relief Act of 2012, among other things, reduced Medicare payments to several providers and increased the statute of limitations period for the government to recover overpayments to providers from three to five years. These new laws may result in additional reductions in Medicare and other health care funding and otherwise affect the prices we may obtain for any of our product candidates for which we may obtain regulatory approval or the frequency with which any such product candidate is prescribed or used.

Since enactment of the ACA, there have been numerous legal challenges and Congressional actions to repeal and replace provisions of the law. For example, with enactment of the Tax Cuts and Jobs Act of 2017, which was signed by the President on December 22, 2017, Congress repealed the "individual mandate." The repeal of this provision, which required most Americans to carry a minimal level of health insurance, became effective on January 1, 2019. In addition, Congress will likely consider other

legislation to replace elements of the ACA, during the next Congressional session. It is possible that such initiatives, if enacted into law, could ultimately result in fewer individuals having health insurance coverage or in individuals having insurance coverage with less generous benefits. We will continue to evaluate the effect that the ACA and its possible repeal and replacement could have on our business.

There have been executive actions to challenge or delay implementation of the ACA. Since January 2017, there have been two Executive Orders issued designed to delay the implementation of certain provisions of the ACA or otherwise circumvent some of the requirements for health insurance mandated by the ACA. One Executive Order directs federal agencies with authorities and responsibilities under the ACA to waive, defer, grant exemptions from, or delay the implementation of any provision of the ACA that would impose a fiscal or regulatory burden on states, individuals, health care providers, health insurers, or manufacturers of pharmaceuticals or medical devices. The second Executive Order terminates the cost-sharing subsidies that reimburse insurers under the ACA. In addition, the CMS has proposed regulations that would give states greater flexibility in setting benchmarks for insurers in the individual and small group marketplaces, which may have the effect of relaxing the essential health benefits required under the ACA for plans sold through such marketplaces. On May 16, 2019, CMS finalized a rule that amends the Medicare Advantage and Medicare Part D prescription drug benefit regulations to reduce out of pocket costs for plan enrollees and allow Medicare plans to negotiate lower rates for certain drugs. Among other things, the rule changes allow Medicare Advantage plans to use preauthorization (PA) and step therapy (ST) for six protected classes of drugs and, with certain exceptions, permit plans to implement PA and ST in Medicare Part B drugs. The first change took effect in January 2020, while the second change will take effect in January 2021. Litigation and legislation over the ACA are likely to continue, with unpredictable and uncertain results.

The costs of prescription pharmaceuticals have also been the subject of considerable discussion in the United States, and members of legislative and executive branches have stated that they will address such costs through new legislative and administrative measures. While any proposed measures will require authorization through additional legislation to become effective, there may be new legislative and/or administrative measures to control drug costs. At the state level, legislatures are increasingly passing legislation and implementing regulations designed to control pharmaceutical and biological product pricing, including price or patient reimbursement constraints, discounts, restrictions on certain product access and marketing cost disclosure and transparency

measures, and, in some cases, designed to encourage importation from other countries and bulk purchasing.

At the state level, individual states are increasingly aggressive in passing legislation and implementing regulations designed to control pharmaceutical and biological product pricing, including price or patient reimbursement constraints, discounts, restrictions on certain product access and marketing cost disclosure and transparency measures, and, in some cases, designed to encourage importation from other countries and bulk purchasing. In addition, regional health care authorities and individual hospitals are increasingly using bidding procedures to determine what pharmaceutical products and which suppliers will be included in their prescription drug and other health care programs. These measures could reduce the ultimate demand for our products, once approved, or put pressure on our product pricing. We expect that additional state and federal health care reform measures will be adopted in the future, any of which could limit the amounts that federal and state governments will pay for health care products and services, which could result in reduced demand for our product candidates or additional pricing pressures.

*If we fail to comply with foreign, federal, state and local health care laws, including fraud and abuse and health information privacy and security laws, and antitrust laws, we could face substantial penalties and our business, results of operations, financial condition and prospects could be adversely affected.*

In the United States, certain of our products are reimbursed under federal and state health care programs such as Medicaid, Medicare, TriCare, and/or state pharmaceutical assistance programs. Many foreign countries have similar laws. Federal and state laws designed to prevent fraud and abuse under these programs prohibit pharmaceutical companies from offering valuable items or services to customers or potential customers to induce them to buy, prescribe, or recommend our product (the so-called "anti-kickback" laws). Exceptions are provided for discounts and certain other arrangements if specified requirements are met. Other federal and state laws, and similar foreign laws, not only prohibit us from submitting any false information to government reimbursement programs but also prohibit us, our employees, or any third party acting on our behalf from doing anything to cause, assist, or encourage our customers to submit false claims for payment to these programs. We are also subject to various federal, state and foreign antitrust and competition laws that prohibit certain activities that may have an impact against potential competitors. Violations of the various fraud and abuse and antitrust laws may result in severe penalties against the responsible employees and us, including jail sentences, large

fines, and the exclusion of our products from reimbursement under federal and state programs. Some of the laws that may affect our ability to operate include:

- the federal Anti-Kickback Statute makes it illegal for any person or entity, including a prescription drug manufacturer (or a party acting on its behalf) to knowingly and willfully solicit, receive, offer or pay remuneration, directly or indirectly, overtly or covertly, to induce, or in return for, either the referral of an individual, or the purchase, lease, prescribing or recommendation of an item, good, facility or service reimbursable by a federally funded health care program, such as the Medicare or Medicaid program. The term "remuneration" has been interpreted broadly and may constrain our marketing practices, educational programs, pricing policies and relationships with health care providers or other entities, among other activities;

- the federal False Claims Act imposes criminal and civil penalties, including through civil whistleblower or qui tam actions, against individuals or entities for, among other things, knowingly presenting, or causing to be presented, false or fraudulent claims for payment by a federal health care program or making a false statement or record material to payment of a false claim or avoiding, decreasing or concealing an obligation to pay money to the federal government, with potential liability including mandatory treble damages and significant per-claim penalties, currently set at $11,181 to $22,363 per false claim;

- the U.S. federal Health Insurance Portability and Accountability Act of 1996 (HIPAA), which imposes criminal and civil liability for, among other things, knowingly and willfully executing, or attempting to execute, a scheme to defraud any health care benefit program or obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, regardless of the payor (e.g., public or private) and knowingly and willfully falsifying, concealing or covering up by any trick or device a material fact or making any materially false statement, in connection with the delivery of, or payment for, health care benefits, items or services. Similar to the U.S. federal Anti-Kickback Statute, a person or entity does not need to have actual knowledge

42

of the statute or specific intent to violate it in order to have committed a violation;

- HIPAA, as amended by the Health Information Technology for Economic and Clinical Health Act (HITECH), and their respective implementing regulations mandates, among other things, the adoption of uniform standards for the electronic exchange of information in common health care transactions, as well as standards relating to the privacy, security and transmission of individually identifiable health information, which require the adoption of administrative, physical and technical safeguards to protect such information. Among other things, HITECH makes HIPAA's security standards directly applicable to "business associates," or independent contractors or agents of covered entities that create, receive or obtain protected health information in connection with providing a service for or on behalf of a covered entity;

