**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| IN RE EMERGENT BIOSOLUTIONS INC. SECURITIES LITIGATION | Civil No. 8:21-cv-00955-PWG<br><br>CLASS ACTION |
| THIS DOCUMENT RELATES TO:<br><br>All Actions | |

**MEMORANDUM IN SUPPORT OF**
**LEAD PLAINTIFFS' MOTION FOR JUDICIAL NOTICE**

**TABLE OF CONTENTS**

I.    BACKGROUND ........................................................................................................ 1

    A.    The FAC's Allegations .............................................................................. 1

        1.    Overview Of The Alleged Fraud ................................................... 1

            a.    The Business Operations Fraud ...................................... 2

            b.    The Reported Results Fraud........................................... 6

            c.    The Internal Controls Fraud........................................... 6

        2.    The FAC's Allegations Evidencing Falsity ................................. 7

        3.    The FAC's Allegations Evidencing Scienter ............................. 13

        4.    The FAC's Alleged Partial Corrective Disclosures ................... 16

    B.    Defendants' Dismissal Arguments .......................................................... 18

II.   THE JUDICIAL NOTICE MATERIALS ........................................................ 20

III.  ARGUMENT........................................................................................................ 30

IV.   CONCLUSION.................................................................................................... 34

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Barry v. Novartis Pharms. Corp.*, No. 3:22CV196 (DJN),
2022 WL 2373452 (E.D. Va. June 30, 2022) ..............................................................32

*Binks v. US Tech Sols.*, No. 2:20-cv-4164-DCN-MGB,
2021 WL 2679697 (D.S.C. June 30, 2021)..................................................................34

*Hall v. Virginia*,
385 F.3d 421 (4th Cir. 2004) ......................................................................................31

*Horne v. Novartis Pharms. Corp.*,
541 F. Supp. 2d 768 (W.D.N.C. 2008) ......................................................................33

*In re 201 N. George St., LLC*,
551 B.R. 786 (N.D. W. Va. Bankr. 2016)...................................................................33

*In re Harmony Holdings, LLC*,
393 B.R.409 (D.S.C. 2008)..........................................................................................34

*In re Human Genome Scis. Inc. Sec. Litig.*,
933 F. Supp. 2d 751 (D. Md. 2013).............................................................................32

*In re Humphrey Hosp. Tr., Inc. Sec. Litig.*,
219 F. Supp. 2d 675 (D. Md. 2002).............................................................................34

*In re Under Armour Sec. Litig.*,
540 F. Supp. 3d 513 (D. Md. 2021).....................................................................31, 32, 33

*Jacobus v. Huerta*,
No. 3:12-CV-02032, 2013 WL 673233 (S.D.W. Va. Feb. 22, 2013),
*report and recommendation adopted*, No. CIV.A. 3:12-02032,
2013 WL 1723631 (S.D.W. Va. Apr. 22, 2013),
*aff'd,* 540 F. App'x 208 (4th Cir. 2013).............................................................32, 33

*Johnson v. Pozen Inc.*, No. 1:07CV599,
2009 WL 426235 (M.D.N.C. Feb. 19, 2009),
*report and recommendation adopted*, No. 1:07CV599,
2009 WL 10680297 (M.D.N.C. Sept. 29, 2009)........................................................32

*Lee v. Virginia State Bd. of Elections*,
188 F. Supp. 3d 577 (E.D. Va. 2016),
*aff'd*, 843 F.3d 592 (4th Cir. 2016) ..........................................................................31

*Mikos v. Abbott Lab'ys.*, No. GLR-21-912,
2021 WL 5416534 (D. Md. Nov. 18, 2021) ................................................................31

*Nat'l Fed. of the Blind v. U.S. Abilityone Comm.*,
421 F. Supp. 3d 102 (D. Md. 2019) ...........................................................................34

*Papasan v. Allain*,
478 U.S. 265 (1986) ...................................................................................................31

*Philips v. Pitt Cty. Mem. Hosp.*,
572 F.3d 176 (4th Cir. 2009) .....................................................................................31

*Phillips v. Univ. of Maryland Baltimore Cnty.*, No. CV ELH-19-570,
2020 WL 1820080 (D. Md. Apr. 10, 2020) ..........................................................33, 34

*Prelich v. Med. Res., Inc.*,
813 F. Supp. 2d 654 (D. Md. 2011) ...........................................................................33

*Sayman v. Lehman Bros. FSB*, No. 3:13-cv-288-RJC-DSC,
2014 WL 2013353 (W.D.N.C. May 16, 2014) ...........................................................33

*Shah v. GenVec, Inc.*, No. CIV.A. DKC 12-0341,
2013 WL 5348133 (D. Md. Sept. 20, 2013) ...............................................................32

*Shore v. Charlotte-Mecklenburg Hosp. Auth.*,
412 F. Supp. 3d 568 (M.D.N.C. 2019) .......................................................................32

*Tchatchou v. India Globalization Cap. Inc.*, No. CV PWG-18-3396,
2021 WL 307415 (D. Md. Jan. 29, 2021) ...................................................................32

*U.S. v. Garcia*,
855 F.3d 615 (4th Cir. 2017) .....................................................................................31

## Statutes

Food, Drug, and Cosmetic Act ...........................................................................................9

Freedom of Information Act (FOIA) .........................................................7, 10, 11, 13, 15, 16

Sarbanes-Oxley Act (SOX).............................................................................................6, 7

Securities Exchange Act of 1934 §§10(b) and 20(a) ...........................................................1

## Rules

Fed. R. Civ. P. 12(b)(6)...........................................................................................31, 32

Fed. R. Evid. 201 ...................................................................................................1, 30

SEC Rule 10b-5 ........................................................................................................................1, 2

Lead Plaintiffs Nova Scotia Health Employees' Pension Plan and City of Fort Lauderdale Police & Firefighter's Retirement System respectfully seek, pursuant to Fed. R. Evid. 201(b) and (c)(2), judicial notice of a recently published Congressional report, press release, and supporting materials assembled by Congress, including manufacturing contracts, inspection reports, emails, and other documents concerning Defendant Emergent's Bayview facility at the heart of this lawsuit that were created, sent, or received by the Individual Defendants and other senior Emergent executives; by governmental entities like the FDA, HHS, and BARDA which contracted with Emergent to reserve Bayview manufacturing capacity; and/or by AstraZeneca and J&J, the two companies that contracted to manufacture COVID vaccines at Bayview. The Congressional report and its supporting documents are archetypal subjects for judicial notice. They are publicly available government documents that present further findings and evidence augmenting earlier Congressional reports, hearings, and supporting materials pled in Lead Plaintiffs' First Amended Class Action Complaint (Dkt. No. 54) ("FAC"). Moreover, the report and its supporting documents corroborate extensive sections of the FAC and speak directly to arguments in Defendants' pending motion to dismiss (Dkt. No. 72) ("Motion").

## I.    BACKGROUND

Lead Plaintiffs' FAC, filed on March 19, 2022, pleads class action claims under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5. On May 19, 2022, Defendants filed their Motion with a memorandum of law (Dkt. No. 72-1) ("Memo") and 51 documents for which they sought judicial notice.

### A.    The FAC's Allegations

#### 1.    Overview Of The Alleged Fraud

The FAC pleads that Defendants engaged in a billion-dollar, multi-prong securities fraud via public statements and omissions during the Class Period of March 10, 2020 to November 4, 2021 by Defendant Emergent and Individual Defendants Robert Kramer (its CEO), Richard Lindahl (its EVP, CFO, Treasurer), and Syed Husain (its SVP, Head of Contract Development and

1

Manufacturing).  ¶¶2-14, 129-235.[1]  It alleges that Emergent was uniquely positioned to aid the fight against COVID-19, given that its Bayview facility was one of just three facilities the U.S. government had approved and reserved to ensure pandemic vaccine supply.  ¶3; *see also* FAC §§V.A.-C.   Driven by Operation Warp Speed, Emergent's Contract Development and Manufacturing (CDMO) segment signed $1 billion in contracts with the U.S. government, J&J, and AstraZeneca.  ¶3; *see also* FAC §V.D.  Emergent began manufacturing bulk drug substance, the feedstock for vaccines, for AstraZeneca in Bayview Area 3 in August 2020 and for J&J in Bayview Areas 1 and 2 in November 2020.  *Id.*  Each batch of J&J drug substance translated to ~10 - 15 million COVID-19 vaccine doses, while an AstraZeneca batch equated to ~2.5 - 3 million vaccine doses.  ¶55.  Emergent's Class Period revenues and earnings soared, driven by the CDMO segment, *e.g.*, 2020 revenues topped $1.5 billion, a single-year 30% increase of $450 million over 2019, as CDMO 2020 revenues of $450.5 million were up 550% ($370.5 million) over 2019.  ¶56.

### a.    The Business Operations Fraud

First, FAC §V.F.1. alleges a Business Operations Fraud, which misrepresented CDMO segment operations and performance and the capabilities, equipment, staffing, and training at Bayview and Emergent's other facilities, particularly with regards to anti-contamination measures – both before and after a March 31, 2021 *New York Times* report (the first alleged partial corrective disclosure discussed *infra*) that 15 million doses of J&J COVID-19 vaccine were discarded because of contamination at Bayview.  ¶¶129-219.  For example:

• Pre-March 31, 2021.  Before March 31, 2021, *inter alia*:  the 4/23/2020 Press Release touted Bayview as "CIADM designed for rapid manufacturing of vaccines… in large quantities during public health emergencies" and Husain said Emergent "will leverage [its] capabilities and capacities up to 300 million doses to advance [J&J's]…vaccine" (¶131);  on the 4/30/2020 Earnings Call, Kramer said "We have proven manufacturing capabilities in place and, in concert with the U.S. government, have built the ability to quickly advance early stage

---

[1]    Herein, unless otherwise noted, all "¶" references are to the FAC's numbered paragraphs, all "§" references are to the FAC's sections, all defined terms have the definitions assigned in the FAC, and all emphasis is added.

candidates through development to commercial-scale manufacturing" and Husain said Emergent has "large scale manufacturing readiness, with a validated process for Johnson & Johnson, supported by our operational capacity of up to 300 million doses annually" (¶¶5, 134(b)); the 5/8/2020 Emergent FDA 483 Response said "We acknowledge the observations from this recent [FDA] inspection and…have taken immediate, holistic and comprehensive measures to address the deficiencies," "[o]ur Training Program defines the requirements for all training activities supporting GxP operations…[and] is applicable to all permanent employees and contingent workers (temporary employees, consultants, contractors, vendors), involved in…the…manufacture…of all products produced at…Bayview," [2] "all employees/contingent workers are required to have training completed prior to performing a task or procedure," "[a]s of 08 May 2020, all employees/contingent workers performing activities, are confirmed to be trained on the task they are performing," and a series of SOP revisions to correct deficiencies in the labeling, transfer, storage, and disposal of waste materials to prevent contamination or mix-ups (¶¶5, 136(d)); the 4/23/2020, 6/11/2020, 7/6/2020, and 7/27/2020 Press Releases all touted Bayview's "unique capabilities across four independent suites to produce at clinical scale…while at the same time scaling up to enable large-scale manufacturing to up to 4000L to prepare for production of commercial volumes to meet customer demand" and "capacity to produce tens to hundreds of millions of doses of vaccine on an annual basis" (¶¶5, 131, 143, 148, 155); Defendant Lindahl said at the 9/14/2020 Conference "Bayview …was designed expressly for the purpose in partnership with the government of dealing with an emergency just like COVID" and has "4 separate manufacturing suites that are very flexible, and each one can handle a different set of applications and be set up to move very rapidly, and that's exactly what we're doing right now" (¶164); when an analyst asked on the 11/5/2020 Earnings Call about Emergent's ability to handle multiple COVID19 vaccine clients, Husain said its facilities are "designed to handle multiple products" and its "Bayview…right now, [ ] is predicated on multiple products being in there"

---

[2]      GxP is a set of quality guidelines and regulations created to ensure bio / pharmaceutical products are safe, meet their intended uses, and adhere to quality processes during their manufacturing, control, storage, and distribution.

