# Lead Plaintiffs' RJN Exhibit 6



# MASTER SERVICES AGREEMENT

This Master Services Agreement (this "**Agreement**") is made as of June 10, 2020 (the "**Effective Date**") by and between AstraZeneca Pharmaceuticals LP, a Delaware limited partnership with offices at 1800 Concord Pike, Wilmington, Delaware 19803, USA ("**AstraZeneca**"), and Emergent Manufacturing Operations Baltimore, LLC, a limited liability company organized and existing under the laws of Delaware, having an office located at 5901 East Lombard Street, Baltimore, Maryland, 21224 ("**Service Provider**"). AstraZeneca and Service Provider are sometimes referred to herein individually as a "**Party**" and collectively as the "**Parties**".

**WHEREAS**, AstraZeneca intends to research, develop, manufacture and commercialize the ChAdOx1 nCoV-19 vaccine candidate (the "**Product**");

**WHEREAS**, AstraZeneca desires to engage Service Provider to perform certain specific activities in connection with the manufacture of the Product, and Service Provider agrees to provide such services on the terms and conditions set forth herein;

**NOW THEREFORE**, in consideration of the premises and of the mutual promises and covenants herein contained, the adequacy of which is acknowledged by each of the parties, the parties hereto agree as follows.

1.      **SERVICES AND PERSONNEL**

1.1     General.

(a)      Service Provider shall use commercially reasonable efforts to perform the specific tasks reflected in each Work Order ("**Services**") in connection with the manufacture of the Product ("**Project**") for AstraZeneca in accordance with this Agreement. All such Services shall be the subject of a work order, substantially in the form of Exhibit A, setting forth the following with respect to the applicable Project: (a) description of Services to be provided, (b) fee and payment schedule for the Services, (c) description of any deliverables to be delivered by Service Provider (each, a "**Deliverable**") and their intended use, (d) materials to be provided by each Party and (e) an estimated Project timeline. After a work order substantially in the form of Exhibit A is agreed upon and executed by the Parties hereto, the same shall be attached to this Agreement as an amendment to Exhibit B (each, a "**Work Order**"), and the Work Order shall then be a part of this Agreement. There will be no limit to the number of Work Orders that may be added to this Agreement. If the terms of a Work Order conflict with the terms of this Agreement, the terms of this Agreement shall control over the conflicting terms of the Work Order, unless specifically stated otherwise in the Work Order.

(b)      The Parties acknowledge that this Agreement is an interim, short form agreement to cover services relating to the technology transfer, scale-up, process performance qualification, and capacity commitment covered by **Work Order #5997-01** and that no Product produced hereunder shall be used for clinical or commercial use. The Parties shall use commercially reasonable efforts, acting reasonably and in good faith, to agree a more detailed master services agreement (the "**Definitive MSA**") by July 15, 2020 that will apply in respect of all then current and future Work Orders, including without limitation for the manufacture of the Product for both clinical and commercial use. Absent agreement by **July 15, 2020** the matter will be escalated to senior management at AstraZeneca and senior management at Service Provider. By entering into force, the Definitive MSA shall replace this Agreement for any Work Order(s) not completed at that time.

(c)      Service Provider will perform Services set forth in a Work Order to a standard of workmanship consistent with industry practices and the Quality Agreement. Service Provider, its employees and agents, have, and will continue to have the knowledge, experience and skill to provide, and will provide, the Services in a professional and timely manner. Service Provider will use commercially reasonable efforts to staff each project set forth in a Work Order sufficiently to ensure the completion of the Project.

-1-

US 167835806v12
US 167835806v13

HIGHLY CONFIDENTIAL

(d)      Any Product delivered by Service Provider to AstraZeneca under a Work Order will be delivered Ex Works Service Provider's facility (INCOTERMS 2020).  Title to and risk of loss of Product delivered hereunder will transfer from Service Provider to AstraZeneca when Service Provider (i) releases the Product in accordance with the terms of the Quality Agreement (ii) notifies AstraZeneca in writing that the Product is available for pick up by Service Provider' designated carrier, Ex Works Service Provider's facility. AstraZeneca is solely responsible for all shipping costs.

1.2      Change Orders.  In the event that Service Provider is requested or required to perform services that are outside the scope of this Agreement, such services or changes and the costs associated with them shall be mutually agreed upon by the Parties in a written change order ("**Change Order**") prior to the provision of, or any obligation to perform, said services.  Any Change Order shall constitute an amendment to the applicable Work Order and the services set forth in the Change Order shall be deemed to be Services forming part of such Work Order.

1.3      Capacity Commitment.

(a)      The Parties acknowledge that Service Provider entered into a task order #75A50120F33007 (the "**Task Order**") pursuant to the prime agreement (Contract #HHS010020120000) (the **"Emergent CIADM Contract"**), it has with Biomedical Advanced Research and Development Authority, part of the Office of the Assistant Secretary for Preparedness and Response at the U.S. Department of Health & Human Services (the "**United States Government**"), and that pursuant to the Task Order, the United States Government has reserved certain capacity within Service Provider's manufacturing facility (the "**United States Government Reserved Capacity**").  For the period commencing on the Effective Date through December 31, 2020 (the "**Initial Period**"), (i) Service Provider will reserve, and AstraZeneca agrees to pay for, capacity to manufacture up to the number of batches of the Product specified on Work Order #5997-01 for such Initial Period, which capacity is not within the United States Government Reserved Capacity (the "**AZ Initial Period Capacity**"), and (ii) Subject to the written approval of the United States Government, Service Provider will reserve, and the United States Government has agreed to pay for, capacity within the United States Government Reserved Capacity to manufacture up to the number of batches of the Product specified on Work Order #5997-01 for such Initial Period (the "**BARDA Initial Period Capacity**", and together with the AZ Initial Period Capacity, the **"Initial Period Capacities"**). In exchange for the AZ Initial Period Capacity, AstraZeneca agrees to pay Service Provider the price for the AZ Initial Period Capacity (the "**AZ Initial Capacity Commitment Fee**") in the amount and on the payment terms set forth on Work Order #5997-01.  The Parties acknowledge and agree that the United States Government has agreed to pay Service Provider the price for the BARDA Initial Period Capacity (the "**BARDA Initial Capacity Commitment Fee**", and together with the AZ Initial Capacity Commitment Fee, the "**Initial Capacity Commitment Fees**").  For clarity, in no event will AstraZeneca be responsible for paying Service Provider any amount of the BARDA Initial Capacity Commitment Fee.

