**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| IN RE EMERGENT BIOSOLUTIONS INC. SECURITIES LITIGATION | Civil No. 8:21-cv-00955-PWG <br><br> CLASS ACTION |
| THIS DOCUMENT RELATES TO: <br><br> All Actions | |

**MEMORANDUM IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS (DKT. NO. 72)**

## TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................... 1

II.     BACKGROUND ............................................................................................ 1

        A.      The FAC's Allegations ....................................................................... 2

                1.      Overview Of The Alleged Fraud ............................................... 2

                2.      The FAC's Allegations Evidencing Falsity .............................. 2

                3.      The FAC's Allegations Evidencing Scienter ............................ 3

                4.      The FAC's Alleged Partial Corrective Disclosures .................. 3

        B.      The Judicial Notice Materials ........................................................... 3

III.    ARGUMENT ................................................................................................. 3

        A.      Applicable Legal Standards ............................................................... 3

        B.      The FAC Is Properly Pled .................................................................. 5

        C.      The FAC Sufficiently Pleads False Or Misleading Statements And
                Omissions ........................................................................................... 8

                1.      The FAC Adequately Pleads The Business Operations Fraud ................... 8

                        a.      Pre-March 31, 2021 Misstatements And Omissions ...................... 8

                                i.      The Statements Were Actionable Non-Puffery ................. 8

                                ii.     The Risk Warnings Fail To Shield Against Liability ......... 9

                                iii.    Defendants Had And Violated A Duty To Disclose ......... 12

                        b.      Post-March 31, 2021 Misstatements And Omissions ................... 22

                2.      The FAC Adequately Pleads The Reported Results Fraud ....................... 25

                3.      The FAC Adequately Pleads The Internal Controls Fraud ....................... 27

        D.      The FAC Sufficiently Pleads A Strong Inference Of Defendants' Scienter ......... 29

                1.      The Knowledge And Recklessness Allegations ....................................... 29

                2.      Defendants' Admissions And Concessions ............................................. 36

i

3. The Motive And Opportunity Allegations ................................................ 41

    a. Suspicious Insider Transactions ...................................................... 41

    b. Suspicious Executive Compensation And Bonuses ....................... 45

    c. Emergent's Unearned, Windfall Government Payments .............. 47

    d. Emergent Raised Funds During The Fraud ................................. 48

4. The FAC's Core Operations Doctrine Allegations ................................... 48

5. Defendants Signed, Were Quoted In, SOX-Certified Misstatements ....... 49

6. Corporate Code of Conduct Violations ..................................................... 50

7. Executive Resignations And Retaliation Against Employees .................. 50

8. Congressional and SEC Investigations ..................................................... 52

9. Defendants' Competing Inference Is Not More Compelling ................... 53

E. The FAC States A Control Person Claim Under §20(a) ....................................... 55

IV. CONCLUSION ........................................................................................................ 55

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*380544 Can., Inc. v. Aspen Tech., Inc.*,
544 F. Supp. 2d 199 (S.D.N.Y. 2008)......................................................................................21

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)...................................................................................................31

*Arnlund v. Deloitte & Touche LLP*,
199 F. Supp. 2d 461 (E.D. Va. 2002) ................................................................................5, 48

*Asher v. Baxter Int'l Inc.*,
377 F.3d 727 (7th Cir. 2004), *as amended* (Sept. 3, 2004)....................................................11

*Barrie, v. Intervoice-Brite, Inc.*,
397 F.3d 249 (5th Cir. 2005) .................................................................................................45

*Beach v. Healthways, Inc.*, No. 3:08-0569,
2009 WL 650408 (M.D. Tenn. Mar. 9, 2009) .......................................................................47

*Black v. Martek Biosciences Corp.*, No. CV MJG-05-1224,
2006 WL 8435572 (D. Md. June 14, 2006).............................................................................18

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
866 F. Supp. 2d 223 (S.D.N.Y. 2012)......................................................................................51

*Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*,
496 F. Supp. 3d 952 (E.D. Va. 2020) .....................................................................................51

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*,
497 F.3d 546 (5th Cir. 2007) ............................................................................................45, 49

*Chamberlain v. Reddy Ice Holdings, Inc.*,
757 F. Supp. 2d 683 (E.D. Mich. 2010)...................................................................................50

*City of Ann Arbor Emps' Ret. Sys. v. Sonoco Prod. Co.*,
827 F. Supp. 2d 559 (D.S.C. 2011)......................................................................................9, 11

*City of Brockton Ret. Sys. v. Avon Prods., Inc.*, No. 11 Civ. 4665 (PGG),
2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014).........................................................................21

*City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*,
565 F. Supp. 3d 478 (S.D.N.Y. 2021)......................................................................................45

*City of Pontic Gen. Emps. Ret. Sys. v. Schweitzer-Mauduit Int'l, Inc.*,
806 F. Supp. 2d 1267 (N.D. Ga. 2011) ...............................................................7, 8

*City of Providence v. Aeropostale, Inc.*, No. 11 Civ. 7132 (CM),
2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ..........................................................45

*City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*,
686 F. Supp. 2d 404 (D. Del. 2009)........................................................................28

*Collier v. ModusLink Glob. Sols., Inc.*,
9 F. Supp. 3d 61 (D. Mass. 2014) ..........................................................................52

*ContraVest Inc. v. Mt. Hawley Ins. Co.*, No. 20-1915,
2021 WL 4782687 (4th Cir. Oct. 13, 2021)..............................................................4

*Cozzarelli v. Inspire Pharms., Inc.*,
549 F.3d 618 (4th Cir. 2008) ........................................................37, 44, 46, 48, 54

*Crutchfield v. Match Grp., Inc.*,
529 F. Supp. 3d 570 (N.D. Tex. 2021) ...................................................................50

*Crutchfield v. Match Grp., Inc.*, No. 3:19-cv-2356-S,
2021 WL 5480682 (N.D. Tex. Nov. 19, 2021)..........................................................50

*Cunningham v. Identiv, Inc.*,
716 F. App'x 663 (9th Cir. 2018).............................................................................50

*Edwards v. McDermott Int'l, Inc.*, No. 18-cv-4330,
2021 WL 1421609 (S.D. Tex. Apr. 13, 2021) ..........................................................47

*Emps.' Ret. Sys. of City of Baton Rouge & Par. Of E. Baton Rouge v. MacroGenics, Inc.*.
No. GJH-19-2713, 2021 WL 4459218 (D. Md. Sept. 29, 2021) ..............................39

*Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*,
794 F.3d 297 (2d Cir. 2015)...........................................................................19, 44

*Epstein v. World Acceptance Corp.*, 6:14-cv-01606-MGL,
2015 WL 2365701 (D.S.C. May 18, 2015)................................4, 11, 20, 30, 51, 53

*Finder v. Pearson PLC*, No. 17 Civ. 1422 (RJS),
2019 WL 10632904 (S.D.N.Y. Sept. 16, 2019).......................................................14

*Fla. State Bd. Of Admin. v. Green Tree Fin. Corp.*,
270 F.3d 645 (8th Cir. 2001) .................................................................................47

*Freudenberg v. E*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010).................................................................43, 45

*Garfield v. NDC Health Corp.*,
   466 F.3d 1255 (11th Cir. 2006) ........................................................................49

*George v. China Auto. Sys., Inc.*, No. 11 Civ. 7533 (KBF),
   2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012) ...................................................44

*Gillis v. ORX Pharma Ltd.*, No. 15 Civ. 4868 (PAE),
   2016 WL 3685095 (S.D.N.Y. July 6, 2016) ....................................................54

*Goldstein v. MCI WorldCom*,
   340 F.3d 238 (5th Cir. 2003) ..........................................................................47

*Hall v. Rent-A-Ctr., Inc.*,No. 4:16cv978,
   2017 WL 6379334 (E.D. Tex. Dec. 14, 2017)..................................................51

*Homeward Residential, Inc. v. Sand Canyon Corp.*, No. 13 CIV. 2107 AT,
   2014 WL 2510809 (S.D.N.Y. May 28, 2014) ..................................................21

*In re 2U, Inc. Sec. Class Action*, No. CV TDC-19-3455,
   2021 WL 3418841 (D. Md. Aug. 5, 2021) ...............................................10, 11, 40

*In re Anadarko Petroleum Corp. Class Action Litig.*,
   957 F. Supp. 2d 806 (S.D. Tex. 2013) ............................................................39

*In re ArthroCare Corp. Sec. Litig.*,
   726 F. Supp. 2d 696 (W.D. Tex. 2010)........................................................49, 51

*In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.*,
   763 F. Supp. 2d 423 (S.D.N.Y. 2011)..............................................................14

*In re BISYS Sec. Litig.*,
   397 F. Supp. 2d (S.D.N.Y. 2005)......................................................................51

*In re Braskem S.A. Sec. Litig.*,
   246 F. Supp. 3d 731 (S.D.N.Y. 2017)..............................................................29

*In re Bristol Myers Squibb Co. Sec. Litig.*,
   586 F. Supp. 2d 148 (S.D.N.Y. 2008)..............................................................53

*In re Cabletron Sys., Inc.*,
   311 F.3d 11 (1st Cir. 2002)..............................................................................18

*In re Cardinal Health Inc. Sec. Litig.*,
   426 F. Supp. 2d 688 (S.D. Ohio 2006) ............................................................47

*In re Career Educ. Corp. Sec. Litig.*, No. 03 C 8884,
   2006 WL 999988 (N.D. Ill. Mar. 28, 2006)....................................................33

v

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, No. 17 Civ. 1580 (LGS),
    2018 WL 2382600 (S.D.N.Y. May 24, 2018) ............................................................31

*In re Comp. Scis. Corp. Sec. Litig.*,
    890 F.Supp.2d 650 (E.D.Va.2012) .........................................................................10

*In re Conventry*,
    2011 WL 3880431 ................................................................................................19

*In re Countrywide*,
    554 F. Supp. 2d at 1044, 1058-1059.................................................................20, 45

*In re Coventry Healthcare Sec. Litig.*,
    2011 WL 1230998 (D. Md. Mar. 30, 2011).........................................................9, 33

*In re DRDGOLD Ltd. Sec. Litig.*,
    472 F. Supp. 2d 562 (S.D.N.Y. 2007).....................................................................51

*In re Enzymotec Sec. Litig.*, No. 14-5556 (JLL) (MAH),
    2015 WL 8784065 (D.N.J. Dec. 15, 2015).........................................................29, 49

*In re Equifax Inc. Sec. Litig.*,
    357 F. Supp. 3d 1189 (N.D. Ga. 2019) ...................................................................23

*In re FBR Inc. Sec. Litig.*,
    544 F. Supp. 2d 346 (S.D.N.Y. 2008).....................................................................29

*In re First Union Corp. Sec. Litig.*,
    128 F. Supp. 2d 871 (W.D.N.C. 2001) ...................................5, 9, 17, 22, 37, 43

*In re Fleming Cos. Sec. & Derivative Litig.*, No. CIVA503MD1530TJW,
    2004 WL 5278716 (E.D. Tex. June 16, 2004).........................................................51

*In re Gentiva Sec. Litig.*,
    971 F. Supp. 2d 305 (E.D.N.Y. 2013) .....................................................................45

*In re Genworth*,
    103 F. Supp. 3d at 785–86 .....................................................................................47

*In re Genworth Fin. Inc. Sec. Litig.*,
    103 F. Supp. 3d 759 (E.D. Va. 2015) .......................................10, 12, 21, 40, 48, 49

*In re GeoPharma, Inc. Sec. Litig.*,
    41 F. Supp. 2d 434 (S.D.N.Y. 2006)........................................................................35

*In re Human Genome Scis. Inc. Sec. Litig.*,
    933 F. Supp. 2d 751 (D. Md. 2013).......................................................................4, 14

*In re Keryx Biopharms., Inc. Sec. Litig.*, 13 Civ. 1307 (KBF),
    2014 WL 585658 (S.D.N.Y. Feb. 14, 2014) ................................................................45

*In re Lehman Bros. Sec. & ERISA Litig.*, No. 09 MD 2017 LAK,
    2013 WL 3989066 (S.D.N.Y. July 31, 2013) ............................................................21

*In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*,
    2014 WL 285103 (S.D.N.Y. Jan. 27, 2014) ..............................................................41

*In re Marriott Int'l, Inc. Customer Data Sec. Breach Litig.*,
    543 F.Supp.3d 96 (D. Md. 2021) ..................................................7, 8, 21, 22, 27, 28, 34, 40, 54

*In re Marriott Int'l, Inc.*,
    31 F.4th 898 (4th Cir. 2022) ........................................................7, 8, 21, 22, 27, 28, 34, 40, 54

*In re Massey Energy Co. Sec. Litig.*,
    883 F. Supp. 2d 597 (S.D.W. Va. 2012) ................................................11, 16, 19, 35

*In re MicroStrategy, Inc. Sec. Litig.*,
    115 F. Supp. 2d 620 (E.D. Va. 2000) ................................................................42, 43

*In re Mun. Mortg. & Equity, LLC, Sec. & Derivative Litig.*,
    876 F. Supp. 2d 616 (D. Md. 2012), ..............................................................18, 19, 45

*In re Nevsun Resources Ltd.*, No. 12 Civ. 1845 (PGG),
    2013 WL 6017402 (S.D.N.Y. Sept. 27, 2013) ..........................................................51

*In re Optionable Sec. Litig.*,
    577 F. Supp. 2d 681 (S.D.N.Y. 2008) ......................................................................21

*In re Oxford Health Plans, Inc.*,
    187 F.R.D. 133 (S.D.N.Y. 1999) ..............................................................................43

*In re Par Pharm. Sec. Litig.*,
    2009 WL 3234273 (D.N.J. Sept. 30, 2009) ..............................................................51

*In re PetroChina Co. Ltd. Sec. Litig.*,
    120 F. Supp. 3d 340 (S.D.N.Y. 2015), *aff'd* (Mar. 21, 2016) ................................29

*In re PetSmart, Inc. Sec. Litig.*,
    61 F. Supp. 2d 982 (D. Ariz. 1999) ........................................................................7, 8

*In re Pozen Sec. Litig.*,
    386 F. Supp. 2d 641 (M.D.N.C. 2005) ......................................................................4

*In re Progress Energy, Inc. Sec. Litig.*,
    371 F. Supp. 2d 548 (S.D.N.Y. 2005) ......................................................................12

*In re Res. Am. Sec. Litig.*, No. 98-5446,
  2000 WL 1053861 (E.D. Pa. July 26, 2000)................................................................................48

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
  351 F. Supp. 2d 334 (D. Md. 2004) ...............................................................................4, 5, 47

*In re SCANA Corp. Sec. Litig.*, No. CV 3:17-2616-MBS,
  2019 WL 1427443 (D.S.C. Mar. 29, 2019) ..............................................................................10, 11

*In re Seadrill Ltd. Sec. Litig.*, No. 14 Civ. 9642 (LGS),
  2016 WL 3461311 (S.D.N.Y. June 20, 2016) .............................................................................12

*In re Sierra Wireless, Inc. Sec. Litig.*,
  482 F. Supp 2d 365 (S.D.N.Y. 2007).................................................................................15, 27

*In re Silvercorp Metals, Inc. Sec. Litig.*,
  26 F. Supp. 3d 266 (S.D.N.Y. 2014).................................................................................48

*In re Sinclair Broad. Grp., Inc. Sec. Litig.*, No. CV CCB-18-2445,
  2020 WL 571724 (D. Md. Feb. 4, 2020),
  *reconsideration denied*,
  473 F. Supp. 3d 529 (D. Md. 2020) ...........................................................................10, 19, 30, 31

*In re SLM Corp. Sec. Litig.*,
  740 F. Supp. 2d 542 (S.D.N.Y. 2010).................................................................................45

*In re Smith & Wesson Holding Corp. Sec. Litig.*,
  604 F. Supp. 2d 332 (D. Mass. 2009) .................................................................................41

*In re Sturm, Ruger & Co., Inc. Sec. Litig.*, No. 3:09-CV-1293 CFD,
  2011 WL 494753 (D. Conn. Feb. 7, 2011) .................................................................................43

*In re Toronto-Dominion Bank Sec. Litig.*, No. CV 17-1665 (NLH/JS),
  2018 WL 6381882 (D.N.J. Dec. 6, 2018)..........................................17, 20, 21, 27, 28, 31, 48

*In re Tyco Int'l, Ltd. Multidistrict Litig.*, No. MDL 02-1335-B,
  2004 WL 2348315 (D.N.H. Oct. 14, 2004) .................................................................................6

*In re Under Armour Sec. Litig.*, No. CV RDB-17-0388,
  2020 WL 363411 (D. Md. Jan. 22, 2020).................................................................................53

*In re UTStarcom, Inc. Sec. Litig.*,
  617 F.Supp.2d 964 (N.D. Cal. Mar. 27, 2009) .................................................................................51

*Institutional Investors Grp. v. Avaya, Inc.*,
  564 F.3d 243 (3d Cir. 2009)..............................................................................................20, 31, 39

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*, No. 0:15-CV-02393-MGL,
2016 WL 3981236 (D.S.C. July 25, 2016) ......................................................35, 39, 42

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*, No. CV 0:15-2393-MGL,
2017 WL 4297450 (D.S.C. Sept. 28, 2017)....................................................15, 34, 44

*KBC Asset Mgmt. NV v. DXC Tech. Co.*,
19 F.4th 601 (4th Cir. 2021) ...................................................................................34, 44

*Kendall v. Odonate Therapeutics, Inc.*, No. 3:20-cv-01828-H-LL,
2021 WL 3406271 (S.D. Cal. Aug. 4, 2021) ...............................................27, 29, 48

*Kiken v. Lumber Liquidators Holdings, Inc.*,
155 F. Supp. 3d 593 (E.D. Va. 2015) ....................................................4, 5, 42, 47

*Klein v. Altria Grp., Inc.*,
525 F. Supp. 3d 638 (E.D. Va. 2021),
*reconsideration denied*, No. 3:20CV75 (DJN),
2021 WL 2349904 (E.D. Va. Apr. 13, 2021) .............................................16, 18, 35

*Latham v. Matthews*,
662 F. Supp. 2d 441 (D.S.C. 2009)...................................................................19, 49

*Lefkoe v. Jos. A. Bank Clothiers*, No. WMN-06-1892,
2008 WL 7275126 (D. Md. May 13, 2008).............................................5, 9, 19, 44

*Lipow v. New1 UEPS Techs., Inc.*,
131 F. Supp. 3d 144 (S.D.N.Y. 2015)..................................................................53

*Local No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharm., Inc.*, No. 15-2250,
2016 WL 5682548 (1st Cir. Oct. 3, 2016) ............................................................54

*Longman v. Food Lion, Inc.*,
197 F.3d 675 (4th Cir. 1999) ...............................................................................9, 24

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) ...............................................................................5, 11

*Malin v. XL Capital Ltd.*,
499 F. Supp. 2d 117 (D. Conn. 2007).......................................................................44

*Marcu v. Cheetah Mobile, Inc.*, No. 18-CV-11184 (JMF),
2020 WL 4016645 (S.D.N.Y. July 16, 2020) .......................................................14

*May v. Borick*, No. CV 95-8407 LGB (EX),
1997 WL 314166 (C.D. Cal. Mar. 3, 1997).......................................................7, 10

*Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*,
674 F.3d 369 (4th Cir. 2012) .................................................................................................4

*McIntyre v. Pedder*, No. 3:12-CV-00213-MOC,
2015 WL 5039431 (W.D.N.C. Aug. 26, 2015)...........................................................................6

*Mulligan v. Impax Lab'ys, Inc.*,
36 F. Supp. 3d 942 (N.D. Cal. 2014) ....................................................................16, 20, 22, 25

*N. Port Firefighters' Pension Local Option Plan v. Templea-Inland, Inc.*,
936 F. Supp. 2d 722 (N.D. Tex. 2013) ...................................................................................51

*Nadoff v. Duane Reade, Inc.*,
107 Fed. App'x 250 (2d Cir. 2004)........................................................................................27

*Nguyen v. New Link Genetics Corp.*,
297 F. Supp. 3d 472 (S.D.N.Y. Mar. 29, 2018)........................................................................31

*No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. West Holding Corp.*,
320 F.3d 920 (9th Cir. 2003) ................................................................................................47

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)......................................................................................18, 21, 30

*Ollila v. Babcock & Wilson Enters., Inc.*, No. 3:17-CV-109,
2018 WL 792069 (W.D.N.C. Feb. 8, 2018) .........................................................9, 11, 30, 41

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015)..............................................................................................................25

*Perez v. Higher One Holdings, Inc.*, No. 3:14-cv-00755 (AWT),
2017 WL 4246775 (D. Conn. Sept. 25, 2017) ........................................................................27

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l. N.V.*,
89 F. Supp. 3d 602 (S.D.N.Y. 2015).......................................................................................31

*Proter v. Medifast, Inc.*, No. GLR-11-720,
2013 WL 1316034 (D. Md. Mar. 28, 2013).....................................................................43, 44

*Raab v. Gen. Physics Corp.*,
4 F.3d 286 (4th Cir. 1993) ....................................................................................................17

*Republican Party of N.C. v. Martin*,
980 F. 2d 943 (4th Cir. 1992) .................................................................................................4

*Rok v. Identiv, Inc.*, No. 15-cv-5775-CRB,
2017 WL 35496 (N.D. Cal. Jan. 4, 2017) *aff'd sub nom* ........................................................50

