**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| IN RE EMERGENT BIOSOLUTIONS INC. SECURITIES LITIGATION | Civil No. 8:21-cv-00955-DLB |
| | CLASS ACTION |
| THIS DOCUMENT RELATES TO: All Actions | |

## REPLY MEMORANDUM IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS

**TABLE OF CONTENTS**

ARGUMENT ........................................................................................................1

I.      The Complaint Fails to Plead Falsity ..................................................................1

A.      The Allegations Concerning "Business Operations" Do Not State a Claim ......................1

    1.      Statements Before the Contamination Incident Are Not Actionable ......................2

    2.      Statements Following the Contamination Incident are Not Actionable ...............14

    3.      The RJN Exhibits Do Not Change the Result ..........................................................17

B.      The Allegations Concerning Financials and Projections Do Not State a Claim ...............32

C.      The Allegations Concerning SOX Certifications Do Not State a Claim ..........................33

II.     The Complaint Fails to Plead Scienter ..............................................................35

A.      The Allegations Concerning "Red Flags" Are Insufficient .............................................35

B.      The Defendants Did Not Admit Scienter ...........................................................................38

C.      The Allegations Concerning Motive Are Insufficient ......................................................40

    1.      Stock Trading ..........................................................................................................40

    2.      Executive Compensation .........................................................................................43

    3.      Capital Raising Efforts ............................................................................................43

    4.      The Complaint's Other Scattershot Allegations are Insufficient ............................44

III.    The Complaint Fails to State a Claim Under Section 20(a) ..............................................45

CONCLUSION ...................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*380544 Canada, Inc. v. Aspen Tech, Inc.*,
  544 F. Supp. 2d 199 (S.D.N.Y. 2008)........................................................................................13

*Abuhamdan v. Blyth, Inc.*,
  9 F. Supp. 3d 175 (D. Conn. 2014) ............................................................................................5

*In re Braskem S.A. Sec. Litig.*,
  246 F. Supp. 3d 731 (S.D.N.Y. 2017)......................................................................................34

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
  2018 WL 2382600 (S.D.N.Y. May 24, 2018) .........................................................................36

*City of Bristol Pension Fund v. Vertex Pharms. Inc.*,
  12 F. Supp. 3d 225 (D. Mass. 2014) ..........................................................................................5

*City of Providence v. Aeropostale, Inc.*,
  2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) .........................................................................41

*City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*,
  686 F. Supp. 2d 404 (D. Del. 2009)....................................................................................34, 35

*In re Constellation Energy Grp., Inc. Sec. Litig.*,
  738 F. Supp. 2d 614 (D. Md. 2010) .........................................................................................41

*DeMarco v. DepoTech Corp.*,
  149 F. Supp. 2d 1212 (S.D. Cal. 2001)....................................................................................36

*In re: Enzymotec Sec. Litig.*,
  No. 14-5556 (JLL) (MAH), 2015 WL 8784065 (D.N.J. Dec. 15, 2015)................................35

*Epstein v. World Acceptance Corp.*,
  203 F. Supp. 3d 655 (D.S.C. 2016)..........................................................................................36

*In re Facebook, Inc. Sec. Litig.*,
  477 F. Supp. 3d 980 (N.D. Cal. 2020) .......................................................................................6

*Freudenberg v. E*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010).................................................................................41, 42

*Genna v. Potts*,
  Civ. A. No. HAR 94-3260, 1995 WL 222043 (D. Md. Apr. 13, 1995)...................................10

*Graff v. Prime Retail, Inc.*,
172 F. Supp. 2d 721 (D. Md. 2001), *aff'd sub nom. Marsh Grp. v. Prime Retail, Inc.*, 46 F. App'x 140 (4th Cir. 2002) ...........................................................33

*Harrington v. Tetraphase Pharms., Inc.*,
No. 16-10133-LTS, 2017 WL 1946305 (D. Mass. May 9, 2017) ............................7

*Hill v. Gozani*,
638 F.3d 40 (1st Cir. 2011) ......................................................................................6

*Homeward Residential, Inc. v. Sand Canyon Corp.*,
No. 13 CIV 2107 AT, 2014 WL 2510809 (S.D.N.Y. May 28, 2013) ....................13

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
564 F.3d 243 (3d Cir. 2009).............................................................................14, 36

*In re Interpool, Inc. Sec. Litig.*,
No. Civ. 04-321(SRC), 2005 WL 2000237 (D.N.J. Aug. 17, 2005) .....................44

*In re Intuitive Surgical Sec. Litig.*,
65 F. Supp. 3d 821 (N.D. Cal. 2014) .......................................................................6

*KBC Asset Mgmt. NV v. DXC Tech. Co.*,
19 F.4th 601 (4th Cir. 2021) ............................................................................36, 41

*KBC Asset Mgmt. NV v. 3d Sys. Corp.,* No. 0:15-CV-02393-MGL, 2016 WL
3981236, at *9 (D.S.C. July 25, 2016).....................................................................39

*Kendall v. Odonate Therapeutics, Inc.*,
2021 WL 3406271 (S.D. Cal. Aug. 4, 2021) ....................................................35, 44

*In re Lehman Bros. Sec. and ERISA Litig.*,
Nos. 10 Civ. 6637 (LAK), 09 MD 2017 (LAK), 2013 WL 3989066 (S.D.N.Y. July 31, 2013)...........................................................................................................13

*In re LendingClub Corp.*,
423 F. Supp. 3d 785 (N.D. Cal. 2019) ......................................................................9

*Lipow v. Newl UEPS Techs., Inc.,*
131 F. Supp. 3d 144 (S.D.N.Y 2015) ......................................................................45

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*,
543 F. Supp. 3d 96 (D. Md. 2021)...................................................................... *passim*

*In re MicroStrategy, Inc. Sec. Litig.*,
115 F. Supp. 2d 620 (E.D. Va. 2000) ................................................................10, 43

*Nguyen v. New Link Genetics Corp.*,
    297 F. Supp. 3d 472 (S.D.N.Y. 2018)................................................................................36

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000).............................................................................................14

*Ollila v. Babcock & Wilson Enterprises, Inc.*,
    2018 WL 792069 (W.D.N.C. Feb. 8, 2018) ..................................................................36

*Omnicare, Inc. v. Laborers Dist. Council Contr. Indus. Pension Fund*,
    575 U.S. 175 (2015).........................................................................................................17

*Ottmann v. Hanger Orthopedic Grp., Inc.*,
    353 F.3d 338 (4th Cir. 2003) ..........................................................................................43

*In re Oxford Health Plans, Inc.*,
    187 F.R.D. 133 (S.D.N.Y. 1999) ....................................................................................42

*Proter v. Medifast, Inc.*,
    2013 WL 1316034 (D. Md. Mar. 28, 2013).....................................................................42

*Rahman v. Kid Brands, Inc.*,
    No. 11-1624 (JLL), 2012 WL 12294490 (D.N.J. Oct. 17, 2012) .....................................9

*Reed v. Amira Nature Foods Ltd.*,
    No. CV 15-0957 FMO, 2016 WL 6571281 (C.D. Cal. July 18, 2016) .............................9

*Rubinstein v. Collins*,
    20 F.3d 160 (5th Cir. 1994) ............................................................................................42

*In re Sanofi Inc. Sec. Litig.*,
    87 F. Supp. 3d 510 (S.D.N.Y. 2015)..................................................................................5

*In re Seadrill Ltd. Sec. Litig.*,
    2016 WL 3461311 (S.D.N.Y. June 20, 2016) ...................................................................5

*Shah v. GenVec, Inc.*,
    No. CIV.A. DKC 12-0341, 2013 WL 5348133 (D. Md. Sept. 20, 2013)..........................32

*In re Silvercorp Metals, Inc. Sec. Litig.*,
    26 F. Supp. 3d 266 (S.D.N.Y. 2014)................................................................................44

*Spitzberg v. Houston Am. Energy Corp.*,
    758 F.3d 676 (5th Cir. 2014) ..........................................................................................36

*In re Sturm, Ruger & Co., Inc. Sec. Litig.*,
    2011 WL 494753 (D. Conn. Feb. 7, 2011) ......................................................................42

*In re Toronto-Dominion Bank Sec. Litig.*,
No. CV 17-1665 (NLH/JS), 2018 WL 6381882 (D.N.J. Dec. 6, 2018) ......................... *passim*

*Van Dongen v. CNinsure Inc.*,
951 F. Supp. 2d 457 (S.D.N.Y. 2013)......................................................................................44

*Veal v. LendingClub Corp.*,
No. 18-cv-02599-BLF, 2020 WL 3128909 (N.D. Cal. June 12, 2020)....................................9

*Williams v. Globus Med., Inc.*,
869 F.3d 235 (3d Cir. 2017)....................................................................................................6

*In re Xerox Corp. Sec. Litig.*,
935 F. Supp. 2d 448 (D. Conn. 2013)......................................................................................5

*Yates v. Municipal Mortg. & Equity, LLC.,*
744 F. 3d 974 (4th Cir. 2014) ...............................................................................................41

**Statutes**

15 U.S.C. § 78u-4(b)................................................................................................................8

Defendants submit this reply memorandum in further support of their motion to dismiss. Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss (the "Opposition" or "Opp.") only underscores the Complaint's fundamental deficiencies. Plaintiffs' Motion for Judicial Notice does not change the result. Whatever the import of the materials from the Congressional investigation and the findings in the staff report, they critically do not bear upon, and do nothing to undermine, the truth of the statements challenged in the Complaint. Indeed, Congress did not address Emergent's public statements at all, nor, of course, did it address the Company's thorough risk disclosures. The Congressional findings merely confirm what Emergent has maintained all along: faced with an unprecedented global pandemic, Emergent partnered with Johnson & Johnson, AstraZeneca, and the federal government to ramp up production at its Bayview facility, on as accelerated a timeline as possible, to address the need for hundreds of millions of doses of yet-to-be-approved COVID-19 vaccine candidates. Emergent had to hire and train new and inexperienced staff and remediate a number of observed issues, all of which Emergent and its partners viewed as feasible. Emergent's robust risk disclosures clearly established the risk that the company might fall short of its ambitious goal, as, with the benefit of hindsight, it of course did. Indeed, Emergent repeatedly warned investors that it may not be able to produce vaccine substance *at all*. The fact that the company fell victim to the same manufacturing and contamination risks about which it had warned repeatedly does not convert the manufacturing or quality system failures that Congress observed into securities fraud.

## ARGUMENT
### I.　THE COMPLAINT FAILS TO PLEAD FALSITY
#### A.　The Allegations Concerning "Business Operations" Do Not State a Claim

The majority of the challenged statements are so-called "business operations" statements. Those made before the contamination incident relate to Emergent's capabilities and partnerships

and are inactionable because (i) Defendants repeatedly disclosed the very risks that Plaintiffs

allege they omitted, and (ii) many are puffery.  The statements made after the contamination

incident relate to the incident and efforts to address it and are inactionable because they were true

or in context had no capacity to mislead.[1]

### 1. Statements Before the Contamination Incident Are Not Actionable

The pre-contamination-incident statements are all generic descriptions of Emergent's

capabilities and partnerships.[2]  The Opposition clarifies that Plaintiffs challenge these statements

not because Emergent was doomed to fail (i.e., lacked the claimed capabilities),[3] but because the

risks were greater than disclosed.  Opp. at 37 n.60.  The Opposition fails to identify a single

challenged statement downplaying the risks, however.  That is because whenever Emergent

addressed these risks, it communicated that they were high and that there was "no assurance that

[Emergent would] be able to produce any significant quantity of [vaccine drug substance] on a

timely basis or at all."  Memorandum in Support of Motion to Dismiss (Mem.) at 11 (citing

exhibits).  Those disclosures, if anything, overstated the risk—Emergent ultimately produced

---

[1] The two categories are distinct—the purportedly downplayed risks of manufacturing errors and contamination both materialized with the contamination incident.  Indeed, the Opposition now attempts to categorize the pre-contamination incident "business operation" statements separately. *See* Opp. at 13-14.

[2] ¶¶ 129, 131, 134, 138, 140, 143, 146, 148, 151, 153, 155, 157, 160, 162, 164, 166, 168, 170, 172, 174-75, 177, 179, 181, 183, 185.

