# EXHIBIT 2

United States District Court
Southern District of Texas

**ENTERED**

April 14, 2021

Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MIRIAM  EDWARDS, *et al*,                §
                                         §
          Plaintiffs,                    §
VS.                                      §          CIVIL ACTION NO. 4:18-CV-4330
                                         §
MCDERMOTT INTERNATIONAL, INC.,           §
*et al*,                                 §
                                         §
          Defendants.                    §

## MEMORANDUM OPINION AND ORDER

Plaintiff Nova Scotia Health Employees' Pension Plan ("Nova Scotia") is the lead

plaintiff in this securities class action brought on behalf of purchasers of the common

stock of Defendant McDermott International, Inc. ("McDermott") between December 18,

2017 and September 17, 2019 (the "Class Period"). Nova Scotia has pled claims against

McDermott and two of its executives, President and Chief Executive Officer David

Dickson ("Dickson") and Executive Vice President and Chief Financial Officer Stuart

Spence ("Spence"), under Section 10(b) of the Securities Exchange Act of 1934

("Section 10(b)") and Rule 10b–5 promulgated thereunder ("Rule 10b–5"). *See* 15 U.S.C.

§ 78j(b); 17 C.F.R. § 240.10b-5. Nova Scotia has also pled claims of control person

liability against Dickson and Spence under Section 20(a) of the Securities Exchange Act

of 1934 ("Section 20(a)"). *See* 15 U.S.C. § 78t(a).

Nova Scotia alleges that the defendants misrepresented the financial health of

Chicago Bridge & Iron Company, N.V. ("CB&I") to investors in order to facilitate a

risky merger between McDermott and CB&I that guaranteed considerable financial

1 / 23

benefits to Dickson and Spence but was disastrous for McDermott shareholders, bankrupting the company and leading to ongoing SEC and federal grand jury investigations. Before the Court is a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) filed by the defendants. The motion (Dkt. 125) is **DENIED**.

## BACKGROUND

The pertinent factual allegations, drawn from Nova Scotia's live complaint and taken as true for the purposes of this motion, are as follows. McDermott provides technology, engineering, and construction services to the energy industry. (Dkt. 105 at p. 24) For much of its history, the company has "focused on upstream field development, with projects such as production facilities, pipeline installations, and subsea systems, and particularly offshore oil platforms for clients who are exploration and production companies." (Dkt. 105 at p. 25)

### *The Merger and Its Aftermath*

In 2017, McDermott was "healthy" and "profitable[,]" with $178 million in net income from $3 billion in revenue, and it "had an established upstream offshore presence in South and Central America and the Middle East[.]" (Dkt. 105 at p. 25) But it was not well-diversified—nearly two-thirds of its 2017 revenue and nearly half of its 2017 contractual backlog came from a single client, Saudi Aramco—and it had "little presence in the stable market of the United States." (Dkt. 105 at p. 25) McDermott was also viewed as a "potential takeover target[.]" (Dkt. 105 at p. 25) Dickson and Spence "discuss[ed] what steps to take next" to alleviate "concern[s] about [McDermott's] lack

2 / 23

of diversification" and its "sensitiv[ity] to the cyclical nature of [the oil and gas] industry and the changes in commodity prices." (Dkt. 105 at p. 25)

Dickson, Spence, and McDermott decided that the next step for McDermott was a merger with CB&I, an engineering and construction company that worked in the oil and gas industry and focused on downstream onshore operations, particularly the construction of petrochemical plants. (Dkt. 105 at p. 25) In December of 2017, McDermott entered into a business combination agreement with CB&I to effectuate a merger between the two companies. (Dkt. 105 at p. 30) Under the terms of the merger agreement, "CB&I would merge into McDermott and CB&I shareholders would receive 0.82407 shares of McDermott stock for each share of CB&I stock, and McDermott shareholders would own approximately 53% of the combined entity." (Dkt. 105 at p. 30) The press release announcing the merger stated that the transaction would create a "premier fully vertically integrated onshore-offshore company, with a broad engineering, procurement, construction and installation service offering and market leading technologies portfolio." (Dkt. 105 at p. 30) The merger closed on May 10, 2018. (Dkt. 105 at p. 239)

