# EXHIBIT 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------x
In re:                                     :
                                           :
SILVERCORP METALS, INC. SECURITIES         :
LITIGATION                                 :
------------------------------------------x
ALAN MARSCH, Individually and on           :
Behalf of All Others Similarly             :
Situated,                                  :
                                           :
        Plaintiff,                         :
                                           :
                                           :          12-cv-9456 (JSR)
            -v-                            :
                                           :          MEMORANDUM ORDER
                                           :
RUI FENG, JIANGO "MYLES" GAO, MENG         :
"MARIA" TANG, and SILVERCORP METALS        :
INC.,                                      :
                                           :
        Defendants.                        :
------------------------------------------x



JED S. RAKOFF, U.S.D.J.

On December 28, 2012, plaintiff filed this class-action suit
against Silvercorp Metals, Inc. ("Silvercorp"), and its officers,
Rui Feng, Jiango Gao, and Meng "Maria" Tang, alleging violations of
section 10(b) of the Securities Exchange Act of 1934 (the "Exchange
Act"), 15 U.S.C. § 78j(b), Rule 10b-5 promulgated thereunder, 17
C.F.R. § 240.10b-5, and section 20(a) of the Exchange Act, 15 U.S.C.
§ 78t(a). By Order dated April 12, 2013, the Court approved Charles
A. Burnes and Dale Hachiya as co-lead plaintiffs for the proposed
class. See Order, ECF No. 32 (S.D.N.Y. Apr. 12, 2013). On June 11,
2013, plaintiffs filed an Amended Complaint, which withdrew their
claims against Jiango Gao but otherwise brought substantially the
same claims as the original Complaint. See Am. Compl., ECF No. 35.

1

On June 14, 2013, defendants jointly moved to dismiss the Amended Complaint, and the Court heard oral argument on the motion on July 17, 2013. On August 5, 2013, the Court, by "bottom-line" Order, granted defendants' motion to dismiss with respect to the individual defendants, including the section 20(a) claims, but denied the motion to dismiss with respect to Silvercorp itself. See ECF No. 46. This Memorandum Order explains the reasons for those decisions and directs further proceedings.

Silvercorp is a Canadian company that operates several mines in China and has stock traded on the New York Stock Exchange and Toronto Stock Exchange. Am. Compl. ¶ 15. The individual defendants named in the Amended Complaint, Rui Feng and Meng "Maria" Teng, served as CEO/Chairman and CFO, respectively. Id. ¶¶ 12-13. Silvercorp is a 100% owner of Victor Mining Ltd., which in turn owns a 77.5% stake in Henan Found Mining Co. Ltd., which has as its primary revenue-generating asset the Yuelianggou Ab-Pb-Zn Mine, a/k/a the "Ying Mine." Id. ¶ 18. On September 13, 2011, an investor report published by Jon Carnes (the "Carnes Report") raised allegations that Silvercorp's filings with the SEC about the Ying Mine were fraudulent, and its stock tumbled 20% that same day. Id. ¶¶ 84-85. This litigation is brought on behalf of the class of persons other than defendants who purchased Silvercorp stock between May 20, 2009 and September 13, 2011 ("Class Period").

Defendants moved to dismiss the Amended Complaint for failure to state a claim on two grounds — failure to adequately plead

2

falsity and failure to adequately plead scienter as to each of the defendants. On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must assess whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Mere conclusory statements and "formulaic recitation[s] of the elements of a cause of action" are insufficient. Twombly, 550 U.S. at 555. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679.

To state a claim under section 10(b) of the Exchange Act, a plaintiff must allege the following elements: (1) falsity, i.e., a material misrepresentation (or omission), (2) scienter, i.e., a wrongful state of mind, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341–42 (2005). Under Rule 9(b) of the Federal Rules of Civil Procedure, these elements, other than scienter, must be pleaded with particularity. Additionally, however, the Private Securities

3

Litigation Reform Act requires the complaint to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . all facts on which that belief is formed," 15 U.S.C. § 78u-4(b)(1), and further requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," Dura Pharms., 544 U.S. at 345.

