IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

IN RE EMERGENT BIOSOLUTIONS INC, )     CIVIL NO.
SECURITIES LITIGATION            ) 8:21-CV-00955-DLB
                                 )
_____)


TRANSCRIPT OF PROCEEDINGS - MOTIONS HEARING
BEFORE THE HONORABLE DEBORAH L. BOARDMAN
UNITED STATES DISTRICT JUDGE
WEDNESDAY, April 19, 2023
GREENBELT, MARYLAND


A P P E A R A N C E S

FOR THE PLAINTIFF:
    NOVA SCOTIA HEALTH EMPLOYEES' PENSION PLAN, CITY OF FORT
    LAUDERDALE POLICE & FIREFIGHTERS' RETIREMENT SYSTEM:
        Matthew L. Tuccillo, Esquire
        Pomerantz LLP

        Daniel S. Sommers, Esquire
        Cohen Milstein Sellers and Toll, PLLC

FOR THE DEFENDANTS:
        Michael Bongiorno, Esquire
        Timothy Perla, Esquire
        Wilmer Cutler Pickering Hale and Dorr, LLP

        William M. Krulak, Jr., Esquire
        Miles & Stockbridge, PC

***Proceedings Recorded by Mechanical Stenography***
Transcript Produced by Computer-Aided Transcription

**P R O C E E D I N G S**

**(10:10 a.m.)**

**THE CLERK:** The matter now pending before this Court is Civil Number DLB-21-955 in Regards to Emergent BioSolutions Inc. Security Litigation.  We're here today for the purpose of a motions hearing.  Counsel, please identify yourselves for the record.

**MR. SOMMERS:**  Good morning, Your Honor.  Daniel Sommers, Cohen Milstein Sellers and Toll, liaison counsel for the lead plaintiffs.  And with me is Matthew Tuccillo from the Pomerantz firm.  He's lead counsel for the lead plaintiffs and he will be presenting oral argument this morning.

**THE COURT:**  Okay, thank you very much. Good morning, gentlemen.

**MR. KRULAK:**  Good morning, Your Honor.  Bill Krulak from Miles & Stockbridge, local counsel representing the defendant, Emergent BioSolutions. Today with me from WilmerHale are Michael Bongiorno and Timothy Perla. Michael will be making the argument for the defense.

**THE COURT:**  Okay.  Good morning, gentlemen.  Thank you for being here.

Before we get started, I just want to acknowledge many people in the audience. We've got students from Eleanor Roosevelt High School; is that right?  Are we nodding?  Okay, great. Welcome. For their benefit and for the benefit of the

record, let me just explain what this is about. We are here for a hearing on a Motion to Dismiss the complaint. The complaint was filed by the plaintiffs who held stock in a company called Emergent BioSolutions. The plaintiffs allege that Emergent BioSolutions made false and misleading statements to the public about their ability to produce COVID-19 vaccines at a facility in Baltimore called Bayview. Now I've simplified it a great deal just for the benefit of those in the audience.

I've, of course, read the first amended complaint; I've read the Motion to Dismiss, the opposition and the reply. So let's get started.

I first want to clarify for the record that we're all on the same page, that what I'm considering on the 12(b)(6) motion of course with the heightened pleading standard under Rule 9(b) is the amended complaint, the judicially-noticed materials that I took judicial notice of a couple months ago on our call and the documents attached to the defendant's opposition.

Any objection to that from the plaintiffs?

MR. TUCCILLO:  No, Your Honor.

THE COURT:  Okay. From the defendants?

MR. BONGIORNO:  No, Your Honor.

THE COURT:  Okay, good.

MR. TUCCILLO:  Your Honor, I would only add we put

in a Notice of Supplemental Authority.

**THE COURT:**  You did.  Judge Chuang's recent case, decision in a similar case, correct?

**MR. TUCCILLO:**  Correct, Your Honor.

**THE COURT:**  All right, very good. Okay, here's how I'd like to try to tackle this:  I think the parties have appropriately divided the public statements to before March 31, 2021, that's the date that the New York Times broke a story that there had been 15 million doses of Johnson & Johnson vaccine that were dumped due to contamination at the Bayview facility. So let's focus on statements before that news article broke. Does that make sense from the plaintiff's perspective?

**MR. TUCCILLO:**  That's fine, Your Honor.  Thank you.

**MR. BONGIORNO:**  That's all right with us.

**THE COURT:**  All right. Let me first also address as a preliminary matter the defendants have argued that the amended complaint should be dismissed because of puzzle pleading.  What I think that essentially means is they're arguing they can't figure out what parts of the false statements are false and what grounds for scienter are alleged and that it's too difficult to understand and to piece the puzzle together. I know that was an issue in *In re Marriott.*

Let me just say this to address that argument: I didn't find the materials that easy to put together, candidly. I

think that's due in large part because there are so many materials and there are so many alleged false statements. Nonetheless, I am able to piece it together given what has been presented to me and how the parties have argued it.  And even if I were to find that it was insufficient puzzle pleadings, the relief would be an amended complaint, probably an amended complaint that's twice as long and I'm just not sure that makes sense and I don't know that I need that.

Do you care to be heard on this issue anymore?

MR. BONGIORNO:  No, Your Honor.

THE COURT:  All right, thank you very much. Okay. So Mr. Tuccillo -- is it Tuccillo or Tuccillo?  Help me out here.

MR. TUCCILLO:  Good question.  Tuccillo.

THE COURT:  Tuccillo, okay.  Very good.  Hopefully I'll get that right consistently. So you've alleged a number of false statements or material omissions that Emergent and its three executives that are named in the complaint made between March 10, 2020 and the last one before the New York Times article is a March 3, 2021 CNBC interview with Mr. Kramer. Those false statements are found in -- alleged.  All of this is alleged, let me just say that. I'm not going to continue to say "alleged" throughout the entire hearing. I think that's implicit, okay?  All of those false statements can be found either in press releases that the company issued; interviews with the press, for example, the CNBC interview

that I mentioned that Mr. Kramer had; earnings calls in which Mr. Kramer does most of the talking; Mr. Husain does some talking, as does Mr. Lindahl. We'll talk about those statements at some point. There's a conference presentation that Mr. Lindahl speaks at. So those are generally the nature or I should say the arena of the false statements; is that correct?

**MR. TUCCILLO:**  Yes, Your Honor. Would you prefer I stand at the table or go to the podium?

**THE COURT:**  You can be where you're comfortable. I appreciate your standing though when you talk to the Court. When I was a lawyer I always stood when I talked to the Court so I think it's a good example for the students here. You can stand wherever you're comfortable with.

**MR. TUCCILLO:**  Thank you, Your Honor.

**THE COURT:**  Okay. Let me clarify one thing:  The Emergent responses to the FDA 483 forms, those were not public; is that correct?  Those aren't any of your bases for false statements, meaning the statements themselves in there. Just clarify that for me.

**MR. TUCCILLO:**  The May 8, 2020 Emergent FDA 483 response is pled as a false statement. That was the document in which they said they were doing, quote, "immediate holistic comprehensive measures to address the deficiencies."

**THE COURT:**  Was that published?  Was that publicized

I should say, in May of 2020?

MR. TUCCILLO:  That -- with respect, I would have to double check the complaint. I know it's pled in the complaint. What I will say is we had to use a FOIA request to get some of these documents and whatever was published is often heavily, heavily redacted.  So whatever version of it was public when it was public was in redacted form. It did not have all of the information available. The bit that we've highlighted as materially misleading was at some point public.

THE COURT:  Okay. Well, without more, without you telling me where in the complaint you've alleged this was a public statement made at or about the time it was given to the FDA, I'm not sure I can even rely on that as an alleged false statement. Perhaps it goes to falsity or it goes to knowledge, but I'm not sure it's a public statement or you've alleged that it is.

Okay, let's move on from that. Let's start with the July 6, 2020 press release.  And I'll tell you why I jumped to there. The reason I jumped to there is the two prior press releases -- well, the several press releases before that, they do tout Emergent's capabilities, its capacity.  But until July of 2020, July 6th of 2020, there weren't a number of audits that had identified relevant deficiencies. So that's why I'd like to start with July 6th of 2020. I'm just not sure that any statement before then even if plausibly false, has the

requisite alleged evidence of scienter intent. Do you care to address that?

MR. TUCCILLO: Yes, Your Honor. And in response to Your Honor's prior question, I did find the paragraph of the complaint. It's paragraph 136 regarding the May 8th Emergent response. It's a 16-page letter transmitted to the FDA. There's numerous subparts, but obviously it is pled as a false and misleading statement. It is pled as having been public.

My recollection -- and Your Honor is right, there are voluminous materials here. The number of reports both by the Government, the company's responses, et cetera that are even just pled in the complaint are more than I'm accustomed to. My recollection of this document standing here today is that it was public, it was public in redacted form, as was the FDA materials --

THE COURT: How public was it if you had to issue a FOIA request for it?

MR. TUCCILLO: The FOIA request, to my recollection, was used to get some of the FDA reports, the Form 483 to which it was responded. Usually these documents are transmitted privately to the company. The FDA doesn't customarily do an inspection of a facility.

By the way, there's inspection reports and there's Forms 483. Those are different documents. And often one is more voluminous than the other. The 483 is the thing to which the

company typically responds. For example, in the Novavax case that we put in on supplemental authority, there was an inspection report on one facility and a 483 on the other. So typically these documents are done for the company's benefit. They are typically done to assess a facility and notify the company as to findings, things that need to be discussed, addressed, et cetera. That's typically transmitted privately to the company.

The versions that we were able to get were one or both of the following: Heavily redacted and in many instances, things that we had to use a FOIA request to get. And in fact Congress, by the way, had to use subpoenas to get some of these things, some of the other inspection reports.

THE COURT:  Let's move on from this in a minute, but where was it publicized?  How could investors access it?  If I wanted to go buy Emergent stock at the time or if I had Emergent stock, was this part of a press release?  Was this you had to do a Google search for it specifically?  How available was it to the public, to just the regular investor?

MR. TUCCILLO:  The materials that we allege in the complaint, both FDA reports and responses thereto to the extent public, would have been public on the FDA's website.

THE COURT:  All right.

MR. TUCCILLO:  I don't recall with perfect recollection sitting here today, I apologize to the Court.  I

can submit something after the hearing to address something this specific if it's important.  I don't recall standing here today at that time whether this was on the FDA report at that -- FDA website at that moment. It very likely was, but it very likely was in heavily redacted form.

**THE COURT:**  Okay.

**MR. TUCCILLO:**  Often these things involve trade secrets. Often these things involve processes that are specific to a company. But the things that we're able to cite, the things that we're able to cite in the earlier sections of the complaint about the FDA reports or the *Janssen* report, et cetera, even the ones published later by Congress are looking at a page that has a lot of redactions, but a good chunk that's visible.  And you can say okay, this bit here is conveying X, Y, Z. Same thing with this response. Not every word of this thing was publicly available, but the stuff we have here was.

**THE COURT:**  All right. I understand. Okay, let's go back to where I had started which was starting with the July 6, 2020 press release.  The reason I think that that's a sensible place to start is at that point in the preceding month, months, but largely in June and early July there were a variety of audits done by Johnson & Johnson, AstraZeneca, Operation Warp Speed, BARDA, Emergent's own auditors.  And importantly, the FDA on June 23, 2020 sent a letter to

Emergent calling its response to the April 2020 inspection "deficient" and stating "it does not consider your facility ready to support commercial operations." All that is to say I'll give you one shot at trying to convince me that statements before then were not only false, but supported by the requisite scienter.

MR. TUCCILLO:  Sure. So if Your Honor will indulge me, the timeline here is important. So March 10, 2020 is the start of our class period.  For context, that was when we all entered lockdown.  I literally remember this --

THE COURT:  We all remember that day.

MR. TUCCILLO:  Right. So in rapid succession these things happen, right?  By April 23rd, the J&J contract is awarded. The BARDA or Federal Government contract is May 30th and the AstraZeneca contract is June 11th. One after the other. These things are a one billion dollar in the aggregate, contractual boom for the company.

There are nine reports on Bayview out of seventeen total reports that we referenced. The earliest of them is actually in April of 2020, right?  Just weeks into the class period. That's the FDA inspection and the FDA 483 report. The Warp Speed report that Your Honor referenced is in June. There's a J&J or Janssen, because I think it was through a subsidiary called Janssen report in July, but there's just a myriad of inspection reports starting in April. Because all these

contracts, billion dollars of contracts, this is the facility that has been tabbed to do production of not one, but two COVID vaccines at the height of the pandemic.  And I say this, by the way --

THE COURT:  But hold on, I just want to interrupt.

MR. TUCCILLO:  Sure.

THE COURT:  The only report -- the only report through the June 11th announcement of the $87 million agreement with AstraZeneca was the April 20, 2020 FDA 483 report. All the other audits occurred after that.  And the only -- and the first statement after all of those audits was July 6th. Are you following me?

MR. TUCCILLO:  I am following you. And in between those two is when the company does the May 8, 2020 483 response.

THE COURT:  Right.

MR. TUCCILLO:  Okay. And whether public or not, it is alleged to be public, it is alleged to be a false and misleading statement or pieces of it that are highlighted in the complaint are.  But importantly, that is where the company says, not just publicly to the extent made public, but specifically to the regulators and I quote, "We are doing immediate holistic comprehensive measures to address these deficiencies."

Now we know, okay, we know that never happened. We know

it never happened, right?  The manufacturing starts by August for AstraZeneca. The first AstraZeneca doses are destroyed by October. J&J starts in November. The first J&J doses are destroyed in November. Batches are destroyed literally every month starting in October of 2020 to the tune ultimately, the body count total on these destructions is 500 million doses.

THE COURT:  Hold on.  I understand. This is where it gets confusing and there's putting puzzle pieces together.

MR. TUCCILLO:  Sure, no problem.

THE COURT:  So how I've conceptually organized your complaint in my mind is you've got problems with preventing contamination that ultimately there was contamination and then there's the problem of you're not ready for commercial operations is what the FDA said. And there were other audits in the summer of 2020 where it says you're not ready for commercial operations. And then you've got Mr. Kramer and the company saying -- and we'll go through the exact words, but we're ready for large-scale manufacturing operations. Those seem to be two slightly different statements. One is that we're prepared to not have contaminated vaccines and we're ready for large-scale operations. Are you saying there are two sides two the same coin?

MR. TUCCILLO:  Yes. Because the April 20 evaluation, Federal Government evaluation found among other things, substantial site CGMP, that's good manufacturing practices.

I'm just going to use the acronym -- found substantial site CGMP noncompliance, failure of quality systems, inadequate training. Right? That was from the jump. This was already in the facility. We have CWs describing, quote, "Every inch of the facility having mold problems." This gets coupled, by the way, with the congressional findings later that the company and its employees tried to hide all of those things from inspectors. So the FDA would come to inspect and there's mold in a pipe. Rather than fix the problem, they'd wrap the pipe. When the FDA left, they'd unwrap it. So the problems of contamination, the problems of people on site having no idea how to run this facility in a way that could generate these things were there from the beginning.

THE COURT: So let's just focus on this what you're claiming is a false statement, May 8, 2020, their response to the 483. "We have taken immediate holistic and comprehensive measures to address the deficiencies." Is that -- I mean, is that false? I mean, they took measures. They were trying to address them. Perhaps they eventually failed, but is that false at that time?

MR. TUCCILLO: Yes. They were completely inadequate from the beginning. There was never a point at which what they did was enough to rectify sort of the core findings. The last report from that committee came out in December of last year. And the end note -- and we could have done multiple additional

judicial notice motions, but throughout these things were never rectified. The fact that they said they were doing this and perhaps made some effort to, right, that doesn't make the statements true. It doesn't make them, for example, not misleading. Right?  They lacked the personnel. They lacked the training. They lacked the quality control environment throughout. It never got to the point where it was in compliance. So they're going to say well, we tried, right?  We made efforts. It's not wrong, we made efforts.  Yeah, but none of those efforts were ever adequate, ever. And it was known each and every turn. I mean, I've never seen this amount of inspection material handed to the CEO who then admits, "I read them all."

**THE COURT:**  I understand.

**MR. TUCCILLO:**  "I don't disagree with it."

**THE COURT:**  Let me ask you this: You're the expert on securities litigation. What does it matter to your case -- and I think it's probably the value of any damages you might get -- if I find that you've alleged false statements a little bit later than you say, so starting in let's say the summer, what does it matter to your case?

**MR. TUCCILLO:**  That's a good question. So if you were to truncate the class period at any given moment, number one, way down the line of course there will be inevitable discovery battles, et cetera.  But each day you take off of

the class period removes investors from the class who is eligible to pursue a claim, right?  All we're talking about right now is whether we've stated a sufficient claim, whether we've pled a sufficient claim to be entitled to advance to the point of discovery, right?  Because the PSLRA, the statute that governs this section imposes a statutory discovery stay. We've pled an exhaustive complaint based on congressional findings, FOIA requests, et cetera. The congressional findings include company e-mails, internal documents, right?  This is exhaustive for this space. But we've not yet had any discovery.

It may be, it may be at Summary Judgment, the stage after discovery, that the company is able to whittle down the class period a little bit, but the question is whether that should happen today.

And the thing is, the statements from the beginning of the class period, really none of them are true. They're just not true. "Proven manufacturing capabilities," you know, "unique capabilities across four independent suites to produce hundreds of millions of doses of vaccine annually." They said that in April, right?  --

**THE COURT:**  So tell me what's false about that.

**MR. TUCCILLO:**  Well, at minimum it's materially misleading because out of those hundreds of millions of doses produced, 85 percent of them get destroyed because they're

contaminated.

THE COURT:  But that's later.  We have to talk about when they made that statement.

MR. TUCCILLO: In April --

THE COURT:  April of 2020.

MR. TUCCILLO:  Right.  In April of '20 they already had not one, but two FDA reports, the inspection report and the 483 saying you are not in compliance with CGMP.  You are not, today, right now, weeks before that statement, right?  So the question is -- well, I guess there's a mix here of is it false or misleading to say everything they said and do they have scienter saying it. Those are two different, but related questions. But unquestionably, they were not in compliance. There was no basis to say that at that time. They could say --

THE COURT:  Okay, hold on. Let's look at the April 23, 2020 press release. So it touted Bayview as a CIADM design for rapid manufacturing of vaccines and treatments in large quantities during public health emergencies. That's not false or misleading. It was designed for that. Let's continue.

With, quote, "unique capabilities across four independent suites to produce at clinical scale," clinical scale, that's different than manufacturing?  Is that false?

MR. TUCCILLO:  Respectfully I would find the statements in this to be at minimum misleading, but you're getting to the better ones, right?  The later ones say "the

CIADM has the capacity to produce tens to hundreds of millions of -- produce, that's not clinical, that's commercial now, "to produce tens to hundreds of millions of doses of vaccine on an annual basis based upon the platform technology being used."

THE COURT:  But was that true at the time?  Has -- so we're April 23, 2020. There's no contamination yet. They've got an FDA report that's saying you've got some problems. It seems to be industry practice.  You then start to fix those problems. So this statement is it has the "capacity to produce tens of hundreds of millions." "Capacity." Is that true?

MR. TUCCILLO:  That is materially misleading when the facility has been maintained in a way where mold is growing -- to hear the CWs who worked there describe it -- on every inch of the facility.

THE COURT:  Is "capacity" different than "capability"?

MR. TUCCILLO:  I'm not sure that it's dramatically different. I'm really not sure that it is.

THE COURT:  Okay.

MR. TUCCILLO:  And every CW across the board said that they lacked the personnel to do any of these things. They just simply didn't have them. They had been sort of treading water as a clinical facility.  COVID hit, right?  And rather--

THE COURT:  But here it says "The CIADM." I think that's actually referring to the building itself, right?  Am I

wrong about that?

MR. TUCCILLO:  I think that -- I believe I'm right here. This might be slightly off, but I believe I'm in the right zone. I think that has to do with the federal designation that was applied to Bayview. I think they had to at the beginning when they were picked as one of three federal --

THE COURT:  Right, it's a designation.

MR. TUCCILLO:  Right. There's three of them in the country that can do this, theoretically.

THE COURT:  But I'm just wondering here if what they're trying to say is the building that is CIADM certified has the capacity to produce tens of hundreds of thousands.

MR. TUCCILLO:  But implicit in that, right, is that it's going to be doing so in the manufacturing suites. There's four of them. You know, three of them were actually used here, two for one of the vaccines, one for the other. All four were in shambles. All four had mold problems, waste disposal problems, inadequate training, inadequate staffing, inadequate control environment the entire time.  The CWs all described -- a foot in the ground, they poked holes at the CWs.  Well, the CW didn't have lunch with the CEO so we can't use that for scienter.  But the CWs were literally there. CW means confidential witnesses, for the folks in the gallery.  They were on-site at the facility and they said, this was a mess.

And when we brought new people in they were unqualified, no pharmaceutical background, wholly inadequate for this and it gets better.

When the CWs try to take notes about this in meetings, those notes get revised. Access to them get restricted. When CW-1 raises concerns to the head of the facility he gets fired. Head of the facility in a rage fires everybody else associated with him, including the note-taker. Those people said, Defendant Husain led, not participated, led calls about the COVID manufacturing facilities and problems with the clients.  Clients are J&J and AstraZeneca, right?  Right in the room. Regular ones. They say, well you don't give me the exact dates. Well, the dates are probably in those notes that were restricted, but it doesn't matter because we plead the frequency, biweekly, bimonthly, et cetera.

THE COURT:  Okay, I'm going to move to Mr. Bongiorno in a moment, but let me ask you this: I've read a number of decisions in these types of cases.  Perhaps -- and I'm sure there are other cases involving so many alleged different false statements such as *In re Marriott* and I'm sure there are others you can probably direct me to. Do I need to decide on a Motion to Dismiss whether every single alleged false statement or material omission is actionable?

MR. TUCCILLO:  That is an excellent and fair question.  I will tell you in my long experience I've seen it

done both ways. So the most exhaustive I've ever seen was Judge Ellison in the BP litigation that I was in for nine years, he would do that and he would write an 80-page decision every time, God bless him, that took six months to come out --

**THE COURT:** So I don't want to shirk my judicial responsibilities. This is a very important case, but I'm also mindful of the benefit to the public and the parties of an expeditious resolution of this.  So what is your position?

**MR. TUCCILLO:** My position is no, because, because many of these statements, particularly in the eras we've used, the pre-March 31, 2021 and post-March 31, 2021 as just kind of a Mason Dixon line. There's no company disclosure by the way that triggers that. That's when the New York Times broke the story, after Mr. Kramer had sold $11 million of stock. They then raised the veil a little bit.  But that's the fulcrum that we've used.

So Your Honor could, for example, just sample among the pre and the post and explain why.  We're not going through each and every one of them. That happens all the time. We've cited several cases of mine honestly that are in here where that's exactly the approach because they're all similar, because they are all false and misleading for basically the same reasons which is why we wrote the complaint that way. Your Honor does not have to go through and write a decision that is commensurate with the voluminous pleading to make the

point. We are only at this stage talking about whether we have sufficiently pled a claim, a 10(b) claim, a claim under Exchange Act Section 10(b), whether we've done that or not. That's it.

**THE COURT:** Okay. I'm sure I'll come back to you, but I think this is a good time to turn to Mr. Bongiorno.

**MR. BONGIORNO:** Thank you, Your Honor.

**THE COURT:** So where should we start?

**MR. BONGIORNO:** Well, I can start where you finished.

**THE COURT:** Yeah, let's see what's useful. I think what would be useful for me is for you to respond to Mr. Tuccillo's position. Let's focus on the April 23, 2020 press release. I think it's a good place to start. You heard the discussion that we had about whether it's -- this statement is literally false. What I heard was maybe, but even if not it's implicitly false. It's certainly misleading. This statement touts Bayview that it has the capacity to produce tens to hundreds of millions of doses on an annual basis. At this point they've alleged that Emergent was told by the FDA I think twice that there were significant problems. And then we've got confidential witness 1, 4, 8 and 10 who I think talk about the unpreparedness of the company at the time.

**MR. BONGIORNO:** Sure, Your Honor. So to start with, the language in each of these is, of course, important and I

know the Court has clearly spent a lot of time looking at the language. And so the language in April and the language in July that you also focused on earlier is important. It's important in what it says, it's important in what it doesn't say and it's obviously important to contextualize it which I know the Court has done.

You know, the quote from Mr. Husain, "We share with our partners the same urgency to combat COVID-19." Obviously that's not false.

THE COURT: Hold on, hold on. Where are you? On April 23rd?

MR. BONGIORNO: I am.

THE COURT: Okay. Hold on one second.

MR. BONGIORNO: Sure.

THE COURT: Just give me one moment.

MR. BONGIORNO: Certainly.

THE COURT: Okay, I'm looking at the complaint right now, the April 23rd press release so I'm ready.

MR. BONGIORNO: Okay, I'm looking at the press release itself.

THE COURT: That's fair.

MR. BONGIORNO: But nonetheless, Husain is a defendant in the case. "We share with our partners the same urgency to combat COVID-19 and will leverage our talents, capabilities, and capacities up to 300 million doses," et

cetera. So certainly "will leverage" is not a statement of the present, it's a statement of the future. But nonetheless, Your Honor asked the question, the difference between capacity, capability, et cetera. The words do matter.

You heard a response that there really isn't much difference. This mentions "unique capabilities across four independent suites." They certainly had that.  That's why the Government went to them, that's why J&J went to them, that's why AstraZeneca went to them, et cetera.

So then the question is are these sort of generalized statements about what we can do and what we expect to do somehow rendered misleading by a 483 or an FDA inspection. And you heard plaintiffs' counsel use the word "findings." The case law is very clear on this. 483s are not final. They're not findings, they're observations. It's an iterative process between the FDA and the manufacturer or the drug sponsor or whomever. When they go in to inspect a facility, they make observations, they send them to the manufacturer, to the site and they go back and forth and try to remedy them. And there's no issue or question as to whether or not Emergent was trying to remedy the observations that the FDA was making and at the same time, disclosing the risks associated with that.

