**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| IN RE EMERGENT BIOSOLUTIONS INC. SECURITIES LITIGATION | Civil No. 8:21-cv-00955-DLB<br><br>CLASS ACTION |
| THIS DOCUMENT RELATES TO:<br><br>All Actions | |

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN
SUPPORT OF MOTION FOR CLASS CERTIFICATION AND
APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL**

**TABLE OF CONTENTS**

I.  INTRODUCTION ............................................................................................. 1

II.  STATEMENT OF FACTS ............................................................................. 6

    A.  Emergent's False and Misleading Statements to the Market ................................ 6

        1.  Emergent Misrepresented Its Business Operations, Including Its Anti-Contamination Measures ................................ 6

        2.  Defendants Made Misrepresentations and Omissions With Knowledge of Their Falsity ................................ 7

        3.  The Truth Emerges ................................ 8

    B.  This Action and the Proposed Class Representatives ................................ 10

III.  CERTIFICATION IS PROPER UNDER RULE 23(a) ................................ 11

    A.  Courts Favor Class Treatment in Securities Fraud Actions ................................ 11

    B.  The Class Is So Numerous that Joinder of All Members Is Impracticable ........... 12

    C.  Common Questions of Law and Fact Exist for All Class Members .................... 13

    D.  Lead Plaintiffs' Claims Are Typical of Those of the Class ................................ 14

    E.  Lead Plaintiffs Will Fairly and Adequately Protect the Class's Interests............. 15

IV.  CERTIFICATION IS PROPER UNDER RULE 23(b)(3) ................................ 17

    A.  Common Questions of Law and Fact Predominate ................................ 17

        1.  The Fraud-on-the-Market Presumption Applies to the Claims................ 19

            (a)  Emergent Common Stock Traded in an Efficient Market During the Class Period................................ 19

            (b)  Other Relevant Factors Also Support Applying the Fraud-on-the-Market Presumption................................ 24

        2.  Damages Can Be Measured on a Class-Wide Basis................................ 25

    B.  A Class Action Is Superior to Other Available Methods to Fairly and Efficiently Adjudicate This Action ................................ 26

V.     THE COURT SHOULD APPOINT LEAD PLAINTIFFS' COUNSEL AS CLASS COUNSEL .............................................................................................................. 27

VI.    CONCLUSION ....................................................................................................... 28

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amaya v. DGS Constr., LLC*,
326 F.R.D. 439 (D. Md. 2018), *appeal dismissed*, 2020 WL 13558079 (4th
Cir. Jan. 8, 2020) ...................................................................................................3, 4

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ...............................................................................................17, 18

*Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*,
568 U.S. 455 (2013) ..........................................................................................5, 11, 12, 18

*Basic Inc. v. Levinson*,
485 U.S. 224 (1998) ..............................................................................................5, 12, 18

*Berry v. Schulman*,
807 F.3d 600 (4th Cir. 2015) .......................................................................................11

*Bulmash v. Travelers Indem. Co.*,
257 F.R.D. 84 (D. Md. 2009) ........................................................................................19

*Califano v. Yamasaki*,
442 U.S. 682 (1979) .......................................................................................................12

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) ............................................................................. *passim*

*City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc.,
HQ*,
322 F. Supp. 3d 676 (D. Md. 2018) ........................................................................ *passim*

*Di Donato v. Insys Therapeutics, Inc.*,
333 F.R.D. 427 (D. Ariz. 2019) ....................................................................................25

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) .......................................................................................................12

*Gariety v. Grant Thornton, LLP*,
368 F.3d 356 (4th Cir. 2004) .........................................................................................20

*Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*,
141 S. Ct. 1951 (2021) ...................................................................................................12

*Gunnells v. Healthplan Servs., Inc.*,
348 F.3d 417 (4th Cir. 2003) .........................................................................................11

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014)..........................................................................................5, 19, 25

*Hart v. Louisiana-Pacific Corp.*,
641 F. App'x 222 (4th Cir. 2016) ......................................................................11

*Hewlett v. Premier Salons Int'l, Inc.*,
185 F.R.D. 211 (D. Md. 1997)...........................................................................17

*In re Comput. Scis. Corp. Sec. Litig.*,
288 F.R.D. 112 (E.D. Va. 2012) ........................................................................21

*In re Hebron Tech. Co., Ltd. Sec. Litig.*,
2020 WL 5548856 (S.D.N.Y. Sept. 16, 2020)....................................................28

*In re Kirschner Med. Corp. Sec. Litig.*,
139 F.R.D. 74 (D. Md. 1991)................................................................ *passim*

*In re NII Holdings, Inc. Sec. Litig.*,
311 F.R.D. 401 (E.D. Va. 2015) .......................................................... *passim*

*In re Sci.-Atlanta, Inc. Sec. Litig.*,
571 F. Supp. 2d 1315 (N.D. Ga. 2007) ..................................................................2

*In re Titanium Dioxide Antitrust Litig.*,
284 F.R.D. 328 (D. Md. 2012), *amended*, 962 F. Supp. 2d 840 (D. Md. 2013)......4, 12, 13, 14

*In re Under Armour Sec. Litig.*,
631 F. Supp. 3d 285 (D. Md. 2022) .......................................................................21

*Kohl v. Ass'n of Trial Lawyers of Am.*,
183 F.R.D. 475 (D. Md. 1998)............................................................................16

*Krogman v. Sterritt*,
202 F.R.D. 467 (N.D. Tex. 2001) ....................................................................20, 23

*Menkes v. Stolt-Nielsen S.A.*,
270 F.R.D. 80 (D. Conn. 2010)...........................................................................18

*Minter v. Wells Fargo Bank, N.A.*,
274 F.R.D. 525 (D. Md. 2011), *aff'd*, *Petry v. Prosperity Mortg. Co.*, 758 F.3d
543 (4th Cir. 2014)..............................................................................................18

*Minter v. Wells Fargo Bank, N.A.*,
279 F.R.D. 320 (D. Md. 2012)...............................................................15, 26, 27

*Mitchell-Tracey v. United General Title Insurance Co.*,
237 F.R.D. 551 (D. Md. 2006)............................................................................13

*Palm Tran, Inc. - Amalgamated Transit Union Loc. 1577 Pension Plan v.*
  *Emergent Biosolutions Inc.*,
  2021 WL 6072812 (D. Md. Dec. 23, 2021)........................................................................10, 26

*Petrie v. Elec. Game Card, Inc.*,
  308 F.R.D. 336 (C.D. Cal. 2015)............................................................................................25

*Phillips Petrol. Co. v. Shutts*,
  472 U.S. 797 (1985)................................................................................................................12

*Pirnik v. Fiat Chrysler Autos., N.V.*,
  327 F.R.D. 38 (S.D.N.Y. 2018) ...............................................................................................2

*Tchatchou v. India Globalization Capital, Inc.*,
  2019 WL 1004591 (D. Md. Feb. 28, 2019) ............................................................................17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)................................................................................................................12

*Villella v. Chem. & Mining Co. of Chile Inc.*,
  333 F.R.D. 39 (S.D.N.Y. 2019) .............................................................................................24

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)..........................................................................................................13, 14

*Wilson v. LSB Indus., Inc.*,
  2018 WL 3913115 (S.D.N.Y. Aug. 13, 2018)........................................................................24

**Statutes**

Securities and Exchange Act of 1934 ..........................................................................1, 4, 15, 28

**Rules**

17 C.R.F. § 240.10b-5...................................................................................................1, 12, 15, 19

Fed. R. Civ. P. 12...............................................................................................................................2

Fed. R. Civ. P. 23.................................................................................................................. *passim*

Lead Plaintiffs, the Nova Scotia Health Employees' Pension Plan ("NSHEPP") and City of Fort Lauderdale Police & Firefighters' Retirement System ("Fort Lauderdale P&F," and, together with NSHEPP, "Lead Plaintiffs"), by and through their counsel, respectfully submit this memorandum of law in support of their motion for an Order: (i) certifying this action as a class action pursuant to Federal Rule of Civil Procedure ("Rule") 23; (ii) appointing NSHEPP and Fort Lauderdale P&F as Class Representatives; and (iii) appointing Lead Counsel Pomerantz LLP ("Pomerantz") as Class Lead Counsel and Liaison Counsel Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein") as Class Liaison Counsel.