- the Physician Payments Sunshine Act and its implementing regulations, which require certain manufacturers of drugs, biologics, medical devices and medical supplies for which payment is available under Medicare, Medicaid or the Centers for Medicare & Medicaid Services (CMS), certain payments and transfers of value made to U.S. physicians and teaching hospitals, and ownership or investment interests held by physicians and their immediate family members. Beginning in 2022, applicable manufacturers will also be required to report information regarding payments and transfers of value provided to U.S. physician assistants, nurse practitioners, clinical nurse specialists, certified nurse anesthetists, and certified nurse-midwives; and

- state law equivalents of each of the above federal laws, such as anti-kickback and false claims laws, which may apply to items or services reimbursed by any third-party payor, including commercial insurers; state and foreign laws governing the privacy and security of health information in certain circumstances, many of which differ from each other in significant ways and may not have the same effect, thus complicating compliance efforts; state, local and foreign laws that require pharmaceutical companies to comply with the pharmaceutical industry's voluntary compliance guidelines and the relevant compliance guidance promulgated by the federal government, obtain

pharmaceutical agent licensure, and/or otherwise restrict payments that may be made to health care providers and entities; and state, local and foreign laws that require drug manufacturers to report information related to payments and other transfers of value to health care providers or entities, or marketing expenditures.

Because of the breadth of these laws and the narrowness of the statutory exceptions and safe harbors available under the federal Anti-Kickback Statute, it is possible that some of our business activities could be subject to challenges under one or more of such laws. Moreover, recent health care reform legislation has strengthened these laws. For example, the ACA, among other things, amends the intent requirement of the federal Anti-Kickback Statute and criminal health care fraud statutes, so that a person or entity no longer needs to have actual knowledge of the statute or specific intent to violate it. In addition, the ACA provides that the government may assert that a claim including items or services resulting from a violation of the federal Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the False Claims Act.

If our operations are found to be in violation of any of the laws described above or any governmental regulations that apply to us, we may be subject to penalties, including civil and criminal penalties, damages, fines, individual imprisonment, integrity obligations, exclusion from funded health care programs and the curtailment or restructuring of our operations. Any such penalties could adversely affect our financial results. We continue to improve our corporate compliance program designed to ensure that our development, marketing, and sales of existing and future products and product candidates are in compliance with all applicable laws and regulations, but we cannot guarantee that this program will protect us from governmental investigations or other actions or lawsuits stemming from a failure to comply with such laws or regulations. If any such actions are instituted against us and we are not successful in defending ourselves or asserting our rights, those actions could have a significant impact on our business, including the imposition of significant fines or other sanctions.

Efforts to ensure that our business arrangements with third parties will comply with applicable health care laws and regulations will involve substantial costs. It is possible that governmental authorities will conclude that our business practices may not comply with current or future statutes, regulations or case law involving applicable fraud and abuse or other health care laws and regulations. If our operations are found to be in violation of any of these laws or any other governmental regulations that may apply to us, we may

43

**EMERGENT BIOSOLUTIONS INC.**

be subject to significant civil, criminal and administrative penalties, damages, fines, individual imprisonment, integrity obligations, exclusion from government funded health care programs, such as Medicare and Medicaid, and the curtailment or restructuring of our operations. If any of the physicians or other health care providers or entities with whom we expect to do business is found to be not in compliance with applicable laws, they may be subject to criminal, civil or administrative sanctions, including exclusion from government funded health care programs. If a third party fails to comply with applicable laws and regulations while acting on our behalf, we may also be subject to criminal, civil, and administrative penalties, including those listed above.

We are committed to conducting the development, sale and marketing of our applicable products and product candidates and all our activities in compliance with all applicable laws and regulations, but certain applicable laws and regulations may impose liability even in the absence of specific intent to defraud. Furthermore, should there be ambiguity, a governmental authority may take a position contrary to a position we have taken, or should an employee or third party acting on our behalf violate these laws without our knowledge, a governmental authority may impose civil and/or criminal sanctions.

The United States government, state governments and private payors regularly investigate the pricing and competitive practices of pharmaceutical companies and biotechnology companies, and many file actions alleging that inaccurate reporting of prices has improperly inflated reimbursement rates. We may also be subject to investigations related to our pricing practices. Regardless of merit or eventual outcome, these types of investigations and related litigation can result in:

- Diversion of management time and attention;

- Expenditure of large amounts of cash on legal fees, costs and payment of damages or penalties;

- Limitations on our ability to continue some of our operations;

- Decreased demand for our products; and

- Injury to our reputation.

Moreover, an adverse outcome, or the imposition of penalties or sanctions for failing to comply with the fraud and abuse and antitrust laws, could adversely affect us and may have a material adverse effect on our business, results of operations, financial condition and cash flows.

*If we fail to comply with our obligations under U.S. governmental pricing programs, we could be required*

*to reimburse government programs for underpayments and could pay penalties, sanctions and fines.*

The issuance of regulations and coverage expansion by various governmental agencies relating to the Medicaid rebate program will continue to increase our costs and the complexity of compliance and will be time-consuming. Changes to the definition of "average manufacturer price" (AMP), and the Medicaid rebate amount under the ACA and CMS and the issuance of final regulations implementing those changes has affected and could further affect our 340B "ceiling price" calculations. Because we participate in the Medicaid rebate program, we are required to report "average sales price" (ASP), information to CMS for certain categories of drugs that are paid for under Part B of the Medicare program. Future statutory or regulatory changes or CMS binding guidance could affect the ASP calculations for our products and the resulting Medicare payment rate and could negatively impact our results of operations.

Pricing and rebate calculations vary among products and programs, involve complex calculations and are often subject to interpretation by us, governmental or regulatory agencies and the courts. The Medicaid rebate amount is computed each quarter based on our submission to CMS of our current AMP and "best price" for the quarter. If we become aware that our reporting for a prior quarter was incorrect, or has changed as a result of recalculation of the pricing data, we are obligated to resubmit the corrected data for a period not to exceed twelve quarters from the quarter in which the data originally were due. Any such revisions could have the impact of increasing or decreasing our rebate liability for prior quarters, depending on the direction of the revision. Such restatements and recalculations increase our costs for complying with the laws and regulations governing the Medicaid rebate program. Price recalculations also may affect the "ceiling price" at which we are required to offer our products to certain covered entities, such as safety-net providers, under the 340B/Public Health Service (PHS) drug pricing program.

In addition to retroactive rebate liability and the potential for 340B program refunds, if we are found to have made a misrepresentation in the reporting of ASP, we are subject to civil monetary penalties for each such price misrepresentation and for each day in which such price misrepresentation was applied. If we are found to have knowingly submitted false AMP or "best price" information to the government, we may be liable for civil monetary penalties per item of false information. Any refusal of a request for information or knowing provision of false information in connection with an AMP survey verification also would subject us to civil monetary penalties. In addition, our failure to submit monthly/quarterly AMP or "best price"

44

**EMERGENT BIOSOLUTIONS INC.**

information on a timely basis could result in a civil monetary penalty per day for each day the information is late beyond the due date. Such failure also could be grounds for CMS to terminate our Medicaid drug rebate agreement, pursuant to which we participate in the Medicaid program. In the event that CMS terminates our rebate agreement, no federal payments would be available under Medicaid or Medicare Part B for our covered outpatient drugs. Governmental agencies may also make changes in program interpretations, requirements or conditions of participation, some of which may have implications for amounts previously estimated or paid. We cannot assure that our submissions will not be found by CMS to be incomplete or incorrect.