(¶168(b)); on the 2/18/2021 Earnings Call, Kramer said "Biologics Manufacturing is an exacting process that requires specialized equipment, disciplined processes and a highly trained staff…service providers must have durable, scalable and compliant manufacturing infrastructures. Emergent has been able to thrive in this environment" and Husain said "J&J…said…their short-term goal is to provide as many as 100 million doses to the U.S. government in the first half of 2021 and we're right on schedule to support that" (¶¶5, 179(b)); and Kramer said "we're producing on a daily basis, 24/7, both AZ and J&J products and we are operating at a level where our capacity is well in excess of 1 billion doses annually for those products" and "because of the large-scale infrastructure we put in place, we were able to take on J&J and AstraZeneca's products…and be able to scale it at a very significant level" (¶185).

• Post-March 31, 2021. Defendants' false or misleading statements, many intended to mute impacts from partial corrective disclosures (discussed *infra*), included, *inter alia*: Kramer said "[I]t isn't the case or wasn't the case where an ingredient from one vaccine contaminated or impacted the other. It was more simply the fact that a one production run, one batch of product was determined to be inconsistent with our quality specifications of Emergent and J&J and subsequently, that batch was pulled aside and will not be processed further" in his 4/1/2021 CNBC Interview (¶189); the 4/1/2021 Form 8-K said only a "single batch of drug substance was identified that did not meet specifications," "[d]iscarding a batch of bulk drug substance…does occasionally happen during vaccine manufacturing," the "Bayview facility has been designed and validated to meet all current Good Manufacturing Practices," and "[w]e continue to manufacture in support of our customers and the U.S. government, and we remain confident in our ability to meet the FDA requirements" (¶187); after news that J&J would take control of Bayview and AstraZeneca vaccine would no longer be manufactured there, the 4/5/2021 Form 8-K called the AstraZeneca ramp down "mutually agreed," adding "Emergent continues to own the facility and perform its contracts consistent with its obligations to all of its customers and in compliance with the regulatory standards promulgated by the FDA and all other applicable regulatory authorities," and touting Emergent's "ability to quickly scale up to produce COVID-19 vaccines at a current rate of more

than one billion dose-equivalents annually" (¶191); Emergent called media reports of ingredient contamination a "'mischaracterization of the situation'" as quoted in the 4/5/2021 J.P. Morgan Analyst Report (¶193); the 4/14/2021 Kramer Op-Ed decried media "misinformation" and instead called it a "setback" that "a batch of Johnson & Johnson vaccines [ ] did not meet specification" which "does occasionally happen," adding "Our Bayview facility…is now ready to produce 1 billion vaccines a year to fight COVID-19" (¶195); the 4/21/2021 Press Release termed the J&J incident "correctible" "shortcomings in our manufacturing facilities or process" (¶197); on  the 4/29/2021 Earnings Call, Kramer committed to "quickly" and "safely" resolve Bayview's issues, adding "Emergent has been steadfastly committed to quality" and Bayview was "capable of producing hundreds of millions of COVID-19 vaccines" (¶199(b)); the 4/30/2021 Emergent FDA 483 Response said "Emergent is confident that potential routes of contamination and cross-contamination have been evaluated and appropriate actions to address such routes are being implemented" and "Emergent…knows that it must do everything within its power to ensure appropriate controls are in place to assure product quality.  We're doing just that," listed anti-contamination and training corrective actions to address the nine negative observations from the FDA's Bayview inspection, said their implementation "ensures that [ ] Bayview…is continuously operating in a state of control" and "Bayview…stands ready to produce drug substances," (¶201(a)-(k)); the 6/11/2021 Press Release sought to mute news that FDA required Emergent to discard 60 million J&J doses due to contamination by touting two batches deemed as suitable, adding "Emergent is actively addressing issues identified by the FDA at [ ] Bayview" and "We look forward to working with the FDA and Johnson & Johnson toward the release of additional batches and resuming production at [ ] Bayview" (¶209); and on the 7/29/2021 Earnings Call, Kramer touted Emergent's "proven manufacturing capabilities" and "[d]espite recent challenges, we have continued to execute across all aspects of the business [including] CDMO" (¶213(b)).

• Kramer's 5/19/2021 Congressional Testimony. Kramer testified under oath that he took "full responsibility" for Bayview's shutdown, before misrepresenting the contamination problem's scope, saying only a "single batch of Johnson & Johnson's COVID-19 vaccine

candidate failed routine quality control testing," "testing was also conducted on other batches that were in process, which did not detect the presence of the AstraZeneca virus," "there was no indication that the AstraZeneca manufacturing would have been subject to contamination," and "the contamination incident that led to the shutdown of new vaccine production at Bayview was very serious and completely unacceptable" but "isolated to a single batch." ¶205(a).  He testified that "the contamination event was identified through our quality control procedures," prompting a Congressman's grilling that got him to admit that a J&J facility in the Netherlands detected it. ¶205(b)(i).  He testified that Emergent had "made significant progress" in implementing remedial measures in the 4/30/2021 Emergent FDA 483 and "We are very close to completing them, and I would expect we will be in a position to resume production within a matter of days."  ¶205(b)(iv). He testified, "Emergent does not believe its employees were inadequately trained."  ¶205(c).  He conceded that "the accelerated development and production plan did increase the likelihood that issues would arise with respect to production batches of drug bulk substance and that some would need to be discarded," without disclosing the huge quantity that needed to be discarded.  *Id.*

### b. The Reported Results Fraud

Second, FAC §V.F.2. pleads a Reported Results Fraud, whereby Defendants filed Forms 10-Q and 10-K reporting Emergent's purportedly positive quarterly and annual financial results (*e.g.*, revenues and earnings) and operating metrics (*e.g.*, backlog) both consolidated and for the CDMO segment, which Defendants attributed to Emergent's U.S. government, J&J, and AstraZeneca contracts to make vaccines at Bayview.  ¶¶220-226.  These statements, notwithstanding any facial compliance with GAAP, were materially false and misleading , in violation of SEC Regulation S-K, Item 303, because they concealed negative underlying trends that, among other things, required reversal of $86 million in revenues and lowering of reported forecasts and backlog.  ¶¶227-230.

### c. The Internal Controls Fraud

Third, FAC §V.F.3. alleges an Internal Controls Fraud, misrepresenting the sufficiency of Emergent's internal controls via false or misleading Sarbanes-Oxley Act (SOX) certifications

signed by Kramer and Lindahl.  ¶¶231-235.  They attested that Emergent's Forms 10-Q and 10-K did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances…not misleading" and the financial statements and information "fairly present in all material respects the financial condition, results of operations, and cash flows" of Emergent.  ¶¶232-234.  They also attested that they had disclosed to Emergent's auditors and audit committee "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information" and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in [Emergent's] internal controls over financial reporting." *Id.*  They attested that they had designed Emergent's "disclosure controls and procedures" or caused them to be designed "to ensure that material information relating to [Emergent] is made known to us by others" and had "evaluated the effectiveness" of such controls and presented their "conclusions about the[ir] effectiveness." *Id.*  They also attested as to Emergent's "internal control over financial reporting" to "provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes." *Id.*

### 2.    The FAC's Allegations Evidencing Falsity

Contrary to Defendants' public statements, FAC §V.E. details 55+ pages of Undisclosed Material Negative Facts evidencing internally known deficiencies and problems at Bayview and Emergent's CDMO facilities that gave rise to persistent, serious contamination risks.  ¶¶58-126.  These facts were:  (i) described by 10 former Emergent employees who worked at Bayview or at Emergent's headquarters (¶¶27-37) and gave Confidential Witness (CW) statements (§V.E.1. ¶¶59-69); (ii) documented by FDA inspection reports across Emergent's CDMO facilities footprint and Emergent's responses (§V.E.2. ¶¶70-116), including Bayview inspections on April 9-20, 2020 and April 12-20, 2021 (§V.E.2.b. ¶¶108-116; §V.F.4. ¶¶245-246, 251, 254, 256), which Lead Plaintiffs obtained via FOIA requests; (iii) revealed through reports by *The New York Times*, *AP*, and other outlets and by Defendant Kramer's Op-Eds (FAC §V.E.3. ¶¶117-120; §V.F.4. ¶¶237-

7

238, 241, 250, 258(d)); and (iv) revealed by the U.S. House of Representatives Committee on Oversight and Reform and Select Subcommittee on the Coronavirus Crisis ("House Committees"), which disclosed evidence and summarized findings from their ongoing investigation in the 5/19/2021 Congressional Memo (§V.E.4. ¶¶121-126).  Using these facts, the FAC pleads with particularity how Defendants' misstatements and omissions were materially false and misleading.