(b)      Furthermore, for the period commencing January 1, 2021 through June 30, 2021 (the "**Subsequent Period**"), AstraZeneca, may, subject to the approval of the United States Government ("**BARDA Consent**"), and otherwise at its sole option (the "**Subsequent Capacity Option**") elect to reserve the capacity to manufacture up to the number of batches of the Product specified on Work Order #5997-01 for such Subsequent Period (the "**Subsequent Period Capacity**"), by delivering written notice to Service Provider (the "**Capacity Exercise Notice**") within five (5) business days' after receipt by Service Provider of the BARDA Consent (the "**Option Deadline**"), which such Capacity Exercise Notice shall specify the additional number of batches of the Product that AstraZeneca is electing to reserve for the Subsequent Period Capacity. For clarity, the Parties acknowledge and agree that: (i) the United States Government may require or direct Service Provider to offer or use the Subsequent Capacity Option to or for third party(ies) at any time, including prior to Option Deadline; and (ii) if the United States Government does not provide the BARDA Consent (or indicates to AstraZeneca or Service Provider it will not provide such consent) or AstraZeneca does not deliver the Capacity Exercise Notice by the Option Deadline, Service Provider may offer and/or use the Subsequent Period Capacity to or for other customers of Service Provider or use such capacity for its own products at no additional cost to AstraZeneca and at no penalty to Service Provider.  Pursuant to the Task Order, the United States Government has agreed to pay Service Provider the price for the Subsequent Period Capacity (the "**BARDA Subsequent Capacity Commitment Fee**").

-2-

US 167835806v13

HIGHLY CONFIDENTIAL

AZ_COR _000050

(c)        The AZ Initial Capacity Commitment Fee is non-refundable, but fully creditable against the Service fees (but not the pass-through costs or other out-of-pocket costs or expenses), on a per-batch of Product basis, as specifically allocated to the AZ Initial Period Capacity under the Definitive MSA.  The BARDA Initial Capacity Commitment Fee is also fully creditable, solely upon the consent of the United States Government, against the Service fees (but not the pass-through costs or other out-of-pocket costs or expenses), on a per-batch of Product basis, as specifically allocated to the BARDA Initial Period Capacity, under the Definitive MSA.  The BARDA Subsequent Capacity Commitment Fee may be creditable, again, solely upon the consent of the United States Government, against the Service fees (but not the pass-through costs or other out-of-pocket costs or expenses), on a per-batch of Product basis, as specifically allocated to the Subsequent Period Capacity, under the Definitive MSA.  For clarity, it is the intent of AstraZeneca and Service Provider that (i) subject to the terms of this Section 1.3(c) and payments due upon termination in accordance with Section 7.3, the entire amount of the Initial Capacity Commitment Fees and, if applicable, the Subsequent Capacity Commitment Fee are intended as upfront amounts and, with respect to the BARDA Initial Capacity Commitment Fee and the BARDA Subsequent Capacity Commitment Fee, subject to the consent of the United States Government to be credited against future Service fees payable by AstraZeneca, and (ii) notwithstanding the foregoing, Service Provider may be required to credit some or all of the BARDA Initial Capacity Commitment Fee and/or the BARDA Subsequent Capacity Commitment Fee to the United States Government, and nothing in this Section 1.3(c) shall require Service Provider to credit to AstraZeneca any amount of the BARDA Initial Capacity Commitment Fee or the BARDA Subsequent Capacity Commitment Fee that Service Provider is required to credit to the United States Government.  The mechanics by which the Initial Capacity Commitment Fees and, if applicable, the Subsequent Capacity Commitment Fee, are creditable against Service fees under the Definitive MSA will be set forth in a Product Schedule to the Definitive MSA.

1.4        Service Provider Personnel/Independent Contractor.   All employees and agents of Service Provider that perform Services under this Agreement are employees and agents, respectively, of Service Provider and not AstraZeneca during the term of this Agreement and shall at all times be directed solely by Service Provider.  Service Provider is acting in the capacity of independent contractor hereunder and not as employee of AstraZeneca.

1.5        Delays; Technical Transfer.   The Parties acknowledge that portions of the work to be performed are experimental in nature and may not have been fully validated within generally accepted standards of the pharmaceutical industry.  To the extent assumptions or information change, or there are unexpected results or events or delays, including but not limited to delays in receipt of materials or information from AstraZeneca, timelines may be impacted.  In the event that Service Provider anticipates any delay in the timelines specified in any Work Order, whether beyond the reasonable control of either Party, due to a Force Majeure, or otherwise (a "**Delay**"), or Service Provider becomes aware of any actually occurring Delay, it shall promptly notify AstraZeneca in writing.  In the event AstraZeneca anticipates any Delay or becomes aware of any actually occurring Delay, AstraZeneca will promptly notify Service Provider in writing.  Unless Service Provider is reasonably able to eliminate an anticipated Delay such that the Deliverables under the Work Order will be delivered in accordance with the estimated schedule set forth on such Work Order, the Parties shall promptly convene to discuss steps that can be taken to mitigate such Delay and agree upon revised timeline(s).

1.6        Quality Agreement.    Within thirty (30) days of execution of this Agreement, and in any event, prior to the release of any Product by Service Provider pursuant to this Agreement or a Work Order, respectively, the Parties will also enter into a technical/quality agreement setting forth, as appropriate, quality assurance provisions, the respective roles and allocation of responsibilities of the Parties with respect to applicable processes and standards and procedures for handling deviations and related matters (a "**Quality Agreement**").

1.7        AstraZeneca Materials.  AstraZeneca shall deliver to Service Provider the items specifically set forth in the Work Order as being provided by AstraZeneca to Service Provider, together with any other tangible items, information, or documentation in in AstraZeneca's possession which is necessary to assist Service Provider in connection with the Services, including but not limited to any active pharmaceutical ingredient, master cell bank, plasma, component, or raw materials (collectively, the "**AstraZeneca Materials**"). AstraZeneca shall deliver to Service Provider the AstraZeneca Materials free of charge in a timely manner and in sufficient quantities to perform the Services.  AstraZeneca shall at all times retain legal title and risk of loss to the AstraZeneca Materials.  AstraZeneca is responsible for ensuring any

-3-

US 167835806v13

HIGHLY CONFIDENTIAL

AZ_COR _000051

components and materials that are necessary or used by Service Provider to perform the Services, including but not limited to the AstraZeneca Materials, are suitable and of appropriate quality for the Product, regardless of whether such components or materials are supplied to Service Provider directly by the applicable material manufacturer or by AstraZeneca. The Work Order and the Quality Agreement set forth any testing to be performed by Service Provider on such components and materials. Subject to such testing obligations, Service Provider shall not be liable for any defect in AstraZeneca Materials or any defect in any other components or materials existing as of the date of delivery to Service Provider.

1.8     Development Services. Notwithstanding Section 1.1(c), AstraZeneca acknowledges that certain portions of the Services to be performed are experimental in nature and/or may not have been fully validated within general accepted standards of the pharmaceutical industry, including without limitation any non-cGMP batches. Service Provider shall not be considered to be in breach of its obligations under this Agreement or otherwise held responsible for not reaching the desired outcome as set forth in the Work Order for such non-cGMP Services and AstraZeneca shall be responsible for all fees and costs associated with such Services, except to the extent such failure was caused by Service Provider's gross negligence or willful misconduct. If it is determined that failure to reach the desired outcome for the non-cGMP activities as set forth in the Work Order was caused by Service Provider's gross negligence or willful misconduct, then Service Provider shall, at AstraZeneca's request and option, as AstraZeneca's sole and exclusive remedy (subject to Section 8.4(e)) and as soon as it is commercially practical to do so following receipt of any required materials at Service Provider's sole cost and expense (excluding costs or expenses for AstraZeneca's Materials but including shipping and transport costs), either (i) re-perform such Services; or (ii) provide AstraZeneca a credit for the amounts paid by AstraZeneca to Service Provider for such Services. AstraZeneca is solely responsible for determining suitability of product for use in humans and final release of product for use in humans.