*Rubinstein v. Collins*,
20 F.3d 160 (5th Cir. 1994) ...................................................................................................45

*Schaeffer v. Nabriva Therapeutics plc*, 19 Civ. 4183 (VM),
2020 WL 7701463 (S.D.N.Y. Apr. 28, 2020)...........................................................................17

*Schwab v. E\*Trade Fin. Corp.*,
285 F. Supp. 3d 745 (S.D.N.Y. 2018),
*aff'd,* 752 F. App'x 56 (2d Cir. 2018)......................................................................................33

*Scott v. Fam. Dollar Stores, Inc.*,
733 F.3d 105 (4th Cir. 2013) .................................................................................................55

*Singer v. Reali*,
883 F.3d 425 (4th Cir. 2018) .................................................................................4, 10, 14, 24

*Siracusano v. Matrixx Initiatives, Inc.*,
585 F.3d 1167 (9th Cir. 2009),
*aff'd*, 563 U.S. 27 (2011) .............................................................................................11, 14, 24

*Slayton v. Am. Express Co.*,
604 F.3d 758 (2d Cir. 2010)...................................................................................................11

*Spitzberg v. Houston Am. Energy Corp.*,
758 F.3d 676 (5th Cir. 2014) .................................................................................................31

*Teachers' Ret. Sys. Of La. v. Hunter*,
477 F.3d 162 (4th Cir. 2007) .......................................................................4, 7, 8, 19, 20, 43

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)...........................................................................5, 32, 33, 34, 53, 55

*TransEnterix Inv. Grp. v. TransEnterix, Inc.*,
272 F. Supp. 3d 740 (E.D.N.C. 2017)....................................................................................43

*Turka v. S.C. Pub. Serv. Auth.*, No. CV 2:19-1102-RMG,
2020 WL 901965 (D.S.C. Feb. 25, 2020)................................................................................11

*Van Dongen, v. CNinsure, Inc.*
951 F. Supp. 2d 457 (S.D.N.Y. 2013).................................................................................48, 51

*Wikimedia Found. v. Nat'l Sec. Agency*,
857 F. 3d 193 (4th Cir. 2017) ..................................................................................................4

*Yates v. Mun. Mortg. & Equity, LLC*,
744 F.3d 874 (4th Cir. 2014) .....................................................................................18, 19, 45

## **Statutes**

15 U.S.C. §78u-4(b)(1) .........................................................................................5, 9

Freedom of Information Act ....................................................................................17, 35

Private Securities Litigation Reform Act (PSLRA)...........................................4, 5, 9, 10

Sarbanes-Oxley Act (SOX)........................................................................................2

Securities Exchange Act of 1934 §10(b) .............................................4, 22, 29, 35, 55

Securities Exchange Act of 1934 §20(a) ....................................................................1

## **Rules**

Fed. R. Civ. P. 12(b)(6)...............................................................3, 4, 9, 35, 44, 45

SEC Rule 10b-5 .........................................................................................................1

Lead Plaintiffs Nova Scotia Health Employees' Pension Plan and City of Fort Lauderdale Police & Firefighter's Retirement System respectfully file this Opposition to Defendants' motion to dismiss (Dkt. No. 72) ("Motion"), which seeks dismissal of Lead Plaintiffs' First Amended Class Action Complaint (Dkt. No. 54) ("FAC")[1] for reasons set forth in their accompanying memorandum of law (Dkt. No. 72-1) ("Memo").  For the following reasons, Lead Plaintiffs respectfully ask that the Court fully deny Defendants' Motion and order the parties into discovery.

## I.    INTRODUCTION

The FAC comprehensively pleads a serious, multi-year, multi-prong fraud by Defendants, who mislead U.S. government regulators, pharmaceutical company clients, and investors while enriching themselves and ***squandering*** the opportunity to timely vaccinate ***400 million people*** in the early stages of one of the most dominant – and ongoing – public health crises of our lives. Emergent could have been a white knight for us all, uniquely pre-positioned with the federally-funded, federally-certified Bayview facility that was literally designed to mass-produce vaccines during a pandemic.  Time and again, Defendants were privately told, warned, practically begged to properly equip, staff, train, maintain, operate, sterilize, and decontaminate Bayview.  Each time, they publicly reassured regulators, clients, and investors they were doing so - they were not.  As soon as Bayview began manufacturing J&J and AstraZeneca COVID vaccines, batches began to be regularly destroyed, due to worker error, microbial contamination, and ultimately cross-contamination of the two vaccines.  Through incompetence, indifference, hubris, and deception, Defendants utterly failed – torpedoing a key part of the global COVID vaccine effort while decimating Emergent's stockholder value.  This lawsuit seeks to hold them accountable.

## II.    BACKGROUND

On March 19, 2022, Lead Plaintiffs' filed the FAC, which pleads class action claims under §§10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5.  On May 19, 2022, Defendants filed their Motion, Memo, and 51 judicial notice documents.

---

[1]    Herein, unless otherwise noted, all "¶" references are to the FAC's numbered paragraphs, all "§" references are to the FAC's sections, all defined terms have the definitions assigned in the FAC, and all emphasis is added.

### A.     The FAC's Allegations

#### 1.     Overview Of The Alleged Fraud

The FAC pleads that Defendant Emergent and Individual Defendants Robert Kramer (its CEO), Richard Lindahl (its EVP, CFO, Treasurer), and Syed Husain (its SVP, Head of Contract Development and Manufacturing) engaged in a billion-dollar securities fraud via public statements and omissions during the Class Period of March 10, 2020 to November 4, 2021.  ¶¶2-14, 129-235.

FAC §V.F.1. alleges a Business Operations Fraud, which misrepresented CDMO segment operations and performance and the capabilities, equipment, staffing, and training at Bayview and Emergent's other facilities, particularly anti-contamination measures – both before and after a March 31, 2021 *New York Times* report  that 15 million doses of J&J COVID-19 vaccine were discarded because of contamination at Bayview.  ¶¶129-219.

FAC §V.F.2. pleads a Reported Results Fraud, whereby Emergent's Forms 10-Q and 10-K reported purportedly positive quarterly and annual financial results and operating metrics, both consolidated and for the CDMO segment, which Defendants attributed to its U.S. government, J&J, and AstraZeneca contracts to make vaccines at Bayview.  ¶¶220-226.  It alleges these statements were materially false and misleading , in violation of SEC Regulation S-K, Item 303, because they concealed negative underlying trends that, among other things, required reversal of $86 million in revenues and lowering of reported forecasts and backlog.  ¶¶227-230.

FAC §V.F.3. alleges an Internal Controls Fraud, 1misrepresenting the sufficiency of Emergent's internal controls via false or misleading Sarbanes-Oxley Act (SOX) certifications signed by Kramer and Lindahl that accompanied Forms 10-Q and 10-K.  ¶¶231-235.

#### 2.     The FAC's Allegations Evidencing Falsity

FAC §V.E. details material, nonpublic, negative facts as to deficiencies and problems at Bayview and Emergent's facilities that caused persistent, serious contamination risks.  ¶¶58-126. These allegations derive from 10 former Emergent employees (¶¶27-37) who gave Confidential Witness (CW) statements (§V.E.1. ¶¶59-69); inspection reports by FDA and other of Bayview and Emergent's facilities and Emergent's responses (§V.E.2. ¶¶70-116; §V.F.4. ¶¶245-246, 251, 254,

2

256); reports by *The New York Times*, *AP*, and others and Defendant Kramer's Op-Eds (FAC §V.E.3. ¶¶117-120; §V.F.4. ¶¶237-238, 241, 250, 258(d)); and (iv) the U.S. House Committees' ongoing investigation and 5/19/2021 Congressional Memo and exhibits (§V.E.4. ¶¶121-126).

### 3.    The FAC's Allegations Evidencing Scienter

The FAC's §V.G.1.-10. pleads 10 categories of allegations that holistically support a strong inference of Defendants' scienter (¶¶260-308): (i) Defendants' knowledge or reckless disregard of negative facts (§V.G.1. ¶¶261-268); (ii) Defendants' suspicious insider trading (§V.G.2. ¶¶269-278); (iii) Defendants' suspicious compensation increases and bonuses (§V.G.3. ¶¶279-284); (iv) Emergent's debt offering (§V.G.4. ¶285); (v) Emergent's taking unearned government payments (§V.G.5. ¶¶286-288); (vi) implication of core operations (§V.G.6. ¶¶289-290); (vii) Defendants' signing, being quoted in, or SOX-certifying the alleged misstatements (§V.G.7. ¶¶291-292); (viii) violation of Emergent's code of conduct (§V.G.8. ¶¶293-300); (ix) suspicious executive resignations and retaliation against employees (§V.G.9. ¶¶301-305); and (x) the House Committees' expanded, ongoing their investigation (§V.G.10. ¶¶306-308).

### 4.    The FAC's Alleged Partial Corrective Disclosures

FAC §V.F.4. pleads that a series of 12 partial corrective disclosures revealed the fraud, starting with the March 31, 2021 *New York Times* report.  ¶¶236-259.

### B.    The Judicial Notice Materials

On May 10, 2022, the House Committees released the 5/10/2022 Congressional Report. Lead Plaintiffs' Motion for Judicial Notice (Dkt. No. 77) and Memorandum (Dkt. No. 78) ("RJN") ask the Court to judicially notice the report and 36 other exhibits ("RJN Exhibits").  The RJN has a more detailed recitation of the FAC's allegations (*id.* at 1-16), Defendants' dismissal arguments (*id.* at 17-20), and the RJN Exhibits (*id.* at 20-30), which is incorporated herein by reference.

## III.    ARGUMENT

### A.    Applicable Legal Standards

Defendants' recitation of basic pleading standards (Memo at 5-6) must be guided by Fourth Circuit jurisprudence as to the proper scope of a Fed. R. Civ. P. 12(b)(6) inquiry in a lawsuit filed

3

under Exchange Act §10(b) and the PSLRA, which together impose a statutory stay of discovery at this stage. "A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F. 2d 943, 952 (4th Cir. 1992). In considering a motion to dismiss, a court "accept[s] as true all well-pleaded facts in a complaint and construe[s] them in the light most favorable to the plaintiff." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F. 3d 193, 208 (4th Cir. 2017). "In the final analysis, a motion to dismiss for failure to state a claim should not be granted unless it appears to a certainty that the plaintiff would be entitled to no relief under any set of facts which could be provided in support of the claims." *In re Human Genome Scis. Inc. Sec. Litig.*, 933 F. Supp. 2d 751, 757 (D. Md. 2013).

Despite listing six elements to a §10(b) claim (Memo at 5), Defendants only challenge the pleading as to two – material misstatements or omissions (often short-handed to falsity) and scienter.[2] As to falsity, a plaintiff must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading," *Singer v. Reali*, 883 F.3d 425, 439 (4th Cir. 2018), *i.e.*, the who, what, where, why, and when. *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 368 (D. Md. 2004). However, a plaintiff need not "prove the falsity of the alleged misrepresentations at the pleading stage." *Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 601 (E.D. Va. 2015). Rather, when a plaintiff alleges "'*sufficient* facts to support a *reasonable belief* in the allegation that the defendant's statement was misleading, the court should deny the Rule 12(b)(6) motion as to this 'misrepresentation' element.'" *Epstein v. World Acceptance Corp.*, 6:14-cv-01606-MGL, 2015 WL 2365701, at *5 (D.S.C. May 18, 2015) (quoting *Teachers' Ret. Sys. Of La. v. Hunter*, 477 F.3d 162, 174 (4th Cir. 2007)) (emphases original). If a complaint specifies defendants' misleading statements, identifies who made them, and explains why they were misleading, that is all the PSLRA requires at this stage. *See In re*

---

[2] Under black-letter law, they have waived all argument at this stage as to the other elements, including loss causation. *See, e.g., ContraVest Inc. v. Mt. Hawley Ins. Co.*, No. 20-1915, 2021 WL 4782687, at *2 (4th Cir. Oct. 13, 2021) ("The plaintiffs have abandoned their other claims by failing to address them in their opening appellate brief.") (quoting *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 377 (4th Cir. 2012) ("A party's failure to discuss an issue in his brief is to be deemed an abandonment of that issue.")).

*Pozen  Sec. Litig.*, 386 F. Supp. 2d 641, 643 (M.D.N.C. 2005).  "As a general rule, the trier of fact decides whether a public statement is misleading." *Kiken*, 155 F. Supp. 3d at 601.

For scienter, the alleged strong inference need only be *as* compelling as any competing inference proffered by Defendants under *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007), with any "tie [going to] the plaintiff." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 254 (5th Cir. 2009).  While the FAC extensively pleads Defendants' motive and opportunity, a showing of scienter does not require evidence of motive.  *Lefkoe v. Jos. A. Bank Clothiers*, No. WMN-06-1892, 2008 WL 7275126, at \*8 (D. Md. May 13, 2008) (citing *Tellabs*, 551 U.S. at 325). "When making the assessment whether scienter has been adequately pleaded, it is prudent to keep in mind that the PSLRA does not require a plaintiff to prove his case in his complaint" and "a plaintiff generally must frame the facts [of the case] without the benefit of discovery." *Arnlund v. Deloitte & Touche LLP*, 199 F. Supp. 2d 461, 475 (E.D. Va. 2002).

### B.    The FAC Is Properly Pled

The FAC is not a "puzzle pleading," as argued in the Memo at 6-7.  To satisfy their burden, Lead Plaintiffs must plead with particularity "the time, place, speaker, and contents, as well as the manner in which statements are false and the specific acts raising an inference of fraud – the 'who, what, where, why, and when.'" *In re Royal Ahold*, 351 F. Supp. 2d at 368 (quoting *In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 884 (W.D.N.C. 2001)).  The PSLRA is satisfied when a complaint can "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.* (quoting 15 U.S.C. §78u-4(b)(1).

The FAC does so, specifying for *every* alleged misstatement the date it was made, the document or presentation containing it, the delivery method used to make it (SEC filing, oral remarks, etc.), the speaker, and its false or misleading content.  *See* ¶¶129-218 (Business Operations Fraud), 220-226 (Reported Results Fraud), ¶¶231-234 (Internal Controls Fraud). Nearly all alleged misstatements have bolded / italicized emphasis indicating the specific

5

portions that are allegedly false or misleading,[3] and the FAC states with particularity all facts on which its two "information and belief" allegations were made.[4]  Each category of the three-prong fraud has its own *separate and different* set of allegations detailing why its misstatements and omissions were materially false and misleading.  *See* ¶¶219(a)-(f) (Business Operations Fraud);[5] ¶¶220, 227, 228, 229(a)-(e), 230 (Reported Results Fraud); ¶235 (Internal Controls Fraud).  The FAC even pleads how securities analysts following Emergent were misled by the alleged misstatements and omissions in real time.  *See, e.g.*, ¶¶133(a)-(d); 142(a)-(d), 145(a)-(b), 150(a)-(c), 159(a)-(c), 193.   In this way, the FAC distills down the exhaustively pled, material, undisclosed, negative facts from its §§V.E.1.-4., V.F.4., and V.G.1. – which total ~ 80 pages – to subsets specifically linked to each category of misstatements and omissions.

This pleading approach, which kept the FAC to under 225 total pages, suffices.[6]  *McIntyre v. Pedder*, No. 3:12-CV-00213-MOC, 2015 WL 5039431, at *8 (W.D.N.C. Aug. 26, 2015) (denying motion to dismiss where plaintiffs pled the falsity of over fifty challenged statements in long block quotes through "a generic paragraph listing the same omissions over and over"); *In re Tyco Int'l, Ltd. Multidistrict Litig.*, No. MDL 02-1335-B, 2004 WL 2348315, at *9 (D.N.H. Oct. 14, 2004) ("After identifying each specific misleading statement, the complaint refers readers to

---

[3]    For the specific Business Operations Fraud misstatements and omissions, *see* ¶¶129, 131, 134(a)-(d), 136(a)-(e), 138, 140, 143, 146, 148, 151, 153, 155, 157(a)-(c), 160, 162, 164, 166, 168(a)-(d), 170, 172, 174, 175, 177, 179(a)-(d), 181, 183, 185, 187, 189, 191, 193, 195, 197, 199(a)-(d), 201(a)-(k), 203, 205(a)-(c), 207, 209, 211, 213(a)-(e), 215, 217.  For the Results Fraud misstatements and omissions, *see* ¶¶221(a)-(c), 222(a)-(c), 223(a)-(c), 224(a)-(c), 225(a)-(c), 226(a)-(c).  For the Internal Controls Fraud misstatements and omissions, *see* ¶¶232, 233, and 234.

[4]    Beyond a customary allegation detailing the scope of Lead Plaintiffs' investigation as the basis for its information and belief in the entire pleading (¶1), the FAC specifically pled all facts on which its information and belief allegations were formed regarding the Individual Defendants' having authorized the 5/8/2020 Emergent FDA 483 Response (¶136) and 4/30/2021 Emergent FDA response (¶201 & n.15) in full satisfaction of the PSLRA's requirements.  Defendants do not argue otherwise and thus waive any argument at this stage.  *See* n.2.

[5]    The Business Operations Fraud is the largest of the three prongs of alleged fraud by page count (topping 70 pages), so interspersed with its paragraphs alleging the various misstatements and omissions are additional short paragraphs indicating that the reasons why they are materially false or misleading are pled altogether in ¶¶219(a)-(f) at the end.  *See* ¶¶129, 132, 135, 137, 139, 141, 144, 147, 149, 152, 154, 156, 158, 161, 163, 165, 167, 169, 171, 173, 176, 178, 180, 182, 184, 186, 188, 190, 192, 194, 196, 198, 200, 202, 204, 206, 208, 210, 212, 214, 216, 218.

[6]    The alternative would have been to plead increasingly large segments of ¶¶219(a)-(f) after every one of the misstatements, turning every one of the FAC's paragraphs noted in the preceding paragraph into an increasingly lengthy, overlapping, and duplicative explication of all the undisclosed facts misrepresented or concealed.  Doing so would have turned the ~225 page FAC into a 400+ page pleading, in which case Defendants would now be arguing the opposite, *i.e.*, that the complaint was unwieldy, inefficient, etc.

other sections that list multiple reasons why the statement is misleading. This is a reasonable way to address a complicated securities fraud case."). Indeed, Defendants' own cited authority expressly states that an acceptable way to avoid a "puzzle-style" complaint in securities fraud lawsuits is "to address defendants' allegedly misleading statements individually, *or even by category*, and to state why each statement, *or category of statements*, is misleading," and the court made clear it was setting forth that guidance "in the hope that plaintiffs' counsel will give considered thought to *efficient pleading* and meaningful analysis." *In re PetSmart, Inc. Sec. Litig.*, 61 F. Supp. 2d 982, 991 n.3 (D. Ariz. 1999) (quoting *May v. Borick*, No. CV 95-8407 LGB (EX), 1997 WL 314166 *8 (C.D. Cal. Mar. 3, 1997)) (emphasis added). Defendants' remaining arguments are readily debunked strawmen,[7] and their cited authority is distinguishable.[8]

---

[7]     Defendants' Memo at 7 incorrectly states that no part of ¶219 directly links a misstatement to a specific reasons why it was false. Not so. *See, e.g.*, ¶219(f) (Defendant Kramer's statement in the 4/1/2021 CNBC Interview that "It isn't the case or wasn't the case where any ingredient from one vaccine contaminated or impacted the other" was conceded to be false by an Emergent spokesperson in the 4/30/2021 CNBC Report). It also misquotes the preamble to ¶219 to falsely accuse Lead Plaintiffs of "deliberate obfuscation," despite the "6 pages" of detail in its subparts. To the contrary, the full preamble language clearly states (with emphasis original): "The misrepresentations and omissions alleged in the preceding ¶¶129-218 were materially false and misleading because, *inter alia*, of the following reasons, some of which predated the Class Period and the rest of which arose as it unfolded. Holistically, they create a *clear and persistent pattern of serious deficiencies and grave contamination risk that existed at the Bayview facility at all relevant times*, regardless of whether any single fact pled below had yet arisen at precisely the time of a specific misstatement pled above, because a sufficient number of the facts pled below existed throughout the *entire* Class Period, with more and more facts arising over time that corroborated and augmented the earlier ones."

[8]     In *In re Marriott Int'l, Inc. Customer Data Sec. Breach Litig.*, 543 F.Supp.3d 96, 111-112 (D. Md. 2021), *aff'd sub nom. In re Marriott Int'l, Inc.*, 31 F.4th 898 (4th Cir. 2022), the "cookie cutter" falsity allegations concerned deficiencies in the systems of a *different* company acquired via merger that plaintiff argued should have been observed by the defendants through due diligence. By contrast, Defendants here own and operate the Bayview facility and are alleged to have been integrally involved in its operations and knowledgeable about the undisclosed negative facts at issue – allegations further strengthened by the RJN Exhibits. Unlike the FAC's differentiated and highly detailed falsity pleading for each category of fraudulent statements, in *In re PetSmart*, the complaint repeated the "same allegations" "with little differentiation" for every misstatement that did not "identify the facts and trends upon which plaintiffs base their claim." 61 F. Supp. 2d at 991. Similarly, in *City of Pontic Gen. Emps. Ret. Sys. v. Schweitzer-Mauduit Int'l, Inc.*, the complaint used an "identical" paragraph containing only "conclusory" statements in "very general and very vague terms." 806 F. Supp. 2d 1267, 1292-1293 (N.D. Ga. 2011). In *Teachers' Ret. Sys.*, the complaint relied only on a repetitive set of "information and belief" allegations to establish falsity, but the court found that the "facts alleged in support of these formulaic reasons fail to support a reasonable belief that they were in fact misleading." 477 F.3d at 174-175.