[3] The Opposition not only fails to argue that these statements about Emergent's capabilities were false, it affirms that they were true. *See, e.g.*, Opp. at 1 ("Emergent could have been a white knight for us all, <u>uniquely pre-positioned</u> with the federally-funded, federally-certified Bayview facility that was <u>literally designed to mass-produce vaccines during a pandemic</u>.") (emphasis added).

bulk drug substance for millions of doses of vaccines.  Mem. at 4.[4]  The Opposition's only response is to assert that Defendants' Memorandum somehow engages in puzzle "pleading" (Opp. at 8-9, 22), despite that the objection applies only to *pleadings*;[5] urging the Court to look at allegations of falsity holistically (*Id.* at 7 & n.7, 19), when that standard applies only to scienter allegations; and mischaracterizing Defendants' arguments as relating to the PSLRA safe harbor for forward-looking statements (*Id.* at 9-12).

### a)  The Opposition Fails to Rebut that Defendants Disclosed the Risks Related to Contamination and Manufacturing COVID-19 Vaccine Drug Substance

Defendants disclosed in detail the very risks that the Complaint alleges they materially understated.  That alone is fatal to Plaintiffs' claims with respect to the pre-contamination incident challenged statements.  Emergent not only explicitly described the risks of contamination and other manufacturing problems, but also the consequences that could follow.[6]

---

[4] Even if Emergent had not disclosed these risks, the challenged statements would still be inactionable because general statements about capabilities do not guarantee that errors will not occur in execution, and the securities laws do not require disclosure of all potential impediments to success.  Mem. at 9 n.7.  Plaintiffs assert that the cases cited in the Memorandum are "distinguishable," but only describe differences in facts without any explanation as to how those differences are meaningful.  Opp. at 14 n.23.

[5] The Memorandum is, of course, not a pleading.  Fed. R. Civ. P. 8.

[6] Mem. Ex. 2 (Q1 2020 10-Q) at 49 ("Manufacturing biologic products, especially in large quantities is complex.  The products must be made consistently and in compliance with a clearly defined manufacturing process.  Problems during manufacturing may arise for a variety of reasons, including . . . failure to follow specific protocols and procedures.  In addition, slight deviations anywhere in the manufacturing process, including . . . contamination including from particulates among other things . . . may result in lot failure or manufacturing shut-downs, delays in the release of lots, production recalls, spoilage or regulatory action. . . . From time to time, we may experience deviations in the manufacturing process that may take significant time and resources to resolve and, if unresolved, may affect manufacturing output and could cause us to fail to satisfy customer orders or contractual commitments, lead to a termination of one or more of our contracts, . . . result in litigation or regulatory action against us, including warning letters and other restrictions on the . . . manufacturing of a product, or cause the FDA to cease releasing

Emergent also disclosed how those risks had materialized (and could again in the future) in the form of observations issued by government regulators.[7] Equally important, Emergent explained that there was risk in developing COVID-19 vaccine drug substance, specifically, because it was complex and the product manufacturing processes were still in development. Emergent cautioned that it may never be able to produce any significant quantity of vaccine drug substance or any at all:

> [W]e are also providing contract development and manufacturing services for the development and/or manufacture of three vaccine product candidates for customers. . . . Even if these product candidates are safe and/or effective and receive approval or authorization by a health regulatory authority, the manufacturing process for these programs are under development and will be complex. As a result, there can be no assurance that we will be able to produce any significant quantity of these products or a timely basis or at all.[8]

Rather than address the risk disclosures directly, the Opposition deflects. First, it claims that the PSLRA's safe harbor does not apply. Opp. 9-12. Defendants did not argue that the safe

---

product until the deviations are explained and corrected, any of which could be costly to us, damage our reputation and negatively impact our business"); Mem. Ex. 3 (Q2 2020 10-Q) at 50; Mem. Ex. 4 (Q3 2020 10-Q) at 53-54; Mem. Ex. 5 (2020 10-K) at 39; Mem. Ex. 6 (Q1 2021 10-Q) at 50-51; Mem. Ex. 7 (Q2 2021 10-Q) at 51.

[7] Mem. Ex. 2 at 46 ("Government regulators enforce cGMP and other requirements through periodic unannounced inspections of manufacturing facilities. . . . Following several of these inspections, regulatory authorities have issued inspectional observations, some of which were significant, but all of which are being, or have been, addressed through corrective actions. If, in connection with any future inspection, regulatory authorities find that we are not in substantial compliance with all applicable requirements, or if they are not satisfied with the corrective actions we take, our regulators may undertake enforcement action against us, which may include warning letters and other communications . . . [and] restrictions on the marketing or manufacture of a product . . ."); Mem. Ex. 3 at 48; Mem. Ex. 4 at 51; Mem. Ex. 5 at 36-37; Mem. Ex. 6 at 48; Mem. Ex. 7 at 48-49.

[8] Mem. Ex. 2 at 54; Mem. Ex. 3 at 55; Mem. Ex. 4 at 58-59; Mem. Ex. 5 at 28; Mem. Ex. 6 at 39 (same and additionally disclosing that Emergent would not manufacture drug substance pending completion of the remediation of FDA's Form 483 findings); Mem. Ex. 7 at 40.

harbor applied, but rather explained that having warned clearly of the allegedly understated risks, Defendants satisfied whatever disclosure duties existed (regardless of whether the statements were forward-looking). Mem. at 10-12.[9] Plaintiffs' assertion that not all challenged statements contained the risk disclosures is another diversion. The securities laws do not require such repetition. *See In re Sanofi Inc. Sec. Litig.*, 87 F. Supp. 3d 510, 547 (S.D.N.Y. 2015) ("Although the complete disclosures were important when made in the first instance, a reasonable investor would not expect repetition at every opportunity. And the securities laws do not require such regurgitation; that approach would bury the shareholders in an avalanche of trivial information.") (internal quotation marks omitted).[10]

The Opposition's only attempt to address the substance of the risk disclosures is its argument that they were not meaningfully cautionary. That standard is irrelevant, as explained above, *see supra* at 4-5 & n.9, and in any event, none of Plaintiffs' critiques holds water. First, Plaintiffs assert that the risk disclosures were inadequate because they did not change over time

---

[9] Plaintiffs' assertion that it is inappropriate for the Court to determine whether cautionary language is meaningful at the motion to dismiss phase, Opp. at 9, is irrelevant because Defendants did not make a safe harbor argument. Moreover, Plaintiffs are simply wrong. Courts (including this one) regularly determine whether language is meaningful under the PSLRA safe harbor at the motion to dismiss phase. *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 543 F. Supp. 3d 96, 126 (D. Md. 2021), *aff'd sub nom. In re Marriott Int'l, Inc.*, 31 F.4th 898 (4th Cir. 2022).

[10] *See also In re Seadrill Ltd. Sec. Litig.*, 14 Civ. 9642 (LGS), 2016 WL 3461311, at *9-10 (S.D.N.Y. June 20, 2016) (finding prior risk disclosures in securities filings undermined assertion that challenged statements misleadingly omitted information concerning risk); *Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d 175, 195-200 (D. Conn. 2014) (finding no duty to disclose information already previously disclosed, including in other communications); *City of Bristol Pension Fund v. Vertex Pharms. Inc.*, 12 F. Supp. 3d 225, 237 (D. Mass. 2014) (disclosure of information regarding study results made available on conference call sufficient to rebut claim that information was omitted from press release); *In re Xerox Corp. Sec. Litig.*, 935 F. Supp. 2d 448, 488-93 (D. Conn. 2013) (finding at summary judgment that prior disclosures of allegedly omitted information in other communications were sufficient).

and cautioned about events that had already transpired (i.e., manufacturing errors).  Opp. at 10-12.[11]  The fact that Emergent destroyed a small number of drug substance batches before Q2 2021 does not render the disclosures inadequate, however.  The focus of the disclosures was not the risk of manufacturing errors, but rather the consequences that could follow.  *Id.* at 10.  The Complaint does not allege that any litigation, regulatory action, failed customer order, or other consequence about which the disclosures warned had occurred before Q2 2021.  Thus, the fact that some manufacturing errors occurred does not render the warnings inadequate.  *See, e.g.*, *Williams v. Globus Med., Inc.*, 869 F.3d 235, 242-43 (3d Cir. 2017) (warning about impact on revenue from loss of customers not rendered misleading by loss of customer relationship where revenue risk had not yet materialized); *In re Facebook, Inc. Sec. Litig.*, 477 F. Supp. 3d 980, 1018 (N.D. Cal. 2020) (improper data disclosure did not render warnings about reputation, business, and competitive harm misleading).  Further, even as to the risk of manufacturing errors, the disclosures warned that they may occur "from time to time," which did not imply that none had occurred, but rather suggested that the risk could materialize on a recurring basis,  *See, e.g.*, *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 836 (N.D. Cal. 2014) (disclosure that lawsuits may be filed from "time to time" not misleading for failure to disclose number of such lawsuits already filed because disclosures were clear that such lawsuits "can and will continue to be a risk").  In this context, Emergent was not required to update its disclosures every time that any manufacturing error occurred.  *Hill v. Gozani*, 638 F.3d 40, 60 (1st Cir. 2011) ("In

---

[11] Plaintiffs are also simply wrong that the disclosures did not change "through the end of Q2 2021." Opp. at 10.  In Emergent's Q1 2021 10-Q, it added that it would cease manufacturing drug substance pending remediation of the observations in the Form 483.  Mem. Ex. 6 at 39; *see also* Mem. at 11 n.11 (noting same).  Emergent was not notified of the contamination until March 16, 2021.  *See* ¶ 125.  Thus, the update was timely.  In any event, the disclosures were accurate throughout the Class Period for the reasons stated above.

circumstances where some level of risk materializes," defendants are not required to

"[completely disclose] all of the details when the overall risk is disclosed and the nature of the

risk remains uncertain."); *see also Harrington v. Tetraphase Pharms., Inc.*, No. 16-10133-LTS,

2017 WL 1946305, at *10 (D. Mass. May 9, 2017) ("While the cautionary statements remained

largely unchanged over time, there were no major changes in the risks Tetraphase faced during

this period.").

Next, Plaintiffs claim that the risk disclosures are "literally false" because they also stated

that Emergent was addressing inspectional observations from regulatory authorities.  Opp. at 12.

Plaintiffs' only support is after-the-fact Congressional reports, however, which nowhere actually

find that Emergent was not addressing the inspectional observations.  Instead, the reports

conclude only that because manufacturing errors occurred, the remediation must have been

insufficient.[12]  But the fact that the remediation was ultimately deemed insufficient does not

mean that Emergent did not undertake it.[13]

### b) The Pre-Contamination Incident Challenged Statements Are Inactionable Puffery

The Opposition asserts that Defendants' puffery argument "should be rejected outright"

as a "sweeping generalization" covering over 12 months of public statements."  Opp. at 8.  That

is a non sequitur.  Plaintiffs also accuse Defendants of puzzle pleading because the

---

[12] Memorandum, Preliminary Findings from Investigation into Emergent BioSolutions, Inc. at 6-7 (May 19, 2021), *available at* https://coronavirus.house.gov/sites/democrats.coronavirus.house.gov/files/Staff%20Memo%20re%20Emergent%20-%20FINAL.pdf (listing the inspectional observations without discussion of execution on remediation plans); RJN Ex. 1 at 2, 9 (same).

[13] BARDA's conclusion that certain observations from prior inspections had not yet been fully remediated (*see, e.g.*, RJN Ex. 1 at 7) fails to demonstrate that Emergent's statements were false for the same reason.

Memorandum highlights examples of the puffing statements rather than listing each one. *Id.* at 8. Again, pleading standards are inapplicable to the Memorandum.[14] Finally, Plaintiffs assert that context can render puffery actionable, but do not identify any context that would supposedly makes the puffery actionable here. *See id.* at 8-9.[15]

### c) Plaintiffs' Assertions Concerning the Severity of the Risk are Unfounded

The Opposition spills much ink defending the Complaint's allegations that the risks of manufacturing errors and cross-contamination were "severe" or "grave" based on CW

---

[14] The Complaint's puzzle pleading remains impermissible. As to the PSLRA's requirement that the Complaint specify each allegedly misleading statement, Plaintiffs note only that "nearly all" of the challenged statements include bolded or italicized text indicating the portion alleged to be misleading, Opp. at 5-6, suggesting that the Complaint challenges other statements not so identified. Plaintiffs also fail to address that the Complaint's efforts in this regard were haphazard. *See* Mem. at 7 (providing examples). Further, the Complaint must also specify why each challenged statement is allegedly false or misleading. 15 U.S.C. § 78u-4(b). The Opposition only maintains that the PSLRA allows a complaint to accomplish this by categorizing the challenged statements. Opp. at 5. That the PSLRA allows this as a theoretical matter misses the point. The Complaint "sorts" most of the challenged statements under the vague and generic descriptor of "business operations," and does not tie any of the six pages of supposedly contradictory facts to those statements. Mem. at 7. And the Opposition does not even attempt to justify how supposedly contradictory facts that arose *after* challenged statements were made demonstrate that the statements were contemporaneously false or misleading. *Id.* Finally, Plaintiffs' excuse that complying with the PSLRA would supposedly somehow result in a 400-plus page Complaint, Opp. at 6 & n.6, falls short. There was no page limit on the Complaint, and the PSLRA makes no such exception.