Commitment to the acquisition of CB&I led Defendants to reject at least one offer to purchase McDermott outright. In 2018, a competitor, Subsea 7, made an initial offer to buy McDermott for $7.00 a share, a premium of 16% over McDermott's then-share price of $6.05 a share. (Dkt. 105 at p. 247) Subsea 7 "said it would also consider increasing its proposed price upon further assessment of McDermott's business through discussions with McDermott management." (Dkt. 105 at p. 247) However, Dickson, Spence, and McDermott "never engaged Subsea 7 in any negotiations regarding a potential deal

choosing, instead, to continue with the proposed Merger with CB&I." (Dkt. 105 at p. 248–49)

The moves took some by surprise. At the time of the merger, CB&I was "basically bankrupt" and "[d]esperate" and "looking to sell business units . . . to raise badly needed capital." (Dkt. 105 at p. 29) The most coveted of those units was CB&I's technology business, Lummus ("the Technology Business"), which "held extremely valuable patents[;]" "had a very high profit margin[;]" and, according to the former Financial Operations Controller for CB&I's USA Oil and Gas Division, was the "gemstone in the rusty crown" that was CB&I. (Dkt. 105 at pp. 17, 29–30) Considering that McDermott could have purchased the Technology Business alone, CB&I employees found it "odd" that McDermott had purchased CB&I in its entirety "because a lot of CB&I seemed to be dead weight that should have been cut out from the deal." (Dkt. 105 at p. 30)

In the end, "dead weight" was an apt metaphor, as acquiring CB&I dragged McDermott's value down precipitously. McDermott's share price dropped 92.5% in less than two years after the merger and experienced multiple single-day double-digit percentage drops along the way as information about the merger's costs came to light. (Dkt. 105 at pp. 8–13) On November 4, 2019, McDermott filed a Form 10-Q with the Securities and Exchange Commission ("SEC") in which the company disclosed that the SEC had served subpoenas on the company on July 26, 2019 and was "conducting an investigation related to disclosures [McDermott] made concerning the reporting of

4 / 23

projected losses associated with the Cameron LNG project."[1] *See* McDermott Form 10-Q dated November 4, 2019.[2] McDermott filed for Chapter 11 bankruptcy protection on January 21, 2020. *See* Southern District of Texas bankruptcy case number 20-30336.[3] On May 8, 2020, McDermott filed a Form 10-Q in which the company reiterated that the SEC is "conducting an investigation related to disclosures [the company] made concerning the reporting of projected losses associated with the Cameron LNG project" and further disclosed that "a Federal Grand Jury is conducting a criminal investigation and [has] requested various documents, including cost forecasts and other financial-related information, related to the Cameron LNG project." *See* McDermott Form 10-Q dated May 8, 2020. The investigations are ongoing.

### *Defendants' Financial Disclosures and Statements*

When McDermott and CB&I merged, CB&I's contractual backlog included four large construction projects in the United States dubbed "the Focus Projects." (Dkt. 105 at p. 5) The Focus Projects consisted of two gas turbine projects, known as the Calpine Gas Turbine Power Project ("Calpine") and the IPL Project ("IPL"), and two liquefied natural gas export facility projects, known as the Freeport LNG Project ("Freeport") and the Cameron LNG Project ("Cameron"). (Dkt. 105 at p. 5) Nova Scotia alleges that, before

---

[1] The Cameron LNG project was part of CB&I's contractual backlog at the time of the merger.

[2] The Court takes judicial notice of the November 4, 2019 Form 10-Q filing, as well as the other SEC filings referenced in this opinion. *Izadjoo v. Helix Energy Solutions Group, Inc.*, 237 F. Supp. 3d 492, 506 (S.D. Tex. 2017) (J. Rosenthal) ("In securities cases, courts may take judicial notice of the contents of public disclosure documents that the law requires be filed with government agencies, such as the SEC, and that are actually filed with the agency.").

[3] The Court takes judicial notice that the bankruptcy petition was filed. "[I]t is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record." *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007).

the merger, "it was already internally apparent that the Four Focus Projects were gravely behind schedule and over budget and, as such, would vastly underperform their contracts." (Dkt. 105 at p. 8) The undisclosed risks and costs and improper accounting alleged in Nova Scotia's complaint largely revolve around the Focus Projects.