Defendants contest only the first two of these elements in the instant motion. Turning first to falsity, the Amended Complaint alleges three categories of false statements in various filings with the SEC: (1) Silvercorp materially misrepresented the Ying Mine's "resource," production level, and mineral quality; (2) Silvercorp materially misrepresented its compliance with applicable legal and regulatory requirements; and (3) Silvercorp failed to make required related-party disclosures in violation of applicable Canadian GAAP and International Financial Reporting Standards. See Am. Compl. ¶ 3.

The first category is the most central to plaintiffs' case, and the best supported in the Amended Complaint, which contends that "in Form 6-K and 40-F filings with the SEC, Silvercorp materially misrepresented three important metrics at its flagship Ying mine (which accounts for the vast majority of its reported revenues): (1) the mine's silver, lead, and zinc 'resource' (i.e., the amount in the mine, what had been removed, and what remained), (2) the mine's production level (i.e., how much silver, lead, zinc, and total ore

4

was produced in 2010), and (3) the grade (i.e., quality) of the silver, lead, and zinc taken from the mine." Id. In particular, the metrics reported in the SEC filings were dramatically different from those filed with Chinese authorities "[u]nder the well-developed legal and regulatory regimes established by the Chinese central government and by Henan province, which are strictly implemented." Id. ¶ 21. These Chinese regulations required Silvercorp to report "its true annual mine production for the **entirety** of the Ying mine and any newly discovered resource veins that affect original resource reserve estimates for the Ying mine **as a whole**." Id. (emphasis in original); see also id. ¶¶ 22-29 (outlining regulatory regime); id. ¶¶ 30-38 (describing enforcement).

In compliance with this Chinese regulatory scheme, Silvercorp, it is alleged, must file in China what is known as a "dynamic report" that sets out the "resource," the production level, and the quality of the ore. See id. ¶ 34(a)-(e) (detailing content of dynamic reports). As compared with the "2010 Dynamic Report" for Silvercorp filed in China, plaintiffs, as noted, allege that the company's SEC filings stated dramatically higher quantities of each of these metrics. See id. ¶¶ 53-68. By way of example, the 2010 Dynamic Report filed with Chinese authorities disclosed a run-of-mine ore head grade for silver of 155 grams per tonne of ore (g/t), whereas the quarterly SEC filings covering the same period reported roughly triple the silver yield at between 429 g/t and 499 g/t. Id. ¶¶ 64-67. For lead, the 2010 Dynamic Report disclosed a 2.9% run-of-

5

mine ore head grade, whereas the quarterly SEC filings covering the same period reported much higher yields of between 7.6% and 8.3%. Id. The Amended Complaint alleges similar overstatements in SEC filings compared with the 2010 Dynamic Report with respect to the remaining reserve, id. ¶¶ 54-56, and actual production, id. ¶¶ 57-63.

When these alleged discrepancies were detailed in the Carnes Report, Silvercorp responded by press release the following day — not by disputing the accuracy of the 2010 Dynamic Report, but by disclaiming the reliability of any comparison with the SEC filings because the 2010 Dynamic Report "(a) was not a full-mine report, (b) was based solely on limited pre-May 2005 exploration results, (c) was not reviewed and checked by an independent qualified person, (d) does not include production figures from veins discovered and explored post-May 2005, and (e) need not be updated until renewal of the mining permit for the Ying mine in September 2014." Id. ¶ 86. Plaintiffs allege, however, that "[e]ach of these contentions runs directly afoul of the extensive body of Chinese laws, Circulars, Measures, regulations, and rules described supra." Id. Finally, the Amended Complaint sets forth a theory that a need to raise capital motivated these alleged misrepresentations. "Defendants had a strong motive to inflate the price of the Company's stock during the Class Period, in the form of the nearly $117 million December 2010 Offering." Id. ¶ 87.

In support of their motion to dismiss for failure to plead falsity, defendants raise three principal arguments: 1) plaintiffs fail to show why the SEC report and not the 2010 Dynamic Report was inaccurate; 2) plaintiffs fail to show why the discrepancies between the Chinese filings and SEC filings are not due to different legal requirements or accounting standards; and 3) the Amended Complaint cites to data that were not in the SEC filings but instead, defendants urge, were the product of plaintiffs' "unexplained arithmetic." Defs.' Mem. Law Supp. Mot. Dismiss 13 ("Defs.' Mem."), ECF No. 38. "[W]hen a securities fraud claim is based on discrepancies between [Chinese regulatory filings] and SEC filings, the plaintiff must allege at least some facts to support that (1) the SEC figures, and not the [Chinese] filings, are false, and (2) any variation is not attributable to variations in reporting rules or accounting standards." In re China Valves Tech. Sec. Litig., No. 11-cv-796, 2012 WL 4039852, at *6 (S.D.N.Y. Sept. 12, 2012). The Court will address each in turn.