You heard plaintiffs' counsel say a couple of times that the complaint says that that statement on May 8th was made

public. The complaint does not say that. The complaint certainly does not say that because that's not true. The complaint says that the letter was sent to the FDA. There is nothing in paragraph 136 of the complaint that says it was made public. It wasn't made public. And the case law is also very clear that back and forth with the FDA is normal. Both on clinical trials for efficacy and safety, and on inspections of facilities and manufacturing, et cetera.

I litigated a case against his firm in the First Circuit called Ocular about 483s and what needed to be disclosed and when it needed to be disclosed and what 483s mean, so I know we're both very aware of that.

And so to say that because the FDA comes in and inspects manufacturing facilities and issues observations and the company is going back and forth with the FDA about those observations somehow the company cannot say that it has entered into a contract which it has undisputedly entered into to manufacture a drug substance for a vaccine candidate on what is very appropriately called Operation Warp Speed, everything is going lightning fast. These are not drugs that have been tested, never mind approved, never mind used. It's all happening at once. That's the context in which this is happening.

And so to stand here and say there's mold in every inch of the facility when J&J is in the facility, AstraZeneca is in

the facility, and the Government is in the facility is not even plausible that they would enter into these contracts when they're in the facilities making observations, et cetera.

THE COURT: What about the statement, the April 23, 2020 statement that I talked to Mr. Tuccillo about, "The CIADM has the capacity to produce tens to hundreds of millions of doses of vaccine on an annual basis based upon the platform technology being used." Even if that's literally true, isn't the company at this point assuring investors that it has the capabilities to do this and at this point did it have the capabilities according to the allegations in the complaint if there were deficiencies and they didn't have enough people? There's at least one CW that says at this time there were mold problems. Another CW, CW-8 says the sample receiving room did not have enough freezers and refrigerator space to store product for multiple different client vaccines. Did not have the office space to accommodate the staff. Needed to manufacture vaccines. Area four was not qualified for mass production, did not have enough quality control employees on the microbiology team to handle all the work for the contracts.

MR. BONGIORNO: So most certainly this statement was true, Your Honor. Most certainly. The company did it so they produced drug substance for tens, if not hundreds of millions of doses of the drug. The confidential witnesses don't say

when any of these things took place. These are their own observations and their opinions. Certainly, certainly the confidential witnesses can't put any of this knowledge in the heads of the individual defendants, so there's a scienter issue there as well. But I know that wasn't your question. Your question was whether or not the statement was true. And it most certainly was because it did happen.

But again, this is talking about capacity. And the press release I'm looking at again here, "Emergent Bayview facility has unique capabilities" -- I'll try to slow down because I know --

**THE COURT:** For the court reporter, yes. Thank you for that.

**MR. BONGIORNO:** And I know we have people here who are trying to follow this as well. "Across four independent suites to produce a clinical scale to get candidates rapidly into the clinic while at the same time scaling up to enable large-scale manufacturing." Scaling up. Not, you know, here we are today ready to hit the ground running and produce 100 million doses or drug substance for 100 million doses today. We're scaling up this manufacturing capability. It's all going very quickly.

And what did they say at the very same time and what warnings were out there in the public? "Regulatory authorities have issued inspectional observations, some of

which are significant." So they acknowledge that. That information is out there in the market. And the warnings go on and talks about what could happen with regard to future inspections and with regard to difficulties in meeting those observations and responding to them. So that context is all out there.

And the plaintiffs say right there in their motion -- opposition to our Motion to Dismiss, "The first amended complaint" -- this is Page 54 of their opposition -- "The first amended complaint does not and need not allege that defendants knew at the outset that Emergent's manufacturing of COVID-19 at Bayview would be futile or was doomed to fail." That's a pretty substantial admission. A pretty substantial admission.

So at the time we're saying this, the plaintiffs are not saying we knew we couldn't do it. We knew it was doomed to fail. We knew it would be futile. They are explicitly --

THE COURT:  I never read that in the complaint either implicitly or explicitly, so I'm not really sure why that's such a big concession.

MR. BONGIORNO:  Because, Your Honor, the case law makes it pretty clear that if it were doomed to fail and if it were futile, and that's the *Inspire* case from the Fourth Circuit, then the risk factors wouldn't be good enough. If you say there's a risk that things might go wrong and you know

they're going to go wrong, then those risks aren't good enough. But they're not alleging that.

So the case law -- and we cite a case from the First Circuit as well on this point, the *Gozani* case which I think is an important case here. That case says if you don't know that this risk is actually going to happen, if you don't know whatever you're pursuing is doomed to fail and is futile, then you don't need to calibrate the risk. You don't need to say "The risk is serious, the risk is pretty bad." You don't need to do that.

THE COURT: Well, let's fast forward to July 6th.

MR. BONGIORNO: Sure.

THE COURT: Can we do that?

MR. BONGIORNO: Of course.

THE COURT: That's another press release that contains alleged false statements. And I'm going to read what I think -- this is from the complaint -- what the plaintiffs allege are the false statements. Mr. Syed Husain who is the senior vice president and CDMO business unit head says, "We have the expertise and capabilities to meet the long-term needs of our customers and provide ongoing commercial manufacturing to benefit patients." At this point -- and then we've got -- I think we've got the same alleged false statement from April which is "Emergent's Bayview facility has unique capabilities across four independent suites to produce

a clinical scale" and so forth. I believe that's identical to what was said in April.

So here the difference is you're making that statement, as well as Mr. Husain's statement.  And these statements come on the heels of all of the audits I referenced earlier.

MR. BONGIORNO:  Yes, and I'd point to the same language, Your Honor. "Scaling up," "long-term," "over the next five years." And again, the risk factors being pointed to in the press release.

THE COURT:  So let's just try to be real. We've got real people here in the back. Let's talk like we're talking to real investors. You've got the FDA, the Federal Drug Administration who receives your response to the deficiency notices. Your response says, Here's what we're doing, X, Y and Z to fix what you said was wrong. And the FDA comes back and says, We do not consider your facility ready to support commercial operations. This is June of 2020. We're only three months into the pandemic. Everyone is wondering when the vaccine is coming. We're hopeful that it's coming. The news is reporting that J&J is on it, Moderna, AstraZeneca are on it. And then you've got BARDA making -- you know, saying that the FDA found you're not ready for commercial operations. You've got an e-mail that Mr. Kramer receives forwarding the FDA letter that you're not ready for commercial operations.  And Kramer says, "We should discuss bringing in outside resources

to get in front of this while we recruit permanent resources to lead." This is a response to an e-mail from Sean Kirk. They apparently had a conversation in the parking lot a few days earlier in which they discussed the problems.  And Mr. Kirk is telling Mr. Kramer, "This is what keeps me up at night. We're not ready." Yet a week-and-a-half later there's an announcement that says, Mr. Husain says, "We have the expertise"--  fine, maybe that's true -- "and capabilities to meet the long-term needs of our customers."

Even if that's literally true, don't you think a reasonable investor would want to know that the FDA has said "You're not ready for commercial operations"?

MR. BONGIORNO:  So two things, Your Honor. Perhaps a reasonable investor would want to know every single word that was said between Emergent and the FDA, but that is not the obligation of a public company, for sure.  And I don't think anyone is going to debate that. And so the question is what do we need to say and when do we need to say it?  And the law is clear that interim back-and-forth between a company and the FDA and differences of scientific opinion between the company and the FDA do not need to be disclosed. What needs to be disclosed are material developments when there is a duty to speak. And nothing in the back-and-forth between the company and the FDA --

THE COURT:  But Mr. Husain has said "We have the

expertise and capabilities to meet the long-term needs of our customers and provide ongoing commercial manufacturing to benefit patients." So he's put it out there. "We have the ability to provide ongoing commercial manufacturing." Isn't that -- doesn't that create the duty?  Once you put your toe in the water you're misleading the public by not telling them the FDA says you're not ready. Help me here.

**MR. BONGIORNO:**  I don't think so, Your Honor.

**THE COURT:**  Okay.

**MR. BONGIORNO:**  Because first of all, we did and we did produce tens, if not hundreds of millions of doses of the vaccine -- of drug substance by which the vaccine was created. So that did happen, okay?  So that's number one.

Number two, again, this is interim back-and-forth with the FDA. This isn't a letter that says, you know, this isn't a clinical hold on a trial because somebody died. This isn't a letter that says, stop doing what you're doing.  We're shutting down the facility because it is noncompliant. This is the FDA in a back-and-forth with the company saying, "We don't think you're ready yet and here's why."  And the company says, "Here's what we're planning to do to solve it." The FDA says, "We don't think that's quite good enough. Keep trying."  And we keep going and here we are announcing a contract with J&J. And J&J is in the facility every day.

And again, I point back to the context because context is

always important, of course.  And the Court is giving context and so I'm giving context here which is we have these risk factors out there that say the Government's been here, the Government has made inspectional observations, we're responding to them. They will be back, they will make other observations.  And if we're unable to respond to those we may not be able to produce a single -- any drug substance for a single dose of vaccine.

So we're telling the public look, the Government is here. The Government investigates. We have issues with them, we go back-and-forth with them. If we can't solve whatever issues they observed, we're not going to be able to do this. But here's what's happening now. We have a new five-year agreement with J&J. And if you read it, of course, which I know the Court has, over the next five years we are committed to leading CDML services to advance important vaccine -- this important vaccine candidate -- you know, Moderna and Pfizer ended up being way ahead of J&J, et cetera, in this country so it didn't turn out to be the end-all/be-all vaccine. But at the time it was a big deal, things were moving forward.

So I would submit to Your Honor that we did not say anything that was not true in that release and we did not have a duty to disclose the interim back-and-forth with the FDA at that moment.

THE COURT:  So I know it's in the papers and you

just said it, but just direct me to your disclaimer language.

MR. BONGIORNO:  Certainly.  It's on page 46 of our 10-Q for the period ending March 31st of 2020. It's page 46 of that particular 10-Q, which I believe it's Exhibit 2 to our Motion to Dismiss papers.

THE COURT:  So you're basically saying the disclaimer absolves you of any obligation to tell the public that the FDA said you weren't commercial ready?

MR. BONGIORNO:  Well, I would say two things, Your Honor: Yes, to your question.  But more to the point, I don't think we had a disclosure obligation on that issue because I don't think there was anything in that press release that gave rise to a disclosure obligation and I don't think that that back-and-forth with the FDA is material. It's not final. Those are observations. Those are scientific discussions between a sponsor or a manufacturer and a regulatory authority.  And therefore, they're not material and do not need to be disclosed under the case law. But do I think, of course --

THE COURT:  What's the best case to support what you just said?

MR. BONGIORNO:  So I would say the *Gozani* case and the *Inspire* case.  I think the *Inspire* case is a very important case on that point.

THE COURT:  Okay. Can I pause and go back to Mr. Tuccillo on this point?

**MR. BONGIORNO:**  Sure, Your Honor.  Absolutely.

**THE COURT:**  Let's do that. Mr. Tuccillo, what's your response?

**MR. TUCCILLO:**  Thank you, Your Honor. Let's look at the most recent case, the Novavax case, right, issued by this District of Maryland. Had an inspection report and a 483.  One inspection report, one 483 for two facilities. The company didn't even own those facilities, right?  It was somebody else's facilities.  They just happened to have employees there who kept reporting back to headquarters. And the argument that was just made was rejected by the Court. There, the Court said that when the defendant's CEO chose to speak about topics like manufacturing progress, et cetera, given that the manufacturing facilities had quality control and contamination issues outlined in an FDA inspection report and Form 483, quote, "The failure to reference the contamination and purity issues at those facilities that were causing delays could constitute material omissions."

So literally the opposite of what was just said. And that company didn't even own the facility. There were two facilities. There was one report each, not seven. And the argument was rejected. And this -- there's bedrock case law here. The best case, *Matrix*. Second best, *Singer,* Fourth Circuit 2018. Once you speak, you have a duty to speak the whole truth so that you make statements made in the context in

which they are made not materially misleading. That's the case. And Your Honor is basically asking that question without citing the case each time you address my colleague here.

I would also if Your Honor would indulge me, I'd like to address the warnings. Because that really is, if you look at the majority of their falsity arguments and frankly, a good portion of their scienter ones, it hinges on these warnings. And I have to admit, this is a fascinating argument for me because typically, right, because the PSLRA statute has a safe harbor provision. And it's important. There's a good reason for it.  It says, look, we want companies to be able to talk about the future.  We don't want them so paranoid that if they say something that doesn't happen, they're on the hook. So the statute creates a safe harbor provision. It says that for forward-looking statements that are accompanied by meaningful risk warnings, right, you can have protection against liability.

I thought we were going to be talking about that. And I keep calling them "warnings" and they keep calling them "disclosures" and I was scratching my head about that. And in their reply they made it clear. The reply at page 5 disavowed any attempt to activate the safe harbor. I can't explain why, but they did. So that's now off the table.

So what he's talking about now and the warnings language kind of came out today, but we're not talking about the safe

harbor anymore. So really what we're talking about is a truth on the market defense. Okay?  And that means that, well -- and I have the *Klein* case, *KBC*, *Massey Energy*.  It's in our opposition, page 35, note 58. "The truth on the market defense is when a defendant has to prove" -- and I'm quoting from *Klein*, the information was, quote, "transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by the previous misstatements." It says at the 12(b)(6) stage, the Motion to Dismiss stage we're at today that this is, quote, "intensely fact specific" and, quote, "rarely an appropriate basis for dismissing a 10(b) compliant."

What they're saying is up front we're saying hey, making vaccines are hard. Manufacturing things are difficult.  It's complicated.  And we might not be able to do it. And they don't change their warnings. They keep saying, "things may arise." There's a warning that says "slight deviations in manufacturing processes including contamination may result in lot failure." When month, after month, after month they are discarding tens and eventually hundreds of millions of doses. And we haven't gotten into yet, meanwhile the CEO is selling stock like crazy. But those warnings up front are supposed to absolve them from every time they speak, not having to comply with a Supreme Court decision in *Matrix* that says you have to speak the whole truth.

Think about the ramifications of a ruling blessing that argument. Car manufacturers: Hey, making electric cars are hard. We may not get it right. Plane manufacturers: Hey, this is a big hunk of metal in the sky. It may not work. And you say that up front and then you're free to give positive updates. Say we're addressing the problems. Say we can, you know, make a billion doses even though we're discarding 80 percent of them in real-time. It's just breathtaking the protection they're trying to get from those --

THE COURT: All right, I understand your argument.

MR. TUCCILLO: --warnings, outside of the safe harbor.

THE COURT: I understand.

MR. TUCCILLO: I've just not seen anything quite like this.

THE COURT: Okay, let's still stick with the pre-New York Times article. I do want to switch to the statements after the article. Statements and press releases that aren't directly attributable to an individual, are you arguing that those are made by the company or are they imputed to the three individuals?

MR. TUCCILLO: Your Honor, there are very few of those that that can be said for because the vast majority of press releases, for example, have pleads. They get filed with the SEC as an attachment to a Form 8K that is signed by one of

the company's officers.  At every turn in our complaint we always say the filing date, the signor.  8Ks aren't SOX-certified so we don't usually have a certification, but we always say who's doing it.  So 90 percent of the time there is a speaker.  In the rare instances sometimes to be honest with you I've seen this, companies start getting a little edgy about what they're saying and they will just post it to the company website and kind of leave it a little ambiguous.

You can have corporate scienter because when things are published by a company and there's no basis to say it, you know, et cetera, you can have the company be on the hook for it. I've had successes in cases with that. I don't even think we really need to spend a lot of time on that because the majority, the vast majority of things here are horse's mouth. I mean, the CEO giving interviews, testimony --

**THE COURT:**  Well, Mr. Kramer I think is in a different situation, but let's talk about Mr. Lindahl.

**MR. TUCCILLO:**  Sure.

**THE COURT:** He made a statement on July 30th of 2020 during an earnings call and said, "There's a transformation occurring in our CDMO business unit to provide long-term sustainable growth as evidenced by our ability to secure 1.5 billion in long-term contracts across our target market's affirm of Biotech and U.S. Government.  That doesn't seem false or misleading to me. Would you agree?

**MR. TUCCILLO:** I'm just looking at the statement.

**THE COURT:** All right.

**MR. TUCCILLO:** Let me say this about Defendant Lindahl. He's the CFO.

**THE COURT:** Right.

**MR. TUCCILLO:** So he signs and SOX-- SOX is Sarbanes-Oxley Act. It's the act that was passed to require executives to be on the hook for what the company is saying. He signs and SOX certifies every 10-Q, every 10-K. He's quoted as speaking on virtually every earnings call. So he's not some sort of shadow operative here. He's front and center.

That particular statement, I mean, I'm not going to die on that hill because I don't think I have to. Overall, thematically from April through and past batch distractions while report, after report, after report come out, right, nine reports about maybe two company responses, batch destruction every month from October onward. The facility is never ready. Any of these statements. With respect, the reason we pled them is because they are materially misleading.

**THE COURT:** All right.

**MR. TUCCILLO:** My colleague I will say quoted from the more extensive press release language that was not in the complaint. I only -- he can feel free to do that, I'm only noting it to highlight that we were selective. We didn't quote every word ever said by anybody at the company. We did try to

focus on things that had to do with the contracts, the facility, the responses to the FDA problems and the incidence once others revealed them.

THE COURT:  Okay, all right.  Just give me one moment.

MR. TUCCILLO:  Sure.

THE COURT:  The alleged insider trading, that didn't start to happen until the end of 2020, correct?

MR. TUCCILLO:  So Your Honor, I would refer you both to the paragraphs in the complaint -- my complaints tend to follow a set sort of format.  We will graphically depict all of the sales. That's in paragraph 270 and 271. The earliest sales noted -- I'm just looking real quickly.  It depends on who you're talking about, but I've got them on May 8, 2020 for Kramer was his first sale. May 8th of 2020 was Lindahl's first sale. But, you know, really if we're going to talk about this -- and I will say also by the way, our Appendix A graphically aligns the misstatements, the correctives, key facts, stock sales, resignations, et cetera, when they all start heading for the exits. This document really makes sense of the timing issues in two pages that are in play.

But if we're going to talk about the sales, we really need to talk about January and February 2021. That's really the heart of what is just so scathingly wrong here. And then with Your Honor's indulgence I'll explain why.

Defendants highlight a Rule 10b5 plan, 10b5-1 plan. Those plans have a good public policy reason, right?  If you're a CEO and you're going to be talking a lot, those are designed so that you can set in place a plan that will just sell stock in regular increments.  You just leave it alone.  It's kind of on autopilot and it then allows you to separate yourself from the very things that bring somebody like me to this court. If you happen to sell one day, but that plan has been in place for ten years, you can say well look, I've always sold on May 1st.

So what is just glaringly wrong here is that Mr. Kramer's plan hadn't sold a single share since 2016, nothing. And he had never sold more than a couple hundred thousand dollars a year. Sounds like a lot to normal folk like us, but it's a relatively modest amount for a CEO.

So what happens?  As we said, we've got the contracts and we have batch destruction starting in October. Not one batch, but there's seven. Congress finds that there's seven batches between October and November. Seven batches of AstraZeneca get destroyed. That first AstraZeneca batch, by the way, got destroyed before Johnson & Johnson even showed up.  The eventual issue is that they cross-contaminate, but each of them gets destroyed right out of the gate on their own.

So what does Mr. Kramer do?  Mr. Kramer while those batch destructions are not publicly disclosed, okay, the ultimate

reveal is when the New York Times breaks that story in March of 2021.  What does he do?  In November he changes that plan that hasn't sold a share in four years and never sold more than 100, couple hundred thousand a year. He changes it so it will sell more. And what does it do?  It sells $10 million of stock in three weeks. Think about that. Three weeks. In January and February of 2021, a month before The Times breaks this story, this guy unloads $10 million of stock on the sly.

THE COURT:  But the subject of the story had not occurred yet. There were other batches that had been destroyed in November and October.

MR. TUCCILLO:  They had occurred and he knew they occurred.  And if they want to get up here and say that the CEO did not know, please ask that question. Did the CEO not know that batches of the AstraZeneca vaccine, the COVID vaccine that was supposed to save us all that's being manufactured in his facility, right?  These contracts are a billion dollars.

THE COURT:  So I guess what I'm trying to say is the particular contamination that was reported in the New York Times article was discovered by Johnson & Johnson on March 5th. There were other contaminated batches that had been disposed of in October and November that were not the subject of the New York Times article.  So I just want to know -- I just don't want to conflate the two.

**MR. TUCCILLO:**  Right, but it's contamination.

**THE COURT:**  I understand.

**MR. TUCCILLO:**  It's the issue of this facility. This facility, 85 percent of the time it made anything it was contaminated.

**THE COURT:**  Okay.

**MR. TUCCILLO:**  They say, we made 100 million. Great.  You also destroyed 525 million doses, right?  Because it just was a contamination factory. The first of them start in October, in October/November and that's when he changes his plan. The incident that got discovered in March happened in January or February. It only got discovered in March by Johnson & Johnson in the Netherlands, not by Emergent.

**THE COURT:**  All right, is there anything else on insider trading?  I think you've made your point with respect to Mr. Kramer.

**MR. TUCCILLO:**  They sold a million dollars totally outside of the plans. They say well, it's for tax reasons but I ask you, if you spend a dollar on tax or a dollar on something else, it's the same dollar and there's a lot of cases that say that.

There's the bonuses and the executive comps. They got rewarded for exemplary corporate performance in 2020. They got rewarded with lavish -- Kramer's exec comp package went from 3.7 million to 7.8 million because he did such a bang up job

while these things were getting destroyed.

Kirk, he got 1.6 million two months before he resigned, in shame. It's breathtaking. I've never seen anything like this. Your Honor, with respect, this is the strongest case I've had in 24 years. I just -- my colleagues are excellent lawyers. If anybody can defend these defendants it's them. But this is just breathtaking.

THE COURT: Okay, thank you. Do you care to be heard on insider trading?

MR. BONGIORNO: Certainly, Your Honor. A couple points. I think the Court -- implicit in the questions the Court asked, I think the Court understand at least our argument on this point, but just to put a finer point on it because of some of the bombastic and, frankly, outrageous language that was just used, this is a securities fraud case and so I'm trying to keep it in some level of perspective here.

Mr. Kramer entered into a 10b5-1 plan or modified a 10b5-1 plan months before this cross-contamination incident occurred. The other incidents, to whatever extent the Court wants to give credit to those incidents or relevance to them, they were not cross-contamination incidents so they were different than what happened that led to the New York Times article that led to everything that followed. So the notion that this is all just more of the same and everybody knew

about it and it was all so bad and people are running for the exits is just -- that narrative is false. But putting aside whether it's false or not, I know this isn't the day to argue falsity.

THE COURT: No, it's not. We've got allegations that in October and November of 2020, just two months after they started to manufacture AstraZeneca vaccines, they've discarded or aborted or rejected eight batches. And I think -- I don't know how much is in a batch, but it's not a few, it's a lot. And it's right after that that we have the change in the 10b5-1 plan by Mr. Kramer, correct?

MR. BONGIORNO: That is the timeline, Your Honor. However, nothing about the developments that you just said really have anything to do with any of the stock drops in this case or the news by the New York Times in this case, et cetera. That was J&J, that was cross-contamination. It was months later. At the time that this was happening, the company was entering into large contracts with multiple drug sponsors generating an enormous amount of potential revenue. And Mr. Kramer was increasing the total amount of his holdings in the company stock.

Plaintiffs' counsel said that the insider trading started in May of 2020. That was 95 shares. A remarkable statement to make before this Court. 95 shares.

So the trading, it's relevant here and we're talking

about what took place in 2021, months after the 10b5-1 plan was modified, months before the incident that we've been discussing became known. So I think that that -- and most importantly, he increased his holdings over the time period, therefore negating scienter.  So that's all I'll say on that.

THE COURT:  Okay.

MR. BONGIORNO:  But Your Honor, if I just may give you two cases because you asked me a question before and I answered it and like most of my answers they're not perfect, I just want to give you two more cases on scientific disagreement.

THE COURT:  Okay.

MR. BONGIORNO:  The *Sanofi* case, *In re Sanofi* case from the Southern District of New York we cite in our pleadings and the *Nabriva* case from the Southern District of New York we also cite in our pleadings.  It was also WilmerHale and Pomerantz. I don't know if the Court has any more questions for me.

THE COURT:  Just give me one minute, please.

MR. BONGIORNO:  Certainly.

THE COURT:  I'm ready to move onto statements after the New York Times article. Mr. Tuccillo, is there anything else you'd like to say before I do that?

MR. TUCCILLO:  I just wanted to answer Your Honor's sort of half-question. An AstraZeneca batch -- we're talking,

what they made is bulk drug substance. It's the feedstock for a vaccine. One batch of AstraZeneca is equivalent to 2.5 to 3 million vaccine doses. So when we say eight batches were destroyed, you have to take eight and multiply it by that number.

One J&J batch was 10 to 15 million doses. So Congress ultimately found at the end of the rainbow in December that 420 million J&J doses had been destroyed and 105 million AstraZeneca.  To get those numbers down to batches you just divide by the numbers I just gave you.

The only other thing I'll say is just to address two quick things: The *Sanofi* case was ironically both our firms, but there the risk warning ahead of time was a complete prior publication of Phase III clinical trial data.  It was just the disclosure of all the data.  It was not some half risk warning at the beginning that doesn't change. It's really very different.

And just to address the comment on "bombastic," I certainly didn't mean to off-put my counsel here, but for me this is a case on which I'm passionate.  I am a high-risk COVID individual.  My parents are undergoing medical treatments.  My mom had cancer treatments at the time.  So I do find this fraud more personal than others.  Because J&J and AstraZeneca, while my counterpart here did sort of say yes, they weren't maybe the be-all and end-all in the U.S., they

were a key part of the global response --

THE COURT:  I know AstraZeneca was popular in Europe.  Did we even have it here in the United States?

MR. TUCCILLO:  AstraZeneca and J&J, this is me ad-libbing a little bit, but I remember this because I was locked in my home, carefully watching all this.  The advantages that these vaccines had over Moderna and Pfizer were that they were one-shot dose and they didn't require the intense refrigeration that the vaccines that I ultimately got which were Moderna, and my kids got which were Pfizer, required.  So they were thought to be a key part of the global response because it was one shot, you didn't have to refrigerate it so intently.  So think of this as a multi-prong thing.  That's why the Government was so intent on getting Emergent fired up, right?  Because we got Moderna and Pfizer here, that's not enough. These other vaccines were going to be shipped out and get everybody up because all these variants, right, spring up because it just doesn't get under control.