In support of this motion, Lead Plaintiffs submit this memorandum of law, the Declaration of Stefan Cowell, the Chief Executive Officer of NSHEPP ("Cowell Decl."), the Declaration of Lynn Wenguer, the Plan Administrator of Fort Lauderdale P&F ("Wenguer Decl."), the Declaration of Matthew L. Tuccillo of Pomerantz ("Tuccillo Decl.") and its exhibits, including the Expert Report of Matthew D. Cain, PhD ("Cain Report"), and a [Proposed] Order, filed concurrently herewith.

## I.    INTRODUCTION[1]

Lead Plaintiffs seek certification of a class of all persons asserting claims for violation of Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder (the "Class") against remaining Defendants Emergent BioSolutions Inc. ("Emergent" or the "Company"), Robert G. Kramer ("Kramer"), and Syed T. Husain ("Husain) (collectively, "Defendants"), as follows:

> All persons and entities who purchased or otherwise acquired the common stock of
> Emergent between July 6, 2020 and November 4, 2021, both dates inclusive (the

---

[1]    All "¶__" or "¶¶__" references are to the First Amended Class Action Complaint, (ECF 54) (the "Complaint"), all citations and internal quotation marks are omitted, and all emphasis is added, unless otherwise noted.

1

"Class Period").[2]

¶¶2, 326-27.

The Complaint alleges a class period starting on March 10, 2020 (¶¶2, 326), but the first misstatement or omission sustained by the Court at the Rule 12(b)(6) stage occurred on July 6, 2020. ECF 124 (Memorandum Opinion) at 25, 62. Accordingly, the Class Period for which certification is now sought starts on July 6, 2020. As alleged in the Complaint, the Class Period ends on November 4, 2021, when the last corrective disclosure was made. ¶¶258-59. While the last misstatements or omissions sustained by the Court occurred on May 19, 2021 (ECF 124 at 25, 62), any shareholder who purchased Emergent's common stock after that date acquired shares that were still artificially inflated by Defendants' prior materially misleading misrepresentations and omissions until the inflation fully dissipated upon the issuance of the last corrective disclosure, on November 4, 2021. "Courts have held that in a securities class action based on material misrepresentations and omissions to the investing public the class period should end when curative information is publicly announced or otherwise effectively disseminated to the market." *In re Kirschner Med. Corp. Sec. Litig.*, 139 F.R.D. 74, 82 (D. Md. 1991); *accord*, *Pirnik v. Fiat Chrysler Autos.*, *N.V.*, 327 F.R.D. 38, 48 (S.D.N.Y. 2018) (in securities actions, the class period ends on the date "when the full truth has been disclosed to the market").[3] All the alleged corrective disclosure dates and correlating stock drops survived the motion to dismiss. Indeed, Defendants did not raise any loss causation argument or otherwise challenge any of the corrective disclosures, and the Court

---

[2]     The following are excluded from the Class: (1) Defendants, (2) Richard S. Lindahl and the other officers and directors of Emergent at all relevant times, (3) Defendants' immediate family members and their legal representatives, heirs, successors, assigns, or their affiliates, and (4) any entities in which Defendants have or had a controlling interest. ¶¶326-27.

[3]     *See also In re Sci.-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1344 (N.D. Ga. 2007) ("Numerous courts have held that, in a securities class action based on material misrepresentations and omissions to the investing public, the class period should end when curative information is publicly announced or otherwise effectively disseminated to the market.") (collecting cases).

2

made no findings concerning their viability.

In the alternative, should the Court decide to truncate the period for stock purchases to qualify for damages recovery, Lead Plaintiffs seek class certification of a class of All persons and entities who purchased or otherwise acquired the common stock of Emergent between July 6, 2020 and May 19, 2021 (the date of the last sustained misrepresentations or omissions), both dates inclusive (the "Alternative Class Period"). Under this Alternative Class Period, the full set of corrective disclosures spanning until November 2021 (with the final alleged stock price drop on November 5, 2021) remains part of the damages analysis, as no corrective disclosures were challenged by the Defendants or dismissed by the Court.  Significantly, the operative Rule 23 analysis and the underpinnings, analysis, and conclusions of the Cain Report do not materially change if the Court instead evaluates the proposed class certification under the Alternative Class Period. The class action requirements imposed by Rule 23(a) and Rule 23(b)(3) are met under both scenarios.

"It is well-recognized that class actions are particularly appropriate to resolve shareholders claims alleging violations of the federal securities laws and that Rule 23 is to be construed liberally to that end."  *In re Kirschner*, 139 F.R.D. at 77; *see also City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*, 322 F. Supp. 3d 676, 682 (D. Md. 2018) ("District courts have wide discretion in deciding whether to certify a class and should liberally construe Rule 23.").  This case is no exception and readily satisfies all the requirements of Rule 23. Certification under Rule 23 is appropriate if:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Rule 23(a); *see also Amaya v. DGS Constr., LLC*, 326 F.R.D. 439, 446-47 (D. Md. 2018), *appeal*

3

*dismissed*, 2020 WL 13558079 (4th Cir. Jan. 8, 2020). Once these elements have been met, a court will find class certification to be appropriate where "questions of law or fact common to class members predominate over any questions affecting only individual members, and [] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Rule 23(b)(3); *see also Amaya*, 326 F.R.D. at 447. The proposed Class satisfies these elements.

*First*, during the proposed Class Period, over 500 million shares of Emergent common stock were outstanding and were traded on the New York Stock Exchange. There are likely thousands of Class members who were harmed by the Defendants' actions. These numbers dwarf the 40-member class size that courts in this circuit "generally" find "sufficiently large to satisfy the impracticability requirement." *In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. 328, 337 (D. Md. 2012), *amended*, 962 F. Supp. 2d 840 (D. Md. 2013).

*Second*, the Exchange Act claims pled in the Complaint present common issues of law and fact, including, among others: (a) whether Defendants' statements to the investing public during the Class Period contained material misstatements or omissions; (b) whether, and to what extent, the market price of Emergent common stock was artificially inflated during the Class Period because of those material misstatements and omissions; and (c) whether the Defendants acted with scienter.

*Third*, Lead Plaintiffs' claims are typical of those of the Class because all the Class members were similarly affected by Defendants' allegedly wrongful conduct, which violated the Exchange Act. Lead Plaintiffs will therefore make the same legal arguments, based on the same course of events, as would absent members of the Class in proving Defendants' liability, and Lead Plaintiffs will prosecute these claims using generalized evidence on a class-wide basis.

*Fourth*, Plaintiffs will fairly and adequately protect the interests of the Class members. No antagonism exists between Lead Plaintiffs and the Class, and proposed Class Lead Counsel, Pomerantz, and proposed Class Liaison Counsel, Cohen Milstein, are competent and experienced in class and securities litigation.