In order for our products to be reimbursed by the primary federal governmental programs, we must report certain pricing data to the USG. Compliance with reporting and other requirements of these federal programs is a pre-condition to: (i) the availability of federal funds to pay for our products under Medicaid and Medicare Part B; and (ii) procurement of our products by the Department of Veterans Affairs (DVA), and by covered entities under the 340B/PHS program. The pricing data reported are used as the basis for establishing Federal Supply Schedule (FSS), and 340B/PHS program contract pricing and payment and rebate rates under the Medicare Part B and Medicaid programs, respectively. Pharmaceutical companies have been prosecuted under federal and state false claims laws for submitting inaccurate and/or incomplete pricing information to the government that resulted in increased payments made by these programs. The rules governing the calculation of certain reported prices are highly complex. Although we maintain and follow strict procedures to ensure the maximum possible integrity for our federal pricing calculations, the process for making the required calculations involves some subjective judgments and the risk of errors always exists, which creates the potential for exposure under the false claims laws. If we become subject to investigations or other inquiries concerning our compliance with price reporting laws and regulations, and our methodologies for calculating federal prices are found to include flaws or to have been incorrectly applied, we could be required to pay or be subject to additional reimbursements, penalties, sanctions or fines, which could have a material adverse effect on our business, financial condition and results of operations.

To be eligible to have our products paid for with federal funds under the Medicaid and Medicare Part B programs as well as to be purchased by certain federal agencies and certain federal grantees, we also must participate in the DVA FSS pricing program. To participate, we are required to enter into an FSS contract with the DVA, under which we must make our innovator "covered drugs" available to the "Big Four"

federal agencies-the DVA, the DoD, the Public Health Service (including the Indian Health Service), and the Coast Guard-at pricing that is capped pursuant to a statutory federal ceiling price (FCP), formula set forth in Section 603 of the Veterans Health Care Act of 1992 (VHCA). The FCP is based on a weighted average wholesale price known as the Non-Federal Average Manufacturer Price (Non-FAMP), which manufacturers are required to report on a quarterly and annual basis to the DVA. Pursuant to the VHCA, knowing provision of false information in connection with a Non-FAMP filing can subject us to significant penalties for each item of false information. If we overcharge the government in connection with our FSS contract or Section 703 Agreement, whether due to a misstated FCP or otherwise, we are required to disclose the error and refund the difference to the government. The failure to make necessary disclosures and/or to identify contract overcharges can result in allegations against us under the False Claims Act and other laws and regulations. Unexpected refunds to the government, and responding to a government investigation or enforcement action, can be expensive and time-consuming, and could have a material adverse effect on our business, financial condition, results of operations and growth prospects.

*Under certain circumstances, we might sell unapproved MCMs to government entities. While this is permissible in some cases, the extent to which we may be able to lawfully market and sell unapproved products in many jurisdictions may be unclear or ambiguous. Such sales could subject us to regulatory enforcement action, product liability and reputational risk.*

Under certain circumstances, MCMs may be procured by government entities prior to approval by the FDA or other regulatory authorities, a practice which we follow in connection with AV7909 and Trobigard. In the United States, the Project BioShield Act of 2004 (Project BioShield) permits the Secretary of HHS to contract to purchase MCMs for the SNS prior to FDA approval of the countermeasure in specified circumstances. Project BioShield and the Pandemic and All-Hazards Preparedness Reauthorization Act of 2013 also allow the FDA Commissioner to authorize the emergency use of medical products that have not yet been approved by the FDA under an EUA. An EUA terminates when the emergency determination underlying the EUA terminates. An EUA is not a long-term alternative to obtaining FDA approval, licensure, or clearance for a product. Absent an applicable exception, our MCM product candidates generally will have to be approved by the FDA or other regulatory authorities in the relevant country through traditional pathways before we can sell those products to governments. Additionally, the laws in certain jurisdictions regarding the ability of government entities to purchase unapproved product candidates are ambiguous, and

45

**EMERGENT BIOSOLUTIONS INC.**

the permissibility of exporting unapproved products from the United States and importing them to foreign countries may be unclear. Nevertheless, government bodies, such as U.S. federal entities other than HHS, state and local governments within the United States, and foreign governments, may seek to procure our MCM product candidates that are not yet approved. If so, we would expect to assess the permissibility and liability implications of supplying our product candidates to such entities on a case-by-case basis, which presents certain challenges, both in the case of U.S. and foreign governments, and particularly under emergency conditions. In addition, agencies or branches of one country's government may take different positions regarding the permissibility of such sales than another country's government or even other agencies or branches of the same government. If we determine that we believe such activities are permissible, local enforcement authorities could disagree with our conclusion and take enforcement action against us.

In addition, the sale of unapproved products also could give rise to product liability claims for which we may not be able to obtain indemnification or insurance coverage. For example, liability protections applicable to claims arising under U.S. law and resulting from the use of certain unlicensed products, such as a declaration issued under the Public Readiness and Emergency Preparedness Act (the PREP Act) do not cover claims arising under non-U.S. law.

Regardless of the permissibility and liability risks, in the event a user of one or more of our products suffers an adverse event, we may be subject to additional reputational risk if the product has not been approved by the FDA or the corresponding regulatory authority of another country, particularly because we will not have approved labeling regarding the safety or efficacy of those products. In addition, legislatures and other governmental bodies that have oversight responsibility for procuring agencies may raise concerns after the fact, even if procurement was permissible at the time, which could result in negative publicity, reputational risk and harm to our business prospects.

There is also a risk that our communications with governments about our unapproved products, such as in the procurement context, could be considered promotion of an unapproved product or unapproved use of an approved product. Therefore, there is a risk that we could be subject to enforcement actions if found to be in violation of such laws or regulations.

*Even after regulatory approval is received, if we fail to comply with regulatory requirements, or if we experience unanticipated problems with our approved products, they could be subject to restrictions, penalties or withdrawal from the market.*

In addition to the requirements and uncertainties related to pre-approval activities discussed previously, any vaccine, therapeutic product or medical device for which we obtain marketing approval, along with the manufacturing processes, post-approval clinical data, labeling, advertising and promotional activities for such product, will be subject to continual requirements of and review by the FDA and other regulatory bodies. Our approved products are subject to these requirements and ongoing review. These requirements include submissions of safety and other post-marketing information and reports, plasma donor testing, registration requirements, cGMP, requirements relating to potency and stability, quality control, quality assurance, restrictions on advertising and promotion, import and export restrictions and recordkeeping requirements. In addition, various state laws require that companies that manufacture and/or distribute drug products within the state obtain and maintain a manufacturer or distributor license, as appropriate. Because of the breadth of these laws, it is possible that some of our business activities could be subject to challenge under one or more of such laws.