First, the Business Operations Fraud misrepresented and concealed material undisclosed facts pled in in FAC §§V.E.1.-4., V.F.4., and V.G.1., which, as pled in the FAC, "holistically [ ] create[d] a clear and persistent pattern of serious deficiencies and grave contamination risk that existed at the Bayview facility at all relevant times, regardless of whether any single fact pled [in the FAC] had yet arisen at precisely the time of a specific misstatement…, because a sufficient number of the facts pled [ ] existed throughout the entire Class Period, with more and more facts arising over time that corroborated and augmented the earlier ones." ¶¶219(a)-(f).  Specifically:

- CWs.  The CWs described widespread problems at Bayview with mold, facilities, equipment, processes, personnel, and training predating the Class Period that posed significant contamination risks.  ¶219(a); §V.E.1.  The CWs said, *inter alia*, that Husain was told of the mold (per CW1) and an "all hands on deck" investigation occurred after the March 2021 FDA inspection (per CW2); employees unsuccessfully tried to fix contamination or hide mold before FDA investigators arrived (per CW3, CW9); the number of contamination alerts increased during the Class Period (per CW6); a COVID-19 vaccine sample requested by the FDA during the September 2020 inspection was mislabeled and could not be found (per CW7); the sample storage area was too small (per CW8); bags of unsterilized hazardous waste were carried through Bayview's sterile areas every Wednesday at 7:00 a.m. (per CW9); employees who raised concerns were terminated (per CW1, CW5); employees were pressured to give sign-off to incorrect documents and data (per CW6); Husain and other executives did not convey the full extent of Bayview's problems to clients (per CW5); the CDMO segment's VP of Development Services tried to prevent notetaking or note sharing from meetings (per CW5); and enhanced training and SOPs that Emergent promised to do during the manufacturing shutdown were not implemented (per CW9, CW10).  *Id.*  Significantly,

8

the CWs cross-corroborate both each other and the new reports, Congressional findings, and reports by the FDA, J&J, AstraZeneca, and Emergent investigators pled in the FAC.  *Id.*

• Inspection reports / responses.  Emergent was repeatedly warned before and during the Class Period of the scope and extent of problems pervading Bayview and its CDMO facilities, through government and client inspections, inspection reports / Forms 483, and regulators' engagement with Emergent staff and "senior management" on-site and during Emergent's Form 483 responses – a clear record of persistent deficiencies in facilities, equipment, processes, personnel, and training, with resulting contamination risks.  ¶219(b); §§V.E.2. and V.F.4.  The FAC details *17* inspection reports or Forms 483 issued by government regulators, including *four* about Bayview – the 4/20/2020 FDA Inspection Report, 4/20/2020 FDA 483 Report, 6/17/2020 Warp Speed Report, and 4/21/2021 FDA 483 Report – and a *fifth* report regarding Bayview by J&J, the 7/24/2020 Janssen Audit Report.  *Id.*; *see also* ¶¶110(a)-(l), 111, 123, 124(a)-(b).  The FAC also details *seven* Emergent Form 483 responses, including *two* regarding Bayview – the 5/8/2020 Emergent FDA 483 Response and 4/30/2021 Emergent FDA 483 Response.  *Id.*; *see also* ¶¶113, 124(c), 125, 136(a)-(e), 201(a)-(k).  These documents communicate serious, recurrent contamination risks from inadequate sanitization, insufficient decontamination, facilities and equipment shortcomings, deficient or disregarded procedures that violated GMP, poorly trained personnel, and failure to investigate known problems or violations – risks that led to the J&J contamination at Bayview.  ¶219(b).[3]  Notably, Kramer testified that he did not dispute the FDA's findings and that he personally read "most" of the FDA's reports.  *Id.*; §§V.E.2.b.ii. and V.G.1.

• Investigative journalism.  Journalists uncovered the fraud by reporting on non-public investigations by the FDA, BARDA, J&J, AstraZeneca, and Emergent's quality investigators and incrementally disclosing the concealed scope of contamination issues and discarded drug substance batches.  ¶219(c); §§V.E.3. and §V.F.4.  *The New York Times* first revealed that human error caused J&J drug substance to be cross-contaminated by AstraZeneca

---

[3] GMP means Good Manufacturing Practice regulations promulgated by the FDA under the Food, Drug, and Cosmetic Act, requiring drug manufacturers to take proactive steps to ensure products are safe, pure, and effective.

material and that J&J – not Emergent – spotted it. *Id.* Its investigation and review of internal Emergent documents revealed a "corporate culture that often ignored or deflected missteps" where "top Emergent leadership tolerated and even encouraged the flouting of federal standards for manufacturing," leading to "critical" risks of viral and microbial contamination. *Id.* It found a "pattern of lapses suggested deeper quality issues" due to failure to follow industry standards, to maintain sanitary facilities, to adequately train personnel, to investigate issues, or to fix repeated disinfection and contamination prevention problems. *Id. The New York Times* – not Defendants – disclosed that Emergent discarded one AstraZeneca drug substance batch (equal to ~ 2-3 million vaccine doses) in October 2020 due to contamination, one J&J drug substance in November 2020 after workers suffocated the virus-growing cells, four AstraZeneca batches (~ 8-12 million doses) in December 2020 due to "bacterial contamination of equipment," and 15 million J&J dose equivalents in early February 2021 due to AstraZeneca cross-contamination – part of 60+ million J&J dose-equivalents that would be discarded from Bayview. *Id.* The *AP* used FOIA to reveal the FDA's many citations of Bayview, *e.g.*, deficient and ignored anti-contamination procedures despite visual risks, a lack of compliance audits, failure to eliminate mold and residues on equipment and surfaces, data violations, and failures to investigate problems. *Id.*

•       Ongoing Congressional investigation. By the FAC's filing, after reviewing some FDA and Operation Ward Speed inspection reports and certain documents from Emergent, J&J, and AstraZeneca and after taking testimony from Emergent's Executive Chairman and Defendant Kramer, the House Committees investigating Emergent had already found that it was warned "multiple times" in 2020 that Bayview's serious manufacturing problems and deficient controls – *e.g.*, persistent mold, poorly disinfected equipment, inadequate training, deficient quality functions, substandard procedures, and deficient contamination control strategy – could cause contamination. ¶219(d); §V.E.4. The Committees found that Emergent knew of and admitted the problems, but failed to take sufficient remedial action, leading to recurrent incidents, *i.e.*, the discarded AstraZeneca batch (equal to ~ 2-3 million doses) in October 2020 due to contamination, the discarded J&J batch in November 2020 after workers suffocated the virus-growing cells, the

four discarded AstraZeneca batches (~ 8-12 million doses) in December 2020 due to "bacterial contamination of equipment," the 15 million J&J dose equivalents of drug substance contaminated with AstraZeneca material between January 19 - February 21, 2021 and discovered by March 5, 2021, and the 60 million dose-equivalents then under possible contamination review. *Id.*

   • Defendants' admissions. Defendants also conceded facts demonstrating that their statements and omissions were materially false or misleading. ¶219(f); §V.F.4. and §V.G.1. The 11/4/2021 Kramer Op-Ed admitted that Bayview never had the level of investment required to maintain its readiness. *Id.*; *see also* ¶¶11, 258(d). Kramer's 5/19/2021 Congressional Testimony admitted knowing of the 7/24/2020 Janssen Audit Report findings that Bayview had contamination issues and no plan to remedy them. *Id.*; *see also* ¶264. Kramer admitted during the 4/29/2021 Earnings Call and his 5/19/2021 Congressional Testimony that the J&J contamination months earlier occurred because of a failure of controls and ignored anti-contamination procedures. *Id.*; *see also* ¶¶205(a), 235, 249. The 4/30/2021 Emergent FDA 483 Response admitted that the AstraZeneca vaccine material likely contaminated the discarded J&J batch, that Defendants knew of the contamination "immediately" after it was detected, that Emergent's cross-contamination control procedures could not handle "the rapid ramp-up of full-scale manufacturing activities for two live virus Covid-19 vaccine drug substances," and that a broad array of reforms were needed. *Id.*; *see also* ¶251. In the 4/30/2021 CNBC Report, an Emergent spokesperson conceded the falsity of Kramer's statement in the 4/1/2021 CNBC Interview that "It isn't the case or wasn't the case where an ingredient from one vaccine contaminated or impacted the other." *Id.*; *see also* ¶250.

   Second, the Reported Results Fraud statements were materially false and misleading because they reported positive financial results and operating metrics, attributed primarily to the U.S. government, J&J, and AstraZeneca contracts, without disclosing underlying negative trends that ultimately forced Emergent to reverse $86 million of reported revenues and to lower forecasts. ¶¶228-230. Specifically concealed were, *e.g.*: (i) negative trends arising from facts pled in FAC §§V.E.1.-4., V.F.4., and V.G.1. evidencing pervasive, longstanding deficiencies in Bayview's facilities, equipment, processes, personnel, and training that were not investigated or remediated,

11

causing a significant and unabating risk of contamination or cross-contamination of either or both of the J&J and AstraZeneca drug substance (¶228); (ii) "execution of the CIADM program and the necessary operational investments by all [Presidential] administrations fell short of what was needed to maintain capability in case of an emergency," a negative trend before and during the Class Period, which Kramer disclosed on the 11/4/2021 Earnings Call (¶229(a); §V.F.4.); (iii) Emergent continued to take monthly $27 million payments from the U.S. government even after it could not perform any COVID vaccine manufacturing, a negative trend that unjustly enriched the company and improperly inflated drove its total to $271 million in government payments (¶229(b); §V.G.5.); (iv) Kramer belatedly disclosed on the 11/4/2021 Earnings Call the negative trend of significant, rising costs from attempts to comply with FDA inspection issues, stating, "Over the last five months, we've invested millions of dollars to overhaul cleaning procedures, upgrade our facilities, implement additional quality control and oversight practices, and make significant improvements to the processes for batch record keeping, personnel training, data integrity and lab testing" (¶229(c); §§V.E.2. and V.F.4.); and Lindahl revealed on the 11/4/2021 Earnings Call belatedly disclosed negative "trends," including a 9% lower "rolling backlog" due to the U.S. government contract termination and "lower capacity utilization for drug substance production at Bayview while it is solely dedicated to J&J's…vaccine," "investments…at Bayview in support of our quality enhancement plan," and "increased operating costs at [ ] Bayview," which "pressure[d]" CDMO margins 10% lower than the prior period (¶229(e); §V.F.4.), as well as the "clearly [ ] unusual circumstance" of the U.S. government failing to pay months' worth of contractual fees, which forced Emergent to "reverse[ ] $86 million of revenue" as of September 30, 2021, "remove[ ] accounts receivable balances related to uncollected amounts," and "reduce[ ] by $180 million" the value of the U.S. government contract while "tighten[ing] the range of our total revenues, which lowered the midpoint by $50 million" (¶229(d); §V.F.4.).