1.9     PPQ Batches. Notwithstanding Section 1.1(c), if it is determined that a process performance qualification ("**PPQ**") batch does not meet the Product specifications set forth in the master batch record ("**Specifications**") as a result of Service Provider's failure to follow cGMP, then Service Provider shall, at AstraZeneca's request and option, and as AstraZeneca's sole and exclusive remedy (subject to Section 8.4(e)), and as soon as it is commercially practical to do so following receipt of any required materials at Service Provider's sole cost and expense (excluding costs or expenses for AstraZeneca's Materials including shipping and transport costs), either (i) re-perform such PPQ batch; or (ii) provide AstraZeneca a credit for the amounts paid by AstraZeneca to Service Provider for such PPQ batch. If a PPQ batch fails to meet Specifications for any cause other than Service Provider's gross negligence, willful misconduct, or failure to follow cGMP, then Service Provider shall have no liability to AstraZeneca with respect to such batch and AstraZeneca shall pay Service Provider for such batch.

## 2.     REPRESENTATIONS, WARRANTIES AND COVENANTS OF SERVICE PROVIDER

2.1     Service Provider represents, warrants and covenants to AstraZeneca as follows:

(a)     Formation/Power and Authority. Service Provider is duly formed and validly existing under the laws of its jurisdiction of formation and has all requisite power and authority to execute and deliver this Agreement and to perform its obligations hereunder.

(b)     Performance. If cGMP services are specified in a Work Order, Service Provider will perform those Services in accordance with cGMPs.

(c)     EXCEPT FOR THE REPRESENTATION AND WARRANTY SET FORTH IN THIS SECTION 2.1, AND THE COVENANT SET FORTH IN SECTION 1.1(C), SERVICE PROVIDER HEREBY DISCLAIMS ALL REPRESENTATIONS, CONDITIONS, WARRANTIES, AND STATEMENTS IN RESPECT OF THE SERVICES AND PRODUCT PROVIDED HEREUNDER, WHETHER EXPRESS OR IMPLIED, CUSTOM OF THE TRADE OR OTHERWISE, INCLUDING WITHOUT LIMITATION, ANY SUCH REPRESENTATIONS, CONDITIONS, WARRANTIES OR STATEMENTS RELATING TO MERCHANTABILITY, NON-INFRINGEMENT, OR FITNESS

-4-

US 167835806v13

HIGHLY CONFIDENTIAL

AZ_COR _000052

FOR A PARTICULAR PURPOSE. SERVICE PROVIDER HAS NOT PARTICIPATED IN THE RESEARCH AND DEVELOPMENT OF THE PRODUCT, NOR HAS SERVICE PROVIDER IN ANY WAY EVALUATED THE PRODUCT'S SAFETY OR EFFICACY IN HUMANS OR OTHERS.

(d)    For the purposes of this Agreement, "**cGMP**" means current good manufacturing practice standards as provided for (and as amended from time to time) in the relevant regulations of, as applicable, the U.S. Food and Drug Administration (the "**FDA**"), the European Medicines Agency ("**EMA**"), and the Medicines and Healthcare products Regulatory Agency (the "**MHRA**").

2.2    <u>Compliance with Applicable Laws and Ethical Standards</u>.

(a)    Service Provider recognizes AstraZeneca's commitment to work only with suppliers and service providers who embrace the standards of ethical behavior consistent with AstraZeneca's Expectations of Third Parties Handbook, a copy of which can be found on *www.astrazeneca.com* or by clicking the "Resources" tab on *https://www.astrazeneca.com/sustainability.html*, as amended from time to time, and in particular those principles in the Section "Anti-Bribery and Anti-Corruption" as amended from time to time ("**AstraZeneca Expectations**").

(b)    Each party shall comply with all applicable laws and regulations in connection with its obligations under this Agreement and the cGMP standards (to the extent applicable to each activity) ("**Applicable Laws**"). Each Party (i) shall perform this Agreement to ethical standards consistent with those set out in its respective Code of Conduct, (ii) will not take any action that will cause the other Party to be in breach of any Applicable Laws for the prevention of fraud, bribery and corruption, racketeering, money laundering, terrorism, including the US Foreign Corrupt Practices Act and the UK Bribery Act, (iii) will not offer, pay, request or accept any bribe, inducement, kickback or facilitation payment, and will not make or cause another to make any offer or payment to any individual or entity for the purpose of influencing a decision for the benefit of such Party, and (iv) will use reasonable efforts to cause its Affiliates, suppliers and subcontractors performing services for such Party or its Affiliates to operate their business in compliance with all Applicable Laws, as amended from time to time.

(c)    In the event a Party fails to meet or maintain such ethical standards, the Parties will agree upon what measures should be taken by such Party to improve such Party's performance (the "**Improvement Plan**"). If the Parties are unable to agree upon an Improvement Plan or the relevant Party does not implement the Improvement Plan within an agreed reasonable timescale (not to exceed twelve- (12) calendar months), the other Party will be entitled to terminate this Agreement with immediate effect and be relieved of any obligations under this Agreement.

(d)    <u>Debarment</u>. Each Party hereby certifies it does not and shall not knowingly employ, contract with or retain any person directly or indirectly in the performance of its obligations under this Agreement if such person is debarred under 21 U.S.C. §§ 335(a). Each Party agrees to promptly disclose in writing to the other Party if it becomes aware that any employee or agent is or becomes debarred, or if any action or investigation is pending or, to the best of such Party's knowledge, threatened, relating to the debarment of the performing Party or any person performing services related to this Agreement.

2.3    <u>Records & Inspections</u>. Service Provider shall maintain and retain complete, detailed and accurate records relating to all Services performed by it hereunder. AstraZeneca shall have the right, upon reasonable notice, to audit and inspect Service Provider's manufacturing site in accordance with the terms of the Quality Agreement. AstraZeneca shall be solely responsible for preparing and submitting all filings necessary to obtain regulatory approvals for the Product and the manufacture of the Product at Service Provider's manufacturing site and Services Provider shall provide all supporting documentation concerning Service Provider and its manufacturing site as is necessary to complete such regulatory filings and will support a pre-approval inspection of its manufacturing site by the U.S. FDA for the Product. Service Provider may limit the number of individuals sent by AstraZeneca to Service Provider's site to conduct an audit or inspection. Any such audits or inspections shall occur at a mutually agreeable time, as reasonably determined by the Parties, only in areas of Service Provider's facilities where the Services are performed and shall be of no more than two

-5-

US 167835806v13

HIGHLY CONFIDENTIAL                    AZ_COR_000053

days in duration. Service Provider may require personnel accessing Service Provider's facility to agree in writing to be bound by Service Provider policies, operating procedures and security procedures. To the extent any audit or inspection is conducted by a third party, Service Provider may require such third party to execute a confidentiality agreement.