For all these reasons, their "puzzle pleading" argument, which myopically focuses on the FAC's packaging and not its substance (and is undercut by Defendants' own ability to file such a well-cited, detailed motion to dismiss), should be rejected.[9]

**C.      The FAC Sufficiently Pleads False Or Misleading Statements And Omissions**

**1.      The FAC Adequately Pleads The Business Operations Fraud**

FAC §V.F.1. ¶¶129-219 pleads an extensive Business Operations Fraud, which can be divided into two segments on either side of the March 31, 2021 *New York Times* report pled in the FAC as the first partial corrective disclosure.  Both segments are detailed in the RJN at 2-6.

**a.      Pre-March 31, 2021 Misstatements And Omissions**

The FAC pleads misstatements and omissions before March 31, 2021 (¶¶129, 131, 134(a)-(d), 136(a)-(e), 138, 140, 143, 146, 148, 151, 153, 155, 157(a)-(c), 160, 162, 164, 166, 168(a)-(d), 170, 172, 174, 175, 177, 179(a)-(d), 181, 183, 185), summarized in detail in the RJN at 2-4.

**i.      The Statements Were Actionable Non-Puffery**

Defendants claim their pre-March 31, 2021 misstatements, as a whole, are "immaterial puffery" – a sweeping generalization seeking to insulate over 12 months of their public statements in SEC filings and press releases, at analyst conferences, on earnings calls with analysts, and in written responses to the FDA, which should be rejected outright.[10]  They have otherwise failed to identify what statements or portions thereof fall within their argument, with only three exceptions (Memo at 9 n.8), a puzzle-pled guessing game the Court should decline to indulge.  They quote, in isolation, single sentences from three larger alleged misstatements – the 3/10/2020 Press Release (¶129), 4/23/2020 Press Release (¶131), and 6/1/2020 Press Release (¶140).  Even assuming,

---

[9]    Notably, Defendants' "puzzle pleading" authority supports granting leave to further amend if the Court finds any pleading deficiencies in the FAC.  Two of the four cases they cite dismissed without prejudice and with leave to further amend.  *See In re PetSmart*, 61 F. Supp. 2d at 1001; *City of Pontiac*, 806 F. Supp. 2d at 1299.  A third was dismissed with prejudice, because the plaintiff had already amended its complaint **three** times.  *See In re Marriott Int'l, Inc.*, 543 F. Supp. 3d at 180-181.  The last one, *Teachers' Ret. Sys.*, affirmed a dismissal with prejudice only because plaintiffs lacked any possible cure for deficient loss causation allegations in their complaint.  477 F.3d at 188.

[10]    Indeed, a scan of just the pre-March 31, 2021 misstatement excerpts quoted in the RJN at 2-4 quickly confirms that they are replete with concrete statements about, *e.g.*, Bayview's capabilities and vaccine manufacturing output, the specific steps Emergent was then taking to satisfy FDA inspection concerns, and Bayview's ability to manufacture multiple COVID-19 products in the same facility at the same time.  *See* RJN at 2-4.

*arguendo*, these isolated snippets could be seen as puffery (they were not), viewed in context (*see* §III.C.1.a.iii. *infra*), they would be actionable. *Longman v. Food Lion, Inc.*, 197 F.3d 675, 683 (4th Cir. 1999) (puffery "may be actionable" "when it is both factual and material"); *In re Coventry Healthcare Sec. Litig.*, 2011 WL 1230998, at *35 (D. Md. Mar. 30, 2011) (even potential puffery must "be consistent with reasonably available data and should not misrepresent existing facts").

## ii.      The Risk Warnings Fail To Shield Against Liability

The purported risk warnings to which Defendants point (Memo at 10-13) do not shield them from liability for the pre-March 31, 2021 misstatements, for these reasons.

First, this argument should not be resolved at this stage. *Ollila v. Babcock & Wilson Enters., Inc.*, No. 3:17-CV-109, 2018 WL 792069, at *5 (W.D.N.C. Feb. 8, 2018) (Ultimately, while some statements may indeed have appropriate cautionary language or be entirely forward-looking, the Court declines to examine them in full at this stage, as "'the adequacy of cautionary language is a question of fact, and, typically, is not a question to be resolved on a motion to dismiss.' …   It is enough to say that the pleadings contain sufficient actionable statements to survive a Rule 12(b)(6) motion.") (quoting *Lefkoe*, 2007 WL 6890353 at *5 Fn. 10); *City of Ann Arbor Emps' Ret. Sys. v. Sonoco Prod. Co.*, 827 F. Supp. 2d 559, 576 (D.S.C. 2011) ("the Court finds there is a question of fact concerning whether the cautionary language accompanying Sonoco's forward-looking projections was meaningful. ... This is a matter for a jury to decide.").

Second, as pled in FAC ¶¶309-310, the PSLRA safe harbor does not apply. The PSLRA safe harbor offers protection against liability only to statements that are identified as *forward-looking* and are *accompanied* by *meaningful cautionary language*. 15 U.S.C. §78u-5(c)(1)(A)(i).

• Here, Defendants have made no effort to identify for the Court and Lead Plaintiffs which alleged misstatements, if any, are forward-looking. Memo at 10-12. The Court should reject this puzzle-pled argument on that basis alone. Even if they had identified snippets of larger misstatements that were forward-looking (which they did not), the vast majority of the alleged misstatements were statements of then-present or then-past fact, and "a 'mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to

9

the present.'" *In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 789 (E.D. Va. 2015) (citing *In re Comp. Scis. Corp. Sec. Litig.*, 890 F.Supp.2d 650, 668 n. 21 (E.D.Va.2012).[11]

   •   Not all alleged misstatements were accompanied by any warnings.  The 5/8/2020 Emergent FDA 483 Response is alleged to have contained false and misleading statements (¶135(a)-(e)), but did not contain or incorporate any risk warnings, which Defendants concede. Memo at 11-12 n.12.[12]  From among the pre-March 31, 2021 misstatements, the same is true of the 7/6/2020 CBS Report (¶151), 7/8/2020 Fox 5 News Report (¶153), 9/14/2020 Conference (¶164), 10/5/2020 Conference (¶166), 1/11/2021 Wells Fargo Meeting (¶177), 3/1/2021 Forbes Article (¶181), and 3/3/2021 CNBC Interview.[13]  *In re Sinclair Broad. Grp., Inc. Sec. Litig.*, No. CV CCB-18-2445, 2020 WL 571724, at *12 (D. Md. Feb. 4, 2020), *reconsideration denied*, 473 F. Supp. 3d 529 (D. Md. 2020) (applying PSLRA safe harbor to forward-looking statements only after confirming they included cautionary statements or incorporated them by reference).

   •   The warnings were not meaningful, for three main reasons:

   (1)  The quoted warnings (Memo at 10-11 & n. 9-11) did not adjust – at all – from Q1 2020 (Def. Ex. 2), before Emergent's COVID vaccine contracts had been signed, through the end of Q2 2021 (Def. Ex. 7), by which point the U.S. government had – months earlier – shut down Bayview's vaccine manufacturing, quarantined all previously-produced vaccine batches, permanently ended AstraZeneca production, and put J&J in charge of the Bayview facility's operation.  ¶241.  Yet the warnings kept saying "problems during manufacturing may arise." Memo at 10.  *Singer*, 883 F.3d at 442-443  (risk warnings too general to immunize misleading statements where defendants warned company "*may* be subject to or otherwise affected by federal and state healthcare, fraud and abuse, and information privacy and security laws, and *could* face

---

[11]   *See also In re 2U, Inc. Sec. Class Action*, No. CV TDC-19-3455, 2021 WL 3418841, at *9 (D. Md. Aug. 5, 2021) (same) (collecting cases); *In re SCANA Corp. Sec. Litig.*, No. CV 3:17-2616-MBS, 2019 WL 1427443, at *7 (D.S.C. Mar. 29, 2019) (same) (collecting cases).
[12]   Defendants expressly limit their arguments to pre-March 31, 2021 misstatements (Memo at 8), but cite (in footnotes 9-12) sources of misstatements that come later, when the purported warnings clearly cannot be asserted.
[13]   The same is also true of many of the post-March 31, 2021 misstatements that fall outside the scope of Defendants' arguments, *e.g.*, Kramer's 4/1/2021 CNBC Interview.

substantial penalties *if* we are unable to fully comply with such laws" while it was concealing a fraudulent reimbursement scheme) (emphasis added).[14]

(2)   The quoted warnings cautioned against events that had ***already*** transpired.   For instance, they cautioned that "slight deviations anywhere in the manufacturing process, including … contamination including from particulates among other things … may result in lot failure." Memo at 10.[15]   Starting in October 2020 and every month thereafter, unbeknownst to investors, Emergent was actively destroying lots due to contamination.   ¶121; RJN at 21-22; RJN Ex. 1 at 1, 9-11 (finding 1).   Such warnings are legally deficient.   *Ollila*, 2018 WL 792069, at *5 (where defendant allegedly failed to disclose that backlog was already adversely affected by lack of operational capability and other issues, "[s]uch an allegation would likely take defendants' statement out of the safe harbor entirely, as the risks defendants warned of had already been realized") (citing *Epstein*, 2015 WL 2365701 at *6 (statements not protected if risk disclosures "purport to warn investors of risks concerning [defendants'] practices of which defendants were already aware") *and City of Ann Arbor Emps.' Ret. Sys. V. Sonoco Prods. Co.*, 827 F. Supp. 2d

---

[14]        *See also Epstein*, 2015 WL 2365701 at *6 (statements not protected by safe harbor if risk disclosures "purport to warn investors of risks concerning [defendants'] practices of which defendants were already aware"); *In re 2U, Inc.* , 2021 WL 3418841, at *11 (warnings about potential future risks of enrollments inadequate where defendant knew of declining enrollment projections and company had already encountered related business challenges); *Ollila*, 2018 WL 792069 at *5 (finding no safe harbor for statements accompanied by cautionary language where risks warned of had already been realized); *Turka v. S.C. Pub. Serv. Auth.*, No. CV 2:19-1102-RMG, 2020 WL 901965, at *1, 6-7 (D.S.C. Feb. 25, 2020) (risk factors that plant construction and engineering performance may contribute to financial risk and daily project oversight would be provided on-site actionable for omitting that project was already insurmountably behind schedule); *In re SCANA Corp.*, 2019 WL 1427443, at *7 (D.S.C. Mar. 29, 2019) (cautions inadequate where failed to warn investors about specific deficiencies defendants knew were occurring); *In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 618-619 (S.D.W. Va. 2012) (risk factor statements that mines could be temporarily or permanently closed or company's operations could be stopped based on noncompliance with safety laws actionable because it had already failed to comply); *Slayton v. Am. Express Co.*, 604 F.3d 758, 772-773 (2d Cir. 2010) (rejecting safe harbor protection where "defendants' cautionary language remained the same even while the problem changed" because "the consistency of the defendants' language over time despite the new information they received…belies any contention that the cautionary language was 'tailored'") (collecting cases); *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734-35 (7th Cir. 2004), *as amended* (Sept. 3, 2004) ("[T]he cautionary language remain[s] fixed even as the risks changed" "[t]hus this complaint could not be dismissed under the safe harbor"); *Lormand*, 565 F.3d at 247 (even "somewhat specific" warnings are inadequate when they "do not provide sufficiently meaningful caution about [a] clearly present danger that was materializing"); *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009) *aff'd*, 563 U.S. 27 (2011) ("the Form 10-Q speaks about the risks of product liability claims in the abstract, with no indication that the risk 'may already have come to fruition'").

[15]        *See also* the warning that "there can be no assurance that we will be able to produce any significant quantity of these products on a timely basis or at all."  Memo at 11.

559, 576 (D.S.C. 2011) (no safe harbor where "[d]efendants knew that the specific risks and uncertainties stated to be 'potential' in their cautionary language had already been realized"); *Genworth*, 103 F. Supp. 3d at 790 (when plaintiff has shown adequate evidence company was using outdated data to support its cautionary statements, court will not determine whether cautionary language was meaningful at the motion to dismiss stage).[16]

(3) One of the quoted warnings is literally false: "Following several of these inspections, regulatory authorities have issued inspectional observations, some of which were significant, ***but all* of which are being, or have been, addressed through corrective actions**." Memo at 11. Because that language did not change over time, it included *all* of the observations and findings of *all* of the governmental inspection reports, including those by the FDA and Operation Warp Speed pled in the FAC. The 5/10/2022 Congressional Report (*see* RJN at 20-30; RJN Ex. 1) and the 5/19/2021 Congressional Memo (¶¶121-126) found that Emergent *never* addressed some of the inspectional observations, *e.g.*, those involving contamination risks and employee training.

### iii. Defendants Had And Violated A Duty To Disclose

Defendants' chronology (Memo at 8) is deficient. Emergent secured a $163 million HHS contract in 2012 to ready Bayview for mass production in a pandemic, it added manufacturing areas to Bayview from 2011-2018, and it then touted Bayview as one of just three U.S. facilities federally CIADM designated. ¶49. Bayview was to play a vital role in the U.S. and global COVID-19 vaccine efforts. ¶50. The Class Period begins on March 10, 2020 – right as U.S. schools closed and we all entered lockdown. ¶1. Emergent signed its contracts with J&J on April 23, 2020 (¶52), BARDA on May 30, 2020 (¶53), and AstraZeneca on June 11, 2020 (¶54). It was manufacturing COVID-19 vaccine drug substance at Bayview for AstraZeneca by August 2020 and J&J by November 2020 (¶55). Serious setbacks arose immediately, requiring destruction of one batch of AstraZeneca vaccine (2-3 million dose-equivalents) in October 2020 due to

---

[16] Defendants' cited cases (Memo at 10) are distinguishable. In *In re Progress Energy, Inc. Sec. Litig.*, 371 F. Supp. 2d 548, 552 (S.D.N.Y. 2005), the proxy for the merger disclosed the alternative minimum tax provision from the IRS Code that served to impact the tax strategies. In *In re Seadrill Ltd. Sec. Litig.*, No. 14 Civ. 9642 (LGS), 2016 WL 3461311, at *9 (S.D.N.Y. June 20, 2016), the challenged statements themselves conveyed the allegedly undisclosed uncertainties by being so vague and equivocal.

contamination, a J&J batch (15 million doses) in November 2020 due to worker error, four AstraZeneca batches (8-12 million doses) in December 2020 due to bacterial contamination, and five J&J batches (75 million doses) in February/March 2021 due to cross-contamination with AstraZeneca material.  ¶¶119, 121, 219(c), 261(c). [17]  Compared to the 100 million doses distributed (Memo at 8) – 10 million bearing a warning (¶254) – ***nearly 400 million doses were destroyed*** due to contamination, worker error, and expiring in quarantine – ***an utterly dismal 20% "success" rate***.  ¶121; RJN at 21-22; RJN Ex. 1 at 1, 9-11 (finding 1).  Due to these failures, in April 2021, the U.S. government halted Bayview's manufacturing, quarantined its prior batches, ended AstraZeneca production, and put J&J in charge of its operation, before freezing payments to Emergent in Q3 2021 and terminating its Emergent contract in November 2021.  ¶¶241, 243.

In this context, the pre-March 31, 2021 statements, beyond lauding the COVID vaccine contracts and their positive effects on the CDMO segment, touted, *inter alia*: (a) Emergent's expertise in vaccine manufacturing;[18] (b) Bayview's CIADM design for rapid manufacturing of vaccines in large quantities during health emergencies (¶¶129, 131) and its proven manufacturing capabilities and ability to quickly advance early-stage candidates to commercial-scale manufacturing (¶134(b)); (c) Emergent's response and remediation plan to Bayview deficiencies noted in the FDA inspection report from April 2020, including cGMP deviations, quality control deficiencies, deficient employee training, and contamination risks (¶136(a)-(e)); (d) Emergent's specialized equipment, disciplined processes, highly trained staff, and its durable, scalable, and compliant manufacturing infrastructures (¶179(b)) and increasing staffing at Bayview (¶153); (e) Bayview's ability to manufacture COVID-19 vaccine drug substance (¶129) and capabilities to produce vaccines at a clinical scale across four independent manufacturing suites;[19] (f) Bayview's

---

[17]     The 5/10/2022 Congressional Report augmented these numbers as follows:  ***seven*** AstraZeneca batches (17 million dose equivalents) destroyed in October – November 2020 due to microbial contamination, ***two*** J&J batches (30 million dose equivalents) destroyed in December 2020 due to microbial contamination and equipment failure, ***six*** AstraZeneca batches (14.5 million dose equivalents) destroyed from December 2020 – April 2021, and ***two*** J&J batches destroyed (30 million dose equivalents) in March – April 2021 due to microbial contamination.  *See* RJN at 21-22; RJN Ex. 1 at 9-11 (finding 1).

[18]     *See, e.g.*, ¶¶129, 134(a)-(b), 143, 148, 168(b), 174, 179(d).

[19]     *See, e.g.*, ¶¶131, 134(b), 143, 148, 155, 164, 166.

ability to scale up to large-scale manufacturing of up to 4000L to produce commercial volumes to meet customer demand;[20] (g) Bayview's CIADM capacity to produce tens to hundreds of million of vaccine doses annually;[21] (h) Bayview's large scale manufacturing readiness with a validated process for J&J;[22] (i) Bayview's capabilities and capacities to manufacture up to 300 million J&J doses (¶131, 134(b), 146) and its being on schedule to produce 100 million J&J doses to the U.S. government in the first half of 2021 (¶179(b)); (j) Bayview's ability to manufacture AstraZeneca vaccines (¶143, 155); (k) Bayview's ability to manufacture two COVID-19 vaccines at once (¶168(b), 185); (l) Emergent's large-scale infrastructure at Bayview enabling it to take on both J&J and AstraZeneca vaccines and to scale them quickly on a significant level (¶185); and (m) Emergent's producing both AstraZeneca and J&J vaccines daily and 24/7 at Bayview with a capacity exceeding 1 billion annual doses for the AstraZeneca and J&J vaccines (¶185).

Contrary to the Memo at 8, these statement topics were directly related to the risks (plural) that materialized in the form of the FAC's alleged corrective disclosures and events. As Defendants concede, a duty to speak the full truth arises "when necessary 'to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *Singer v. Reali*, No. 883 F.3d 425, 440 (4th Cir. 2018) ("[D]isclosure of material information is required 'when necessary to make the statements made, in light of the circumstances under which they were made, not misleading.'") (quoting *Matrixx*, 563 U.S. at 44 ). On the FAC's alleged facts, Defendants were under such a disclosure duty, which they violated, regarding the material, negative, undisclosed facts pled in the FAC.[23] Defendants' reliance on the legally deficient risk warnings (Memo at 13) does not alter the equation. *In re Bear Stearns Cos., Inc. Sec., Derivative*

---

20    *See, e.g.*, ¶¶131, 143, 148, 155.
21    *See, e.g.*, ¶131, 140, 143, 148, 155.
22    *See, e.g.*, ¶134(b)-(c), 138, 146, 148, 157(b).
23    Defendants' cited cases (Memo at 9) are distinguishable. *Marcu v. Cheetah Mobile, Inc.*, No. 18-CV-11184 (JMF), 2020 WL 4016645, at *4 (S.D.N.Y. July 16, 2020) involved an advertising fraud scheme by a cell phone company and the challenged statements concerned user experience or were not alleged to be misleading. In *Finder v. Pearson PLC*, No. 17 Civ. 1422 (RJS), 2019 WL 10632904, at *11 (S.D.N.Y. Sept. 16, 2019), the court found that praising a product's new features did not obligate disclosure about the problems with its old features. In *In re Human Genome*, 933 F. Supp. 2d at 761, defendants disclosed the results of two prior, completed, blinded trials and only withheld information about a still-ongoing unblinded trial.

*& ERISA Litig.*, 763 F. Supp. 2d 423, 495 (S.D.N.Y. 2011) ("To be 'meaningful,' a cautionary statement must discredit the alleged misrepresentations to such an extent that the 'risk of real deceptions drops to nil'" and even "warnings of specific risks…do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described") (quotations omitted) (collecting cases).[24]

**Inspections, Reports, Responses**.  The FAC pleads U.S. regulators issued 17 reports on Emergent's facilities from May 2017 to April 2021, including four about Bayview – the 4/20/2020 FDA Inspection Report and 4/20/2020 FDA 483 Report issued one month into the Class Period and the 6/17/2020 Warp Speed Report issued three months into it.  ¶¶110(a)-(l), 111, 123, 124(a), 261(b); FAC §§V.E.2. and V.F.4.  J&J also issued a report about Bayview, the 7/24/2020 Janssen Audit Report four months into the Class Period.  ¶124(b).  The FAC pleads that these reports, as well as Emergent's engagement during the inspections and its written responses,[25] ensured that Defendants understood the deficiencies plaguing Bayview and the other CDMO facilities.  ¶¶219(b), 261(b).  For instance, the 4/20/2020 FDA 483 Report identified as a deficiency "Separate or defined areas to prevent contamination or mix-ups are deficient regarding operations related to the holding of rejected components before disposition" (¶¶110(f), 110(k)), and the 5/8/2020 Emergent FDA 483 Response listed a half-dozen measures and SOP revisions to purportedly address the issue (¶136).  Kramer (the CEO) admitted that he read the FDA reports, found their observations to be "correct" and "accurate," and did not dispute them.  ¶¶114, 115, 266.