Plaintiffs also grouse about Defendants' quotation of portions of the challenged statements instead of the full statements, Opp. at 8, but they do not point to any omitted portions that are actionable.

[15] Plaintiffs also misconstrue the cases they cite. In *Longman v. Food Lion, Inc.*, the court only observed that an opinion could be actionable if the speaker did not in fact believe it to be true. 197 F. 3d 675, 683 (4th Cir. 1999). In *In re Coventry Healthcare, Inc. Sec. Litig.*, the court quoted from a decision that made the unremarkable observation that puffery is inactionable, but that public statements must be consistent with reasonably available data and not misrepresent existing facts. No. 08:09-CV-2337-AW, 2011 WL 1230998 (D. Md. Mar. 30, 2011). Neither case applies here and neither states that puffery is made actionable because of some unspecified additional "context."

statements, FDA inspections, news articles, and Congressional reports. As set forth above, however characterized, Defendants' disclosures more than adequately warned of these risks. The Opposition not only does not address the substance of those risk disclosures but fails to demonstrate that the Complaint pleads adequately facts establishing such a "severe" or "grave" risk in the first instance.

### i. Confidential Witnesses

Defendants' Memorandum explains in detail why each of the CW allegations is deficient, including the ways in which they are irrelevant, contradictory, vague, and conclusory. *See* Mem. at 13-21. Plaintiffs address just one of those specific arguments.[16] They instead urge the Court to consider the CW allegations holistically. Opp. at 19. The Court need only consider allegations holistically when assessing scienter, however—it must assess falsity on a statement-by-statement basis. *See, e.g.*, *In re Marriott Int'l, Inc. Customer Data Sec. Breach Litig.*, 543 F. Supp. 3d 96, 143 (D. Md. 2021); *see also Veal v. LendingClub Corp.*, No. 18-cv-02599-BLF, 2020 WL 3128909, at *8 (N.D. Cal. June 12, 2020) (clarifying that scienter allegations are reviewed holistically, not falsity allegations). In any event, Plaintiffs fail to explain how the irrelevant, contradictory, vague, and conclusory allegations add up to more.[17]

---

[16] Plaintiffs accuse Defendants of attempting to "rewrite" CW9's allegations, but they misunderstand the Memorandum. CW9 alleged that employees carried bags of waste through areas of the facility "right before the FDA came to inspect." The Memorandum noted that this allegation suggests that the event occurred after the contamination incident (because the FDA inspection was in response to the contamination incident), and thus that the event did not result in the contamination incident or suggest a heightened risk of cross-contamination. Mem. at 20. Defendants did not argue (as Plaintiffs suggest) that the alleged conduct occurred after the FDA inspection.

[17] Plaintiffs also make no attempt to explain how otherwise deficient CW allegations become more than the sum of their parts even as to scienter. *Cf. Reed v. Amira Nature Foods Ltd.*, No. CV 15-0957 FMO (PJWx), 2016 WL 6571281, at *10 (C.D. Cal. July 18, 2016) (CW allegations that do not support that a defendant had knowledge of an untrue statement do not holistically

The Opposition also contends that it was not necessary for the Complaint to plead when any of the alleged facts described by the CWs occurred. Opp. at 9. But Plaintiffs do not explain how allegations can possibly support that a statement was false or misleading *when it was made* if they do not state when the supposedly contradictory fact existed. *In re Marriott Int'l, Inc.*, 543 F. Supp. 3d at 115; *see also Genna v. Potts*, Civ. A. No. HAR 94-3260, 1995 WL 222043, at *5 (D. Md. Apr. 13, 1995) ("Plaintiffs must establish that Defendants' statements were false when made; the requirements of Rule 9(b) are not satisfied by mere allegations of fraud by hindsight.") (internal quotation marks omitted).[18]

### ii.  FDA Communications

Plaintiffs focus on their allegations concerning FDA communications, Opp. at 15-17, but fail to rebut the Memorandum's contrary arguments substantively. For example, the Opposition makes no effort to explain how inspectional observations of facilities other than Bayview, some taking place years before Emergent even began manufacturing COVID-19 vaccine drug substance, demonstrate that the risk at Bayview was greater than Defendants disclosed. Plaintiffs simply assert, without explanation, that the observations from these other sites "persistently

---

support scienter); *Rahman v. Kid Brands, Inc.*, No. 11-1624 (JLL), 2012 WL 12294490, at *14 (D.N.J. Oct. 17, 2012) (same); *see also In re LendingClub Corp.*, 423 F. Supp. 3d 785, 817-18 (N.D. Cal. 2019) (individual "unpersuasive" CW allegations do not establish scienter viewed holistically); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 631 (E.D. Va. 2000) (inquiry is whether facts "take on added significance when combined" or have a "synergistic effect on probative value").

[18] Plaintiffs also do not address any of the cases cited in the Memorandum in which courts rejected undated confidential witness allegations. *See* Mem. at 14. The Opposition's sole citation to *Latham v. Matthews* (Opp. at 19) is inapposite. The court was assessing scienter, not falsity. 662 F. Supp. 2d 441, 465 (D.S.C. 2009). The distinction matters because the Complaint must allege that the challenged statements were false or misleading *when made*. Moreover, the confidential witness in that case alleged exactly when an individual defendant told the witness that the challenged statement was false. *Id.*

pervaded Emergent's operations."[19]  The Complaint does not allege that any manufacturing errors even occurred at those sites, which puts the lie to Plaintiffs' assertion (and confirms that inspectional observations do not unavoidably foretell later manufacturing issues).

Emergent also was not required to disclose interim FDA feedback related to Bayview, which feedback documented issues that were explicitly preliminary and correctable.  *See* Mem. at 22.  The Opposition's only retort is that the observations must not have been preliminary and correctable because issues later arose, Opp. at 16 & n.26, but this is just more hindsight.  *In re Marriott Int'l, Inc.*, 543 F. Supp. 3d at 139.  Plaintiffs also assert that the risks of manufacturing issues and contamination must have been greater than disclosed, claiming that a post-contamination incident Form 483 report demonstrated that Emergent did not address prior observations.  Although Plaintiffs assert that this argument does *not* rely on hindsight, they fail to explain how.  Opp. at 17-18.[20]  That FDA later concluded more work needed to be done does not demonstrate that Emergent failed to act in good faith to execute the remediation plan to which it agreed with FDA, or that it was a foregone conclusion that its work would be insufficient.

Other Opposition arguments are illogical.  For example, Plaintiffs argue that "regardless of its public release," information in the April 30, 2021 Form 483 supports the claim that the

---

[19] *In re Toronto-Dominion Bank Sec. Litig.* does not provide the missing explanation.  There, the court assessed whether *scienter* could be inferred from the nationwide nature of the illegal scheme at issue.  No. 17-1665 (NLS/JS), 2018 WL 6381882, at *13 (D.N.J. Dec. 6, 2013).  The case does not state that inspectional observations at one facility so clearly portended issues at another as to require disclosure.

[20] Plaintiffs' CWs also describe ways in which Emergent was working to correct issues, suggesting that manufacturing errors related to the observations were far from the forgone conclusion that Plaintiffs assert.  *See, e.g.*, ¶¶ 60 (alleging CW1 was brought in to help establish capabilities needed), 62 (alleging Emergent attempted to fix problems relating to vaccine contamination), 63 (alleging that Emergent was "fast tracking [Area 4] with [process performance qualification] and qualifying the area for mass production").

information contained therein was misleadingly withheld by Defendants.  The Opposition ignores, however, the case law that issuers need not disclose information readily accessible in the public domain.  Mem. at 22, n.17.  Plaintiffs' retort that the Form 483 "incorporates and addressed the 4/21/2021 FDA 483 Report's observations, thus entrenching it within the falsity pleading in that time frame," Opp. at 18, is a non-sequitur.[21]

The Opposition asserts that the Memorandum ignored allegations regarding three pre-contamination incident reports.  Opp. at 17.  One of the supposedly ignored reports is the April 20, 2020 FDA Inspection Report.  That report only provided additional detail to the Form 483 report issued on the same day, which Defendants addressed at length.  The Memorandum addressed the other two reports—the Warp Speed and Janssen Reports—in the section dealing with Preliminary Congressional Findings, because the Complaint described them in that context. *Compare* Mem. at 24-25 *with* ¶ 124.  There is no waiver.

Finally, the Opposition attempts to rebut the argument that it is implausible that BARDA and Janssen would have proceeded with production if they knew the contamination risk was as severe as Plaintiffs allege, asserting that Defendants concealed the risk from these parties.  This does not address the Memorandum's argument, however.  While the Complaint alleges that Defendants did not disclose what was documented in BARDA's and Janssen's own reports, BARDA and Janssen were clearly aware of the contents of those reports when they decided to move forward with production.  Therefore, the facts described in their reports do not plausibly

---

[21] Defendants also were not required to disclose the contents of the April 2020 Form 483 because FDA already publicly released it.  Mem. at 22 n.15.  In response, Plaintiffs assert without any further explanation, that unlike in the authority cited in the Memorandum, "the FAC's allegations do not support the conclusion that those facts were ever made 'credibly available to the market.'"  Opp. at 17, n.28.  The Opposition provides no further argument, however, as to how the Form 483 was not "credibly available."

support or suggest that the endeavor was doomed to fail. *See* ¶ 124. In any event, nothing was hidden from BARDA or Janssen, as discussed below. *See infra* at 18-19.

### iii.    Newspaper Article

Plaintiffs next assert that a *New York Times* article demonstrates that the risks were greater than disclosed.[22] The article's conclusions are all impermissibly rooted in hindsight, however, and therefore fail to support the Complaint's allegations. The Opposition responds that if Plaintiffs were not able to support their claims with hindsight contained in news articles, it "would eviscerate the ability of securities claims to ever be based on third party journalism." Opp. at 20-21. The Memorandum directly addresses the sources in the article who purport to speak to contemporaneous facts, however. Mem. at 23.[23] What the Complaint cannot assert as

---

[22] Plaintiffs also assert that all arguments as to an *Associated Press* article are waived. Opp. at 20 n.30. But the Complaint only alleges that the article summarized the FDA inspection reports, which Defendants addressed directly elsewhere. ¶ 219(c) ("The *AP* cited documents obtained by FOIA to describe the litany of FDA citations leveled on the Bayview facility . . . ."); *see also* Mem. at 21-22 (addressing reports). Again, there is no waiver.