Defendants announced the proposed merger between CB&I and McDermott on December 18, 2017 (Dkt. 105 at p. 30) On that date, Dickson and Spence, along with CB&I's CEO, participated in a conference call. *See* McDermott Form 425 dated December 18, 2017. Dickson and Spence repeatedly told the analysts on the call that they had "dedicated a significant amount of time performing joint due diligence together with CB&I's team[,]" including "a great deal of due diligence" on the Focus Projects. (Dkt. 105 at p. 218) In response to a question about how McDermott had "priced in the potential risk" on the Focus Projects, Dickson said that the Focus Projects were "fairly well-progressed, so that takes out a lot of the risk that you would expect at the start-up." (Dkt. 105 at p. 62)

On February 20, 2018, CB&I disclosed $101 million in project charges for the Focus Projects for the fourth quarter of 2017. (Dkt. 105 at p. 73); *see also* CB&I Form 8-K dated February 20, 2018. Because of those project charges, CB&I's Engineering & Construction group posted a $41.2 million operating loss for the quarter. *See* CB&I Form 8-K dated February 20, 2018. CB&I reported a net loss of $1.5 billion for the full year 2017; CB&I had reported a net loss of $313.2 million in 2016. *See* CB&I Form 8-K dated February 20, 2018. Nevertheless, at a conference call the next day, Dickson said that Defendants were "even more confident" in the merger and that CB&I's financial

disclosures were no cause for alarm. (Dkt. 105 at pp. 72–73); *see also* McDermott Form 425 dated February 21, 2018. With regard to the Focus Projects specifically, Dickson told the analysts on the call that "[t]he potential for incremental overruns on [the Focus] projects was considered during our due diligence and these charges are well within the potential downside scenarios we contemplated as part of our due diligence." (Dkt. 105 at p. 73); *see also* McDermott Form 425 dated February 21, 2018. An analyst asked for clarification regarding whether CB&I's disclosure "impl[ied] that we're already starting off below where we wanted to or in line[.]" (Dkt. 105 at p. 73); *see also* McDermott Form 425 dated February 21, 2018. Dickson restated his prepared remarks, telling the analyst that:

> all of it is within our evaluation that we did during this due diligence period. Obviously, today, we're operating in separate companies, but credit to the CB&I management team they kept us posted as developments have occurred. So we're obviously monitoring the situation, but what I could say today is that it's in line with what we've been looking at and well within the work that we did during the due diligence.
> Dkt. 105 at pp. 73–74; *see also* McDermott Form 425 dated February 21, 2018.

McDermott and a subsidiary of CB&I filed proxy materials on January 24, March 2, March 23, March 27, and April 2, 2018. (Dkt. 105 at p. 83) The companies scheduled shareholder meetings on April 4, 2018 and May 2, 2018. (Dkt. 105 at p. 83) In its proxy solicitation materials, McDermott disclosed that one of its board members had voted against the merger with CB&I on the basis that the problems with the Focus Projects could "be difficult for McDermott's management to remedy (at least in the near term)[,]" rendering the transaction "too risky for McDermott[.]" (Dkt. 105 at p. 85); *see also*

7 / 23

McDermott Form S-4/A dated March 27, 2018. In a warning that proved prescient, the dissenting director recounted his experience as president and CEO of a company that had gone bankrupt after suffering $2 billion in losses related to its acquisition of "a business with two significant, fixed-price, lump-sum combined-cycle gas power plant projects[.]" (Dkt. 105 at p. 86); *see also* McDermott Form S-4/A dated March 27, 2018.