The Amended Complaint alleges several facts in support of its contention that the SEC figures were incorrect. The first such set of facts relates to the nature of the Chinese regulatory regime, particularly that it is "strictly enforced." Am. Compl. ¶ 30. Accordingly, any fraud by Silvercorp in connection with the Chinese filings "would risk revocation of its mining permit and effective termination of its only revenue-generating activities." Id. ¶ 47(a). Relatedly, the annual reporting requires "dynamic reconnaissance of

7

mining resources reserves, which shall be reviewed, scrutinized and opined by [a] technical expert team organized by the land and resources administration departments of province-governed municipality, city and county level." Id. ¶ 33. It follows, plaintiffs argue, that such exacting local scrutiny and greater ease of access for local regulators make it less likely that the Chinese filings are false and more likely that the SEC filings are false. Finally, plaintiffs urge that the greater accuracy of the Chinese filing is essentially self-evident: "the text of the 2010 Dynamic Report itself illustrates that this multi-layered oversight and enforcement machinery indeed worked," including that four layers of experts and bureaucrats signed off on it. Id. ¶ 47(d).

A second set of facts pleaded in the Amended Complaint concern arithmetic and tend to show the falsity of the SEC filings; in essence, plaintiffs contend that the 2010 Dynamic Report's numbers find greater support from logic and external corroboration. First, they are more internally consistent, because the 534,831 tons removed for the 2005-2009 time period would be expected given the Ying Mine's 198,000-ton annual permitted production level and the ramp-up period that might be expected from its first operation in April 2006. Id. ¶¶ 44, 47(e). Second, the Amended Complaint alleges that the 207,037 tons of resource drawdown reported in the 2010 Dynamic Report is far more consistent with the 198,000-ton permit than would be the quarterly SEC filings' numbers adding up to 310,749 tons. Id. ¶ 47(f). Third, the 207,037 tons reported in the

Chinese filing finds external corroboration from a report prepared by AMC Mining Consultants (Canada) Ltd., which reported a total drawdown of 639,312 tons over the three-year period 2009-2011, for an average of 213,104 annually, which is much closer to the 2010 Dynamic Report than the SEC filings. Id. ¶ 47(g).

These two sets of facts are mostly ignored by defendants, who instead train their fire on what they label the "only allegation in this regard," which is that "some unnamed 'Henan L&R Dept Staff' supposedly said that noncompliance with Chinese mining regulations would create 'significant risks, liabilities, and penalties.'" Defs.' Mem. 9 (citing Am. Compl. ¶¶ 29, 30.). Defendants argue that under the test of Novak v. Kasaks, 216 F.3d 300 (2d Cir. 2000), this confidential witness is insufficiently identified to support an inference of personal knowledge. See Novak, 216 F.3d at 314 (holding that confidential sources need not "be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged"). But even if defendants are correct that the allegations from the confidential witness, standing alone, would be insufficient to adequately plead falsity, they nevertheless add force to the allegations concerning the enforcement regime and the arithmetic; conversely, moreover, the other facts are sufficient by themselves to plead falsity.

There is an additional reason that plaintiffs have adequately pleaded that the SEC filings are false, which is that plaintiffs

9

allege that there is a motive for inflating the numbers in the SEC filings but no corresponding motive for deflating the numbers in the Chinese filings. See Ho v. Duoyuan Global Water, Inc., 887 F. Supp. 2d 547, 568 (S.D.N.Y. 2012) ("Based on the fact alleged that [the defendant] had more negative disclosures in China and positive disclosures with the SEC, the reasonable conclusion is that there is a fraudulent motive to overstate the numbers yet no fraudulent motive to understate them."); Yee v. NIVS Intellimedia Techn. Grp., Inc., No. 11-cv-8472, 2013 WL 1276024, at *5 (C.D. Cal. Mar. 25, 2013) (finding that the defendant "had a greater incentive to falsify its numbers" in SEC filings because "Chinese penalties for falsifying [Chinese] filings are substantially harsher than [defendant] would face for falsifying SEC filings" and the defendant had an incentive to file fraudulent SEC reports "to attract U.S. investors to purchase shares" with little risk due to "the difficulty of enforcing a U.S. judgment against a Chinese national"). While motive cannot create falsity by itself, it renders more plausible as falsity what might otherwise appear accidental or ambiguous. It is therefore not the case that the Amended Complaint "alleges only that differences exist in the SEC and [Chinese] filings and assumes or concludes the SEC filings must be false." China Valve, 2012 WL 4039852, at *6. Instead, plaintiffs have met their burden to adequately plead that the SEC filings rather than the Chinese filings were false.