But anyway, I just wanted to answer Your Honor's questions.  I'm certainly happy to move on.

THE COURT:  Okay, thank you. All right, ready to move on to the post-New York Times article statements?  Okay, it seems to me that reading your alleged false statements, Mr. Tuccillo, that they -- the nature then changes at this point.  The New York Times comes out with an article -- this is for

the benefit of the record and the students that are here -- and reports for the first time publicly on March 31, 2021 that 15 million doses of J&J vaccines or the equivalent of 15 million doses of J&J vaccines had to be thrown out because of cross-contamination from the J&J and AstraZeneca vaccines at the Bayview facility. Of course you can't contaminate them, they're different vaccines. They need to remain separate. So that breaks. That news breaks. And then the next day Emergent issues a press release and it states in part, "A single batch of drug substance was identified that did not meet specifications and our rigorous quality standards. Emergent isolated this batch and it will be disposed of properly." It assured people that "safety and quality are Emergent's top priorities. The Bayview facility has been designed and validated to meet all current good manufacturing practices. There are rigorous quality checks throughout Emergent's vaccine manufacturing processes, that those quality control systems worked as designed and that discarding a batch of bulk drug substance does occasionally happen during vaccine manufacturing. Emergent remains confident in our ability to meet the FDA requirements."

So let's just focus on this statement, Mr. Tuccillo. What is false, misleading, or what's the material omission?

**MR. TUCCILLO:** It's difficult to pick where to start. Characterizing this as a sort of single event that does

occasionally happen, right, all the way in April of 2021 at which point again, starting back in October of 2020, batches were destroyed every month. Every month. AstraZeneca batch in October, seven by November, December. We get to January/February now we have them cross-contaminating. It's just -- this is an orchestrated counter-messaging campaign. So they get caught. The Times and the Associated Press both put out articles on March 31st to April 1st.

And what happens next?  The company puts out a press release. Kramer, God bless him.  He is a fighter, if anything. He gets out and does an interview and he disclaims that it was even the ingredients of the two vaccines cross-contaminating each other.

THE COURT:  Well, that's a different one.  That's a statement we'll talk about in a moment.  I understand holistic, but it's important that I read every statement and understand every word.

MR. TUCCILLO:  Sure.  Here it was not a single batch that did not meet specifications. That's the language they chose they didn't say a single batch was cross-contaminated, they said a single batch of drug substance was identified that did not meet specifications. That's literally false.

By that point I've lost count, but we're up to maybe ten, a dozen that have not met specifications, the language they chose to use.

THE COURT: That could also maybe include the one that resulted from worker error with the wrong gas line too.

MR. TUCCILLO: Sure. That's the other thing. It's not just contamination; they suffocated the cells because they didn't know what they were doing. "We isolated this batch."

THE COURT: Well, they did that. That's literally true.

MR. TUCCILLO: Not exactly, because it wasn't caught at the Emergent facility. It got shipped to the Johnson & Johnson facility in the Netherlands where it got caught a month later.

THE COURT: Now we're talking about materiality.

MR. TUCCILLO: But in fairness, right, this message says look, nothing to worry about. We're on it. We caught it. Occasionally things go awry. Something happens. Machine misfires. We caught it.

THE COURT: Is this statement immaculate? "Bayview facility has been validated to meet all current good manufacturing practices." At this time?

MR. TUCCILLO: False.

THE COURT: Why is that false?

MR. TUCCILLO: It was not in compliance with good manufacturing practices and had not been for gosh, six, seven, eight months.

THE COURT: Well, they were producing the vaccine.

The FDA knew they were. AstraZeneca had left, but they were producing J&J on April 1, 2021. So you're saying they still had not met all current good manufacturing practices at that time?

**MR. TUCCILLO:** I'm not sure AstraZeneca had left by that point. As a matter of fact, just to correct Your Honor respectfully, the New York Times and the AP breaks the story. Over the course of the next month as the company pushes back with the press release, the interview, Kramer writes an op-ed. God bless him, he didn't have to do that, but he goes out and he writes a fiery op-ed.

**THE COURT:** I'm sorry, I got confused. You're right. They were still producing AstraZeneca.

**MR. TUCCILLO:** By the time they correct his misstatement, AstraZeneca had left the building, literally. J&J is now in control of Bayview by that point.  That's a month later.

**THE COURT:** So to my point, I misspoke, but let's clarify for the record. On April 1, 2021 when this press release was issued, they're still manufacturing J&J and AstraZeneca vaccines and they state that the Bayview facility has been validated to meet all current good manufacturing practices.

**MR. TUCCILLO:** False then. It was not in compliance -- I mean, if we're going to get into parsing words about

validated and in compliance with, I can't understand the difference in this context if there even is one because The Times has caught them.  The AP has caught them. This is their moment, right?  They could say, you know what --

THE COURT:  Well, can't you have a cross-contamination and -- I guess you can't meet all good manufacturing practices if you've had cross-contamination.

MR. TUCCILLO:  Absolutely not.  But it's not a chicken and egg. It's not like they had been in compliance, whoops, a cross-contamination and now they're out.  They were never in compliance.  The reports back to April and May of '20 that we were talking about, those e-mails, those internal e-mails, right, the loud noise and hey, I'm telling everybody that will listen, we are not in CGMP compliance that Congress uncovers with its subpoena power and publishes later. They knew it.

THE COURT:  Okay, let's move on to Mr. Kramer's statement that same day, April 1, 2021 during an interview on CNBC where he says, "It isn't the case or wasn't the case where an ingredient from one vaccine contaminated or impacted the other." He then says, "So it was again an out-of-specification result for one batch product.  And to put it in proper context, Meg," it was the name of the interviewer -- "for your viewers, this was one of many other batches of product that has been successfully manufactured in

accordance with our and J&J's product specifications. And again, it's unfortunate that it happened, but it's one of many batches that had been successfully manufactured."

So the first statement that this isn't the case or wasn't the case where an ingredient from one vaccine contaminated or impacted the other --

**MR. TUCCILLO:**  Blatantly false. A lie.

**THE COURT:**  Could he have been mistaken?

**MR. TUCCILLO:**  No. How could you be mistaken?  These contracts are the soul of this company, right?  With all the correctives, investors have lost a billion, one billion with a B, dollars in shareholder value because of this.  These contracts pumped up the company's revenue, $500 million. They're getting 30 million a month from the Government just to be available. These contracts are the lifeblood of Emergent.

You have a cross-contamination event back in January and February, by the way, when he's selling $10 million of stock that The Times then reports and the AP reports. Ha, gotcha. You know, this happened. He gets out and he talks it down. How could you not investigate?  There is no way he could have been mistaken.  And we know that because two weeks later he writes a fiery op-ed that doubles down.

When this statement eventually gets walked back, he doesn't do it. He won't admit the falsity.  And by that point a month later when a spokesperson does and says "Oh, he

misspoke," by that point AstraZeneca has stopped being manufactured. The Government took Bayview and said, Johnson & Johnson, you run it. These guys have no idea what they're doing. Right?  By that point after all that happens, a spokesperson says "Oh, he misspoke."

THE COURT:  Okay. Let's move on to his other statement to the interviewer on CNBC. So again, he says "It's an out-of-specification result for one batch product." And then he says, "This was one of many other batches of product that has successfully been manufactured in accordance with our and J&J's product specifications."

I understand your position is that's misleading, but that's literally true. It is one of many other batches that has -- there were successfully manufactured some J&J vaccines.

MR. TUCCILLO:  And some were destroyed, J&J too. It wasn't just AstraZeneca.

THE COURT:  So on that point, I thought the only other J&J batch that was destroyed other than the one that's the New York Times article subject, the cross-contamination one that occurred in February was in November and that was after workers hooked up the wrong gas line. That's different than cross-contamination. I thought -- and maybe it doesn't matter, but the AstraZeneca batches were spoiled by bacterial or microbial contamination.

MR. TUCCILLO:  Right.  But he's not saying this was

the first time that J&J had a batch destroyed because it was cross-contaminated with the AstraZeneca and that hadn't happened before. That's not what he said. He said, "This was an out-of-specification result for one batch. And to put it into proper context, Meg, let me help you understand it, Meg," a little mansplaining, he says, "This is one of many other batches of product that has been successfully manufactured in accordance with our and J&J's product specifications."

There was the batch from November of 2020 that Your Honor highlighted that was destroyed because Emergent's non-CGMP facility with inadequately trained personnel and a lack of a control environment suffocated the cells. And again, one batch is the equivalent of 10 to 15 million vaccine doses.

That's the proper context if you're myopically focused on Johnson & Johnson and ignoring all of the destruction of AstraZeneca that had been occurring one suite over.

THE COURT: All right, I'm going to turn to Mr. Bongiorno now and just pause. So now we're focusing as you've heard, on the April 1st press release and Mr. Kramer's interview with CNBC. Let's start first with the press release. "A single batch of drug substance was identified that did not meet specifications in our rigorous quality standards." If that's not false, why isn't it misleading? Or why isn't there a material omission that there were other drug batches, batches of drug substance that were identified that did not

meet specifications?

MR. BONGIORNO:  Well, it certainly doesn't say there weren't.  And in fact, it goes on to say that this happens from time to time during this process. So I don't think there's anything about this press release that is somehow misleading by not saying something else that was unrelated that happened with the different vaccine in some of the cases previously, because it says this happens from time to time. And here is what happened here.

THE COURT:  Yeah, but I mean, let's just put our real people hat on. If the company comes out and says, you know, the New York Times article comes out. They're probably panicking and they say, a single batch of drug substance was identified that did not meet specifications. We've isolated it. It will be thrown away. Our facility is validated, meets current good manufacturing practices. We have rigorous quality checks. This happens from time to time. I'm hearing that and I'm thinking okay, there was a one-off. There was cross-contamination that happened. Let's cut him some slack, right?  Things happen, we're moving quickly. But I think as an investor it would matter to me that this had happened several times before that.

MR. BONGIORNO:  Well, fair enough, Your Honor. And that's why Courts don't impose that duty to disclose everything at all times. And one could always answer that

question yes.  Would an investor want to know that?  Sure, an investor would want to know that, maybe. Maybe not. Because it all depends on context.

And here we're talking about a cross-contamination incident, the first and only one. And it's in response as Your Honor says, to the context of the New York Times article. And so they're responding to it.

And they don't say, you know, "Don't worry about it, it's all good." They say, "It happens from time to time and here's what happened here." And so they're not -- absolutely not saying this has never happened before, it will never happen again. They say the opposite. They say it happens from time to time and this happened.  And you got deflexion in response to the question --

THE COURT:  How much of our back and forth right now really is a question for a jury as opposed to here we are at the Motion to Dismiss stage?

MR. BONGIORNO:  I don't think so, Your Honor. I don't think this is a question for a jury and I'll tell you why. Because -- and, I mean, it's either a question for a Motion to Dismiss which I certainly think it is or for Summary Judgment on loss causation or class certification issues. Perhaps on loss causation, but I don't want to invite a debate about that right now because we'll miss lunch and dinner if we do that and we'll lose our students, for sure.

THE COURT:  You might lose me too.

MR. BONGIORNO:  And me. And me. But, Your Honor, there is a question of materiality here.  And let's not forget, the New York Times article comes out, the stock price drops. And so what about this press release mislead anyone or mislead the market?  You know, you heard discussion about this whole was it a mixup?  Was it not a mixup?  What did Mr. Kramer say and what was the reaction to that?  And then you heard about this supposed retraction or whoever was described. Stock price went up after the clarification about whether it was an ingredient mixup or a cross-contamination incident or not.

THE COURT:  But we can agree that Mr. Kramer's statement to CNBC that this wasn't a case where one ingredient from one vaccine contaminated or impacted the other, that that was not true. We can agree on that, right?

MR. BONGIORNO:  Well, for the purposes of today, Your Honor, I will concede the point so as not to delve too far into it on the Motion to Dismiss stage. But I will say this:  The question that started it all by the interviewer was "Wasn't this a mixup of ingredients?"  And he was responding to that. That was what set the stage for that statement. And this was not a mixup of ingredients. This was a cross-contamination. This wasn't somebody thinking "Oh, this ingredient goes in the J&J product. Oops, it's actually an

AstraZeneca ingredient." That's not what happened. It wasn't a mixup. It was a cross-contamination incident where an ingredient --

THE COURT:  Well, weren't they bringing the trash out from AstraZeneca vaccines through the J&J site and that's how it got mixed up or contaminated I should say?

MR. BONGIORNO:  Contaminated, yes.  Mixed up, no.  I don't think anybody thought that they were using the right ingredient and they were really using the wrong ingredient which is what the implication I would understand from a mixup would be.  So that's the context in which the statement was made where he was saying "No, it was not a mixup." So I will leave it at that for that point.

THE COURT:  Okay, all right. Okay. And then to use Mr. Tuccillo's words, Mr. Kramer doubles down in an op-ed two weeks later in the Baltimore Sun and says, "Our Bayview facility in Baltimore exists and is now ready to produce one billion vaccines a year to fight COVID-19. We recently had a setback.  That was not something we ever like to see. During our rigorous quality control process we found a batch of J&J vaccines that did not meet specification. This occasionally happens." I guess that's all literally true, but --

MR. BONGIORNO:  Yes.

THE COURT:  And the big elephant in the room that's missing is that it's happened on other occasions.

MR. BONGIORNO:  Well, I don't know, Your Honor, because I think that when he says this occasionally happens, that that is most certainly indicative of the fact that they're not saying this never happened before, it's never going to happen again, this was a one-time incident. They're saying the opposite. They're saying, here's what happened here and this occasionally does happen.

THE COURT:  But aren't they saying this occasionally happens, sort of we're Emergent, we know what we're doing. We've been doing this for 20 years. This is our business. This happens. That's how I read that. Not that this occasionally happens and it's happened in the past several months.

MR. BONGIORNO:  Well, I don't know that I see so much daylight between those two statements, Your Honor.  And I don't know that any daylight that does exist is necessarily material because they are producing drug substance for the vaccines and they are doing it successfully.  Tens, if not hundreds of millions of doses having been produced in this facility in addition to, of course, everything else that they've done for as you say, the past 20 years.

THE COURT:  Did they destroy more vaccine doses than they created?

MR. BONGIORNO:  I don't think that they did, Your Honor.  And the reason why --

THE COURT:  Well, were they destroyed?  We can use

passive voice if you'd like.

MR. BONGIORNO:  There are a lot of people who would laugh at the concept of me using a passive voice because of how much disdain I show for it in my brief writing. But putting that aside, the reason why doses were destroyed is perhaps something for discovery, Your Honor.  But I said before and I'll say it again, that some of this -- some of these manufacturers or sponsors for these drugs, their vaccines went out of favor at some point. Side effects, et cetera.  J&J vaccine is not one that's being -- was being used in this country for very long. So why vaccines were timed out and ultimately destroyed is a question for another day. But at this moment in time which is really all that matters, the fact that vaccine substance was destroyed months or years later is really --

THE COURT:  No, I'm sorry.  Let me clarify my question. My question was focusing on this moment in time on April 14, 2020. At that point in time had Emergent produced more vaccines than had been destroyed?

MR. BONGIORNO:  I don't know the answer, but I believe so, Your Honor, but this is early on. So it wouldn't be surprising if, you know, bumps in the road caused a substance to be destroyed for different reasons that are entirely irrelevant to what is going on at the time of this press release.

THE COURT:  I understand, I understand.

MR. BONGIORNO:  And to go back on sort of the context here because I think the context is quite important as to what was being said at this time, I'd point to right there in the complaint, some of the allegations here about what these statements were that were supposedly misleading, you know, when a company says we're never satisfied to see shortcomings in our manufacturing facilities or processes, to say oh, but they said that they were CMGP certified or whatever, they're saying "We're not satisfied to see shortcomings in our manufacturing processes and facilities." They're saying -- paragraph 203 of their complaint they quote Emergent as saying that "they have started making improvements and are fully committed to making the necessary short and long-term enhancements to meet or exceed FDA standards."

That's more than just suggesting that whatever they're doing now is not necessarily meeting short and long-term -- sorry, meeting or exceeding FDA standards because they say that they're committed to making the necessary enhancements to do so.

So the fact that they were certified CMGP compliant, the fact that they were manufacturing drug substances at facilities that the FDA was allowing them to, that J&J and AZ that were on-site were allowing them to, the fact that there was a cross-contamination incident, it was honest, it was

disclosed and they said, this is unfortunate, we're never satisfied to see these shortcomings, we'll do better. That's the context in which all of this was said. Nobody is sitting there thinking, wow, I guess it's perfect and this is just one hiccup. They're saying we're disappointed, there were shortcomings, we'll do better, we're going to work hard. So I think that context is quite important. And the disclosures and the risk factors -- and we can get into this sort of the imperiality and forward-looking statements and all that stuff if you like, Your Honor, but the important point here is at this point, their risk factors absolutely do change and they do say, we've stopped, we'll stop manufacturing and we're not going to start again until we're ready, until we've done what we need to do and we're satisfied with the appropriate folks to go forward.

So at that point in time, everybody knows there were problems, that manufacturing was shut down and that it would only continue later once they did what they needed to do to get it going again.

**THE COURT:** Okay. That was April 21st. The press release was, "We are never satisfied to see shortcomings. They are correctable. We will fix them."

**MR. BONGIORNO:** Yes, Your Honor.

**THE COURT:** Let's go back to one of the questions I asked Mr. Tuccillo early on. What's your position on whether I

have to go through every alleged false statement?

**MR. BONGIORNO:** I don't think you would be surprised by my answer, Your Honor. I think you do. I'm sure the clerks will really appreciate that answer. But let's remember here there's a lot of allegations mentioned in this courtroom today, but these are real people. There are three individual defendants here who are being accused of something quite serious, securities fraud, intentionally or recklessly misleading the public. That's a pretty serious allegation and one that I know everyone in this room takes quite seriously. So to say, oh, there's a lot in there and somebody signed an 8-K and then attached a press release to it so you really don't need to go and do all that work, to me is not really appropriate.

I understand this is just the pleading stage and if anything is allowed to go forward, it's only allowed to go forward because of that. And at a later date people will get their day in court, if needed, if the case goes forward. But there are a lot of statements here, way too many statements here that are being challenged which makes it hard to focus. And these folks are entitled to know what it is they're defending themselves against. There's discovery --

**THE COURT:** Well, let me ask you this: Let's say I find -- I'm sorry, I'm looking off, but I'm talking to him. I'm going to pick a random number. Please don't read into

this number.  Let's say I find three false statements that meet the pleading requirements. How does that change discovery?  Why do I need to go into the 75 -- well, let's say there's 50 different statements.

**MR. BONGIORNO:**  It changes the complexion of the case, Your Honor, for discovery, for damages analyses, perhaps it changes what defendants are in the case, how long the class period is. It could be a very substantial change to the dynamic.

**THE COURT:**  Certainly it affects the class period as Mr. Tuccillo has explained that to me and of course I'm aware of that.  But assuming there's an identified class period but within that class period let's say there are four misstatements, why does it matter if there are four versus seventeen?

**MR. BONGIORNO:**  Well, for example, again the individual defendants, some may have spoken or not spoken.

**THE COURT:**  Understood.  That's very important.

**MR. BONGIORNO:**  So I'll put that aside, Your Honor, because I know the Court appreciates that. There are categories of statements and plaintiffs did categorize their theories of liability in the case, including financial fraud I think was the description of one of them and then there's -- so there's SOX certification issues which we don't think belong in this case.

THE COURT: I was viewing that as separate. We haven't talked about that yet.

MR. BONGIORNO: Okay, okay.

THE COURT: Yeah.

MR. BONGIORNO: So there are different categories of --

THE COURT: Right, that's fair.

MR. BONGIORNO: --challenged statements that I think are important to differentiate here. And then even among the statements that I think we've spoken about this morning that all have the same general subject matter, it certainly could affect discovery into the truth or falsity or misleading nature of any given statement. There could be discovery on a point that wouldn't necessarily take place if that particular statement is dismissed.

THE COURT: All right. Okay, let's do this: Let's move on. I'm winding down, just so everyone knows, but I do want to talk about and I'll now switch to Mr. Tuccillo, what Mr. Bongiorno just referred to, the reported results fraud and your internal controls fraud theories. Just to cut to the chase, I don't see them. I need you to help me see them because I don't see them under the cases you've cited.

MR. TUCCILLO: Two quick points. Your Honor asked if more doses had been destroyed than produced by the time that production was halted. The answer to that question is

yes. It was found in the May 2022 report that 240 million doses were destroyed in late '20 and early '21, including 180 million made before the production pause. They also in December said that the grand total, the total accounting of all this was 525 million destroyed, versus 100 million distributed. So all they ever produced was 100 million and they had already destroyed 180 million by the time the pause happened.

I do want to address also how Your Honor will rule. So I'm involved in a very involved case in Texas called McDermott, that's a good sort of barometer of how this happened. Judge Hanks there issued a very short three-line short order.  Judge Rakoff does this a lot too in the Southern District of New York saying, "motion denied, opinion to follow." And then in the opinion kind of goes through things a little bit more.

What doesn't have to happen is if Your Honor is upholding many, many, many misstatements, you don't have to go through them all. You can and it's helpful to identify key ones, right?  The first one, the last one, the big ones in the middle. You could say, these five are just like it and for similar reasons, it's denied. It's really more important from my perspective that when something is denied, it gets explained so that we kind of know the perspective. But I don't think Your Honor has to go through every line that's

highlighted and bolded saying, this is denied because, this is denied because. That's going to take forever. And the reason I suggest respectfully --

THE COURT: No, I think you said you want to know -- you meant to say when it's granted, not when it's denied.

MR. TUCCILLO: I misspoke.

THE COURT: Of course.

MR. TUCCILLO: The reason I'm suggesting that is because we are under a discovery stay. The clock is ticking and the assets of this company are negatively impacted by the events that we are talking about.

THE COURT: Thank you.

MR. TUCCILLO: Pivoting to your question, so the reported results fraud and the internal controls fraud, those are two different frauds. We segregate them because thematically they are different. The business operations fraud is about things like the facility, the dose production, the capacity, are we responding? Was it a cross-contamination? Real guts of the events.

The reported results fraud is a half-sibling, right? And many of the cases I'm citing, Your Honor, quite candidly, I'm on: The *Higher One* case, *Toronto-Dominion*, *Odonate*, those are all cases of mine.

THE COURT: It's nice to cite yourself.

MR. TUCCILLO: It is. It gets interesting. The

more gray hair you get, the more it happens.  But the thing that is key to understand about this is those cases find that GAAP compliant, Generally Accepted Accounting Principles, GAAP compliant financial results, so the number is technically right and there's no misstatements. Nonetheless, the MD&A section of the financial reports, the Management Discussion and Analysis section of a 10-K or a 10-Q with those results can be materially misleading because of the way they are attributed, the way they are explained.

When you have those results like hey, we made X million this quarter. Hey, our numbers look great, our backlog is this, et cetera, and you're attributing it to things and not disclosing the negative trends in those things.  So here it was attributed to these COVID contracts, the Bayview facility, the CDMO segment, the business segment that encompasses those, positive results there and you are omitting negative trends, that's regulation S-K item 303.

My colleagues on the other side cite some cases on reply that say well, you know, regulation S-K violations are not per se violations of 10(b). But they nevertheless are the springboard to 10(b) violations, right?  And you are violating that duty to disclose.  It has a duty of disclosure.  And when you are choosing, these things are in 10-Qs and 10-Ks.  These very same documents that have all the business operations fraud.  These are contemporaneous to those misstatements, we

just categorize them a little differently to make intellectual sense of it. Those attributions in the MD&A render those actionable. That's what all those decisions found.

So with respect, those are actionable. They are a separate thread of this fraud.  And at the end of the rainbow there wasn't a restatement of financials, but there was a reversal of income. The company had to reverse $86 million worth of income -- or revenue rather, that it had booked. It had to reduce its -- the midpoint of its margins.

THE COURT:  That's because the contract was cancelled, not because there was a misstatement.

MR. TUCCILLO:  Correct, but they had already started booking revenue.  And the Government stopped paying them which was highly unusual.  The Government said, we are not paying for this anymore and eventually the Government cancelled its contract.  And as a result, they had to reverse.  Reverse revenue means they booked the revenue already.  So as they are saying, hey our CDML segment is going great; hey, the Bayview facility is doing all the things we say it's doing and our numbers are consequently X, they're omitting the negative trend of what is going on and ultimately, they have to say well, actually the number is X minus 86 million, right?  It's not a misstatement per se, but it's a reversal of revenue. That's the reported results fraud.

The internal controls fraud, if you want me to quick

pivot, or I'm not sure if you want him to --

THE COURT:  Please, yes.

MR. TUCCILLO:  So the internal controls fraud basically look, the internal controls fraud is about those SOX certifications. Those things have to have teeth. Congress enacted the Sarbanes-Oxley Act to end the era where the CEO and CFO can say, "I didn't know.  I didn't know what was going on." Puts them on the hook. They have to certify that 10-Q or that 10-K, for example, does not omit facts necessary to make the statements made not misleading. Disclosure controls.

THE COURT:  So does that mean every time there's a 10b5 violation there's an internal controls violation?

MR. TUCCILLO:  Not necessarily. And it depends on who is talking, et cetera. But here, Kramer admitted an internal controls violation.  They're going to say "Well, that was controls of the facility, not controls of what we're saying about the facility."  But that jump is about from me to him.  Because if you don't have a control environment at all at the facility and then you are making repeated statements in these SEC filings about that facility, the disclosure controls the companion piece.  One controls about operations, one controls about disclosures, but those controls are deficient too because you know the stuff.  You're reading the FDA reports.  You admit you read the FDA reports.

THE COURT:  I guess I need to read the cases a

little more closely, but what I've read indicates that the internal control is over the financial reporting and that cases that have found internal control violations involve companies that misattribute the source of the funds or didn't disclose that the funds were obtained through unlawful conduct.