*Fifth*, as Rule 23(b)(3) requires, common issues of fact and law predominate the claims – including falsity, materiality, causation, scienter, and damages. Further, because the market for Emergent common stock, which traded on the New York Stock Exchange, was efficient during the Class Period, the Class is entitled to rely on the "fraud-on-the-market" presumption under *Basic Inc. v. Levinson*, 485 U.S. 224, 246-47 (1998), *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 277-78 (2014) ("*Halliburton II*"), and *Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*, 568 U.S. 455, 458 (2013). *See* Cain Report (Tuccillo Decl. Ex. A) ¶¶28-105. Additionally, damages are measurable on a class-wide basis for the Class.

*Finally*, Rule 23(b)(3)'s mandate that a class action be superior to all other available forms of action is satisfied because: (a) joinder of all members of the Class is impracticable; (b) the damages suffered by individual members of the Class may be relatively small; and (c) the expense and burden of individual litigation makes it impracticable for members of the Class to individually redress the wrongs done to them.

For these reasons, Lead Plaintiffs respectfully request certification of the Class, appointment of the Proposed Class Representatives as Class Representatives, and appointment of Pomerantz as Class Lead Counsel and Cohen Milstein as Class Liaison Counsel.

## II.    STATEMENT OF FACTS

### A.    Emergent's False and Misleading Statements to the Market

#### 1.    Emergent Misrepresented Its Business Operations, Including Its Anti-Contamination Measures

Emergent is a Maryland-based biopharmaceutical company that provides preparedness and response products to address public health threats. ECF 124 at 2. Emergent is comprised of six segments focusing on different public health threat categories, including a Contract Development and Manufacturing Organization ("CDMO") segment that provides "molecule-to-market" offerings such as drug substance manufacturing for vaccines. *Id*. Emergent provides CDMO services to biopharmaceutical companies, government agencies, and non-governmental organizations. *Id*.  Emergent has seven manufacturing and development facilities in the United States, including a facility in Baltimore, Maryland ("the Bayview facility" or "Bayview"). *Id*. Pursuant to U.S. government contracts, Bayview was one of three facilities in the U.S. pre-authorized to manufacture vaccines in the event of a pandemic.  *Id.* at 2-3.  Soon after the COVID-19 pandemic began, Emergent entered into an agreement with Johnson & Johnson ("J&J") to provide drug substance manufacturing for its COVID-19 vaccine at the Bayview facility, as well as to reserve large-scale manufacturing capacity. *Id*. at 3. Emergent also contracted with AstraZeneca to provide CDMO services and to reserve large-scale manufacturing capacity at the Bayview facility for its  COVID-19 vaccine. *Id*. at 4.

Defendants were consistently warned to properly equip, staff, train, maintain, operate, sterilize, and decontaminate Bayview. *See*, *e.g*., ¶¶58-69, 108-25, 219. Each time, they publicly reassured regulators, clients, and investors they were doing so.  But these representations were false. As soon as Bayview began manufacturing bulk drug substance for the J&J and AstraZeneca COVID vaccines, batches had to be regularly destroyed due to worker error, microbial

6

contamination, and ultimately cross-contamination of the two vaccines. *Id*. Contrary to their public statements, Bayview was non-compliant with current good manufacturing practices (cGMP) throughout the Class Period and Defendants utterly failed at their task to deliver well-manufactured J&J and AstraZeneca bulk drug substance – thereby torpedoing a key part of the global COVID vaccine effort while decimating Emergent's stockholder value.

Meanwhile, during the Class Period, Defendants repeatedly misrepresented the CDMO segment's operations and performance, and the capabilities, equipment, staffing, and training at Bayview, particularly anti-contamination measures. ¶¶129-219. For example, Defendants made false and misleadingly incomplete statements about the Bayview facility's readiness for large-scale manufacturing and its ability to manufacture multiple products at once. *See*, *e.g.*, ¶¶148, 157, 168, 185. Even after production was underway, Defendants continued touting Bayview's capabilities, without disclosing contamination issues, inadequate staffing and training, inadequate quality control policies, and inadequate facility space and equipment – and the resulting large-scale destruction of COVID vaccine batches. These undisclosed issues triggered the destruction of 240 million vaccine dose-equivalents by early 2021. ECF 124 at 40. Ultimately, 400 million out of 500 million dose-equivalents manufactured at Bayview were destroyed or discarded. *See* ECF 79-2 at 4.

Defendants' misrepresentations occurred both before and after a March 31, 2021 *New York Times* report that 15 million doses of J&J COVID-19 vaccine were discarded because of contamination at Bayview. ¶10.

### 2. Defendants Made Misrepresentations and Omissions With Knowledge of Their Falsity

The Complaint details material, nonpublic, negative facts about the numerous deficiencies and problems at the Bayview facility that caused persistent, serious contamination risks. ¶¶58-126.

These allegations derive, *inter alia*, from inspection reports by the Food and Drug Administration ("FDA") and others of the Bayview facility, and Emergent's responses (¶¶70-116; 245-46, 251, 254, 256); reports by *The New York Times*, *Associated Press*, and others, and Defendant Kramer's Op-Eds (¶¶117-20; 237-38, 241, 250, 258(d)); ten former Emergent employees (¶¶27-37) who gave confidential witness statements (¶¶59-69); and the U.S. House Committees' extensive investigation and Congressional report and exhibits published in May 2021 (¶¶121-26). *See also* ECF 79-2 through 79-38 (May 2022 Congressional report and exhibits).

The Complaint also alleges that Defendants had a financial motivation to commit the fraud, evidenced primarily by insider transactions. ¶¶269-78. For example, Defendant Kramer made millions of dollars in insider sales suspiciously timed as they occurred shortly after multiple vaccine batches were destroyed, and around the same time as the alleged misstatements. *Id*.

### 3.      The Truth Emerges

A series of partial corrective disclosures incrementally revealed Defendants' fraud and removed the artificial inflation from Emergent's stock price – despite their ongoing misstatements and omissions that muted the impacts.

On March 31, 2021, the *New York Times* reported that in February 2021, Emergent employees at Bayview mixed up the J&J and AstraZeneca COVID-19 vaccine ingredients, thereby contaminating up to 15 million J&J vaccine dose-equivalents, prompting regulator actions, the freezing of other batches, and J&J to assert more control over the Bayview facility. ¶¶10, 237. On April 1, 2021, *AP* reported that FOIA documents revealed Emergent's history of FDA citations for contamination and training deficiencies, and its failure to follow appropriate protocols and procedures at its facilities as far back as 2017. ¶¶10, 238. On this news, Emergent's stock price fell $12.45, or 13.4%, per share on April 1, 2021. ¶239.

On April 3, 2021, *The New York Times* reported that J&J was assuming control of Bayview, which would no longer produce the AstraZeneca vaccine. ¶¶10, 241. On this news, Emergent's stock price fell $1.84 per share, or roughly 2.3%, on April 5, 2021. ¶242.

On April 19, 2021, Emergent disclosed that, at FDA's request, it was halting manufacturing of any new vaccine material at Bayview and was quarantining all prior- produced material. ¶¶10, 243. On this news, its stock price fell $9.77 per share, or roughly 12.6%, on April 19, 2021. ¶244.