Government regulators enforce cGMP and other requirements through periodic unannounced inspections of manufacturing facilities. The FDA is authorized to inspect domestic and foreign manufacturing facilities without prior notice at reasonable times and in a reasonable manner. Health Canada may conduct similar inspections of our domestic and foreign facilities where Canadian marketed products are produced, or related formulation and filling operations are conducted. The FDA, Health Canada, and other foreign regulatory agencies conduct periodic inspections of our facilities. Following several of these inspections, regulatory authorities have issued inspectional observations, some of which were significant, but all of which are being, or have been, addressed through corrective actions. If, in connection with any future inspection, regulatory authorities find that we are not in substantial compliance with all applicable requirements, or if they are not satisfied with the corrective actions we take, our regulators may undertake enforcement action against us, which may include:

- warning letters and other communications;

- product seizure or withdrawal of the product from the market;

- restrictions on the marketing or manufacturing of a product;

- suspension or withdrawal of regulatory approvals or refusal to approve pending

46

applications or supplements to approved applications;

- fines or disgorgement of profits or revenue; and

- injunctions or the imposition of civil or criminal penalties.

Similar action may be taken against us should we fail to comply with regulatory requirements, or later discover previously unknown problems with our products or manufacturing processes. For instance, our products are tested regularly to determine if they satisfy potency and stability requirements for their required shelf lives. Failure to meet potency, stability or other specification requirements could result in delays in distributions, recalls or other consequences. Even if regulatory approval of a product is granted, the approval may be subject to limitations on the indicated uses for which the product may be marketed or to the conditions of approval. Regulatory approval may also contain requirements for costly post-marketing testing and surveillance to monitor the safety or efficacy of the product. If we experience any of these post-approval events, our business, financial condition, operating results and cash flows could be materially and adversely affected.

Additionally, companies may not promote unapproved products or unapproved uses of approved products (i.e. "off-label" uses or uses that are not described in the product's approved labeling and that differ from the uses approved by the applicable regulatory agencies). A company that is found to have improperly promoted an unapproved product or unapproved use of an approved product may be subject to significant liability, including civil and administrative remedies (such as entering into corporate integrity agreements with the USG), as well as criminal sanctions. If our employees or agents engage in marketing of an unapproved product or the unapproved use of an approved product, we could be subject to civil or criminal investigations and monetary and injunctive penalties, which could adversely impact our ability to conduct business in certain markets, negatively affect our business, financial condition, operating results and cash flows, and damage our reputation.

*Failure to obtain or maintain regulatory approval in international jurisdictions could prevent us from marketing our products abroad and could limit the growth of our business.*

We intend to sell certain of our products, outside the United States and received market authorization under the mutual recognition procedure to sell BioThrax in France, Italy, the Netherlands, Poland, and the United Kingdom. To market our products in foreign jurisdictions under normal circumstances, we

generally need to obtain separate regulatory approvals and comply with numerous and varying requirements or use alternative "emergency use" or other exemptions from general approval and import requirements. Approval by the FDA in the United States or the mutual recognition procedure in the European member states does not ensure approval by all foreign regulatory authorities. The approval procedures in foreign jurisdictions can vary widely and can involve additional clinical trials and data review beyond that required by the FDA or under the mutual recognition procedure. There is also a risk that a regulatory authority in another country could conclude that we have violated the rules and regulations related to product development, approval or promotion in that country. Therefore, there is a risk that we could be subject to a foreign enforcement action if found to be in violation of such laws and regulations. We and our collaborators may not be able to obtain foreign regulatory approvals on a timely basis, if at all, and we may be unable to successfully commercialize our products internationally if no alternate procurement pathway is identified for authorized government customers in a particular jurisdiction. We have limited experience in preparing, filing and prosecuting the applications necessary to gain foreign regulatory approvals and expect to rely on third-party contract research organizations and consultants to assist us in this process. Our reliance on third parties can introduce additional uncertainty into the process.

On January 31, 2020, the United Kingdom formally withdrew from the European Union and entered into a transition period through December 31, 2020 pursuant to a Withdrawal Agreement. Since a significant proportion of the regulatory framework in the United Kingdom is derived from European Union directives and regulations, Brexit could materially impact the regulatory regime with respect to the approval of our products or product candidates in the United Kingdom or the European Union. Any delay in obtaining, or an inability to obtain, any marketing approvals, as a result of Brexit or otherwise, would prevent us from commercializing product candidates in the United Kingdom and/or the European Union and could restrict our ability to generate revenue and achieve and sustain profitability. Therefore, there is a risk that we could be subject to an enforcement action if found to be in violation of such laws or regulations.

*Laws and regulations governing international operations may preclude us from developing, manufacturing and selling certain products outside of the United States and require us to develop and implement costly compliance programs.*

As we continue to expand our commercialization activities outside of the United States, we are subject to an increased risk of, and must dedicate additional resources towards avoiding inadvertently conducting

47

**EMERGENT BIOSOLUTIONS INC.**

activities in a manner that violates the U.S. Foreign Corrupt Practices Act (FCPA), the U.K. Bribery Act, Canada's Corruption of Foreign Public Officials Act, and other similar foreign laws, which prohibit corporations and individuals from paying, offering to pay, or authorizing the payment of anything of value to any foreign government official, government staff member, political party, or political candidate in an attempt to obtain or retain business or to otherwise influence a person working in an official capacity. The FCPA also obligates companies whose securities are listed in the United States to comply with certain accounting provisions requiring the company to maintain books and records that accurately and fairly reflect all transactions of the corporation, including international subsidiaries, and to devise and maintain an adequate system of internal accounting controls for international operations.  Compliance with the FCPA is expensive and difficult, particularly in countries in which corruption is a recognized problem. In addition, the FCPA presents particular challenges in the pharmaceutical industry, because, in many countries, hospitals are operated by the government, and doctors and other hospital employees are considered foreign officials. Certain payments to hospitals in connection with clinical trials and other work have been deemed to be improper payments to government officials and have led to FCPA enforcement actions.

Many countries, including the United States, also have various lobbying laws and regulations governing the conduct of individuals and companies who interact with government officials. These laws and regulations typically include certain restrictions and disclosure obligations. If we, our employees, or third parties acting on our behalf do not comply with these laws and regulations, we may be subject to civil and criminal penalties.

Many countries, including the United States, restrict the export or import of products to or from certain countries through, for example, bans, sanction programs, and boycotts. Such restrictions may preclude us from supplying products in certain countries, which could limit our growth potential. Furthermore, if we, or third parties acting on our behalf, do not comply with these restrictions, we may be subject to civil and criminal penalties.

Various laws, regulations and executive orders also restrict the use and dissemination outside of the United States, or the sharing with certain non-U.S. nationals, of information classified for national security purposes, as well as certain products and technical data relating to those products. If we continue to expand our presence outside of the United States, it will require us to dedicate additional resources to comply with these laws, and these laws may preclude us from developing, manufacturing, or

selling certain products and product candidates outside of the United States, which could limit our growth potential and increase our development costs.

The failure to comply with laws governing international business practices may result in substantial civil and criminal penalties and suspension or debarment from government contracting. The SEC also may suspend or bar issuers from trading securities on U.S. exchanges for violations of the FCPA's accounting provisions.