By concealing negative underlying trends, the Reported Results Fraud statements violated SEC Regulation S-K, Item 303.  ¶230.  The FAC pleads that the SEC is investigating Emergent regarding its 2020 10-K and its Q1 2021 10-Q and required Emergent to indicate how it considered

12

compliance with the Regulation S-K, Item 303 disclosure requirement. ¶227. Defendant Lindahl filed the 9/30/2021 SEC Letter confirming that Emergent "considered Item 303 of Regulation S-K in the preparation of its Form 10-K and Form 10-Q, concluding that nearly all of the increase in CDMO services revenue was related to the Company's COVID-19 related arrangements." *Id.*

Third, the Internal Controls Fraud statements were materially false and misleading because: (i) Emergent's Forms 10-Q and 10-K did, in fact, contain untrue statements of a material fact and omitted to state material facts necessary to make the statements made, in light of the circumstances in which they were made, not misleading and (ii) the alleged fraud involved management and employees with a significant role in Emergent's internal controls over financial reporting, but Kramer and Lindahl did not disclose it to Emergent's auditors or to its Board of Directors audit committee. ¶235. Kramer's 5/19/2021 Congressional Testimony also conceded that a failure of Emergent's internal controls led to the Bayview contamination: "I understand that we are here today to answer for, and to explain the circumstances that led to, the cross-contamination incident. I apologize for the failure in our controls that led to the contamination…."

### 3.      The FAC's Allegations Evidencing Scienter

The FAC's §V.G.1.-10. explains how these and other allegations holistically support a strong inference of Defendants' scienter. ¶¶260-308. Its §V.G.1. details Defendants' knowledge or reckless disregard of negative facts that rendered their public statements materially false and misleading. ¶¶261-268. Its ¶261(a) augments FAC §V.E.1. with CW statements establishing, *inter alia*, that Husain led regular meetings about COVID vaccine projects at Bayview, and was told of mold problems there, yet failed to disclose the extent of problems to Emergent's vaccine clients. ¶261(b) pleads that the FDA reports detailed in §V.E.2. documented a widespread contamination risk at Bayview and other facilities, which was relayed to Emergent's "senior management," and that Kramer testified that he did not dispute the FDA's findings and personally read "most" of the FDA's reports. ¶261(c) augments §V.E.3. and §V.F.4. by explaining that the *AP* and *New York Times* investigations, based on FOIA materials and internal Emergent documents, found significant deficiencies and anti-contamination deviations and a "corporate

13

culture that often ignored or deflected missteps" where "top Emergent leadership tolerated and even encouraged the flouting of federal standards for manufacturing," leading to "critical" contamination risks and the discarding of one AstraZeneca batch (~2-3 million doses) in October 2020 due to contamination; one J&J batch in November 2020 after workers suffocated cells; four AstraZeneca batches (~8-12 million doses) in December 2020 due to bacterial contamination; and J&J drug substance (~15 million doses) in February 2021 due to contamination. ¶261(d) ties these incidents to the Congressional investigation detailed in §V.E.4., which had found that Emergent was warned "multiple times" in 2020 that Bayview risked contamination from serious manufacturing problems and deficient controls, persistent mold, poorly disinfected equipment, insufficient training, substandard procedures, and deficient quality functions and contamination control strategy. ¶261(f) highlights Defendant admissions, like the 4/30/2021 Emergent FDA 483 Response's admissions that Emergent's cross-contamination control procedures could not handle the "rapid ramp-up of full-scale manufacturing activities for two live virus COVID-19 vaccine drug substances" and that Defendants knew "immediately" that AstraZeneca vaccine material had likely contaminated the discarded J&J batch and the Emergent spokesperson's admission in the 4/30/2021 CNBC Report that Kramer's prior interview statement ("It isn't the case or wasn't the case where an ingredient from one vaccine contaminated or impacted the other") was false.

§V.G.1. alleges extensive facts demonstrating Kramer's specific knowledge or reckless disregard of facts contrary to his public statements. ¶262 pleads his Bayview site visits during the Class Period and includes a photo of his giving a tour of it to the Governor of Maryland. The FAC recounts admissions in the 11/4/2021 Kramer Op-Ed that Bayview never had sufficient investment to maintain readiness (¶261(f)) and "we … understood the risks of producing two viral-vector vaccines in the same facility" (¶267), as well as Kramer's admission on the 4/29/2021 Earnings Call that the J&J contamination in early 2021 arose because of a failure of controls and disregarded anti-contamination procedures (¶261(f)). It cites Kramer's 5/19/2021 Congressional Testimony that he reads "the majority" of FDA inspection reports on Emergent's facilities (¶266), that he was "aware" in June 2020 of J&J's findings in the 7/24/2020 Janssen Audit Report, which found that

14

Bayview had a deficient contamination control strategy, a deficient disinfectant program against industry standards, and quality systems weaknesses requiring correction (¶¶124(b); 264), that such findings are "recorded in the company's systems to make sure that they are monitored and responded to appropriately and in a timely manner" (¶265); that "it is a well-known risk that if the precautions are not taken there is a likelihood of a cross-contamination" when producing drug substance from multiple viral products in a single plant (*id.*); and that he took "full responsibility" for the "very serious and completely unacceptable" contamination problems at Bayview, which caused the destruction of drug substance batches and the shutdown of production (¶263).

The FAC buttresses these allegations with others to holistically plead a strong scienter inference. §V.G.2. pleads that Kramer and Lindahl were motivated to commit the alleged fraud to capitalize on suspicious transactions in Emergent stock, options, and RSUs, which netted them $9.2 million+ in ill-gotten gains that drew Congressmembers' ire and that compare suspiciously against their base salaries, their transactions in the comparable pre-Class Period timeframe, and the alleged misstatements and partial corrective disclosures. ¶¶269-278. §V.G.3. alleges that the Individual Defendants were also motivated to commit fraud to permit themselves and senior executives (like Sean Kirk, Emergent's EVP for Manufacturing and Technical Operations) to reap suspicious performance-linked compensation increases and bonuses in early 2021 that were misaligned with the undisclosed negative facts pled in the FAC. ¶¶279-284. §V.G.4. and §V.G.5. plead that Emergent also capitalized on the alleged fraud by completing a $450 million offering (¶285) and by reaping hundreds of millions of dollars in unearned windfall payments from the U.S. government (¶¶286-288). FAC §V.G.6.-8. augment the knowledge and recklessness pleading by alleging that the fraud implicated Emergent's core operations (¶¶289-290); the Individual Defendants signed, were quoted in or SOX-certified the alleged misstatements (¶¶291-292); and the fraud violated Emergent's code of conduct (¶¶293-300). §V.G.9. alleges that the suspiciously timed resignations of Husain and senior executives including Sean Kirk further evidence scienter. ¶¶301-305. Finally, §V.G.10. pleads that after testimony by Kramer and Emergent, the House

15

Committees expanded their investigation and sent letters seeking documents from J&J and AstraZeneca and that the investigation's expansion and continuation support scienter.  ¶¶306-308.

### 4.      The FAC's Alleged Partial Corrective Disclosures

FAC §V.F.4. pleads that a series of partial corrective disclosures revealed the fraud.  ¶¶236-259.  They included: (i) on March 31, 2021, *The New York Times* reported that in late February 2021, J&J uncovered that "human error" at Bayview mixed J&J and AstraZeneca ingredients, contaminating 15 million J&J doses, forcing regulators to delay authorizing Bayview's production lines, and delaying shipment of 24 million J&J doses (¶237); (ii) on April 1, 2021, *AP* reported on a series of negative FDA inspection reports obtained through FOIA that found repeated violations for issues including training, waste disposal, and contamination at Bayview and other facilities (¶238);[4] (iii) on April 3, 2021, *The New York Times* reported that the Biden administration put J&J in charge of running the "troubled" Bayview facility and halted AstraZeneca production in "a significant setback and a public relations debacle for Emergent" (¶241); (iv) Emergent's 4/19/2021 Form 8-K disclosed that it agreed on April 16, 2021 to the FDA's request after an April 12, 2021 inspection that it not begin manufacturing any new material at Bayview and quarantine material already manufactured there (¶243); (v) the 4/21/2021 FDA Press Release and 4/21/2021 FDA 483 Report listed nine observations faulting Emergent for decontamination, sterilization, sanitization, cleaning, waste disposal, maintenance, process, personnel, and training failures in January to April 2021 that led to the manufacturing halt (¶245); (vi) on the 4/29/2021 Earnings Call, Lindahl stated lower projected CDMO revenues and earnings due to Bayview impacts, Kramer disclosed senior resignations including Husain, and Kramer admitted, "We believe that the batch was likely contaminated when one or more … precautions did not function as anticipated resulting in the transmission of the AstraZeneca virus to the Johnson & Johnson production suite" (¶249); (vii) on CNBC's April 30, 2021 program, an Emergent spokesperson walked back Kramer's April 1, 2021 false statement that "It isn't the case or wasn't the case where an ingredient from one vaccine

---

[4]      Details from these same reports, which Lead Plaintiffs obtained by FOIA request, are pled in FAC §V.E.2.

16

contaminated or impacted the other" (¶250); (viii) the 4/30/2021 Emergent FDA 483 Response confirmed "contamination" of the J&J drug substance, summarized Emergent's investigation, outlined remedial steps, and said, "Emergent also recognizes that the rapid ramp-up of full-scale manufacturing activities for two live virus Covid-19 vaccine drug substances revealed several areas for further strengthening with respect to the Bayview facility's cross-contamination control procedures" (¶251); (ix) on June 11, 2021, *The New York Times* reported that 60 million unusable J&J doses produced at Bayview would be discarded and 10 million more required a warning that regulators cannot guarantee that Emergent used proper manufacturing procedures and a *The Hill* report quoted an FDA official on the scope of its investigation (¶254); (x) on June 18, 2021, *The New York Times* reported that 100 million J&J and AstraZeneca doses made at Bayview remained in limbo while the FDA was "poring over records of virtually every batch that Emergent produced to determine if doses are safe" (¶256); (xi) the 11/4/2021 Earnings Form 8-K, 11/4/2021 Earnings Release, 11/4/2021 Earnings Call Slides, 11/4/2021 Contract Form 9-K, and the 11/4/2021 Earnings Call disclosed that the U.S. government CIADM contract for Bayview was terminated and Emergent would not realize $180 million left on it, Emergent's Head of Global Quality resigned, and Emergent reversed $86 million in Q3 2021 revenue and announced negative backlog and projections impacts (¶¶258(a)-(c)); (xii) the 11/4/2021 Kramer Op-Ed disclosed that government work sufficient to build and maintain Bayview's capabilities had not occurred, Emergent "understood the risks of producing two viral-vector vaccines in the same facility," yet "J&J vaccine was cross contaminated with the AstraZeneca vaccine," "Emergent has taken full responsibility for this incident," and additional Bayview batches remained under review (¶258(d).