2.4      Grant Funding Requirements.

(a)      AstraZeneca: The Parties acknowledge and agree that this Agreement will be considered to be a United States Government subcontract pursuant to AstraZeneca OTA (Other Transactional Agreement) with the U.S. Department of Health and Human Services ("**HHS**"), Contract # (provided upon the OTA execution) (the "**AZ OTA**"), and Service Provider further understands that its performance of Services under this Agreement will be subject to certain additional government requirements. These requirements will be outlined in the AZ OTA, upon its execution. To the extent applicable to Service Provider's activities under this Agreement, the Service Provider agrees to comply with relevant United States Government terms and conditions, as documented in an amendment to this Agreement and/or inclusion in the Definitive MSA, as appropriate.

(b)      Service Provider: The Parties acknowledge and agree that, in the event this Agreement is considered to be a United States Government subcontract pursuant to the Task Order under the Emergent CIADM Contract, this Agreement will be considered to be a United States Government subcontract pursuant to the Task Order and AstraZeneca further understands that its performance under this Agreement may be subject to certain additional government requirements. To the extent applicable to AstraZeneca's activities under this Agreement, AstraZeneca agrees to comply with relevant United States Government terms and conditions, as documented in an amendment to this Agreement and/or inclusion in the Definitive MSA, as appropriate.

## 3.      REPRESENTATIONS, WARRANTIES AND COVENANTS OF ASTRAZENECA

AstraZeneca represents, warrants and covenants to Service Provider as follows:

3.1      Formation/Power and Authority. AstraZeneca is duly formed and validly existing under the laws of its jurisdiction of formation and has all requisite power and authority to execute and deliver this Agreement and to perform its obligations hereunder.

3.2      Compliance with Applicable Law. The execution, delivery or performance of this Agreement will not contravene any Applicable Law and AstraZeneca shall perform its obligations and responsibilities hereunder in accordance with all Applicable Law.

3.3      Delivery of Data and Materials. AstraZeneca shall act to ensure the timely delivery of data and Project materials, including the AstraZeneca Materials, to Service Provider, so as to permit Service Provider to perform its obligations hereunder, in all cases in accordance with the applicable Work Order.

3.4      Additional Representations.

(a)      AstraZeneca owns or has the right to provide to Service Provider in connection with the performance of the Services all AstraZeneca Materials;

(b)      All AstraZeneca Materials have been or will be manufactured in accordance with cGMP and relevant specifications, and no specific safe handling instructions are applicable to any such items, except as disclosed to Service Provider in writing by AstraZeneca in sufficient time for review by Service Provider and prior to delivery to Service Provider;

(c)      all Product delivered by Service Provider to AstraZeneca will be stored, labeled, distributed, sold and/or used or disposed of by AstraZeneca in a safe and responsible manner, and in accordance with all Applicable Laws; and

-6-

US 167835806v13

HIGHLY CONFIDENTIAL                                                                              AZ_COR _000054

(d)        the Product and the manufacturing, processing, use, or distribution thereof, will not, to AstraZeneca's knowledge, violate the intellectual property rights of any third party, and AstraZeneca is not, to its knowledge, engaged in the theft or misuse of any third party's confidential or trade secret information regarding the manufacturing, processing, use, or distribution of Product, nor does AstraZeneca have notice of any claim of a third party regarding any such violation, theft or misuse.

## 4.        COMPENSATION

The fees for Services, payment terms, and estimated pass-through costs to be paid to Service Provider in connection with the Services are contained in each Work Order. Unless specifically agreed otherwise, all purchase orders, invoices and payments hereunder shall be in U.S. Dollars. AstraZeneca, or an Affiliate of AstraZeneca designated in the applicable Work Order, will issue one or more purchase orders in respect of the Services under such applicable Work Order. Service Provider, in turn, will submit invoices to AstraZeneca, or the Affiliate of AstraZeneca designated in the applicable Work Order to the address specified in the applicable purchase order and Work Order and payment will be made by AstraZeneca or its Affiliate within thirty (30) days after the receipt of Service Provider's invoice unless otherwise agreed in the relevant Work Order. The Parties agree that amounts due under a Work Order shall not be set off against another or applied to sums due as a result of the performance of other Work Orders without the prior written consent of the other Party.

## 5.        DATA, PREEXISTING TECHNOLOGY AND INVENTIONS, TECHNICAL TRANSFER

5.1        <u>Preexisting Technology</u>.  It is recognized and understood that the other preexisting inventions, materials, and technologies of AstraZeneca or Service Provider are their separate property, respectively, and are not affected by this Agreement.

5.2        <u>Ownership of Data and Inventions</u>.

(a)        All inventions, developments, improvements, software, programs, practices, procedures (including standard operating procedures), policies, methods, manuals, know-how and information (i) owned or otherwise controlled by Service Provider on the Effective Date, or (ii) developed by Service Provider independently of this Agreement (collectively, "**Service Provider Background Technology**") shall be and remain the sole and exclusive property of Service Provider.

(b)        All inventions, developments, improvements, software, programs, practices, procedures (including standard operating procedures), policies, methods, manuals, know-how and information (i) owned or otherwise controlled by AstraZeneca on the Effective Date, or (ii) developed by AstraZeneca independently of this Agreement (collectively, "**AstraZeneca Background Technology**") shall be and remain the sole and exclusive property of AstraZeneca.

(c)        All intellectual property rights discovered or developed in the performance of the Services ("**Foreground Technology**"), solely by or on behalf of Service Provider or jointly with AstraZeneca, that relate to and are not severable from: (i) the Product or (ii) any AstraZeneca Materials or AstraZeneca Confidential Information, and which do not relate generally to developing, formulating, manufacturing, filling, processing, packaging, analyzing or testing pharmaceutical products generally, will (in the case of (i)-(ii) herein) be solely owned by AstraZeneca ("**AstraZeneca Foreground Technology**"). As between the parties, Service Provider will own any and all Foreground Technology that is not owned by AstraZeneca in the preceding sentence, including but not limited to any improvements or modifications to Service Provider Background Technology ("**Service Provider Foreground Technology**"). Service Provider hereby grants to AstraZeneca a non-exclusive, perpetual, fully paid-up, royalty-free, worldwide, sub-licensable license to use the Service Provider Foreground Technology, but only to the extent necessary or useful for AstraZeneca or its Affiliates to develop, manufacture, commercialize or otherwise exploit the Product manufactured by Service Provider under this Agreement.

US 167835806v13

HIGHLY CONFIDENTIAL

AZ_COR _000055

(d)       Service Provider will ensure that AstraZeneca acquires, to the extent legally permissible, all rights, title and interest in and to any AstraZeneca Foreground Technology generated by its employees or agents, and hereby assigns to AstraZeneca all rights, title and interest in and to any and all AstraZeneca Foreground Technology.  AstraZeneca will ensure that Service Provider acquires, to the extent legally permissible, all rights, title and interest in and to any Service Provider Foreground Technology generated by its employees or agents, and hereby assigns to Service Provider all rights, title and interest in and to any and all Service Provider Foreground Technology.  Each Party agrees that such technology of each Party is commercially valuable to such Party and agrees not to disclose such technology of the other Party to any other party without the other Party's prior written consent. AstraZeneca hereby grants to Service Provider a royalty-free nonexclusive license to the AstraZeneca Background Technology and/or the AstraZeneca Foreground Technology during the Term as useful or necessary for Service Provider to provide the Services or Deliverables.