Two non-public, early-Class Period reports about Bayview were issued by Operation Warp Speed, a public-private partnership involving HHS and the Department of Defense (the 6/17/2020

---

[24]    Defendants' cited case, *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp 2d 365, 367 (S.D.N.Y. 2007) misses the mark.  Defendants here did not have to be "crabbed" or "defeatist," but once they *chose* to speak, they had a duty to disclose the negative, concealed facts necessary to make their statements not misleading.

[25]    The FAC pleads that Emergent prepared seven written responses, including two regarding Bayview - the 5/8/2020 Emergent FDA 483 Response issued two months into the Class Period and 4/30/2021 Emergent FDA 483 Response.  *Id.*; *see also* ¶¶113, 124(c), 125, 136(a)-(e), 201(a)-(k)).  Defendants question how the FAC can plead one of these responses as both containing materially false or misleading statements and as establishing the falsity of other misstatements (Memo at 8 n.6), but that circumstance arises commonly, particularly from a document that is 16 pages long.  *See, e.g.*, *KBC Asset Mgmt. NV v. 3D Sys. Corp.*, No. CV 0:15-2393-MGL, 2017 WL 4297450, at *4 (D.S.C. Sept. 28, 2017) (alleging Defendants' partial disclosures throughout the class period were coupled with misrepresentations and omissions that continued to mislead investors).

15

Warp Speed Report), and by J&J (the 7/24/2020 Janssen Audit Report).  ¶¶124(a)-(b).  They raise serious concerns about "significant" "personnel risk," "significant" "compliance risk," a need to "strengthen" the "control process … and quality oversight," "mold issues," a "deficient" "disinfectant program," a "fail[ure] to follow basic industry standard for disinfecting the plant," "no[ ] formal Bayview contamination control strategy," and "deficient" "site virus contamination control strategy." *Id.*  Defendants argue that the reports noted – in June / July 2020, before COVID vaccine manufacturing began – that these deficiencies were correctable and "can" be addressed, an argument that they likewise level at the 4/20/2020 FDA Inspection Report and 4/20/2020 FDA 483 Report issued in April 2020.  Memo at 22, 24-25 & n.18.  It would be stronger to argue that they *were* addressed, but Defendants cannot, because they ***never*** addressed the issues raised, which caused the parade of (undisclosed) horribles starting with the October 2020 destruction of AstraZeneca doses and leading to the U.S. government's contract termination in November 2021.[26]

Defendants assert, "It is implausible that BARDA or Janssen [J&J] would proceed with production if they knew that contamination was a severe risk." Memo at 25.  Correct.  Defendants ***concealed*** from U.S. government regulators, J&J, and AstraZeneca the full extent of Bayview's problems –  damning new evidence that strongly supports the FAC's pleading.  *See* 5/10/2022 Congressional Report, RJN at 22-23, Ex. 1, at 1, 13-14 and RJN Exs. 35-36.  *Klein v. Altria Grp., Inc.*, 525 F. Supp. 3d 638, 651 (E.D. Va. 2021), *reconsideration denied*, No. 3:20CV75 (DJN), 2021 WL 2349904 (E.D. Va. Apr. 13, 2021) (emphasizing allegations that defendants intentionally misled the FDA when determining Plaintiffs adequately pled falsity and scienter); *Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 968 (N.D. Cal. 2014) (falsity supported by allegations that employees would make "temporary" changes to pass an FDA inspection into Form 483 deficiencies then be undone afterward); *In re Massey Energy*, 883 F. Supp. 2d at 615 (plaintiff

---

[26]    That cascade of events demonstrates that the issues observed in the Bayview reports were not "routine" (Memo at 22), as do the findings of the 5/19/2021 Congressional Memo ¶¶122-125), the 5/10/2022 Congressional Report (RJN Ex. 1), J&J's statement to the House Committees that the reject rate of batches at Bayview was "higher than what we normally see" (RJN Ex. 1 at 9), and the "clearly unusual" decision by the U.S. government to stop paying Emergent (¶229(d)), among other things.

adequately pled falsity based, *inter alia*, on company's "system to deceive [federal] MSHA safety inspectors to hide the dangerous conditions of its mines").

Defendants' Memo at 21-22 otherwise raises three challenges to the FDA reports:

First, it discounts the FDA's inspections at Emergent's other facilities predating Bayview's COVID vaccine manufacturing, which reveal that the same deficiencies persistently pervaded Emergent's operations, including Bayview, and courts credit well-pled allegations that operational issues and misconduct pervade a company's disparate locations as supporting federal securities claims. *See, e.g.*, *In re Toronto-Dominion Bank Sec. Litig.,* No. CV 17-1665 (NLH/JS), 2018 WL 6381882 at *13 (D.N.J. Dec. 6, 2018) (denying motion to dismiss after crediting allegations of widespread underlying misconduct throughout large bank's retail branches, based on statements by lower-level CW employees in various roles and sources cited in investigative news piece).

Second, it wrongly calls the 4/20/2020 FDA 483 Report the "only pre-contamination report related to Bayview," says there was no standalone duty to disclose it, and claims it was publicly released.  There were three other reports – the 4/20/2020 FDA Inspection Report (that Defendants ignore), the 6/17/2020 Warp Speed Report, and the 7/24/2020 Janssen Audit Report – none of which were made public,[27] and the FAC pleads that the 4/20/2020 FDA 483 Report was published in "heavily redacted" form.  ¶111.  Defendants' cited authority agrees that "Defendants' failure to disclose the Form 483 will be actionable only if disclosure was necessary to render the statements [made] … not misleading."  *Schaeffer v. Nabriva Therapeutics plc*, 19 Civ. 4183 (VM), 2020 WL 7701463, at *9 (S.D.N.Y. Apr. 28, 2020).  The FAC's allegations give rise to a clear duty to not just publish the unredacted report, but to disclose the non-public, negative facts concerning the serious deficiencies and contamination risks at Bayview and Emergent's CDMO facilities.[28]

Third, it says that the 4/21/2021 FDA 483 Report, issued after the J&J cross-contamination was first revealed, does not demonstrate a prior undisclosed risk because its conclusions were

---

[27]    Unlike the 4/20/2020 FDA 483 Report, Defendants do not argue that the 4/20/2020 FDA Inspection Report was publicly released.  Indeed, the FAC pleads that Lead Counsel obtained a redacted copy via a FOIA request.  ¶110.
[28]    Unlike in Defendants' cited case, *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289 (4th Cir. 1993), the FAC's allegations do not support the conclusion that those facts were ever made "credibly available to the market."

17

reached in "hindsight." To the contrary, that report memorializes the deficiencies at Bayview as of April 2021, thereby permitting a comparison against those set forth in the 4/20/2020 FDA Inspection Report and the 4/20/2020 FDA 483 Report, which proves the earlier-identified deficiencies had not been resolved in the intervening year of the Class Period, despite having been termed correctable problems that "can" in theory be addressed. Contrary to the Memo at 22 & n.17, one of the alleged post-March 31, 2021 misstatements is the 4/30/2021 Emergent FDA 483 Response, which incorporates and addressed the 4/21/2021 FDA 483 Report's observations, thus entrenching it within the falsity pleading in that time frame (regardless of its public release).

    __CWs__.  To be credited, CW allegations must plead their employment dates, positions held, duties, where they worked, with whom they spoke, and to whom the reported. *Klein*, 525 F. Supp. 3d at 667. CWs must be described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Black v. Martek Biosciences Corp.*, No. CV MJG-05-1224, 2006 WL 8435572, at *5 Fn. 13 (D. Md. June 14, 2006) (citing *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)).  "[I]nterlocking and corroborating accounts add support to the reliability of the statements." *Id.* (citing *In re Cabletron Sys., Inc.*, 311 F.3d 11, 30 (1st Cir. 2002) ("consistent accounts reinforce one another" and "undermine" counter arguments)). The complaint may "provide other evidence to support their allegations." *In re Mun. Mortg. & Equity, LLC, Sec. & Derivative Litig.*, 876 F. Supp. 2d 616, 640 (D. Md. 2012), *aff'd sub nom. Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874 (4th Cir. 2014). The FAC readily meets these standards, pleading the required information and the substantive statement for CW. *See* ¶¶28, 60 (CW1); ¶¶29, 61 (CW2); ¶¶30, 62 (CW3); ¶¶31, 63 (CW4); ¶¶32, 64 (CW5); ¶¶33, 65 (CW6); ¶¶34, 66 (CW7); ¶¶35, 67 (CW8); ¶¶36, 68 (CW9); ¶¶37, 69 (CW10). Not only do these CWs cross-corroborate each other, the FAC corroborates their statements with extensive allegations drawn from the inspection reports by FDA and others (§V.E.2. ¶¶70-116; §V.F.4. ¶¶245-246, 251, 254, 256), the investigative news reports §V.E.3. ¶¶117-120; §V.F.4. ¶¶237-238, 241), and the 5/19/2021 Congressional Memo and its exhibits (§V.E.4. ¶¶121-126). They are further corroborated by the 5/10/2022 Congressional Report (RJN Ex. 1 and its exhibits

(RJN Exs. 2-37), as explained in the RJN as 20-30. *Lefkoe*, 2008 WL 7275126 at *7 (CW allegations credited where complaint "provide[d] multiple sources to corroborate").

The CW allegations are to be read holistically, with each other and these other sources. *In re Mun. Mortg.*, 876 F. Supp. 2d at 640 ("Confidential witness allegations must be examined to consider the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, the coherence and plausibility of the allegations, and similar indicia.") (citations omitted); *In re Conventry*, 2011 WL 3880431 at *4-*5 (finding rejecting defendants' argument that "*Teachers' Retirement* requires such an individualized assessment of the reliability of the confidential witnesses, as *Teachers' Retirement* allows the Court to assess the "complaint as a whole") (citing  *Hunter*, 477 F.3d 162 at 174).  Defendants' Memo at 13-21 runs afoul of this approach.  Read together and with the FAC's other sources, the CW allegations pass muster.

Defendants' most prevalent attack is that the CWs fail to provide *precise* dates – beyond the bookends provided by their alleged employment tenures – or buttoned-up outcomes to certain statements, *e.g.*, the literal dates of weekly or monthly meetings.  That level of detail is simply not required.  *See, e.g.*, *Latham v. Matthews*, 662 F. Supp. 2d 441, 465 (D.S.C. 2009) (crediting a single CW's statement that the CEO told him "after" a webcast that alleged sales orders did not exist and rejecting defense argument that it was too vague, based on CW2's description and corroborating evidence).  Moreover, the FAC's other sources and the 5/10/2022 Congressional Report strongly corroborate the CW statements indicating that Emergent tried to mislead FDA inspectors, that "many" contaminations occurred at Bayview with "one of every five batches" affected, and that problems with mold, waste disposal, sterilization went unaddressed are strongly corroborated by the FAC's *other* alleged sources and by the 5/10/2022 Congressional Report. They also fault CWs for not personally interacting with the Individual Defendants, but that, too, is not needed.[29]  Thus, Defendants' piecemeal attacks on the CWs lack merit and should be rejected.

---

[29]     *See Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*, 794 F.3d 297, 301, 307-08 (2d Cir. 2015) (crediting allegations from low-level employees); *In re Sinclair,* 2020 WL 571724 at *16 (crediting low-level witnesses like a news anchor); *In re Massey,* 883 F. Supp. 2d at 606 (crediting various low-level witnesses, including a belt buster);

Defendants' attempt to rewrite CW9's statement relaying that Bayview's Head of Manufacturing told employees to carry bags of hazardous waste waiting to be sterilized through sterile areas of the facility right before the FDA inspected inspect Bayview in early 2021, so that it somehow occurred *after* (not before) that inspection (Memo at 20-21) is inappropriate and should be rejected. The 5/10/2022 Congressional Report strongly corroborates this allegation. *See* RJN at 22-23; RJN Ex. 1 at 1, 13-14 (finding 2: "Emergent hid evidence from government investigators") (describing removal of "hold tags" from segregated J&J batches right before an FDA inspection on February 11, 2021, a deception known to "VP of Manufacturing Operations / acting Bayview site head" and others). *Mulligan*, 36 F. Supp. 3d at 968 (statements as to remediation efforts sufficiently pled to be false or misleading where complaint alleges pervasive problems with manufacturing and quality control at a facility, FDA repeatedly identifying Form 483 deficiencies, and three CWs saying that "temporary" changes would be made to pass an FDA inspection then be undone afterward); *Epstein*, 203 F. Supp. 3d at 666, 669 (crediting CWs who described a "business culture" where supervisors and managers encouraged them to engage in misconduct to plead falsity and scienter") (citing *Hunter*, 477 F.3d at 174)).

**Investigative Reporting**. The FAC pleads a series of corrective disclosures from March – November 2021, the first triggered by *The New York Times* (¶237) and the *AP* (¶238) reports on March 31-April 1, 2021, which revealed the J&J cross-contamination a month earlier, the then-unfolding impacts to Bayview's operations and J&J and AstraZeneca vaccine production, and some of the prior FDA inspections from 2017-2020, including the April 2020 Bayview inspection, that had raised red flags. Defendants call this explosive, timely reporting "fraud by hindsight" (Memo at 23)[30] – an argument that, if credited, would eviscerate the ability of securities claims to ever be based on third party journalism. *Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 243, 249 n.13, 268-269 (3d Cir. 2009) ("both post-class-period data and pre-class data could be used to

---

*In re Toronto-Dominion,* 2018 WL 6381882 at *13 (crediting allegations of nationwide illegal scheme based on CW statements of lower-level employees in a variety of roles); *In re Countrywide*, 554 F. Supp. 2d at 1044, 1058-1059 (scienter sufficiently pled based on collection of CW statements from low-level employees up to a regional VP).

[30]    Defendants' argument is limited to the *New York Times* article. They raise no arguments regarding the *AP* piece (¶238) and thus waive them at this stage.

'confirm what a defendant should have known during the class period' because '[a]ny information that sheds light on whether class period statements were false or materially misleading is relevant'"); *Novak*, 216 F.3d at 312-313 (relying on post-class period data to support allegations pertaining to class period).[31]  They also fault *The New York Times* for "not cit[ing] the basis for its conjecture," despite the FAC pleading that it drew from audits and investigations by AstraZeneca, J&J, two federal agencies, and Emergent's own quality auditors[32] and former employees.  ¶237.[33]  Though *The New York Times* failed to disclose the identities of its Emergent contacts – as journalists often do – the Court should credit the article and the employee statements it recounts. *In re Toronto-Dominion*, 2018 WL 6381882 at *6 (considering allegations taken from CWs described in a news report and finding "[c]onsidering Plaintiffs' CW allegations are consistent with those made by the [news outlet] CWs, there is no reason to seriously doubt their reliability at this stage in the proceedings").  Plaintiffs may draw CWs from other sources, *e.g.*, pleadings in another matter, at this stage,[34]  and courts have held that witness statements taken from news articles are even *more* reliable than those taken from other pleadings.  *See, e.g.*, *In re Lehman Bros. Sec. & ERISA Litig.*, No. 09 MD 2017 LAK, 2013 WL 3989066, at *4 (S.D.N.Y. July 31, 2013).

**Ongoing Congressional Investigation**.  Defendants' sole argument against the 5/19/2021 Congressional Memo is that it looked in "hindsight" to present only "preliminary" findings.  Memo at 24.  All investigations, by their nature, look in "hindsight" to reveal what happened, what key individuals knew and when they knew it, and what they did with that information.  *In re Genworth*, 103 F. Supp. 3d at 777 (plaintiffs did not assert "fraud by hindsight" where they set forth clear and

---

[31]    Defendants' lone cited case, *In re Marriott*, is distinguishable, because there, the undisclosed negative fact was a data breach due to a longstanding vulnerability in an acquired company's systems, about which the Marriott defendants did not know until a security alert occurred two years after the acquisition and an investigative report identified the breach's existence and duration – well after the misstatements had been made.  543 F. Supp. 3d at 139.

[32]    For reasons pled throughout the FAC and set forth herein, Lead Plaintiffs dispute Defendants' uncited arguments (Memo at 24 n. 18-19) that Emergent's conducting audits into the pervasive problems it failed to resolve and its destroying the critically-needed vaccine batches it ruined somehow evidence diligence and working controls.

[33]    These facts make Defendants' cited cases (Memo at 23), *City of Brockton Ret. Sys. v. Avon Prods., Inc.*, No. 11 Civ. 4665 (PGG), 2014 WL 4832321, at *23 (S.D.N.Y. Sept. 29, 2014) and *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 690 (S.D.N.Y. 2008) distinguishable.

[34]    *See, e.g.*, *Homeward Residential, Inc. v. Sand Canyon Corp.*, No. 13 CIV. 2107 AT, 2014 WL 2510809, at *7 (S.D.N.Y. May 28, 2014); *380544 Can., Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 224-225 (S.D.N.Y. 2008).

specific allegations that established the information available to defendants and why, given possession of that information, defendants' statements were misleading).  Defendants cite no authority barring governmental investigation and reports from being pled as a basis for federal securities claims – as frequently occurs.[35]  The leap they ask the Court to take is mind-boggling – taken to conclusion, it would preclude reference to SEC investigations, reports, and trial outcomes concerning the very subject matter of §10(b) lawsuits.  Their "preliminary" argument also fails because the 5/19/2021 Congressional Memo presented "*findings*" (Congress's word) from the investigation, based on extensive non-public evidence it revealed and authenticated.  Moreover, those "preliminary" findings were confirmed and expanded by the findings in the recently-issued 5/1/2022 Congressional Report, RJN Ex. 1, and its exhibits, which are the RJN materials.

### b.    Post-March 31, 2021 Misstatements And Omissions

The FAC pleads extensive misstatements and omissions after March 31, 2021 (¶¶187, 189, 191, 193, 195, 197, 199(a)-(d), 201(a)-(k), 203, 205, (a)-(c), 207, 209, 211, 213(a) –(e), 215, 217), a detailed summary of which is in the RJN at 4-5.  Defendants raise just four challenges (Memo at 25-27) and waive all post-March 31, 2021 falsity arguments at this stage.  *See* n.2 *supra*.

First, they claim "many" of these misstatements are "puffery," but provide only two single-sentence examples, a "puzzle-pled" argument that improperly leaves it to the Court and Lead Plaintiffs to guess at what portions, if any, of the others they claim suffer from the same issue.  The Court should decline to do so.  The two statements they cite are the 4/21/2021 Press Release's statement that the 4/21/2021 FD 483 Report's negative observations were "correctible" and "we will take swift action to remedy them" (¶197) and the subsequent 5/12/2021 Press Release's statement that Emergent had "started making improvements and [was] fully committed to making the necessary short- and long-term enhancements to meet or exceed FDA's standards (¶203).  Neither is inactionable puffery.  *See, e.g.*, *Mulligan*, 36 F. Supp. 3d at 968 (when manufacturing facility received significant warnings in FDA Form 483, highly plausible that investors would find

---

[35]    Defendants' cited case on this point, *In re Marriott*, is distinguishable, as set forth in n. 31 *supra*.

material statements by corporate officers that appropriate responses were "well underway," which in context were not puffery); *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1224–25 (N.D. Ga. 2019) (statements regarding a company's commitment to cybersecurity actionable where the company repeatedly made these statements and the Plaintiffs asserted allegations to the contrary).

Second, Defendants claim (Memo at 26) the 4/1/2021 Press Release was not misleading because it "stopped short of admitting cross-contamination" of the J&J batch. As detailed in §III.D.2. below, this press release was part of an orchestrated counter-narrative in response to news reports that 15 million J&J doses were destroyed due to cross-contamination with the AstraZeneca vaccine. Its full text[36] falsely depicts the contamination as affecting a "single batch" in an "isolated incident," Bayview as operating in compliance with cGMP, and Emergent's quality controls – which Kramer later admitted had failed and caused the cross-contamination (¶261(f)) – as robustly functioning to catch the issue. The FAC extensively pleads why these statements were materially false and misleading. The RJN materials strongly corroborate that pleading.

Third, FAC ¶189 pleads that Kramer's 4/1/2021 CNBC Interview was materially false and misleading, including his blatantly false statement:

> [I]t isn't the case or wasn't the case where an ingredient from one vaccine contaminated or impacted the other. It was more simply the fact that a one production run, one batch of product was determined to be inconsistent with our quality specifications of Emergent and J&J and subsequently, that batch was pulled aside and will not be processed further.