[23] The witness reports discussed in the article are not sufficiently described to meet the standards the Court would have applied had they been alleged in the Complaint. The Opposition asserts that the Court should consider the statements regardless, Opp. at 21, but Plaintiffs do not substantively address the authority that the Memorandum cites. *Id.* at 21 & n.33. Plaintiffs' cases are also distinguishable. In *In re Toronto-Dominion Bank Sec. Litig.*, the court only partially credited CWs cited in an article, but to the extent a time period could not be discerned from their allegations (which is true as to all sources cited in the *New York Times* article), for the limited purpose of corroboration. 2018 WL 6381882, at *6. Further, in that case, some of the confidential witnesses admitted to actions that could give rise to their own civil or criminal liability (not so here), which the court found bolstered their reliability. *Id.* at *6 n.4. Plaintiffs also cite two cases in which courts permitted citation of confidential witnesses from another complaint. *See Homeward Residential, Inc. v. Sand Canyon Corp.*, No. 13 Civ 2107 (AT), 2014 WL 2510809, at *7 (S.D.N.Y. May 28, 2013); *380544 Canada, Inc. v. Aspen Tech, Inc.*, 544 F. Supp. 2d 199, 224-225 (S.D.N.Y. 2008). This is irrelevant because the Complaint does not cite CWs from other pleadings who met the PSLRA pleading standards. Mem. at 23. (And Plaintiffs themselves cite a case that states that the Complaint cannot draw from such other pleadings. *See In re Lehman Bros. Sec. and ERISA Litig.*, Nos. 10 Civ. 6637 (LAK), 09 MD 2017 (LAK), 2013 WL 3989066, at *4 (S.D.N.Y. July 31, 2013).)

contemporaneous fact are unadorned conclusions reached in hindsight.  *See, e.g.*, ¶¶ 117 ("[I]t reported that Emergent had 'a corporate culture that often ignored or deflected missteps . . . .'"), 118 ("Emergent had not followed some basic industry standards at the Baltimore plant, and identified repeated shortcomings in efforts to disinfect and prevent contamination.") (emphasis omitted).  Plaintiffs do not cite any authority demonstrating that such conclusions permissibly support securities fraud claims.[24]

### iv.  Preliminary Congressional Findings

The Opposition also attempts to defend the Complaint's allegations concerning the preliminary congressional findings.  Plaintiffs incorrectly assert that the Memorandum's sole argument is that the Congressional report is impermissible hindsight.  Mem. at 21.  This is not so—the Memorandum addressed each of the inspectional reports on which the preliminary Congressional report relied, including the Warp Speed and Janssen Reports that the Complaint pleaded were "new."  *See* Mem. at 21-22 (addressing FDA reports), 24-25 (addressing Warp Speed and Janssen Reports); *see also* ¶ 124 (describing the "new evidence").  The Opposition does not respond to the Memorandum's arguments concerning those inspectional reports.[25]

### 2.  Statements Following the Contamination Incident are Not Actionable

The second bucket of challenged statements includes statements **following** the contamination incident that focus on the incident itself or Emergent's subsequent effort to

---

[24] Instead, Plaintiffs cite one case finding that post-class period information can be used to demonstrate scienter and one case in which, after the class period, the defendants admitted that inventory was "seriously overvalued."  *See Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 249 n.13, 168-269 (3d Cir. 2009); *Novak v. Kasaks*, 216 F.3d 300, 312-13 (2d Cir. 2000).

[25] *In re Genworth Financial Inc. Sec. Litig.*, which Plaintiffs cite, merely held that certain allegations were not made in hindsight, not that hindsight was permissible.  103 F. Supp. 3d 759, 777 (E.D. Va. 2015).

remediate.  None is actionable.[26]  The challenged statements regarding remediation are inactionable puffery,[27] as are the post-contamination incident's statements regarding the Company's capabilities and partnerships.[28]  Mem. at 25-26.  Plaintiffs contend again that, because the Memorandum does not list each puffing statement, they are somehow made actionable.  Opp. at 22.  That argument fails for the same reasons above.  *See supra* at 7-8.  Plaintiffs' mere say-so that the statements are not puffery also fails.  Opp. at 22.[29]

Defendants' statements concerning the contamination incident also remain inactionable.[30]  Plaintiffs assert that the statements were part of "an orchestrated counter-narrative in response" to the contamination incident.  Opp. at 23-24.  This new characterization fails to alter the

---

[26] Plaintiffs' assertion that Defendants have "waive[d] all post-March 31, 2021 falsity allegations at this stage," (Opp. at 22), is meritless.  Defendants challenged the post-contamination incident statements (Mem. at 25-27), and Plaintiffs dedicate a section of the Opposition to attempt to address those arguments (Opp. at 22-25).

[27] ¶¶ 195, 197, 199, 201, 203, 205, 209, 213.  The Complaint also challenges pre-contamination incident statements about remediation made in Emergent's response to an FDA Form 483.  Those statements are inactionable for the same reasons as the post-contamination incident statements about remediation.  Further, as noted, the response to the Form 483 cannot both mislead for failure to disclose risks and also demonstrate that those same risks were greater than previously disclosed.  Mem. at 8, n.6.

[28] ¶¶ 191, 195, 199, 207, 211, 213, 215, 217, 221-227.

[29] The Opposition's cited cases are inapposite.  In *Mulligan v. Impax Laboratories, Inc.*, the defendants "specifically represented to investors that they had undertaken significant manufacturing and quality control changes in their operations to rectify the issues highlighted by the FDA's Form 483s and Warning Letter in a relatively short period of time."  36 F. Supp. 3d 942, 968 (N.D. Cal. 2014).  Emergent's statements that it was "committed" to remediating and that it would take "swift action" do not touch on what steps Emergent had taken or imply that remediation was complete.  In *In re Equifax Inc. Sec. Litig.*, the company allegedly represented that its cybersecurity efforts were "extensive" and that it was "committed" to data security.  357 F. Supp. 3d 1189, 1224 (N.D. Ga. 2019).  These were also statements about ongoing efforts, not a commitment to a future remediation.

[30] ¶¶ 187, 189, 191, 195, 197, 205.

analysis, however—the Complaint must still plead actionable false or misleading statements.  It fails to do so:

- The Opposition asserts that Emergent's April 1, 2021 press release "falsely depicts" that the contamination affected a single batch and was an isolated incident, that Bayview was designed and validated to meet all current cGMP, and that Emergent's quality control systems identified the out-of-specification batch.  Opp. at 36.  Setting aside the Opposition's *ipse dixit*, the Complaint does not actually allege that any of these things were false.

- Mr. Kramer's statements during an April 1, 2021 interview on CNBC describing the problem with a particular batch of the J&J and AstraZeneca vaccines are inactionable because they would not have been material to a reasonable investor—and indeed, were not.  Critically, after Emergent clarified Mr. Kramer's alleged misstatement on April 30, 2021, its stock price increased on May 3, the next day of trading, indicating no adverse market reaction to the additional information.  Notably, none of the analyst reports that Plaintiffs cite mentions the CNBC interview even in passing, only reinforcing that Mr. Kramer's statements were simply not material to reasonable investors.

- Plaintiffs' argument that the CNBC report persuaded analysts also misses the mark.  Opp. at 23-24.  The analyst report makes no reference to the CNBC interview, however, and Plaintiffs do not rebut that in fact media reports *had* mischaracterized the situation, calling it an "ingredient mix-up."  Mem. at 26-27 & n.22.

- Mr. Kramer's Congressional Testimony remains inactionable.[31]  As to Mr. Kramer's statements regarding the manner in which the contaminated batch was identified, the

---

[31] Despite Plaintiffs' incorrect assertion that Defendants waived all argument as to Mr. Kramer's testimony other than with respect to his estimate of when Bayview would resume production,

Opposition itself describes how Mr. Kramer stated precisely that which was allegedly omitted—that a J&J facility identified the out-of-specification batch.[32]  As to Mr. Kramer's estimate of when Emergent would resume manufacturing, Plaintiffs assert that the statement is actionable only because it took longer to resume manufacturing than Mr. Kramer estimated.  Opp. at 25 (arguing that production did not resume until 71 days later).  Plaintiffs do not deny that the statement was an opinion, however, and nowhere contend that Mr. Kramer did not believe it was true at the time he made it.  Mem. at 27.[33]  Further, contrary to the Opposition's claim, the ending of the CIADM relationship between the U.S. Government and Emergent months later does not render Mr. Kramer's estimate false.  Emergent did resume production, and the Complaint does not allege that Mr. Kramer knew the relationship would end when he gave his Congressional testimony.

### 3.   The RJN Exhibits Do Not Change the Result

At Plaintiffs' request, the Court took notice of a May 2022 Congressional Report (the "Report"), a press release, and exhibits to the Report (the "RJN Materials").  *See* Memorandum in Support of Lead Plaintiffs' Motion for Judicial Notice ("RJN").  The RJN recites at length the Report's "six key findings" and organizes its discussion of the cited exhibits according to those findings.  *See* RJN at 20-30.  Whatever the import of Congress's findings, none of the findings

---

Opp. at 24-25, Defendants in fact responded to other supposedly false or misleading aspects of Mr. Kramer's testimony.  *See* Mem. at 27.

[32] The Complaint still nowhere alleges that the assay conducted at J&J's facility was not a part of Emergent's procedures, which is all that the Complaint asserts is false.  Mem. at 27.

[33] Plaintiffs' citation to *Omnicare* only states that if an opinion omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, it could create liability.  *Omnicare, Inc. v. Laborers Dist. Council Contr. Indus. Pension Fund*, 575 U.S. 175, 189-90 (2015).  Plaintiffs do not allege that Mr. Kramer's estimate was uninformed or that his statement implied some level of inquiry that he had not made.

supports a conclusion that Emergent *violated the securities laws*.  Indeed, the Report does not

address Emergent's disclosures at all.  The exhibits also fail to support the Complaint's

contention that the risks of manufacturing errors or contamination were greater than that which

Defendants disclosed.[34]  Defendants address each finding and the cited exhibits in turn:

**Finding 1.**  The first finding is an updated estimate of the total number of batches of

COVID-19 vaccine drug substance that were discarded.  RJN at 21-22.  The finding does not

demonstrate that the risk of contamination or manufacturing error was greater than that which

Defendants disclosed because Defendants warned that there was no guarantee that Emergent

would successfully produce COVID-19 vaccine drug substance *at all*.  Mem. at 11.[35]  The Report

also notes that 180 million doses were released, reinforcing that Defendants' disclosures if

anything overstated the risks.

**Finding 2.**  The second finding—that Emergent "hid evidence" from government

investigators (RJN at 22-23)—also fails to support a securities fraud claim.  The Report does not

find that anything was hidden from investors, and Defendants made no representations to

investors about the adequacy or completeness of FDA's or BARDA's inspections:

- The first exhibit is an email exchange in which Emergent personnel told a J&J employee that

  they would prefer he not join a site tour because many people were already included.  RJN

  Ex. 34.  The email does not demonstrate that Emergent hid anything.  Indeed, the email states

---

[34] Further, Plaintiffs maintained (and judicial notice was granted on the basis) that they did not seek judicial notice of the truth of any of the documents, only their existence.  Tr. Motions Hearing (Feb. 2, 2023) at 11:7-20, 14:4-13.  Thus, whether anyone purported to assess the risk of manufacturing error or contamination in any email is irrelevant.  The truth of those emails has not been alleged and the Court has not noticed it.

[35] Included in the Report's calculation are 60 million doses that were destroyed because they expired while in quarantine (not because they were determined to be contaminated) and that some batches remain in quarantine pending review (RJN Ex. 1 at 1).

that walkthroughs were occurring daily and over the weekend and that they included PIPs [persons-in-plant] from Emergent's commercial partners. *Id.* And the Report acknowledges that FDA conducted a site visit the very next week.

- The next exhibit is an email exchange in which a consultant claimed that Quality Assurance Hold tags were temporarily removed from containers of bulk drug substance so as not to draw attention by FDA during a site visit. RJN Ex. 35. Regardless of the seriousness of the alleged conduct, it does not demonstrate that risks were greater than disclosed. Neither the email nor the RJN claim that these batches were contaminated or that the removal of the tags materially increased the risk of contamination. Further, the email does not claim that any Individual Defendant was aware of or approved the conduct.

- The final exhibit is an email exchange between an Emergent employee and Mr. Husain discussing Emergent's response to questions from BARDA concerning the contamination incident. RJN Ex. 36. Far from evidencing an attempt to mislead, the Emergent employee's desire not to "send anything that would contradict what J&J would have sent already" more plausibly reflects an intent to provide only accurate information. *Id.* Mr. Husain suggested responding by informing BARDA that Emergent was actively investigating with J&J and that it would share details at the conclusion of the investigation. *Id.* Contrary to the Report's assessment, completing an investigation before relaying conclusions is not "hiding evidence"—it is common sense. There is also no evidence that Emergent's report following the conclusion of its investigation hid anything. In any event, anything that was allegedly hidden would have been hidden from BARDA, not investors. And Plaintiffs offer no explanation as to how Emergent's response to BARDA's questions proves that the risk of manufacturing error or contamination was greater than disclosed.

-19-

**Finding 3.** The third finding—that "Emergent executives promoted the company's manufacturing capabilities despite being warned of severe deficiencies" (RJN at 23-26)—is also irrelevant to Plaintiffs' claims. The Report focuses on Emergent's promotion of its capabilities to commercial partners. But Plaintiffs are not Emergent's commercial partners, they are its shareholders. The Report does not analyze any of Emergent's disclosures to shareholders. Those disclosures stated that there was no guarantee that Emergent would be able to produce *any* batches of COVID-19 vaccine drug substance. Regardless of whether Emergent promoted its manufacturing capabilities to investors, it very clearly warned of the risks involved in manufacturing COVID-19 vaccine drug substance. Moreover, the Report also does not demonstrate that J&J or AstraZeneca were even misled—to the contrary, it shows that J&J and AstraZeneca inspected Bayview, identified issues for Emergent to correct, and decided to move forward with manufacturing despite those observations. RJN at 24.