In response to the dissenting director, the proxy materials stated that "McDermott's management team . . . expressed the belief that, based on McDermott's due diligence and the experience and capabilities of the McDermott management team, the risks related to CB&I's four significant contracts that have negatively impacted CB&I's results of operations in recent periods could be managed and that similar problems could be avoided in the future through improved project management." (Dkt. 105 at p. 86); *see also* McDermott Form S-4/A dated March 27, 2018. The proxy materials did not mention internal forecasts by CB&I personnel that are discussed in more detail below and that supported the dissenting director's position regarding the Focus Projects. (Dkt. 105 at pp. 86–88) The CB&I internal forecasts indicated that CB&I's financial statements were underreporting costs for the Focus Projects by $1 billion. (Dkt. 105 at p. 53)

The proxy materials also omitted consideration of the CB&I internal forecasts for the Focus Projects from their calculation of the fair value of assets. (Dkt. 105 at pp. 88–89) The proxy materials instead "assumed" that, for assets other than intangible assets, "the fair value of all assets and liabilities equal[ed] their respective carrying values." (Dkt. 105 at p. 88–89); *see also* McDermott Form S-4/A dated March 27, 2018. Despite

Defendants' repeated claims of extensive due diligence and cooperation with CB&I, the proxy materials stated that McDermott "w[ould] not have full access to all relevant information" until the merger was approved and that "the fair value of CB&I's contracts in process, net of advance billings on contracts[,]" could change after the merger. (Dkt. 105 at p. 88–89); *see also* McDermott Form S-4/A dated March 27, 2018.

Defendants appeared to be somewhat vindicated just before the scheduled merger vote, when CB&I reported that it "did not incur any material project changes to the Focus Projects in the first quarter 2018[.]" (Dkt. 105 at pp. 92–98) In a Form 8-K dated April 24, 2018, McDermott stated that it had identified $350 million in potential savings in operating costs that could result from the merger. (Dkt. 105 at pp. 96–97); *see also* McDermott Form 8-K dated April 24, 2018. In a conference call the same day, Dickson noted that McDermott had rejected the Subsea 7 offer and was moving ahead with the CB&I merger. (Dkt. 105 at p. 97); *see also* McDermott Form 425 dated April 24, 2018. Dickson stated that McDermott's management had "spent considerable time with CB&I reviewing the project portfolio" and felt "very comfortable with the progress" CB&I had made to "de-risk" the Focus Projects. (Dkt. 105 at p. 98); *see also* McDermott Form 425 dated April 24, 2018.

The merger with CB&I closed on May 10, 2018. (Dkt. 105 at p. 34) After the merger, McDermott essentially bled out financially. On July 31, 2018, McDermott reported a $221 million change in cost estimates for the Focus Projects. (Dkt. 105 at p. 101); *see also* McDermott Form 8-K dated July 31, 2018. Dickson said that McDermott was "clearly disappointed with the increased cost estimates" but continued to insist that

"[t]he increases [we]re within the bounds of the scenarios [McDermott] contemplated during [its] due diligence[.]" (Dkt. 105 at p. 101); *see also* McDermott Form 8-K dated July 31, 2018.

The next quarter brought worse news. On October 30, 2018, McDermott disclosed that, "[f]or the third quarter of 2018, [it] recorded $744 million of changes in estimates" for the Focus Projects. (Dkt. 105 at p. 109); *see also* McDermott Form 8-K dated October 30, 2018. As a result, "goodwill[4] increased by approximately $782 million since the second quarter of 2018[,]" calculated as of the merger date—meaning that, five months after the merger, McDermott had determined that the price it had paid to purchase CB&I's assets exceeded the fair value of those assets by at least $782 million, a discrepancy almost entirely attributable to the cost of the Focus Projects. (Dkt. 105 at pp. 208–09); *see also* McDermott Form 10-Q dated October 30, 2018. Even so, Dickson said that McDermott "expect[ed] no further material changes in the cost estimates on [the Focus] projects" because McDermott's "first full quarter of ownership of CB&I" had given McDermott "the ability to fully grasp the magnitude of the challenges associated with our legacy Focus Projects[.]" (Dkt. 105 at p. 109–10); *see also* McDermott Form 8-K dated October 30, 2018.