10

The Court next turns to defendants' second argument in support of their motion to dismiss for lack of falsity, which is that plaintiffs failed to adequately plead that the discrepancies between the Chinese filings and SEC filings were not due to different standards of measurement being used. Defendants' main contention here is the same made in their press release responding to the Carnes Report, mentioned earlier: The 2010 Dynamic Report covers only those resources that had been identified as of 2005, whereas the SEC filings, properly following the Canadian guidelines, covered the whole Ying Mine including resource that was discovered after 2005. Accordingly, defendants urge, plaintiffs are really comparing "apples and oranges." See In re A-Power Energy Generation Sys. Ltd. Sec. Litig., No. 11-MDL-2302, 2012 WL 1983341, at *8 (C.D. Cal. May 31, 2012) ("Absent at least [an allegation of common measurements], it is not clear to the Court that Plaintiff has adequately pled falsity with respect to the SEC/[Chinese] filings because the Court would have no way of knowing whether it was comparing apples-to-apples or apples-to-oranges.").

The parties strenuously contest the identity of the fruit here. But whether the 2010 Dynamic Report is apple, orange, or lychee, plaintiffs have adequately pleaded that it uses the same denominator as the SEC filings, i.e., the whole of the Ying Mine. See, e.g., Am. Compl. ¶ 46 ("The 2010 Dynamic Report is a report on the **full** reserves and production of the entire Ying mine, with updated data through 2009 and for 2010. It is **not** a report on only a lesser

11

segment or portion of the mine.") (emphasis in original). And even if defendants' contention that the 2010 Dynamic Report covers only those veins known to Silvercorp in 2005 proves correct, that does not explain away the enormous gap between silver grade reported in the Chinese filings and SEC filings as described above. Here, at the pleading stage, the Court may not prematurely determine the truth of plaintiffs' allegation that the comparison is proper, though it expects to be aided by affidavits from dueling experts in Chinese mining law if summary judgment is sought. Accordingly, defendants' argument about the appropriateness of the comparison is not a basis for granting their motion to dismiss.

The final argument raised by defendants with respect to plaintiffs' first falsity allegation is that the numbers cited in the Amended Complaint as appearing in the 2010 Dynamic Report do not actually appear there, and are instead the product of an "unexplained," and presumably errant, "arithmetic" by plaintiffs. Defs.' Mem. 13. Defendants are correct that when "allegations of securities fraud conflict with the plain language of the publicly filed disclosure documents, the disclosure documents control, and the court need not accept the allegations as true." In re Optionable Sec. Litig., 577 F. Supp. 2d 681, 692 (S.D.N.Y. 2008). Here, however, it is apparent that the Amended Complaint's cited data reflect simple computations of the sort required to make useful comparisons between the SEC filings and Chinese filings. See Pls.'

12

Mem. Law Opp'n Mot. Dismiss 14-18 & App. 1, ECF No. 40 (describing each step of calculations).

The Court now turns from plaintiffs' primary falsity allegations to the two other sets of subordinate allegations pleaded with respect to falsity. The first is that Silvercorp "made materially false and misleading statements regarding its compliance with applicable laws, rules, and regulations, including both the U.S. federal securities laws and the Chinese legal and regulatory regime" in various anodyne statements asserting Silvercorp's compliance with laws applicable to it. Am. Compl. ¶ 69. Obviously, if the central falsity allegations about the performance of the Ying Mine and fraudulent SEC filings are true, defendants were not in compliance with the securities laws, among others. But plaintiffs muster only one way in which this second falsity allegation is anything beyond bootstrapping: Silvercorp's "production at the Ying mine – 207,037 tons as stated in the 2010 Dynamic Report – exceeded the production limit (198,000 tons) set by the Ying mine's permit. As such, in 2010, the Company operated the Ying mine in violation of its permit, and by extension, in violation of the Chinese legal and regulatory regime." Id. ¶ 71.