MR. TUCCILLO: So I'll refer Your Honor, our opposition cites the *Toronto-Dominion and Odonate* cases which are my power cases where this was upheld, but it also cites the *City of Roosevelt* case from the District of Delaware in 2009. What that case says at page 420 is that defendants can be held liable under Section 10(b) for their SOX certifications if the plaintiffs plead with particularity that they were, quote, "aware or should have been aware" close quote, of the underlying misconduct when they made their SOX certifications. That's basically what we're talking about. And that case also says and I quote, "Sarbanes-Oxley is not directed solely at ensuring numerical accuracy and preventing dishonest accounting practices." Continuing the quote, "Any interpretation restricting its scope to these purposes would be artificially narrow and inconsistent with the remedial purposes of the statute." End quote.

THE COURT: Okay. Mr. Bongiorno, talk to me about reported results fraud and internal controls fraud. And why don't we start with internal controls fraud where he just left

off.

MR. BONGIORNO: Sure. Your Honor, we cite -- and what he just said, the quote was "numerical accuracy in the financial reporting." It's not restricted to numerical acts in the financial reporting. But it's financial controls, it's not manufacturing controls. And the cases we cite, we cite a couple from the Southern District, the *Brasken* case and the *PetroChina* case and those are important cases on that point. But internal controls, SOX violations, securities fraud claims based on them have never been expanded to what we're talking about in this case which is cross-contamination events at manufacturing facilities or anything of that nature. And to expand it that way, I think Your Honor anticipated this in her question about the financial control, the financial reporting piece, but the same can be said for the SOX piece which is if either one of these claims is allowed to go forward we will see them every single time in every single case because they'll say oh, you are reporting results and you were reporting revenue, but you were sloppy. You knew your product was going to fail. You knew your iPhone wasn't going to work anymore. You knew your Facebook account was not going to generate revenue anymore. Whatever the company is that's being sued, it's going to be yeah, maybe the numbers are right, but they were based on revenue that wasn't going to be able to continue because things weren't going well. And there's also

a SOX violation because you said that you had good internal controls.  And you didn't have good internal controls because whatever it is, you had a problem in your manufacturing facility, you had a problem with product liability and an environmental problem, you've had a personal injury case that you knew was going to come down a different way and you sort of disclosed that that was around the horizon and therefore, there's a SOX violation and that revenue that you reported is not as good as we all thought it was.  So those two claims shouldn't survive.

We don't see these claims in these types of cases. He and I have been doing this for over half-a-century together and against each other and we don't see these types of claims and there's a reason for it, because the law doesn't allow it.

THE COURT:  You've been doing this for 50 years?

MR. BONGIORNO:  Combined with Mr. Tuccillo.  I've only been doing it for 33 years, but combined with him it's been over 50.

MR. TUCCILLO:  He's a real progeny.

THE COURT:  All right.

MR. BONGIORNO:  Anyway, it's all in the brief, Your Honor. That's all I have to say on those points.

THE COURT:  All right, just give me one moment. Those are all the questions I have for now. I'll certainly ask Mr. Tuccillo if he has anything else he'd like to add that's

not already in the briefs or hasn't been covered.

**MR. TUCCILLO:** The only thing I'll say in closing, Your Honor, we talked about pieces of this scienter analysis. The scienter analysis under *Tellabs* is a comparison of inferences. Supreme Court binding decision. It says that their competing inference has to be more compelling than mine. If they're the same, we win. If mine is more, great, we win. But they have to be more.

And the thing is, when I read their opposition at page -- or their Motion to Dismiss memo rather at page 30 and 31, they put forward their competing inference. And the way they characterize it is, quote, "a fair inference." They said "a fair inference is defendants worked in good faith to manufacture vaccine drug substance in response to a pandemic, disclosed the risk, suffered an unfortunate contamination incident and worked to address it." Number one, they're talking about a singular incident. But putting that aside, they call it a fair inference, not a more compelling one.

This argument doesn't facially meet the standard of *Tellabs*. It has to be more compelling than mine or they lose at this stage. I thought that was important to mention.

**THE COURT:** Okay, thank you. Mr. Bongiorno, anything else?

**MR. BONGIORNO:** I'll just keep it to one sentence, Your Honor. The *Gozani* case and the *Inspire* case on scienter

are very important cases for us in response to the point that Mr. Tuccillo just made. Thank you.

THE COURT:  All right. Okay. I may have follow-up questions.  If I do, you'll hear from me.  Otherwise, I will rule as quickly as I can. Thank you very much.

(Proceeding concluded at 12:13 p.m.)

*Nadine M. Bachmann, RMR, CRR  Federal Official Court Reporter*
*101 W. Lombard Street, Fourth Floor,  Baltimore, MD  21201*

**CERTIFICATE OF OFFICIAL REPORTER**

I, Nadine M. Bachmann, Certified Realtime Reporter and Registered Merit Reporter, in and for the United States District Court for the District of Maryland, do hereby certify, pursuant to 28 U.S.C. § 753, that the foregoing is a true and correct transcript of the stenographically-reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this <u>22nd</u> day of <u>April, 2022</u>.


*-S-*

_____

NADINE M. BACHMANN, CRR, RMR
FEDERAL OFFICIAL COURT REPORTER

**$**

$10 [3] - 43:5, 43:8, 55:17
$11 [1] - 21:14
$500 [1] - 55:13
$86 [1] - 72:7
$87 [1] - 12:8

**'**

'20 [3] - 17:6, 54:11, 69:2
'21 [1] - 69:2

**1**

1 [4] - 22:22, 53:2, 53:19, 54:18
1.5 [1] - 39:22
1.6 [1] - 45:2
10 [5] - 5:18, 11:8, 22:22, 48:6, 57:13
10(b [5] - 22:2, 22:3, 37:12, 71:21, 74:12
10(b) [1] - 71:20
10-K [3] - 40:9, 71:7, 73:9
10-Ks [1] - 71:23
10-Q [5] - 34:3, 34:4, 40:9, 71:7, 73:8
10-Qs [1] - 71:23
100 [6] - 27:19, 27:20, 43:4, 44:7, 69:5, 69:6
105 [1] - 48:8
10:10 [1] - 2:2
10b5 [2] - 42:1, 73:12
10b5-1 [5] - 42:1, 45:18, 45:19, 46:11, 47:1
11th [2] - 11:15, 12:8
12(b)(6 [2] - 3:14, 37:9
12:13 [1] - 78:6
136 [2] - 8:5, 25:4
14 [1] - 63:18
15 [5] - 4:9, 48:6, 50:3, 57:13
16-page [1] - 8:6
180 [2] - 69:2, 69:7
19 [1] - 1:7
1st [3] - 42:10, 51:8, 57:19

**2**

2 [1] - 34:4
2.5 [1] - 48:2
20 [4] - 12:9, 13:23, 62:10, 62:20

2009 [1] - 74:11
2016 [1] - 42:12
2018 [1] - 35:24
2020 [34] - 5:18, 6:21, 7:1, 7:18, 7:22, 7:24, 10:20, 10:25, 11:1, 11:8, 11:20, 12:9, 12:14, 13:5, 13:15, 14:15, 17:5, 17:16, 18:6, 22:13, 26:5, 30:17, 34:3, 39:19, 41:8, 41:14, 41:15, 44:23, 46:6, 46:23, 51:2, 57:9, 63:18
2021 [13] - 4:8, 5:19, 21:11, 41:23, 43:2, 43:7, 47:1, 50:2, 51:1, 53:2, 53:19, 54:18
2022 [2] - 69:1, 79:14
2023 [1] - 1:7
203 [1] - 64:12
21st [1] - 65:20
22nd [1] - 79:14
23 [5] - 10:25, 17:16, 18:6, 22:13, 26:4
23rd [3] - 11:13, 23:11, 23:18
24 [1] - 45:5
240 [1] - 69:1
270 [1] - 41:12
271 [1] - 41:12
28 [1] - 79:8

**3**

3 [2] - 5:19, 48:2
3.7 [1] - 44:25
30 [2] - 55:14, 77:10
300 [1] - 23:25
303 [1] - 71:17
30th [2] - 11:14, 39:19
31 [5] - 4:8, 21:11, 50:2, 77:10
31st [2] - 34:3, 51:8
33 [1] - 76:17
35 [1] - 37:4

**4**

4 [1] - 22:22
420 [2] - 48:8, 74:11
46 [2] - 34:2, 34:3
483 [15] - 6:17, 6:21, 8:19, 8:24, 8:25, 9:3, 11:21, 12:9, 12:14, 14:16, 17:8, 24:12, 35:6, 35:7, 35:15
483s [3] - 24:14, 25:10, 25:11

**5**

5 [1] - 36:21
50 [3] - 67:4, 76:15, 76:18
500 [1] - 13:6
525 [2] - 44:8, 69:5
54 [1] - 28:9
58 [1] - 37:4
5th [1] - 43:22

**6**

6 [2] - 7:18, 10:20
6th [4] - 7:22, 7:24, 12:12, 29:11

**7**

7.8 [1] - 44:25
75 [1] - 67:3
753 [1] - 79:8

**8**

8 [5] - 6:21, 12:14, 14:15, 22:22, 41:14
8-K [1] - 66:12
80 [1] - 38:7
80-page [1] - 21:3
85 [2] - 16:25, 44:4
86 [1] - 72:22
8:21-CV-00955-DLB [1] - 1:3
8K [1] - 38:25
8Ks [1] - 39:2
8th [3] - 8:5, 24:25, 41:15

**9**

9(b [1] - 3:16
90 [1] - 39:4
95 [2] - 46:23, 46:24

**A**

a.m [1] - 2:2
ability [4] - 3:6, 32:4, 39:22, 50:20
able [10] - 5:3, 9:9, 10:9, 10:10, 16:13, 33:7, 33:12, 36:11, 37:15, 75:24
aborted [1] - 46:8
above-entitled [1] - 79:10
absolutely [4] - 35:1, 54:8, 59:10, 65:11
absolve [1] - 37:23

absolves [1] - 34:7
Accepted [1] - 71:3
access [2] - 9:15, 20:5
accommodate [1] - 26:17
accompanied [1] - 36:15
accordance [3] - 55:1, 56:10, 57:8
according [1] - 26:11
account [1] - 75:21
accounting [2] - 69:4, 74:19
Accounting [1] - 71:3
accuracy [2] - 74:18, 75:3
accused [1] - 66:7
accustomed [1] - 8:12
acknowledge [2] - 2:22, 28:1
acronym [1] - 14:1
Act [3] - 22:3, 40:7, 73:6
act [1] - 40:7
actionable [3] - 20:23, 72:3, 72:4
activate [1] - 36:22
acts [1] - 75:4
ad [1] - 49:5
ad-libbing [1] - 49:5
add [2] - 3:25, 76:25
addition [1] - 62:19
additional [1] - 14:25
address [14] - 4:16, 4:24, 6:24, 8:2, 10:1, 12:23, 14:17, 14:19, 36:3, 36:5, 48:11, 48:18, 69:9, 77:16
addressed [1] - 9:7
addressing [1] - 38:6
adequate [1] - 15:10
Administration [1] - 30:13
admission [2] - 28:13, 28:14
admit [3] - 36:8, 55:24, 73:24
admits [1] - 15:12
admitted [1] - 73:14
advance [2] - 16:4, 33:16
advantages [1] - 49:7
affect [1] - 68:12
affects [1] - 67:10
affirm [1] - 39:24
aggregate [1] - 11:16
ago [1] - 3:17
agree [3] - 39:25, 60:13, 60:16

agreement [2] - 12:9, 33:13
ahead [2] - 33:18, 48:13
Aided [1] - 1:25
aligns [1] - 41:18
all/be [1] - 33:19
allegation [1] - 66:9
allegations [4] - 26:11, 46:5, 64:5, 66:5
allege [4] - 3:4, 9:20, 28:10, 29:18
alleged [21] - 4:21, 5:2, 5:15, 5:20, 5:21, 5:22, 7:11, 7:13, 7:15, 8:1, 12:18, 15:19, 20:19, 20:22, 22:20, 29:16, 29:23, 41:7, 49:23, 66:1
alleging [1] - 29:2
allow [1] - 76:14
allowed [3] - 66:16, 75:16
allowing [2] - 64:23, 64:24
allows [1] - 42:6
alone [1] - 42:5
ambiguous [1] - 39:8
amended [7] - 3:10, 3:16, 4:18, 5:6, 5:7, 28:8, 28:10
amount [4] - 15:11, 42:15, 46:19, 46:20
analyses [1] - 67:6
Analysis [1] - 71:7
analysis [2] - 77:3, 77:4
announcement [2] - 12:8, 31:7
announcing [1] - 32:23
annual [3] - 18:4, 22:19, 26:7
annually [1] - 16:20
answer [7] - 47:24, 49:19, 58:25, 63:20, 66:3, 66:4, 68:25
answered [1] - 47:9
answers [1] - 47:9
anticipated [1] - 75:13
anyway [2] - 49:19, 76:21
AP [3] - 53:7, 54:3, 55:18
apologize [1] - 9:25
Appendix [1] - 41:17
applied [1] - 19:5
appreciate [2] - 6:11, 66:4

2

**appreciates** [1] - 67:20
**approach** [1] - 21:21
**appropriate** [3] - 37:12, 65:14, 66:14
**appropriately** [2] - 4:7, 25:19
**approved** [1] - 25:21
**April** [31] - 1:7, 11:1, 11:13, 11:20, 11:25, 12:9, 13:23, 16:21, 17:4, 17:5, 17:6, 17:15, 18:6, 22:13, 23:2, 23:11, 23:18, 26:4, 29:24, 30:2, 40:14, 51:1, 51:8, 53:2, 53:19, 54:11, 54:18, 57:19, 63:18, 65:20, 79:14
**area** [1] - 26:18
**arena** [1] - 6:6
**argue** [1] - 46:3
**argued** [2] - 4:17, 5:4
**arguing** [2] - 4:20, 38:19
**argument** [10] - 2:12, 2:19, 4:24, 35:10, 35:22, 36:8, 38:2, 38:10, 45:13, 77:19
**arguments** [1] - 36:6
**arise** [1] - 37:17
**article** [14] - 4:12, 5:19, 38:17, 38:18, 43:21, 43:24, 45:24, 47:22, 49:22, 49:25, 56:19, 58:12, 59:6, 60:4
**articles** [1] - 51:8
**artificially** [1] - 74:21
**aside** [4] - 46:2, 63:5, 67:19, 77:17
**assess** [1] - 9:5
**assets** [1] - 70:10
**associated** [2] - 20:8, 24:22
**Associated** [1] - 51:7
**assuming** [1] - 67:12
**assured** [1] - 50:13
**assuring** [1] - 26:9
**AstraZeneca** [33] - 10:23, 11:15, 12:9, 13:2, 20:11, 24:9, 25:25, 30:20, 42:19, 42:20, 43:15, 46:7, 47:25, 48:2, 48:9, 48:24, 49:2, 49:4, 50:5, 51:3, 53:1, 53:5, 53:13, 53:15, 53:21, 56:1, 56:16, 56:23, 57:2, 57:16,

61:1, 61:5
**attached** [2] - 3:18, 66:12
**attachment** [1] - 38:25
**attempt** [1] - 36:22
**attributable** [1] - 38:19
**attributed** [2] - 71:9, 71:14
**attributing** [1] - 71:12
**attributions** [1] - 72:2
**audience** [2] - 2:23, 3:9
**auditors** [1] - 10:24
**audits** [6] - 7:22, 10:23, 12:10, 12:11, 13:14, 30:5
**August** [1] - 13:1
**authorities** [1] - 27:25
**Authority** [1] - 4:1
**authority** [2] - 9:2, 34:16
**autopilot** [1] - 42:6
**available** [4] - 7:8, 9:19, 10:16, 55:15
**awarded** [1] - 11:14
**aware** [4] - 25:12, 67:11, 74:14
**awry** [1] - 52:15
**AZ** [1] - 64:23

# B

**Bachmann** [1] - 79:5
**BACHMANN** [1] - 79:18
**back-and-forth** [7] - 31:19, 31:23, 32:14, 32:19, 33:11, 33:23, 34:14
**background** [1] - 20:2
**backlog** [1] - 71:11
**bacterial** [1] - 56:23
**bad** [2] - 29:9, 46:1
**Baltimore** [3] - 3:7, 61:16, 61:17
**bang** [1] - 44:25
**BARDA** [3] - 10:24, 11:14, 30:21
**barometer** [1] - 69:11
**based** [5] - 16:7, 18:4, 26:7, 75:10, 75:24
**bases** [1] - 6:18
**basis** [6] - 17:14, 18:4, 22:19, 26:7, 37:12, 39:10
**batch** [28] - 40:14, 40:16, 42:17, 42:20, 42:24, 46:9, 47:25, 48:2, 48:6, 50:9,

50:12, 50:18, 51:3, 51:18, 51:20, 51:21, 52:5, 54:22, 56:8, 56:18, 57:1, 57:4, 57:9, 57:12, 57:21, 58:13, 61:20
**batches** [18] - 13:4, 42:18, 42:19, 43:10, 43:15, 43:22, 46:8, 48:3, 48:9, 51:2, 54:25, 55:3, 56:9, 56:13, 56:23, 57:7, 57:24, 57:25
**battles** [1] - 15:25
**Bayview** [18] - 3:7, 4:11, 11:18, 17:16, 19:5, 22:18, 27:9, 28:12, 29:24, 50:6, 50:14, 52:17, 53:16, 53:21, 56:2, 61:16, 71:14, 72:18
**be-all** [1] - 48:25
**became** [1] - 47:3
**bedrock** [1] - 35:22
**BEFORE** [1] - 1:6
**beginning** [5] - 14:13, 14:22, 16:16, 19:6, 48:16
**belong** [1] - 67:25
**benefit** [8] - 2:25, 3:8, 9:4, 21:7, 29:22, 32:3, 50:1
**best** [3] - 34:19, 35:23
**better** [4] - 17:25, 20:3, 65:2, 65:6
**between** [11] - 5:18, 12:13, 24:3, 24:16, 31:15, 31:19, 31:20, 31:23, 34:15, 42:19, 62:14
**big** [5] - 28:20, 33:20, 38:4, 61:24, 69:20
**Bill** [1] - 2:15
**billion** [8] - 11:16, 12:1, 38:7, 39:23, 43:18, 55:11, 61:18
**bimonthly** [1] - 20:15
**binding** [1] - 77:5
**BIOSOLUTIONS** [1] - 1:3
**BioSolutions** [4] - 2:4, 2:17, 3:4, 3:5
**Biotech** [1] - 39:24
**bit** [7] - 7:8, 10:14, 15:20, 16:14, 21:15, 49:5, 69:16
**biweekly** [1] - 20:15
**blatantly** [1] - 55:7
**bless** [3] - 21:4, 51:10, 53:10

**blessing** [1] - 38:1
**board** [1] - 18:20
**BOARDMAN** [1] - 1:6
**body** [1] - 13:6
**bolded** [1] - 70:1
**bombastic** [2] - 45:14, 48:18
**Bongiorno** [8] - 1:15, 2:18, 20:16, 22:6, 57:18, 68:19, 74:23, 77:22
**BONGIORNO** [54] - 3:23, 4:15, 5:10, 22:7, 22:9, 22:24, 23:12, 23:14, 23:16, 23:19, 23:22, 26:22, 27:14, 28:21, 29:12, 29:14, 30:6, 31:13, 32:8, 32:10, 34:2, 34:9, 34:21, 35:1, 45:10, 46:12, 47:7, 47:13, 47:20, 58:2, 58:23, 59:18, 60:2, 60:17, 61:7, 61:23, 62:1, 62:13, 62:23, 63:2, 63:20, 64:2, 65:23, 66:2, 67:5, 67:16, 67:19, 68:3, 68:5, 68:8, 75:2, 76:16, 76:21, 77:24
**bonuses** [1] - 44:22
**booked** [2] - 72:8, 72:17
**booking** [1] - 72:13
**boom** [1] - 11:17
**BP** [1] - 21:2
**Brasken** [1] - 75:7
**breaks** [5] - 43:1, 43:7, 50:8, 53:7
**breathtaking** [3] - 38:8, 45:3, 45:7
**brief** [2] - 63:4, 76:21
**briefs** [1] - 77:1
**bring** [1] - 42:7
**bringing** [2] - 30:25, 61:4
**broke** [3] - 4:8, 4:12, 21:13
**brought** [1] - 20:1
**building** [3] - 18:25, 19:12, 53:15
**bulk** [2] - 48:1, 50:18
**bumps** [1] - 63:22
**business** [6] - 29:19, 39:21, 62:10, 70:16, 71:15, 71:24
**buy** [1] - 9:16

# C

**calibrate** [1] - 29:8
**campaign** [1] - 51:6
**cancelled** [2] - 72:11, 72:15
**cancer** [1] - 48:22
**candidate** [2] - 25:18, 33:17
**candidates** [1] - 27:16
**candidly** [2] - 4:25, 70:21
**cannot** [1] - 25:16
**capabilities** [13] - 7:21, 16:18, 16:19, 17:20, 23:25, 24:6, 26:10, 26:11, 27:10, 29:20, 29:25, 31:8, 32:1
**capability** [3] - 18:16, 24:4, 27:21
**capacities** [1] - 23:25
**capacity** [11] - 7:21, 18:1, 18:9, 18:10, 18:15, 19:13, 22:18, 24:3, 26:6, 27:8, 70:18
**car** [1] - 38:2
**care** [3] - 5:9, 8:1, 45:8
**carefully** [1] - 49:6
**cars** [1] - 38:2
**case** [61] - 4:2, 4:3, 9:1, 15:17, 15:21, 21:6, 23:23, 24:14, 25:5, 25:9, 28:21, 28:23, 29:3, 29:4, 29:5, 34:18, 34:19, 34:21, 34:22, 34:23, 35:5, 35:22, 35:23, 36:2, 36:3, 37:3, 45:4, 45:15, 46:15, 47:13, 47:15, 48:12, 48:20, 54:19, 55:4, 55:5, 60:14, 66:18, 67:6, 67:7, 67:22, 67:25, 69:10, 70:22, 74:10, 74:11, 74:17, 75:7, 75:8, 75:11, 75:17, 76:5, 77:25
**cases** [21] - 20:18, 20:19, 21:20, 39:12, 44:21, 47:8, 47:10, 58:7, 68:22, 70:21, 70:23, 71:2, 71:18, 73:25, 74:3, 74:8, 74:9, 75:6, 75:8, 76:11, 78:1
**categories** [2] - 67:21, 68:5
**categorize** [2] - 67:21,

72:1
**caught** [7] - 51:7, 52:8, 52:10, 52:14, 52:16, 54:3
**causation** [2] - 59:22, 59:23
**caused** [1] - 63:22
**causing** [1] - 35:17
**CDML** [2] - 33:16, 72:18
**CDMO** [3] - 29:19, 39:21, 71:15
**cells** [2] - 52:4, 57:12
**center** [1] - 40:11
**century** [1] - 76:12
**CEO** [10] - 15:12, 19:22, 35:12, 37:21, 39:15, 42:3, 42:15, 43:14, 73:6
**certainly** [21] - 22:17, 23:16, 24:1, 24:7, 25:2, 26:22, 26:23, 27:2, 27:7, 34:2, 45:10, 47:20, 48:19, 49:20, 58:2, 59:21, 62:3, 67:10, 68:11, 76:24
**CERTIFICATE** [1] - 79:1
**certification** [3] - 39:3, 59:22, 67:24
**certifications** [3] - 73:5, 74:13, 74:16
**certified** [4] - 19:12, 39:3, 64:9, 64:21
**Certified** [1] - 79:5
**certifies** [1] - 40:9
**certify** [2] - 73:8, 79:8
**cetera** [19] - 8:11, 9:7, 10:12, 15:25, 16:8, 20:15, 24:1, 24:4, 24:9, 25:8, 26:3, 33:18, 35:13, 39:11, 41:19, 46:16, 63:10, 71:12, 73:14
**CFO** [2] - 40:4, 73:7
**CGMP** [5] - 13:25, 14:2, 17:8, 54:14, 57:10
**challenged** [2] - 66:20, 68:8
**change** [6] - 37:16, 46:10, 48:16, 65:11, 67:2, 67:8
**changes** [6] - 43:2, 43:4, 44:10, 49:24, 67:5, 67:7
**characterize** [1] - 77:12
**characterizing** [1] -

50:25
**chase** [1] - 68:21
**check** [1] - 7:3
**checks** [2] - 50:16, 58:17
**chicken** [1] - 54:9
**choosing** [1] - 71:23
**chose** [3] - 35:12, 51:20, 51:25
**Chuang's** [1] - 4:2
**chunk** [1] - 10:13
**CIADM** [5] - 17:16, 18:1, 18:24, 19:12, 26:5
**Circuit** [4] - 25:9, 28:24, 29:4, 35:24
**cite** [10] - 10:9, 10:10, 29:3, 47:14, 47:16, 70:24, 71:18, 75:2, 75:6
**cited** [2] - 21:20, 68:22
**cites** [2] - 74:8, 74:9
**citing** [2] - 36:3, 70:21
**CITY** [1] - 1:11
**City** [1] - 74:10
**Civil** [1] - 2:4
**CIVIL** [1] - 1:3
**claim** [6] - 16:2, 16:3, 16:4, 22:2
**claiming** [1] - 14:15
**claims** [5] - 75:9, 75:16, 76:9, 76:11, 76:13
**clarification** [1] - 60:10
**clarify** [5] - 3:13, 6:16, 6:20, 53:19, 63:16
**class** [12] - 11:9, 11:20, 15:23, 16:1, 16:13, 16:17, 59:22, 67:7, 67:10, 67:12, 67:13
**clear** [5] - 24:14, 25:6, 28:22, 31:19, 36:21
**clearly** [1] - 23:1
**CLERK** [1] - 2:3
**clerks** [1] - 66:3
**client** [1] - 26:16
**clients** [2] - 20:11
**clinic** [1] - 27:17
**clinical** [9] - 17:21, 18:2, 18:23, 25:7, 27:16, 30:1, 32:16, 48:14
**clock** [1] - 70:9
**close** [1] - 74:14
**closely** [1] - 74:1
**closing** [1] - 77:2
**CMGP** [2] - 64:9, 64:21