On April 21, 2021, the FDA published a detailed report outlining a litany of decontamination, sterilization, sanitization, cleaning, waste transport and disposal, maintenance, process, personnel, and training failures at Bayview between January and April 2021, and confirmed that Emergent was halting all new production there. ¶¶10, 245. On this news, its stock price fell $2.88 per share, or 4.4%, on April 22, 2021. ¶247.

On April 29-30, 2021, Defendant Kramer and Emergent confirmed cross-contamination of the J&J production suite with the AstraZeneca vaccine, and its CFO Richard Lindahl disclosed impacts in the form of lowered projected revenues and earnings. ¶¶10, 249-50. On April 30, 2021, Emergent filed a 52-page response to the FDA's report which, among other things, (i) confirmed the cross-contamination and how quickly it was known, and (ii) conceded that trying to manufacture drug substance for two COVID-19 vaccines at once revealed cross-contamination control procedures flaws. ¶¶10, 251. At this juncture, Defendant Husain left the company to "pursue another opportunity," while Emergent's EVP for Manufacturing and Technical Operations took "a personal leave of absence." ¶¶10, 249. On this news, its stock price fell $2.17 per share, or 3.4%, on April 30, 2021. ¶252.

On June 11, 2021, *The New York Times* reported that the FDA said 60 million doses of J&J vaccine produced at Bayview would be discarded and 10 million more would get a warning. ¶¶11, 254. On this news, Emergent's stock price fell $1.97 per share, or 3%, on June 11, 2021. ¶255.

On June 18, 2021, *The New York Times* reported that Bayview's problems were so serious that 100 million J&J and AstraZeneca vaccine doses were in limbo pending FDA review. ¶¶11, 256.  On this news, Emergent's stock price fell $2.57 per share, or 4.1%, on June 18, 2021. ¶257.

On November 4, 2021, Defendants disclosed that the U.S. Department of Health and Human Services had terminated its $650 million contract with Emergent, which lowered the realized value of the contract by $180 million to $470 million; that Emergent was reversing $86 million in Q3 2021 revenue and lowering its backlog by $171 million; and that its Head of Global Quality was leaving the company.  ¶¶11, 258. The same day, Defendant Kramer published an op-ed disclosing that Bayview had never received the work and funding needed to build and maintain the Bayview facility at the level necessary to ready it for Emergent's COVID-19 vaccine manufacturing obligations. *Id.* On this news, Emergent's stock price fell $19.50 per share, on November 5, 2021, a precipitous decline of over 37%. ¶259.

### B.      This Action and the Proposed Class Representatives

The initial complaint in this action (ECF 1) was filed on April 19, 2021, with similar actions filed May 14, 2021 and June 2, 2021.  On December 23, 2021, the Court consolidated the three actions and appointed NSHEPP and Fort Lauderdale P&F as Lead Plaintiffs, Pomerantz as Lead Counsel, and Cohen Milstein as Liaison Counsel.  *Palm Tran, Inc. - Amalgamated Transit Union Loc. 1577 Pension Plan v. Emergent Biosolutions Inc.*, 2021 WL 6072812, at *2, *6 (D. Md. Dec. 23, 2021).

On March 19, 2022, Lead Plaintiffs filed the Complaint. ECF 54. Motion to dismiss briefing followed and, on September 1, 2023, this Court denied in part and granted in part Defendants' motion to dismiss. ECFs 124, 125.

Lead Plaintiffs traded thousands of shares of Emergent common stock throughout the Class Period and suffered damages as a result of the violations of the federal securities laws, as alleged in the Complaint. *See* Cowell Decl. (Decl. Ex. B) ¶3; Wenguer Decl. (Tuccillo Decl. Ex. C) ¶3; ECFs 54-1, 54-2. Lead Plaintiffs now seek appointment from this Court to serve as Class Representatives and appointment of their counsel to serve as Class Lead Counsel and Class Liaison Counsel.

## III.    CERTIFICATION IS PROPER UNDER RULE 23(a)

In order for a court to certify a class under Rule 23(a), the moving party must first establish that: (1) the class is so numerous that joinder of all members is impracticable ("numerosity"); (2) there are questions of law or fact common to the class ("commonality"); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ("typicality"); and (4) the representative parties will fairly and adequately protect the interests of the class ("adequacy"). *See* Rule 23(a); *see also Hart v. Louisiana-Pacific Corp.*, 641 F. App'x 222, 232 (4th Cir. 2016); *Berry v. Schulman*, 807 F.3d 600, 608 (4th Cir. 2015). Courts in the Fourth Circuit construe Rule 23 liberally. *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 424 (4th Cir. 2003); *City of Cape Coral*, 322 F. Supp. 3d at 682. Lead Plaintiffs satisfy all four of Rule 23(a)'s prerequisites.

### A.      <u>Courts Favor Class Treatment in Securities Fraud Actions</u>

Courts of all levels throughout the country, including the Supreme Court, have repeatedly recognized the importance of private class actions in addressing violations of the federal securities laws. *See, e.g.*, *Amgen*, 568 U.S. at 478 ("Congress, the Executive Branch, and this Court [] have recognized that meritorious private actions to enforce federal antifraud securities laws are an

11

essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the Securities and Exchange Commission."); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) ("This Court has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions . . . ."); *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) ("The securities statutes seek to maintain public confidence in the marketplace."); *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1958 (2021) ("We have inferred from [Section 10(b) of the Exchange Act and Rule 10b-5] an implied private cause of action permitting the recovery of damages for securities fraud. . . . Although the *Basic* [fraud-on-the-market] presumption can be invoked by any Rule 10b-5 plaintiff, it has particular significance in securities-fraud class actions."); *In re Kirschner*, 139 F.R.D. at 77 ("It is well-recognized that class actions are particularly appropriate to resolve shareholders claims alleging violations of the federal securities laws and that Rule 23 is to be construed liberally to effectuate that end."). Indeed, the Supreme Court has identified the suitability of class certification in such instances. *Califano v. Yamasaki*, 442 U.S. 682, 699-700 (1979); *see*, *e.g.*, *Phillips Petrol. Co. v. Shutts*, 472 U.S. 797, 809 (1985) ("[M]ost of the plaintiffs would have no realistic day in court if a class action were not available."); *Amgen*, 568 U.S. at 478 ("We have no warrant to encumber securities-fraud litigation by adopting an atextual requirement of precertification proof of materiality that Congress, despite its extensive involvement in the securities field, has not sanctioned.").

**B.     The Class Is So Numerous that Joinder of All Members Is Impracticable**

A proposed class satisfies the Rule 23(a) "numerosity" prerequisite if "the class is so numerous that joinder of all members is impracticable." Rule 23(a)(1). "The Fourth Circuit has held that no specified number is needed to maintain a class action." *In re Titanium*, 284 F.R.D. at

12

337.  However, "generally speaking, courts find classes of at least 40 members sufficiently large to satisfy the impracticability requirement."  *Id.*

During the Class Period, Emergent's outstanding shares traded publicly on the New York Stock Exchange and ranged in number from 53.7 million shares to 55.8 million shares[4], with an average weekly trading volume of 3.3 million shares.  *See* Cain Report ¶¶37, 93.  While Lead Plaintiffs do not currently possess the information necessary to determine the exact number of Class members,[5] the sheer volume of Emergent shares traded over the course of the Class Period suggests that there are thousands of Class members.  As a result, joinder of all Class members would be impracticable.

In addition to the large number of Class members, because Emergent's stock traded publicly on a national market, it is highly likely that the Class members are geographically diverse. This reality further supports the conclusion that joinder is impracticable for the Class, thus satisfying Rule 23(a)'s numerosity requirement.