### MANUFACTURING RISKS

*Disruption at, damage to or destruction of our manufacturing facilities could impede our ability to manufacture AV7909, BioThrax, ACAM2000 or our other products, as well as deliver our contract development and manufacturing services, which would harm our business, financial condition, operating results and cash flows.*

An interruption in our manufacturing operations could result in our inability to produce our products for delivery to satisfy the product demands of our customers in a timely manner, which would reduce our revenues and materially harm our business, financial condition, operating results and cash flows. A number of factors could cause interruptions, including:

• equipment malfunctions or failures;

• technology malfunctions;

• cyber-attacks;

• work stoppages or slowdowns;

• protests, including by animal rights activists;

• injunctions;

• damage to or destruction of the facility; and

• product contamination or tampering.

Providers of PHT countermeasures could be subject to an increased risk of terrorist activities. The USG has designated both our Lansing, Michigan and our Bayview bulk manufacturing facility in Baltimore, Maryland as facilities requiring additional security. Although we continually evaluate and update security measures, there can be no assurance that any additional security measures would protect these facilities from terrorist efforts determined to disrupt our manufacturing activities.

The factors listed above could also cause disruptions at our other facilities, including our manufacturing facilities in Winnipeg, Manitoba, Canada; other Baltimore, Maryland facilities in Camden; facilities in Canton, Massachusetts; Rockville, Maryland, Bern, Switzerland; and

48

**EMERGENT BIOSOLUTIONS INC.**

Hattiesburg, Mississippi. We do not have any redundant manufacturing facilities for any of our marketed products. Accordingly, any disruption, damage, or destruction of these facilities could impede our ability to manufacture our marketed products, our product candidates and our ability to produce products for external customers, result in losses and delays, including delay in the performance of our contractual obligations or delay in our clinical trials, any of which could be costly to us and materially harm our business, financial condition, operating results and cash flows.

*We may not be able to utilize the full manufacturing capacity of our manufacturing facilities, which could impact our future revenues and materially harm our business, financial condition, operating results and cash flows.*

Despite our ongoing efforts to optimize the utilization of our manufacturing infrastructure (including bulk, fill/finish, support, aseptic filling, lyophilization, final packaging), we may not be able to realize full utilization, which could adversely affect our future revenues, financial condition, operating results and cash flows.

*Problems may arise during the production of our marketed products and product candidates due to the complexity of the processes involved in their manufacturing and shipment. Significant delays in product manufacturing or development could cause delays in revenues, which would harm our business, financial condition, operating results and cash flows.*

Several of our products, including BioThrax and ACAM2000 and many of our current product candidates, including AV7909, are biologics. Manufacturing biologic products, especially in large quantities, is complex. The products must be made consistently and in compliance with a clearly defined manufacturing process. Problems during manufacturing may arise for a variety of reasons, including problems with raw materials, equipment malfunction and failure to follow specific protocols and procedures. In addition, slight deviations anywhere in the manufacturing process, including obtaining materials, maintaining master seed or cell banks and preventing genetic drift, seed or cell growth, fermentation, contamination including from particulates among other things, filtration, filling, labeling, packaging, storage and shipping, potency and stability issues and other quality control testing, may result in lot failures or manufacturing shut-downs, delays in the release of lots, product recalls, spoilage or regulatory action. Such deviations may require us to revise manufacturing processes or change manufacturers. Additionally, as our equipment ages, it will need to be replaced. Replacement of equipment has the potential to introduce variations in the manufacturing process that may result in lot failures

or manufacturing shut-downs, delay in the release of lots, product recalls, spoilage or regulatory action. Success rates can also vary dramatically at different stages of the manufacturing process, which can reduce yields and increase costs. From time to time, we may experience deviations in the manufacturing process that may take significant time and resources to resolve and, if unresolved, may affect manufacturing output and could cause us to fail to satisfy customer orders or contractual commitments, lead to a termination of one or more of our contracts, lead to delays in our clinical trials, result in litigation or regulatory action against us, including warning letters and other restrictions on the marketing or manufacturing of a product, or cause the FDA to cease releasing product until the deviations are explained and corrected, any of which could be costly to us, damage our reputation and negatively impact our business.

Additionally, if changes are made to the manufacturing process, we may be required to provide the FDA with pre-clinical and clinical data showing the comparable identity, strength, quality, purity or potency of any impacted products before and after the changes.

We are contractually required to ship our biologic products at a prescribed temperature range and variations from that temperature range could result in loss of product and could significantly and adversely impact our revenues, which would harm our business, financial condition, operating results and cash flows.

Manufacturing delays, lot failures, shipping deviations, spoilage or other loss during shipping could cause us to fail to satisfy customer orders or contractual commitments, lead to a termination of one or more of our contracts, lead to delays in potential clinical trials or result in litigation or regulatory action against us, any of which could be costly to us and otherwise harm our business.

*Our products and product candidates procured by the USG and other customers require us to perform tests for and meet certain potency and lot release standards prescribed by the FDA and other agencies, which may not be met on a timely basis or at all.*

Our products and product candidates procured by the USG and other customers require us to perform tests for and meet certain potency and lot release standards prescribed by the FDA and other agencies, which may not be met on a timely basis or at all. We are unable to sell any products and product candidates that fail to satisfy such testing specifications. For example, we must provide the FDA with the results of certain tests, including potency tests, before certain lots are released for sale. Potency testing of each applicable lot is performed against qualified control lots that we maintain. We continually monitor the

49

## EMERGENT BIOSOLUTIONS INC.

status of such reference lots for FDA compliance and periodically produce and qualify a new reference lot to replace the existing reference lot. If we are unable to satisfy USG requirements for the release of our products or product candidates, our ability to supply such products and product candidates to authorized buyers would be impaired until such time as we become able to meet such requirements, which could materially harm our future business, financial condition, operating results and cash flows.

*Our operations, including our use of hazardous materials, chemicals, bacteria and viruses, require us to comply with regulatory requirements and expose us to significant potential liabilities.*

Our operations involve the use of hazardous materials, including chemicals, bacteria and viruses, and may produce dangerous waste products. Accordingly, we, along with the third parties that conduct clinical trials and manufacture our products and product candidates on our behalf, are subject to federal, state, local and foreign laws and regulations that govern the use, manufacture, distribution, storage, handling, exposure, disposal and recordkeeping with respect to these materials. Under the Federal Select Agent Program, pursuant to the Public Health Security and Bioterrorism Preparedness and Response Act, we are required to register with and be inspected by the Centers for Disease Control (CDC) and the Animal and Plant Health Inspection Service if we have in our possession, or if we use or transfer, select biological agents or toxins that could pose a threat to public health and safety, to animal or plant health or to animal or plant products. This legislation requires stringent safeguards and security measures for these select agents and toxins, including controlled access and the screening of entities and personnel and establishes a comprehensive national database of registered entities. We are also subject to a variety of environmental and occupational health and safety laws. Compliance with current or future laws and regulations can require significant costs and we could be subject to substantial fines and penalties in the event of noncompliance. In addition, the risk of contamination or injury from these materials cannot be completely eliminated. In such event, we could be held liable for substantial civil damages or costs associated with the cleanup of hazardous materials. From time to time, we have been involved in remediation activities and may be so involved in the future. Any related cost or liability might not be fully covered by insurance, could exceed our resources and could have a material adverse effect on our business, financial condition, operating results and cash flows. In addition to complying with environmental and occupational health and safety laws, we must comply with special regulations relating to biosafety administered by the CDC, HHS, U.S. Department of

Agriculture and the DoD, as well as regulatory authorities in Canada.