The FAC pleads that these partial corrective disclosures, despite being muted by Defendants' continuing fraud and contemporaneous misstatements, prompted analyst reactions and drove declines in Emergent's stock price, damaging Lead Plaintiffs and the Class members. ¶¶239-240, 242, 244, 246-248, 252-253, 255, 257, 259, 317-322.[5]

---

[5]   Defendants' Motion does not present any argument seeking dismissal for failure to plead loss causation based on these partial corrective disclosures and correlating stock drops.

17

### B.    Defendants' Dismissal Arguments

Defendants' Motion, filed May 19, 2022, thematically over-simplifies the underlying issues to the mere contamination of a "single batch" (*e.g.*, *id.* at 4) of J&J vaccine drug substance in an isolated "contamination incident."  *See* Memo at 1-5, 7-8, 15, 20, 22-23, 25-27, 29-32, 34-35, 37.  From there, it argues that the FAC failed to sufficiently plead falsity and scienter.

Falsity.  Memo §II.A.1.c.i. at pages 13-21 critiques the 10 CWs' statements in isolation, divorced from each other and the many corroborating facts pled in the FAC.  *Id.* at 13-20.  It attacks the CWs for not providing precise dates (beyond their employment tenures) or outcomes to certain statements.[6]  It minimizes CW statements indicating that Emergent tried to mislead FDA inspectors, *e.g.*, by faulting CWs for describing "serious problems with mold" that were "concealed from FDA" but not clarifying if those problems later "went unaddressed" (*id.* at 16, 20, 21) and by baselessly arguing that a CW's recounting of the Bayview Head of Manufacturing's instructing employees "to carry bags of hazardous waste waiting to be sterilized through sterile areas of the facility" "right before the FDA came to inspect the Bayview facility in early 2021" somehow occurred after (not before) that inspection (*id.* at 20-21).  It faults the CWs for "not say[ing] what those problems [at Bayview] were, when they arose, that they were not fixed after the [FDA] inspection" (*id.* at 15, 17), "not alleg[ing] that the [Bayview] suite was not qualified when Emergent began production" (*id.* at 16), and "not alleg[ing] that Emergent remained unprepared by the time it started manufacturing vaccine drug substance" (*id.* at 14).  It even faults CWs for relaying that the early 2021 J&J contamination was "one of the many contaminations that occurred" at Bayview and for estimating that "one of every five batches of the J&J vaccine was

---

[6]    *See, e.g.*, "employees at Bayview were not adequately trained and lacked experience" (Memo at 19), "employees complained about training, staff, and equipment, and that the manufacturing department was understaffed and underequipped" (*id.* at 20), "Emergent did not have enough quality control employees on the microbiology team" (*id.* at 16) which was "understaffed, under-equipped, and undertrained" (*id.* at 17), "the QC department was understaffed" (*id.* at 21), "manufacturing remained short-staffed and provided inadequate training [which] led to errors and deviations from standard operating procedures, which increased significantly" (*id.* at 16), "manufacturing employees at Bayview did not follow standard operating procedures with respect to labeling" (*id.* at 18), "in September 2020…a lab technician did not follow procedures for cleaning equipment" (*id.* at 18), "samples were broken and lost more than average" (*id.* at 19), and "the number of contamination alerts increased during [a CW's] tenure" (*id.* at 18).

contaminated in some way" by arguing that they had to provide a precise date of occurrence, date of identification, and description of severity for each separate contamination incident (*id.* at 20).

Memo §II.A.1.c.ii. at pages 21-22 discounts the FAC's allegations as to FDA inspections of Bayview and other CDMO facilities. *Id.* at 21-22. It argues the widespread, similar issues the FDA identified at other facilities were insufficiently tied to Bayview and that the FAC did not adequately plead that the Bayview issues the FDA identified were "anything other than routine" or "not correctable." *Id.* It baselessly dismisses the FDA's April 2021 inspection, which again found serious ongoing issues at Bayview, because it followed the initial J&J contamination disclosure (during an alleged period of ongoing fraud) and thus looked "in hindsight." *Id.* at 22.

Memo §II.A.1.c.iii. at page 23 discounts the FAC's allegations from the April 2021 *New York Times* article. *Id.* at 23. Though the FAC alleges the article drew from investigations and audits by J&J, AstraZeneca, two federal agencies, and Emergent's own quality auditors and former employees, the Memo faults it for "not cit[ing] the basis for its conjecture." *Id.* The Memo also argues that *The New York Times* reporting revealing that Emergent had discarded other batches prior to the contaminated J&J batch disclosed in March 2021 failed to establish that the number of discarded batches was "unusual" or resulted from the same "type of contamination." *Id.*

Memo §II.A.1.c.iv. at pages 24-25 downplays the 5/19/2021 Congressional Memo as "preliminary Congressional findings" and "hindsight conclusions reached preliminarily by Congressional staff." *Id.* at 24. It discounts the evidence revealed by the 5/19/2021 Congressional Memo, including FDA' inspections of Bayview, the 6/17/2020 Warp Speed Report, and the 7/24/2020 Janssen Audit Report, by arguing that they noted that the serious issues they identified "can be addressed … within the timelines of [Operation Warp Speed]" and "can be mitigated with incremental support to the quality organization and appropriate planning to ensure training is performed," and the FAC failed to plead that "Emergent failed to address them." *Id.* at 24-25.

Scienter. The Memo attacks the FAC's knowledge and recklessness allegations. *Id.* at 31-33. It faults the CWs for insufficiently detailing the Individual Defendants' oversight of COVID-19 vaccine projects and not alleging they were "aware of any particular problem that ought to have

19

been conveyed [to J&J and AstraZeneca] or anything connecting the 'problems' to any alleged undisclosed risk." *Id.* at 31-32. It argues the FDA inspection reports "do not establish the risk asserted by the Complaint" and the investigative reporting and Congressional investigation pled "do not say anything about Defendants' knowledge other than that Defendants were aware of the communications with FDA." *Id.* at 32. It touts Emergent's investment in Bayview (amounting to less than 1/3 of the funds it reaped from its U.S. government, J&J, and AstraZeneca contracts), the fact that it "began" to hire and train over 300 "new" employees, and that 100 million viable vaccine doses were made from drug substance manufactured at Bayview. *Id.* at 33. It argues that Kramer "simply misspoke" when he falsely said in an April 1, 2021 interview that "it isn't the case where an ingredient from one vaccine contaminated or impacted the other." *Id.* It concedes that Kramer read the FDA's reports, knew that manufacturing multiple different drug substances in a single facility created a risk of cross-contamination, gave Governor Hogan a tour of Bayview and knew the facility, and said that a failure of controls caused the J&J cross-contamination, but argues that these undisputed facts do not support his scienter. *Id.* at 34-35. The Memo also seeks to undercut other scienter allegations, including those arising from the Individual Defendants' insider trading, compensation increases and bonuses, and resignations of Husain and senior executives like Sean Kirk. *Id.* at 35-40. It argues that the FAC's "allegations concerning the SEC and Congressional investigations … fail to support scienter because they are only investigations, and the Complaint does not plead that either reached a finding suggesting securities fraud." *Id.* at 39.

## II.    THE JUDICIAL NOTICE MATERIALS

On May 10, 2022 – nine days before Defendants filed their Motion – the House Committees released a report entitled "The Coronavirus Vaccine Manufacturing Failures of Emergent Biosolutions" ("5/10/2022 Congressional Report") (RJN Ex. 1) with ***findings*** from their investigation (that the FAC pled as being ongoing in ¶¶122, 306-308), as announced in a press release and backed by a trove of underlying evidence – much of it publicly released. Together, these materials, marked as RJN Exhibits 1 through 37, strongly corroborate the FAC and undercut Defendants' Motion, which fails to acknowledge the 5/10/2022 Congressional Report's filing.

20

The press release, entitled "Committees' Report on Emergent Biosolutions Uncovers Extensive Vaccine Manufacturing Failures, Deliberate Efforts to Hide Deficiencies" ("5/10/2022 Press Release") (RJN Ex. 2) stated, "The report presents findings from the Committees' year-long investigation of Emergent, which began in April 2021," during which "the Committees obtained documents from Emergent, Johnson & Johnson, AstraZeneca, FDA, and HHS, held bipartisan staff briefings with representatives from Johnson & Johnson, AstraZeneca, FDA, and HHS, and conducted a September 2021 staff site visit of Emergent's Bayview facility."  It summarized the reports' six key findings (discussed *infra*) and highlighted the House Committees' conclusions:

> New evidence shows that nearly ***400 million doses*** of coronavirus vaccines – ***significantly more than previously known*** – ***were destroyed because of Emergent's failure to meet or maintain quality standards at*** its ***Bayview*** manufacturing facility.  ***Internal communications reveal*** ***efforts by Emergent*** ***executives to hide evidence of contamination*** in an attempt ***to evade oversight*** ***from government regulators***.

It also quoted the Chairpersons' outrage over Defendants' conduct.[7]

The 5/10/2022 Congressional Report (RJN Ex. 1) set forth ***six "key findings*,*"*** supported by evidence, which build upon the "preliminary findings" in its prior 5/19/2021 Congressional Memo (pled in FAC ¶¶122-125), strongly corroborate the FAC's allegations, and undermine Defendants' Motion.  They are:

(1)      "***Nearly*** ***400 million doses of coronavirus vaccines have been destroyed as a result*** ***of Emergent's failure to meet or maintain quality standards***."  *See* RJN Ex. 1 at 1, 9-11.  The report summarized this staggering new total as follows:

> The Committees' investigation revealed that ***due to poor quality control*** approximately ***240 million vaccine doses had to be destroyed in late 2020 and*** ***early 2021 – significantly more than revealed*** previously [including]…more than 180 million doses manufactured before the [production] pause [and] an additional

---

[7]      Chairwoman Maloney said, "[O]ur report shows that Emergent's ***manufacturing failures*** and ***deceptive*** ***tactics*** led to the destruction of millions of doses of desperately needed vaccines.  Emergent's business practices are simply ***unacceptable*…."  Chairman Clyburn added the report "demonstrates how Emergent Biosolutions and its executives failed the American people through the contamination of hundreds of millions of desperately-needed vaccines at a pivotal point in the pandemic. ***These doses were squandered despite repeated warnings*** from employees, outside consultants, pharmaceutical companies, and FDA regulators that the company's manufacturing practices were unsafe and that it was unlikely to fulfill the contract" and "Emergent executives prioritized profits over producing vaccines in a responsible manner that complies with FDA requirements."