## 6.       CONFIDENTIALITY/PUBLICATIONS

6.1       Confidential Information.  Neither Party shall, at any time, without the other Party's prior written consent, disclose to any third party any of the other Party's Confidential Information or the fact that the Services are being conducted hereunder.  Each Party shall use such Confidential Information solely for the purposes for which it was provided, including provision of the Services.  Each Party shall take all reasonable precautions to prevent any unauthorized use or disclosure of the Confidential Information.  For purposes of this Agreement, "**Confidential Information**" means any information of a Party in any form, whether of a technical, business or other nature, including but not limited to, information, documents, data and images which relate to such Party's materials, trade secrets, products, promotional material, developments, proprietary rights or business affairs. For clarity, Confidential Information shall include any information (i) relating to the terms of this Agreement, and (ii) defined as "Confidential Information" in the "Reciprocal Confidentiality Agreement" between the Parties effective May 19, 2020 (the "**RCDA**"), and this Article 6 shall likewise apply to any such information disclosed under the RCDA, which shall, as of the Effective Date, be replaced by this Agreement.  All Service Provider Background Technology and Service Provider Foreground Technology is the Confidential Information of Service Provider.  All AstraZeneca Background Technology and AstraZeneca Foreground Technology is the Confidential Information of AstraZeneca. The financial terms of this Agreement are the Confidential Information of the Parties.  Confidential Information does not include any information that (a) the receiving party can prove was known to it prior to the date of disclosure under this Agreement and any other agreement between the Parties hereto; (b) the receiving Party can prove was lawfully obtained from a third party without any obligation of confidentiality; (c) is or becomes part of the public domain other than through any act or omission of the receiving Party; or (d) is independently developed by the receiving Party without use of or reference to the disclosing Party's Confidential Information, as evidenced by the receiving Party's business records.

6.2       Required Disclosure.

(a)       Notwithstanding other provisions of this Agreement, a Party may disclose Confidential Information of the other Party to the extent and to the persons or entities required under Applicable Law, rule, regulation or order, provided that such Party (i) first gives prompt notice of such disclosure requirement to the other Party so as to enable the other Party to seek any limitations on or exemptions from such disclosure requirement, (ii) reasonably cooperates at the other Party's request and expense in any such efforts by the other Party, and (iii) only discloses that portion of such Confidential Information as is legally required.

(b)       Service Provider understands and acknowledges that AstraZeneca is in negotiations of a proposal in response to the Department of Health and Human Services' ("**HHS**") Request for Proposal (RFP) Number BAA-18-100-SOL-00003 "Broad Agency Announcement for the Advanced Research and Development of Chemical, Biological, Radiological, and Nuclear Medical Countermeasures": Area of Interest #8.3,  ChAdOx1: Manufacturing and Clinical Evaluation of a COVID-19 Vaccine (the "**Proposal**").

(c)       Service Provider further understands and agrees that AstraZeneca may provide Confidential Information provided under this Agreement (including information exchanged pursuant to the RDCA) to representatives or agents of

-8-

HIGHLY CONFIDENTIAL                                                                                   AZ_COR _000056

the U.S. Government in connection with the Proposal. AstraZeneca further understands and agrees that Emergent may provide Confidential Information provided under this Agreement (including information exchanged pursuant to the RDCA) to representatives or agents of the United States Government in connection with the Task Order. Each Party takes commercially reasonable steps to restrict their disclosure by the U.S. Government under applicable public disclosure / transparency laws. Each Party, however, shall have no liability for the U.S. Government's release of any Confidential Information.

6.3    Return of Confidential Information. Upon the earlier of the termination of this Agreement or at a Party's request for any reason at any time, the other Party shall (a) immediately cease all use of the other Party's Confidential Information disclosed thereunder and (b) promptly, at the requestor's instruction, either return to the requestor or destroy the other Party's Confidential Information disclosed thereunder, including any copies, extracts, summaries, or derivative works thereof, and certify in writing to the requestor the completion of such return and/or destruction, provided, however, that such party may retain one copy solely for archival purposes.

7.    **TERM AND TERMINATION**

7.1    Term. The term of this Agreement shall begin on the Effective Date and shall end twelve (12) months thereafter, unless sooner terminated in accordance the terms hereof. The term of this Agreement may be extended upon written agreement by AstraZeneca and Service Provider. Any uncompleted, unterminated Work Orders shall continue notwithstanding the expiry of this Agreement.

7.2    Termination. A Work Order or this Agreement may be terminated (a) by either Party upon the material breach of this Agreement by the other Party, which material breach continues un-remedied for twenty (20) days after delivery to the non-breaching Party of notice of the material breach, and (b) by either Party immediately in the event of the bankruptcy (voluntary or otherwise), insolvency or other similar financial distress of the other Party; or (c) by AstraZeneca for any reason upon thirty (30) days' prior written notice to Service Provider.

7.3    Payment upon Termination. If this Agreement or any Work Order is terminated in accordance with Section 7.2, AstraZeneca shall pay all outstanding amounts for all work performed and in process in accordance with the terms of this Agreement and any Work Order through the date of termination, plus all reasonable, bona fide and duly documented non-cancellable out-of-pocket costs and expenses incurred by Service Provider on behalf of AstraZeneca in connection with this Agreement and the Work Order and/or as a result of such termination (collectively "**Accrued Amounts**"). In addition, if this Agreement is terminated for any reason other than by AstraZeneca pursuant to Section 7.2(a), AstraZeneca shall pay Service Provider: (i) any portion of the AZ Initial Capacity Commitment Fee not yet paid to Service Provider; (ii) a cancellation fee equal to 100% of all remaining fees (i.e., other than the Accrued Amounts) for all activities set forth in the Work Order(s), whether initiated or not as of the termination date.

8.    **MISCELLANEOUS**

8.1    Entire Agreement. This Agreement (together with the Exhibits hereto and the Quality Agreement) constitutes the entire agreement between the Parties and supersedes all prior negotiations, representations or agreements, either written or oral, with respect to the subject matter hereof.

8.2    Subcontractors. Service Provider is not permitted to delegate any of the Services provided for in any Work Order to non-Affiliate third parties who are not identified in a Work Order unless prior written consent is first obtained from AstraZeneca, which shall not be unreasonably withheld or delayed, and unless such subcontractors have executed a written agreement with AstraZeneca or with Service Provider which obligates any such subcontractor to substantially similar terms as is required of Service Provider by this Agreement; provided, for clarity, Service Provider will remain responsible for the full and complete performance of all of its obligations and duties under this Agreement and the compliance of any such subcontractors, agents and other third parties with the terms of this Agreement.