Defendants claim (Memo at 26) this statement did not alter the total mix of information, because it immediately followed third party news reports that a cross-contamination had occurred and was made in response to the interviewer's similar statements. To the contrary, that is *precisely why* it misleads investors. As discussed in §III.D.2. *infra*, it was part of a broader counter-narrative pushed by Defendants to stem the decline in Emergent's stock price. The FAC even pleads that

---

[36]    FAC ¶187 pleads that the 4/1/2021 Press Release stated, *inter alia*, that "a single batch of drug substance was identified that did not meet specifications and our rigorous quality standards" and Emergent had "isolated this batch and it will be disposed of properly," the "Bayview facility has been designed and validated to meet all current Good Manufacturing Practices" and its "quality control systems worked as designed," and "[d]iscarding a batch of bulk drug substance … does occasionally happen during vaccine manufacturing" and "[w]e continue to manufacture in support of our customers and the U.S. government, and we remain confident in our ability to meet the FDA requirements."

securities analysts noted Kramer's statement, were further told by Emergent that the media reports were a "'mischaracterization' of the situation," and were persuaded.  ¶¶193, 240.[37]  Disclosure was necessary to make his statements, under the circumstances, not misleading.  *Singer*, 883 F.3d at 440 (quoting *Matrixx*, 563 U.S. at 44).[38] [39]

Finally, FAC ¶¶205(a)-(c) pleads a litany of false and misleading statements in Kramer's 5/19/2021 Congressional Testimony.  Defendants challenge the pleadings as to just two of them.  Memo at 27.  Kramer testified that Emergent's "internal quality control procedures" identified the J&J cross-contamination and even said "[n]one of that material left our control" and "the production lot … never left our facility."  ¶205(b)(i).  Only under withering questioning, during which a Congressmember expressed being "highly confused" by Kramer's testimony, did he admit that a J&J facility in the Netherlands actually detected it.  *Id.*  At minimum, his testimony is both evasive and materially misleading.[40]  Kramer also testified, as regards the myriad deficiencies noted in the 4/21/2021 FDA 483 Report (¶¶112(a)-(i)): "We have made significant progress against all of those commitments.  We are very close to completing them, and I would expect we will be in a position to resume production within a matter of days."  ¶205(b)(iv).  Defendants challenge only the "expect" part of his testimony (Memo at 27) and waive argument at this stage as to his

---

[37]     Defendants' cited authority, *Longman v. Food Lion, Inc.*, 197 F.3d 675, 684 (4th Cir. 1999), is readily distinguishable because there, a lawsuit claiming $358 million in potential exposure was filed "more than a year before" the broadcast in question and the company promised to conduct an investigation and take appropriate action.

[38]     The FAC pleads (¶252) that Emergent's stock price fell on April 30, 2021 in response to three alleged corrective disclosures (the 4/29/2021 Earnings Call (¶249), the 4/30/2021 CNBC Report (¶250), and the 4/30/2021 Emergent FDA 483 Response (¶251)), which it further pleads were muted by contemporaneous misstatements within the 4/29/2021 Earnings Call and 4/30/2021 Emergent FDA 483 Responses (¶252).  Defendants' argument (Memo at 26 n.21) about the degree to which an analyst report pled in ¶253 as an example of the market's reactions to this informational mix does not undercut the degree to which Kramer's 4/1/2021 CNBC Interview statements, or the broader counter-narrative campaign of which they were a part, misled investors.  It also bears emphasizing that Defendants have not presented a proper loss causation argument, which is waived at this stage.  *See* n.2 *supra*.

[39]     In a footnote, Defendants claim that an alleged misstatement by Emergent management days later, on April 5, 2021, as memorialized in an analyst report that day, calling media reports (*i.e.*, the reports by *The New York Times* and the *AP* on March 31-April 1, 2021) about the ingredient contamination a "'mischaracterization of the situation'" (¶193) was not false or misleading.  In so arguing, they cite to a snippet of ¶125, where the FAC recounts Congress's summary of *Emergent's* explanation that the "most probable" cause was contact by the J&J vaccines with AstraZeneca waste.  As discussed in §III.D.2. *infra*, Emergent's statement set forth in the 4/5/2021 J.P. Morgan Analyst Report was part of an orchestrated counter-narrative to rebut the accurate reporting that revealed the destruction of COVID-19 vaccine doses due to persistent contamination and other risks at Bayview.  Read in context, it was as materially false and misleading as the other (unchallenged) statements in that campaign.

[40]     Defendants' cited case, *Longman*, 197 F.3d at 684, is again distinguishable for the reasons in n.37 *supra*.

24

preceding statements, *see* n.2 *supra*, which are categorically false statements of fact.    As Defendants concede, production did not resume until ***71 days*** later.  *Id.* (citing ¶213(a)).  Just ***98 days*** after that, the U.S. government terminated its contracts with Emergent due to the utter failure to remediate the issues in the 4/21/2021 FDA 483 Report.  ¶258(a).  The RJN Materials strongly corroborate these allegations.[41]  This statement is actionable.  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 , 176 (2015) ("[A] reasonable investor may…understand an opinion statement to convey facts about how the speaker has formed the opinion – or, otherwise put, about the speaker's basis for holding that view. And if the real facts are otherwise, but not provided, the opinion statement will mislead the audience.").[42]

### 2.    The FAC Adequately Pleads The Reported Results Fraud

The FAC pleads a Reported Results Fraud, which alleges that Emergent's quarterly and annual reported financial and operating results were materially false or misleading because of Defendants' (i) the MD&A section's [43] attributions of those results to the Bayview facility's purportedly positive performance under and generation of revenues from the U.S. government, J&J, and AstraZeneca COVID-19 vaccine contracts, coupled with (ii) the failure to disclose negative underlying facts and trends concerning the myriad undisclosed facts and risks pervading its CDMO segment and especially the Bayview facility (as pled in FAC §§V.E.1.-4., V.F.4. and V.G.1.), all in violation of SEC Regulation S-K, Item 303, 17 C.F.R. §229.303(a)(3)(i)-(ii) and (b)(2).  ¶¶220-230; *see also* RJN §I.A.1.b.  It further pleads that this violation and disclosure failure continued well ***after*** the undisclosed risks had materialized (¶229(a)-(e)), until Emergent was forced in November 2021 to retroactively ***reverse*** $86 million in revenue, reduce the value of a

---

[41]        *See, e.g.*, RJN at 21-22 (finding 1) (citing RJN Ex. 1 at 1 ("After Emergent was permitted to resume manufacturing in July 2021, an additional 90 million newly manufactured coronavirus vaccine doses had to be destroyed for quality control reasons, and 135 million remain sequestered pending further testing.")

[42]        *See also Mulligan*, 36 F. Supp. 3d at 968 (when manufacturing facility received significant warnings in a FDA Form 483, it was highly plausible that investors would find material statements by corporate officers that appropriate responses were "well underway" or nearly completed, and in context of allegations that the responses were inadequate and problems continued to pervade the facility, they were not puffery or statements of optimism).

[43]        "MD&A" is shorthand for Management's Discussion and Analysis of Financial Condition and Results of Operations, which is the portion of a company's financial statements that explains the reasons for its reported results.

cancelled BARDA task order by $180 million, tighten the range of its total revenues and lower the revenues midpoint by $50 million.  ¶229(d).[44]

Remarkably, Defendants' attacks on the Reported Results Fraud fail to even mention their MD&A statements, Emergent's reversal of $86 million in revenues, or Regulation S-K, Item 303. *See* Memo at 27-29.[45]  Instead, they make the facially inaccurate claim that "Plaintiffs do not even claim that any part of reported revenues were earned unlawfully or improperly" (*id.* at 28), when ¶229(b) expressly pleads that Emergent's continuing to take $27 million in monthly reservation fees despite being unable perform manufacturing duties was an undisclosed trend that was "unjustly enriching the company."  While the securities laws may not impose a generic "duty to self-disparage" (*id.* at 28), Regulation S-K, Item 303 does impose significant disclosure obligations concerning a company's Forms 10-K and 10-Q, and the FAC even pleads that, in response to the SEC's questions during its investigation of Emergent, Defendant Lindahl's 9/30/2021 SEC Letter confirmed for regulators that "[t]he Company considered Item 303 of Regulation S-K in the preparation of its Form 10-K and Form 10-Q, concluding that nearly all of the increase in CDMO services revenue was related to the Company's COVID-19 related arrangements."  ¶227.  Further, any purported risk warnings (Memo at 29) are unavailing, as the statements of present or past performance and the correlating MD&A attributions are not forward-looking, the Defendants

---

[44]    The materialization of these risks was evidenced by Defendants' belated disclosures of previously concealed, negative, underlying facts and trends, as evidenced by (i) Kramer's 11/4/2021 Earnings Call statement blaming a trend that predated and extended throughout the Class Period ("execution of the CIADM program and the necessary operational investments by all [Presidential] administrations fell short of what was needed to maintain capability in case of an emergency") for HHS's decision to end its CIADM partnership with Emergent and terminate all open task orders (¶229(a)); (ii) his 11/4/2021 Earnings Call statement disclosing "millions of dollars" of expenditures "[o]ver the last five months" in an unsuccessful attempt to remediate the problems at its facilities (¶229(c)); (iii) Emergent's continuing to take $27 million in monthly reservation fees from the U.S. government even after it was unable to perform any COVID vaccine manufacturing services, which unjustly enriched the company (¶229(b)); (iv) Defendant Lindahl's 11/4/2021 Earnings Call statement disclosing that the U.S. government had stopped paying amounts due under Emergent's task orders, which Kramer called "clearly an unusual circumstance," which forced the revenues adjustments (¶229(d)); and Lindahl's belated disclosure on the 11/4/2021 of "trends" that were "applying pressure to margins," including "lower capacity utilization for drug substance production at Bayview while it is solely dedicated to J&J's COVID-19 vaccine candidate," "the additional investments we are making at Bayview in support of our quality enhancement plan," and "increased operating costs at our Bayview facility" (¶229(e)).

[45]    As such, they waive any argument at this stage as to all of these allegations. *See* n.2, *supra*.

lacked reasonable basis for their statements setting forth forecasts, and the risks had already materialized.  *See* §III.C.1.a.ii., *supra.*[46]

Contrary to Defendants' cited authority (Memo at 30),[47] courts nationwide uphold similar pleadings alleging that GAAP-compliant financials and operating metrics, which were not restated, nevertheless were false or misleading for failing to disclose negative underlying facts or trends in violation of Regulation S-K, Item 303.  *See, e.g.*, *In re Toronto-Dominion Bank Sec. Litig.*,  2018 WL 6381882, at *2, *9-*10  (upholding complaint that alleged a Reported Results Fraud in violation of Regulation S-K, Item 303 (Dkt. No. 43 at ¶¶176-183) because GAAP-compliant financial results were misleadingly attributed and omitted negative underlying facts and trends identified by CWs); *Perez v. Higher One Holdings, Inc.*, No. 3:14-cv-00755 (AWT), 2017 WL 4246775, at *8 (D. Conn. Sept. 25, 2017) (substantially upholding complaint, including entirety of an Operating Results Fraud alleging misleading attributions of financial and operating results that omitted negative facts and trends identified by CWs in violation of Regulation S-K, Item 303 (Dkt. No.86 at ¶¶108-117)); *Kendall v. Odonate Therapeutics, Inc.*, No. 3:20-cv-01828-H-LL, 2021 WL 3406271 (S.D. Cal. Aug. 4, 2021) (upholding complaint alleging a Reported Results Fraud for misleading attributions of financial results and operating metrics that omitted negative facts and trends identified by CWs in violation of Regulation S-K, Item 303 (Dkt. No. 24 at ¶¶139-153)).  Lead Plaintiffs respectfully ask the Court to likewise reject Defendants' arguments.

### 3.    The FAC Adequately Pleads The Internal Controls Fraud

The FAC also pleads an Internal Controls Fraud arising from Defendant Kramer's and Lindahl's SOX certifications.  ¶¶231-235; FAC §V.F.3.  It also pleads – and Defendants do not dispute – that Kramer ***admitted*** in his 5/19/2021 Congressional Testimony that a "failure in our controls [ ] led to the contamination" at Bayview and he took "full responsibility."  ¶205(a).

---

[46]    Defendants' cited case, *In re Marriott*, 543 F. Supp. 3d at 153 is distinguishable, because the warnings there were about a cyberattack, something outside of the company's control.  Here, by contrast, the purported risk warnings concerned things within Defendants' control, like the implementation of corrective actions to satisfy FDA concerns.

[47]    Significantly, Defendants' primary authority (Memo at 28), *Nadoff v. Duane Reade, Inc.*, 107 Fed. App'x 250, 252 (2d Cir. 2004), involved alleged misstatements in an earnings call, not a Form 10-K or 10-Q, and the decision did not discuss Regulation S-K, Item 303.  Likewise,  *Sierra Wireless,.*, 482 F. Supp. 2d at 367 (S.D.N.Y. 2007) and *In re Marriott*, 543 F. Supp. 3d at 121 do not discuss Regulation S-K, Item 303.

Instead, Defendants' Memo at 29-30 raises only two challenges.  First, they wrongly argue that SOX certifications attest only to "internal controls over *financial reporting* – not operational controls or other controls."  Not so.  "Sarbanes-Oxley…is not directed solely at ensuring numerical accuracy and preventing dishonest accounting practices.  Any interpretation restricting its scope to these purposes would be artificially narrow and inconsistent with the remedial purposes of the statute."  *City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 418 (D. Del. 2009).  Indeed, the plain text of their SOX certifications makes clear that Defendants Kramer and Lindahl attested to far more.[48]  Second, after wrongly asserting that there was no fraud to disclose (there was, as pled in the FAC, discussed herein, and evidenced in the RJN Exhibits), they nonsensically argue that even if there was one, the FAC fails to plead that Kramer and/or Lindahl did not disclose it to the Audit Committee.  Suffice it to say the FAC's allegations – and Defendants' ongoing denials – clearly support the inference (if not the certainty) that Kramer and/or Lindahl did not self-report their own fraud or that of Defendant Husain, to anyone.

Significantly, contrary to Defendants' arguments, courts have upheld similar pleadings by Lead Counsel of an "Internal Controls Fraud" by companies that did not restate their financials but did suffer serious *operational* issues.  *See, e.g.*, *In re Toronto-Dominion*, 2018 WL 6381882, at *2, *9-*10 (fully upholding a complaint that alleged a Risk Management and Internal Controls Fraud (Dkt. No. 43 at ¶¶150-157), because "SOX certifications are typically actionable when…there is an allegation that the internal controls within a company were deficient") (*citing City of Roseville*, 686 F. Supp. 2d at 418 (SOX certifications actionable if complaint sufficiently

---

[48]    Their certifications attested that Emergent's Forms 10-Q and 10-K did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances…not misleading" and the financial statements and information "fairly present in all material respects the financial condition, results of operations, and cash flows" of Emergent.  ¶¶232-234.  They also attested that they had disclosed to Emergent's auditors and audit committee both "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information" and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in [Emergent's] internal controls over financial reporting."  *Id.*  They attested that they had designed Emergent's "disclosure controls and procedures" or caused them to be designed "to ensure that material information relating to [Emergent] is made known to us by others" and had "evaluated the effectiveness" of such controls and presented their "conclusions about the[ir] effectiveness."  *Id.*  They also attested as to Emergent's "internal control over financial reporting" to "provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes."  *Id.*

pleads individual defendants knew or should have been aware of unlawful scheme contributing in part to accurately reported revenues)); *Kendall*, 2021 WL 3406271 (fully upholding a complaint that alleged an Internal Controls Fraud (Dkt. No. 24 at ¶¶154-162)).[49]  Lead Plaintiffs respectfully ask the Court to likewise reject Defendants' arguments.[50]

### D.     The FAC Sufficiently Pleads A Strong Inference Of Defendants' Scienter

The FAC includes a robust, 24-page section that ties together its allegations and explains how they holistically support a strong inference of Defendants' scienter.  FAC §V.G.1. ¶¶260-308. Defendants' challenges to these allegations (Memo at 30-39) lack merit and should be rejected.

#### 1.     The Knowledge And Recklessness Allegations

FAC exhaustively pleads Defendants' knowledge or reckless disregard of red flags and negative facts that rendered there public statements materially false or misleading.  ¶¶261(a)-(f) through 268.  Defendants' challenges to ¶¶260-261(a)-(d) fail.[51]

CWs.  The FAC pleads that the CW statements in its §V.E.1. are based on relevant first-hand knowledge and establish that "Emergent's locations – including Bayview – had widespread problems with facilities, equipment, processes and procedures, personnel, and training that posed significant risks well before the Class Period."  ¶261(a).[52]  Defendants attack the CW statements on the grounds that none were based on "direct contact" with the Individual Defendants and none concerned "what any Individual Defendant actually knew."  Memo at 31-32.  That argument is

---

[49]     *See also In re Enzymotec Sec. Litig.*, No. 14-5556 (JLL) (MAH), 2015 WL 8784065, at *16 (D.N.J. Dec. 15, 2015) (despite no financial restatement or auditor questions about internal controls, rejecting motion to dismiss Exchange Act §10(b) claim based on SOX certifications where plaintiffs alleged that deficient internal controls permitted the fraudulent conduct);

[50]     Defendants' cited authority (Memo at 29-30) does not counsel otherwise.  Unlike the FAC, the complaint *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 758 (S.D.N.Y. 2017) "does not concretely allege that any of Brasken's financial reports were in any way inaccurate."  Similarly, in *In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 359 (S.D.N.Y. 2015), *aff'd* (Mar. 21, 2016), not only did the complaint not "Make any allegation as to how or why PetroChina's internal controls were inadequate," but the internal controls at issue were validated by a company evaluation and an external audit.  Unlike the FAC, In *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 363 (S.D.N.Y. 2008), the underlying misconduct was alleged insider trading that the defendants purportedly knew about and aided, but did not directly undertake themselves.

[51]     Defendants' separate challenges ¶¶261(f) – 268 as admissions supporting scienter are discussed *infra*.

[52]     Defendants' Memo at 31 wrongly implies that the FAC "only" bases its scienter pleading on CW1 and CW5, because they are the two CWs it "singles out" in ¶261(a).  While ¶261(a) does include additional allegations specific to CW1 and CW5, its first sentence clearly states that the CW-based scienter pleading flows from *all* of the CWs.

incorrect both factually – as Defendants acknowledge in their attacks on CW1 and CW5, discussed below – and legally.  For instance, in *Ollila*, 2018 WL 792069, the court held that a strong inference of the individual defendants' scienter was pled based on CW statements that "unfavorable monthly reports were regularly provided to senior management officers" regarding issues with an expansive project requiring redesign and defendants visited certain project sites.  because:

> While plaintiff may not be able to show smoking gun documentation that [individual] defendants [CEO] Ferland and [CFO] Apker explicitly knew of these issues as they made public statements, plaintiffs have sufficiently alleged that they had access to information on such issues.

*Id.* at *2*3 (denying motion to dismiss) (citing, *inter alia*, *Novak*, 216 F.3d at 308 (recklessness sufficiently pled when plaintiffs alleged "defendants' knowledge of facts or *access to information contradicting their public statements*") (emphasis supplied by *Ollila*) and *Epstein*, 203 F. Supp. 3d 655, 671 (D.S.C. 2016) (factors indicating scienter include "Defendants' close monitoring of the Company's day-to-day business and corporate practices" and "accounts from Plaintiffs' Confidential sources regarding the "business culture")).  In *Epstein*, lower-level CWs not alleged to have interacted with the individual defendants recounted a "business culture" based on their manager' and supervisors' encouraging them into loan misconduct and a "corporate culture of looking the other way" about it.  203 F. Supp. 3d at 666, 667-669.  The *Epstein* court denied a motion to dismiss, holding that the complaint holistically pled scienter based on these CW statements and allegations about defendants' monitoring company operations; the existence of government scrutiny, investigations, and a NORA letter; executive resignations; and changes in business practices after identification of material weaknesses.  *Id.*  Similarly, the court in *In re Sinclair*, 2020 WL 571724, held that corporate scienter was adequately pled for a misstatement about an entity (Cunningham) being separately operated, when it was closely tied to the founder of a company (Sinclair) using it for a sham asset divestiture to evade an FCC rule, based on CW

statements describing "a widespread understanding among Sinclair and Cunningham employees that, despite Cunningham's 'technical' independence, Sinclair was in charge." *Id.* at \*17.[53]

The FAC adds specific allegations regarding CW1 and CW5:

• CW1 stated, *inter alia*: (i) CW1 was a senior project management team member from December 2018 - December 2021 who oversaw COVID-19 vaccine projects, created a system to manage and track Emergent's multiple contracts, and set up project planning tools to track its projects (¶¶28, 60); (ii) CW1 reported to Rick Welch (VP of Development Services, CDMO Business Unit), who reported to Defendant Husain (¶28); (iii) Husain was intimately involved in overseeing progress on all the COVID-19 projects and "nothing happened without his direction" (¶¶60, 261(a)); (iv) Emergent lacked the necessary personnel, equipment, and functional capability to handle the work it took on in 2020 (¶60); (v) these deficiencies caused significant delays and missed deadlines in every COVID-19 project, yet Husain told customers in summer / fall 2020 that Emergent could take on more development and manufacturing work (¶¶60, 261(a)); (vi) Husain and Welch **_led_** highly-attended, bi-monthly project management meetings at which all COVID-19 projects were discussed, including these issues (¶¶28, 60, 261(a)); (vii) CW1 and other project managers told Husain and Welch about mold problems – a potential contamination risk – at Bayview (¶¶60, 261(a)); (viii) facility problem discussions were then restricted to a smaller circle of employees (¶60); (ix) Bayview project managers constantly resigned due to frustration

53      *See also Avaya*, 564 F.3d at 268-269 (finding scienter sufficiently pled based on holistic examination of facts including CW statements even those "Shareholders do not point to any particular document or conversation that would have informed [CEO and CFO] of unusual discounting during the class period"); *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 682, 684-685 (5th Cir. 2014) (reversing dismissal after crediting allegations by CW who worked for non-party business partner of company and had no interactions with the individual defendants); *In re Toronto-Dominion*, 2018 WL 6381882, at \*1, \*4-\*7, \*12-\*14 (denying motion to dismiss after finding scienter sufficiently pled by allegations of insider transactions, core operations doctrine, SOX certifications, and statements of 19 lower-level CWs, ranging from bank tellers to district VPs, none of whom interacted with the individual defendants and only one of whom put knowledge of the underlying scheme into the "corporate office"); *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.,* No. 17 Civ. 1580 (LGS), 2018 WL 2382600, at \*30 (S.D.N.Y. May 24, 2018) (strong scienter inference pled based on statements by CWs who lacked direct contact with individual defendants but who confirmed large contracts were discussed at monthly meetings and relevant information was made available to senior executives via a Sharepoint system); *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 483 (S.D.N.Y. Mar. 29, 2018*), aff'd in part, vacated in part, remanded sub nom. Abramson v. Newlink Genetics Corp.*, 965 F.3d 165 (2d Cir. 2020) (plaintiff not required to allege specific contact between CWs and individual defendants); *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l. N.V.*, 89 F. Supp. 3d 602, 615-16 (S.D.N.Y. 2015) (same).

and overwork or were terminated for speaking up about problems (¶60); and (x) Welch cursed at, humiliated, and reprimanded employees who told him about problems on projects (¶60).