- The first exhibit is a three-page slide deck summarizing findings from an April 2020 inspection by BARDA. RJN Ex. 3. The deck purports to describe "[r]isk[s] to CIADM [r]eadiness," but nowhere states that the risks were significant or greater than what Emergent disclosed to investors. *Id.* at 2. On the next slide, BARDA proposed measures to mitigate those same risks, suggesting that they were indeed capable of mitigation. *Id.* at 3. There is no evidence that Emergent did not take the steps outlined.

- The Report next asserts without a supporting exhibit that an FDA report identified inspectional observations for remediation. RJN at 23-24. This report is presumably the report of the April 2020 FDA inspection, which the Memorandum addresses (Mem. at 22). *See also supra at* 10-13.

- The next exhibit is an email exchange in which Mr. Husain stated to an AstraZeneca employee that Emergent was "ready and focused on ensuring the [AstraZeneca] project is a success" and that Bayview "is capable of producing four independent products simultaneously." RJN Ex. 4. The RJN does not explain how this email demonstrates that the risks of manufacturing error or contamination were greater than disclosed. RJN at 24.

- The next exhibit is a June 2020 contract between AstraZeneca and Emergent. RJN Ex. 6. The RJN provides no explanation as to how the contract shows that any challenged statement was false or misleading.[36]

- The Report next describes findings of audits by AstraZeneca and J&J. The Janssen Report was addressed in the Memorandum. *See* Mem. at 25 & Mem. Ex. 46. The AstraZeneca Report fails to establish that any challenged statement was false or misleading for many of the same reasons. As an initial matter, AstraZeneca approved Bayview for manufacturing, which belies the suggestion that the risks of contamination or manufacturing error were as severe as Plaintiffs now claim. RJN Ex. 5 at 1. Although the report identified observations, none were categorized as "critical." *Id.* at 2-3. As to the non-critical observations it identified, the Report stated that AstraZeneca approved Emergent's plan to address them and committed to "work closely with Emergent to mitigate and address ongoing issues." RJN Ex. 1 at 4. In addition, the AstraZeneca report concluded that "[s]ite personnel were very forthright and presented as technically competent," and the "[t]he audit management team executed the remote tours and document reviews very capably." RJN Ex. 5 at 3

---

[36] Other contracts between Emergent, on the one hand, and AstraZeneca or J&J on the other, are also attached to the RJN and similarly fail to evidence that the risks were greater than what Defendants disclosed. *See* RJN Exs. 7, 10, 11, 13, 15.

- The next exhibit is an Office of Pharmaceutical Manufacturing Assessment Post-Application Letter ("OPMA") from FDA.  RJN Ex. 8.  According to the Report, the OPMA Letter identified deficiencies in Emergent's responses to observations from the April 2020 FDA inspection.  RJN Ex. 1 at 4.  The letter did not purport to identify any of these deficiencies as severe or uncorrectable, however, and no other allegation or document demonstrates that they were not ultimately corrected.[37]  Nor does the RJN or the Report explain how any of the deficiencies identified in the letter relates to the risk of contamination.  RJN Ex. 8 at 2 (describing potential that data deletion may not be detected by audit trail, that a record review did not "extend to all methods used" to handle and test an anthrax treatment, and that a proposed corrective action did not include re-investigation for certain investigations conducted by the same analyst who performed an invalid test).

- The next exhibit is an email chain in which Emergent personnel discussed the OPMA letter.  RJN Ex. 9.  Although personnel expressed frustration that FDA did not accept Emergent's response to its audit observations, no one on the email chain disputed that Emergent would ultimately resolve the issues.  Mr. Kirk's statement with respect to Emergent's Quality group—"room to improve is a huge understatement"—also does not establish that the risks were greater than Emergent disclosed.  Emergent warned that its programs to manufacture vaccine drug substance were "under development and will be complex," and that there was no assurance that Emergent "will be able to produce any significant quantity of these products [on] a timely basis or at all."  Mem. at 11.  Moreover, in a separate email exchange in which Mr. Kirk discussed this view with Mr. Kramer, Mr. Kramer thanked him and

---

[37] To the contrary, in an email chain discussing the letter, Emergent personnel noted that "[a]ctions to close the identified deficiencies are all readily achievable," and "[s]ome have already been completed."  RJN Ex. 9 at EBSI_HCOR_0033062.

-22-

responded that "[w]e should discuss bringing in outside resources to get in front of this, while we recruit permanent resources to lead," suggesting the good-faith belief of Emergent's management that Emergent's efforts were not doomed and that Emergent was actively working to put itself in a position to succeed.  The Complaint nowhere alleges that these resources were not brought in—in fact, it alleges that they were.  *See, e.g.*, ¶ 62 (alleging a "massive hiring effort"); *see also* Mem. Ex. 1.

- The Report next claims that "[d]espite Emergent's executives' private acknowledgement that its quality systems were deficient," it entered into contracts with J&J and AstraZeneca.  RJN at 25.  The only support for the supposed "private acknowledgement" is the exhibits discussed above, which do not support that conclusion.  In the RJN, Plaintiffs claim that the deficiencies "ran counter" to the contracts, *id.*, but offer no explanation for this assertion and only cite the contracts (without pincites) in support.

- The next exhibits cited by the Report are two drafts of a document prepared by Emergent employees (other than Individual Defendants), purportedly for a meeting to prepare for a September 2020 FDA site visit.  RJN Ex. 1 at 7-8.  There is no indication any Individual Defendant saw or was involved in preparing the document.  Similarly, there is no indication that any of the statements in the drafts made their way into any final version of the document (to the extent the document was ever even used).  Regardless, none of the portions of the draft upon which Plaintiffs focus demonstrates the falsity of any challenged statement.  First, Plaintiffs isolate the comment "Our risk is high!" from the rest of the document, omitting all context as to how Emergent was managing risk.[38]  Plaintiffs also take issue with the

---

[38] For example, the document describes that "Internal Audit [was] using external consultants, BARDA audit, AZ Audit, Janssen audit – all of the findings quickly used to develop an

statement "we are not in full compliance yet – BUT – we are making batches NOW," yet omit that the document proceeded to describe numerous layers of oversight employed to mitigate risk while improvements were put in place, including adding external consultants and experts "in all facets of the operation/organization" with "full support of Emergent Executive Management Team (spending what is needed to achieve commercial GMP compliance readiness in short order)." RJN Exs. 18, 19. Rather than show that the risk was greater than disclosed, these measures show that Emergent was actively working to *reduce* the level of risk. Plaintiffs also focus on the statement, "We have been operating a clinical phase GMP Quality System (phase appropriate with a lot of flexibility) until the pandemic hit – we lack commercial GMP compliance maturity." RJN at 26. But Plaintiffs do not challenge any statement in which Emergent said that it had commercial GMP compliance maturity—in fact, Emergent repeatedly disclosed that its programs to manufacture vaccine drug substance were "under development and will be complex," Mem. at 11. Similarly, Plaintiffs take issue with the statement "We have little to no (FDA) Regulatory inspection experience," without identifying any challenged statement implying otherwise. Finally, Plaintiffs challenge various statements about the need to manage the inspection (*e.g.*, "Only SUPER [Subject Matter Experts] (already known to FDA if possible) will be allowed to interact (for the most part) – this way we can consistently manage the message of continuous improvement and build confidence with FDA"). RJN at 26. But Plaintiffs fail to explain how these efforts increased the risk of manufacturing error or contamination. If anything,

---

accelerated quality improvement plan for commercial GMP readiness <u>with the full support</u> of Emergent Executive Management Team." RJN Ex. 18 at EBSI_HCOR_0032965.

they evidence a commonsense approach to managing the inspection to make sure FDA had access to the most knowledgeable individuals.  RJN Ex. 18 at EBSI_HCOR_0032965-66.

**Finding 4.**  The fourth finding—"that J&J and AstraZeneca identified multiple deficiencies at Bayview which Emergent failed to remediate despite urgent warnings" (RJN at 26-29)—is conclusory and unsupported by the exhibits cited.  The exhibits also fail to render any challenged statement false or misleading.

- The first exhibit is an email chain in which an AstraZeneca employee raised concern about the three deficiencies identified in the OPMA letter.  RJN Ex. 14.  The email only further supports that the identified deficiencies were unrelated to the allegedly omitted risks and that Emergent was nevertheless working diligently to address them, however.  For example, AstraZeneca acknowledged that "[it] was clear from [a review by AstraZeneca] that a lot of action [sic] have and are being taken to address the situation."  RJN Ex. 14 at AZ_COR_001349.  And in response, Mr. Kirk offered to discuss Emergent's plans to remediate, noted that the observations related to "analytical testing of a specific product," and explained that Emergent had "brought to bear a significant number of additional resources and external support."  *Id.* at AZ_COR_001348.

- The next exhibit (RJN Ex. 17) is the Warp Speed Report, which was an exhibit to the Memorandum.  Mem Ex. 45.  It fails to support the allegations in the Complaint for the reasons stated.  Mem. at 24-25.  Contrary to Plaintiffs' assertion, the Warp Speed Report did not "confirm[] that Emergent had not yet addressed the FDA's April 2020 finding[s]."  RJN at 27.  It does not even purport to make any such assessment.  To the extent it acknowledges those findings at all, it simply describes that Emergent had not yet sent a response to the June

-25-

11, 2020 letter and states that "Emergent is working with BARDA to have a discussion with FDA." RJN Ex. 17 at EBSI_HCOR_0020165.

- The RJN next asserts that "[a] letter from AstraZeneca to the House Committees confirmed that Emergent began manufacturing the first commercial batches of AstraZeneca's vaccine in late July 2020 before remediating all deficiencies." RJN at 27. The RJN does not include this letter, however, and there is no indication that AstraZeneca had reached this conclusion contemporaneously; it is pure hindsight. *In re Marriott Int'l, Inc.*, 543 F. Supp. 3d at 139.

- The RJN next asserts that an FDA official told the Committee that in September 2020, FDA found Bayview's manufacturing practices were non-compliant and gave Emergent guidance for compliance. RJN at 27. Neither the RJN nor the Report explains in what respect the practices were not compliant or that the deficiencies posed a risk greater than disclosed. They also do not allege that Emergent could not or did not implement FDA's guidance.

- The next exhibit is an October 2020 email from a J&J employee to redacted recipients. RJN Ex. 20. Plaintiffs focus on the statement that "Emergent has been challenged with all the holistic gap assessments / improvement projects to maintain focus on basic GMP standards." *Id.* The email does not conclude, however, that Emergent could not or would not meet that challenge. In fact, the email notes progress on several fronts.[39]

---

[39] For example, with respect to a Qualification Audit follow-up item, it states that an assessment was "on target to be approved by the end of the month." RJN Ex. 20 at JNJ_HOUSE_COR00000927. Regarding a Quality Standards Gap Assessment, the email states that "28 of 36 elements have been completed to date." *Id.* at JNJ_HOUSE_COR00000928. And regarding a Retrospective Deviation Review, it states that the review was "97% complete." *Id.*

- The next exhibits are emails between J&J and Emergent personnel describing actions to be completed before manufacturing.  RJN Exs. 21, 22, 23.  The emails nowhere suggest that the actions could not or would not be taken.

- The next exhibit is an internal J&J email describing its decision to move forward with manufacturing batches of vaccine drug substance.  RJN Ex. 25.  Plaintiffs highlight that the email states that the decision "is not without known risks," (RJN at 27) but omit that it also states, "[a]s a team we agreed that we can live with the risks and there are enough controls in place to ensure that all outstanding issues will be addressed prior to any material being released."  RJN Ex. 25 at JNJ_HOUSE_COR00000990.  The email also describes the remediation of many observations that Plaintiffs highlight from prior inspections.  For example, with respect to mold (upon which Plaintiffs are focused), it states, "2020 3Q EM trend shows no significant mold problem in Areas #1/2.  Emergent has implemented extensive training which has resulted in lower EM trends."  *Id.*  It also states, "Most equipment was in its final location and areas were not as cluttered/disorganized as the visit on October 20th," and "Gowning areas were fully stocked, well organized and maintained in a compliant manner" with "[n]o additional follow-up needed."  *Id.*  Far from suggesting that Emergent was doomed to fail, the email suggests that risks were under control.  In any event, Emergent never told investors that manufacturing COVID-19 vaccine drug substance was riskless—it repeatedly disclosed the opposite.  Mem. at 11.