There were additional material changes to the cost estimates, as well as additional assurances that McDermott and the Focus Projects were turning a corner. On February 13, 2019, McDermott disclosed that, "[f]or the fourth quarter of 2018, [it] expect[ed] to report an adverse change in estimate of approximately $168 million" for the Cameron

---

[4] Goodwill is the amount a buyer pays beyond the book value of an acquired company's assets.

project. (Dkt. 105 at p. 212); *see also* McDermott Form 8-K dated February 13, 2019. On a February 25, 2019 earnings call, Spence said that the second half of 2019 was "likely to be stronger than the first half" and that "[o]perating cash flow [wa]s similarly expected to be stronger in the second half, as [McDermott would] begin to see reduced outflows on the focus projects." (Dkt. 105 at p. 117)

On July 29, 2019, McDermott disclosed a net loss of $146 million and an operating loss of $61 million for the second quarter of 2019, along with a $205 million cash burn tied to the Cameron project. (Dkt. 105 at p. 213); *see also* McDermott Form 8-K dated July 29, 2019. Dickson acknowledged the "weaker than expected" second-quarter numbers but stated that McDermott "expect[ed] to see a sharp improvement in [its] operating income by the fourth quarter of this year, as [it] buil[t] momentum heading into 2020." (Dkt. 105 at p. 202); *see also* McDermott Form 8-K/A dated July 30, 2019.

But the Focus Projects ultimately sank McDermott before that "sharp improvement" could come. The SEC began its investigation on July 26, 2019 (though the investigation does not seem to be mentioned in McDermott's SEC filings until November 4, 2019), and McDermott filed for Chapter 11 bankruptcy protection on January 21, 2020. On its website, McDermott explained that it filed for bankruptcy protection because "the 'focus projects' (Freeport and Cameron LNG) have significantly strained McDermott's finances, and have made it difficult to maintain a timely balance between cash received from customers and cash spent on projects."[5]

---

[5]The Court takes judicial notice of this explanation on McDermott's website. *See Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*, 325 F. Supp. 3d 728, 746 n.3 (N.D. Tex. 2018),

### *Nova Scotia's Allegations Regarding the Cost of the Focus Projects and the Companies' Internal Estimates*

According to several CB&I and McDermott project directors, cost managers, and executives discussed in Nova Scotia's complaint, "to accurately account for [the Focus Projects], McDermott needed to take $1 billion or more in charges at the Merger closing and to clearly state that the Four Focus Projects would create an ongoing cash burn in the hundreds of millions of dollars each quarter." (Dkt. 105 at p. 51) The Financial Operations Controller for CB&I's USA Oil and Gas Division said that the Cameron project—the subject of the ongoing SEC and federal grand jury investigations—alone was $1 billion over budget as of November of 2017 and was projected to have project end costs of at least $1 billion over project budget. (Dkt. 105 at pp. 52–53) The Controller further stated that CB&I's "management was ignoring [that] forecast and using a more optimistic forecast." (Dkt. 105 at p. 53)

The Controller's account was seconded by a project controls director who worked on both the Calpine and Cameron projects, who "said there was such rampant corporate override of the Cameron project's costs at the end of 2017 and throughout the first quarter of 2018, that it was just a deception to stakeholders of the company." (Dkt. 105 at p. 52) The project controls director left McDermott on June 12, 2018, just after the merger closed, and stated in an exit interview and a report that Cameron would "lose an

---

*aff'd*, 935 F.3d 424 (5th Cir. 2019). The Court accessed the page at: https://www.mcdermott.com/CMSPages/GetAzureFile.aspx?path=~%5Cmdrsite%5Cmedia%5C pdf-docs%5Cfinal-public-faq-post-filing.pdf&hash=29edc26c55102ea2dd4d2ab923bafb487b128b646c1d77385a70ed0726714ef8.

additional 700MM to 1.2B before th[e] project [wa]s completed," that "$700 million to $1 billion more in cost should be reported on Cameron[,]" and that the "[p]roject cost forecast on the [Cameron] project [wa]s being overridden by corporate" in a way that was "deceptive to [the company's] stakeholders." (Dkt. 105 at p. 57)

Nova Scotia alleges that documents showing the accurate forecasts were part of Defendants' pre-merger due diligence; "[i]nternal CB&I documents" titled Risk Registers, "which were part of the extensive pre-Merger due diligence that McDermott conducted, confirm [the project controls director's] account that charges between $700 million and $1 billion would be incurred at Cameron before completion." (Dkt. 105 at p. 53) The Risk Registers "confirm[ed] that risks at Cameron were escalating between the fourth quarter of 2017 and the first quarter of 2018, contrary to Defendants' repeated statements touting a de-escalation of risk at the Four Focus Projects." (Dkt. 105 at p. 54) The project controls director, who helped compile the Risk Registers, "stated that, by the end of 2017, forecasted costs on Cameron had escalated well beyond what CB&I was budgeting and forecasting publicly" and that "the inaccuracy of publicly reported forecasts got worse as the Cameron project went on." (Dkt. 105 at pp. 37, 53)