The Court is sympathetic to defendants' concern that "[i]f this were sufficient, then every individual who purchased the stock of a company that was later discovered to have broken any law could theoretically sue for fraud." Gusinsky v. Barclawy PLC, 944 F. Supp. 2d 279, 289 (S.D.N.Y. 2013). But while the bootstrapped securities-

13

law-compliance alleged misstatement rises and falls with the primary falsity allegation, the production-limit-compliance alleged misstatement has independent force. Suppose, for example, that defendants later succeed in proving that the SEC filings correctly stated that Silvercorp extracted not 207,037 but 310,749 tons from the Ying Mine in 2010. Such a showing might make Silvercorp's statement about its compliance with applicable laws into a material misstatement, depending on ultimate conclusions about the Chinese mining regulations and enforcement risk. Also dependent on such conclusions is whether, as plaintiffs allege, exceeding their permit limit by fewer than 10,000 tons makes material misstatements out of Silvercorp's various proclamations of total legal and regulatory compliance. Accordingly, this alleged falsity is sufficiently pleaded in the Amended Complaint, and the Court denies the motion to dismiss on this ground.

The Court is not, however, satisfied that plaintiffs' third kind of alleged misstatement, the omission of related-party disclosures, is adequately pleaded. The Amended Complaint alleges that Silvercorp's largest customer was Yongning Smelting Co. Ltd. ("Yongning"), and that from 2005 to 2009, "Silvercorp's ownership interest in Yongning fluctuated between 11.75% and 18%." Am. Compl. ¶¶ 72, 74. Plaintiffs urge that under applicable Canadian GAAP and International Financial Reporting Standards ("IFRS"), Silvercorp should have made related-party disclosures because "Silvercorp's 15% ownership stake and its representation on Yongning's board of

14

directors enabled Silvercorp to exercise joint control over Yongning." Id. ¶ 77.

But this is purely conclusory. Under Canadian GAAP, related-party disclosure is required "when one party has the ability to exercise, directly or indirectly, control, joint control or significant influence over the other." Id. Under both Canadian GAAP and IFRS rules, however, there is a presumption that an investment constituting less than 20% of the equity in a company does not give the investor "the ability to exercise significant influence, unless such influence is clearly demonstrated." Decl. of Craig A. Batchelor Supp. Mot. Dismiss, ECF No. 39 ("Batchelor Decl."), Ex. 15 at § 5 (Canadian GAAP); id. Ex. 16 at § 5 (IFRS). The Amended Complaint defines joint control as "the contractually agreed sharing of the continuing power to determine its strategic operating, investing and financing policies," Am. Compl. ¶ 77, but provides nary a fact supporting the otherwise naked assertion that joint control existed here. Accordingly, plaintiffs have failed to adequately plead falsity with respect to the alleged omission of related-party disclosures.

Defendants' alternative ground for dismissing the Amended Complaint is their assertion that it fails to adequately plead scienter. As previously noted, a complaint, to state a claim under section 10(b) of the Exchange Act, must not only "specify each misleading statement," as discussed at length above, but must also "state with particularity facts giving rise to a strong inference

15

that the defendant acted with the required state of mind." Dura

Pharms., 544 U.S. at 345. For an inference to qualify as strong, "a

reasonable person" must find it "at least as strong as any opposing

inference." Tellabs, Inc v. Makor Issues & Rights, Ltd., 551 U.S.

308, 326 (2007). Plaintiffs may show a strong inference of scienter

by "alleging facts (1) showing that the defendants had both motive

and opportunity to commit the fraud or (2) constituting strong

circumstantial evidence of conscious misbehaviour or recklessness."

ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir.

2007).

As already mentioned with respect to motive, the Amended

Complaint speculates that the $117 million stock offering in

December 2010 provided "a strong motive" for inflated reports on the

performance of the Ying Mine. Am. Compl. ¶ 87. Plaintiffs further

urge that an inference of scienter may be drawn from the

discrepancies that form the basis of the falsity allegation. See

McIntire v. China MediaExpress Holdings, Inc., 927 F. Supp. 2d 105,

125 (S.D.N.Y. 2013) ("[T]he reasonable conclusion is that there is a

fraudulent motive to overstate the numbers yet no fraudulent motive

to understate them.").