**CNBC** [6] - 5:19, 5:25, 54:19, 56:7, 57:20, 60:14
**Cohen** [2] - 1:14, 2:9
**coin** [1] - 13:22
**colleague** [2] - 36:3, 40:21
**colleagues** [2] - 45:5, 71:18
**combat** [2] - 23:8, 23:24
**combined** [2] - 76:16, 76:17
**comfortable** [2] - 6:10, 6:14
**coming** [2] - 30:19
**commensurate** [1] - 21:25
**comment** [1] - 48:18
**commercial** [12] - 11:3, 13:13, 13:16, 18:2, 29:21, 30:17, 30:22, 30:24, 31:12, 32:2, 32:4, 34:8
**committed** [3] - 33:15, 64:14, 64:19
**committee** [1] - 14:24
**comp** [1] - 44:24
**companies** [3] - 36:11, 39:6, 74:4
**companion** [1] - 73:21
**company** [45] - 3:4, 5:24, 8:21, 9:1, 9:6, 9:8, 10:9, 11:17, 12:14, 12:20, 13:17, 14:6, 16:9, 16:13, 21:12, 22:23, 25:15, 25:16, 26:9, 26:23, 31:16, 31:19, 31:20, 31:23, 32:19, 32:20, 35:7, 35:20, 38:20, 39:8, 39:10, 39:11, 40:8, 40:16, 40:25, 46:17, 46:21, 51:9, 53:8, 55:10, 58:11, 64:7, 70:10, 72:7, 75:22
**company's** [4] - 8:11, 9:4, 39:1, 55:13
**comparison** [1] - 77:4
**compelling** [3] - 77:6, 77:18, 77:20
**competing** [2] - 77:6, 77:11
**complaint** [35] - 3:2, 3:3, 3:10, 3:16, 4:18, 5:6, 5:7, 5:17, 7:3, 7:11, 8:5, 8:12, 9:21, 10:11, 12:20, 13:11, 16:7, 21:23, 23:17,

24:25, 25:1, 25:3, 25:4, 26:11, 28:9, 28:10, 28:18, 29:17, 39:1, 40:23, 41:10, 64:5, 64:12
**complaints** [1] - 41:10
**complete** [1] - 48:13
**completely** [1] - 14:21
**complexion** [1] - 67:5
**compliance** [9] - 15:8, 17:8, 17:13, 52:22, 53:24, 54:1, 54:9, 54:11, 54:14
**compliant** [4] - 37:12, 64:21, 71:3, 71:4
**complicated** [1] - 37:15
**comply** [1] - 37:23
**comprehensive** [3] - 6:24, 12:23, 14:16
**comps** [1] - 44:22
**Computer** [1] - 1:25
**Computer-Aided** [1] - 1:25
**concede** [1] - 60:18
**concept** [1] - 63:3
**conceptually** [1] - 13:10
**concerns** [1] - 20:6
**concession** [1] - 28:20
**concluded** [1] - 78:6
**conduct** [1] - 74:6
**conference** [1] - 6:4
**Conference** [1] - 79:12
**confident** [1] - 50:20
**confidential** [4] - 19:24, 22:22, 26:25, 27:3
**conflate** [1] - 43:25
**conformance** [1] - 79:11
**confused** [1] - 53:12
**confusing** [1] - 13:8
**Congress** [6] - 9:12, 10:12, 42:18, 48:6, 54:14, 73:5
**congressional** [3] - 14:6, 16:7, 16:8
**consequently** [1] - 72:20
**consider** [2] - 11:2, 30:16
**considering** [1] - 3:14
**consistently** [1] - 5:15
**constitute** [1] - 35:18
**contains** [1] - 29:16
**contaminate** [2] - 42:22, 50:6

**contaminated** [11] - 13:20, 17:1, 43:22, 44:5, 51:20, 54:20, 55:5, 57:2, 60:15, 61:6, 61:7
**contaminating** [2] - 51:5, 51:12
**contamination** [32] - 4:10, 13:12, 14:11, 18:6, 35:14, 35:16, 37:18, 43:20, 44:1, 44:9, 45:19, 45:22, 46:16, 50:5, 52:4, 54:6, 54:7, 54:10, 55:16, 56:19, 56:22, 56:24, 58:19, 59:4, 60:11, 60:24, 61:2, 64:25, 70:19, 75:11, 77:15
**contemporaneous** [1] - 71:25
**context** [19] - 11:9, 25:22, 28:5, 32:25, 33:1, 33:2, 35:25, 54:2, 54:23, 57:5, 57:14, 59:3, 59:6, 61:11, 64:3, 65:3, 65:7
**contextualize** [1] - 23:5
**continue** [4] - 5:22, 17:19, 65:18, 75:25
**continuing** [1] - 74:19
**contract** [7] - 11:13, 11:14, 11:15, 25:17, 32:23, 72:10, 72:16
**contracts** [13] - 12:1, 26:2, 26:21, 39:23, 41:1, 42:16, 43:17, 46:18, 55:10, 55:13, 55:15, 71:14
**contractual** [1] - 11:17
**control** [13] - 15:6, 19:20, 26:19, 35:14, 49:18, 50:17, 53:16, 57:12, 61:20, 73:18, 74:2, 74:3, 75:14
**controls** [21] - 68:20, 70:14, 72:25, 73:3, 73:4, 73:10, 73:12, 73:15, 73:16, 73:20, 73:21, 73:22, 74:24, 74:25, 75:5, 75:6, 75:9, 76:2
**conversation** [1] - 31:3
**conveying** [1] - 10:15
**convince** [1] - 11:4
**core** [1] - 14:23
**corporate** [2] - 39:9,

44:23
**correct** [10] - 4:3, 4:4, 6:7, 6:18, 41:8, 46:11, 53:6, 53:14, 72:12, 79:9
**correctable** [1] - 65:22
**correctives** [2] - 41:18, 55:11
**counsel** [8] - 2:6, 2:9, 2:11, 2:16, 24:13, 24:24, 46:22, 48:19
**count** [2] - 13:6, 51:23
**counter** [1] - 51:6
**counter-messaging** [1] - 51:6
**counterbalance** [1] - 37:8
**counterpart** [1] - 48:24
**country** [3] - 19:10, 33:18, 63:11
**couple** [6] - 3:17, 24:24, 42:13, 43:4, 45:10, 75:7
**coupled** [1] - 14:5
**course** [13] - 3:10, 3:15, 15:24, 22:25, 29:14, 33:1, 33:14, 34:18, 50:6, 53:8, 62:19, 67:11, 70:7
**Court** [20] - 2:3, 6:11, 6:12, 9:25, 23:1, 23:6, 33:1, 33:15, 35:11, 37:24, 45:11, 45:12, 45:20, 46:24, 47:17, 67:20, 77:5, 79:7
**court** [3] - 27:12, 42:7, 66:18
**COURT** [136] - 1:1, 2:13, 2:20, 3:22, 3:24, 4:2, 4:5, 4:16, 5:11, 5:14, 6:10, 6:16, 6:25, 7:10, 8:16, 9:14, 9:23, 10:6, 10:18, 11:11, 12:5, 12:7, 12:16, 13:7, 13:10, 14:14, 15:14, 15:16, 16:22, 17:2, 17:5, 17:15, 18:5, 18:15, 18:19, 18:24, 19:8, 19:11, 20:16, 21:5, 22:5, 22:8, 22:11, 23:10, 23:13, 23:15, 23:17, 23:21, 26:4, 27:12, 28:18, 29:11, 29:13, 29:15, 30:10, 31:25, 32:9, 33:25, 34:6, 34:19, 34:24, 35:2,

38:10, 38:13, 38:16, 39:16, 39:19, 40:2, 40:5, 40:20, 41:4, 41:7, 43:9, 43:19, 44:2, 44:6, 44:14, 45:8, 46:5, 47:6, 47:12, 47:19, 47:21, 49:2, 49:21, 51:14, 52:1, 52:6, 52:12, 52:17, 52:21, 52:25, 53:12, 53:18, 54:5, 54:17, 55:8, 56:6, 56:17, 57:17, 58:10, 59:15, 60:1, 60:13, 61:4, 61:14, 61:24, 62:8, 62:21, 62:25, 63:16, 64:1, 65:20, 65:24, 66:23, 67:10, 67:18, 68:1, 68:4, 68:7, 68:16, 70:4, 70:7, 70:12, 70:24, 72:10, 73:2, 73:11, 73:25, 74:23, 76:15, 76:20, 76:23, 77:22, 78:3, 79:18
**courtroom** [1] - 66:5
**Courts** [1] - 58:24
**covered** [1] - 77:1
**COVID** [6] - 12:3, 18:23, 20:10, 43:15, 48:21, 71:14
**COVID-19** [5] - 3:7, 23:8, 23:24, 28:12, 61:18
**crazy** [1] - 37:22
**create** [1] - 32:5
**created** [3] - 32:12, 37:8, 62:22
**creates** [1] - 36:14
**credibility** [1] - 37:7
**credit** [1] - 45:21
**cross** [23] - 42:22, 45:19, 45:22, 46:16, 50:5, 51:5, 51:12, 51:20, 54:6, 54:7, 54:10, 55:16, 56:19, 56:22, 57:2, 58:19, 59:4, 60:11, 60:24, 61:2, 64:25, 70:19, 75:11
**cross-contaminate** [1] - 42:22
**cross-contaminated** [2] - 51:20, 57:2
**cross-contaminating** [2] - 51:5, 51:12
**cross-contamination** [18] - 45:19, 45:22, 46:16, 50:5, 54:6, 54:7, 54:10, 55:16,

56:19, 56:22, 58:19, 59:4, 60:11, 60:24, 61:2, 64:25, 70:19, 75:11
**CRR** [1] - 79:18
**current** [5] - 50:15, 52:18, 53:3, 53:22, 58:16
**customarily** [1] - 8:21
**customers** [3] - 29:21, 31:9, 32:2
**cut** [2] - 58:19, 68:20
**Cutler** [1] - 1:16
**CW** [5] - 18:20, 19:22, 19:23, 26:13, 26:14
**CW-1** [1] - 20:6
**CW-8** [1] - 26:14
**CWs** [6] - 14:4, 18:13, 19:20, 19:21, 19:23, 20:4

# D

**damages** [2] - 15:18, 67:6
**Daniel** [2] - 1:13, 2:8
**data** [2] - 48:14, 48:15
**date** [3] - 4:8, 39:2, 66:17
**Dated** [1] - 79:14
**dates** [2] - 20:13
**daylight** [2] - 62:14, 62:15
**days** [1] - 31:4
**deal** [2] - 3:8, 33:20
**debate** [2] - 31:17, 59:23
**DEBORAH** [1] - 1:6
**December** [4] - 14:24, 48:7, 51:4, 69:4
**decide** [1] - 20:21
**decision** [5] - 4:3, 21:3, 21:24, 37:24, 77:5
**decisions** [2] - 20:18, 72:3
**defend** [1] - 45:6
**defendant** [3] - 2:17, 23:23, 37:5
**Defendant** [2] - 20:9, 40:3
**defendant's** [2] - 3:18, 35:12
**DEFENDANTS** [1] - 1:15
**defendants** [11] - 3:22, 4:17, 27:4, 28:11, 42:1, 45:6, 66:7, 67:7, 67:17, 74:11, 77:13

**defending** [1] - 66:22
**defense** [3] - 2:19, 37:2, 37:4
**deficiencies** [5] - 6:24, 7:23, 12:24, 14:17, 26:12
**deficiency** [1] - 30:13
**deficient** [2] - 11:2, 73:22
**deflexion** [1] - 59:13
**degree** [1] - 37:7
**Delaware** [1] - 74:10
**delays** [1] - 35:17
**delve** [1] - 60:18
**denied** [6] - 69:14, 69:22, 69:23, 70:1, 70:2, 70:5
**depict** [1] - 41:11
**describe** [1] - 18:13
**described** [2] - 19:20, 60:9
**describing** [1] - 14:4
**description** [1] - 67:23
**design** [1] - 17:16
**designation** [2] - 19:5, 19:8
**designed** [4] - 17:19, 42:3, 50:14, 50:18
**destroy** [1] - 62:21
**destroyed** [27] - 13:2, 13:4, 16:25, 42:20, 42:21, 42:23, 43:10, 44:8, 45:1, 48:4, 48:8, 51:3, 56:15, 56:18, 57:1, 57:10, 62:25, 63:5, 63:12, 63:14, 63:19, 63:23, 68:24, 69:2, 69:5, 69:7
**destruction** [3] - 40:16, 42:17, 57:15
**destructions** [2] - 13:6, 42:25
**developments** [2] - 31:22, 46:13
**deviations** [1] - 37:17
**die** [1] - 40:12
**died** [1] - 32:16
**difference** [4] - 24:3, 24:6, 30:3, 54:2
**differences** [1] - 31:20
**different** [21] - 8:24, 13:19, 17:12, 17:22, 18:15, 18:18, 20:19, 26:16, 39:17, 45:23, 48:17, 50:7, 51:14, 56:21, 58:7, 63:23, 67:4, 68:5, 70:15, 70:16, 76:6
**differentiate** [1] - 68:9

**differently** [1] - 72:1
**difficult** [3] - 4:22, 37:14, 50:24
**difficulties** [1] - 28:4
**dinner** [1] - 59:24
**direct** [2] - 20:21, 34:1
**directed** [1] - 74:18
**directly** [1] - 38:19
**disagree** [1] - 15:15
**disagreement** [1] - 47:11
**disappointed** [1] - 65:5
**disavowed** [1] - 36:21
**discarded** [1] - 46:8
**discarding** [3] - 37:20, 38:7, 50:18
**disclaimer** [2] - 34:1, 34:7
**disclaims** [1] - 51:11
**disclose** [4] - 33:23, 58:24, 71:22, 74:5
**disclosed** [9] - 25:10, 25:11, 31:21, 31:22, 34:18, 42:25, 65:1, 76:7, 77:15
**disclosing** [2] - 24:22, 71:13
**disclosure** [7] - 21:12, 34:11, 34:13, 48:15, 71:22, 73:10, 73:20
**disclosures** [3] - 36:20, 65:7, 73:22
**discovered** [3] - 43:21, 44:11, 44:12
**discovery** [12] - 15:25, 16:5, 16:6, 16:11, 16:13, 63:6, 66:22, 67:3, 67:6, 68:12, 68:13, 70:9
**discuss** [1] - 30:25
**discussed** [2] - 9:6, 31:4
**discussing** [1] - 47:3
**Discussion** [1] - 71:6
**discussion** [2] - 22:15, 60:6
**discussions** [1] - 34:15
**disdain** [1] - 63:4
**dishonest** [1] - 74:19
**Dismiss** [10] - 3:2, 3:11, 20:22, 28:8, 34:5, 37:10, 59:17, 59:21, 60:19, 77:10
**dismissed** [2] - 4:18, 68:15
**dismissing** [1] - 37:12
**disposal** [1] - 19:18
**disposed** [2] - 43:23,

50:12
**distractions** [1] - 40:14
**distributed** [1] - 69:6
**DISTRICT** [3] - 1:1, 1:1, 1:7
**District** [8] - 35:6, 47:14, 47:15, 69:14, 74:10, 75:7, 79:7
**divide** [1] - 48:10
**divided** [1] - 4:7
**DIVISION** [1] - 1:2
**Dixon** [1] - 21:12
**DLB-21-955** [1] - 2:4
**document** [3] - 6:22, 8:13, 41:20
**documents** [7] - 3:18, 7:5, 8:20, 8:24, 9:4, 16:9, 71:24
**dollar** [4] - 11:16, 44:19, 44:20
**dollars** [5] - 12:1, 42:13, 43:18, 44:17, 55:12
**Dominion** [2] - 70:22, 74:8
**done** [9] - 9:4, 9:5, 10:23, 14:25, 21:1, 22:3, 23:6, 62:20, 65:13
**doomed** [4] - 28:12, 28:16, 28:22, 29:7
**Dorr** [1] - 1:16
**dose** [3] - 33:8, 49:8, 70:17
**doses** [28] - 4:9, 13:2, 13:3, 13:6, 16:20, 16:24, 18:3, 22:19, 23:25, 26:7, 26:25, 27:20, 32:11, 37:20, 38:7, 44:8, 48:3, 48:6, 48:8, 50:3, 50:4, 57:13, 62:18, 62:21, 63:5, 68:24, 69:2
**double** [1] - 7:3
**doubles** [2] - 55:22, 61:15
**down** [11] - 15:24, 16:13, 27:10, 32:18, 48:9, 55:19, 55:22, 61:15, 65:17, 68:17, 76:6
**dozen** [1] - 51:24
**dramatically** [1] - 18:17
**drops** [2] - 46:14, 60:5
**Drug** [1] - 30:12
**drug** [19] - 24:16, 25:18, 26:24, 26:25,

27:20, 32:12, 33:7, 46:18, 48:1, 50:10, 50:19, 51:21, 57:21, 57:24, 57:25, 58:13, 62:16, 64:22, 77:14
**drugs** [2] - 25:20, 63:8
**due** [2] - 4:10, 5:1
**dumped** [1] - 4:10
**during** [6] - 17:18, 39:20, 50:19, 54:18, 58:4, 61:19
**duty** [7] - 31:22, 32:5, 33:23, 35:24, 58:24, 71:22
**dynamic** [1] - 67:9

**E**

**e-mail** [2] - 30:23, 31:2
**e-mails** [3] - 16:9, 54:12, 54:13
**earliest** [2] - 11:19, 41:12
**early** [4] - 10:22, 63:21, 65:25, 69:2
**earnings** [3] - 6:1, 39:20, 40:10
**easy** [1] - 4:25
**ed** [4] - 53:9, 53:11, 55:22, 61:15
**edgy** [1] - 39:6
**effectively** [1] - 37:8
**effects** [1] - 63:9
**efficacy** [1] - 25:7
**effort** [1] - 15:3
**efforts** [3] - 15:9, 15:10
**egg** [1] - 54:9
**eight** [4] - 46:8, 48:3, 48:4, 52:24
**either** [4] - 5:24, 28:19, 59:20, 75:16
**Eleanor** [1] - 2:23
**electric** [1] - 38:2
**elephant** [1] - 61:24
**eligible** [1] - 16:2
**Ellison** [1] - 21:2
**emergencies** [1] - 17:18
**Emergent** [23] - 2:4, 2:17, 3:4, 3:5, 5:16, 6:17, 6:21, 8:5, 9:16, 9:17, 11:1, 22:20, 24:20, 27:9, 31:15, 44:13, 49:15, 50:8, 52:9, 55:15, 62:9, 63:18, 64:13
**emergent** [2] - 50:11, 50:20
**EMERGENT** [1] - 1:3

**Emergent's** [7] - 7:21, 10:24, 28:11, 29:24, 50:13, 50:16, 57:10
**employees** [3] - 14:7, 26:19, 35:9
**EMPLOYEES'** [1] - 1:11
**enable** [1] - 27:17
**enacted** [1] - 73:6
**encompasses** [1] - 71:15
**end** [8] - 14:25, 33:19, 41:8, 48:7, 48:25, 72:5, 73:6, 74:22
**end-all** [1] - 48:25
**end-all/be-all** [1] - 33:19
**ended** [1] - 33:18
**ending** [1] - 34:3
**Energy** [1] - 37:3
**enhancements** [2] - 64:15, 64:19
**enormous** [1] - 46:19
**ensuring** [1] - 74:18
**enter** [1] - 26:2
**entered** [4] - 11:10, 25:17, 45:18
**entering** [1] - 46:18
**entire** [2] - 5:22, 19:20
**entirely** [1] - 63:24
**entitled** [3] - 16:4, 66:21, 79:10
**environment** [4] - 15:6, 19:20, 57:12, 73:18
**environmental** [1] - 76:5
**equivalent** [3] - 48:2, 50:3, 57:13
**era** [1] - 73:6
**eras** [1] - 21:10
**error** [1] - 52:2
**Esquire** [5] - 1:12, 1:13, 1:15, 1:16, 1:17
**essentially** [1] - 4:19
**et** [19] - 8:11, 9:7, 10:11, 15:25, 16:8, 20:15, 23:25, 24:4, 24:9, 25:8, 26:3, 33:18, 35:13, 39:11, 41:19, 46:15, 63:9, 71:12, 73:14
**Europe** [1] - 49:3
**evaluation** [2] - 13:23, 13:24
**event** [2] - 50:25, 55:16
**events** [3] - 70:11, 70:19, 75:11

**eventual** [1] - 42:22
**eventually** [4] - 14:19, 37:20, 55:23, 72:15
**evidence** [1] - 8:1
**evidenced** [1] - 39:22
**exact** [2] - 13:17, 20:13
**exactly** [2] - 21:21, 52:8
**example** [8] - 5:25, 6:13, 9:1, 15:4, 21:17, 38:24, 67:16, 73:9
**exceed** [1] - 64:15
**exceeding** [1] - 64:18
**excellent** [2] - 20:24, 45:5
**Exchange** [1] - 22:3
**exec** [1] - 44:24
**executive** [1] - 44:22
**executives** [2] - 5:17, 40:8
**exemplary** [1] - 44:23
**exhaustive** [3] - 16:7, 16:10, 21:1
**Exhibit** [1] - 34:4
**exist** [1] - 62:15
**exists** [1] - 61:17
**exits** [2] - 41:20, 46:2
**expand** [1] - 75:13
**expanded** [1] - 75:10
**expect** [1] - 24:11
**expeditious** [1] - 21:8
**experience** [1] - 20:25
**expert** [1] - 15:16
**expertise** [3] - 29:20, 31:8, 32:1
**explain** [4] - 3:1, 21:18, 36:22, 41:25
**explained** [3] - 67:11, 69:24, 71:9
**explicitly** [2] - 28:17, 28:19
**extensive** [1] - 40:22
**extent** [3] - 9:22, 12:21, 45:20

**F**

**Facebook** [1] - 75:21
**facially** [1] - 77:19
**facilities** [14] - 20:10, 25:8, 25:14, 26:3, 35:7, 35:8, 35:9, 35:14, 35:17, 35:21, 64:8, 64:11, 64:23, 75:12
**facility** [50] - 3:7, 4:11, 8:22, 9:3, 9:5, 11:2, 12:1, 14:4, 14:5,

14:12, 18:12, 18:14, 18:23, 19:25, 20:6, 20:7, 24:17, 25:25, 26:1, 27:9, 29:24, 30:16, 32:18, 32:24, 35:20, 40:17, 41:2, 43:17, 44:3, 44:4, 50:6, 50:14, 52:9, 52:10, 52:18, 53:21, 57:11, 58:15, 61:17, 62:19, 70:17, 71:14, 72:19, 73:16, 73:17, 73:19, 73:20, 76:4
**fact** [10] - 9:11, 15:2, 37:11, 53:6, 58:3, 62:3, 63:13, 64:21, 64:22, 64:24
**factors** [5] - 28:24, 30:8, 33:3, 65:8, 65:11
**factory** [1] - 44:9
**facts** [2] - 41:18, 73:9
**fail** [5] - 28:12, 28:17, 28:22, 29:7, 75:20
**failed** [1] - 14:19
**failure** [3] - 14:2, 35:16, 37:19
**fair** [7] - 20:24, 23:21, 58:23, 68:7, 77:12, 77:13, 77:18
**fairness** [1] - 52:13
**faith** [1] - 77:13
**false** [45] - 3:5, 4:20, 4:21, 5:2, 5:16, 5:20, 5:23, 6:6, 6:19, 6:22, 7:13, 7:25, 8:7, 11:5, 12:18, 14:15, 14:18, 14:20, 15:19, 16:22, 17:11, 17:18, 17:22, 20:20, 20:22, 21:22, 22:16, 22:17, 23:9, 29:16, 29:18, 29:23, 39:25, 46:2, 46:3, 49:23, 50:23, 51:22, 52:20, 52:21, 53:24, 55:7, 57:23, 66:1, 67:1
**falsity** [5] - 7:14, 36:6, 46:4, 55:24, 68:12
**far** [1] - 60:19
**fascinating** [1] - 36:8
**fast** [2] - 25:20, 29:11
**favor** [1] - 63:9
**FDA** [53] - 6:17, 6:21, 7:13, 8:6, 8:14, 8:19, 8:21, 9:21, 10:3, 10:4, 10:11, 10:25, 11:21, 12:9, 13:14, 14:8, 14:10, 17:7, 18:7, 22:20, 24:12,

24:16, 24:21, 25:3, 25:6, 25:13, 25:15, 30:12, 30:15, 30:22, 30:23, 31:11, 31:15, 31:20, 31:21, 31:24, 32:7, 32:15, 32:19, 32:21, 33:23, 34:8, 34:14, 35:15, 41:2, 50:21, 53:1, 64:15, 64:18, 64:23, 73:23, 73:24
**FDA's** [1] - 9:22
**February** [5] - 41:23, 43:7, 44:12, 55:17, 56:20
**federal** [2] - 19:4, 19:6
**FEDERAL** [1] - 79:18
**Federal** [3] - 11:14, 13:24, 30:12
**feedstock** [1] - 48:1
**few** [3] - 31:3, 38:22, 46:9
**fiery** [2] - 53:11, 55:22
**fight** [1] - 61:18
**fighter** [1] - 51:10
**figure** [1] - 4:20
**filed** [2] - 3:3, 38:24
**filing** [1] - 39:2
**filings** [1] - 73:20
**final** [2] - 24:14, 34:14
**financial** [9] - 67:22, 71:4, 71:6, 74:2, 75:4, 75:5, 75:14
**financials** [1] - 72:6
**findings** [7] - 9:6, 14:6, 14:23, 16:8, 24:13, 24:15
**fine** [2] - 4:14, 31:8
**finer** [1] - 45:13
**finished** [1] - 22:10
**fired** [2] - 20:7, 49:15
**FIREFIGHTERS'** [1] - 1:11
**fires** [1] - 20:7
**firm** [2] - 2:11, 25:9
**firms** [1] - 48:12
**first** [19] - 3:10, 3:13, 4:16, 12:11, 13:2, 13:3, 28:8, 28:10, 32:10, 41:15, 42:20, 44:9, 50:2, 55:4, 57:1, 57:20, 59:5, 69:20
**First** [2] - 25:9, 29:3
**five** [4] - 30:8, 33:13, 33:15, 69:21
**five-year** [1] - 33:13
**fix** [4] - 14:9, 18:8, 30:15, 65:22
**focus** [6] - 4:11,