### C.    Common Questions of Law and Fact Exist for All Class Members

Rule 23(a)(2) requires there be "questions of law or fact common to the class."  To satisfy this prerequisite, "even a single common question will do," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011); "it is not necessary that all issues are shared. . . . Thus, factual differences among the class members' cases will not preclude certification if the class members share the same legal theory[,]" *Mitchell-Tracey v. United General Title Insurance Co.*, 237 F.R.D. 551, 557 (D. Md. 2006).  For this Class, the Complaint alleges core factual issues and legal theories that are common to the Class members, which include:

---

[4]    This was between 53.7 million and 55.8 million shares during the Alternative Class Period as well. Cain Report ¶94 n.93.

[5]    The precise number of Class members can be determined later through appropriate discovery.

- Whether the Defendants violated the federal securities laws by their acts and omissions alleged in the Complaint;

- Whether the statements the Defendants made to the investing public during the Class Period contained material misrepresentations or omitted material information;

- Whether, and to what extent, the market price of Emergent's common stock was artificially inflated during the Class Period because of the material misstatements or omissions alleged in the Complaint;

- Whether the Defendants acted with the requisite level of scienter;

- Whether Kramer and Husain were controlling persons of Emergent; and

- Whether members of the Class have sustained damages because of the conduct alleged in the Complaint, and if so, the proper measure of those damages.

Each of these questions is common to the Class. "It is well-established that a class action is appropriate in securities fraud cases involving similar or identical misrepresentations (even if they are issued at different times)." *In re Kirschner*, 139 F.R.D. at 78. The claims center on alleged misrepresentations and omissions that are identical among all the Class members. The proposed Class therefore easily satisfies the commonality requirement.

### D.    Lead Plaintiffs' Claims Are Typical of Those of the Class

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Rule 23(a)(3). A class representative "must be part of the class and possess the same interest and suffer the same injury as the class members." *In re Titanium*, 284 F.R.D. at 338. Like commonality, typicality "serve[s] as [a] guidepost[] for determining whether . . . the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected." *Dukes*, 564 U.S. at 349

14

n.5. Thus, as was the case with commonality, "factual differences will not necessarily render a claim atypical, provided the named plaintiff's claim is predicated on the same course of conduct and legal theory as the claims of the class." *Minter v. Wells Fargo Bank, N.A.*, 279 F.R.D. 320, 325 (D. Md. 2012) ("*Minter II*").

Lead Plaintiffs' and the Class's claims arise from Defendants' wrongful conduct in violation of federal securities laws, as alleged in the Complaint. Their causes of action are based on the legal theory that the Defendants violated Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder – specifically, that: (i) the Defendants, acting with scienter, misrepresented or concealed information regarding CDMO segment operations and performance and the capabilities, equipment, staffing, and training at Bayview, particularly anti-contamination measures, which artificially inflated the price of Emergent's common stock; (ii) Lead Plaintiffs and the Class members purchased Emergent common stock during the Class Period at those artificially inflated prices; and (iii) Lead Plaintiffs and the Class members were damaged when the truth of the Defendants' material misstatements and omissions came to light. "To the extent that all purchasers throughout the [c]lass [p]eriod share a common interest in proving plaintiffs' allegations, this is sufficient to make the claims of the class representatives typical of those of the class members." *In re Kirschner*, 139 F.R.D. at 79.

### E. <u>Lead Plaintiffs Will Fairly and Adequately Protect the Class's Interests</u>

The final prerequisite of Rule 23(a) demands that representative parties "fairly and adequately protect the interests of the class." Rule 23(a)(4). To satisfy this element, "(1) the interests of the plaintiff and other members of the class must coincide; and (2) it must appear that plaintiff and his attorney will vigorously prosecute the action." *City of Cape Coral*, 322 F. Supp. 3d at 683. Lead Plaintiffs' interests fully align with those of the Class because, as discussed above, their claims arise from the same wrongful conduct and are based on the same legal theories. Since

15

their appointment as Lead Plaintiffs, NSHEPP and Fort Lauderdale P&F have each taken their roles and obligations to the putative Class seriously and have acted to protect the Class's interests. To date, Lead Plaintiffs have actively monitored and supervised experienced counsel who have, among other things: (i) thoroughly investigated the claims; (ii) prepared and filed the robust Complaint; (iii) researched, briefed, and argued the opposition to Defendants' motion to dismiss; (iv) overcame Defendants' motion to dismiss; (v) begun pursuing discovery, including pursuit of extensive documentary evidence from Defendants and third parties; and (vi) prepared and filed this motion.  Cowell Decl. ¶6; Wenguer Decl. ¶6. Lead Plaintiffs will continue in this fashion if appointed as Class Representatives: Lead Plaintiffs have certified that they are willing and able to provide deposition and trial testimony, will continue to oversee further motion practice, and will participate in settlement discussions at the Court-ordered mediation and thereafter if needed. Cowell Decl. ¶7; Wenguer Decl. ¶7.

In addition to having interests that coincide with other Class members, Lead Plaintiffs also collectively owned thousands of shares of Emergent common stock during the Class Period.  As a result, Lead Plaintiffs' interests in seeing the claims prosecuted to their fullest are directly aligned with those of the Class.  Cowell Decl. ¶¶3, 5; Wenguer Decl. ¶¶3, 5.  Thus, by proving their own claims, Lead Plaintiffs will prove the Class's claims as well.  *Kohl v. Ass'n of Trial Lawyers of Am.*, 183 F.R.D. 475, 484-85 (D. Md. 1998) ("The last requirement of Rule 23(a) . . . is met if [p]laintiff's interests are not antagonistic to the interests of the proposed class, and [p]laintiff's attorneys are qualified and have experience with class actions and complex litigation."). Lead Plaintiffs are also adequate because they have retained attorneys with considerable experience in securities class actions and complex litigation.  *See* Tuccillo Decl. Ex. D (Firm Resume of Pomerantz). Lead Counsel Pomerantz has "considerable experience with securities class actions

16

such as this one." *Tchatchou v. India Globalization Capital, Inc.*, 2019 WL 1004591, at *9 (D. Md. Feb. 28, 2019). Pomerantz has committed substantial time and resources to representing the Class, has worked vigorously to prosecute this action, and has and will continue to zealously and competently represent the interests of the Class.[6]  Thus, Lead Plaintiffs have satisfied Rule 23(a)(4). Cohen Milstein, proposed Class Liaison Counsel, is also adequate. *See* Tuccillo Decl. Ex. E (Firm Resume Excerpt of Cohen Milstein).

## IV.   CERTIFICATION IS PROPER UNDER RULE 23(b)(3)

Having met each of the four prerequisites of Rule 23(a), Lead Plaintiffs seek certification of the Class under Rule 23(b)(3), which provides that class certification is appropriate where "questions of law or fact common to class members predominate over any questions affecting only individual members, and [] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  This requirement is also met.

### A.     Common Questions of Law and Fact Predominate

Predominance exists when a proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997) (citing 7A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 1777, at 518-19 (2d ed. 1986)). "In determining whether the predominance standard is met, courts focus on the issue of liability. If the liability issue is common to the class, common questions are held to predominate over individual ones." *Hewlett v. Premier Salons Int'l, Inc.*, 185 F.R.D. 211, 220 (D. Md. 1997). Rule 23(b)(3) "does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof. What the rule does require is that common questions *predominate* over any questions affecting only individual class members."

---

[6]    These qualifications also satisfy Rule 23(g), which requires a district court to assess the adequacy of proposed class counsel. *See infra* Section V.