### RELIANCE ON THIRD PARTIES

*The loss of any of our non-exclusive, sole-source or single source suppliers or an increase in the price of inventory supplied to us could have an adverse effect on our business, financial condition and results of operations.*

We purchase certain supplies used in our manufacturing processes from non-exclusive, or single sources due to quality considerations, costs or constraints resulting from regulatory requirements, including key components for NARCAN® Nasal Spray. Where a particular single-source supply relationship is terminated, we may not be able to establish additional or replacement suppliers for certain components or materials quickly. This is largely due to the FDA approval system, which mandates validation of materials prior to use in our products, and the complex nature of manufacturing processes. In addition, we may lose a sole-source supplier due to, among other things, the acquisition of such a supplier by a competitor (which may cause the supplier to stop selling its products to us) or the bankruptcy of such a supplier, which may cause the supplier to cease operations. Any reduction or interruption by a sole-source supplier of the supply of materials or key components used in the manufacturing of our products or an increase in the price of those materials or components could adversely affect our business, financial condition and results of operations.

Additionally, any failure by us to forecast demand for, or our suppliers to maintain an adequate supply of, the raw material and finished product for producing NARCAN® Nasal Spray could result in an interruption in the supply of NARCAN® Nasal Spray and a decline in sales of the product.

*If we are unable to obtain supplies for the manufacture of our products and product candidates in sufficient quantities, at an acceptable cost and in acceptable quality, our ability to manufacture or to develop and commercialize our products and product candidates could be impaired, which could materially harm our revenues, lead to a termination of one or more of our contracts, lead to delays in clinical trials or otherwise materially harm our business.*

We depend on certain single-source suppliers for key materials and services necessary for the manufacture of AV7909, BioThrax, ACAM2000, NARCAN Nasal Spray and our other products and product candidates. For example, we rely on a single-source supplier to provide us with Alhydrogel in sufficient quantities to meet our needs to manufacture BioThrax and AV7909. We also rely on single-source suppliers for the specialty plasma in our hyperimmune

50

**EMERGENT BIOSOLUTIONS INC.**

specialty plasma products and certain ingredients for ACAM2000. A disruption in the availability of such materials or services from these suppliers or in the quality of the material provided by such suppliers could require us to qualify and validate alternative suppliers. If we are unable to locate or establish alternative suppliers, our ability to manufacture our products and product candidates could be adversely affected and could harm our revenues, cause us to fail to satisfy contractual commitments, lead to a termination of one or more of our contracts or lead to delays in our clinical trials, any of which could be costly to us and otherwise materially harm our business, financial condition, operating results and cash flows.

*We depend on third parties to conduct many of our clinical and non-clinical trials. If these third parties do not perform as contractually required or as we expect, we may not be able to obtain regulatory approval for or commercialize our product candidates and, as a result, our business, financial condition, operating results and cash flows may suffer.*

We depend on third parties, such as independent clinical investigators, contract research organizations and other third-party service providers to conduct the clinical and non-clinical trials of our product candidates and expect to continue to do so. We rely heavily on these third parties for successful execution of our clinical and non-clinical trials, but do not exercise day-to-day control over their activities. Our reliance on these service providers does not relieve us of our regulatory responsibilities, including ensuring that our trials are conducted in accordance with good clinical practice regulations and the plan and protocols contained in the relevant regulatory application. In addition, these organizations may not complete these activities on our anticipated or desired timeframe. We also may experience unexpected cost increases that are beyond our control. Problems with the timeliness or quality of the work of a contract research organization may lead us to seek to terminate the relationship and use an alternative service provider, which may prove difficult, costly and result in a delay of our trials. Any delay in or inability to complete our trials could delay or prevent the development, approval and commercialization of our product candidates.

In certain cases, government entities and non-government organizations conduct studies of our product candidates, and we may seek to rely on these studies in applying for marketing approval for certain of our product candidates. These government entities and non-government organizations have no obligation or commitment to us to conduct or complete any of these studies or clinical trials and may choose to discontinue these development efforts at any time. Furthermore, government entities depend on annual

Congressional appropriations to fund their development efforts, which may not be approved.

If we are unable to obtain any necessary third-party services on acceptable terms or if these service providers do not successfully carry out their contractual duties or meet expected deadlines, our efforts to obtain regulatory approvals for our product candidates may be delayed or prevented.

### RISKS RELATED TO STRATEGIC ACQUISITIONS AND COLLABORATIONS

*Our strategy of generating growth through acquisitions may not be successful.*

Our business strategy includes growing our business through acquisition and in-licensing transactions. We may not be successful in identifying, effectively evaluating, structuring, acquiring or in-licensing, and developing and commercializing additional products on favorable terms, or at all. Competition for attractive product opportunities is intense and may require us to devote substantial resources, both managerial and financial, to an acquisition opportunity. A number of more established companies are also pursuing strategies to acquire or in-license products in the biopharmaceutical field. These companies may have a competitive advantage over us due to their size, cash resources, cost of capital, effective tax rate and greater clinical development and commercialization capabilities.

Acquisition efforts can consume significant management attention and require substantial expenditures, which could detract from our other programs. In addition, we may devote significant resources to potential acquisitions that are never completed. Even if we are successful in acquiring a company or product, it may not result in a successfully developed or commercialized product or, even if an acquired product is commercialized, competing products or technologies could render a product noncompetitive, uneconomical or obsolete. Moreover, the cost of acquiring other companies or in-licensing products could be substantial, and in order to acquire companies or new products, we may need to incur substantial debt or issue dilutive securities.

If we are unsuccessful in our efforts to acquire other companies or in-license and develop additional products, or if we acquire or in-license unproductive assets, it could have a material adverse effect on the growth of our business, and we could be compelled to record significant impairment charges to write-down the carrying value of our acquired intangible assets, which could materially harm our business, financial condition, operating results and cash flows.

*Our failure to successfully integrate acquired businesses and/or assets into our operations could*

51

## EMERGENT BIOSOLUTIONS INC.

*adversely affect our ability to realize the benefits of such acquisitions and, therefore, to grow our business.*

We may not be able to integrate any acquired business successfully or operate any acquired business profitably, including our acquisitions of Adapt and PaxVax. In addition, cost synergies, if achieved at all, may be less than we expect, or may take greater time to achieve than we anticipate.

Issues that could delay or prevent successful integration or cost synergies of an acquired business or products include, among others:

- retaining existing customers and attracting new customers;

- retaining key employees;

- diversion of management attention and resources;

- conforming internal controls, policies and procedures, business cultures and compensation programs;

- consolidating corporate and administrative infrastructures;

- successfully executing technology transfers and obtaining required regulatory approvals;

- consolidating sales and marketing operations;

- identifying and eliminating redundant and underperforming operations and assets;

- assumption of known and unknown liabilities;

- coordinating geographically dispersed organizations; and

- managing tax costs or inefficiencies associated with integrating operations.