> 60 million doses [that] will have to be destroyed because they expired while in quarantine. *After* Emergent was permitted to resume manufacturing in *July 2021*, an additional *90 million newly manufactured* coronavirus vaccine *doses had to be destroyed for quality control reasons*, and *135 million remain sequestered* pending further testing.

*Id.* at 1.  Both AstraZeneca and J&J doses were destroyed in alarming numbers.

The report stated, "Documents obtained during the investigation show that *between October and November 2020*, *Emergent aborted or rejected seven batches of AstraZeneca's vaccine due to microbial contamination*."   RJN Ex. 1 at 9.   It added, "In *December 2020*, *microbial contamination* and equipment failure necessitated the *termination of roughly 30 million Johnson & Johnson doses*."   *Id.*   J&J told the House Committees in a briefing that "the reject rate at Emergent is typically higher than what we normally see."   *Id.*   The report continued, "*Six additional AstraZeneca batches were aborted or rejected between December 2020 and April 2021*," and "[a]ccording to AstraZeneca, *one-third of the commercial AstraZeneca batches* manufactured at Bayview *between July 2020 and April 2021 were either rejected or aborted due to Emergent's deficiencies*."   *Id.* at 10.[8]   In addition, *two J&J batches* (~30 million doses) were also "*terminated and discarded due to microbial contamination in March and April 2021*."   *Id.*

(2)  "***Emergent hid evidence of contamination from government investigators***." *Id.* at 1, 13-14.  Indeed, Emergent knowingly misled J&J, AstraZeneca, and government regulators:

> The investigation revealed that *Emergent took repeated steps to conceal its quality failures from the federal government and other third parties* by limiting access to Bayview, tampering with drug-substance labels to impede FDA oversight, and strategizing to withhold information from HHS following the cross-contamination event in March 2021.

*Id.* at 13.  Some obstruction concerned FDA's February 9-11, 2021 inspection to assess efforts to remediate deficiencies the FDA had noted in September 2020.  *Id.* at 13-14.  In an email thread (RJN Ex. 34), Emergent rebuffed J&J quality staff requests to access Bayview before the FDA's site visit:  "I appreciate your want to be onsite and tour, but I would prefer that we not add additional folks at this time."  In another thread (RJN Ex. 35), a consultant detailed for Emergent

---

[8]   The 5/10/2022 Congressional Report explains that "destroyed" batches include both "aborted" and "rejected" batches and explains the difference. *Id.* at n.1.

how one hour before the FDA's February 11th Bayview tour, yellow "hold tags" were removed by Emergent personnel from two J&J containers (1/3 of a batch), which were segregated due to potential quality issues, so as "to avoid drawing attention" to those containers by FDA inspectors; that Emergent's Quality Assurance Manager, Senior Manager in Quality Systems, Senior Director of Quality, and VP of Manufacturing Operations / acting Bayview site head all knew of the removal; and that the tags were replaced just after the inspection ended.

The FDA nevertheless found serious issues during the February 2021 inspection, which the Director of FDA's Center for Biologics and Evaluation Research described to the House Committees in a briefing. *See* RJN Ex. 1 at 14. He said Emergent was "operating in a manner still not in compliance with good manufacturing practices and still needed to make changes" and "[t]o be very blunt about it and very concrete, having many cross-contamination events – regardless of GMP – is still not acceptable." *Id.*

The investigation revealed more obstruction in March 2021. *Id.* Per AstraZeneca's letter to the House Committees, Emergent waited until March 26, 2021 to inform it and HHS of another batch cross-contamination that J&J detected three weeks earlier. *Id.* & n.71. A March 30-31, 2021 email thread (RJN Ex. 36) begins with BARDA's questions and requests for information from Emergent, prompting internal emails in which the Bayview Site Head of Quality told Defendant Husain, "They are getting too involved and I don't want to send anything that would contradict what J&J would have sent already. Please advise how to manage this email." – and he responded, "Pls respond along the following lines – Appreciate the questions, we are actively working on the investigation with Janssen, we will share details via Janssen as we conclude the investigation."

(3) "***Emergent executives promoted the company's manufacturing capabilities despite being warned of severe deficiencies***." RJN Ex. 1 at 1, 3-7. The investigation revealed a BARDA Quality Branch Evaluation titled "CGMP Quality Risk Analysis – Emergent Bayview Facility" (RJN Ex. 3) dated April 1, 2020 – just three weeks into the Class Period – which found that Bayview suffered from "substantial evidence of site cGMP non-compliance" and "risk to CIADM readiness" from "inadequate quality unit oversight" and a "failure of quality systems,"

such as "failing to follow site SOPs," "mishandling" of product, and "unqualified personnel."  The same month, an FDA inspection of Bayview identified multiple deficiencies, including that "employees are not given training in the particular operations they perform as part of their function and current good manufacturing practices" and that "separate or defined areas to prevent contamination or mix-ups are deficient."  RJN Ex. 1 at 3.

Nevertheless, from May 31-June 1, 2020, Defendant Husain sent emails (RJN Ex. 4) to AstraZeneca saying Emergent was "ready and focused on ensuring the AZ project is a success" and Bayview "is capable of producing four independent products simultaneously."  He executed the AstraZeneca contract (RJN Ex. 6) on June 10, 2020.

However, audits by J&J and AstraZeneca from June 9-18, 2020 found more issues at Bayview – J&J found that "the disinfectant program used in the facility," "the Quality Management Review process," and "the site virus contamination control strategy" were all deficient, RJN Ex. 1 at 4, while AstraZeneca's audit (RJN Ex. 5) identified "documentation control issues; contamination control deficiencies; an inadequate quality management system; inadequate computerized systems; and certain other faulty manufacturing and cleaning practices."  In briefings to the House Committees, both companies said they identified corrective actions Emergent needed to implement at Bayview to be ready for manufacturing, accepted its plans to do so, and understood they would work closely with Emergent.  RJN Ex. 1 at 4.  On June 23, 2020, the FDA sent an email (RJN Ex. 9) forwarding an Office of Pharmaceutical Manufacturing Assessment Post-Application Letter (RJN Ex. 8) to Emergent calling its responses to the April 2020 Bayview inspection deficient, stating that "remaining deficiencies" outlined therein "should be addressed," and "OPMA does not consider your facility ready to support commercial operations."

Internal email threads among Emergent executives (RJN Exs. 9, 10) followed on June 23-24, 2020, directly implicating Defendant Kramer.  *See* RJN Ex. 1 at 4-6.  On one thread, EVP of Manufacturing and Technical Operations Sean Kirk emailed SVP of Global Quality John Ducote calling the FDA letter "deeply concerning," adding "[t]hat concern is exponentially amplified as we ramp up to produce hundreds of millions of doses of covid vaccine," and demanding "Fix this."

24

RJN Ex. 9.  EVP and Chief Medical Officer Karen Smith emailed Mr. Kirk, saying, "It concerns me that John [Ducote] says, 'The level of expectation from the FDA is at a new level for us, and we'll need to adjust accordingly.'  My view is that we should always have been operating at a level that would pass an FDA audit!  [I]t is one thing to incur audit findings, but then we shouldn't also 'fail' the subsequent clean up plans."  *Id.*  Kirk responded that he "had the same response" and was "very frustrated" and that "The one thing about OWS [Operation Warp Speed] effort that keeps me up at night is this.  The perception of quality systems at bayview."  *Id.*  Ms. Smith responded, "I get the impression that you think our Quality group has room to improve?"  *Id.*  Kirk replied, "Yes, Room to improve is a huge understatement" because "[a]s our complexity as an org has increased our quality systems and associated harmonization have not kept pace," adding, "I've been on this soapbox for a few years with Adam [Havey], John [Ducote], and Bob [Kramer]."  *Id.* On a second thread, Kirk forwarded the FDA's letter to Defendant Kramer, saying "To our parking lot discussion at bayview last Friday [June 19, 2020], see below" and adding that while "we navigated the AZ and JNJ audits although they designated our systems not ready for commercial," a BARDA audit was upcoming and "[o]f all the things we have to deliver on OWS [Operation Warp Speed], the thing that keeps me up at night is overall perception of state of quality systems at bayview."  RJN Ex. 10.  Kramer responded, "We should discuss bringing in outside resources to get in front of this, while we recruit permanent resources to lead."  *Id.*

The 5/10/2022 Congressional Report found that Emergent finalized agreements with J&J and AstraZeneca "[d]espite Emergent's executives' private acknowledgement that its quality systems were deficient."  RJN Ex. 1 at 6.  Indeed, the above deficiencies ran counter to Emergent's contracts with AstraZeneca (RJN Ex. 6, 7, 13, 15) and J&J (RJN Ex. 11, 12), first executed by Defendant Husain on June 10, 2020 and July 1, 2020 respectively, which through various, increasingly detailed iterations required Emergent, *inter alia*, to maintain and operate Bayview in compliance with current good manufacturing practices.  *Id.*

The House Committees found that even after work began, "[d]uring the late summer and fall of 2020, Emergent executives continued to internally acknowledge compliance shortcomings

25

and the lack of commercial manufacturing experience at the Bayview facility."  RJN Ex. 1 at 7-8. Before an FDA site visit, Bayview's Senior Director of Quality sent emails to the EVP of Business Operations and Mr. Kirk attaching a document entitled "FDA Prep Meeting 02Sep2020" (RJN Ex. 18, 19), concluding "Our risk is high!" after listing myriad concerns, including:

> We have been operating a clinical phase GMP Quality System (phase appropriate with a lot of flexibility) until the pandemic hit – we lack commercial GMP compliance maturity…
>
> We have little to no FDA (Regulatory) inspection experience…
>
> Make sure short term, mid-term continuous improvement provisions are in place – we are not in full compliance yet -BUT- we are making batches NOW…
>
> What do I mean when I say 'manage' the inspection/visit?  AND THIS IS IMPORTANT… We have a limited window to give FDA confidence in our ability to achieve commercial GMP compliance at an accelerated pace – how do we do it?…
>
> Only SUPER SMEs (already known to FDA if possible) will be allowed to interact (for the most part) – this way we can consistently manage the message of continuous improvement and build confidence with FDA (when you are head of Q at a mature commercial with a great GMP record, you can sit back and parage SMEs in and out all day – we are not there).   …

(4)      "***FDA, Johnson & Johnson, and AstraZeneca identified multiple deficiencies at Bayview which Emergent failed to remediate despite urgent warnings***."   RJN Ex. 1 at 3, 6-8. AstraZeneca's SVP leading global COVID-19 efforts expressed concerns about the OPMA letter and remediation timeline in a July 22, 2020 email (RJN Ex. 14).  *See also* RJN Ex. 16 (July 24, 2020 AstraZeneca email stating, "I'm concerned that the FDA observation was that Emergent isn't prepared for commercial manufacturing as things stand currently, and yet we will start commercial manufacture there very soon.").  Kirk responded, copying Defendant Husain, that Emergent was "confident Bayview has the appropriate fundamental quality systems and the capable workforce to successfully execute this acceleration" and "very confident" that its plan "will ensure the appropriate level of oversight of near-term manufacturing / testing / release of your product … balanced with the ongoing quality system optimization and cultural evolution."  RJN Ex. 14.