-9-

US 167835806v13

HIGHLY CONFIDENTIAL

AZ_COR _000057

8.3    Indemnification.

(a)    Indemnification by AstraZeneca. AstraZeneca shall indemnify, defend and hold harmless Service Provider, its Affiliates, and their respective directors, officers, employees and agents (the "**Service Provider Indemnitees**") from and against any and all losses, damages, costs and expenses, including reasonable attorneys' fees arising out of claims by third parties as a result of: (i) the negligence or willful misconduct of AstraZeneca or a AstraZeneca Indemnitee (as defined in Section 8.3(b)) or (ii) AstraZeneca's breach of this Agreement, including without limitation, any representations, warranties and covenants herein, or (iii) any use, handling or disposal of any product produced by Service Provider for AstraZeneca, including without limitation, any claim or liability asserted by any participant in any clinical trial of AstraZeneca's Product; or (iv) any alleged or actual infringement or misappropriation of third-party intellectual property rights in the Product or any portion thereof, or manufacture of the Product, or resulting from, use of any AstraZeneca provided information, data, or property in the performance of the Services; except in each case to the extent that (A) such third party claim is based upon the negligence or willful misconduct of Service Provider or a Service Provider Indemnitee or breach of this Agreement by Service Provider or (B) Service Provider has an obligation to indemnify AstraZeneca pursuant to Section 8.3(b), as to which third party claims each Party shall indemnify the other to the extent of its respective liability for such third party claims. Service Provider must promptly notify AstraZeneca of a covered claim, must tender to AstraZeneca (and/or its insurer) full authority to defend or settle (for monetary damages) the claim, and must reasonably cooperate with the defense at AstraZeneca's request and expense.

(b)    Indemnification by Service Provider. Subject to Section 8.4, Service Provider shall indemnify, defend and hold harmless AstraZeneca, its Affiliates, and their respective directors, officers, employees, and agents (the "**AstraZeneca Indemnitees**") from and against any and all losses, damages, costs and expenses, including reasonable attorneys' fees arising out of claims by third parties as a result of (i) Service Provider's gross negligence or willful misconduct; or (ii) Service Provider's breach of this Agreement, including without limitation, any representations, warranties and covenants herein; or (iii) any alleged or actual infringement or misappropriation of third-party intellectual property rights resulting from use of any Service Provider provided information, data, or property in the performance of the Services, except in each case to the extent that (A) such third party claim is based upon the negligence or willful misconduct of AstraZeneca or a AstraZeneca Indemnitee or breach of this Agreement by AstraZeneca or (B) AstraZeneca has an obligation to indemnify Service Provider pursuant to Section 8.3(a), as to which third party claims each Party shall indemnify the other to the extent of its respective liability for such third party claims. AstraZeneca must promptly notify Service Provider of a covered claim, must tender to Service Provider (and/or its insurer) full authority to defend or settle (for monetary damages) the claim, and must reasonably cooperate with the defense at Service Provider's request and expense.

(c)    The foregoing indemnification rights shall apply only to third party losses.

8.4    **LIMITATION OF LIABILITY.** NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, TO THE MAXIMUM EXTENT PERMITTED BY LAW:

(a)    EXCEPT TO THE EXTENT CAUSED SOLELY BY SERVICE PROVIDER'S GROSS NEGLIGENCE, FRAUD OR WILLFUL MISCONDUCT, IN NO EVENT SHALL SERVICE PROVIDER HAVE ANY LIABILITY FOR THE LOSS OR DAMAGE, THE REPLACEMENT, OR THE COST OR VALUE, OF ANY ASTRAZENECA MATERIALS (AS DEFINED ABOVE). WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, AND EXCEPT TO THE EXTENT CAUSED SOLELY BY SERVICE PROVIDER'S GROSS NEGLIGENCE, FRAUD OR WILLFUL MISCONDUCT, SERVICE PROVIDER HAS NO LIABILITY FOR THE ASTRAZENECA MATERIALS DURING THE PROCESSING OR MANUFACTURING OF PRODUCT NOR FOR ANY LOSS OR DAMAGE OF ASTRAZENECA MATERIALS CAUSED BY A CONFORMING OR NON-CONFORMING BATCH.

(b)    EXCEPT WITH RESPECT TO A PARTY'S MATERIAL BREACH OF ITS CONFIDENTIALITY OBLIGATIONS UNDER SECTION 6, IN NO EVENT SHALL EITHER PARTY BE LIABLE UNDER THIS

-10-

US 167835806v13

HIGHLY CONFIDENTIAL

AZ_COR _000058

AGREEMENT TO THE OTHER PARTY FOR THE COST OF SUBSTITUTE SERVICES, DAMAGES FOR DELAYS, LOSS OF USE, DATA, REVENUE OR PROFIT OR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL, OR PUNITIVE DAMAGES, INCLUDING ANY DAMAGES FOR BUSINESS INTERRUPTION, WHETHER ARISING OUT OF BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, REGARDLESS OF WHETHER SUCH DAMAGES WERE FORESEEABLE AND WHETHER OR NOT SUCH PARTY WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.  FOR AVOIDANCE OF DOUBT, THE PARTIES AGREE THAT ANY CLAIM BY SERVICE PROVIDER FOR ANY PORTION OF THE CAPACITY COMMITMENT FEE OR ANY OTHER FEES OWED BY ASTRAZENECA AND NOT PAID IN ACCORDANCE WITH THIS AGREEMENT SHALL NOT BE EXCLUDED BY THIS SECTION 8.4(b).

(c)     IN ADDITION TO THE FOREGOING, EXCEPT FOR SERVICE PROVIDER'S (A) BREACH OF ITS RESERVED CAPACITY OBLIGATION HEREUNDER WHICH SHALL BE AS SET FORTH IN SECTION 8.4(d) BELOW, SERVICE PROVIDER'S AGGREGATE LIABILITY TO ASTRAZENECA HEREUNDER, FOR ANY REASON WHATSOEVER, INCLUDING WITHOUT LIMITATION FOR ANY AND ALL BREACHES OF ITS OBLIGATIONS UNDER THIS AGREEMENT, IS LIMITED TO THE FEES (EXCLUDING THE CAPACITY COMMITMENT FEE(S)) PAID BY ASTRAZENECA TO SERVICE PROVIDER  WITHIN THE TWELVE MONTHS PRECEDING THE INCIDENT GIVING RISE TO SUCH CLAIM.

(d)     FURTHERMORE, SERVICE PROVIDER'S AGGREGATE LIABLITY TO ASTRAZENECA SOLELY WITH RESPECT TO A BREACH BY SERVICE PROVIDER OF ITS OBLIGATION TO RESERVE CAPACITY PURSUANT TO A WORK ORDER SHALL BE LIMITED TO THE AMOUNTS ACTUALLY PAID BY ASTRAZENECA TO SERVICE PROVIDER HEREUNDER IN THE FORM OF A CAPACITY COMMITMENT FEE (EXCLUDING THE BARDA INITIAL CAPACITY COMMITMENT FEE AND THE BARDA SUBSEQUENT CAPACITY COMMITMENT FEE).  FOR CLARITY, SERVICE PROVIDER SHALL HAVE NO LIABILITY TO ASTRAZENECA FOR A BREACH OF RESERVED CAPACITY OBLIGATIONS TO THE EXTENT CAUSED BY A UNITED STATES GOVERNMENT DIRECTION OR REQUIREMENT.

(e)     NOTWITHSTANDING THE PROVISIONS OF THIS SECTION 8.4, NOTHING IN THIS AGREEMENT SHALL OPERATE TO EXCLUDE OR RESTRICT EITHER PARTY'S LIABILITY FOR FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

8.5     Insurance.  Each Party agrees to keep in full force and effect and maintain at its sole cost and expense insurance coverage in types and amounts commensurate in its industry for the performance of services substantially similar to the services by similarly-sized companies, and as otherwise prudent or required by law.  Each Party agrees to provide the other party with certificates of insurance if requested to do so by the other Party.