• CW5 stated, *inter alia*: (i) CW5 was a Project Analyst at corporate headquarters from August 2020 - January 2021 who created project plans and took notes during internal meetings and Emergent's weekly meetings with clients, including AstraZeneca, to discuss progress on projects (¶32);[54] (ii) CW5 reported to CW1 and Rick Welch (¶32); (iii) CW5 described "constant conversations about something going wrong in the lab" at Bayview "every single week" and that "it really seemed like people working in there were frequently making some sort of mistake" (¶64); (iv) CW5 described frequent meetings with Husain and Welch about the vaccine projects (¶¶64, 261(a)); (v) Husain had weekly meetings with vaccine clients (*i.e.*, J&J and AstraZeneca) to discuss progress of work, deadlines, etc., during which Husain did not convey the full extent of Bayview's problems (¶¶64, 261(a)); (vi) Welch tightly controlled the contents and distribution of meeting notes, required CW1 to create SOPs for tracking meeting notes, did not want CW5 taking detailed notes including who said what about action items, reviewed CW5's notes before they could be released to others, and revised CW5's notes to remove parts before distribution (¶¶64, 261(a)); (vii) Welch often became angry, cursed, and blamed others at reports about Bayview problems (¶64); (viii) Welch fired CW1 shortly they had a discussion about what was happening at Bayview, then fired CW5 and everyone closely associated with CW1 (¶64).

Defendants dissect snippets of these cross-corroborating statements in isolation, counter to the clear directive of *Tellabs* to view scienter pleading holistically. Memo at 31-32. Both CW1 and CW5 describe Husain's active oversight of the COVID-19 projects, including Husain's ***leading*** (not just "attending" as Defendants mischaracterize it) highly-attended, bi-monthly project management meetings at which ***all*** COVID-19 projects and their problems were discussed; having frequent meetings with Welch about the COVID-19 vaccine projects; conducting weekly meetings with J&J and AstraZeneca to provide COVID-19 project updates, where Husain did not disclose

---

[54]    This disproves the Memo's assertion (at 32 n.23) that the FAC did not plead the relevance of CW5's notes.

the full extent of Bayview's problems; having meetings with potential clients in the summer / fall of 2020 about Emergent's manufacturing capabilities.  That is scienter by direct oversight, not "scienter-by-status," as Defendants claim.[55]  Their claim that these detailed CW statements should be rejected for failure to specify "when any of the meetings occurred" is absurd.  The FAC pleads the tenures of CW1 and CW5, which provide bookend dates within which the "weekly" and "bi-monthly" meetings they describe occurred.  Defendants fail to cite *any* authority requiring these CWs to literally recite the precise meeting dates (which are likely memorialized in CW5's notes, which are in Defendants' possession) – that is precisely the sort of "smoking gun" evidence that *Tellabs*, 551 U.S. at 324, disavowed.[56]  Indeed, in Defendants' own authority, *In re Coventry*, 2011 WL 1230998 at *6, the court credited the statement of a CW who interacted with the defendants and attended a meeting that covered the inadequate reserve levels – like CW1 and CW5 here.

Defendants also baselessly disregard Husain's having been told, firsthand, by CW1 and other project managers about an alarming contamination risk – mold growing in the Bayview facility – because it was not the specific cause of the later J&J cross-contamination in early 2021. That argument is like the operator of Jurassic Park justifying his failure to lock the gates, despite being told of dinosaurs escaping their cages, by saying, "Well, those dinosaurs were velociraptors. The one that penetrated the building later was a T-rex."  Defendants wonder aloud (Memo at 32) what problems Husain could have disclosed to J&J and AstraZeneca in their weekly progress meetings described by CW5 – widespread mold contamination of Bayview and the underlying personnel failures that permitted it to occur and failed to remediate it would make the list.

At most, Defendants' authority (Memo at 31-32) stands for the proposition that the *strength* of the inference from the CW statements – viewed in isolation – may depend on the degree to which they can place information directly into the hands of the Individual Defendants.  *See, e.g.*,

---

[55]    By contrast, Defendants' cited case, *Schwab v. E\*Trade Fin. Corp.*, 285 F. Supp. 3d 745, 757 (S.D.N.Y. 2018), *aff'd,* 752 F. App'x 56 (2d Cir. 2018), rejected allegations that the individual defendants "knew, by dint of their responsibilities as CEO" or "would have known" negative facts.

[56]    By contrast, in Defendants' cited case, *In re Career Educ. Corp. Sec. Litig.*, No. 03 C 8884, 2006 WL 999988, at *3 (N.D. Ill. Mar. 28, 2006), the CWs failed to allege "when the allegedly improper activities occurred, how the witnesses learned of th[o]se activities or had access to this information, or…how these activities affected [the company's] statements and omissions.

33

*KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 609 (4th Cir. 2021) ("This general lack of direct contact with Defendants *weakens* the inference of scienter…")(emphasis supplied). However, *Tellabs* requires the CW allegations to be viewed *holistically* with the full scienter pleading, and significantly, all the CW statements – including those by CW1 and CW5 – are strongly corroborated by the FAC's other scienter allegations arising from the inspections and reports by government entities (FDA, HHS, BARDA, etc.), J&J and AstraZeneca, and Emergent's own quality personnel; by the facts revealed by investigative journalism, and by the facts revealed and findings reached by the House Committees.[57]  As such, they support a strong inference of Defendants' scienter.

Moreover, the RJN materials strongly corroborate and augment these CW allegations, including CW5's description of Husain not disclosing problems to clients, as well as CW1's statement that Husain and Welch restricted discussion of Bayview problems, CW5's description of Welch's altering and restricting access to meeting notes, and both of their recounting of Welch's retaliatory actions toward employees who raised concerns.  *See* RJN at 20-30; RJN Ex. 1 at 1, 3-7, 13-14 (findings 2 and 3); RJN Exs. 3, 6, 7, 8, 9, 10, 11, 12, 13, 15, 35.

FDA Inspection, Reports, and Responses.  As detailed in §III.D.2. below, the FAC pleads 17 reports by government regulators, including four about Bayview, and seven Emergent responses, including *two* regarding Bayview, spanning May 2017 through April 2021.  *See* FAC §§V.E.2. and V.F.4.; ¶261(b).  These inspections involved active engagement with Emergent's on-site personnel and "senior management," written responses by Emergent, and duties to remediate. *Id.*  The FAC alleges that these reports create a clear record of persistent deficiencies in facilities, equipment, processes and procedures, personnel, and training across Emergent's U.S. footprint and at Bayview, including recurrent "contamination risks resulting from inadequate sanitization,

---

[57] Indeed, these alleged facts make Defendants' other cited cases (Memo at 31) distinguishable.  In *KBC* – a case that lacked the panoply of corroborating facts from inspection reports to Congressional findings pled in the FAC here – the CWs failed to establish that they passed concerns to the company's two principal executives "or that they were otherwise aware of the problems alleged." 19 F.4th at 609.  In *Marriott*, "none of the Confidential Witness allegations are regarding what any of the Individual Defendants actually knew about Marriott's cybersecurity or the falsity of any statements." 543. F. Supp. 3d at 145.

34

insufficient decontamination, facilities and equipment shortcomings, deficient or disregarded procedures that violated GMP, poorly trained personnel, and a failure to investigate known problems or violations," which led to the J&J cross-contamination in early 2021.  ¶216(b).

Defendants' assertion (Memo at 32) that "they do not establish the risk asserted in the Complaint" is unintelligible, unsupported, and should be rejected.  Moreover, Defendants' argument that "versions" of these reports sufficient to undermine the scienter pleading were publicly available is likewise unsupported and counter to the pleadings, which allege that the *AP* (¶¶10, 219(c), 238) and Lead Counsel (¶73, ¶110, ¶238 & n. 17) required FOIA requests to obtain copies; that the copies obtained were heavily redacted and missing their exhibits (¶¶72 & n.3, ¶110 & n.5-8) in ways that obscured their pertinent content; that the company has an informational advantage because it received unredacted copies with exhibits (¶72); and discovery of unredacted copies, exhibits, and related documents and communications will support the pleadings (¶72 n.3). Indeed, both the 5/19/2021 Congressional Memo and the 5/10/2022 Congressional Report (discussed in the RJN materials) present the FDA and other government reports as evidence uncovered by the House Committees through their investigatory powers.[58]  Defendants' argument that they "directed investors to the post-contamination incident report" (in April 2021) obviously has zero bearing on their scienter at all times prior, and is hardly exonerating, considering that by that point the J&J cross-contamination had already been revealed (by the press), AstraZeneca production was stopped, J&J was put in charge of Bayview, and its manufacturing operations were shutdown pending review of quarantined batches.[59]

Investigative Reporting.  The FAC pleads that the scienter inference is further supported by the fact that *The New York Times* and the *AP*, not Defendants, first disclosed the J&J cross-

---

[58]    Defendants are raising a "truth on the market" defense, which cannot be resolved on a Rule 12(b)(6) motion. *See Klein*, 525 F. Supp. 3d at 664 (rejecting truth-on-the-market defense, which requires defendant to prove that the information "was transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by their previous misstatements," at the Rule 12(b)(6) stage after noting that it is "intensely fact-specific" and "rarely an appropriate basis for dismissing a §10(b) complaint") (citation omitted).  *See also KBC Asset Mgmt. NV v. 3D Sys. Corp.*, No. 0:15-CV-02393-MGL, 2016 WL 3981236, at *9 (D.S.C. July 25, 2016) (same); *In re Massey Energy*, 883 F. Supp. 2d 597 (same).
[59]    Thus, Defendants' cited case, *In re GeoPharma, Inc. Sec. Litig.*, 41 F. Supp. 2d 434, 446-447 (S.D.N.Y. 2006), which lacks any similar facts, is distinguishable.

contamination incident and the number of J&J and AstraZeneca batches destroyed due to contamination going back to October 2020; the fact that J&J (not Emergent) identified the cross-contamination; myriad Bayview deficiencies including deficient and ignored anti-contamination procedures despite visual risks, a lack of compliance audits, and failure to eliminate mold and residues on equipment and surfaces; and a "corporate culture that often ignored or deflected missteps" where "top Emergent leadership tolerated and even encouraged the flouting of federal standards for manufacturing." ¶261(c).  It pleads that this reporting was based on non-public audits and investigations by FDA, BARDA, J&J, AstraZeneca, and *Emergent's* quality investigators, internal *Emergent* documents, interviews with current and former federal officials, and interviews with former *Emergent* employees, including "four Emergent officials."  ¶¶117, 261(c).

Defendants' claims that these allegations only establish that they were "aware of the communications with the FDA" (Memo at 32) and that the outlets fail to "cite the basis for [their] conjecture" (Memo at 23) are facially incorrect.  Defendants raise no additional scienter-specific arguments beyond those already raised on the issue of falsity in the Memo at 22-25, which for reasons set forth above lack merit and should be rejected.

Congressional Reports.  The FAC also pleads scienter based on the 5/19/2021 Congressional Memo, the evidence it uncovered, and its findings.  ¶261(d).  Here, too, Defendants argue (Memo at 32) that these materials establish only that "Defendants were aware of the communications with FDA," a facially invalid claim.  They otherwise refer back to their falsity arguments in the Memo at 22-25, which for reasons set forth above lack merit and should be rejected.  It bears noting that the FAC's allegations regarding the House Committees' investigation, 5/19/2021 Congressional Memo and its findings, and the underlying evidence are materially corroborated and enhanced by all of the RJN materials.

### 2.    Defendants' Admissions And Concessions

The FAC pleads that Defendant Kramer made numerous admissions, which add to a strong inference of their scienter.  Defendants fail to challenge certain of these admissions, including Kramer's 5/19/2021 Congressional Testimony that he was "aware" in June 2020 of J&J's findings

in the 7/24/2020 Janssen Audit Report, which found that Bayview had a deficient contamination control strategy, a deficient disinfectant program against industry standards, and quality systems weaknesses requiring correction (¶¶124(b); 264); that such findings are "recorded in the company's systems to make sure that they are monitored and responded to appropriately and in a timely manner" (¶265); and that he took "full responsibility" for the "very serious and completely unacceptable" contamination problems at Bayview, which caused the destruction of drug substance batches and the shutdown of production (¶263). Defendants waive any arguments against these allegations at this stage. *See* n. 2, *supra*. Defendants' challenges to other alleged admissions by Kramer (Memo at 33-35) lack merit and should be rejected.

First, the FAC recounts the 11/4/2021 Kramer Op-Ed's admission that Bayview never had sufficient government investment to maintain readiness. ¶261(f). His statement was absolute – Kramer did not say that for a time, the government provided sufficient work to maintain Bayview's readiness before stopping. Rather, he said the necessary level of government support *never* materialized. Defendants wrongly call this an "after-the-fact conclusion" – it was an "after-the-fact *admission*" of an *ongoing* conclusion. That Emergent invested $200 million in Bayview (only 1/3 of the funds it reaped from the U.S. government, J&J, and AstraZeneca contracts) and "began" to hire 300 new employees do not negate the admission. The array of reports by regulators (from FDA, HHS, BARDA), J&J, AstraZeneca, Emergent's quality auditors, and the House Committees all make clear that Emergent's investment was insufficient and the poorly trained, new employees were part of the problem, not the solution. That 100 million vaccine doses were distributed – at least 10 million accompanied by a warning that regulators could not guarantee Emergent used proper manufacturing procedures (¶254) – pales in comparison to the nearly 400 million doses that were discarded. ¶¶219(d), 261(c); *See also* RJN at 21-22; RJN Ex. 1 at 1, 9  (finding 1).[60]

---

[60]     *Cozzarelli v. Inspire Pharms., Inc.*, 549 F.3d 618, 622, 627 (4th Cir. 2008) is inapposite. The FAC does not plead that anything was "doomed to fail" – only that the risks posed by Bayview manufacturing J&J and AstraZeneca COVID-19 vaccines were materially higher than what was represented publicly.

<u>Second</u>, the FAC pleads that Kramer's 4/1/2021 CNBC Interview statements were materially false and misleading.  ¶¶189, 190.  They included this blatant falsehood:

> [I]t isn't the case or wasn't the case where an ingredient from one vaccine contaminated or impacted the other. It was more simply the fact that a one production run, one batch of product was determined to be inconsistent with our quality specifications of Emergent and J&J and subsequently, that batch was pulled aside and will not be processed further.

¶¶189.  Context matters.  The first partial corrective events, which sunk Emergent's stock by 13.45%, were negative reports by *The New York Times* (March 31, 2021 after-hours) and *AP* (April 1, 2021), which together revealed, *inter alia*, FDA's "string of citations" regarding Bayview and that "Emergent employee(s) at the Bayview facility mixed up ingredients of J&J and AstraZeneca COVID-19 vaccines, which are biologically different and not interchangeable, thereby contaminating up to 15 million doses of J&J's vaccine, forcing regulators to delay authorization of the facility's production lines, and delaying future U.S. shipments of up to 24 million J&J vaccine doses from the Bayview facility while the FDA investigates."  ¶¶237-239.  Kramer's statements were part of an organized counter-narrative blitz in early April 2021 (¶¶187-196), which included the 4/14/2021 Kramer Op-Ed that fought back against "confrontational" coverage, in which not only did he not correct his 4/1/2021 CNBC Interview statements, he doubled down, downplaying the incident as a "setback" where "we found a batch of Johnson & Johnson vaccines that did not meet specification" and that "[i]n typical pharmaceutical manufacturing, this does occasionally happen."  ¶195.  The FAC pleads that analysts noted Kramer's 4/1/2021 CNBC Interview statements and were swayed.  ¶¶193, 240.  It was not until a month passed - during which J&J took over running Bayview, AstraZeneca ceased to be made there, all previously-made vaccines were quarantined, all new production was halted, and Defendant Husain and Sean Kirk resigned – that corrections to his 4/1/2021 CNBC Interview were finally made by the Emergent spokesperson (¶250) and Kramer (¶249) on April 29-30, 2021.[61]

---

[61]     Even assuming, *arguendo*, that the FDA report to which Defendants point as their Exhibit 44 served to correct Kramer's 4/1/2021 CNBC Interview statement, that report was not published until April 21, 2021.  ¶245.

Contrary to the Memo at 33-34, the FAC *does* contradict Kramer's mealy-mouthed "simply misspoke" explanation, which Lead Plaintiffs reject.  That explanation is not *more* compelling than the one supporting scienter, particularly where Kramer attempts to justify it by referencing the CNBC reporter's "repeated" questions.  *KBC*, 2016 WL 3981236, at *9 ("'[T]he most powerful evidence of scienter is the content and context of [defendants] statements themselves,' and when a defendant is 'specifically asked, directly and repeatedly' about these core operations, denials of any issues can support a strong inference of scienter.") (quoting *Avaya*, 564 F.3d at 269).  *See also In re Anadarko Petroleum Corp. Class Action Litig.*, 957 F. Supp. 2d 806, 835 (S.D. Tex. 2013) (executive's statement denying company's involvement in design of a leaking oil well was actionably made with scienter where complaint pled such involvement and executive "spoke so directly and did not use any qualifying or hedging words" – despite the statement being an "isolated occurrence" "not part of a coordinated scheme to blunt the effect of the oil spill on [the company's] share price" and the executive not engaging in suspicious trading and claiming he misspoke).[62]

Third, the FAC details *17* reports by government regulators, including *four* about Bayview – the 4/20/2020 FDA Inspection Report, 4/20/2020 FDA 483 Report, 6/17/2020 Warp Speed Report, and 4/21/2021 FDA 483 Report (¶¶110(a)-(l), 111, 123, 124(a)-(b), 219(b), 261(b); FAC §§V.E.2. and V.F.4.) and *seven* Emergent responses, including *two* regarding Bayview – the 5/8/2020 Emergent FDA 483 Response and 4/30/2021 Emergent FDA 483 Response (*Id.*; *see also* ¶¶113, 124(c), 125, 136(a)-(e), 201(a)-(k)).  Defendants concede that Kramer admitted he read these reports, but they wrongly assert that his statements "say nothing about the inferences he drew from them."  Memo at 34.  Not so.  Kramer also admitted that he found the FDA's observations were "correct" and "accurate" and that he did not dispute them.  ¶¶114, 115, 266.  These allegations

---

[62]   Defendants' cited cases (Memo at 34) are distinguishable.  In *Emps.' Ret. Sys. of City of Baton Rouge & Par. Of E. Baton Rouge v. MacroGenics, Inc.*. No. GJH-19-2713, 2021 WL 4459218, at *15 (D. Md. Sept. 29, 2021), because the study was ongoing, the defendants said data was "accruing" and more data would be available in a few months, which they then voluntarily disclosed themselves.  In *Geopharma*, 399 F. Supp. 2d at 452-453, plaintiffs failed to allege any plausible motive to commit fraud, which could not have succeeded because the alleged misstatement (describing as a "prescription product" something that was FDA approved as a device and not a drug) was easily verified by financial reporters and analysts who could (and did) contact FDA themselves and because the alleged scheme required the stock to maintain artificial inflation from fraud for five days.

already suffice, and they are strengthened by the RJN materials, which include copies of reports or correspondence by FDA, BARDA, and HHS. *See* RJN at 20-30; RJN Exs. 3, 8, 17, 37.

Fourth, Kramer testified that "it is a well-known risk that if the precautions are not taken there is a likelihood of a cross-contamination" when producing drug substance from multiple viral products in a single plant, and the 11/4/2021 Kramer Op-Ed conceded, "we…understood the risks of producing two viral-vector vaccines in the same facility." ¶¶265, 267. Defendants argue that these admissions fail to support scienter, due to Emergent's risk warnings. Memo at 34. However, those risk warnings are legally deficient; the *Marriott* case cited by Defendants for this point is distinguishable for reasons discussed *supra*; and these statements are not forward-looking. *See, e.g.*, *In re 2U*, 2021 WL 3418841 at *14; *In re Genworth*, 103 F. Supp. 3d at 790. That said, this argument misses the point. By Kramer's admitting that *Defendants* understood the risks of manufacturing J&J and AstraZeneca vaccines simultaneously at Bayview, he is also saying that their understanding was informed by the litany of *non-public* reports by the FDA and others that Kramer admitted reading, *i.e.*, that their understanding of those risks were vastly superior to that of any investor. These allegations also suffice, but are enhanced by the RJN materials. *See* RJN at 20-30; RJN Exs. 1 (at 3, 6-8 (finding 4)), 14, 17, 20, 21, 22, 23, 27, 28, 37.