- The next exhibit is an email from a consultant about Emergent's response to an FDA inspection concerning the qualification of two pieces of unspecified equipment.  RJN Ex. 24.  Plaintiffs make much of the email's tone (e.g., "And I am stating very loudly that this work in NON-CGMP compliance.  And a direct regulatory risk."), RJN at 27, but the email does

not provide any context suggesting that the state of the two pieces of equipment heightened manufacturing or contamination risk (or even that the consultant's concerns were valid or went unaddressed). Indeed, the Report explicitly states that it makes no conclusion as to whether the concerns were addressed. RJN Ex. 1 at 8.

- The RJN next focuses on statements from AstraZeneca representatives to the Committee describing that in November 2020, AstraZeneca sent teams to Bayview to help identify and control microbial contamination at Emergent's request. RJN Ex. 1 at 9. AstraZeneca purportedly identified the root cause as "poor cleaning" and identified "potential issues" that were "likely" related to microbial contamination. *Id.* Neither the RJN nor the Report concludes that AstraZeneca's efforts to assist in controlling contamination were unsuccessful. Far from suggesting that the risk of contamination was greater than disclosed, the statements suggest that Emergent was working to control them.

- The next exhibit is email correspondence between Emergent personnel discussing the status of various action items. RJN Ex. 26. Plaintiffs make much of a question about when certain trash bags would be removed (RJN at 28), but there is no indication from the email that the issue was not addressed or that it increased the risks to a level beyond what Defendants disclosed. Plaintiffs also focus on the statement that "AstraZeneca 'said lack of GMP fundamentals (gowning, clean room behavior, etc) contributing to bioburden issue,'" (RJN at 28) but similarly do not demonstrate that it was not being addressed.

- The next exhibit is email correspondence from AstraZeneca to a number of its commercial partners describing an increase in cross-contamination of control cells with AstraZeneca's vaccine drug substance. The RJN implies that the cross-contamination was caused by Emergent, but the email does not support that inference. Multiple commercial partners other

than Emergent were included on the email and AstraZeneca stated the issue occurred at "multiple sites." Even if somehow all the cross-contamination was caused by Emergent, it never represented that cross-contamination could not occur. Regardless, the cross-contamination at issue (with a control cell) is not the same as the cross-contamination that occurred in March 2021 (among batches of drug substance), and the Complaint pleads no facts to support that this issue portended the March 2021 contamination incident.

- The next exhibit is an internal AstraZeneca document that purports to be an invitation for a meeting in advance of a call with Emergent. RJN Ex. 28. Plaintiffs focus on the bullet "10 rejected batches to date (nearly $30M in liability), some very clearly GmP deficiency related." *Id.* Plaintiffs omit, however, that the bullet is under the heading, "[w]ould like to line up our facts," and that the purpose of the meeting was clearly to test factual arguments in advance of a discussion with Emergent about the failed batches. *Id.*

- The next exhibit is an FDA-prepared summary of a meeting with Emergent discussing a June 2021 inspection. RJN Ex. 37. Plaintiffs assert that the document demonstrates Emergent "still had not made needed corrections," (RJN at 28) but the document makes no such conclusion. Although it identifies concerns to be remediated, it does not state that Emergent failed to implement any of its prior remediation plans or even state the concerns are the same as those raised previously. It also does not conclude that the concerns identified posed risks greater than what Defendants already disclosed. The document also states that no Form 483 would be issued. RJN Ex. 37 at EmerCly_0005728.

**Finding 5.** The fifth finding—that "inexperienced staff and high staff turnover contributed to the vaccine contamination" (RJN at 29-30)—is irrelevant. The Complaint does not challenge any statements about Emergent's staff or identify a statement that was misleading

for failure to disclose details about Emergent's staff.  Emergent was also clear that it was hiring

many new employees.  *See* ¶ 153 (challenging statements made in news article describing the

"significant" number of new employees).  In any event, Emergent was hiring new employees

precisely to mitigate the risk of contamination or other manufacturing errors.

- The first exhibit is the same email discussed above in which Mr. Kramer proposed bringing
  in resources to address Mr. Kirk's concerns.  The email was written before the contamination
  incident and does not conclude as to its cause.  RJN Ex. 10.  In any event, Mr. Kramer's
  response was to propose specific mitigation strategies to address Mr. Kirk's concerns.

- The next exhibits are two monthly reports to HHS from July and August 2020.  Contrary to
  the RJN's assertion, the reports do not state that "its staff were mostly 'temporary
  employees.'"  RJN at 29.  Instead, it stated that because "most temporary employees having
  little or no pharmaceutical experience, the need to increase the rate of experienced, full time
  hires remains."  RJN Ex. 30 at 4.  The documents further suggested that Emergent was
  actively working to hire both temporary and full-time employees.

- The next exhibit is an email from Mr. Husain to AstraZeneca and Emergent personnel with
  an update in lieu of a meeting.  RJN Ex. 31   Plaintiffs focus on the statement that Emergent
  had a new Senior Director "that will be fully focuse[d] on processes and people."  RJN at 29;
  RJN Ex. 31.  Plaintiffs nowhere explain how the email evidences that the risk of
  manufacturing errors or contamination was greater than what Defendants disclosed.  If
  anything, it demonstrates that Emergent was diligently working to mitigate any such risk.

- The RJN next purports to describe committee briefings by J&J, AstraZeneca, and FDA.  RJN
  at 29.  The RJN states that these parties "noted that Emergent staff actions were 'not
  acceptable,'" but the Report includes no such quotation when describing the briefings.

*Compare* RJN at 29 *with* RJN Ex. 1 at 12. The Report's explanation that it was asserted during the briefing that Emergent changed the personnel within two positions twice and that this made coordinating "difficult" also does not demonstrate that the risk of contamination incidents was greater than what Defendants disclosed. Further, J&J's conclusion during the briefing that the cross-contamination incident was caused by Emergent personnel not decontaminating or disposing of waste properly is a conclusion reached in hindsight. *In re Marriott Int'l, Inc.*, 543 F. Supp. 3d at 139.

- The next exhibit is purportedly a set of talking points that J&J prepared for an April 3, 2021 discussion with Mr. Kramer. RJN Ex. 32. Plaintiffs focus on a statement that J&J received "signals" that "FDA is very unhappy" and that they had "expressed specific concerns about [us] continuing even at risk to fill your [drug substance] into vials." RJN at 29-30. The talking points make no mention of Emergent's employee turnover. In any event, despite FDA's supposed unhappiness, it ultimately permitted Emergent to resume manufacturing after the contamination incident. ¶ 213.[40]

- The next exhibit is an April 2021 email exchange between J&J and Emergent personnel in which J&J raised that employees had crossed over a line of demarcation in the warehouse and that some personnel appeared to be unsure which bins could travel to which locations and how to clean and disinfect certain items. RJN Ex. 33. Plaintiffs assert that this email shows that Emergent did not address the matters purportedly discussed using the talking points described above. RJN at 29-30. There is no apparent connection between the talking

---

[40] Plaintiffs also omit statements by J&J supporting that FDA's scrutiny of Emergent was unusual (*e.g.*, "[e]very small thing is amplified thousands of times over," "[t]hings that are not noticed in normal times are now huge problems in today's world," "[w]e know it is not easy to start-up a new process yet we also are expected to have a high level of compliance every minute of everyday"). RJN Ex. 32.

points and the email, however.  Moreover, Plaintiffs omit that Emergent personnel responded with a list of steps the company had taken to address the observations.  RJN Ex. 33.

**Finding 6.**  The sixth and final finding—that HHS terminated its contract with Emergent because it "*failed to follow federal manufacturing standards*" (RJN at 30)—is not supported by the material cited in the report and irrelevant.  The finding is supported solely by a BARDA director's statement during a Committee briefing that HHS could have sought to terminate its contract with Emergent for default or cause but that it chose to terminate for convenience "to avoid a legal battle."  RJN at 30.  The reality is that HHS did not terminate for default or cause.  Even if it had, Emergent warned investors that termination of one or more of its contracts could result from problems during manufacturing.  Mem. at 10.

**B.     The Allegations Concerning Financials and Projections Do Not State a Claim**

Plaintiffs do not address the arguments that alleged "reported results fraud"[41] amounted to nothing more than accurate reports of revenue, net income, and earnings and forward-looking projections (Mem. at 27-29).  Nor do Plaintiffs address the case law holding that numbers reported accurately in earnings statements are not actionable.  *See In re Toronto-Dominion Bank Sec. Litig.*, 2018 WL 6381882, at *9 ("Considering the strength of the case law in this area, this Court will dismiss any claims – to the extent they are made – which are premised on numbers reported in the earnings statements.").  Instead, Plaintiffs recast their argument as an alleged violation of SEC Regulation S-K, Item 303.  This is a red herring.  "There is no private right of action under SEC Regulation SK," and "because the materiality standards under [Rule] 10b–5 and Regulation S–K 303 differ significantly, a violation of Regulation S–K does not lead to a failure to disclose under 10b–5."  *Shah v. GenVec*, *Inc*., No. DKC 12-0341, 2013 WL 5348133,

---

[41] ¶¶ 220-227.

at *15 (D. Md. Sept. 20, 2013) (citations omitted).  Where "plaintiffs have failed to plead any actionable misrepresentation or omission under [Rule 10b–5], SK–303 cannot provide a basis for liability." *Id*. (citing *Oran v. Stafford*, 226 F .3d 275, 288 (3d Cir. 2000).

As Defendants articulated in their Memorandum, Plaintiffs' allegations are insufficient to impart liability.  Plaintiffs do not allege that Defendants' reported financial results were false, nor do they allege that the future projections constituted guarantees or were supported by "specific statements of fact" that could make them actionable.  *Graff v. Prime Retail, Inc.*, 172 F. Supp. 2d 721, 725-27 (D. Md. 2001), *aff'd sub nom. Marsh Grp. v. Prime Retail, Inc.*, 46 F. App'x 140 (4th Cir. 2002) (declining to impose liability based on earnings reports that were either "accurate reports of current results or immaterial forward-looking statements").  At most, Plaintiffs allege a failure by Emergent to disclose general corporate mismanagement, which is not actionable under the securities laws.  *Id*. at 728.

### C.    The Allegations Concerning SOX Certifications Do Not State a Claim

Plaintiffs attempt to revive their argument that Defendants' SOX certifications were false or misleading because of the purportedly undisclosed risk of contamination and other operational risks.[42]  Plaintiffs rely primarily on Mr. Kramer's hindsight conclusion in his Congressional testimony that a control failure led to the contamination incident.  Opp at. 27.  But the SOX certifications Plaintiffs cite in the Amended Complaint as alleged false statements certified the company's internal control *over financial reporting alone*, not any other type of "internal controls."  ¶¶ 232, 233.  That Mr. Kramer made a subsequent statement concerning operational controls does not render prior statements expressly regarding financial controls inaccurate or actionable.  Plaintiffs must state a claim based on what Messrs. Lindahl and Kramer actually said

---

[42] ¶¶ 231-35.

in the SEC filings, and their statements regarding internal controls concerned financial controls specifically.  Moreover, nothing in SOX suggests that *manufacturing controls as distinct from financial controls* fall within the ambit of a SOX certification.  As Plaintiffs' cited authority recognizes, Congress enacted SOX "to restore investor confidence in the wake of numerous, highly-publicized, cases of accounting fraud."  *City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 417 (D. Del. 2009).  As then Senator Biden declared on the floor of the Senate, the remedial purpose of the statute is to "ensure that corporate executives certify that their books are not cooked and that their numbers are truthful."  *Id*. (internal quotation and citation omitted).  Plaintiffs do not allege accounting fraud.  Therefore, the SOX certifications are not actionable.  *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 757-58 (S.D.N.Y. 2017).[43]

In the alternative, Plaintiffs argue once again that Messrs. Kramer and Lindahl's SOX certifications were false insofar as they did not disclose any alleged fraud relevant to Emergent's financial condition to the audit committee.  As Defendants explained, however, Plaintiffs failed to allege any facts about what was or was not disclosed to the audit committee.  Mem. at 29-30.  Plaintiffs ask the court to draw an inference from "the FAC's allegations" (spanning 225 pages).  Opp. at 28.  Plaintiffs cannot excuse themselves of the burden to plead fraud with particularity under Rule 9.  Moreover, as set forth above, Emergent's SEC filings included lengthy risk disclosures covering the specific risks at issue here (which Plaintiffs do not rebut).  *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 543 F. Supp. 3d at 141-42 ("Because

---

[43] Plaintiffs' attempt to distinguish Defendants' authority falls short.  Plaintiffs claim that "[u]nlike the FAC, the complaint *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 758 (S.D.N.Y 2017) 'does not concretely allege that any of Brasken's financial reports were in any way inaccurate.'"  Opp. at 29, n.50.  That is exactly like the FAC, in which Plaintiffs allege no facts that the financial reports were inaccurate.

neither the risk factor disclosures nor other statements identified by Plaintiff in Marriott's SEC filings were false or misleading or contained material omissions, Plaintiff's allegations regarding the SOX certifications fail.").