The project directors, cost managers, and executives cited in Nova Scotia's complaint also claimed that, instead of correcting CB&I's improper accounting and cost forecasting practices after the merger, Defendants continued those practices. For instance, the cost manager for Cameron "stated that the practice of upper management altering cost forecasts downward before publicly reporting them continued unabated after McDermott closed the merger." (Dkt. 105 at p. 237) According to the Cameron cost manager, both

13 / 23

CB&I and McDermott "changed the forecasts provided by [the cost manager's] team and the Project Controls group for the Freeport project, as was done on the Cameron project." (Dkt. 105 at p. 49) The Cameron cost manager further said that with both CB&I and McDermott, top executives, including the CEO and CFO, "received both the real forecasted numbers in initial reports and later revised forecasts with better numbers, which would be publicly published." (Dkt. 105 at p. 237) The Cameron cost manager stated that Defendants Dickson and Spence specifically "knew the numbers because they came on site to Cameron, and [the Cameron cost manager] went over the true cost estimates with Spence." (Dkt. 105 at p. 38) Defendants Dickson and Spence also received emails containing "the complete package of Project Control's unaltered forecasts, including low-level details and their basis." (Dkt. 105 at p. 38)

Nova Scotia further alleges that, in addition to improperly manipulating forecasts, both CB&I and McDermott delayed payment every quarter to vendors and suppliers on other, more successful projects in order to inflate cash reserves and fund the Focus Projects, particularly Cameron and Freeport. (Dkt. 105 at p. 46) A project procurement director for both CB&I and McDermott referred to the practice as "robbing Peter to pay Paul" and "cooking the books[.]" (Dkt. 105 at p. 46) After the merger, in line with this practice, payment decisions over $50 million required review and approval by Defendant Spence and sometimes Defendant Dickson. (Dkt. 105 at p. 238) The project procurement director said that the practice jeopardized McDermott's other projects; "this conduct caused vendors to shut down, refuse new purchase orders, and/or refuse to ship materials for money-making projects because they had not been paid on Cameron or Freeport."

14 / 23

(Dkt. 105 at p. 46) On the Calpine and Freeport projects, McDermott also continued CB&I's practice of keeping "two schedules, one that was real and one that they showed to the client." (Dkt. 105 at pp. 48, 51, 238)

Nova Scotia alleges that McDermott's financial fortunes plummeted because "Defendants concealed the true risks of merging with CB&I rather than merely acquiring the Technology Business." (Dkt. 105 at p. 129) Dickson and Spence concealed the risks for financial reasons. The acquisition of CB&I elevated McDermott into a different Performance Peer Group of companies, "leading to Defendants Dickson and Spence receiving increases in their base and incentive compensation." (Dkt. 105 at p. 13) Dickson and Spence received "recognition bonuses"—$1,125,000 for Dickson; $637,500 for Spence—for their work on the merger. (Dkt. 105 at p. 238) For 2018, Dickson was paid total executive compensation of $11,294,007, and Spence was paid total executive compensation of $7,530,641, "primarily for [their] four plus months' work prior to the Merger[.]" (Dkt. 105 at p. 239) Dickson and Spence also engaged in "suspicious" stock, performance unit, and restricted stock unit transactions during the Class Period that "yielded [Dickson and Spence] a combined $9,984,700 ($8,015,187 for Dickson, $1,969,513 for Spence), along with 727,464 additional shares acquired at no expense (556,986 for Dickson, 170,478 for Spence) in net ill-gotten gains from prices inflated" while "the true facts regarding McDermott's business and operations . . . remained hidden from investors[.]" (Dkt. 105 at p. 239–46)