Defendants contend, however, that the Amended Complaint fails

to allege a motive as to any defendant, as it contains no allegation

that any senior executives sold stock during the Class Period.

Indeed, defendant Feng personally, and defendant Silvercorp as a

company, acquired company stock during this period, as reflected in

16

public filings. See Batchelor Decl. Exs. 17, 18. "It is well settled that . . . the purchase of additional company shares during the class period [] is inconsistent with an intent to commit fraud." In re Regeneron Pharms., Inc. Sec. Litig., No. 03-cv-3111, 2005 WL 225288, at *22 (S.D.N.Y. Feb. 1, 2005). Defendants further urge that the December 2010 stock offering is an inadequate motive, because "[t]he alleged motivation of a corporation to raise money . . . is far too generalized (and generalizable) to allege the proper 'concrete and personal' benefit required by the Second Circuit." In re PXRE Grp., Ltd. Sec. Litig., 600 F. Supp. 2d 510, 532 (S.D.N.Y. 2009), aff'd, 357 F. App'x 393 (2d Cir. 2009); but see In re Twinlab Corp. Sec. Litig., 103 F. Supp. 2d 193, 206 (E.D.N.Y. 2000) (finding inference of scienter from company's alleged motive to inflate stock price to maximize secondary offering).

But the plaintiffs do not plead merely motive; the Amended Complaint contains extensive allegations of circumstantial evidence of recklessness and misconduct that strongly buttress the motive alleged, and turn what might be a weak inference standing alone into a strong one. Even without the somewhat generalized motive pleaded, such circumstantial allegations, if strong enough, may suffice to defeat a motion to dismiss. See Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001) ("Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial evidence must be correspondingly stronger.").

17

The first arena of circumstantial evidence concerns Silvercorp's alleged retaliatory actions following the Carnes Report. The company went so far as to sue the Carnes Report's author in the United States. Am. Compl. ¶ 89. Yet, on September 8, 2012, Toronto's The Globe and Mail reported that it "had obtained documents, including receipts for police expenses, showing that Silvercorp worked with local Chinese authorities and paid for an investigation that led to the arrest and long-term detention of Huang Kun (a Canadian citizen) and the arrest and interrogation of two of his associates. Mr. Huang has been interrogated, held without charge, had his personal property (phone, laptops, glasses, passport) confiscated, and has been forced to pay a $32,000 unofficial bail (only to be re-imprisoned)." Id. The newspaper also "reported that Mr. Huang had reason to believe that Silvercorp provided interrogation instructions and a company car (in which Mr. Huang was transported 150 km) to assist the police," id., and that "Defendant Feng virtually admitted the Company's involvement, telling TGM that 'The police sometimes do contact me' and 'We are big taxpayers in the Luoyang County,'" id. These allegations, especially Feng's non-denial of his and the company's role in Huang's detention, provide a strong inference of scienter. This is no mere "press speculation about defendants' motive." Stern v. Leucadia Nat'l Corp., 844 F.2d 997, 1004 (2d Cir. 1988).

The other misconduct and recklessness alleged in the Amended Complaint is comparatively weaker, but nevertheless marginally

18

strengthens the inference of scienter. In the strongest of these, plaintiffs allege that three of Silvercorp's biggest customers in 2010 were registered (i.e., incorporated) in late 2009 with inexplicably low capitalization of about $73,206 each, but made purchases comprising more than $10,000,000. Am. Compl. ¶ 92. When the Carnes Report raised concerns about whether these were fictitious companies, two of them canceled their registrations within months. Id. Fictitious transactions constitute circumstantial evidence of misconduct. See In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 278 (3d Cir. 2006). Two other allegations concerning restated Chinese filings, Am. Compl. ¶ 90, and complicity in a fictitious auction, id. ¶ 91, are related to this case only tangentially but weakly increase the inference that defendants acted "with the intent to deceive the investment community." In re Advanced Batter Techs., Inc. Sec. Litig., No. 11-cv-2279, 2012 WL 3758085, at *11 (S.D.N.Y. Aug. 29, 2012). As a result of all this, "the Company now faces a Corruption of Foreign Public Officials Act investigation by the Royal Canadian Mounted Police's Anti-Corruption Unit related to the arrest and detention of Mr. Huang and his associates and a subpoena from the SEC related to the concerns raised by various investors." Am. Compl. ¶ 93.