14:14, 22:13, 41:1, 50:22, 66:20
**focused** [2] - 23:3, 57:14
**focusing** [2] - 57:18, 63:17
**FOIA** [5] - 7:4, 8:17, 8:18, 9:11, 16:8
**folk** [1] - 42:14
**folks** [3] - 19:24, 65:14, 66:21
**follow** [4] - 27:15, 41:11, 69:15, 78:3
**follow-up** [1] - 78:3
**followed** [1] - 45:24
**following** [3] - 9:10, 12:12, 12:13
**foot** [1] - 19:21
**FOR** [3] - 1:1, 1:10, 1:15
**foregoing** [1] - 79:8
**forever** [1] - 70:2
**forget** [1] - 60:4
**form** [3] - 7:7, 8:14, 10:5
**Form** [3] - 8:19, 35:15, 38:25
**format** [2] - 41:11, 79:11
**forms** [1] - 6:17
**Forms** [1] - 8:23
**FORT** [1] - 1:11
**forth** [12] - 24:19, 25:6, 25:15, 30:1, 31:19, 31:23, 32:14, 32:19, 33:11, 33:23, 34:14, 59:15
**forward** [10] - 29:11, 33:20, 36:15, 65:9, 65:15, 66:16, 66:17, 66:18, 75:16, 77:11
**forward-looking** [2] - 36:15, 65:9
**forwarding** [1] - 30:23
**four** [12] - 16:19, 17:20, 19:16, 19:17, 19:18, 24:6, 26:18, 27:15, 29:25, 43:3, 67:13, 67:14
**Fourth** [2] - 28:23, 35:23
**frankly** [2] - 36:6, 45:14
**fraud** [20] - 45:15, 48:23, 66:8, 67:22, 68:19, 68:20, 70:14, 70:17, 70:20, 71:25, 72:5, 72:24, 72:25, 73:3, 73:4, 74:24, 74:25, 75:9

**frauds** [1] - 70:15
**free** [2] - 38:5, 40:23
**freezers** [1] - 26:15
**frequency** [1] - 20:15
**front** [5] - 31:1, 37:13, 37:22, 38:5, 40:11
**fulcrum** [1] - 21:15
**fully** [1] - 64:14
**funds** [2] - 74:4, 74:5
**futile** [4] - 28:12, 28:17, 28:23, 29:7
**future** [3] - 24:2, 28:3, 36:12

## G

**GAAP** [2] - 71:3
**gallery** [1] - 19:24
**gas** [2] - 52:2, 56:21
**gate** [1] - 42:23
**general** [1] - 68:11
**generalized** [1] - 24:10
**Generally** [1] - 71:3
**generally** [1] - 6:5
**generate** [2] - 14:12, 75:22
**generating** [1] - 46:19
**gentlemen** [2] - 2:14, 2:20
**given** [5] - 5:3, 7:12, 15:23, 35:13, 68:13
**glaringly** [1] - 42:11
**global** [2] - 49:1, 49:11
**God** [3] - 21:4, 51:10, 53:10
**Google** [1] - 9:18
**gosh** [1] - 52:23
**gotcha** [1] - 55:18
**Government** [15] - 8:11, 11:14, 13:24, 24:8, 26:1, 33:4, 33:9, 33:10, 39:24, 49:14, 55:14, 56:2, 72:13, 72:14, 72:15
**Government's** [1] - 33:3
**governs** [1] - 16:6
**Gozani** [3] - 29:4, 34:21, 77:25
**grand** [1] - 69:4
**granted** [1] - 70:5
**graphically** [2] - 41:11, 41:17
**gray** [1] - 71:1
**great** [6] - 2:25, 3:8, 44:8, 71:11, 72:18, 77:7
**GREENBELT** [1] - 1:8

**ground** [2] - 19:21, 27:19
**grounds** [1] - 4:21
**growing** [1] - 18:13
**growth** [1] - 39:22
**guess** [6] - 17:10, 43:19, 54:6, 61:22, 65:4, 73:25
**guts** [1] - 70:19
**guy** [1] - 43:8
**guys** [1] - 56:3

## H

**hair** [1] - 71:1
**Hale** [1] - 1:16
**half** [5] - 31:6, 47:25, 48:15, 70:20, 76:12
**half-a-century** [1] - 76:12
**half-question** [1] - 47:25
**half-sibling** [1] - 70:20
**halted** [1] - 68:25
**handed** [1] - 15:12
**handle** [1] - 26:20
**Hanks** [1] - 69:12
**happy** [1] - 49:20
**harbor** [5] - 36:10, 36:14, 36:22, 37:1, 38:12
**hard** [4] - 37:14, 38:3, 65:6, 66:20
**hat** [1] - 58:11
**head** [4] - 20:6, 20:7, 29:19, 36:20
**heading** [1] - 41:19
**headquarters** [1] - 35:10
**heads** [1] - 27:4
**HEALTH** [1] - 1:11
**health** [1] - 17:18
**hear** [2] - 18:13, 78:4
**heard** [10] - 5:9, 22:14, 22:16, 24:5, 24:13, 24:24, 45:8, 57:19, 60:6, 60:9
**hearing** [5] - 2:6, 3:2, 5:22, 10:1, 58:17
**HEARING** [1] - 1:6
**heart** [1] - 41:24
**heavily** [4] - 7:5, 7:6, 9:10, 10:5
**heels** [1] - 30:5
**height** [1] - 12:3
**heightened** [1] - 3:15
**held** [3] - 3:3, 74:12, 79:10
**help** [4] - 5:12, 32:7, 57:5, 68:21

**helpful** [1] - 69:19
**hereby** [1] - 79:7
**hiccup** [1] - 65:5
**hide** [1] - 14:7
**High** [1] - 2:24
**high** [1] - 48:20
**high-risk** [1] - 48:20
**Higher** [1] - 70:22
**highlight** [2] - 40:24, 42:1
**highlighted** [4] - 7:8, 12:19, 57:10, 70:1
**highly** [1] - 72:14
**hill** [1] - 40:13
**hinges** [1] - 36:7
**hit** [2] - 18:23, 27:19
**hold** [7] - 12:5, 13:7, 17:15, 23:10, 23:13, 32:16
**holdings** [2] - 46:20, 47:4
**holes** [1] - 19:21
**holistic** [4] - 6:23, 12:23, 14:16, 51:16
**home** [1] - 49:6
**honest** [2] - 39:5, 64:25
**honestly** [1] - 21:20
**Honor** [64] - 2:8, 2:15, 3:21, 3:23, 3:25, 4:4, 4:14, 5:10, 6:8, 6:15, 8:3, 8:9, 11:7, 11:22, 21:17, 21:24, 22:7, 22:24, 24:3, 26:23, 28:21, 30:7, 31:13, 32:8, 33:21, 34:10, 35:1, 35:4, 36:2, 36:4, 38:22, 41:9, 45:4, 45:10, 46:12, 47:7, 53:6, 57:9, 58:23, 59:6, 59:18, 60:2, 60:18, 62:1, 62:14, 62:24, 63:6, 63:21, 65:10, 65:23, 66:3, 67:6, 67:19, 68:23, 69:9, 69:17, 69:25, 70:21, 74:7, 75:2, 75:13, 76:22, 77:3, 77:25
**Honor's** [4] - 8:4, 41:25, 47:24, 49:19
**HONORABLE** [1] - 1:6
**hook** [4] - 36:13, 39:11, 40:8, 73:8
**hooked** [1] - 56:21
**hopeful** [1] - 30:19
**hopefully** [1] - 5:14
**horizon** [1] - 76:7
**horse's** [1] - 39:14
**hundred** [2] - 42:13,

43:4
**hundreds** [12] - 16:20, 16:24, 18:1, 18:3, 18:10, 19:13, 22:19, 26:6, 26:24, 32:11, 37:20, 62:18
**hunk** [1] - 38:4
**Husain** [7] - 6:2, 20:9, 23:7, 23:22, 29:18, 31:7, 31:25
**Husain's** [1] - 30:4

## I

**idea** [2] - 14:11, 56:3
**identical** [1] - 30:1
**identified** [7] - 7:23, 50:10, 51:21, 57:21, 57:25, 58:14, 67:12
**identify** [2] - 2:6, 69:19
**ignoring** [1] - 57:15
**III** [1] - 48:14
**immaculate** [1] - 52:17
**immediate** [3] - 6:23, 12:23, 14:16
**impacted** [4] - 54:20, 55:6, 60:15, 70:10
**imperiality** [1] - 65:9
**implication** [1] - 61:10
**implicit** [3] - 5:23, 19:14, 45:11
**implicitly** [2] - 22:17, 28:19
**important** [24] - 10:2, 11:8, 21:6, 22:25, 23:3, 23:4, 23:5, 29:5, 33:1, 33:16, 33:17, 34:23, 36:10, 51:16, 64:3, 65:7, 65:10, 67:18, 68:9, 69:22, 75:8, 77:21, 78:1
**importantly** [3] - 10:25, 12:20, 47:4
**impose** [1] - 58:24
**imposes** [1] - 16:6
**impression** [1] - 37:8
**improvements** [1] - 64:13
**imputed** [1] - 38:20
**IN** [2] - 1:1, 1:3
**inadequate** [6] - 14:2, 14:21, 19:19, 20:2
**inadequately** [1] - 57:11
**Inc** [1] - 2:5
**INC** [1] - 1:3
**inch** [3] - 14:4, 18:14,

25:24
**incidence** [1] - 41:2
**incident** [10] - 44:11, 45:19, 47:2, 59:5, 60:11, 61:2, 62:5, 64:25, 77:16, 77:17
**incidents** [3] - 45:20, 45:21, 45:22
**include** [2] - 16:9, 52:1
**including** [4] - 20:8, 37:18, 67:22, 69:2
**income** [2] - 72:7, 72:8
**inconsistent** [1] - 74:21
**increased** [1] - 47:4
**increasing** [1] - 46:20
**increments** [1] - 42:5
**independent** [5] - 16:19, 17:20, 24:7, 27:15, 29:25
**indicates** [1] - 74:1
**indicative** [1] - 62:3
**individual** [5] - 27:4, 38:19, 48:21, 66:6, 67:17
**individuals** [1] - 38:21
**indulge** [2] - 11:7, 36:4
**indulgence** [1] - 41:25
**industry** [1] - 18:8
**inevitable** [1] - 15:24
**inference** [5] - 77:6, 77:11, 77:12, 77:13, 77:18
**inferences** [1] - 77:5
**information** [3] - 7:8, 28:2, 37:6
**ingredient** [9] - 54:20, 55:5, 60:11, 60:14, 60:25, 61:1, 61:3, 61:9
**ingredients** [3] - 51:12, 60:21, 60:23
**injury** [1] - 76:5
**insider** [4] - 41:7, 44:15, 45:9, 46:22
**inspect** [2] - 14:8, 24:17
**inspection** [13] - 8:22, 8:23, 9:3, 9:13, 11:1, 11:21, 11:25, 15:12, 17:7, 24:12, 35:6, 35:7, 35:15
**inspectional** [2] - 27:25, 33:4
**inspections** [2] - 25:7, 28:4
**inspectors** [1] - 14:8

**inspects** [1] - 25:13
**Inspire** [4] - 28:23, 34:22, 77:25
**instances** [2] - 9:10, 39:5
**insufficient** [1] - 5:5
**intellectual** [1] - 72:1
**intense** [1] - 49:9
**intensely** [1] - 37:11
**intensity** [1] - 37:7
**intent** [2] - 8:1, 49:14
**intentionally** [1] - 66:8
**intently** [1] - 49:13
**interesting** [1] - 70:25
**interim** [3] - 31:19, 32:14, 33:23
**internal** [16] - 16:9, 54:12, 68:20, 70:14, 72:25, 73:3, 73:4, 73:12, 73:15, 74:2, 74:3, 74:24, 74:25, 75:9, 76:1, 76:2
**interpretation** [1] - 74:20
**interrupt** [1] - 12:5
**interview** [6] - 5:19, 5:25, 51:11, 53:9, 54:18, 57:20
**interviewer** [3] - 54:24, 56:7, 60:20
**interviews** [2] - 5:25, 39:15
**investigate** [1] - 55:20
**investigates** [1] - 33:10
**investor** [6] - 9:19, 31:11, 31:14, 58:21, 59:1, 59:2
**investors** [5] - 9:15, 16:1, 26:9, 30:12, 55:11
**invite** [1] - 59:23
**involve** [3] - 10:7, 10:8, 74:3
**involved** [2] - 69:10
**involving** [1] - 20:19
**iPhone** [1] - 75:20
**ironically** [1] - 48:12
**irrelevant** [1] - 63:24
**isolated** [3] - 50:12, 52:5, 58:14
**issue** [8] - 4:23, 5:9, 8:16, 24:20, 27:5, 34:11, 42:22, 44:3
**issued** [5] - 5:24, 27:25, 35:5, 53:20, 69:12
**issues** [9] - 25:14, 33:10, 33:11, 35:15, 35:17, 41:21, 50:9,

59:22, 67:24
**item** [1] - 71:17
**iterative** [1] - 24:15
**itself** [2] - 18:25, 23:20

## J

**J&J** [32] - 11:13, 11:23, 13:3, 20:11, 24:8, 25:25, 30:20, 32:23, 32:24, 33:14, 33:18, 46:16, 48:6, 48:8, 48:23, 49:4, 50:3, 50:4, 50:5, 53:2, 53:16, 53:20, 56:14, 56:15, 56:18, 57:1, 60:25, 61:5, 61:20, 63:10, 64:23
**J&J's** [3] - 55:1, 56:11, 57:8
**Janssen** [3] - 10:11, 11:23, 11:24
**January** [4] - 41:23, 43:7, 44:12, 55:16
**January/February** [1] - 51:5
**job** [1] - 44:25
**Johnson** [16] - 4:9, 4:10, 10:23, 42:21, 43:21, 44:13, 52:9, 52:10, 56:2, 56:3, 57:15
**Jr** [1] - 1:17
**JUDGE** [1] - 1:7
**judge** [3] - 4:2, 69:12, 69:13
**Judge** [1] - 21:2
**Judgment** [2] - 16:12, 59:22
**judicial** [3] - 3:17, 15:1, 21:5
**Judicial** [1] - 79:12
**judicially** [1] - 3:16
**judicially-noticed** [1] - 3:16
**July** [11] - 7:17, 7:21, 7:22, 7:24, 10:19, 10:22, 11:24, 12:12, 23:3, 29:11, 39:19
**jump** [2] - 14:3, 73:17
**jumped** [2] - 7:18, 7:19
**June** [6] - 10:22, 10:25, 11:15, 11:22, 12:8, 30:17
**jury** [2] - 59:16, 59:19

## K

**KBC** [1] - 37:3

59:22, 67:24
**keep** [7] - 32:22, 32:23, 36:19, 37:16, 45:16, 77:24
**keeps** [1] - 31:5
**kept** [1] - 35:10
**key** [5] - 41:18, 49:1, 49:11, 69:19, 71:2
**kids** [1] - 49:10
**kind** [6] - 21:11, 36:25, 39:8, 42:5, 69:15, 69:24
**Kirk** [3] - 31:2, 31:5, 45:2
**Klein** [2] - 37:3, 37:6
**knowledge** [2] - 7:14, 27:3
**known** [2] - 15:10, 47:3
**knows** [2] - 65:16, 68:17
**Kramer** [21] - 5:20, 6:1, 6:2, 13:16, 21:14, 30:23, 30:25, 31:5, 39:16, 41:15, 42:24, 44:16, 45:18, 46:11, 46:20, 51:10, 53:9, 60:8, 61:15, 73:14
**Kramer's** [5] - 42:11, 44:24, 54:17, 57:19, 60:13
**Krulak** [2] - 1:17, 2:15
**KRULAK** [1] - 2:15

## L

**lack** [1] - 57:11
**lacked** [4] - 15:5, 15:6, 18:21
**language** [11] - 22:25, 23:2, 30:7, 34:1, 36:24, 40:22, 45:15, 51:19, 51:24
**large** [6] - 5:1, 13:18, 13:21, 17:17, 27:18, 46:18
**large-scale** [3] - 13:18, 13:21, 27:18
**largely** [1] - 10:22
**last** [4] - 5:18, 14:23, 14:24, 69:20
**late** [1] - 69:2
**LAUDERDALE** [1] - 1:11
**laugh** [1] - 63:3
**lavish** [1] - 44:24
**law** [8] - 24:14, 25:5, 28:21, 29:3, 31:18, 34:18, 35:22, 76:14
**lawyer** [1] - 6:12

**lawyers** [1] - 45:6
**lead** [4] - 2:10, 2:11, 31:2
**leading** [1] - 33:16
**least** [2] - 26:13, 45:12
**leave** [3] - 39:8, 42:5, 61:13
**led** [4] - 20:9, 45:23, 45:24
**left** [5] - 14:10, 53:1, 53:5, 53:15, 74:25
**letter** [6] - 8:6, 10:25, 25:3, 30:24, 32:15, 32:17
**level** [1] - 45:16
**leverage** [2] - 23:24, 24:1
**liability** [3] - 36:17, 67:22, 76:4
**liable** [1] - 74:12
**liaison** [1] - 2:9
**libbing** [1] - 49:5
**lie** [1] - 55:7
**lifeblood** [1] - 55:15
**lightning** [1] - 25:20
**likely** [2] - 10:4, 10:5
**Lindahl** [4] - 6:3, 6:5, 39:17, 40:4
**Lindahl's** [1] - 41:15
**line** [6] - 15:24, 21:12, 52:2, 56:21, 69:12, 69:25
**listen** [1] - 54:14
**literally** [12] - 11:10, 13:4, 19:23, 22:16, 26:8, 31:10, 35:19, 51:22, 52:6, 53:15, 56:13, 61:22
**litigated** [1] - 25:9
**Litigation** [1] - 2:5
**litigation** [2] - 15:17, 21:2
**LITIGATION** [1] - 1:3
**LLP** [2] - 1:12, 1:16
**local** [1] - 2:16
**lockdown** [1] - 11:10
**locked** [1] - 49:6
**long-term** [8] - 29:20, 30:7, 31:9, 32:1, 39:21, 39:23, 64:15, 64:17
**look** [9] - 17:15, 33:9, 35:4, 36:5, 36:11, 42:9, 52:14, 71:11, 73:4
**looking** [10] - 10:12, 23:1, 23:17, 23:19, 27:9, 36:15, 40:1, 41:13, 65:9, 66:24
**lose** [3] - 59:25, 60:1,

77:20
**loss** [2] - 59:22, 59:23
**lost** [2] - 51:23, 55:11
**loud** [1] - 54:13
**lunch** [2] - 19:22, 59:24

## M

**machine** [1] - 52:15
**mail** [2] - 30:23, 31:2
**mails** [3] - 16:9, 54:12, 54:13
**maintained** [1] - 18:12
**majority** [4] - 36:6, 38:23, 39:14
**Management** [1] - 71:6
**mansplaining** [1] - 57:6
**manufacture** [4] - 25:18, 26:18, 46:7, 77:14
**manufactured** [7] - 43:17, 54:25, 55:3, 56:2, 56:10, 56:14, 57:7
**manufacturer** [3] - 24:16, 24:18, 34:16
**manufacturers** [3] - 38:2, 38:3, 63:8
**manufacturing** [38] - 13:1, 13:18, 13:25, 16:18, 17:17, 17:22, 19:15, 20:10, 25:8, 25:14, 27:18, 27:21, 28:11, 29:22, 32:2, 32:4, 35:13, 35:14, 37:14, 37:18, 50:15, 50:17, 50:20, 52:19, 52:23, 53:3, 53:20, 53:22, 54:7, 58:16, 64:8, 64:11, 64:22, 65:12, 65:17, 75:6, 75:12, 76:3
**March** [13] - 4:7, 5:18, 5:19, 11:8, 21:11, 34:3, 43:1, 43:21, 44:11, 44:12, 50:2, 51:8
**margins** [1] - 72:9
**market** [4] - 28:2, 37:2, 37:4, 60:6
**market's** [1] - 39:23
**Marriott** [2] - 4:23, 20:20
**Maryland** [2] - 35:6, 79:7
**MARYLAND** [2] - 1:1, 1:8

**Mason** [1] - 21:12
**mass** [1] - 26:18
**Massey** [1] - 37:3
**material** [10] - 5:16, 15:12, 20:23, 31:22, 34:14, 34:17, 35:18, 50:23, 57:24, 62:16
**materiality** [2] - 52:12, 60:3
**materially** [6] - 7:9, 16:23, 18:11, 36:1, 40:19, 71:8
**materials** [6] - 3:17, 4:25, 5:2, 8:10, 8:15, 9:20
**Matrix** [2] - 35:23, 37:24
**matter** [12] - 2:3, 4:17, 15:17, 15:21, 20:14, 24:4, 53:6, 56:23, 58:21, 67:14, 68:11, 79:10
**matters** [1] - 63:13
**Matthew** [2] - 1:12, 2:10
**McDermott** [1] - 69:11
**MD&A** [2] - 71:5, 72:2
**mean** [11] - 14:17, 14:18, 15:11, 25:11, 39:15, 40:12, 48:19, 53:25, 58:10, 59:20, 73:11
**meaning** [1] - 6:19
**meaningful** [1] - 36:15
**means** [4] - 4:19, 19:23, 37:2, 72:17
**meant** [1] - 70:5
**meanwhile** [1] - 37:21
**measures** [4] - 6:24, 12:23, 14:17, 14:18
**Mechanical** [1] - 1:24
**medical** [1] - 48:21
**meet** [18] - 29:20, 31:9, 32:1, 50:10, 50:15, 50:21, 51:19, 51:22, 52:18, 53:22, 54:6, 57:22, 58:1, 58:14, 61:21, 64:15, 67:2, 77:19
**meeting** [3] - 28:4, 64:17, 64:18
**meetings** [1] - 20:4
**meets** [1] - 58:15
**Meg** [3] - 54:23, 57:5
**memo** [1] - 77:10
**mention** [1] - 77:21
**mentioned** [2] - 6:1, 66:5
**mentions** [1] - 24:6
**Merit** [1] - 79:6

**mess** [1] - 19:25
**message** [1] - 52:13
**messaging** [1] - 51:6
**met** [2] - 51:24, 53:3
**metal** [1] - 38:4
**Michael** [3] - 1:15, 2:18
**microbial** [1] - 56:24
**microbiology** [1] - 26:20
**middle** [1] - 69:21
**midpoint** [1] - 72:9
**might** [5] - 15:18, 19:3, 28:25, 37:15, 60:1
**Miles** [2] - 1:18, 2:16
**million** [34] - 4:9, 12:8, 13:6, 21:14, 23:25, 27:20, 43:5, 43:8, 44:7, 44:8, 44:17, 44:25, 45:2, 48:3, 48:6, 48:8, 50:3, 50:4, 55:13, 55:14, 55:17, 57:13, 69:1, 69:3, 69:5, 69:6, 69:7, 71:10, 72:7, 72:22
**millions** [11] - 16:20, 16:24, 18:1, 18:3, 18:10, 22:19, 26:6, 26:24, 32:11, 37:20, 62:18
**Milstein** [2] - 1:14, 2:9
**mind** [3] - 13:11, 25:21
**mindful** [1] - 21:7
**mine** [5] - 21:20, 70:23, 77:6, 77:7, 77:20
**minimum** [2] - 16:23, 17:24
**minus** [1] - 72:22
**minute** [2] - 9:14, 47:19
**misattribute** [1] - 74:4
**misconduct** [1] - 74:15
**misfires** [1] - 52:16
**mislead** [2] - 60:5, 60:6
**misleading** [27] - 3:5, 7:9, 8:8, 12:19, 15:5, 16:24, 17:11, 17:19, 17:24, 18:11, 21:22, 22:17, 24:12, 32:6, 36:1, 37:8, 39:25, 40:19, 50:23, 56:12, 57:23, 58:6, 64:6, 66:9, 68:12, 71:8, 73:10

**miss** [1] - 59:24
**missing** [1] - 61:25
**misspoke** [4] - 53:18, 56:1, 56:5, 70:6
**misstatement** [3] - 53:15, 72:11, 72:23
**misstatements** [6] - 37:9, 41:18, 67:14, 69:18, 71:5, 71:25
**mistaken** [3] - 55:8, 55:9, 55:21
**mix** [1] - 17:10
**mixed** [2] - 61:6, 61:7
**mixup** [8] - 60:7, 60:11, 60:21, 60:23, 61:2, 61:10, 61:12
**Moderna** [5] - 30:20, 33:17, 49:7, 49:10, 49:15
**modest** [1] - 42:15
**modified** [2] - 45:18, 47:2
**mold** [6] - 14:5, 14:8, 18:12, 19:18, 25:24, 26:13
**mom** [1] - 48:22
**moment** [11] - 10:4, 15:23, 20:17, 23:15, 33:24, 41:5, 51:15, 54:4, 63:13, 63:17, 76:23
**month** [14] - 10:22, 13:5, 37:19, 40:17, 43:7, 51:3, 52:11, 53:8, 53:17, 55:14, 55:25
**months** [13] - 3:17, 10:22, 21:4, 30:18, 45:2, 45:19, 46:6, 46:17, 47:1, 47:2, 52:24, 62:12, 63:14
**morning** [6] - 2:8, 2:12, 2:13, 2:15, 2:20, 68:10
**most** [9] - 6:2, 21:1, 26:22, 26:23, 27:7, 35:5, 47:3, 47:9, 62:3
**Motion** [10] - 3:2, 3:11, 20:22, 28:8, 34:5, 37:10, 59:17, 59:21, 60:19, 77:10
**motion** [3] - 3:15, 28:7, 69:14
**MOTIONS** [1] - 1:6
**motions** [2] - 2:6, 15:1
**mouth** [1] - 39:14
**move** [9] - 7:17, 9:14, 20:16, 47:21, 49:20, 49:22, 54:17, 56:6,