*Amgen*, 568 U.S. at 469 (emphases in original). Moreover, the Supreme Court has recognized that "[p]redominance is a test readily met in certain cases alleging . . . securities fraud." *Amchem*, 521 U.S. at 625; *see also Minter v. Wells Fargo Bank, N.A.*, 274 F.R.D. 525, 534 (D. Md. 2011), *aff'd*, *Petry v. Prosperity Mortg. Co.*, 758 F.3d 543 (4th Cir. 2014).

As discussed in Section III.C, *supra*, Lead Plaintiffs' claims raise questions common to all the Class members. These common questions arise from the elements required to establish the claims, and therefore go to the core of this action. Specifically, the Class's claims depend on the same factual circumstances – Defendants' false and misleading statements, materiality, scienter, reliance, and loss causation. The Supreme Court has held that questions of falsity, materiality, scienter, and loss causation are each common questions of law and fact that predominate over individualized ones. *Amgen*, 568 U.S. at 467 ("[M]ateriality is a common question for purposes of Rule 23(b)(3)."); *id.* at 475 ("[T]his Court has held that loss causation and the falsity or misleading nature of the defendant's alleged statements or omissions are common questions that need not be adjudicated before a class is certified."); *Basic*, 485 U.S. at 242 ("This case required resolution of several common questions of law and fact concerning the falsity or misleading nature of the three public statements made by Basic, the presence or absence of scienter, and the materiality of the misrepresentations, if any."). And because Lead Plaintiffs are entitled to invoke the "fraud-on-the-market" presumption approved by the Supreme Court in *Basic*, *see infra* Section IV.A.1, the element of reliance is also common to the Class. 485 U.S. at 246-47. The predominance requirement is therefore satisfied as to the Class.[7]

---

[7]     Questions of control person liability are also common to the entire class. *Menkes v. Stolt-Nielsen S.A.*, 270 F.R.D. 80, 91 (D. Conn. 2010) ("[E]ach class member's control person claim should be identical given that Defendants' conduct alone is relevant to satisfying the applicable standard . . . .").

Finally, although specific damages may vary for each Class member, "as the Fourth Circuit noted, Rule 23 contains no suggestion that the necessity for individual damage determinations destroys commonality, typicality, or predominance, or otherwise forecloses class certification.  In fact, Rule 23 explicitly envisions class actions with such individualized damage determinations." *Bulmash v. Travelers Indem. Co.*, 257 F.R.D. 84, 91 (D. Md. 2009) (quoting *Gunnells*, 348 F.3d at 427-28).  Damages to all Class members "may be resolved by a legal finding applicable to the entire Class.  After these legal determinations are made, the damages calculation could be, for most claimants, a matter of simple arithmetic." *Id.*  Accordingly, predominance is satisfied.

### 1. The Fraud-on-the-Market Presumption Applies to the Claims

The fraud-on-the-market theory "holds that the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." *Halliburton II*, 573 U.S. at 268 (quoting *Basic*, 485 U.S. at 246-47).  Because "the typical investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price . . . whenever the investor buys or sells stock at the market price, his reliance on any public material misrepresentations may be presumed for purposes of a Rule 10b-5 action." *Id.*  To invoke the presumption of reliance on a class-wide basis under this theory, Lead Plaintiffs must establish: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Id.* Lead Plaintiffs have satisfied each of these elements.

### (a) Emergent Common Stock Traded in an Efficient Market During the Class Period

In the Fourth Circuit,

> to determine whether a security trades on an efficient market, a court should consider factors such as, among others . . . (1) average trading volume, (2) number

of securities analysts following the stock, (3) number of market makers, (4) whether the company was entitled to file an S-3 Registration Statement, if relevant, and (5) evidence of a cause and effect relationship between unexpected news and stock-price changes.

*Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 368 (4th Cir. 2004) (citing *Cammer v. Bloom*, 711 F. Supp. 1264, 1285-87 (D.N.J. 1989)).  "No one factor is more important than another when a court undertakes the holistic and fact-intensive inquiry of determining whether a market is efficient."  *City of Cape Coral*, 322 F. Supp. 3d at 687.  In addition to these five so-called *Cammer* factors, courts have also relied on three additional factors enumerated in *Krogman v. Sterritt*: "(1) the capitalization of the company; (2) the bid-ask spread of the stock; and (3) the percentage of stock not held by insiders (the 'float')."  202 F.R.D. 467, 474 (N.D. Tex. 2001).  *See also City of Cape Coral*, 322 F. Supp. 3d at 687 (citing the *Krogman* factors).  As explained in the Cain Report, an analysis using these eight factors shows that Emergent's common stock traded in an efficient market during both the Class Period and the Alternative Class Period.  *See* Cain Report ¶¶28-105.

### (i)    Emergent Common Stock Traded at a High Weekly Volume

A stock with a large weekly trading volume evidences the existence of an actively traded market and "suggests [that] there is an efficient market [] because it implies significant investor interest in the company."  *Cammer*, 711 F. Supp. at 1286.  During the Class Period, Emergent had between 53.7 million shares and 55.8 million shares of common stock outstanding[8], of which, on average, 3.3 million shares, or 6.2% of Emergent's total outstanding shares, were traded weekly.  Cain Report ¶¶36-37, 93, 36 n.36.  This trading volume exceeds the 2% that the *Cammer* court concluded "would justify a strong presumption that the market for the security is an efficient

---

[8]    This was between 53.7 million and 55.8 million shares during the Alternative Class Period as well. Cain Report ¶94 n.93. The average weekly trading volume was 7.1% of Emergent's common shares outstanding over the Alternative Class Period. *Id.* ¶36 n.36.

one[,]" and therefore supports a finding that Emergent's common shares traded in an efficient market during the Class Period.  711 F. Supp. at 1293; *see also In re NII Holdings, Inc. Sec. Litig.*, 311 F.R.D. 401, 410 (E.D. Va. 2015) (finding a "strong presumption" of an efficient market where average weekly trading volume was 2.94%); Cain Report ¶36.

**(ii)**   **Many Financial Analysts Covered Emergent During the Class Period**

During the Class Period, 25 different analyst firms issued at least 244 reports covering Emergent, including major firms such as Cowen and Company, JP Morgan, Guggenheim, and Wells Fargo. Cain Report ¶41.[9] "Collectively, Emergent's analyst coverage served to disseminate important new publicly available information to investors, including company news, financial performance, forecasts, and analyst commentary and recommendations."  Cain Report ¶41.  *See, e.g.*, *Cammer*, 711 F. Supp. at 1286 ("[I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period.").  Thus, the second *Cammer* factor also favors a finding that Emergent's stock traded in an efficient market.

**(iii)**   **Designated Market Makers Supervised Trading of Emergent's Stock on the New York Stock Exchange**

Emergent common stock traded on the New York Stock Exchange throughout the Class Period and had at least 103 market makers and brokers providing similar activity during that time. Cain Report ¶51 & n.55.[10]  The New York Stock Exchange is "a market with continuous public price and volume reporting." *NII*, 311 F.R.D. at 410-11 (discussing the NASDAQ, a similar national exchange); *In re Under Armour Sec. Litig.*, 631 F. Supp. 3d 285, 312 (D. Md. 2022) (finding efficient market where security traded on the NYSE in substantial volumes); *In re*

---

[9]     During the Alternative Class Period, 23 separate firms issued a total of 175 reports. Cain Report ¶43 n.45.