If we are unable to successfully integrate pending and future acquisitions with our existing businesses, or operate any acquired business profitably, we may not obtain the advantages that the acquisitions were intended to create, which may materially adversely affect the growth of our business, financial condition, operating results and cash flows.

### COMPETITIVE AND POLITICAL RISKS

*We face substantial competition, which may result in others developing or commercializing products before or more successfully than we do.*

The development and commercialization of new biopharmaceutical and medical technology products is highly competitive and subject to rapid technological advances. We may face future competition from other companies and governments, universities and other non-profit research organizations in respect to our products, any products that we acquire, our current product candidates and any products we may seek to develop or commercialize in the future. Our competitors may develop products that are safer, more effective, more convenient or less costly than any products that we may develop or market. Our competitors may have greater resources to devote to marketing or selling their products, adapt more quickly to new technologies, scientific advances or patient preferences and needs, initiate or withstand substantial price competition more successfully than we can, or more effectively negotiate third-party licensing and collaborative arrangements.

There are a number of companies with products or product candidates addressing PHT preparedness that are competing with us for both USG procurement and development resources. Many of our competitors have greater financial, technical and marketing resources than we do. Our competitors may receive patent protection that dominates, blocks or adversely affects our products or product candidates.

Any reduction in demand for our products or reduction or loss of development funding for our products or product candidates in favor of a competing product could lead to a loss of market share for our products and cause reduced revenues, margins and levels of profitability for us, which could adversely affect our business, financial condition, operating results and cash flows.

*Our Biologic Products may face risks of competition from biosimilar manufacturers.*

Competition for BioThrax, ACAM2000, and our other biological products and product candidates, including AV7909, otherwise referred to as our "Biologic Products," may be affected by follow-on biologics, or "biosimilars," in the United States and other jurisdictions. Regulatory and legislative activity in the United States and other countries may make it easier for generic drug manufacturers to manufacture and sell biological drugs similar or identical to our Biologic Products, which might affect the profitability or commercial viability of our Biologic Products. Under the Biologics Price Competition and Innovation Act of 2010, the FDA cannot approve a biosimilar application until the 12-year exclusivity period for the innovator biologic has expired. Regulators in the European Union and in other foreign jurisdictions have already approved biosimilars. The specific regulatory framework for this biosimilar approval path and the extent to which an approved biosimilar would be substituted for the innovator biologic are not yet clear and will depend on many factors. If a biosimilar version of one of our Biologic Products were approved, it could have a material adverse effect on the sales and gross profits of the affected Biologic Product and could

52

**EMERGENT BIOSOLUTIONS INC.**

adversely affect our business, financial condition, operating results and cash flows.

*We expect our NARCAN® Nasal Spray marketed product to face future competition from other treatments.*

Our marketed product NARCAN® Nasal Spray faces potentially substantial competition from other treatments, including injectable naloxone, auto-injectors, nasal sprays or improvised nasal spray kits. In addition, other entrants may seek approval to market generic versions of NARCAN® Nasal Spray before the underlying patents expire. For example, in 2016 Teva filed, and in 2018 Perrigo filed, Abbreviated new Drug Applications with the FDA (ANDAs) which sought regulatory approval to market generic versions of NARCAN® Nasal Spray before the expiration of certain underlying patents and in April 2019, Teva received FDA approval to market its generic version of NARCAN® Nasal Spray. Perrigo recently entered into a settlement agreement with us. However, Teva may decide to sell its approved generic product in the market, although we have sued Teva and the litigation has not yet been resolved, so any market launch could subject Teva to the risk of damages for patent infringement.

Additionally, we are aware that other companies are developing other product candidates containing naloxone that, if successful, would compete with NARCAN Nasal Spray and reduce our market share. In January 2019, the FDA released new proposed template Drug Facts Labels to assist sponsors of investigational naloxone nasal sprays and auto-injectors seeking approval from the FDA for over-the-counter naloxone products. Any reduction in demand for NARCAN® Nasal Spray in favor of a competing product, or unsuccessful efforts to defend underlying patents from infringement by generic entrants, could lead to a loss of market share and cause reduced revenues, margins and levels of profitability for us, which could adversely affect our business, financial condition, operating results and cash flows.

*Political or social factors may delay or impair our ability to market our products and may require us to spend significant management time and financial resources to address these issues.*

Products developed to counter the potential impact of PHTs are subject to changing political and social environments. The political responses and social awareness of the risks of these threats on military personnel or civilians may vary over time. If the threat of terrorism were to decline, then the public perception of the risk on public health and safety may be reduced. This perception, as well as political or social pressures, could delay or cause resistance to bringing our products in development to market or limit pricing or purchases of our products, any of which

could negatively affect our revenues and our business, financial condition, operating results and cash flows.

In addition, substantial delays or cancellations of purchases could result from protests or challenges from third parties. Lawsuits brought against us by third parties or activists, even if not successful, could require us to spend significant management time and financial resources defending the related litigation and could potentially damage the public's perception of us and our products. Any publicity campaigns or other negative publicity may adversely affect the degree of market acceptance of our PHT countermeasures and thereby limit the demand for our products, which would adversely affect our business, financial condition, operating results and cash flows.

## PRODUCT DEVELOPMENT AND COMMERCIALIZATION RISKS

*Our growth depends on our success in developing and commercializing our product candidates. If we are unable to commercialize these product candidates, or experience significant delays or unanticipated costs in doing so, our business would be materially and adversely affected.*

We have invested significant effort and financial resources in the development of our vaccines, therapeutics and medical device product candidates and the acquisition of additional product candidates. In addition to our product sales, our ability to generate revenue is dependent on a number of factors, including the success of our development programs, the USG's interest in providing development funding for or procuring certain of our product candidates, and the commercial viability of our acquired or developed product candidates. The commercial success of our product candidates will depend on many factors, including accomplishing the following in an economical manner:

- successful development, formulation and cGMP scale-up of manufacturing that meets FDA or other foreign regulatory requirements;

- successful program partnering;

- successful completion of clinical or non-clinical development, including toxicology studies and studies in approved animal models;

- receipt of marketing approvals from the FDA and equivalent foreign regulatory authorities;

- establishment of commercial manufacturing processes and product supply arrangements;

- training of a commercial sales force for the product, whether alone or in collaboration with others;

53

**EMERGENT BIOSOLUTIONS INC.**

- successful registration and maintenance of relevant patent and/or other proprietary protection; and

- acceptance of the product by potential government and other customers.

*The COVID-19 product candidates we are working on may not be safe or effective and, even if they are, we may not be able to manufacture sufficient quantities to meet demand.*

We are developing two product candidates for the possible prophylaxis or treatment of COVID-19 and we are also providing contract development and manufacturing services for the development and/or manufacture of three vaccine product candidates for customers. There can be no assurance that any of these product candidates will be safe or effective. There can be no assurance that any of these product candidates will receive approval or be authorized for emergency use by the FDA or any other health regulatory authority. Even if these product candidates are safe and/or effective and receive approval or authorization by a health regulatory authority, the manufacturing process for these programs are under development and will be complex. As a result, there can be no assurance that we will be able to produce any significant quantity of these products or a timely basis or at all.