Yet, BARDA's report (RJN Ex. 17) from its audit of Bayview from June to July 2020 raised numerous observations, including three "critical" observations on Emergent's quality-control, its control of microbiological contamination, and data integrity issues with its audit trails and electronic records, and confirmed that Emergent had not yet addressed the FDA's April 2020 finding that Bayview was "not ready for commercial operations."  A letter from AstraZeneca to the House Committees confirmed that Emergent began manufacturing the first commercial batches of AstraZeneca's vaccine in late July 2020 before remediating all deficiencies.  RJN Ex. 1 at 7. Indeed, according to an FDA briefing to the House Committees, FDA's September 2020 site visit found that Bayview's manufacturing practices were not compliant, so the FDA gave Emergent guidance to bring it into compliance.  RJN Ex. 1, at 8.

After a readiness review on October 20-21, 2020, J&J personnel circulated an email on October 22, 2020 (RJN Ex. 20) raising concerns that Bayview was still not ready for commercial manufacturing, noting that Emergent had been "challenged" to "maintain focus on basic GMP standards, and listing myriad concerns and deficiencies.  *See* RJN Ex. 1 at 8.  That week, J&J sent a series of emails (RJN Exs. 21, 22, 23) to Bayview's Site Head of Quality listing six specific issues that J&J identified during the site visit related to Bayview's readiness to follow good manufacturing practices, including "mold remediation," "floor damage," "overcrowding of equipment," and "retrospective deviation review," and said that "the concern from Janssen is related to GMP readiness (being less than 2 weeks away)."  *Id.*  An internal J&J email weeks later (RJN Ex. 25) noted that the decision to "move forward" with Emergent was not without risks.

On November 16, 2020, a consultant sent an email (RJN Ex. 24), which was circulated to Bayview's Site Head of Quality, stating that there was "no debate" that Emergent's FDA response regarding equipment qualification steps was "not acceptable," that "[u]ltimately, Emergent will have to decide what level of risk they are willing to accept, but this is one of those where you really better listen to me and do exactly what I tell you to," and "I am stating very loudly that this work is NON-CGMP compliant.  And a direct regulatory risk."  The House Committees found that it was unclear if Emergent took any immediate steps to address the concerns.  *See* RJN Ex. 1 at 8.

27

The House Committees found that, despite these warnings, Bayview's issues were not remediated, leading to the heavy batch destructions described *supra*. RJN Ex. 1 at 9-10. In a briefing and a letter, AstraZeneca told the Committees it sent teams to Bayview in November 2020 to help identify and control microbial contamination that had forced destruction of seven batches, after Emergent "acknowledged that its team lacked the appropriate level of knowledge or expertise to address the contamination event." *Id.* at 9. AstraZeneca's team concluded that "poor cleaning was part of the root cause of the persistent microbial contamination" and "resulted in "the 'proliferation of undesirable microorganisms growing in the facility.'" *Id.* They also "identified potential issues related to lack of oversight and general GMP expectations that were likely directly related to the microbial contamination." *Id.* Emergent's Senior VP of Manufacturing wrote an internal email on November 10, 2020 (RJN Ex. 26) noting that AstraZeneca "said lack of GMP fundamentals (gowning, clean room behavior, etc.) contributing to bioburden issue," outlining issues at Bayview, and asking when trash "piling up" in the hall outside manufacturing suites would be removed. AstraZeneca kept sending teams to Bayview through December 2020 to help identify and remediate ongoing contamination. *Id.* at 9. On a December 19, 2020 email thread (RJN Ex. 27), Emergent's Senior VP of Global Quality emailed Defendant Husain, Mr. Kirk, and other executives that a message from AstraZeneca "shows 8 events of control cell cross-contamination, with the most recent earlier this week. Perhaps you all were already aware that this is an ongoing issue. I thought it happened once, perhaps twice, and that it had been remediated." An AstraZeneca email dated January 25, 2021 (RJN Ex. 28), sent in advance of a call with Defendant Husain to discuss his "interesting view," noted that there were "10 rejected batches to date (nearly $30M in liability), some very clearly GmP deficiency related" and "Quality challenges requiring join-up between J&J and AZ quality orgs."

Bayview's problems continued even after the cross-contamination was discovered in March 2021, AstraZeneca production was permanently halted, and J&J's production was paused. RJN Ex. 1 at 15. The FDA's Bayview investigation report from June 2021 (RJN Ex. 37) found that Emergent still had not made needed corrections and outlined 10 concerns, including

"[r]esponsibilities applicable to the quality unit [are] not fully followed," "[e]mployee training [is] not adequately documented," and "[p]rocedures for transporting materials and waste are not followed." *Id.* Five concerns persisted when the FDA returned in July 2021, including issues concerning equipment, training, and decontamination protocols. *Id.* [9]

(5) "***Inexperienced staff and high staff turnover contributed to the vaccine contamination***." RJN Ex. 1 at 3, 11-13. The "investigation revealed that inexperienced staff and high employee turnover at [ ] Bayview … impaired Emergent's quality systems and ability to manufacture vaccines in compliance with good manufacturing practices." *Id.* at 11. The House Committees found that Defendant Kramer "was aware of these issues." *Id.* His June 24, 2020 email (RJN Ex. 10) stated a need to "discuss bringing in outside resources to get in front of this, while we recruit permanent resources to lead." *Id.* Emergent's reports to HSS in July and August 2020 (RJN Ex. 29, 30), on which Defendant Husain was the Principal Investigator, noted its staff were mostly "temporary employees [with] little or no pharmaceutical experience" and that it needed "in the short term to increase the rate of experienced, full time hires." *Id.* Husain's November 6, 2020 email to AstraZeneca (RJN Ex. 31) acknowledged that "QC" was a "critical topic for Emergent to improve on," which lead it to install a dedicated Project Manager and a Senior Director focused on processes and people. *Id.* at 12.

Committee briefings by J&J, AstraZeneca, and the FDA noted that Emergent staff actions were "not acceptable" and that high turnover among the quality oversight leadership, including the SVP of Global Quality and Bayview Senior Director of Quality both changing twice, were an unusual "disruption" that made coordinating efforts "difficult." *Id.* at 12. J&J said at a briefing that the cross-contamination incident detected on March 5, 2021 occurred because "Emergent personnel were not decontaminating properly and disposing of waste properly." *Id.* J&J prepared talking points for an April 3, 2021 call with Defendant Kramer (RJN Ex. 32), stating that FDA was "very strong" in expressing to J&J that FDA was "very unhappy" and "expressed specific

---

[9]     The FDA has not done an on-site inspection of Bayview since July 2021.

concerns about [J&J] continuing even at risk to fill your [drug substance] into vials." *Id.* Yet, J&J's Quality Lead on Vaccines later sent an email (RJN Ex. 33) to Bayview's Site Head of Quality listing quality failures observed by J&J's personnel at Bayview. *Id.* at 12-13.

(6) "***Under the Biden Administration, HHS terminated its contract with Emergent because the company failed to follow federal manufacturing standards***," a move that followed the House Committees releasing their preliminary findings. RJN Ex. 1 at 3, 16-17. During a Committee briefing, BARDA's Director said HHS could have pursued a contract termination for default or cause but chose to terminate it for convenience via agreement to avoid a legal battle. *Id.* at 16. The Committees found that "Emergent's failures wasted hundreds of millions of taxpayer dollars" and "cost AstraZeneca and Johnson & Johnson tens of millions of dollars." *Id.* at 17.

## III.    ARGUMENT

Taken together, the 5/10/2022 Congressional Report and other RJN Exhibits strongly corroborate the FAC's falsity and scienter pleading and undermine Defendants' Motion. These materials specifically augment FAC §V.E.1. (alleging undisclosed facts and risks described by CWs); §V.E.2. (alleging undisclosed facts and risks uncovered by Bayview inspections); §V.E.4. (alleging undisclosed facts and risks uncovered by Congress); the FAC's paragraphs explaining why the Business Operations Fraud (¶219(a)-(f)), Reported Results Fraud (¶¶228-230), and Internal Controls Fraud (¶235) misstatements and omissions were materially false and misleading; and numerous FAC sections pleading bases for a strong inference of Defendants' scienter, including §V.G.1. (pleading Defendants' scienter based on knowledge or reckless disregard of negative facts rendering their public statements false or misleading), §V.G.6. (core operations doctrine), §V.G.7. (the Individual Defendants were quoted in, signed, or SOX-certified the alleged misstatements), §V.G.9. (executive resignations), and §V.G.10. (ongoing investigations).

Lead Plaintiffs respectfully seek judicial notice of these documents. A "court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Indeed, Fourth

Circuit courts take judicial notice of government-generated documents that support securities plaintiffs' allegations, like the 5/10/2022 Congressional Report, at the Fed. R. Civ. P. 12(b)(6) stage. *See, e.g.*, *In re Under Armour Sec. Litig.*, 540 F. Supp. 3d 513, 521 (D. Md. 2021) (taking notice of SEC cease-and-desist order and its findings, noting that it "lends support to the allegations of the Plaintiffs in this case," and denying defendants' motion to dismiss).

Here, all the RJN Exhibits have one or more bases for the Court to take judicial notice:

(1)     All 37 RJN Exhibits, having been published by the House Committees in May 2022 on a Congressional website, are now documents in the public record.  For that reason alone, the Court may take judicial notice of them.  *See, e.g.*, *Philips v. Pitt Cty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) ("In reviewing a Rule 12(b)(6) dismissal, we may properly take judicial notice of matters of public record.") (*citing, inter alia*, *Papasan v. Allain*, 478 U.S. 265, 268 n.1 (1986) ("Although this case comes to us on a motion to dismiss …, we are not precluded in our review of the complaint from taking notice of items in the public record….")); *U.S. v. Garcia*, 855 F.3d 615, (4th Cir. 2017) (taking judicial notice of U.S. Citizenship and Immigration Services website describing naturalization process because it contained facts as to what constituted a naturalization interview); *Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004) (judicially noticing statistics on a Virginia Division of Legislative Services website); *Lee v. Virginia State Bd. of Elections*, 188 F. Supp. 3d 577, 606 n. 16 (E.D. Va. 2016) *aff'd*, 843 F.3d 592 (4th Cir. 2016) (judicially noticing voter statistics from the Virginia Department of Elections website) ; *Mikos v. Abbott Lab'ys.*, No. GLR-21-912, 2021 WL 5416534, at *2 n.4 (D. Md. Nov. 18, 2021) (noticing premarket approval documents on the FDA website).