8.6     Publicity.  Except as required by Applicable Law, neither of the Parties shall use the name of the other Party (or of the other Party's Affiliate) for promotional purposes without the prior written consent of the party whose name is proposed to be used, such consent not to be unreasonably withheld or delayed, nor shall either Party disclose the existence or substance of this Agreement (except as already previously disclosed through a prior written mutually agreed disclosure). In particular, neither Party shall make any publications, presentations, or public disclosures related to this Agreement and the subject matter thereof without the other Party's prior review and written approval, such approval not to be unreasonably withheld or delayed; provided, for clarity, AstraZeneca is in no way restricted by this Section 8.6 from making any publications, presentations, or public disclosures related to the Product or AstraZeneca's COVID-19 program generally, which do not specifically include details of this Agreement.

8.7     Choice of Law; Dispute Resolution.

(a)     Choice of Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, excluding any conflicts or choice of law rule or principle that might otherwise refer construction or

-11-

US 167835806v13

HIGHLY CONFIDENTIAL                                    AZ_COR _000059

interpretation of this Agreement to the substantive law of another jurisdiction. The Parties agree to exclude the application to this Agreement of the United Nations Convention on Contracts for the International Sale of Goods.

(b)       Service. Each Party further agrees that service of any process, summons, notice or document by registered mail to its address set forth in Section 8.14 shall be effective service of process for any action, suit, or proceeding brought against it under this Agreement in or before any court or other tribunal, including in respect of the alternative dispute resolution procedures contemplated by Section 8.7(c).

(c)       Dispute Resolution.

(i)       If a dispute arises between the Parties in connection with or relating to this Agreement a Work Order or any document or instrument delivered in connection herewith (a "**Dispute**"), then either Party shall have the right to refer such Dispute to the executive officers of the Parties for attempted resolution by good faith negotiations during a period of ten (10) business says.  Any final decision mutually agreed to by such executive officers in writing shall be conclusive and binding on the Parties.

(ii)       If such executive officers are unable to resolve any such Dispute within such ten (10)-business day period, either Party shall be free to institute binding arbitration in accordance with Section 8.7(c)(iii) upon written notice to the other Party (an "**Arbitration Notice**") and seek such remedies as may be available.

(iii)       Upon receipt of an Arbitration Notice by a Party, the applicable Dispute shall be resolved by final and binding arbitration before a panel of three (3) experts with relevant industry experience (the "**Arbitrators**").  Each of Service Provider and AstraZeneca shall promptly select one (1) Arbitrator, which selections shall in no event be made later than fifteen (15) days after the notice of initiation of arbitration.  The third Arbitrator shall be chosen promptly by mutual agreement of the Arbitrator chosen by Service Provider and the Arbitrator chosen by AstraZeneca, but in no event later than fifteen (15) days after the date that the last of such Arbitrators was appointed.  The Arbitrators shall determine what discovery will be permitted, consistent with the goal of reasonably controlling the cost and time that the Parties must expend for discovery; provided that the Arbitrators shall permit such discovery as they deem necessary to permit an equitable resolution of the dispute.  The arbitration shall be administered by the American Arbitration Association (or its successor entity) in accordance with the then current Commercial Rules of the American Arbitration Association including the Procedures for Large, Complex Commercial Disputes (including the Optional Rules for Emergency Measures of Protection), except as modified in this Agreement.  The arbitration shall be held in Wilmington, Delaware, and the Parties shall use reasonable efforts to expedite the arbitration if requested by either Party.  The Arbitrators shall, within fifteen (15) days after the conclusion of the arbitration hearing, issue a written award and statement of decision describing the essential findings and conclusions on which the award is based, including the calculation of any damages awarded.  The decision or award rendered by the Arbitrators shall be final and non-appealable, and judgment may be entered upon it in accordance with Applicable Law in the State of Delaware or any other court of competent jurisdiction. The Arbitrators shall be authorized to award compensatory damages, but shall not be authorized to reform, modify or materially change this Agreement or any other agreements contemplated hereunder.

(iv)       Each Party shall bear its own counsel fees, costs, and disbursements arising out of the dispute resolution procedures described in this Section 8.7(c), and shall pay an equal share of the fees and costs of the Arbitrators and all other general fees related to any arbitration described in Section 8.7(c); provided, however, the Arbitrators shall be authorized to determine whether a Party is the prevailing Party, and if so, to award to that prevailing Party reimbursement for its reasonable counsel fees, costs and disbursements (including expert witness fees and expenses, photocopy charges, or travel expenses), or the fees and costs of the Arbitrators.  Unless the Parties otherwise agree in writing, during the period of time that any arbitration proceeding described in Section 8.7(c) is pending under this Agreement, the Parties shall continue to comply with all those terms and provisions of this Agreement that are not the subject of such pending arbitration proceeding.  Nothing contained in this Agreement shall deny any Party the right to seek injunctive or other equitable relief from a court of competent jurisdiction in the context of a bona fide

-12-

US 167835806v13

HIGHLY CONFIDENTIAL

AZ_COR _000060

application to prevent irreparable harm involving a Party's Confidential Information, and such an action may be filed and maintained notwithstanding any ongoing arbitration proceeding. All arbitration proceedings and decisions of the Arbitrator under this Section 8.7(c) shall be deemed Confidential Information of both Parties under Section 6.

8.8     Agreement Modification/Assignment. This Agreement, or any of its Exhibits, may not be altered, amended, or modified except by a written document signed by the Parties. Neither Party may assign this Agreement or any of its rights or obligations without the prior written consent of the other Party and any purported assignment in contravention of this Section shall be null and void, provided, however, that either Party may assign this Agreement to a corporate Affiliate or to any corporation with which it may merge or consolidate or to which it may assign substantially all of its assets or that portion of its business to which this Agreement pertains without obtaining the agreement of the other Party. AstraZeneca's use of purchase orders is for its convenience only and no purchase order shall modify or supersede the terms of this Agreement or of any Work Order. If this Agreement conflicts with the terms of the Quality Agreement with respect to any quality-related matters, then the Quality Agreement shall control. If this Agreement conflicts with the Quality Agreement with respect to any matters not related to Quality, then this Agreement shall control.

8.9     Performance Through Affiliates. Each Party may discharge any obligations and exercise any right hereunder and under any Work Order through any of its Affiliates. Each Party hereby guarantees the performance by its Affiliates of such Party's obligations under this Agreement and any Work Order, and shall cause its Affiliates to comply with the provisions of this Agreement and any Work Order in connection with such performance. Any breach by a Party's Affiliate of any of such Party's obligations under this Agreement or any Work Order shall be deemed a breach by such Party, and the other Party may proceed directly against such Party without any obligation to first proceed against such Party's Affiliate. As used in this Agreement, "**Affiliate**" means, with respect to either Party, any present or future legal entity that, directly or indirectly through one or more intermediate legal entities, controls, is controlled by, or is under common control with such Party. For purposes of this definition, "**Control**" means (a) fifty percent (50%) or more of the outstanding voting stock of a corporation or company limited by shares, (b) fifty percent (50%) or more of the equity of a limited liability company, partnership or joint venture, (c) a general partnership interest in a partnership or joint venture, or (d) the power, direct or indirect, to direct or cause the direction of the management and policies of the controlled entity, whether through the ownership of voting equity interests in the entity, through contract or otherwise.