Fifth, the FAC pleads that Kramer admitted that the J&J / AstraZeneca cross-contamination in early 2021 arose because of a failure of controls and disregarded anti-contamination procedures. ¶261(f). Defendants do not dispute or abandon this admission. Instead, they say that Kramer's explanation for the incident was articulated after it happened (as the space-time continuum dictates) and argue that the FAC fails to plead that Kramer knew of the controls deficiency earlier. Memo at 35. It is black-letter law, however, that scienter arises from knowledge or reckless disregard of undisclosed negative facts. Here, the litany of prior reports by government regulators and Emergent's contractual partners put Defendants on notice of serious deficiencies in its control environment, as discussed *supra*. Moreover, Kramer executed SOX certifications attesting, *inter alia*, to his responsibility over Emergent's internal and disclosure controls. ¶¶232, 292.

Last, the FAC pleads that Kramer visited Bayview during the Class Period and knew it well enough to give a tour to Governor Hogan (pictured in ¶262).  Kramer argues this allegation is "scienter-by-status."  Memo at 35.  To the contrary, his *status* (as CEO) has nothing to do with it – the allegation is that his *presence*, repeatedly, at the facility supports the inference that he knew or recklessly disregarded negative non-public circumstances that existed there.  That point would apply equally to a member of the janitorial staff.  When coupled with Kramer's admission that he read the FDA reports about Bayview – the first of which issued in April 2020 – when Kramer visited Bayview, including when he gave Governor Hogan a tour in February 2021, he knew the issues FDA had identified and either observed them firsthand or recklessly disregarded them by putting his head in the sand.  *In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, 2014 WL 285103, at *4 (S.D.N.Y. Jan. 27, 2014) (scale of fraud, CFO's responsibility over internal controls, and his time spent at facility at issue support scienter); *Ollila*, 2018 WL 792069 at *2-*3 (scienter sufficiently pled for "statements about how a given incident was isolated to one site even though defendants allegedly knew of four others" and statements failing to report issues facing projects based, *inter alia*, on CW allegations that defendants "visited the sites themselves" and had access to unfavorable monthly reports provided to "senior management officers"); *In re Smith & Wesson Holding Corp. Sec. Litig.*, 604 F. Supp. 2d 332, 344 (D. Mass. 2009) (complaint alleging statements by 12 CWs who "[e]ach provide[ ] bits and pieces of the larger mosaic" that included sales data, internal reporting, and executives visiting the plant at issue sufficiently pled scienter).  These allegations suffice, but are materially strengthened by the RJN materials, some directly implicating Kramer.  *See* RJN at 20-30; RJN Exs. 1 (at 1, 3-7 (finding 3)), 6-13, 15, 18-19.

### 3.    The Motive And Opportunity Allegations

#### a.    Suspicious Insider Transactions

As the Memo at 35 concedes, insider trades evidence scienter if "unusual or suspicious" in timing and amount.  Kramer sold 9,483 shares for $1 million+ and Lindahl sold 6,133 shares for $600,000+ in proceeds – all outside of any 10b5-1 plan.  ¶¶270-271.  In November 2020, *after* the contaminated Bayview batches were destroyed (¶¶119, 276), Kramer revised his 10b5-1 plan,

41

which had not sold shares since April 2016, so as to increase selling – resulting in sales of 88,500+ shares for gross proceeds of $10.1 million+ in a three-week period in January-February 2021, at prices between 77% and 87.2% of the stock's Class Period high, just before the J&J cross-contamination was revealed.  ¶¶270, 274.  The *Washington Post* decried these suspicious sales, noting that his 10b5-1 plan had never sold over $161,000 in any year from 2016 onward, the options exercised to fuel these sales had expiration dates years away, and Kramer would have made only half as much if the sales occurred in April 2021, after the J&J contamination was revealed, AstraZeneca production ended, and Bayview was shutdown.  ¶275.  So did Senator Warren, who cited the adverse facts Kramer knew before his 10b5-1 plan revision and called his $10 million in sales "pandemic profiteering."  ¶276.  The FAC pleads that all these trades were suspicious in timing vis-à-vis the alleged misstatements and partial corrective disclosures.  ¶273; *see also* Appendix A hereto.  It also pleads that they were suspicious in amount, because Kramer's gross proceeds were 31 times larger than in the comparable pre-Class Period timeframe ($11.1 million versus $344,444) and his $8.61 million in net gains compared suspiciously to his base salary in 2020 ($875,000) and 2021 ($1 million), while Lindahl's gains were eight times larger than in the comparable pre-Class Period timeframe ($607,000 versus $72,500) and compared suspiciously to his base salary in 2020 ($550,000) and 2021 ($575,000).  ¶272.

These allegations support a strong inference of Defendants' scienter.  *See, e.g.*, *KBC*, 2016 WL 3981236 at *10 (strong inference of scienter supported where defendants sold stock near class period high price, timed to take advantage of favorable disclosures, at levels higher than before the class period, *e.g.* 150,000 shares sold during 14-month class period versus 75,000 shares during 22-month period pre-class period supported scienter); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 644, 646 (E.D. Va. 2000) (factors for assessing unusual trading include whether trades were "normal and routine" or compare suspiciously against compensation levels) and 646 (even if sales as a percentage of total holdings "superficially appear unimpressive," *e.g.*, 2.2% of holdings, they are "clearly probative of scienter" where there is a "confluence of timing and magnitude" close to alleged misstatements); *Kiken*, 155 F. Supp. 3d at 607 (substantial stock sales

42

"during the Class Period, when stock prices were at their highest values" supports scienter); *TransEnterix Inv. Grp. v. TransEnterix, Inc.*, 272 F. Supp. 3d 740, 755 (E.D.N.C. 2017) (scienter inference is "straightforward" when an insider "sells stock during the class period before the release of 'bad' news and while the stock price is allegedly inflated").[63]

Defendants' arguments (Memo at 35-36) lack merit:

First, they claim Lindahl's selling "only" 17% of his holdings undercuts scienter.  Not so. *In re MicroStrategy*, 115 F. Supp. 2d 620 at 646 (sales of 2.2% of holdings evidenced scienter). Moreover, Kramer sold *70%* of his pre-Class Period holdings, a damning fact they avoid.[64]

Second, they claim Kramer and Lindahl "increased" their "holdings" during the Class Period, omitting that they did not make *any* open-market purchases or expend *any* funds because the only shares they acquired and retained were via exercise of no-cost RSUs and PSUs.  ¶¶269-271 & n. 19-20.[65]  Boiled down, *e.g.*, they urge the Court to disregard Kramer's *9,483 shares* sold on the open market (for *$1 million* in proceeds) and his *88,555 shares* acquired via option and immediately sold (for $10.1 million in gross proceeds, and *$7.6 million* in net proceeds) because he also acquired 33,231 shares by exercising RSUs and PSUs at a cost of *zero dollars*.  The Court should decline.  *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) (when defendants included shares gained via options exercise in stated "holdings," court noted that options exercised at a low price remain valuable even after the stock drops and found scienter based on suspicious trades); *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 201 (S.D.N.Y. 2010) (same); *In re Sturm, Ruger & Co., Inc. Sec. Litig.*, No. 3:09-CV-1293 CFD, 2011

---

[63]    Defendants' authority (Memo at 35) is in harmony.  In *Hunter*, 477 F.3d at 184, the stock trades failed to support scienter because – unlike the FAC – the complaint "does not allege that defendants timed their sales to profit from any particular disclosures, and [the] sales generally occurred at prices that were not especially high for the class period" which at 46 months was "exceedingly long" (75% of trades were below $30; the class period trading high was $198) and "does not provide defendants' trading patterns outside the class period to permit comparison."

[64]    Defendants' cited case (Memo at 36), *Proter v. Medifast, Inc.*, No. GLR-11-720, 2013 WL 1316034, at \*21 & n.21 (D. Md. Mar. 28, 2013) stated that "there is no bright-line test as to an amount or percentage of holdings that must be sold to give rise to a strong inference of scienter" and found no scienter was pled where, *inter alia*, defendants did not sell suspiciously compared to their prior trading histories.

[65]    Kramer "paid" a strike price to exercise his stock options, but each time he did, the shares were immediately sold the same day for a vastly higher sum, such that he expended zero dollars and retained no shares.  ¶270.

WL 494753, at *8 (D. Conn. Feb. 7, 2011) (finding scienter from sales made shortly after favorable statements and rejecting argument that defendants emerged from trading with more net shares).[66]

Third, Kramer argues that sales in his 10b5-1 plan "undermine" scienter – a defense premature at the Rule 12(b)(6) stage. *Lefkoe*, 2007 WL 6890353 at *6 n. 11 (finding scienter pled by stock sales and that affirmative defense of 10b5–1 plan trading is "typically premature...in a motion to dismiss" even where the "sales were scheduled in advance of the class period").[67] If the argument is addressed, the Court should reject it, given the highly suspicious timing of his 10b5-1 plan revision after he knew of material non-public adverse facts, the highly suspicious timing and amount of his plan sales, and a comparison against prior plan sales back to 2016.[68] *See KBC*, 19 F.4th at 611–12 ("the problem for defendants" is that whether existence of a 10b5-1 plan mitigates scienter depends on *when* it was entered); *Blanford*, 794 F.3d at 309 ("When executives enter into a trading plan during the Class Period and the Complaint sufficiently alleges that the purpose of the plan was to take advantage of an inflated stock price, the plan provides no defense to scienter allegations.") (citing, *inter alia*, *Yates*, 744 F.3d at 891 (noting that a "10b5-1 plan does less to shield [a defendant] from suspicion [when] he instituted the plan … after the start of the class period") and *George v. China Auto. Sys., Inc.*, No. 11 Civ. 7533 (KBF), 2012 WL 3205062, *9 (S.D.N.Y. Aug. 8, 2012) (axiom that 10b5-1 plan trades do not support scienter inference "does not apply…where a 10b5-1 plan is entered into – or strategically amended – to take advantage of an inflated stock price or insider information" so "where (as here) 10b5-1 trading plans are entered

---

[66]    Defendants' cited cases (Memo at 35) are distinguishable. In *Cozzarelli*, 549 F.3d at 622, 628, the defendants acquired vested stock options during the drug study at issue and sold stock as they left the company. In *Proter*, 2013 WL 1316034 at *20, defendants sold in amounts consistent with prior trading and/or "mushroomed" hugely during the class period (*e.g.*, a 33% increase).

[67]    *See also Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 156 (D. Conn. 2007) (refusing to consider 10b5-1 plans on motion to dismiss after noting their existence is affirmative defense that must be pled and proved) (citing 17 C.F.R. §240.10b5-1(c)(1)(i)).

[68]    Regarding Defendants' cited authority (Memo at 36), *KBC* failed to rule on whether the 10b5-1 plan altered the scienter analysis, because the court lacked information on when it was entered. 19 F.4th at 611-612. Unlike Defendant Kramer, the defendant in *Yates* did not sell outside his 10b5-1 plan (Kramer sold $1M+) and entered into it a year before any knowledge of negative facts (Kramer modified his after an AstraZeneca batch was discarded in October 2020 due to contamination) – and the *Yates* court still held that the plan "does not completely immunize" him from suspicion. *Yates*, 744 F.3d at 891.

into during the class period, they 'are not a cognizable defense to scienter allegations on a motion to dismiss'")).[69]

Last, they argue that a small portion of Kramer's sales were to pay taxes (on the vastly larger portion of his sales). Courts reject this argument, since dollars are fungible and the difference between Kramer's paying his taxes with a dollar from stock sale proceeds or one he already had is meaningless.[70] *Freudenberg*, 712 F. Supp. 2d 171 at 201 (sales made to cover exercise price and taxes for options evidenced scienter); *City of Providence v. Aeropostale, Inc*., No. 11 Civ. 7132 (CM) (THK), 2013 WL 1197755, at *16 (S.D.N.Y. Mar. 25, 2013) (defendant admission that stock sales were made to satisfy tax liability viewed by court as personal motive to keep stock price inflated, thereby satisfying motive prong of scienter analysis).[71]

### b.    Suspicious Executive Compensation And Bonuses

The FAC pleads that for purportedly "exemplary overall 2020 corporate performance," Kramer received a $1.225 million bonus (1.4 times his salary),[72] $4.1 million in stock awards and options in 2020, and a $7.8 million 2021 executive compensation package including $5.6 million in stock awards and options issued in February 2021. ¶280. Lindahl got a $462,000 bonus (84%

---

[69]    *See also In re Gentiva Sec. Litig.*, 971 F. Supp. 2d 305, 328 (E.D.N.Y. 2013), <u>*on reconsideration in part*</u> (Dec. 10, 2013) (same); *In re Mun. Mortg.*, 876 F. Supp. 2d at 642 n. 34; *Freudenberg*, 712 F. Supp. 2d at 200-201 ("Trading plans are not a cognizable defense to scienter allegations on a motion to dismiss where, as here, they were adopted during the Class Period.") (collecting cases); *In re Countrywide*, 554 F. Supp. 2d at 1068-1069 (changes to 10b5-1 plans during alleged fraud to permit increased sales "defeat the very purpose of 10b5-1 plans, which were created to allow corporate insiders to 'passively' sell their stock based on triggers, such as specified dates and prices, without direct involvement" and support scienter); *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 554 (5th Cir. 2007) (trades pursuant to 10b5-1 Plan entered into during class period contribute to scienter inference); *City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*, 565 F. Supp. 3d 478, 489 (S.D.N.Y. 2021) ("10b5-1 trading plans that are entered into *during* the alleged fraudulent activity…are not a complete defense to scienter because the insider might be aware of an impending price drop and could use a 10b5-1 plan to make his or her premeditated stock dump appear legitimate.").

[70]    Alternatively, courts often will not even consider purported *explanations* for insider sales at the Rule 12(b)(6) stage. *See, e.g.*, *Rubinstein v. Collins*, 20 F.3d 160, 169 n.38 (5th Cir. 1994) (declining to consider at the dispositive motion stage whether certain insider sales allegedly supporting scienter were made for tax purposes); *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 558 n.6 (S.D.N.Y. 2010) (explanations offered by defendant for stock sales, *e.g.*, to pay exercise price of expiring options, are disputed facts not to be resolved on motion to dismiss).

[71]    In Defendants' cited case on this point, *In re Keryx Biopharms., Inc. Sec. Litig.*, 13 Civ. 1307 (KBF), 2014 WL 585658, at *13 (S.D.N.Y. Feb. 14, 2014), the sales were small in amount, not suspiciously timed as compared to events like the corrective disclosures, and marked as being made for tax payments.

[72]    *See Barrie*, *v. Intervoice-Brite, Inc.*, 397 F.3d 249, 260-261 (5th Cir. 2005) (executive compensation package supported scienter inference where defendant got a performance-based bonus that was 175% of his base salary).

45

of salary) and a $2.42 million compensation package that included 1.5 million in stock awards and options. ¶281. Sean Kirk, EVP of Manufacturing and Technical Operations who oversaw Bayview's manufacturing, for his "exceptional role in executing on key manufacturing strategy throughout the year," received a $362,000 bonus, a $100,000 special award related to COVID-19 work and "exceptional performance in 2020," and $1.2 million in stock awards and options. ¶282.

The FAC pleads that these awards suspicious both in amount, given their total disconnect from Emergent's disastrous performance, and in timing, occurring after multiple contamination events happened but just before they were publicly revealed, leading the government to order Bayview to halt all production and Kirk to resign along with Defendant Husain. ¶¶279-284; *see also* Appendix A.[73] It pleads the House Committees found, *inter alia*, that Emergent knew that Bayview's longstanding, serious deficiencies had significantly impacted COVID vaccine manufacturing right after it started in August 2020 (for AstraZeneca) and November 2020 (for J&J), resulting in Emergent discarding one AstraZeneca batch (2-3 million vaccine dose equivalents) in October 2020 due to suspected contamination, one J&J batch (15 million dose equivalents) in November 2020 due to worker errors, four AstraZeneca batches (8-12 million doses) in December 2020 due to bacterial contamination, and the J&J batch (15 million doses) that was cross-contaminated with AstraZeneca material as early as January 19, 2021. ¶¶3, 219(d).

These alleged facts arose **before** the Compensation Committee met on February 9, 2021, thus Defendants' argument (Memo at 37) that the awards it made recognized "work successfully performed in 2020, and before any knowledge of an operational error" while Emergent was "successfully manufacturing bulk vaccine drug product pursuant to its strategic partnerships" is indefensible. Moreover, the 5/10/2022 Congressional Memo and RJN Exhibits corroborate and strengthen these allegations, by amplifying the number of batches discarded in 2020 and 2021 and attributing most to contamination. *See* RJN at 21-22 (finding 1); RJN Exs. 1 at 1, 9-11. Defendants

---

[73]     By contrast, in Defendants' only cited case from this Circuit (Memo at 37), *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 627 (4th Cir. 2008), the defendant merely "puff[ed] up the outlook" of a clinical trial because her compensation was tied to performance.

are also wrong to argue that the FAC fails to plead that the compensation awards were unusual compared to prior years – FAC ¶278 recounts a Congressmember berating Kramer for the 51% jump in his compensation from 2019 to 2020 (from $3.7 million to $7.8 million).

The FAC's allegations suffice. *See, e.g.*, *In re Royal Ahold*, 351 F. Supp. 2d at 382-83 (CEO's "generous bonus compensation" including bonus of 33% - 50% resulting from earnings manipulation supports inference of scienter); *In re Genworth*, 103 F. Supp. 3d at 785–86 (individual defendant bonuses of between $1.15 - $3 million that were +48% to +50% over target supported scienter inference).[74]

### c.    Emergent's Unearned, Windfall Government Payments

The FAC pleads that Emergent violated its lucrative government contract, which paid $27 million monthly just to reserve COVID vaccine manufacturing capacity, by failing to maintain Bayview in accordance with current good manufacturing practices (cGMP) (¶286); Emergent kept taking these payments after it could not manufacture any COVID vaccine products, due to myriad, longstanding deficiencies it failed to address (¶287); Emergent had to reverse $86 million in revenue when the government terminated the contract (¶229(d)); the House Committees found that Emergent's failures and destruction of contaminated COVID vaccines "wasted hundreds of millions of taxpayer dollars" (¶307); and Emergent's unjust acceptance of the government payments, especially when viewed alongside the lavish 2020 bonus payments and pay raises reaped by Kramer, Lindahl, and other insiders, evidences scienter (¶288). *See, e.g.*, *Beach v. Healthways, Inc.,* No. 3:08-0569, 2009 WL 650408, at *1-*2, *4-*5 (M.D. Tenn. Mar. 9, 2009)

---

[74]    *See also Kiken*, 155 F. Supp. 3d at 607 (scienter pled where defendants' compensation tied directly to company performance and they profited significantly during class period); *Goldstein v. MCI WorldCom*, 340 F.3d 238, 250 (5th Cir. 2003) (potential negative impacts on executive compensation package absent the fraud supported strong scienter inference to engage in it). *See also, e.g.*, *In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 737 (S.D. Ohio 2006) (where specific facts tied defendants' compensation package to company performance, complaint pled more than "bare allegations" and scienter supported) (collecting cases); *No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. West Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003) (even absent insider trading, scienter supported by allegations that executive compensation package based on company financial performance); *Fla. State Bd. Of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 661 (8th Cir. 2001) (compensation package, together with suspicious timing of misstatements to benefit executive, evidenced scienter); *Edwards v. McDermott Int'l, Inc.*, No. 18-cv-4330, 2021 WL 1421609, at *9 (S.D. Tex. Apr. 13, 2021) (scienter pled where defendants received bonuses and increases in base pay because the allegedly misrepresented acquisition elevated company to different peer group).

(allegations that defendants knew but failed to disclose that company was not meeting and would not be able to meet terms of government contract, which might cause it to forfeit millions in fees and be ineligible for future phases of government work sufficiently pled materially false and misleading statements and supported strong inference of scienter). These allegations are corroborated and strengthened by the 5/10/2022 Congressional Report and RJN Exhibits. *See* RJN at 20-30 (findings 1 and 6); RJN Exs. 1 at 3, 9-11, 16-17. Defendants' one-sentence counter argument (Memo at 37-38), based on a generic "need to raise capital" should be rejected.