Contrary to Plaintiffs' representations, *City of Roseville Employees' Retirement System v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404 (D. Del. 2009) does not support that SOX certifications create liability for inadequate operational or manufacturing controls; in fact, the *Roseville* court held that plaintiffs did not state a claim for violation of the securities laws on *any* theory. *Id*. at 428. The *Roseville* court considered, but did not ultimately uphold, a theory that the defendant's SOX certifications were false or misleading because they failed to disclose that the defendant's revenue was obtained via a criminal price-fixing conspiracy. *Id*. at 419-20. In any event, the allegedly omitted fact related to the defendant's financials, not its manufacturing controls. Plaintiffs also cite *Kendall v. Odonate Therapeutics, Inc.*, No. 3:20-cv-01828-H-LL, 2021 WL 3406271, at *6 (S.D. Cal. Aug. 4, 2021) and *In re: Enzymotec Sec. Lit.*, No. 14-5556 (JLL) (MAH), 2015 WL 8784065, at *16 (D.N.J. Dec. 15, 2015). Neither sways the analysis. *Kendall* does not address SOX certifications at all, and *Enzymotec* concerned "internal controls over financial reporting," not manufacturing controls. 2015 WL 8784065, at *16.

## II.    THE COMPLAINT FAILS TO PLEAD SCIENTER

### A.    The Allegations Concerning "Red Flags" Are Insufficient

Plaintiffs insist that scienter can be inferred as to pre-contamination incident challenged statements from so-called "red flags" that are nothing more than the same CW statements, inspection reports, news articles, and Congressional reports that Plaintiffs use to allege falsity. *See* Opp. at 29-36. These allegations fail for the same reasons as the falsity allegations, namely the absence of any well-pleaded facts to support the conclusion that the risks of manufacturing

errors or contamination were greater than what Defendants disclosed.  *See DeMarco v. DepoTech Corp.*, 149 F. Supp. 2d 1212, 1232 (S.D. Cal. 2001) (in the absence of false or misleading statements, scienter analysis "entails the illogical inquiry into whether the defendant intended to deceive when, in fact, there was no deception").

Rather than engage with Defendants' arguments regarding the CWs, Plaintiffs take issue with Defendants' characterization that the Complaint "only" bases its scienter pleading on CW1 and CW5.  Opp. at 29, n.52.  It was the Complaint that singled out CW1 and CW5, however, not Defendants.  *See* ¶ 261(a).  The other CWs make no mention of any Individual Defendant, did not report to any Individual Defendant, and were not in position to have any information regarding Individual Defendants' knowledge.  *In re Marriott Int'l.*, 543 F. Supp. at 145 (rejecting CWs because "none of the Confidential Witness allegations are regarding what any of the Individual Defendants actually knew about Marriott's cybersecurity or the falsity of any statements"); *see also KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 609 (4th Cir. 2021) (same).  None of Plaintiffs' cited authority permits an inference of scienter from these CW allegations.[44]

---

[44] *See Ollila v. Babcock & Wilson Enters., Inc.*, No. 3:17-cv-109, 2018 WL 792069 (W.D.N.C. Feb. 8, 2018) (finding inference of scienter where CWs who did not directly interact with individual defendants nevertheless alleged details of information defendants were provided in reporting prepared by the CWs); *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 17 Civ. 1580 (LGS), 2018 WL 2382600, at *10 (S.D.N.Y. May 24, 2018) (same); *see also Institutional Inv'rs. Grp. v. Avaya, Inc.*, 564 F.3d at 270 (finding inference of scienter where CWs alleged widespread corporate culture of dishonesty and illegal schemes); *In re Toronto-Dominion Bank Sec. Litig.*, 2018 WL 6381882, at *13 (same); *Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 671 (D.S.C. 2016) (same).  The other cases that Plaintiffs cite are simply irrelevant.  *See Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 682 (5th Cir. 2014) (defendants conceded that CW's allegations were relevant); *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 483 (S.D.N.Y. 2018) (defendants argued CW did not have access to information to support falsity allegation, not that CW did not interact with individual defendants in alleging scienter).

Despite their alleged access to Mr. Husain, CW1 and CW5 also fail to support an inference of scienter.[45] The CWs' allegations regarding meetings Mr. Husain led remain vague and conclusory. The Opposition claims that "***all*** COVID-19 projects and their problems were discussed" at these meetings. Opp. at 32. The CWs do not actually allege that "all problems" were discussed, however. ¶¶ 60, 65. Regardless, the allegations remain untethered to the risks Plaintiffs allege Defendants downplayed. Plaintiffs again focus on CW1's allegation that Mr. Husain was told about "mold problems," Opp. at 31, but none of the challenged statements discussed mold; Defendants repeatedly disclosed manufacturing risks; and CW1's allegations fail to demonstrate Mr. Husain knew those warnings were deficient.

Plaintiffs next point to FDA inspection reports and Emergent's responses as "red flags." Having failed to demonstrate that the FDA reports established that the risks of manufacturing errors or contamination were greater than what Defendants disclosed, however, the fact that Defendants read or received them does not support an inference of scienter. The only pre-contamination incident report regarding Bayview identified nothing more than routine and correctable issues. Mem. at 22.[46] Similarly, after-the-fact media reporting and Congressional investigations fail to support an inference of scienter because they do not say anything about Defendants' knowledge, other than that they were aware of various FDA and audit reports—all of which independently fail to support an inference of scienter. *Id.* at 21-25.

---

[45] Plaintiffs misstate the Complaint's allegations about CW1's tenure at Emergent which, as pled, apparently spanned only nine months. *Compare* Opp. at 31 *with* ¶ 28.

[46] Plaintiffs take issue with Defendants' assertion that the Form 483s and Emergent's responses fail to support a cogent theory of scienter because versions of each were available to the public, alleging that Lead Counsel could only obtain these through FOIA requests. This is simply not true. The two Bayview Form 483s and Emergent's responses were published on the FDA's website in April and May 2021.

###### B.        The Defendants Did Not Admit Scienter

Plaintiffs insist that Defendants admitted to securities fraud.[47]  First, Plaintiffs focus on Mr. Kramer's statement in a November 2021 op-ed that continued investment in Bayview was necessary to maintain readiness and that the government did not provide Emergent with necessary drug development work.  Plaintiffs assert that Mr. Kramer did not reach this conclusion in hindsight, but rather that it was an "after-the-fact *admission*" of an *ongoing* conclusion.  Opp. at 37.  The op-ed does not say any of this.  Far from admitting that he knew all along that investment in Bayview was insufficient, Mr. Kramer described Emergent's own significant investment in the facility.  And in any event, the Complaint does not challenge any statements about investment in Bayview, nor does it allege facts sufficient to show that the level of investment rendered Emergent's statements about the risks of manufacturing error or contamination misleading.[48]  It remains implausible that Emergent would make such an investment if the venture was doomed.  *Cozzarelli v. Inspire Pharms.* Inc., 549 F.3d 618, 622, 627 (4th Cir. 2008).

---

[47] Plaintiffs assert Defendants failed to challenge two of these "admissions," thereby waiving argument: (1) Mr. Kramer said he reviewed the Janssen Report and that its findings were recorded in Emergent's systems; and (2) Mr. Kramer said he took "full responsibility" for the contamination incident.  Defendants have not waived anything.  The Janssen Report does not establish that the risk of contamination or manufacturing error was greater than what Defendants disclosed.  Mem. at 24-25.  Thus, whether Mr. Kramer read the Report is irrelevant.  As to Mr. Kramer's accepting responsibility, in the same Complaint paragraph, Plaintiffs bolded numerous dates on which Mr. Kramer said he learned certain information (¶ 263), which Defendants reasonably assumed was the portion of the statement that Plaintiffs were alleging amounted to an admission of scienter, as opposed to a general platitude.  Regardless, Mr. Kramer accepted responsibility for the contamination incident, not any supposed securities fraud.

[48] Plaintiffs' contention that reports from the government, J&J, AstraZeneca, Emergent and Congress "make clear that Emergent's investment was insufficient," fails because Plaintiffs do not identify any conclusions from those reports to that effect.  Even if those reports had made such a conclusion, it would necessarily have been reached in hindsight.

Plaintiffs next focus on Mr. Kramer's April 2021 CNBC interview in which he stated it "wasn't the case where an ingredient from one vaccine contaminated or impacted the other." As the Complaint alleges, Emergent thereafter explained the Mr. Kramer "simply misspoke." ¶ 250 (emphasis omitted). Plaintiffs assert that it is more plausible that Mr. Kramer's statement was part of an "organized counter-narrative blitz," (Opp. at 38) despite the fact that (1) the reporter said during the same interview that the cause of the incident was cross-contamination (and the media reported the same just prior), (2) that FDA would shortly thereafter publicly confirm that conclusion, and (3) Emergent would itself direct investors to FDA's statement. Mem. at 34. It is not plausible that Mr. Kramer intended to deceive when his statement had little capacity to do so.[49] Plaintiffs also ignore that the interviewer repeatedly suggested (incorrectly) that the cause of the incident was not just cross-contamination, but an ingredient "mix-up," which is different and explains why Mr. Kramer used the terminology he did. *Id.* at 34 n.24.

Plaintiffs next focus on Mr. Kramer's statement that he read FDA reports. Opp. at 39-40. That he read such reports says nothing about what he inferred from them, much less that he inferred something contrary to the Company's disclosures. Mem. at 34. The Opposition's only rejoinder is that Mr. Kramer said they were "correct" and "accurate." Opp. at 39. This is beside the point. The FDA reports say nothing about Emergent's disclosures. And even to the extent

---

[49] Plaintiffs' citations are distinguishable. In *KBC Asset Management NV v. 3d Systems. Corp.*, the court did not hold that misspeaking in response to a repeated question demonstrated scienter. Instead, it simply found that repeated statements about a product line supported the inference that it was a core operation. No. 0:15-CV-02393-MGL, 2016 WL 3981236, at *9 (D.S.C. July 25, 2016). In *In re Anadarko Petroleum Corp. Class Action Litig.*, contrary information was not provided in the same interview, in media reports beforehand, and thereafter by a regulator and the company itself—all of which further the inference here that the statement was inadvertent. 957 F. Supp 2d 806 (S.D. Tex. 2013).

that the reports included observations relevant to the risks of manufacturing errors or contamination, they did not offer any comparison to Emergent's disclosure.

Plaintiffs proceed to assert that statements by Mr. Kramer acknowledging that there were risks to producing the COVID-19 vaccine drug substance are also admissions of scienter. Opp. at 40. Defendants disclosed this very risk, however. Plaintiffs' arguments that those disclosures were insufficient are relevant to falsity, not scienter, and are also wrong. *See supra* at 1-17.

Plaintiffs also focus on Mr. Kramer's statement that the contamination incident was caused by a failure in controls. Plaintiffs concede that this conclusion was reached in hindsight, and thus it says nothing about what Mr. Kramer believed at the time of any challenged disclosure. Opp. at 40. Plaintiffs pivot, arguing that FDA reports put Defendants on notice of control deficiencies. This has nothing to do with Mr. Kramer's supposed "admission," however. And the FDA reports do not establish scienter. *See* Mem. at 21-22, 32, 34-35; *supra at* 37.[50]

Finally, Plaintiffs maintain that Mr. Kramer's giving a tour of Bayview to the Governor of Maryland somehow demonstrates scienter. Opp. at 41. Plaintiffs do not allege that Mr. Kramer visited Bayview regularly before the tour, that he saw a red flag while on the tour, or that anything during the tour would reveal that Defendants' disclosures were insufficient.