## MOTIONS TO DISMISS AND THE PSLRA

Rule 8 of the Federal Rules of Civil Procedure requires a pleading to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A motion filed under Federal Rule of Civil Procedure 12(b)(6) tests a pleading's compliance with this requirement and is "appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). A complaint can be dismissed under Rule 12(b)(6) if its well-pleaded factual allegations, when taken as true and viewed in the light most favorable to the plaintiff, do not state a claim that is plausible on its face. *Amacker v. Renaissance Asset Mgmt., LLC*, 657 F.3d 252, 254 (5th Cir. 2011); *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). As the Fifth Circuit has further clarified:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. This includes the basic requirement that the facts plausibly establish each required element for each legal claim. However, a complaint is insufficient if it offers only labels and conclusions, or a formulaic recitation of the elements of a cause of action.
> *Coleman v. Sweetin*, 745 F.3d 756, 763–64 (5th Cir. 2014) (quotation marks and citations omitted).

Section 10(b) states that "[i]t shall be unlawful for any person, directly or indirectly . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange Commission] may prescribe as necessary or appropriate in the public interest

or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5 then implements Section 10(b), disallowing the making of an "untrue statement of material fact" or the omission of any material fact "necessary in order to make the statements made . . . not misleading." 17 C.F.R. § 240.10b-5. To state a claim under Section 10(b) and Rule 10b-5, "a plaintiff must allege, in connection with the purchase or sale of securities, (1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which plaintiff relied (5) that proximately caused [the plaintiff's] injury." *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 641 (5th Cir. 2005) (internal quotation marks and citations omitted). Omissions are material for purposes of the second element when there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 747 (S.D. Tex. 2012) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 232, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). The third element, scienter, requires "an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it." *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009) (quoting *R2 Invs. LDC,* 401 F.3d at 643). "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care." *Id*. (quotation marks omitted).

The Private Securities Litigation Reform Act ("the PSLRA") and Federal Rule of Civil Procedure 9(b) impose a heightened pleading requirement for the misrepresentation and scienter elements of a Section 10(b) claim. *Owens v. Jastrow*, 789 F.3d 529, 535 (5th Cir. 2015); *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009). Rule 9(b), which applies where there are allegations of fraud, requires the pleading party to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The PSLRA requires a plaintiff to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, ... all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Additionally, a plaintiff must allege facts "giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). To establish a strong inference of scienter, the allegations must create an inference of scienter that is "at least as compelling as any opposing inference one could draw from the facts alleged." *Owens*, 789 F.3d at 536. "[A] tie favors the plaintiff." *Lormand*, 565 F.3d at 254.

Motions to dismiss under Rule 12(b)(6) are viewed with disfavor and are rarely granted. *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011). Furthermore, the PSLRA "was not enacted to raise the pleading burdens under Rule 9(b) and section 78u-4(b)(1) to such a level that facially valid claims, which are not brought for nuisance value or as leverage to obtain a favorable or inflated settlement, must be routinely dismissed on Rule 9(b) and 12(b)(6) motions." *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 354 (5th Cir. 2002).

## ANALYSIS

In their motion to dismiss, Defendants argue that Nova Scotia's Section 10(b) claims must be dismissed because: (1) all of the statements relied on by Nova Scotia are either puffery or non-actionable opinions; and (2) Nova Scotia's allegations do not give rise to the requisite strong inference of scienter.[6] The Court disagrees. Nova Scotia has sufficiently pled facts showing that Defendants made statements regarding the Focus Projects that, in context, were material, misleading, and made with at least severe recklessness.

"Under the judicially created puffery doctrine, general, forward-looking, optimistic corporate statements that are so vague and indefinite that they do not affect the price of a security because a reasonable investor would not rely on them in deciding whether to purchase or sell stock, are immaterial as a matter of law and should be dismissed." *Kurtzman v. Compaq Computer Corp.*, No. 4:99-CV-779, 2000 WL 34292632, at *37–38 (S.D. Tex. Dec. 12, 2000). The term "puffery" can also refer to "predictive or forward-looking statements" that "neither rise to the level of a guarantee nor include a specific statement of fact." *Id*.

The Fifth Circuit does not have a *per se* rule for dismissing puffery. *Id*. Rather, courts in this Circuit must "examine each corporate statement in the context in which it was made." *Id.* "Materiality is not judged in the abstract, but in light of the surrounding circumstances." *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1448 (5th Cir. 1993).