The motive alleged may have been strong enough to survive dismissal on its own because the stock offering in December 2010 was temporally connected with the allegedly fraudulent SEC reports in the several quarters preceding it. But the motive was not pleaded on

19

its own; instead, it finds strong support from the misconduct that the company is alleged to have committed, especially the retaliation against Huang and the allegedly fictitious major customers. Courts routinely credit analyst and investor reports like those at issue here, even those of short-sellers, as sufficiently reliable for allegations of scienter against a company. See, e.g., McIntire, 927 F. Supp. 2d at 124. Accordingly, as to the company, the Court, in its "bottom-line" Order, concluded that the Amended Complaint adequately pleaded scienter and denied the motion to dismiss for failure to plead scienter as to Silvercorp itself.

The individual defendants present a different story with respect to the sufficiency of the scienter allegations, and the Court granted the motion to dismiss as to them. "[T]he fact that Lead Plaintiff failed to allege scienter for the individual Defendants does not preclude a finding of recklessness against [the company] . . . . All that is required is that the pleaded facts create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." In re MBIA, Inc. Sec. Litig., 700 F. Supp. 2d 566, 591 (S.D.N.Y. 2010).

As to the individual defendants, plaintiffs rely on a theory of recklessness, which is a sufficiently culpable mental state for securities fraud. See ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009). "Examples of recklessness include plausible allegations that the defendants knew facts or had access to information suggesting that

20

their public statements were not accurate or failed to check information they had a duty to monitor." In re Bank of Am. Corp. Sec. ERISA Litig., No. 09-md-2058, 2011 WL 3211472, at *4 (S.D.N.Y. July 29, 2011) (internal quotations omitted). As against Tang, however, the Amended Complaint alleges only that she signed Silvercorp's SEC filings, certifying that they were true. Am. Compl. ¶¶ 12-13, 51. Although plaintiffs argue in opposition to the instant motion that these signatures indicate that she had access to or was required to review the information underlying the filings and that she had a duty to monitor such filings, these contentions are not pleaded in the Amended Complaint. Even if they had been pleaded, moreover, they would not, standing alone, be sufficient. See MBIA, 700 F. Supp. 2d at 590 ("Lead Plaintiff's allegations that [individual defendants] signed MBIA's SEC disclosures and Sarbanes-Oxley certificates are insufficient to support a strong inference of recklessness in the absence of more particularized allegations."). Accordingly, the Court, in its "bottom-line" Order, found scienter inadequately pleaded against Tang and dismissed the section 10(b) claim as against her.

Feng is also alleged to have signed and certified these filings, but plaintiffs have the additional allegation against him that he did not deny cooperating with the police to detain Huang. Am. Compl. ¶ 89. Although troubling, if true, this is still insufficiently particularized to plead scienter against Feng, especially considering the countervailing fact that he personally

21

bought rather than sold stock during the Class Period, Batchelor Decl. Ex. 17, which undermines the inference of a personal motive on his part, see In re Regeneron Pharms., 2005 WL 225288, at *22. Accordingly, the Court, in its "bottom-line" Order, found scienter inadequately pleaded against Feng and dismissed the section 10(b) as against him.

Turning finally from the section 10(b) claims to the section 20(a) "controlling person liability" claims, these claims were brought only against Feng and Tang. Because the Court found that scienter was inadequately pleaded as to the individual defendants and accordingly dismissed the section 10(b) claims as to them, the Court also dismissed the section 20(a) claims. See China Valves, 2012 WL 4039852, at *8 ("As the [complaint] fails to plead an underlying violation of the Exchange Act, its allegations of control person liability under Section 20(a) fail also.").

For the foregoing reasons, the Court reaffirms its prior Order dismissing the Amended Complaint's claims against the individual defendants but not (except in one respect) against the corporate defendant. The parties are directed to jointly telephone Chambers within two weeks of receiving this Memorandum Order to schedule further proceedings.

SO ORDERED.

Dated: New York, NY
June 23, 2014

_____
JED S. RAKOFF, U.S.D.J.

22