68:17

**moving** [2] - 33:20, 58:20

**MR** [136] - 2:8, 2:15, 3:21, 3:23, 3:25, 4:4, 4:14, 4:15, 5:10, 5:13, 6:8, 6:15, 6:21, 7:2, 8:3, 8:18, 9:20, 9:24, 10:7, 11:7, 11:12, 12:6, 12:13, 12:17, 13:9, 13:23, 14:21, 15:15, 15:22, 16:23, 17:4, 17:6, 17:23, 18:11, 18:17, 18:20, 19:2, 19:9, 19:14, 20:24, 21:9, 22:7, 22:9, 22:24, 23:12, 23:14, 23:16, 23:19, 23:22, 26:22, 27:14, 28:21, 29:12, 29:14, 30:6, 31:13, 32:8, 32:10, 34:2, 34:9, 34:21, 35:1, 35:4, 38:11, 38:14, 38:22, 39:18, 40:1, 40:3, 40:6, 40:21, 41:6, 41:9, 43:12, 44:1, 44:3, 44:7, 44:17, 45:10, 46:12, 47:7, 47:13, 47:20, 47:24, 49:4, 50:24, 51:18, 52:3, 52:8, 52:13, 52:20, 52:22, 53:5, 53:14, 53:24, 54:8, 55:7, 55:9, 56:15, 56:25, 58:2, 58:23, 59:18, 60:2, 60:17, 61:7, 61:23, 62:1, 62:13, 62:23, 63:2, 63:20, 64:2, 65:23, 66:2, 67:5, 67:16, 67:19, 68:3, 68:5, 68:8, 68:23, 70:6, 70:8, 70:13, 70:25, 72:12, 73:3, 73:13, 74:7, 75:2, 76:16, 76:19, 76:21, 77:2, 77:24

**multi** [1] - 49:13

**multi-prong** [1] - 49:13

**multiple** [3] - 14:25, 26:16, 46:18

**multiply** [1] - 48:4

**myopically** [1] - 57:14

**myriad** [1] - 11:24

## N

**Nabriva** [1] - 47:15

**Nadine** [1] - 79:5

**NADINE** [1] - 79:18

**name** [1] - 54:23

**named** [1] - 5:17

**narrative** [1] - 46:2

**narrow** [1] - 74:21

**nature** [4] - 6:5, 49:24, 68:13, 75:12

**necessarily** [4] - 62:15, 64:17, 68:14, 73:13

**necessary** [3] - 64:14, 64:19, 73:9

**need** [19] - 5:8, 9:6, 20:21, 28:10, 29:8, 29:9, 31:18, 31:21, 34:17, 39:13, 41:23, 50:7, 65:14, 66:13, 67:3, 68:21, 73:25

**needed** [5] - 25:10, 25:11, 26:17, 65:18, 66:18

**needs** [4] - 29:21, 31:9, 31:21, 32:1

**negating** [1] - 47:5

**negative** [3] - 71:13, 71:16, 72:20

**negatively** [1] - 70:10

**Netherlands** [2] - 44:13, 52:10

**never** [22] - 12:25, 13:1, 14:22, 15:2, 15:7, 15:11, 25:21, 28:18, 40:17, 42:13, 43:3, 45:3, 54:11, 59:11, 62:4, 64:7, 65:1, 65:21, 75:10

**nevertheless** [1] - 71:20

**new** [2] - 20:1, 33:13

**New** [20] - 4:8, 5:18, 21:13, 38:16, 43:1, 43:20, 43:24, 45:23, 46:15, 47:14, 47:16, 47:22, 49:22, 49:25, 53:7, 56:19, 58:12, 59:6, 60:4, 69:14

**news** [4] - 4:12, 30:19, 46:15, 50:8

**next** [5] - 30:8, 33:15, 50:8, 51:9, 53:8

**nice** [1] - 70:24

**night** [1] - 31:6

**nine** [3] - 11:18, 21:2, 40:15

**NO** [1] - 1:3

**nobody** [1] - 65:3

**noise** [1] - 54:13

**non** [1] - 57:10

**non-CGMP** [1] - 57:10

**noncompliance** [1] - 14:2

**noncompliant** [1] - 32:18

**none** [2] - 15:9, 16:17

**nonetheless** [4] - 5:3, 23:22, 24:2, 71:5

**normal** [2] - 25:6, 42:14

**note** [3] - 14:25, 20:8, 37:4

**note-taker** [1] - 20:8

**noted** [1] - 41:13

**notes** [3] - 20:4, 20:5, 20:13

**nothing** [5] - 25:4, 31:23, 42:12, 46:13, 52:14

**Notice** [1] - 4:1

**notice** [2] - 3:17, 15:1

**noticed** [1] - 3:16

**notices** [1] - 30:14

**notify** [1] - 9:5

**noting** [1] - 40:24

**notion** [1] - 45:24

**NOVA** [1] - 1:11

**Novavax** [2] - 9:1, 35:5

**November** [10] - 13:3, 13:4, 42:19, 43:2, 43:11, 43:23, 46:6, 51:4, 56:20, 57:9

**Number** [1] - 2:4

**number** [13] - 5:15, 7:22, 8:10, 15:23, 20:17, 32:13, 32:14, 48:5, 66:25, 67:1, 71:4, 72:22, 77:16

**numbers** [5] - 48:9, 48:10, 71:11, 72:20, 75:23

**numerical** [3] - 74:18, 75:3, 75:4

**numerous** [1] - 8:7

## O

**objection** [1] - 3:20

**obligation** [4] - 31:16, 34:7, 34:11, 34:13

**observations** [12] - 24:15, 24:18, 24:21, 25:14, 25:16, 26:3, 27:2, 27:25, 28:5, 33:4, 33:6, 34:15

**observed** [1] - 33:12

**obtained** [1] - 74:5

**obviously** [3] - 8:7, 23:5, 23:8

**occasionally** [8] -

50:19, 51:1, 52:15, 61:21, 62:2, 62:7, 62:8, 62:11

**occasions** [1] - 61:25

**occurred** [6] - 12:10, 43:10, 43:12, 43:13, 45:20, 56:20

**occurring** [2] - 39:21, 57:16

**October** [11] - 13:3, 13:5, 40:17, 42:17, 42:19, 43:11, 43:23, 44:10, 46:6, 51:2, 51:4

**October/November** [1] - 44:10

**Ocular** [1] - 25:10

**Odonate** [2] - 70:22, 74:8

**OF** [4] - 1:1, 1:6, 1:11, 79:1

**off-put** [1] - 48:19

**office** [1] - 26:17

**officers** [1] - 39:1

**OFFICIAL** [2] - 79:1, 79:18

**often** [4] - 7:5, 8:24, 10:7, 10:8

**omission** [3] - 20:23, 50:23, 57:24

**omissions** [2] - 5:16, 35:18

**omit** [1] - 73:9

**omitting** [2] - 71:16, 72:20

**on-site** [2] - 19:25, 64:24

**once** [5] - 25:22, 32:5, 35:24, 41:3, 65:18

**One** [1] - 70:22

**one** [71] - 5:18, 6:16, 8:24, 9:3, 9:9, 11:4, 11:15, 11:16, 12:2, 13:19, 15:24, 17:7, 19:6, 19:17, 21:19, 23:13, 23:15, 26:13, 32:13, 35:6, 35:7, 35:21, 38:25, 41:4, 42:8, 42:17, 47:19, 48:2, 48:6, 49:8, 49:12, 51:14, 52:1, 54:2, 54:20, 54:22, 54:24, 55:2, 55:5, 55:11, 56:8, 56:9, 56:13, 56:18, 56:20, 57:4, 57:6, 57:12, 57:16, 58:18, 58:25, 59:5, 60:14, 60:15, 61:17, 62:5, 63:10, 65:4, 65:24, 66:10,

67:23, 69:20, 73:21, 75:16, 76:23, 77:16, 77:18, 77:24

**one-off** [1] - 58:18

**one-shot** [1] - 49:8

**one-time** [1] - 62:5

**ones** [7] - 10:12, 17:25, 20:12, 36:7, 69:19, 69:20

**ongoing** [3] - 29:21, 32:2, 32:4

**onward** [1] - 40:17

**oops** [1] - 60:25

**op** [4] - 53:9, 53:11, 55:22, 61:15

**op-ed** [4] - 53:9, 53:11, 55:22, 61:15

**Operation** [2] - 10:24, 25:19

**operations** [12] - 11:3, 13:14, 13:16, 13:18, 13:21, 30:17, 30:22, 30:24, 31:12, 70:16, 71:24, 73:21

**operative** [1] - 40:11

**opinion** [3] - 31:20, 69:14, 69:15

**opinions** [1] - 27:2

**opposed** [1] - 59:16

**opposite** [3] - 35:19, 59:12, 62:6

**opposition** [7] - 3:11, 3:19, 28:8, 28:9, 37:4, 74:8, 77:9

**oral** [1] - 2:12

**orchestrated** [1] - 51:6

**order** [1] - 69:13

**organized** [1] - 13:10

**otherwise** [1] - 78:4

**out-of-specification** [3] - 54:22, 56:8, 57:4

**outlined** [1] - 35:15

**outrageous** [1] - 45:14

**outset** [1] - 28:11

**outside** [3] - 30:25, 38:11, 44:18

**overall** [1] - 40:13

**own** [5] - 10:24, 27:1, 35:8, 35:20, 42:23

**Oxley** [3] - 40:7, 73:6, 74:17

## P

**p.m** [1] - 78:6

**package** [1] - 44:24

**page** [10] - 3:14, 10:13, 34:2, 34:3,

36:21, 37:4, 74:11, 77:9, 77:10, 79:11
**Page** [1] - 28:9
**pages** [1] - 41:21
**pandemic** [3] - 12:3, 30:18, 77:14
**panicking** [1] - 58:13
**papers** [2] - 33:25, 34:5
**paragraph** [5] - 8:4, 8:5, 25:4, 41:12, 64:12
**paragraphs** [1] - 41:10
**paranoid** [1] - 36:12
**parents** [1] - 48:21
**parking** [1] - 31:3
**parsing** [1] - 53:25
**part** [5] - 5:1, 9:17, 49:1, 49:11, 50:9
**participated** [1] - 20:9
**particular** [4] - 34:4, 40:12, 43:20, 68:14
**particularity** [1] - 74:13
**particularly** [1] - 21:10
**parties** [3] - 4:6, 5:4, 21:7
**partners** [2] - 23:8, 23:23
**parts** [1] - 4:20
**passed** [1] - 40:7
**passionate** [1] - 48:20
**passive** [2] - 63:1, 63:3
**past** [3] - 40:14, 62:12, 62:20
**patients** [2] - 29:22, 32:3
**pause** [4] - 34:24, 57:18, 69:3, 69:7
**paying** [2] - 72:13, 72:14
**PC** [1] - 1:18
**pending** [1] - 2:3
**PENSION** [1] - 1:11
**people** [13] - 2:23, 14:11, 20:1, 20:8, 26:12, 27:14, 30:11, 46:1, 50:13, 58:11, 63:2, 66:6, 66:17
**per** [2] - 71:19, 72:23
**percent** [4] - 16:25, 38:8, 39:4, 44:4
**perfect** [3] - 9:24, 47:9, 65:4
**performance** [1] - 44:23
**perhaps** [8] - 7:14, 14:19, 15:3, 20:18, 31:13, 59:23, 63:6,

67:6
**period** [12] - 11:9, 11:20, 15:23, 16:1, 16:14, 16:17, 34:3, 47:4, 67:8, 67:10, 67:12, 67:13
**Perla** [2] - 1:16, 2:18
**permanent** [1] - 31:1
**personal** [2] - 48:23, 76:5
**personnel** [3] - 15:5, 18:21, 57:11
**perspective** [4] - 4:13, 45:16, 69:23, 69:24
**PetroChina** [1] - 75:8
**Pfizer** [4] - 33:17, 49:7, 49:10, 49:15
**pharmaceutical** [1] - 20:2
**Phase** [1] - 48:14
**pick** [2] - 50:24, 66:25
**picked** [1] - 19:6
**Pickering** [1] - 1:16
**piece** [5] - 4:22, 5:3, 73:21, 75:15
**pieces** [3] - 12:19, 13:8, 77:3
**pipe** [2] - 14:9
**pivot** [1] - 73:1
**pivoting** [1] - 70:13
**place** [7] - 10:21, 22:14, 27:1, 42:4, 42:8, 47:1, 68:14
**PLAINTIFF** [1] - 1:10
**plaintiff's** [1] - 4:12
**plaintiffs** [10] - 2:10, 2:11, 3:3, 3:4, 3:20, 28:7, 28:15, 29:17, 67:21, 74:13
**plaintiffs'** [3] - 24:13, 24:24, 46:22
**plan** [11] - 42:1, 42:4, 42:8, 42:12, 43:2, 44:11, 45:18, 45:19, 46:11, 47:1
**PLAN** [1] - 1:11
**Plane** [1] - 38:3
**planning** [1] - 32:21
**plans** [2] - 42:2, 44:18
**platform** [2] - 18:4, 26:7
**plausible** [1] - 26:2
**plausibly** [1] - 7:25
**play** [1] - 41:21
**plead** [2] - 20:14, 74:13
**pleading** [5] - 3:15, 4:19, 21:25, 66:15, 67:2
**pleadings** [3] - 5:6,

47:15, 47:16
**pleads** [1] - 38:24
**pled** [9] - 6:22, 7:3, 8:7, 8:8, 8:12, 16:4, 16:7, 22:2, 40:18
**PLLC** [1] - 1:14
**podium** [1] - 6:9
**point** [41] - 6:4, 7:9, 10:21, 14:22, 15:7, 16:5, 22:1, 22:20, 26:9, 26:10, 29:4, 29:22, 30:6, 32:25, 34:10, 34:23, 34:25, 44:15, 45:13, 49:24, 51:2, 51:23, 53:6, 53:16, 53:18, 55:24, 56:1, 56:4, 56:17, 60:18, 61:13, 63:9, 63:18, 64:4, 65:10, 65:11, 65:16, 68:14, 75:8, 78:1
**pointed** [1] - 30:8
**points** [3] - 45:11, 68:23, 76:22
**poked** [1] - 19:21
**POLICE** [1] - 1:11
**policy** [1] - 42:2
**Pomerantz** [3] - 1:12, 2:11, 47:17
**popular** [1] - 49:2
**portion** [1] - 36:7
**position** [5] - 21:8, 21:9, 22:13, 56:12, 65:25
**positive** [2] - 38:5, 71:16
**post** [4] - 21:11, 21:18, 39:7, 49:22
**post-March** [1] - 21:11
**post-New** [1] - 49:22
**potential** [1] - 46:19
**power** [2] - 54:15, 74:9
**practice** [1] - 18:8
**practices** [9] - 13:25, 50:15, 52:19, 52:23, 53:3, 53:23, 54:7, 58:16, 74:19
**pre** [3] - 21:11, 21:18, 38:16
**pre-March** [1] - 21:11
**pre-New** [1] - 38:16
**preceding** [1] - 10:21
**prefer** [1] - 6:8
**preliminary** [1] - 4:17
**prepared** [1] - 13:20
**present** [1] - 24:2
**presentation** [1] - 6:4
**presented** [1] - 5:4
**presenting** [1] - 2:12

**president** [1] - 29:19
**Press** [1] - 51:7
**press** [29] - 5:24, 5:25, 7:18, 7:19, 7:20, 9:17, 10:20, 17:16, 22:13, 23:18, 23:19, 27:8, 29:15, 30:9, 34:12, 38:18, 38:24, 40:22, 50:9, 51:9, 53:9, 53:19, 57:19, 57:20, 58:5, 60:5, 63:25, 65:20, 66:12
**pretty** [5] - 28:13, 28:22, 29:9, 66:9
**preventing** [2] - 13:11, 74:18
**previous** [1] - 37:9
**previously** [1] - 58:8
**price** [2] - 60:4, 60:10
**Principles** [1] - 71:3
**priorities** [1] - 50:14
**privately** [2] - 8:21, 9:7
**problem** [6] - 13:9, 13:13, 14:9, 76:3, 76:4, 76:5
**problems** [15] - 13:11, 14:5, 14:10, 14:11, 18:7, 18:9, 19:18, 19:19, 20:10, 22:21, 26:14, 31:4, 38:6, 41:2, 65:17
**Proceeding** [1] - 78:6
**Proceedings** [1] - 1:24
**PROCEEDINGS** [1] - 1:6
**proceedings** [1] - 79:10
**process** [3] - 24:16, 58:4, 61:20
**processes** [5] - 10:8, 37:18, 50:17, 64:8, 64:11
**produce** [16] - 3:6, 16:19, 17:21, 18:1, 18:2, 18:3, 18:9, 19:13, 22:18, 26:6, 27:16, 27:19, 29:25, 32:11, 33:7, 61:17
**produced** [6] - 16:25, 26:24, 62:18, 63:18, 68:24, 69:6
**Produced** [1] - 1:25
**producing** [4] - 52:25, 53:2, 53:13, 62:16
**product** [12] - 26:16, 54:22, 54:25, 55:1, 56:8, 56:9, 56:11, 57:7, 57:8, 60:25,

75:19, 76:4
**production** [5] - 12:2, 26:19, 68:25, 69:3, 70:17
**progeny** [1] - 76:19
**progress** [1] - 35:13
**prong** [1] - 49:13
**proper** [3] - 54:23, 57:5, 57:14
**properly** [1] - 50:12
**protection** [2] - 36:16, 38:9
**prove** [1] - 37:5
**proven** [1] - 16:18
**provide** [4] - 29:21, 32:2, 32:4, 39:21
**provision** [2] - 36:10, 36:14
**PSLRA** [2] - 16:5, 36:9
**public** [31] - 3:6, 4:7, 6:18, 7:6, 7:7, 7:9, 7:12, 7:15, 8:8, 8:14, 8:16, 9:19, 9:22, 12:17, 12:18, 12:21, 17:18, 21:7, 25:1, 25:5, 27:24, 31:16, 32:6, 33:9, 34:7, 37:6, 42:2, 66:9
**publication** [1] - 48:14
**publicized** [2] - 6:25, 9:15
**publicly** [4] - 10:16, 12:21, 42:25, 50:2
**published** [4] - 6:25, 7:5, 10:12, 39:10
**publishes** [1] - 54:15
**pumped** [1] - 55:13
**purity** [1] - 35:16
**purpose** [1] - 2:5
**purposes** [3] - 60:17, 74:20, 74:22
**pursuant** [1] - 79:8
**pursue** [1] - 16:2
**pursuing** [1] - 29:7
**pushes** [1] - 53:8
**put** [14] - 3:25, 4:25, 9:2, 27:3, 32:3, 32:5, 45:13, 48:19, 51:7, 54:22, 57:4, 58:10, 67:19, 77:11
**puts** [2] - 51:9, 73:8
**putting** [4] - 13:8, 46:2, 63:5, 77:17
**puzzle** [4] - 4:18, 4:23, 5:5, 13:8

### Q

**qualified** [1] - 26:18
**quality** [11] - 14:2,

15:6, 26:19, 35:14, 50:11, 50:13, 50:16, 50:17, 57:22, 58:16, 61:20
**quantities** [1] - 17:18
**quarter** [1] - 71:11
**questions** [7] - 17:13, 45:11, 47:18, 49:20, 65:24, 76:24, 78:4
**quick** [3] - 48:12, 68:23, 72:25
**quickly** [4] - 27:22, 41:13, 58:20, 78:5
**quite** [7] - 32:22, 38:14, 64:3, 65:7, 66:7, 66:10, 70:21
**quote** [18] - 6:23, 12:22, 14:4, 17:20, 23:7, 35:16, 37:6, 37:11, 40:24, 64:12, 74:14, 74:15, 74:17, 74:19, 74:22, 75:3, 77:12
**quoted** [2] - 40:10, 40:21
**quoting** [1] - 37:5

## R

**rage** [1] - 20:7
**rainbow** [2] - 48:7, 72:5
**raised** [1] - 21:15
**raises** [1] - 20:6
**Rakoff** [1] - 69:13
**ramifications** [1] - 38:1
**random** [1] - 66:25
**rapid** [2] - 11:12, 17:17
**rapidly** [1] - 27:16
**rare** [1] - 39:5
**rarely** [1] - 37:11
**rather** [4] - 14:9, 18:23, 72:8, 77:10
**RE** [1] - 1:3
**re** [3] - 4:23, 20:20, 47:13
**reaction** [1] - 60:8
**read** [14] - 3:10, 3:11, 15:12, 20:17, 28:18, 29:16, 33:14, 51:16, 62:11, 66:25, 73:24, 73:25, 74:1, 77:9
**reading** [2] - 49:23, 73:23
**ready** [20] - 11:3, 13:13, 13:15, 13:18, 13:21, 23:18, 27:19, 30:16, 30:22, 30:24,

31:6, 31:12, 32:7, 32:20, 34:8, 40:17, 47:21, 49:21, 61:17, 65:13
**real** [9] - 30:10, 30:11, 30:12, 38:8, 41:13, 58:11, 66:6, 70:19, 76:19
**real-time** [1] - 38:8
**really** [21] - 16:17, 18:18, 24:5, 28:19, 36:5, 37:1, 39:13, 41:16, 41:20, 41:22, 41:23, 46:14, 48:16, 59:16, 61:9, 63:13, 63:15, 66:4, 66:12, 66:13, 69:22
**Realtime** [1] - 79:5
**reason** [10] - 7:19, 10:20, 36:10, 40:18, 42:2, 62:24, 63:5, 70:2, 70:8, 76:14
**reasonable** [2] - 31:11, 31:14
**reasons** [4] - 21:23, 44:18, 63:23, 69:22
**receives** [2] - 30:13, 30:23
**receiving** [1] - 26:14
**recent** [2] - 4:2, 35:5
**recently** [1] - 61:18
**recklessly** [1] - 66:8
**recollection** [4] - 8:9, 8:13, 8:18, 9:25
**record** [5] - 2:7, 3:1, 3:13, 50:1, 53:19
**Recorded** [1] - 1:24
**recruit** [1] - 31:1
**rectified** [1] - 15:2
**rectify** [1] - 14:23
**redacted** [5] - 7:6, 7:7, 8:14, 9:10, 10:5
**redactions** [1] - 10:13
**reduce** [1] - 72:9
**refer** [2] - 41:9, 74:7
**reference** [1] - 35:16
**referenced** [3] - 11:19, 11:22, 30:5
**referred** [1] - 68:19
**referring** [1] - 18:25
**refrigerate** [1] - 49:13
**refrigeration** [1] - 49:9
**refrigerator** [1] - 26:15
**regard** [2] - 28:3, 28:4
**regarding** [1] - 8:5
**Regards** [1] - 2:4
**Registered** [1] - 79:6
**regular** [3] - 9:19, 20:12, 42:5
**regulation** [2] - 71:17,

71:19
**regulations** [1] - 79:11
**regulators** [1] - 12:22
**regulatory** [2] - 27:24, 34:16
**rejected** [3] - 35:11, 35:22, 46:8
**related** [1] - 17:12
**relatively** [1] - 42:15
**release** [24] - 7:18, 9:17, 10:20, 17:16, 22:14, 23:18, 23:20, 27:9, 29:15, 30:9, 33:22, 34:12, 40:22, 50:9, 51:10, 53:9, 53:20, 57:19, 57:20, 58:5, 60:5, 63:25, 65:21, 66:12
**releases** [5] - 5:24, 7:20, 38:18, 38:24
**relevance** [1] - 45:21
**relevant** [2] - 7:23, 46:25
**relief** [1] - 5:6
**rely** [1] - 7:13
**remain** [1] - 50:7
**remains** [1] - 50:20
**remarkable** [1] - 46:23
**remedial** [1] - 74:21
**remedy** [2] - 24:19, 24:21
**remember** [4] - 11:10, 11:11, 49:5, 66:4
**removes** [1] - 16:1
**render** [1] - 72:2
**rendered** [1] - 24:12
**repeated** [1] - 73:19
**reply** [4] - 3:11, 36:21, 71:18
**report** [20] - 9:3, 10:3, 10:11, 11:21, 11:22, 11:24, 12:7, 12:10, 14:24, 17:7, 18:7, 35:6, 35:7, 35:15, 35:21, 40:15, 69:1
**reported** [8] - 43:20, 68:19, 70:14, 70:20, 72:24, 74:24, 76:8, 79:9
**REPORTER** [2] - 79:1, 79:18
**reporter** [1] - 27:12
**Reporter** [2] - 79:5, 79:6
**reporting** [8] - 30:20, 35:10, 74:2, 75:4, 75:5, 75:14, 75:18, 75:19
**reports** [18] - 8:10, 8:19, 8:23, 9:13,

9:21, 10:11, 11:18, 11:19, 11:25, 17:7, 40:16, 50:2, 54:11, 55:18, 71:6, 73:24
**representing** [1] - 2:16
**request** [4] - 7:4, 8:17, 8:18, 9:11
**requests** [1] - 16:8
**require** [2] - 40:7, 49:8
**required** [1] - 49:11
**requirements** [2] - 50:21, 67:2
**requisite** [2] - 8:1, 11:6
**resignations** [1] - 41:19
**resigned** [1] - 45:2
**resolution** [1] - 21:8
**resources** [2] - 30:25, 31:1
**respect** [5] - 7:2, 40:18, 44:15, 45:4, 72:4
**respectfully** [3] - 17:23, 53:7, 70:3
**respond** [2] - 22:12, 33:6
**responded** [1] - 8:20
**responding** [5] - 28:5, 33:5, 59:7, 60:21, 70:18
**responds** [1] - 9:1
**response** [18] - 6:22, 8:3, 8:6, 10:15, 11:1, 12:15, 14:15, 24:5, 30:13, 30:14, 31:2, 35:3, 49:1, 49:12, 59:5, 59:13, 77:14, 78:1
**responses** [5] - 6:17, 8:11, 9:21, 40:16, 41:2
**responsibilities** [1] - 21:6
**restatement** [1] - 72:6
**restricted** [3] - 20:5, 20:14, 75:4
**restricting** [1] - 74:20
**result** [5] - 37:18, 54:22, 56:8, 57:4, 72:16
**resulted** [1] - 52:2
**results** [10] - 68:19, 70:14, 70:20, 71:4, 71:7, 71:10, 71:16, 72:24, 74:24, 75:18
**RETIREMENT** [1] - 1:11
**retraction** [1] - 60:9