[10]     Emergent had at least 96 market makers and brokers over the Alternative Class Period. Cain Report ¶51 n.55.

21

*Comput. Scis. Corp. Sec. Litig.*, 288 F.R.D. 112, 119 (E.D. Va. 2012) (Defendant "has cited no case, and none has been found, holding that the NYSE is not an efficient market for shares of common stock traded, as here, in substantial volumes."). *See* Cain Report ¶¶47-53. "Similar to other large, national exchanges, the NYSE reports volume, prices, bid-ask spreads, and other trading details which ensure the market for stocks remains well-developed, liquid, and efficient." *Id.* ¶49. This supports a showing of market efficiency. *NII*, 311 F.R.D. at 411. Furthermore, Lead Plaintiffs "have demonstrated market efficiency by pointing to over 100 separately identifiable market participants who traded in [Emergent common stock] during the [C]lass [P]eriod." *Id. See also Cammer*, 711 F. Supp. at 1293 ("Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one . . . .").

**(iv)    Emergent Qualified to File Form S-3 Throughout the
Class Period**

To be eligible to file Form S-3 with the SEC, a company must meet certain requirements, such as filing all necessary forms with the SEC in a timely manner for the preceding 12 months, not failing to pay any dividend, and not defaulting on any material debts or leases. Cain Report ¶55. The ability for a company to file Form S-3 indicates an efficient market because "when an issuer of securities meets Form S-3's requirements, the market for its securities is likely one that quickly assimilates material public information into the price because the market is well developed and trading is robust." *NII*, 311 F.R.D. at 411; *see also* Cain Report ¶55. Throughout the Class Period (which includes the Alternative Class Period), Emergent was eligible to file Form S-3, and it did in fact do so on August 9, 2021. Cain Report ¶56 & n.62.

**(v)    Emergent's Stock Price Reacted to New, Company-
Specific Information**

"[O]ne of the most convincing ways to demonstrate efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in

22

stock price." *Cammer*, 711 F. Supp. at 1291. Plaintiffs' expert, Dr. Cain, evaluated this factor by, *inter alia*, conducting an event study, performing a regression analysis, and calculating the statistical significance of the findings therefrom. *See* Cain Report ¶¶57-81. From his analysis, Dr. Cain found that there was "a clear cause-and-effect relationship between the release of new company-specific information and Emergent Common Stock price movements." *Id.* ¶81.[11] This further supports the conclusion that Emergent's common stock traded in an efficient market during both the Class Period and the Alternative Class Period. *Id.*; *see also NII*, 311 F.R.D. at 412 (crediting plaintiffs' expert's findings of a cause and effect relationship based on regression analyses).

### (vi)    Emergent's Market Capitalization Further Indicates It Traded in an Efficient Market

Throughout the Class Period, Emergent had a large market capitalization, which favors a finding that its stock traded in an efficient market. *See Krogman*, 202 F.R.D. at 478. During the Class Period, Emergent's market capitalization averaged $4.4 billion. Cain Report ¶84 & n.83.[12] *See also NII*, 311 F.R.D. at 412-13 (large market capitalization indicative of market efficiency).

### (vii)    Emergent's Stock Had a Nominal Bid-Ask Spread

Bid-ask spread is the difference between the price at which an investor may purchase a stock (the ask) and the price at which an investor may sell a stock (the bid). Cain Report ¶87. "A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade." *Krogman*, 202 F.R.D. at 478. During the Class Period, Emergent's bid-ask

---

[11]    This analysis and Dr. Cain's conclusion do not materially change for the Alternative Class Period. Cain Report ¶79 n.77.

[12]    Emergent's market capitalization averaged over $5.1 billion during the Alternative Class Period. Cain Report ¶84 n.83.

spread averaged 0.06%. Cain Report ¶¶88, 90.[13]   "This spread is narrower than those other courts have found to weigh in favor of finding market efficiency[,]" and therefore indicates that Emergent's stock traded in an efficient market.  *NII*, 311 F.R.D. at 412-13.

### (viii) Emergent's Float Evidences Market Efficiency

Of Emergent's outstanding stock during this time, only 2.7% was held by Emergent insiders during the Class Period and only 2.6% was held by Emergent insiders during the Alternative Class Period, meaning that approximately 97.3-97.4% of Emergent Common Stock outstanding was not held by insiders.  *Id.* ¶¶93-94 & n.93.   That figure far exceeded the required $75 million threshold for filing Form S-3 during the Class Period, with a public float average of $3.9 billion during the Class Period. *Id*. ¶¶56 & n.61.[14]  Thus, Emergent's float supports a finding of market efficiency. *Id.* ¶¶93-94; *see also NII*, 311 F.R.D. at 412-13 (public float of 98.9% indicative of market efficiency); *Villella v. Chem. & Mining Co. of Chile Inc.*, 333 F.R.D. 39, 54 (S.D.N.Y. 2019) (market float of between 65% and 95%); *Wilson v. LSB Indus., Inc.*, 2018 WL 3913115, at *15 (S.D.N.Y. Aug. 13, 2018) (average public float of 82.41% "exceeds amounts other courts have deemed sufficient to suggest a finding of market efficiency").

### (b)    Other Relevant Factors Also Support Applying the Fraud-on-the-Market Presumption

As set forth above, all the *Cammer* and *Krogman* factors indicate that Emergent's common stock traded in an efficient market.[15]  To "demonstrate that the presumption of reliance applies"

---

[13]    Likewise, Emergent's monthly average bid-ask spread was 0.06% during the Alternative Class Period.  Cain Report ¶90 n.90.

[14]    Emergent's float averaged $3.9 billion over the full Class Period and $4.4 billion over the Alternative Class Period.  Cain Report ¶56 n.61.

[15]    Going beyond the *Cammer / Krogman* factors, Dr. Cain's report also evidences that the large number of institutional investors who held Emergent stock, the absence of persistent autocorrelation in Emergent's common stock returns, and the high volume of options trading in Emergent common stock further support market efficiency.  Cain Report ¶¶96, 103, 105.  These

here, Lead Plaintiffs must also establish "(1) that the alleged misrepresentations were publicly known, (2) that they were material, . . . and [3] that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Halliburton II*, 573 U.S. at 268. The Defendants' alleged misstatements were undeniably known to the investing public, having been made in SEC filings, press releases, Kramer op-eds, and earnings calls with analysts. The misstatements were also material, as this Court determined when it denied Defendants' motion to dismiss. *See* ECF 124 at 25-26. Finally, Lead Plaintiffs have demonstrated that they purchased Emergent common stock within the Class Period – that is, between the time the misrepresentations were made and when the truth was revealed. *See* Cowell Decl. ¶3 and ECF 54-1; Wenguer Decl. ¶3 and ECF 54-2. Lead Plaintiffs are accordingly entitled to invoke the fraud-on-the-market reliance presumption.