*Clinical trials of product candidates are expensive and time-consuming, and their outcome is uncertain. We must invest substantial amounts of time and financial resources in these trials, which may not yield viable products. Failure to obtain regulatory approval for product candidates, particularly in the United States, could materially and adversely affect our financial resources, which would adversely affect our business, financial condition, operating results and cash flows.*

Before obtaining regulatory approval for the marketing of our product candidates, we and our collaborative partners, where applicable, must conduct preclinical studies and clinical trials to establish proof of concept and demonstrate the safety and efficacy of our product candidates. Preclinical and clinical testing is expensive, difficult to design and implement, can take many years to complete and is uncertain as to outcome. Success in preclinical testing and early clinical trials does not ensure that later clinical trials or animal efficacy studies will be successful, and interim results of a clinical trial or animal efficacy study do not necessarily predict final results. An unexpected result in one or more of our clinical trials can occur at any stage of testing.

Preclinical and clinical testing for certain of our product candidates addressing CBRNE threats may face additional difficulties and uncertainties because

they cannot ethically or feasibly be tested in human subjects. We therefore expect to rely on the Animal Rule to obtain regulatory approval. The Animal Rule permits, in certain limited circumstances, the use of animal efficacy studies, together with human clinical safety and immunogenicity trials, to support an application for marketing approval. For a product approved under the Animal Rule, certain additional post-marketing requirements apply. For example, to the extent feasible and ethical, applicants must conduct post-marketing studies, such as field studies, to verify and describe the drug's clinical benefit and to assess its safety when used as indicated. We have limited experience in the application of these rules to the product candidates that we are developing. It is possible that results from these animal efficacy studies may not be predictive of the actual efficacy of our product candidates in humans.

Under Project BioShield, the Secretary of HHS can contract to purchase MCMs for the SNS prior to FDA approval of the countermeasure in specified circumstances. Project BioShield also allows the FDA commissioner to authorize the emergency use of medical products that have not yet been approved by the FDA under an EUA. If our product candidates are not selected under this Project BioShield authority, they generally will have to be approved by the FDA through traditional regulatory mechanisms for distribution in the United States.

We may experience unforeseen events or issues during, or as a result of, preclinical testing, clinical trials or animal efficacy studies. These issues and events, which could delay or prevent our ability to receive regulatory approval for a product candidate, include, among others:

- our inability to manufacture sufficient quantities of materials for use in trials;

- the unavailability or variability in the number and types of subjects for each study;

- safety issues or inconclusive or incomplete testing, trial or study results;

- drug immunogenicity;

- lack of efficacy of product candidates during the trials;

- government or regulatory restrictions or delays; and

- greater than anticipated costs of trials.

*We may fail to select or capitalize on the most scientifically, clinically or commercially promising or profitable product candidates.*

**EMERGENT BIOSOLUTIONS INC.**

We continue to evaluate our product development strategy and, as a result, may modify our strategy in the future. In this regard, we may, from time to time, focus our product development efforts on different product candidates or may delay or halt the development of various product candidates. We may change or refocus our existing product development, commercialization and manufacturing activities based on government funding decisions. This could require changes in our facilities and our personnel. Any product development changes that we implement may not be successful. In particular, we may fail to select or capitalize on the most scientifically, clinically or commercially promising or profitable product candidates or choose candidates for which government development funds are not available. Our decisions to allocate our research and development, management and financial resources toward particular product candidates or therapeutic areas may not lead to the development of viable commercial products and may divert resources from better business opportunities. Similarly, our decisions to delay or terminate product development programs may also prove to be incorrect and could cause us to miss valuable opportunities.

## INTELLECTUAL PROPERTY RISKS

*If we are unable to protect our proprietary rights, our business, financial condition, operating results, and cash flows could be materially harmed.*

Our success will depend, in large part, on our ability to obtain and maintain protection in the United States and other countries for the intellectual property incorporated into or covering our technology, products, and product candidates. Obtaining and maintaining protection of our intellectual property is very costly. The patentability of technology in the biopharmaceutical field generally is highly uncertain and involves complex legal and scientific questions.

We may not be able to obtain additional issued patents relating to our technology or products. Even if issued, patents may inadvertently lapse or be challenged, narrowed, invalidated, or circumvented, and such happenings could limit our ability to stop competitors from marketing similar products or limit the duration of patent protection we may have for our products. In the past, we have abandoned the prosecution and/or maintenance of patent applications related to patent families in the ordinary course of business. In the future we may choose to abandon such prosecution and/or maintenance in a similar fashion. If these patent rights are later determined to be valuable or necessary to our business, our competitive position may be adversely affected. Changes in patent laws or administrative patent office rules or changes in interpretations of patent laws in the United States and in other countries

may diminish the value of our intellectual property, narrow the scope of our patent protection, or result in costly defensive measures. In addition, some countries do not grant patent claims directed to methods of treating humans and, in these countries, patent protection may not be available at all to protect our products or product candidates.

Changes to the U.S. patent system under the Leahy-Smith America Invents Act (the America Invents Act), affected the way patent applications are filed, prosecuted and litigated. For example, the America Invents Act enacted proceedings involving post-issuance patent review procedures, such as inter parties review (IPR) post-grant review (PGR) and covered business methods review (CBM). These proceedings are conducted before the Patent Trial and Appeal Board (the PTAB) of the U.S. Patent and Trademark Office. Each proceeding has different eligibility criteria and different patentability challenges that can be raised. In this regard, the IPR process permits any person (except a party who has been litigating the patent for more than a year) to challenge the validity of some patents on the grounds that it was anticipated or made obvious by prior art. As a result, non-practicing entities associated with hedge funds, pharmaceutical companies who may be our competitors and others have challenged certain valuable pharmaceutical U.S. patents based on prior art through the IPR process. A decision in such a proceeding adverse to our interests could result in the loss of valuable patent rights which would have a material adverse effect on our business, financial condition, results of operations and growth prospects. The America Invents Act and any other potential future changes to the U.S. patent system could increase the uncertainties and costs surrounding the prosecution of our patent applications and the enforcement or defense of our issued patents, all of which could have a material adverse effect on our business, financial condition, results of operations and growth prospects.

The cost of litigation to uphold the validity of patents to prevent or stop infringement or to otherwise protect or enforce our proprietary rights could be substantial and, from time to time, our patents may be subjected to opposition proceedings or validity challenges. Some of our competitors may choose to or be better able to sustain the costs of complex patent litigation. Intellectual property lawsuits are expensive and unpredictable and consume management's time and attention and other resources, even if the outcome is successful. In addition, there is a risk that a court could decide that our patents are not valid, are unenforceable, or are not infringed by a competitor product. There is also a risk that, even if the validity of a patent is upheld, a court could refuse to stop the other party from using the invention(s), including on the grounds that its

55

## EMERGENT BIOSOLUTIONS INC.

### SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

EMERGENT BIOSOLUTIONS INC.


By: /s/ROBERT G. KRAMER, SR.
Robert G. Kramer, Sr.
President, Chief Executive Officer and Director
(Principal Executive Officer)


Date: April 30, 2020


By: /s/RICHARD S. LINDAHL
Richard S. Lindahl
Executive Vice President, Chief Financial Officer and Treasurer
(Principal Financial and Accounting Officer)


Date: April 30, 2020


66