(2)     The 5/10/2022 Congressional Report (RJN Ex. 1) is a publicly available government document, the majority of which relays facts that are not subject to reasonable dispute, inasmuch as they are quoted from documents made publicly available (including Emergent documents, as discussed *infra*) or from statements made to the House Committees in briefings or written submissions as part of a Congressional investigation.  As such, the report is a proper document for judicial notice.  "The court may take judicial notice of public documents and

government documents because their sources 'cannot reasonably be questioned.'" *Shore v. Charlotte-Mecklenburg Hosp. Auth.*, 412 F. Supp. 3d 568, 573 (M.D.N.C. 2019) (quotations omitted) (taking judicial notice at the Rule 12(b)(6) stage of several statutes, administrative rulings, an IRS private letter ruling, and a hospital authority's governing statute, articles of incorporation, and registration in the Secretary of State's website); *see also In re Under Armour*, 540 F. Supp. 3d. at 521; *Jacobus v. Huerta*, No. 3:12-CV-02032, 2013 WL 673233 at *7 n. 8 (S.D.W. Va. Feb. 22, 2013) (taking judicial notice of information in federal governmental agency reports and postings related to the purpose, creation, and function of a federal terrorist screening database), *report and recommendation adopted*, No. CIV.A. 3:12-02032, 2013 WL 1723631 (S.D.W. Va. Apr. 22, 2013), *aff'd*, 540 F. App'x 208 (4th Cir. 2013).

(3)      The 5/10/2022 Press Release (RJN Ex. 2) issued by the House Committees can also be judicially noticed, as it evidences what the House Committees and their leadership have publicly said regarding their investigation. *Tchatchou v. India Globalization Cap. Inc.*, No. CV PWG-18-3396, 2021 WL 307415, at *5 (D. Md. Jan. 29, 2021) (court overseeing securities fraud case may take judicial notice of matters of public record like press releases); *Johnson v. Pozen Inc.*, No. 1:07CV599, 2009 WL 426235, at *2 (M.D.N.C. Feb. 19, 2009) (courts in securities fraud cases routinely take judicial notice of press releases), *report and recommendation adopted*, No. 1:07CV599, 2009 WL 10680297 (M.D.N.C. Sept. 29, 2009); *Shah v. GenVec, Inc.*, No. CIV.A. DKC 12-0341, 2013 WL 5348133, at *1 n. 2 (D. Md. Sept. 20, 2013) (same); *In re Human Genome Scis. Inc. Sec. Litig.*, 933 F. Supp. 2d 751, 758 (D. Md. 2013) (same).

(4)      Four RJN documents are reports (RJN Ex. 3, 17) or written correspondence (RJN Ex. 8, 37) regarding Bayview generated by government entities – FDA, BARDA, and HHS – that originally were transmitted confidentially to Emergent and that the 5/10/2022 Congressional Report made publicly available. The Court may judicially notice these documents, which establish what they conveyed to Defendants at the time. *See Barry v. Novartis Pharms. Corp.*, No. 3:22CV196 (DJN), 2022 WL 2373452, at *4 (E.D. Va. June 30, 2022) (taking judicial notice of publicly available FDA publications); *Shore*, 412 F. Supp. 3d at 573 (taking judicial notice of an

32

IRS private letter ruling); *Horne v. Novartis Pharms. Corp.*, 541 F. Supp. 2d 768, 777 (W.D.N.C. 2008) ("[T]he Court may take judicial notice of and consider the public records of the FDA, such as the Public Health Advisory, without transforming this motion into a motion for summary judgment."); *Jacobus*, 2013 WL 673233 at *7 (taking judicial notice of information in federal governmental agency reports); *see also In re Under Armour*, 540 F. Supp. 3d at 517 (taking judicial notice of an SEC Order and denying a motion to dismiss a securities fraud complaint "read in light of and in combination with the allegations set forth in the SEC's Order").

(5)     Six RJN documents are agreements between Emergent and J&J (RJN Ex. 11, 12) or AstraZeneca (RJN Exs. 6, 7, 13, 15), most of them signed by Defendant Husain, which are pled in the FAC (*see, e.g.*, ¶¶52, 54) and/or more generally give rise to the multi-million dollar contractual obligations pursuant to which Emergent engaged in both the COVID-19 vaccine drug substance manufacturing and the correlating manufacturing failures at the heart of this lawsuit. As such, these documents are judicially noticeable. *See, e.g.*, *In re 201 N. George St., LLC*, 551 B.R. 786, 789 (N.D. W. Va. Bankr. 2016) (taking judicial notice of debtor company's amended and restated operating agreement incorporated by reference in the complaint); *see also Sayman v. Lehman Bros. FSB*, No. 3:13-cv-288-RJC-DSC, 2014 WL 2013353 at *4 (W.D.N.C. May 16, 2014) (granting request for judicial notice of documents executed by the opposing party); *Prelich v. Med. Res., Inc.*, 813 F. Supp. 2d 654, 668 (D. Md. 2011) (court took judicial notice of severance agreement in a factually similar case it previously decided).

(6)     Fourteen RJN documents (RJN Ex. 8, 9, 10, 17, 18, 19, 24, 26, 27, 29, 30, 35, 36, 37) are Emergent documents and emails, many of them signed, sent, or received by Defendants Kramer and Husain, that Emergent itself produced to the House Committees as part of the Congressional investigation, bearing Bates stamps beginning with the prefixes "EBSI" or "EmerCly," thereby representing them to be true and accurate copies of Emergent documents and emails responsive to the House Committees' document requests. Defendants cannot reasonably question the accuracy, contents, or authenticity of these documents, which are proper subjects for judicial notice for all permissible purposes. *See Phillips v. Univ. of Maryland Baltimore Cnty.*,

33

No. CV ELH-19-570, 2020 WL 1820080 at *8 (D. Md. Apr. 10, 2020) (judicially noticing an exhibit consisting of emails proffered by plaintiff in opposing a Rule 12(b)(6) motion and considering that exhibit and others in resolving the motion because they "pertain to events referenced in the Complaint, their authenticity is not contested, nor is their content"); *In re Harmony Holdings, LLC*, 393 B.R.409, 414 (D.S.C. 2008) (where a member of the LLC that owns the debtors acknowledged that emails in question were "sent or received by him between several recipients," the court took judicial notice of 11 emails he sent to a creditor as being "his prior statements"). *See also, e.g.*, *Binks v. US Tech Sols.*, No. 2:20-cv-4164-DCN-MGB, 2021 WL 2679697 at *1 n.1 (D.S.C. June 30, 2021) (taking judicial notice of an email integral to and relied on in complaint where its authority was not challenged); *Nat'l Fed. of the Blind v. U.S. Abilityone Comm.*, 421 F. Supp. 3d 102, 122 n.8 (D. Md. 2019) (judicially noticing Congressional testimony as matters of public record); *In re Humphrey Hosp. Tr., Inc. Sec. Litig.*, 219 F. Supp. 2d 675, 686 (D. Md. 2002) (judicially noticing defendants' trading reports filed with the SEC). For the same reasons, ten more RJN documents (RJN Exs. 4, 14, 16, 21, 22, 23, 31, 32, 33, 34), which are Emergent emails to or from J&J or AstraZeneca that those companies Bates-stamped and produced to the House Committees in response to document requests made during the Congressional investigation, are likewise subject to judicial notice – unless Defendants can credibly questioning their accuracy, which they cannot. *Phillips*, 2020 WL 1820080 at *8; *In re Harmony Holdings, LLC*, 393 F.R. at 313. The same is true of the two RJN documents (RJN Ex. 20, 25) that are internal emails at these companies, which they also produced to the House Committees as part of the Congressional investigation. *Id.*

IV.    CONCLUSION

For these reasons, Lead Plaintiffs respectfully ask the Court to grant judicial notice of RJN Exhibits 1-37.

34

Dated:  July 19, 2022                                 Respectfully submitted,

**POMERANTZ LLP**

*/s/ Matthew L. Tuccillo*

Matthew L. Tuccillo (admitted *pro hac vice*)
Jeremy A. Lieberman (admitted *pro hac vice*)
Jennifer Banner Sobers (admitted *pro hac vice*)
Dolgora Dorzhieva (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, NY 10016
Tel.: (212) 661-1100
Fax: (212) 661-8665
jalieberman@pomlaw.com
mltuccillo@pomlaw.com
jbsobers@pomlaw.com
ddorzhieva@pomlaw.com

**POMERANTZ LLP**
Jennifer Pafiti (admitted *pro hac vice*)
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Tel.: (310) 405-7190
jpafiti@pomlaw.com

***Lead Counsel for Lead Plaintiffs and the Class***

35

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Steven J. Toll (Md. Bar No. 15824)
Daniel S. Sommers (Md. Bar No. 15822)
S. Douglas Bunch (admitted *pro hac vice*)
Brendan Schneiderman (admitted *pro hac vice*)
1100 New York Avenue N.W.
Suite 500, East Tower
Washington, DC 20005
Tel.: (202) 408-4600
Fax: (202) 408-4699
stoll@cohenmilstein.com
dsommers@cohenmilstein.com
dbunch@cohenmilstein.com
bschneiderman@cohenmilstein.com

*Liaison Counsel for Lead Plaintiffs*

**KLAUSNER, KAUFMAN, JENSEN & LEVINSON**
Robert D. Klausner
Stuart Kaufman
(*pro hac vice* applications forthcoming)
7080 NW 4th Street
Plantation, Florida 33317
Tel.: (954) 916-1202
Fax: (954) 916-1232
bob@robertdklausner.com
stu@robertdklausner.com

*Additional Counsel for City of Fort Lauderdale Police & Firefighter's Retirement System*

36

## CERTIFICATE OF SERVICE

I hereby certify that on July 19, 2022, I electronically filed the foregoing with the Clerk of

Court using the Court's CM/ECF system, which in turn sent notice to all counsel of record.

Dated:   July 19, 2022                              /s/ *Matthew L. Tuccillo*
                                                    Matthew L. Tuccillo