8.10    Counterparts. This Agreement may be executed in counterparts, each of which will be deemed an original and both of which together will constitute one and the same instrument. Each Party may execute this Agreement by facsimile transmission or in Adobe™ Portable Document Format ("**PDF**") or DocuSign® format sent by electronic mail. In addition, facsimile, PDF or DocuSign signatures of authorized signatories of any Party will be deemed to be original signatures and will be valid and binding, and delivery of a facsimile, PDF or DocuSign signature by any Party will constitute due execution and delivery of this Agreement.

8.11    Survival of Obligations. Notwithstanding expiration or termination of this Agreement for any reason, the rights and obligations under Sections 2.1(c), 2.3, 5, 6, 7.3 and 8 will survive the expiration or termination of this Agreement.

8.12    Enforceability. If any of the provisions or a portion of any provision of this Agreement is held to be unenforceable or invalid by a court of competent jurisdiction, the validity and enforceability of the enforceable portion of any such provision and/or the remaining provisions will not be affected thereby. In such event, the Parties shall negotiate promptly to replace such invalid, unenforceable, or illegal part with a valid, enforceable, and legal provision which most closely effectuates the Parties' original intent.

8.13    Force Majeure. If either Party fails to fulfill its obligations hereunder (other than an obligation for the payment of money), when such failure is due to an act of God, emergency order of government, or other circumstances beyond its reasonable control, whether or not foreseeable, including but not limited to facility shutdown, supplier delays or failures, equipment failure, fire, flood, civil commotion, epidemic or pandemic, riot, war (declared and undeclared), revolution, action by government including delays in obtaining governmental approvals or embargoes, then said failure shall be excused for the duration of such event and for such a time thereafter as is reasonable to enable the Parties to

-13-

US 167835806v13

HIGHLY CONFIDENTIAL

resume performance under the Work Order (each a "**Force Majeure**"). In the event of a Force Majeure, the provisions of Section 1.5 shall apply.

8.14    Notices. Any notices given hereunder shall be sent by email (with a confirmation copy sent via overnight courier) or via overnight courier to the following addresses (or such other address as a party may designate as a notice address in a prior written notice to the other party) and shall be deemed delivered when received (or if received on a weekend or holiday, on the next business day thereafter) as follows:

| Service Provider | To: | With a copy to: |
|---|---|---|
| | Emergent Manufacturing Operations Baltimore, LLC 400 Professional Drive, Suite 400 Gaithersburg, MD 20879 Attention: Syed Husain, Senior Vice President, BU Head, CDMO | Emergent BioSolutions Inc. 400 Professional Drive, Suite 400 Gaithersburg, MD 20879 Attention: General Counsel |
| **AstraZeneca** | To: | With a copy to (which shall not constitute effective notice): |
| | AstraZeneca Pharmaceuticals LP 1800 Concord Pike, Wilmington, Delaware 19803, USA Attention: Head of Global Supply Chain and Strategy | Email: ██████@astrazeneca.com Attention: Legal Department |

8.15    Third Party Beneficiaries. The provisions set forth in this Agreement are for the sole benefit of the Parties and their successors and assigns, and they shall not be construed as conferring any rights on any other persons.

8.16    Waiver of Jury Trial. TO THE FULLEST EXTENT PERMITTED BY LAW, THE PARTIES HERETO HEREBY IRREVOCABLY WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY ACTION RELATED TO THIS AGREEMENT.

*    *    *    *    *

-14-

US 167835806v13

HIGHLY CONFIDENTIAL                                    AZ_COR _000062

IN WITNESS WHEREOF, the Parties have caused this Master Services Agreement to be executed by their duly authorized representatives as of the Effective Date.

**ASTRAZENECA PHARMACEUTICALS LP**



BY:

Name:

Title:  Operations - BES Director

**EMERGENT MANUFACTURING OPERATIONS BALTIMORE, LLC**

DocuSigned by:

BY:  Syed T Husain

Name:  Syed T Husain

Title:  SVP & CDMO BU Head

US 167835806v13

HIGHLY CONFIDENTIAL

CONFIDENTIAL

## EXHIBIT A

## FORM OF WORK ORDER

## WORK ORDER #[●] - [PROJECT TITLE]

Pursuant to Section 1.1 of the Master Services Agreement dated June 10, 2020, by and between [AstraZeneca Pharmaceuticals LP ("**Client**") and [●]][1] ("**Service Provider**") and in consideration of the mutual promises contained therein and for other good and valuable consideration the receipt and adequacy of which each of the Parties does hereby acknowledge, the Parties hereby agree to amend Exhibit B by adding this Work Order entitled [PROJECT TITLE], which is designated Work Order #1 (this "**Work Order**"). This Work Order is effective as of [●], 2020 and shall terminate on [●], unless earlier terminated as permitted in the Master Services Agreement. Capitalized terms used in this Work Order that are not otherwise defined herein have the meanings given to them in the Master Services Agreement.

1.      <u>Services</u>.  Service Provider will render to Client the following Services:

1.1      [●].

1.2      [●].

2.      <u>Deliverables</u>.

2.1      [●].

2.2      [●].

3.      <u>Materials</u>.  Client will provide to Service Provider the following Materials for the Services: [●].

4.      <u>Timeline</u>. [●].

5.      <u>Capacity Reservation</u>. [●].

6.      <u>Service Fees</u>.

6.1      The fees due to Service Provider for Services under this Work Order shall be as follows: [●]

6.2      Such compensation will be paid [INSERT PAYMENT SCHEDULE].  Client and Service Provider must agree in advance of either Party making any change in compensation. Invoices, referencing the purchase order number below, should reference this Agreement and should be submitted to [INSERT ASTRAZENECA UK LIMITED OR APPROPRIATE AZ AFFILIATE] the following address: [●].

6.3      All undisputed payments will be made by Client within thirty [(30) days] of its receipt of an invoice to the [Service Provider Account] or such other bank account as specified by Service Provider on the invoice.

---

[1] **Note to Draft**: AZ and Service Provider to each a Work Order to be confirmed.

US 167835806v13

CONFIDENTIAL

7.      <u>Miscellaneous</u>. All terms and conditions of the Master Services Agreement apply to this Work Order.

[***Signature page follows***]

US 167835806v13

HIGHLY CONFIDENTIAL                                                                      AZ_COR _000065

**[ASTRAZENECA PHARMACEUTICALS LP]    [SERVICE PROVIDER]**


By:_____    By:_____

Name: _____    Name: _____

Title: _____    Title: _____

Date: _____    Date: _____

US 167835806v13

HIGHLY CONFIDENTIAL                    AZ_COR _000066

**EXHIBIT B**

**WORK ORDERS**
**(in the form of <u>Exhibit A</u>)**

US 167835806v13

HIGHLY CONFIDENTIAL                                                                    AZ_COR _000067