### d.      Emergent Raised Funds During The Fraud

The FAC pleads that Emergent's $450 million debt offering, which closed during the alleged fraud on August 7, 2020, evidences corporate scienter arising from the motivation to complete the offering at elevated pricing. ¶285; *see also* Appendix A. Defendants argue in a single sentence that offerings are a general corporate motive that can never support scienter. Memo at 38.[75] Not so. *See In re Genworth*, 103 F. Supp. 3d at 786 (scienter inference can be supported by the temporal relationship between defendants' statements and company's $400 million debt offering) (citing *Arnlund,* 199 F.Supp.2d at 482).[76]

### 4.      The FAC's Core Operations Doctrine Allegations

As Defendants concede (Memo at 38), allegations that they were senior executives and the underlying operations at issue were a core business of Emergent are "relevant to the court's holistic analysis of scienter," but need to be accompanied by other allegations establishing their exposure to the issues. *Yates*, 744 F.3d at 890. The full text of FAC ¶290, which they miscite, does so, by

---

[75]      Defendants' cited case, *Cozzarelli*, 549 F.3d at 627 is distinguishable, because the defendants there simply made "overly optimistic" statements about a drug candidate for FDA approval as part of corporate fundraising efforts.
[76]      Indeed, the cases are legion finding that debt and equity offerings capitalizing on securities values inflated by a fraud support scienter. *See, e.g.*, *In re Toronto-Dominion,* 2018 WL 6381882, at *18-*19 (scienter supported by two note offerings and two expanded preferred shares offerings where misstatements allegedly inflated prices or permitted better credit terms); *In re Silvercorp Metals, Inc. Sec. Litig.*, 26 F. Supp. 3d 266, 275-277 (S.D.N.Y. 2014) ($117 million offering evidenced corporate scienter, even when all individual defendants dismissed from case); *Kendall*, 2021 WL 3406271, at *8  (scienter supported by two public offerings, even where individual defendants did not sell shares and acquired shares through open market purchases); *In re Res. Am. Sec. Litig.*, No. 98-5446, 2000 WL 1053861, at *6 (E.D. Pa. July 26, 2000) (alleged desire to raise capital via secondary offering gave rise to a strong inference of scienter); *Van Dongen, v. CNinsure, Inc.* 951 F. Supp. 2d 457, 474 (S.D.N.Y. 2013) (($109.6 million offering can provide motive for fraud).

adding to those relevant allegations "the facts regarding the funneling of information to them and their personal involvement in the key events and circumstances at issue…including…by information revealed by CW statements; the FDA inspection reports and Forms 483 and company responses thereto; the investigative reports in the *New York Times* and other outlets, and the subjects, testimony, and findings of the May 2021 Congressional hearing, as discussed in §§V.E.1.-4., *supra*." Such allegations, viewed holistically with the full scienter pleading, suffice. *See In re Genworth*, 103 F. Supp. 3d at 784-786 (scienter sufficiently pled with allegations, *inter alia*, that business was part of core operations; defendants had senior positions, involvement with underlying operations, and knowledge of certain adverse facts; defendants repeatedly spoke about the topics at issue; defendants received elevated bonuses; and company initiated debt offering). They are only strengthened by the RJN Exhibits.

### 5.   Defendants Signed, Were Quoted In, SOX-Certified Misstatements

The FAC pleads that Defendants Kramer, Lindahl, and Husain signed, were quoted in, or orally made the alleged misstatements, were under a duty to familiarize themselves with the subject matter and to speak truthfully, and violated those duties.  ¶291. *Exxon Mobil Corp.*, 334 F. Supp. 3d at 854 (defendants signing SEC filings supported a strong inference of scienter).  Defendants ignore these allegations and waive any counter-argument at this stage.  *See* n.2, *supra*.

Instead, they argue only that the FAC's SOX certification allegations (¶292), standing alone, cannot establish scienter.  Memo at 38.  However, they (and their cited cases) concede that those SOX allegations, combined with others, holistically can support the scienter inference, as the FAC pleads.  *See, e.g.*, *Latham v. Matthews*, 662 F. Supp. 2d 441, 466-467 (D.S.C. 2009) (SOX certification combined with facts establishing reckless ignoring of red flags or personal involvement in activities alleged to be false or misleading support scienter).[77]

---

[77]      *See also In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 725 (W.D. Tex. 2010) (red flags, role of defendants in company, magnitude and duration of fraud, insider trading, and SOX certifications collectively support strong scienter inference); *Enzymotec,*, 2015 WL 8784065, at *17-*19  (scienter sufficiently pled based on insider sales, SOX certifications, and implication of core operations); *Cent. Laborers' Pension Fund*, 497 F.3d at 555 (scienter inference proper "if the person signing the [SOX] certification had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags' that the financial statements contained material misstatements or omissions") (quoting *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006)).

### 6.    Corporate Code of Conduct Violations

The FAC pleads Emergent's Corporate Code of Conduct imposed specific, binding requirements, in that it expressly: (a) stated that it was binding on all employees (¶294); (b) required employees to "always provide accurate and truthful public statements in a timely manner" (¶295); (c) required employees "must act with transparency, accuracy and care when navigating…relationships" with the U.S. government and "[i]t is our responsibility to know all the specifications and requirements for any government work and to comply with them completely, including any reporting and disclosure requirements" (¶296); (d) mandated that "[w]e are committed to…maintaining compliance with all currently established standards including…Good Manufacturing Practice" (¶297); (e) required employees to "never use any material, non-public information to buy or sell securities" (¶298); and (f) required employees to comply with "all applicable regulations and laws" (¶299). It further pleads that Defendants' fraud violated the Code of Conduct, including these provisions. ¶¶293, 300. These Code of Conduct allegations support the scienter inference. *See Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 712 n.7 (E.D. Mich. 2010) (where Code of Conduct specifically addressed conduct implicated in the lawsuit, court considered it as part of analysis that found scienter sufficiently pled).[78]

### 7.    Executive Resignations And Retaliation Against Employees

The FAC alleges that the resignations of Defendant Husain and Sean Kirk, Emergent's EVP for Manufacturing and Technical Operations who oversaw Bayview manufacturing and quality assurance, were announced on the 4/29/2021 Earnings Call (¶¶302-303), an alleged corrective disclosure on which Kramer admitted that AstraZeneca virus in fact cross-contaminated the J&J production suite and Lindahl announced lowered projected CDMO revenues and earnings due to Bayview impacts (¶249), shortly after Kirk received $1.6 million in stock awards, options,

---

[78]    Defendants' cited cases (Memo at 38) do not counsel otherwise. Emergent's Code of Conduct was not "broadly worded," as was the case in *Rok v. Identiv, Inc.*, No. 15-cv-5775-CRB, 2017 WL 35496, at *15 (N.D. Cal. Jan. 4, 2017) *aff'd sub nom. Cunningham v. Identiv, Inc.*, 716 F. App'x 663 (9th Cir. 2018), or "broadly expressed" as in *Crutchfield v. Match Grp., Inc.*, 529 F. Supp. 3d 570, 599.n19 (N.D. Tex. 2021). It also bears noting that Defendants cited the first motion to dismiss order in *Crutchfield*, a case in which Lead Counsel serves in the same capacity, and sidestepped the second such order, which fully upheld the pleadings eight months later. *See Crutchfield v. Match Grp., Inc.*, No. 3:19-cv-2356-S, 2021 WL 5480682 (N.D. Tex. Nov. 19, 2021).

and bonuses for "exceptional performance" in 2020 (¶¶282-283).  It also alleges that the departure of Emergent's Head of Global Quality was announced on the 11/4/2021 Earnings Call, a corrective disclosure event that announced the U.S. government contract termination (¶¶258(c), 304). Contrary to Defendants' argument (Memo at 39), the FAC sufficiently pleads these resignations were suspicious in timing and support scienter.  ¶301; *see also* Appendix A.  *See Epstein*, 203 F. Supp. 3d at 671–72 (denying motion to dismiss where plaintiffs alleged scienter based on, *inter alia*, defendants' monitoring of operations, CW statements regarding business culture, government scrutiny and investigation, receipt of NORA letter, and suspicious resignation by three senior officers); *Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*, 496 F. Supp. 3d 952, 967–68 (E.D. Va. 2020) (CFO's resignation part of holistic pleading supporting strong scienter inference).[79] [80]

The FAC also alleges that CW5 described Emergent's VP of Development Services for the CDMO segment, who reported directly to Defendant Husain, as attending frequent meetings with Defendant Husain about the vaccine projects, preventing CW5 from taking notes or removing parts of the notes CW5 took, and firing CW1 – and everyone closely associated with CW1, including CW5 – shortly after CW1 had a discussion with him about what was happening at Bayview.  ¶¶64, 305.  Defendants' uncited argument (Memo at 39) lacks merit, as these allegations also support scienter.  *See, e.g.*, *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean*

---

[79]       *See also, e.g.*, *Hall v. Rent-A-Ctr., Inc.*, No. 4:16cv978, 2017 WL 6379334, at *12 n.8 (E.D. Tex. Dec. 14, 2017) (adopting magistrate's ruling that termination/resignation of CEO and CFO are circumstantial evidence supporting strong scienter inference); *Hall*, 2017 WL 6398742, at *34 (magistrate's ruling as to same); *In re UTStarcom, Inc. Sec. Litig.*, 617 F.Supp.2d 964, 976 (N.D. Cal. Mar. 27, 2009) ("proximity of Defendants' departures to the financial restatements and investigations adds 'one more piece to the scienter puzzle'"); *CNinsure, Inc.*, 951 F. Supp. 2d at 474  (sales by defendants and other insiders pled motive and opportunity while allegations that insiders involved in scheme resigned and retired contributed to scienter inference); *In re Nevsun Resources Ltd.*, No. 12 Civ. 1845 (PGG), 2013 WL 6017402, *13 (S.D.N.Y. Sept. 27, 2013) (departure of three top on-site executives supported scienter inference based on defendants' stock sales); *In re Par Pharm. Sec. Litig.*, 2009 WL 3234273, at *2 (D.N.J. Sept. 30, 2009) (scienter sufficiently pled based, *inter alia*, on stock sales and resignation); *CNinsure, Inc.*, 951 F. Supp. 2d at 474 (scienter inference based on sales by defendants and other insiders, as well as resignations and retirements of insiders involved in the fraud); *See also In re Fleming Cos. Sec. & Derivative Litig.*, No. CIVA503MD1530TJW, 2004 WL 5278716, at *35 (E.D. Tex. June 16, 2004) (executive resignation supported strong scienter inference); *In re ArthroCare*, 726 F. Supp. 2d at 725 (same); *N. Port Firefighters' Pension Local Option Plan v. Templea-Inland, Inc.*, 936 F. Supp. 2d 722, 754 (N.D. Tex. 2013) (resignation of high-level officials may contribute to scienter).

[80]       Defendants' cited authority (Memo at 39) is distinguishable, because in *In re BISYS Sec. Litig.*, 397 F. Supp. 2d at 446-447 (S.D.N.Y. 2005), the resignations were explained by things like health reasons, and in *In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 575 (S.D.N.Y. 2007), the resignation occurred after only three weeks on the job.

*Ltd.*, 866 F. Supp. 2d 223, 234 (S.D.N.Y. 2012) (allegations that company retaliated against whistleblowers supported a strong inference of scienter); *Collier v. ModusLink Glob. Sols., Inc.*, 9 F. Supp. 3d 61, 72 (D. Mass. 2014) (scienter inference supported by dismissal of CW shortly after raising revenue discrepancy issue can be inferred as retaliation "to prevent CW[ ] from raising more questions that could expose the fraud" where defendants offer no competing inference).

The newly published 5/10/2022 Congressional Report corroborates and strengthens this point, inasmuch as Congress uncovered evidence that Emergent repeatedly tried to conceal its Bayview quality issues from government regulators, J&J, and AstraZeneca. *See* RJN at 22-23 (finding 2).; RJN Exs. 1 (at 1, 13-14), 34, 35, 36.

### 8.    Congressional and SEC Investigations

The FAC pleads that the SEC is investigating Emergent over is 2020 10-K and Q1 2021 10-Q and its compliance with Regulation S-K, Item 303. ¶227. It extensively pleads that the House Committees' ongoing 15-month investigation resulted, as of the FAC's filing, in Kramer's 5/19/2021 Congressional Testimony and the 5/19/2021 Congressional Memo, which disclosed evidence and interim findings. *See* FAC §V.E.4. ¶¶121-126, 219(d), 278-283, 306-308. Congress revealed, *inter alia*, that Emergent knew of but failed to remedy extensive problems at Bayview, resulting in multiple prior incidents of batch destruction of 85 million dose-equivalents, including an AstraZeneca batch in October 2020 due to suspected contamination, a J&J batch in November 2020 due to human error, four AstraZeneca batches in December 2020 due to bacterial contamination, the J&J batch cross-contaminated with AstraZeneca in early 2021, and 60 million more vaccine dose-equivalents then under review for potential contamination. ¶219(d). Congress also revealed that senior executives including the Individual Defendants nonetheless received lavish bonuses and pay raises for their 2020 performance and reaped "pandemic profiteering" from stock sales, for which Congressmembers excoriated Defendant Kramer. ¶¶276, 278, 306-308. The FAC pleads that after Kramer's testimony, the House Committees expanded their investigation and sought more documents from J&J and AstraZeneca, supporting scienter. ¶¶306-308.

These allegations support scienter. *See Epstein*, 203 F. Supp. 3d at 671–72 (denying motion to dismiss where plaintiffs alleged scienter inference based on, *inter alia*, defendants' monitoring of operations, CW statements regarding business culture, government scrutiny and investigation, receipt of NORA letter, and suspicious resignations); *In re Under Armour Sec. Litig.*, No. CV RDB-17-0388, 2020 WL 363411, at *8 (D. Md. Jan. 22, 2020) (defendants' alleged awareness of company conduct that became the subject of a federal inquiry by the SEC and DOJ generates a "cogent and compelling" inference of scienter).

Defendants' lone citation does not counsel otherwise,[81] and their single-sentence argument to the contrary (Memo at 39) should be rejected. Moreover, they are strongly corroborated and amplified by the 5/10/2022 Congressional Report and the other RJN Exhibits – which Defendants ignore in their Motion filed nine days later – which, *inter alia*, revealed in its ***findings*** that over 400 million dose-equivalents were destroyed at Bayview, largely due to ongoing batch contamination problems, and that Kramer, Husain, Sean Kirk and other senior executives furthered Emergent's extensive efforts to mislead J&J, AstraZeneca, and regulators. *See* RJN §II.

### 9.     Defendants' Competing Inference Is Not More Compelling

Under *Tellabs*, 551 U.S. at 324, Defendants' competing inference must be ***more*** compelling than that pled by Lead Plaintiffs or their Motion must be denied. To give themselves a chance, they miscast the FAC's "overall scienter theory." Memo at 30. The FAC's scienter inference is coherent, well-pled, well-documented, and supported by the findings of multiple Congressional investigation reports drawing from extensive documentary evidence and the Defendants' own testimony. Defendants executed $1 billion worth of contracts with the U.S. government, J&J, and AstraZeneca and knowingly chose to speak about topics like (1) Emergent's facilities, staffing, training, processes, and capabilities to fulfill those lucrative contracts, (2) Bayview's ability to rapidly reach and sustain commercial capacity to produce hundreds of

---

[81]     Defendants' cited case, *Lipow v. New1 UEPS Techs., Inc.*, is in harmony, stating, "'[W]hile the existence of an [government] investigation alone is not sufficient to give rise to a requisite cogent and compelling inference of scienter, it may be considered by the Court as part of its analysis.'" 131 F. Supp. 3d 144, 164 (S.D.N.Y. 2015) (citing, *inter alia*, *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 168 (S.D.N.Y. 2008) (allegation that the DOJ launched an investigation was one of many allegations that established a strong inference of scienter)).

millions of doses of two kinds of desperately needed COVID-19 vaccines, (3) Emergent's soaring CDMO results, driven by Bayview's performance under these contracts, (4) the sufficiency of Emergent's internal controls, (5) the extent and nature of the J&J contamination incident reported in March 2021, (6) the scope, duration, and persistence of deficiencies, prior incidents, and contamination risk at Bayview and across Emergent's CMDO facilities, and (7) Emergent's ability to timely and effectively remedy these issues so as to permit it to continue to fulfill its contracts – while omitting critical information, later revealed by the CWs, inspection reports, investigative reporting, and the Congressional investigation, that was necessary to make their statements not misleading when made. In doing so, Defendants misrepresented the true risks of Emergent's COVID-19 vaccine contracts and Bayview's ability to fulfill them, thereby artificially inflating Emergent's stock price. While its price was elevated, Defendants altered their stock trading plans to increase sales and enriched themselves with suspicious insider transactions, lavish bonuses and pay raises, and company offerings, all while delaying disclosure of concealed negative information and perpetuating the deception, until its revelation prompted senior resignations. The effect of this fraud was to mislead investors into a ***far riskier bet*** than the one for which they had bargained. The FAC does not – and need not – allege that Defendants knew at the outset that Emergent's manufacturing of COVID-19 vaccines at Bayview "would be futile" or was "doomed to failure."[82]

For their counter-inference (Memo at 30-31), Defendants, *inter alia*: (a) point to legally deficient cautionary language warning of potential risks *that had already materialized*; (b) brush aside the persistent, unaddressed, serious deficiencies and contamination risks that pervaded Emergent's CDMO footprint before and during the Class Period; (c) sidestep the repeated warnings they received about those issues from FDA, BARDA, HHS, J&J, AstraZeneca, and even Emergent's own inspectors and employees; (d) disregard the consistent, cross-corroborating CW statements, investigative journalist reports, facility inspection reports, and Congressional findings;

---

[82]   Thus, Defendant's citations (Memo at 30) to *Cozzarelli*, 549 F.3d at 627, *Gillis v. ORX Pharma Ltd.*, No. 15 Civ. 4868 (PAE), 2016 WL 3685095, at *30 (S.D.N.Y. July 6, 2016), and *Local No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharm., Inc.*, No. 15-2250, 2016 WL 5682548, at *4 (1st Cir. Oct. 3, 2016) is misplaced. Their citation to *In re Marriott*, 543 F. Supp. 3d at 153 fails for reasons discussed in n.46 *supra*.

54

(e) ignore the evidence that Emergent tried to mislead government regulators; (f) fail to acknowledge the *hundreds of millions* of Bayview-manufactured dose equivalents that had to be destroyed between October 2020 and April 2021, most due to contamination, including one-third of commercial AstraZeneca batches made there; (g) dumb down Bayview's myriad failings to merely "an unfortunate contamination incident" involving a "single batch" of J&J drug substance; (h) look past their failure to disclose halting of U.S. government payments that led to the reversal of $86 million in revenues and lowering of forecasts and backlog; (i) ignore their stock plan modifications that permitted massive increases in self-enriching insider transactions just before the fraud was revealed; and even (j) cast aside their own concessions, including the admission (a month later) that Kramer's 4/1/2021 CNBC Interview statement denying that the March 2021 incident involved vaccine cross-contamination was false when made.  Based on all the foregoing leaps of faith and mental gymnastics, Defendants posit that their contrary "fair inference" – not the *more* compelling one, as *Tellabs* requires – "is instead that Defendants worked in good faith to manufacture vaccine drug substance in response to a pandemic, disclosed the risks, suffered an unfortunate contamination incident, and worked to address it."  Lead Plaintiffs respectfully urge the Court to reject this position and find that Defendants' contrary inference is not more compelling than the strong inference of their scienter that the FAC exhaustively pleads.

### E.      The FAC States A Control Person Claim Under §20(a)

Defendants' lone challenge to the FAC's §20(a) claim is a failure to plead the underlying §10(b) claim.  If the §10(b) claim is upheld, in whole or in part, the §20(a) claim must survive.

## IV.    CONCLUSION

For reasons, Lead Plaintiffs respectfully ask the Court to deny Defendants' Motion.[83]

---

[83]     If the court is inclined to grant dismissal, Lead Plaintiffs respectfully request that it be without prejudice and with leave to further amend to plead, *inter alia*, the 5/10/2022 Congressional Report and its exhibits (RJN Exs. 1-37) and any documents that they can obtain from the SEC investigation, Congressional investigation, U.S. governmental entities, J&J, or AstraZeneca. *Scott v. Fam. Dollar Stores, Inc.*, 733 F.3d 105, 117 (4th Cir. 2013) (district court erred in denying leave to amend given the 4th Circuit's "policy favoring liberal amendment of complaints").

Dated:  July 19, 2022                    Respectfully submitted,

                                         **POMERANTZ LLP**

                                         */s/ Matthew L. Tuccillo*

                                         Matthew L. Tuccillo (admitted *pro hac vice*)
                                         Jeremy A. Lieberman (admitted *pro hac vice*)
                                         Jennifer Banner Sobers (admitted *pro hac vice*)
                                         Dolgora Dorzhieva (admitted *pro hac vice*)
                                         600 Third Avenue, 20th Floor
                                         New York, NY 10016
                                         Tel.: (212) 661-1100
                                         Fax: (212) 661-8665
                                         jalieberman@pomlaw.com
                                         mltuccillo@pomlaw.com
                                         jbsobers@pomlaw.com
                                         ddorzhieva@pomlaw.com

                                         **POMERANTZ LLP**
                                         Jennifer Pafiti (admitted *pro hac vice*)
                                         1100 Glendon Avenue, 15th Floor
                                         Los Angeles, CA 90024
                                         Tel.: (310) 405-7190
                                         jpafiti@pomlaw.com

                                         *Lead Counsel for Lead Plaintiffs and the Class*

56

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Steven J. Toll (Md. Bar No. 15824)
Daniel S. Sommers (Md. Bar No. 15822)
S. Douglas Bunch (admitted *pro hac vice*)
Brendan Schneiderman (admitted *pro hac vice*)
1100 New York Avenue N.W.
Suite 500, East Tower
Washington, DC 20005
Tel.: (202) 408-4600
Fax: (202) 408-4699
stoll@cohenmilstein.com
dsommers@cohenmilstein.com
dbunch@cohenmilstein.com
bschneiderman@cohenmilstein.com

*Liaison Counsel for Lead Plaintiffs*

**KLAUSNER, KAUFMAN, JENSEN & LEVINSON**
Robert D. Klausner
Stuart Kaufman
(*pro hac vice* applications forthcoming)
7080 NW 4th Street
Plantation, Florida 33317
Tel.: (954) 916-1202
Fax: (954) 916-1232
bob@robertdklausner.com
stu@robertdklausner.com

*Additional Counsel for City of Fort Lauderdale Police & Firefighter's Retirement System*

57

**CERTIFICATE OF SERVICE**

I hereby certify that on July 19, 2022, I electronically filed the foregoing with the Clerk of

Court using the Court's CM/ECF system, which in turn sent notice to all counsel of record.

Dated:    July 19, 2022                                    /s/ *Matthew L. Tuccillo*
                                                          Matthew L. Tuccillo

58