C.      **The Allegations Concerning Motive Are Insufficient**

1. **Stock Trading**

The Opposition attempts but fails to show scienter from allegedly suspicious stock sales. As Defendants' Memorandum outlines, approximately $10 million of the $11 million in trades Mr. Kramer executed during the Relevant Period were made pursuant to a 10b5-1 plan, which

---

[50] Defendants address the Opposition's argument that Mr. Kramer signed SOX certifications above. *See supra* at 33-35.

negates the inference of scienter.  Mem. at 36.  Plaintiffs argue that this is "a defense premature at the Rule 12(b)(6) stage."  Opp. at 44.  The Fourth Circuit disagrees.  *KBC Asset Mgmt.*, 19 F.4th at 611 (4th Cir. 2021) (trades pursuant to 10b5-1 plan "weakens any inference of fraudulent purpose"); *Yates v. Municipal Mortg. & Equity, LLC*, 744 F.3d 874, 891 (4th Cir. 2014); *In re Constellation Energy Grp., Inc. Sec. Litig.*, 738 F. Supp. 2d 614, 638 (D. Md. 2010).

The Opposition asserts in the alternative that Mr. Kramer's entry into a 10b5-1 plan was itself suspicious.  Opp. at 41-42, 44-45.  Plaintiffs fail to allege any material nonpublic information Mr. Kramer would have possessed at the time he entered the plan, however.  Mem. at 35-36.  Mr. Kramer entered into the plan on November 13, 2020.  ¶ 274.  At that time, Plaintiffs allege only that a single batch of COVID-19 drug substance had been destroyed in October and without any allegation that Mr. Kramer was aware the batch had been destroyed.  ¶ 119.  The Opposition's reliance on statements from *The Washington Post* and Senator Elizabeth Warren, which allegedly "decried these suspicious sales," Opp. at 42, adds nothing.

The limited number of sales Mr. Kramer made outside of his 10b5-1 plan also lack indicia of scienter as the trades were automatically triggered upon option grants to cover taxes.  Mem. at 36.  Plaintiffs claim that courts reject this argument, but the cited authority is inapposite.  Neither case addresses the situation here, in which the sales were triggered automatically.  *See City of Providence v. Aeropostale, Inc.*, No. 11 Civ. 7132(CM)(THK), 2013 WL 1197755, at *16 (S.D.N.Y. Mar. 25, 2013) (no allegation of insider trading in support of inference of scienter); *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 201 (S.D.N.Y. 2010) (no automatic sales triggered to cover taxes).[51]

---

[51] Plaintiffs' contention that this issue cannot be decided at the motion to dismiss stage is also without merit.  In *In re SLM Corp. Sec. Litig.*, the explanation for the sales was a disputed fact.

Setting aside the 10b5-1 plans, the fact that both Mr. Kramer's and Mr. Lindahl's holdings increased over the Class Period negates any inference of scienter.  Mem. at 36.  Plaintiffs encourage the Court to disregard this fact because the increase in shares resulted from the exercise of zero cost options.  Whether Messrs. Kramer and Lindahl purchased the shares on the open market or by exercising options, their accumulation and continued holding of shares is inconsistent with the theory that they were dumping shares to take advantage of supposedly inflated prices.  *Cozzarelli*, 549 F.3d at 628 (noting that the total holdings of each defendant increased during relevant period, "hardly suggesting that the defendants sought to dump their shares at an inflated price"); *Proter v. Medifast, Inc.*, No. GLR-11-720, 2013 WL 1316034, at *19 (D. Md. Mar. 28, 2013).  The case law that Plaintiffs cite does not demonstrate otherwise.[52]

Finally, Mr. Lindahl's trades are not suspicious because they made up only 17% of his holdings.  Mem. at 35-36.  In response to the weight of caselaw suggesting that such sales are not suspicious, Plaintiffs cite only a single case in which sales of 2.2% of shares were found suspicious.  Opp. at 43.  But Plaintiffs omit that in that case, the court found it significant that the shares sold converted to another class of stock that held a significant voting advantage, thus

---

740 F. Supp. 2d 542, 558 n.6 (S.D.N.Y. 2010).  Plaintiffs offer no dispute here, and the explanation comes directly from a Form 4 filed with the SEC, upon which Plaintiffs based their trading allegations.  Plaintiffs' other citation, which predates the PSLRA, involved a court disregarding the argument that negative tax consequences would follow if sales were not made (which would not be reflected in a Form 4 filing), not that the sales were automatic.  *See Rubinstein v. Collins*, 20 F.3d 160, 169 n.38 (5th Cir. 1994); Appellee Br. 1992 WL 12129439, at *8 n.3.

[52] *See Freudenberg*, 712 F. Supp. 2d at 201 (not addressing argument that overall holdings increased); *In re Sturm, Ruger & Co., Inc. Sec. Litig.*, No. 3:09-cv-1293 (CFD), 2011 WL 494753, at *8 (D. Conn. Feb. 7, 2011) (addressing argument that executives did not sell certain shares in order to exercise options to buy more shares); *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) (addressing argument that in analyzing percentage of holdings, court should consider vested options and shares gained by exercising options that were about to expire and would have been lost).

rendering the sale more significant than the number of shares alone would imply.  *See In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d at 646.

### 2.  Executive Compensation

The Opposition rehashes Plaintiffs' generic argument that because Defendants received performance-based compensation, they had a motive to commit fraud.  Opp. at 47.  Plaintiffs ignore, however, the well-established principles that (1) an executive's generalized motive to obtain job benefits is insufficient to plead scienter; and (2) the bare assertion that executive-level bonuses are "based in part" on financial performance is inadequate to plead scienter.  Mem. at 36-37 (citing cases).  This is particularly true when the compensation is not alleged to be tied to the stock price, and Emergent is not alleged to have misstated financials.  Instead, Plaintiffs cite cases (consistent with these principles), in which courts found motive to commit fraud where incentive compensation was directly tied to financial metrics or goals impacted by the alleged fraudulent scheme.  Opp. at 47 & n.74.

### 3.  Capital Raising Efforts

The Opposition argues that Defendants were motivated to defraud investors because (1) they sought to profit from government contracts, and (2) Emergent raised capital through a debt offering.  Opp. at 47-48.  These "types of generalized motives—which are shared by *all* companies—are insufficient to plead scienter under the PSLRA."  *See Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 352 (4th Cir. 2003).  Plaintiffs' authority is inapposite.  In *In re Genworth Financial Inc. Sec. Litig.*, the court inferred scienter because the defendant company initiated a public debt offering the "very next day" after the alleged misstatement and the alleged misstatements allowed the company to preserve its investment grade credit and debt ratings.  103 F. Supp. 3d 759, 786 (E.D. Va. 2015).  Here, Emergent closed a debt offering

months before any alleged contamination incident, ¶ 285, and there is no allegation that

Emergent was in jeopardy of losing its investment grade status.[53]  In *Beach v. Healthways, Inc.*,

the court found that plaintiffs had successfully alleged that defendants made false and misleading

statements regarding their government contracts, not that the existence of these contracts was

probative of scienter.  3:08-0569, 2009 WL 650408, at *1-2, 4-5 (M.D. Tenn. Mar. 9, 2009).

### 4.  The Complaint's Other Scattershot Allegations are Insufficient

The Opposition concedes that the Complaint's core operations and SOX certification

allegations are insufficient standing alone to support a strong inference of scienter, rejoining only

that the allegations must be viewed holistically.  Opp. at 48-49.[54]  Even so, the Opposition fails

to demonstrate how the sum of these threadbare allegations is greater than the parts.  *In re*

*Marriott Int'l, Inc.*, 543 F. Supp. 3d at 153.

The Opposition asserts that Emergent's code of conduct demonstrates scienter.  Plaintiffs

cite only *Chamberlain v. Reddy Ice Holdings, Inc.*, but there, the ethics policy specifically

---

[53] The citations that Plaintiffs relegate to a footnote fare no better.  *See In re Toronto-Dominion*, 2018 WL 6381882, at *18-19 (finding that even alleged misstatements "made directly before company offerings" were "not particularly helpful"); *In re Silvercorp Metals, Inc. Sec. Litig.*, 26 F. Supp. 3d 266, 275-77 (S.D.N.Y. 2014) (finding inference of scienter from debt offering allegations "weak," and inferring scienter from recklessness/misconduct allegations); *Kendall*, 2021 WL 3406271, at *8 (considering public offerings made within one to two months of alleged misstatements); *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 474 (S.D.N.Y. 2013) (considering offering where alleged misstatements occurred in March, May, and June 2010, before July 2010 offering).  Although Plaintiffs identify one out-of-circuit decision in which a court found that the motive to complete a public offering alone was sufficient to infer scienter, *In re Resource Am. Sec. Litig.*, the decision is against the weight of authority and another court in the same circuit rejected its reasoning.  *See In re Interpool, Inc. Sec. Litig.*, No. Civ. 04-321(SRC), 2005 WL 2000237, at *11 (D.N.J. Aug. 17, 2005).

[54] Indeed, Plaintiffs cite *Latham v. Matthews*, which remarks that no court has ever found that merely signing a SOX certification gives rise to an inference of scienter without alleging red flags that the signor recklessly ignored.  662 F. Supp. 2d 441, 467 (D.S.C. 2009).

forbade participation in market allocation agreements, such that the court could infer wrongful intent from the individual defendants' course of conduct.  757 F. Supp. 2d 683, 712 (E.D. Mich. 2010).  Here, Plaintiffs highlight only generic commandments not to make false statements or engage in insider trading.  Opp. at 50.  These are exactly the types of policies that fail to demonstrate scienter.  *See* Mem. at 38 (citing cases).

Plaintiffs' employee resignation allegations also miss the mark.  Rather than address the non-fraudulent explanations for the departures (Mem. at 39), the Opposition simply regurgitates what was alleged in the Complaint.  Opp. at 50-52.[55]  As to the alleged termination of Plaintiffs' "whistleblower," the Opposition likewise fails to address that the Complaint does not allege that the termination had anything to do with fraud.  Mem. at 39.

The Congressional investigation fails to support scienter for the reasons discussed.  *See supra* at 14, 17-32.  The SEC investigation remains just an investigation, which is insufficient standing alone to establish scienter. *See Lipow v. New1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 167 (S.D.N.Y. 2015).

## III.    THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 20(a)

Plaintiffs do not dispute that their Section 20(a) claim does not survive if the Section 10(b) claims are dismissed.  Opp. at 55.  Because the Section 10(b) claims fail for the reasons discussed *supra*, the § 20(a) claim should also be dismissed as well.

### CONCLUSION

For the foregoing reasons and those set forth in Defendants' opening brief, the Court should dismiss the Complaint with prejudice.

---

[55] Plaintiffs' Appendix A also misrepresents Ms. Oates' departure as having occurred on April 29, 2021, when the Complaint alleges that she departed the Company months later in November 2021.  *Compare* Appendix A at 2 *with* ¶ 304.

Dated:   March 2, 2023                          Respectfully submitted,

                                                 _/s/  William M. Krulak, Jr._____
                                                **MILES & STOCKBRIDGE P.C.**
                                                William M. Krulak, Jr. (Fed. Bar No. 26452)
                                                Ariana K. DeJan-Lenoir (Fed. Bar No. 20522)
                                                100 Light Street
                                                Baltimore, Maryland 21202
                                                (410) 385-3448
                                                wkrulak@milesstockbridge.com
                                                adejanlenoir@milesstockbridge.com


                                                **WILMER CUTLER PICKERING HALE AND
                                                DORR LLP**

                                                Michael G. Bongiorno (NY Bar No. 4347316)*
                                                7 World Trade Center
                                                250 Greenwich Street
                                                New York, NY 10007
                                                Michael.Bongiorno@wilmerhale.com
                                                Phone: (212) 230-8800
                                                Facsimile: (212) 230-8888

                                                Timothy J. Perla (MA Bar No. 660447)*
                                                Arjun K. Jaikumar (MA Bar No. 691311)*
                                                Kim A. Crowley (MA Bar No. 707072)*
                                                60 State Street
                                                Boston, MA 02109
                                                Phone: (617) 526-6000
                                                Facsimile: (617) 526-5000

                                                *** Pro hac vice*
                                                *Attorneys for Defendants*