---

[6] Defendants attack Nova Scotia's Section 20(a) claims solely on the basis that the Section 10(b) claims are inadequately pled.

19 / 23

Similarly, opinion statements can also be actionable, since "the disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers." *Lormand*, 565 F.3d at 248. In order to make an opinion statement actionable, a plaintiff must "call into question the issuer's basis for offering the opinion." *Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund*, 575 U.S. 175, 194 (2015). "The investor must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id*.

Here, as set out above, Nova Scotia has pled sufficient facts to establish that Defendants' repeated assurances regarding the Focus Projects before and after the merger were material and misleading. Internal CB&I forecasts and risk registers compiled by project directors, cost managers, and executives showed that, at the time of the merger, McDermott was understating the costs associated with the Focus Projects by about $1 billion. A project controls director who worked on both the Calpine and Cameron projects at CB&I left McDermott shortly after the merger because the company, like CB&I before the merger, refused to report an additional $700 million to $1 billion in costs on Cameron and was engaging in "a deception to stakeholders of the company."

The forecasts that Defendants allegedly ignored or buried proved correct after the merger as the Focus Projects bled cash from McDermott. Even so, Defendants did not so much as mention those internal forecasts; rather, as the bad news regarding the Focus

20 / 23

Projects mounted, Dickson and Spence repeatedly insisted that there would be "no further material changes in the cost estimates on [the Focus] projects" and that "a sharp improvement" was only one quarter away. Defendants' repeated assurances regarding the Focus Projects before and after the merger omitted material facts and are actionable. *See Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corporation*, No. 4:20-CV-576, 2021 WL 182316, at *6 (S.D. Tex. Jan. 19, 2021) (J. Atlas) ("[B]y the time Defendants made 'forward-looking' statements during the Class Period regarding Shenandoah, Defendants already knew that the potential for Shenandoah was being exaggerated and needed 'a significant downward adjustment.'"). If nothing else, the existence of internal cost forecasts that were ignored even as they proved accurate tends to either belie Defendants' claims that they conducted extensive due diligence jointly with CB&I or demonstrate that Defendants ignored the results of the very due diligence that they repeatedly touted to analysts and investors.

Nova Scotia has also alleged sufficient facts to establish that Dickson and Spence behaved in a manner that was, at a minimum, severely reckless. Among other things, Nova Scotia alleges that CB&I's practice of manipulating cost forecasts downward before publicly releasing them continued after the merger. Nova Scotia has further alleged that documents showing the accurate forecasts were part of Defendants' pre-merger due diligence and that, after the merger, top executives, including the CEO and CFO, received the accurate internal forecasts in initial reports. The Cameron cost manager said that he went over the true cost estimates for Cameron with Spence at a site visit at which Dickson was also present; the Cameron cost manager also said that

21 / 23

Dickson and Spence received emails containing the complete package of Project Control's unaltered forecasts, including low-level details and their basis.

Nova Scotia has also alleged that Dickson and Spence stood to, and did, benefit greatly from staving off the takeover by Subsea 7 and closing the merger with CB&I. Because the acquisition of CB&I elevated McDermott into a different Performance Peer Group of companies, Dickson and Spence received bonuses and increases in their base pay. Nova Scotia also alleges that Dickson and Spence engaged in suspicious stock, performance unit, and restricted stock unit transactions during the Class Period, before the scope of the problems with the Focus Projects became clear to investors. Finally, judicially noticeable documents indicate that even though the SEC served subpoenas on McDermott and commenced an investigation into the Cameron project on July 26, 2019, the company did not disclose the investigation either in its July 29, 2019 SEC filings or at its earnings call for the second quarter of 2019, which took place on July 29, 2019. In fact, it does not appear that the company disclosed the existence of the investigation until over three months later, on November 4, 2019.

Under the circumstances, Nova Scotia has established an entitlement to further discovery in this case.

22 / 23

**CONCLUSION**

The defendants' motion to dismiss (Dkt. 125) is **DENIED**. Discovery in this case

may proceed.

SIGNED at Houston, Texas, this 13th day of April, 2021.

_____

GEORGE C. HANKS, JR.
UNITED STATES DISTRICT JUDGE