**reveal** [1] - 43:1
**revealed** [1] - 41:3
**revenue** [11] - 46:19, 55:13, 72:8, 72:13, 72:17, 72:23, 75:19, 75:22, 75:24, 76:8
**reversal** [2] - 72:7, 72:23
**reverse** [3] - 72:7, 72:16
**revised** [1] - 20:5
**rewarded** [2] - 44:23, 44:24
**rigorous** [5] - 50:11, 50:16, 57:22, 58:16, 61:20
**rise** [1] - 34:13
**risk** [15] - 28:24, 28:25, 29:6, 29:8, 29:9, 30:8, 33:2, 36:16, 48:13, 48:15, 48:20, 65:8, 65:11, 77:15
**risks** [2] - 24:22, 29:1
**RMR** [1] - 79:18
**road** [1] - 63:22
**room** [4] - 20:12, 26:14, 61:24, 66:10
**Roosevelt** [2] - 2:24, 74:10
**rule** [2] - 69:9, 78:5
**Rule** [2] - 3:16, 42:1
**ruling** [1] - 38:1
**run** [2] - 14:12, 56:3
**running** [2] - 27:19, 46:1

## S

**safe** [5] - 36:9, 36:14, 36:22, 36:25, 38:11
**safety** [2] - 25:7, 50:13
**sale** [2] - 41:15, 41:16
**sales** [4] - 41:12, 41:13, 41:19, 41:22
**sample** [2] - 21:17, 26:14
**Sanofi** [3] - 47:13, 48:12
**Sarbanes** [3] - 40:7, 73:6, 74:17
**Sarbanes-Oxley** [3] - 40:7, 73:6, 74:17
**satisfied** [5] - 64:7, 64:10, 65:2, 65:14, 65:21
**save** [1] - 43:16
**scale** [7] - 13:18, 13:21, 17:21, 27:16, 27:18, 30:1

**scaling** [4] - 27:17, 27:18, 27:21, 30:7
**scathingly** [1] - 41:24
**School** [1] - 2:24
**scienter** [12] - 4:21, 8:1, 11:6, 17:12, 19:23, 27:4, 36:7, 39:9, 47:5, 77:3, 77:4, 77:25
**scientific** [3] - 31:20, 34:15, 47:10
**scope** [1] - 74:20
**SCOTIA** [1] - 1:11
**scratching** [1] - 36:20
**se** [2] - 71:20, 72:23
**Sean** [1] - 31:2
**search** [1] - 9:18
**SEC** [2] - 38:25, 73:20
**second** [2] - 23:13, 35:23
**secrets** [1] - 10:8
**section** [3] - 16:6, 71:6, 71:7
**Section** [2] - 22:3, 74:12
**sections** [1] - 10:10
**secure** [1] - 39:22
**SECURITIES** [1] - 1:3
**securities** [4] - 15:17, 45:15, 66:8, 75:9
**Security** [1] - 2:5
**see** [13] - 22:11, 61:19, 62:13, 64:7, 64:10, 65:2, 65:21, 68:21, 68:22, 75:17, 76:11, 76:13
**seem** [2] - 13:19, 39:24
**segment** [3] - 71:15, 72:18
**segregate** [1] - 70:15
**selective** [1] - 40:24
**sell** [3] - 42:4, 42:8, 43:5
**Sellers** [2] - 1:14, 2:9
**selling** [2] - 37:21, 55:17
**sells** [1] - 43:5
**send** [1] - 24:18
**senior** [1] - 29:19
**sense** [4] - 4:12, 5:8, 41:20, 72:2
**sensible** [1] - 10:21
**sent** [2] - 10:25, 25:3
**sentence** [1] - 77:24
**separate** [4] - 42:6, 50:7, 68:1, 72:5
**serious** [3] - 29:9, 66:8, 66:9
**seriously** [1] - 66:10

**services** [1] - 33:16
**set** [3] - 41:11, 42:4, 60:22
**setback** [1] - 61:19
**seven** [6] - 35:21, 42:18, 42:19, 51:4, 52:23
**seventeen** [2] - 11:18, 67:15
**several** [4] - 7:20, 21:20, 58:21, 62:12
**shadow** [1] - 40:11
**shambles** [1] - 19:18
**shame** [1] - 45:3
**share** [4] - 23:7, 23:23, 42:12, 43:3
**shareholder** [1] - 55:12
**shares** [2] - 46:23, 46:24
**shipped** [2] - 49:17, 52:9
**shirk** [1] - 21:5
**short** [4] - 64:14, 64:17, 69:12, 69:13
**shortcomings** [5] - 64:8, 64:11, 65:2, 65:6, 65:21
**shot** [3] - 11:4, 49:8, 49:12
**show** [1] - 63:4
**showed** [1] - 42:21
**shut** [1] - 65:17
**shutting** [1] - 32:18
**sibling** [1] - 70:20
**side** [2] - 63:9, 71:18
**sides** [1] - 13:22
**signed** [2] - 38:25, 66:11
**significant** [2] - 22:21, 28:1
**signor** [1] - 39:2
**signs** [2] - 40:6, 40:9
**similar** [3] - 4:3, 21:21, 69:22
**simplified** [1] - 3:8
**simply** [1] - 18:22
**Singer** [1] - 35:23
**single** [14] - 20:22, 31:14, 33:7, 33:8, 42:12, 50:9, 50:25, 51:18, 51:20, 51:21, 57:21, 58:13, 75:17
**singular** [1] - 77:17
**site** [7] - 13:25, 14:1, 14:11, 19:25, 24:19, 61:5, 64:24
**sitting** [2] - 9:25, 65:3
**situation** [1] - 39:17
**six** [2] - 21:4, 52:23

**SK** [2] - 71:17, 71:19
**sky** [1] - 38:4
**slack** [1] - 58:19
**slight** [1] - 37:17
**slightly** [2] - 13:19, 19:3
**sloppy** [1] - 75:19
**slow** [1] - 27:10
**sly** [1] - 43:8
**sold** [7] - 21:14, 42:9, 42:12, 42:13, 43:3, 44:17
**solely** [1] - 74:18
**solve** [2] - 32:21, 33:11
**sometimes** [1] - 39:5
**SOMMERS** [1] - 2:8
**Sommers** [2] - 1:13, 2:9
**sorry** [4] - 53:12, 63:16, 64:18, 66:24
**sort** [13] - 14:23, 18:22, 24:10, 40:11, 41:11, 47:25, 48:24, 50:25, 62:9, 64:2, 65:8, 69:11, 76:6
**soul** [1] - 55:10
**sounds** [1] - 42:14
**source** [1] - 74:4
**Southern** [4] - 47:14, 47:15, 69:13, 75:7
**SOUTHERN** [1] - 1:2
**SOX** [12] - 39:3, 40:6, 40:9, 67:24, 73:4, 74:12, 74:15, 75:9, 75:15, 76:1, 76:8
**SOX-certified** [1] - 39:3
**space** [3] - 16:10, 26:15, 26:17
**speaker** [1] - 39:5
**speaking** [1] - 40:10
**speaks** [1] - 6:5
**specific** [3] - 10:2, 10:9, 37:11
**specifically** [2] - 9:18, 12:22
**specification** [4] - 54:22, 56:8, 57:4, 61:21
**specifications** [10] - 50:11, 51:19, 51:22, 51:24, 55:1, 56:11, 57:8, 57:22, 58:1, 58:14
**Speed** [3] - 10:24, 11:22, 25:19
**spend** [2] - 39:13, 44:19
**spent** [1] - 23:1

**spoiled** [1] - 56:23
**spoken** [3] - 67:17, 68:10
**spokesperson** [2] - 55:25, 56:5
**sponsor** [2] - 24:17, 34:16
**sponsors** [2] - 46:18, 63:8
**spring** [1] - 49:18
**springboard** [1] - 71:21
**staff** [1] - 26:17
**staffing** [1] - 19:19
**stage** [9] - 16:12, 22:1, 37:9, 37:10, 59:17, 60:19, 60:22, 66:15, 77:21
**stand** [3] - 6:9, 6:14, 25:24
**standard** [2] - 3:15, 77:19
**standards** [4] - 50:11, 57:22, 64:15, 64:18
**standing** [3] - 6:11, 8:13, 10:2
**start** [17] - 7:17, 7:24, 10:21, 11:9, 18:8, 22:8, 22:9, 22:14, 22:24, 39:6, 41:8, 41:19, 44:9, 50:25, 57:20, 65:13, 74:25
**started** [8] - 2:22, 3:12, 10:19, 46:7, 46:22, 60:20, 64:13, 72:12
**starting** [6] - 10:19, 11:25, 13:5, 15:20, 42:17, 51:2
**starts** [2] - 13:1, 13:3
**state** [1] - 53:21
**statement** [43] - 6:22, 7:12, 7:14, 7:15, 7:25, 8:8, 12:11, 12:19, 14:15, 17:3, 17:9, 18:9, 20:22, 22:15, 22:17, 24:1, 24:2, 24:25, 26:4, 26:5, 26:22, 27:6, 29:24, 30:3, 30:4, 39:19, 40:1, 40:12, 46:23, 50:22, 51:15, 51:16, 52:17, 54:18, 55:4, 55:23, 56:7, 60:14, 60:22, 61:11, 66:1, 68:13, 68:15
**statements** [44] - 3:6, 4:7, 4:11, 4:21, 5:2, 5:16, 5:20, 5:23, 6:4, 6:6, 6:19, 11:5,

13:19, 15:4, 15:19, 16:16, 17:24, 20:20, 21:10, 24:11, 29:16, 29:18, 30:4, 35:25, 36:15, 38:17, 38:18, 40:18, 47:21, 49:22, 49:23, 62:14, 64:6, 65:9, 66:19, 67:1, 67:4, 67:21, 68:8, 68:10, 73:10, 73:19
**States** [3] - 49:3, 79:6, 79:12
**STATES** [2] - 1:1, 1:7
**states** [1] - 50:9
**stating** [1] - 11:2
**statute** [4] - 16:5, 36:9, 36:14, 74:22
**statutory** [1] - 16:6
**stay** [2] - 16:6, 70:9
**stenographically** [1] - 79:9
**stenographically-reported** [1] - 79:9
**Stenography** [1] - 1:24
**stick** [1] - 38:16
**still** [4] - 38:16, 53:2, 53:13, 53:20
**stock** [14] - 3:3, 9:16, 9:17, 21:14, 37:22, 41:18, 42:4, 43:6, 43:8, 46:14, 46:21, 55:17, 60:4, 60:10
**Stockbridge** [2] - 1:18, 2:16
**stood** [1] - 6:12
**stop** [2] - 32:17, 65:12
**stopped** [3] - 56:1, 65:12, 72:13
**store** [1] - 26:15
**story** [6] - 4:9, 21:14, 43:1, 43:8, 43:9, 53:7
**strongest** [1] - 45:4
**students** [4] - 2:23, 6:13, 50:1, 59:25
**stuff** [3] - 10:16, 65:9, 73:23
**subject** [4] - 43:9, 43:23, 56:19, 68:11
**submit** [2] - 10:1, 33:21
**subparts** [1] - 8:7
**subpoena** [1] - 54:15
**subpoenas** [1] - 9:12
**subsidiary** [1] - 11:23
**substance** [16] - 25:18, 26:24, 27:20, 32:12, 33:7, 48:1, 50:10, 50:19, 51:21,

57:21, 57:25, 58:13, 62:16, 63:14, 63:23, 77:14

**substances** [1] - 64:22

**substantial** [5] - 13:25, 14:1, 28:13, 67:8

**successes** [1] - 39:12

**successfully** [6] - 54:25, 55:3, 56:10, 56:14, 57:7, 62:17

**succession** [1] - 11:12

**sued** [1] - 75:23

**suffered** [1] - 77:15

**sufficient** [3] - 16:3, 16:4, 37:7

**sufficiently** [1] - 22:2

**suffocated** [2] - 52:4, 57:12

**suggest** [1] - 70:3

**suggesting** [2] - 64:16, 70:8

**suite** [1] - 57:16

**suites** [6] - 16:19, 17:21, 19:15, 24:7, 27:16, 29:25

**Summary** [2] - 16:12, 59:21

**summer** [2] - 13:15, 15:20

**Sun** [1] - 61:16

**Supplemental** [1] - 4:1

**supplemental** [1] - 9:2

**support** [3] - 11:3, 30:16, 34:19

**supported** [1] - 11:5

**supposed** [3] - 37:22, 43:16, 60:9

**supposedly** [1] - 64:6

**Supreme** [2] - 37:24, 77:5

**surprised** [1] - 66:2

**surprising** [1] - 63:22

**survive** [1] - 76:10

**sustainable** [1] - 39:22

**switch** [2] - 38:17, 68:18

**Syed** [1] - 29:18

**SYSTEM** [1] - 1:11

**systems** [2] - 14:2, 50:18

---

## T

**tabbed** [1] - 12:2

**table** [2] - 6:9, 36:23

---

**tackle** [1] - 4:6

**taker** [1] - 20:8

**talents** [1] - 23:24

**talks** [2] - 28:3, 55:19

**target** [1] - 39:23

**tax** [2] - 44:18, 44:19

**team** [1] - 26:20

**technically** [1] - 71:4

**technology** [2] - 18:4, 26:8

**teeth** [1] - 73:5

**Tellabs** [2] - 77:4, 77:20

**ten** [2] - 42:9, 51:23

**tend** [1] - 41:10

**tens** [10] - 18:1, 18:3, 18:10, 19:13, 22:18, 26:6, 26:24, 32:11, 37:20, 62:17

**term** [8] - 29:20, 30:7, 31:9, 32:1, 39:21, 39:23, 64:15, 64:17

**tested** [1] - 25:21

**testimony** [1] - 39:15

**Texas** [1] - 69:10

**THE** [140] - 1:1, 1:1, 1:6, 1:10, 1:15, 2:3, 2:13, 2:20, 3:22, 3:24, 4:2, 4:5, 4:16, 5:11, 5:14, 6:10, 6:16, 6:25, 7:10, 8:16, 9:14, 9:23, 10:6, 10:18, 11:11, 12:5, 12:7, 12:16, 13:7, 13:10, 14:14, 15:14, 15:16, 16:22, 17:2, 17:5, 17:15, 18:5, 18:15, 18:19, 18:24, 19:8, 19:11, 20:16, 21:5, 22:5, 22:8, 22:11, 23:10, 23:13, 23:15, 23:17, 23:21, 26:4, 27:12, 28:18, 29:11, 29:13, 29:15, 30:10, 31:25, 32:9, 33:25, 34:6, 34:19, 34:24, 35:2, 38:10, 38:13, 38:16, 39:16, 39:19, 40:2, 40:5, 40:20, 41:4, 41:7, 43:9, 43:19, 44:2, 44:6, 44:14, 45:8, 46:5, 47:6, 47:12, 47:19, 47:21, 49:2, 49:21, 51:14, 52:1, 52:6, 52:12, 52:17, 52:21, 52:25, 53:12, 53:18, 54:5, 54:17, 55:8, 56:6, 56:17, 57:17, 58:10,

---

59:15, 60:1, 60:13, 61:4, 61:14, 61:24, 62:8, 62:21, 62:25, 63:16, 64:1, 65:20, 65:24, 66:23, 67:10, 67:18, 68:1, 68:4, 68:7, 68:16, 70:4, 70:7, 70:12, 70:24, 72:10, 73:2, 73:11, 73:25, 74:23, 76:15, 76:20, 76:23, 77:22, 78:3

**thematically** [2] - 40:14, 70:16

**themselves** [2] - 6:19, 66:22

**theoretically** [1] - 19:10

**theories** [2] - 67:22, 68:20

**therefore** [3] - 34:17, 47:5, 76:7

**thereto** [1] - 9:21

**they've** [4] - 18:6, 22:20, 46:7, 62:20

**thinking** [3] - 58:18, 60:24, 65:4

**thousand** [2] - 42:13, 43:4

**thousands** [1] - 19:13

**thread** [1] - 72:5

**three** [11] - 5:17, 19:6, 19:9, 19:16, 30:17, 38:20, 43:6, 66:6, 67:1, 69:12

**three-line** [1] - 69:12

**throughout** [4] - 5:22, 15:1, 15:7, 50:16

**thrown** [2] - 50:4, 58:15

**ticking** [1] - 70:9

**timed** [1] - 63:11

**timeline** [2] - 11:8, 46:12

**timing** [1] - 41:20

**Timothy** [2] - 1:16, 2:18

**today** [13] - 2:5, 2:17, 8:13, 9:25, 10:3, 16:15, 17:9, 27:19, 27:20, 36:25, 37:10, 60:17, 66:6

**toe** [1] - 32:5

**together** [5] - 4:23, 4:25, 5:3, 13:8, 76:12

**Toll** [2] - 1:14, 2:9

**took** [6] - 3:17, 14:18, 21:4, 27:1, 47:1, 56:2

---

**top** [1] - 50:13

**topics** [1] - 35:12

**Toronto** [2] - 70:22, 74:8

**Toronto-Dominion** [2] - 70:22, 74:8

**total** [5] - 11:18, 13:6, 46:20, 69:4

**totally** [1] - 44:17

**tout** [1] - 7:21

**touted** [1] - 17:16

**touts** [1] - 22:18

**trade** [1] - 10:7

**trading** [5] - 41:7, 44:15, 45:9, 46:22, 46:25

**trained** [1] - 57:11

**training** [3] - 14:3, 15:6, 19:19

**Transcript** [1] - 1:25

**transcript** [2] - 79:9, 79:11

**TRANSCRIPT** [1] - 1:6

**Transcription** [1] - 1:25

**transformation** [1] - 39:20

**transmitted** [4] - 8:6, 8:20, 9:7, 37:6

**trash** [1] - 61:4

**treading** [1] - 18:22

**treatments** [3] - 17:17, 48:22

**trend** [1] - 72:21

**trends** [2] - 71:13, 71:16

**trial** [2] - 32:16, 48:14

**trials** [1] - 25:7

**tried** [2] - 14:7, 15:8

**triggers** [1] - 21:13

**true** [17] - 15:4, 16:17, 16:18, 18:5, 18:10, 25:2, 26:8, 26:23, 27:6, 31:8, 31:10, 33:22, 52:7, 56:13, 60:16, 61:22, 79:9

**truncate** [1] - 15:23

**truth** [5] - 35:25, 37:1, 37:4, 37:25, 68:12

**try** [6] - 4:6, 20:4, 24:19, 27:10, 30:10, 40:25

**trying** [9] - 11:4, 14:18, 19:12, 24:21, 27:15, 32:22, 38:9, 43:19, 45:16

**TUCCILLO** [80] - 3:21, 3:25, 4:4, 4:14, 5:13, 6:8, 6:15, 6:21, 7:2, 8:3, 8:18, 9:20, 9:24,

---

10:7, 11:7, 11:12, 12:6, 12:13, 12:17, 13:9, 13:23, 14:21, 15:15, 15:22, 16:23, 17:4, 17:6, 17:23, 18:11, 18:17, 18:20, 19:2, 19:9, 19:14, 20:24, 21:9, 35:4, 38:11, 38:14, 38:22, 39:18, 40:1, 40:3, 40:6, 40:21, 41:6, 41:9, 43:12, 44:1, 44:3, 44:7, 44:17, 47:24, 49:4, 50:24, 51:18, 52:3, 52:8, 52:13, 52:20, 52:22, 53:5, 53:14, 53:24, 54:8, 55:7, 55:9, 56:15, 56:25, 68:23, 70:6, 70:8, 70:13, 70:25, 72:12, 73:3, 73:13, 74:7, 76:19, 77:2

**Tuccillo** [19] - 1:12, 2:10, 5:12, 5:13, 5:14, 26:5, 34:25, 35:2, 47:22, 49:24, 50:22, 65:25, 67:11, 68:18, 76:16, 76:25, 78:2

**Tuccillo's** [2] - 22:13, 61:15

**tune** [1] - 13:5

**turn** [5] - 15:11, 22:6, 33:19, 39:1, 57:17

**twice** [2] - 5:7, 22:21

**two** [29] - 7:19, 12:2, 12:14, 13:19, 13:21, 13:22, 17:7, 17:12, 19:17, 31:13, 32:14, 34:9, 35:7, 35:20, 40:16, 41:21, 43:25, 45:2, 46:6, 47:8, 47:10, 48:11, 51:12, 55:21, 61:15, 62:14, 68:23, 70:15, 76:9

**types** [3] - 20:18, 76:11, 76:13

**typically** [5] - 9:1, 9:4, 9:5, 9:7, 36:9

---

## U

**U.S** [2] - 39:24, 48:25

**U.S.C** [1] - 79:8

**ultimate** [1] - 42:25

**ultimately** [6] - 13:5, 13:12, 48:7, 49:9, 63:12, 72:21

**unable** [1] - 33:6

---

14



**uncovers** [1] - 54:15
**under** [8] - 3:15, 22:2, 34:18, 49:18, 68:22, 70:9, 74:12, 77:4
**undergoing** [1] - 48:21
**underlying** [1] - 74:15
**understood** [1] - 67:18
**undisputedly** [1] - 25:17
**unfortunate** [3] - 55:2, 65:1, 77:15
**unique** [5] - 16:19, 17:20, 24:6, 27:10, 29:25
**unit** [2] - 29:19, 39:21
**UNITED** [2] - 1:1, 1:7
**United** [3] - 49:3, 79:6, 79:12
**unlawful** [1] - 74:5
**unloads** [1] - 43:8
**unpreparedness** [1] - 22:23
**unqualified** [1] - 20:1
**unquestionably** [1] - 17:13
**unrelated** [1] - 58:6
**unusual** [1] - 72:14
**unwrap** [1] - 14:10
**up** [23] - 23:25, 27:17, 27:18, 27:21, 30:7, 31:5, 33:18, 37:13, 37:22, 38:5, 42:21, 43:13, 44:25, 49:15, 49:17, 49:18, 51:23, 55:13, 56:21, 60:10, 61:6, 61:7, 78:3
**updates** [1] - 38:6
**upheld** [1] - 74:9
**upholding** [1] - 69:17
**urgency** [2] - 23:8, 23:24
**useful** [2] - 22:11, 22:12

## V

**vaccine** [28] - 4:10, 16:20, 18:3, 25:18, 26:7, 30:19, 32:12, 33:8, 33:16, 33:17, 33:19, 43:15, 43:16, 48:2, 48:3, 50:17, 50:19, 52:25, 54:20, 55:5, 57:13, 58:7, 60:15, 62:21, 63:10, 63:14, 77:14
**vaccines** [26] - 3:7, 12:3, 13:20, 17:17,

19:17, 26:16, 26:18, 37:14, 46:7, 49:7, 49:9, 49:16, 50:3, 50:4, 50:5, 50:7, 51:12, 53:21, 56:14, 61:5, 61:18, 61:21, 62:17, 63:9, 63:11, 63:19
**validated** [5] - 50:15, 52:18, 53:22, 54:1, 58:15
**value** [2] - 15:18, 55:12
**variants** [1] - 49:17
**variety** [1] - 10:23
**vast** [2] - 38:23, 39:14
**veil** [1] - 21:15
**version** [1] - 7:6
**versions** [1] - 9:9
**versus** [2] - 67:14, 69:5
**vice** [1] - 29:19
**viewers** [1] - 54:24
**viewing** [1] - 68:1
**violating** [1] - 71:21
**violation** [5] - 73:12, 73:15, 76:1, 76:8
**violations** [5] - 71:19, 71:20, 71:21, 74:3, 75:9
**virtually** [1] - 40:10
**visible** [1] - 10:14
**voice** [2] - 63:1, 63:3
**voluminous** [3] - 8:10, 8:25, 21:25

## W

**walked** [1] - 55:23
**wants** [1] - 45:21
**warning** [3] - 37:17, 48:13, 48:15
**warnings** [10] - 27:24, 28:2, 36:5, 36:7, 36:16, 36:19, 36:24, 37:16, 37:22, 38:11
**Warp** [3] - 10:24, 11:21, 25:19
**waste** [1] - 19:18
**watching** [1] - 49:6
**water** [2] - 18:23, 32:6
**ways** [1] - 21:1
**website** [3] - 9:22, 10:4, 39:8
**WEDNESDAY** [1] - 1:7
**week** [1] - 31:6
**week-and-a-half** [1] - 31:6
**weeks** [6] - 11:20, 17:9, 43:6, 55:21,

61:16
**welcome** [1] - 2:25
**whittle** [1] - 16:13
**whole** [3] - 35:25, 37:25, 60:7
**wholly** [1] - 20:2
**whoops** [1] - 54:10
**William** [1] - 1:17
**Wilmer** [1] - 1:16
**WilmerHale** [2] - 2:18, 47:17
**win** [2] - 77:7
**winding** [1] - 68:17
**witness** [1] - 22:22
**witnesses** [3] - 19:24, 26:25, 27:3
**wondering** [2] - 19:11, 30:18
**word** [5] - 10:16, 24:13, 31:14, 40:25, 51:17
**words** [4] - 13:17, 24:4, 53:25, 61:15
**worker** [1] - 52:2
**workers** [1] - 56:21
**worry** [2] - 52:14, 59:8
**worth** [1] - 72:8
**wow** [1] - 65:4
**wrap** [1] - 14:9
**write** [2] - 21:3, 21:24
**writes** [3] - 53:9, 53:11, 55:21
**writing** [1] - 63:4
**wrote** [1] - 21:23

## Y

**year** [5] - 14:24, 33:13, 42:14, 43:4, 61:18
**years** [11] - 21:3, 30:8, 33:15, 42:9, 43:3, 45:5, 62:10, 62:20, 63:14, 76:15, 76:17
**York** [20] - 4:8, 5:18, 21:13, 38:17, 43:1, 43:20, 43:24, 45:23, 46:15, 47:14, 47:16, 47:22, 49:22, 49:25, 53:7, 56:19, 58:12, 59:6, 60:4, 69:14
**yourself** [2] - 42:6, 70:24
**yourselves** [1] - 2:6

## Z

**zone** [1] - 19:4

## §

**§** [1] - 79:8

*Nadine M. Bachmann, RMR, CRR   Federal Official Court Reporter*
*101 W. Lombard Street, Fourth Floor,  Baltimore, MD  21201*