### 2.      Damages Can Be Measured on a Class-Wide Basis

In addition to factual and legal issues predominating the claims, the methodologies for calculating damages are also applicable to all members of the Class. Dr. Cain has provided a detailed explanation of how damages resulting from the claims could be calculated on a class-wide basis using the "out-of-pocket" method. Cain Report ¶¶106-20. "[O]ut-of-pocket damages calculations through an event study analysis as outlined in [Cain's] Report have been recognized by courts as an accepted method for the evaluation of damages in securities fraud cases based on allegations similar to those made in this case." *City of Cape Coral*, 322 F. Supp. 3d at 692. Thus,

---

factors also support market efficiency for the Alternative Class Period. *Id.* ¶¶97 n.96, 103 n.102, 105 n.106. *See NII,* 311 F.R.D. at 413 (significant institutional ownership supported finding of efficient market); *Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 356 (C.D. Cal. 2015) (finding of no significant autocorrelation supported finding of efficient market); *Di Donato v. Insys Therapeutics, Inc.*, 333 F.R.D. 427, 441-42 (D. Ariz. 2019) (holding that in addition to *Cammer* and *Krogman* factors, expert's findings on "several other factors," including "considerable option trading," supported finding that stock traded in an efficient market).

the calculation of damages stemming from the claims satisfies the predominance prong of Rule 23(b)(3). *Id.* at 693.

> **B.** **A Class Action Is Superior to Other Available Methods to Fairly and Efficiently Adjudicate This Action**

Rule 23(b)(3) requires that a party seeking class certification show that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." To determine this issue of superiority, courts consider the following factors:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular form; and
> (D) the likely difficulties in managing a class action.

Rule 23(b)(3). Courts recognize that "securities fraud cases are favorably adjudicated through class actions." *City of Cape Coral*, 322 F. Supp. 3d at 685 n.3. This action is no exception – prosecuting the claims here as a class action will serve judicial economy and efficiency.

The Class members have minimal interest in individually controlling the prosecution of their individual claims because of the disproportionate size of costs and expenses in pursuing such a case compared to an individual member's potential recovery. *See Minter II*, 279 F.R.D. at 330 ("Allowing Plaintiffs to proceed as a class action meets the requirement of superiority because it promotes justice by providing class members, who would not have sufficient incentive to pursue their claims individually, access to the courts to seek vindication of their rights.").[16]

---

[16]    Lead Plaintiffs are unaware of any other pending litigation concerning the issues raised in this action against Defendants, other than related actions consolidated with this action and a shareholder derivative lawsuit. *See Palm Tran*, 2021 WL 6072812, at \*3 (listing related securities class actions that were consolidated with this action).

The parties and the Court have an interest in this action proceeding in a single forum to promote judicial economy and prevent inconsistent rulings. *See Minter II*, 279 F.R.D. at 331 ("[C]lass certification protects the defendant from inconsistent adjudication by providing a single proceeding in which to determine the merits of the plaintiffs' claims."). This Court in particular has an interest in continuing oversight of this litigation because Emergent's principal executive offices are located in Maryland and this Court has already expended judicial resources overseeing this action for over two years, most recently in the form of a detailed order denying in part and granting in part Defendants' motion to dismiss following extensive legal briefing by the parties. Accordingly, the District of Maryland is the most desirable forum in which to prosecute this action.

Finally, there are no unique elements of this action that would make management of the suit difficult. Pomerantz has handled numerous similar actions, and the appropriate procedures and techniques for the management of securities fraud suits are well established. And even in the event that difficulties managing the suit arise, Rule 23 provides flexibility in order to enable the Court to address and resolve any such issues. *See* Rule 23(c), (d). In consideration of all these factors, Rule 23 counsels that this case would be best adjudicated in the form of a class action.

## V.    THE COURT SHOULD APPOINT LEAD PLAINTIFFS' COUNSEL AS CLASS COUNSEL

In addition to satisfying the adequacy prong of Rule 23(a)(4), Pomerantz also satisfies the elements of Rule 23(g) and should therefore be appointed as Class Lead Counsel. Under Rule 23(g), a court appointing class counsel must consider:

(i) the work counsel has done in identifying or investigating potential claims in the action;
(ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
(iii) counsel's knowledge of the applicable law; and
(iv) the resources that counsel will commit to representing the class[.]

Rule 23(g)(1)(A). As detailed in Section III.E, *supra*, in its capacity as Lead Counsel, Pomerantz has substantial experience handling class actions asserting claims under the Exchange Act, has committed and will continue to commit substantial resources to representing the Class, has done substantial work identifying and investigating the claims, and has worked vigorously to prosecute this action. *See, e.g.*, *In re Hebron Tech. Co., Ltd. Sec. Litig.*, 2020 WL 5548856, at *6 (S.D.N.Y. Sept. 16, 2020) (noting that Pomerantz has "extensive experience as lead counsel in securities class actions"); *In re: Petrobras Sec. Litig.*, 312 F.R.D. 354, 362 (S.D.N.Y. 2016) ("There is no real dispute that Pomerantz is an established firm with considerable class action experience, and the [c]ourt has now had multiple opportunities to observe Pomerantz's performance. The [c]ourt finds that the Pomerantz firm has both the skill and resources to represent the Classes adequately."), *aff'd in part, vacated in part sub nom*. *In re Petrobras Sec.*, 862 F.3d 250 (2d Cir. 2017); Tuccillo Decl. Ex. D (Firm Resume of Pomerantz). Cohen Milstein, proposed Class Liaison Counsel, is also adequate. *See* Tuccillo Decl. Ex. E (Firm Resume Excerpt of Cohen Milstein). In light of the firms' expertise and the absence of any conflict between the firms and the Class, the Court should honor Lead Plaintiffs' choice of counsel and appoint Pomerantz as Class Lead Counsel and Cohen Milstein as Class Liaison Counsel.

## VI.    CONCLUSION

For the foregoing reasons, Lead Plaintiffs respectfully request that the Court: (i) certify this action as a class action pursuant to Rules 23(a) and 23(b)(3); (ii) appoint Lead Plaintiffs as Class Representatives pursuant to Rules 23(a) and 23(b)(3); and (iii) appoint Lead Counsel Pomerantz as Class Lead Counsel and Liaison Counsel Cohen Milstein as Class Liaison Counsel pursuant to Rule 23(g).

Dated:  February 9, 2024               **POMERANTZ LLP**

                                       */s/ Matthew L. Tuccillo*_____

28

Matthew L. Tuccillo (admitted *pro hac vice*)
Jeremy A. Lieberman (admitted *pro hac vice*)
Jennifer Banner Sobers (admitted *pro hac vice*)
Zachary Denver (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, NY 10016
Tel.: (212) 661-1100
Fax: (212) 661-8665
mltuccillo@pomlaw.com
jalieberman@pomlaw.com
jbsobers@pomlaw.com
zdenver@pomlaw.com

**POMERANTZ LLP**
Jennifer Pafiti (admitted *pro hac vice*)
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Tel.: (310) 405-7190
jpafiti@pomlaw.com

*Lead Counsel for Lead Plaintiffs and the Class*

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Steven J. Toll (Md. Bar No. 15824)
Daniel S. Sommers (Md. Bar No. 15822)
S. Douglas Bunch (admitted *pro hac vice*)
Brendan Schneiderman (admitted *pro hac vice*)
1100 New York Avenue N.W.
Suite 500, East Tower
Washington, DC 20005
Tel.: (202) 408-4600
Fax: (202) 408-4699
stoll@cohenmilstein.com
dsommers@cohenmilstein.com
dbunch@cohenmilstein.com
bschneiderman@cohenmilstein.com

*Liaison Counsel for Lead Plaintiffs*

**KLAUSNER, KAUFMAN, JENSEN & LEVINSON**
Robert D. Klausner
Stuart Kaufman
(*pro hac vice* applications forthcoming)
7080 NW 4th Street

29

Plantation, Florida 33317
Tel.: (954) 916-1202
Fax: (954) 916-1232
bob@robertdklausner.com
stu@robertdklausner.com

***Additional Counsel for City of Fort Lauderdale
Police & Firefighter's Retirement System***