# EXHIBIT A

**UNITED STATES DISTRICT COURT**

**DISTRICT OF MARYLAND**

| | |
|---|---|
| IN RE EMERGENT BIOSOLUTIONS INC. SECURITIES LITIGATION | Civil No. 8:21-cv-00955-PWG <br><br> CLASS ACTION |

EXPERT REPORT OF MATTHEW D. CAIN, PHD

February 9, 2024

**Table of Contents**

I.      Scope of Report and Opinions ...............................................................................................1

II.     Qualifications.........................................................................................................................2

III.    Case Background and Alleged Fraud Scheme .......................................................................5

IV.     Bases for Opinions on Market Efficiency .............................................................................7

V.      Evaluation of Market Efficiency Factors for Emergent Common Stock ....................10

        A.    *Cammer* Factor 1: Average Weekly Trading Volume ............................... 12

        B.    *Cammer* Factor 2: Analyst Coverage ......................................................... 14

        C.    *Cammer* Factor 3: Market Makers .............................................................. 16

        D.    *Cammer* Factor 4: SEC Form S-3 Filing Eligibility ................................. 19

        E.    *Cammer* Factor 5: Cause and Effect Relationship Between
              Company Information and Stock Prices........................................................ 20

        F.    Additional Factor 1: Market Capitalization ................................................. 28

        G.    Additional Factor 2: Bid-Ask Spread........................................................... 30

        H.    Additional Factor 3: Public Float ................................................................. 31

        I.    Additional Factor 4: Institutional Ownership............................................... 32

        J.    Additional Factor 5: Autocorrelation ........................................................... 33

        K.    Additional Factor 6: Active Options Trading .............................................. 35

VI.     Ability to Calculate Damages on a Class-Wide Basis.....................................................36

        A.    Calculation of Damages for Violation of §10(b) of the Exchange
              Act ............................................................................................................... 36

        B.    Damage Methodologies are Flexible and Can Incorporate
              Alternative Findings .................................................................................... 38

VII.    Conclusion .........................................................................................................................40

Appendix A ...................................................................................................................... A-1

Appendix B ......................................................................................................................B-1

Exhibits ............................................................................................................................E-1

## I.  Scope of Report and Opinions

1.      Plaintiffs, through their attorneys Pomerantz LLP, have asked me to determine whether the market for Emergent BioSolutions Inc. ("Emergent" or the "Company") common stock ("Common Stock") was efficient during the period of July 6, 2020 to November 4, 2021, inclusive (the "Class Period") and the period of July 6, 2020 to May 19, 2021, inclusive (the "Alternative Class Period").

2.      In addition, Plaintiffs have asked me to opine on whether damages for investors trading in Emergent Common Stock during the Class Period and the Alternative Class Period can be calculated using a common methodology for all Class members that is consistent with Plaintiffs' claims under §10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and U.S. Securities & Exchange Commission ("SEC") Rule 10b-5 adopted thereunder (collectively, the "§10(b) claims").[1]

3.      Based on my analysis to date and the evaluation of the factors described throughout this report, I have formed the following opinions:

a.      The market for Emergent Common Stock was efficient throughout the Class Period.

b.      The *Cammer*, *Krogman*, and other additional factors accepted and applied by courts in the United States to assess market efficiency corroborate that Emergent Common Stock traded in an efficient market.

c.      Though not necessary for a finding of market efficiency, the cause-and-effect relationship between new Company disclosures and resulting

---

[1] *See* Complaint (Doc. No. 54); Order Granting in Part and Denying in Part Defendants' Motion to Dismiss First Amended Complaint Re: Dkt. No. 72 (Doc. No. 125) ("MTD Order"). I understand that Defendants include Emergent, Robert G. Kramer, and Syed T. Husain. *See id*. Defendant Richard S. Lindahl was dismissed by the Court. Dkt. 124.

Common Stock price movements (which I analyze under the fifth *Cammer* factor) further shows that Emergent Common Stock traded in an efficient market throughout the Class Period.

d.    Damages for both the Class Period and the Alternative Class Period in this matter can be calculated on a class-wide basis subject to standard, common methodologies for Plaintiffs' pending §10(b) claims. In particular, the out-of-pocket damages methodology, which is used in virtually all §10(b) class action securities cases, is appropriate and applicable here.

4.    The remainder of my report is organized as follows: **Section II** describes my qualifications. **Section III** summarizes the case background. **Section IV** briefly explains the bases for the reliance requirement and the "fraud on the market" theory relating to market efficiency. **Section V** presents my analyses of the market efficiency factors for the Common Stock during the Class Period. **Section VI** addresses how damages can be calculated on a class-wide basis subject to common methodologies. **Section VII** summarizes my conclusions.

## II.  Qualifications

5.    I hold a Ph.D. in Finance from Purdue University and am a Senior Fellow at the Berkeley Center for Law and Business at the University of California - Berkeley. I teach courses, deliver guest lectures, participate in academic seminars, and conduct research in various topic areas related to finance, economics, accounting, law, and business.

6.    My research focuses on a variety of topics, including empirical corporate finance, corporate governance, board independence, mergers and acquisitions, hostile takeovers, shareholder lawsuits, negotiations, financial contracting, disclosures of financial information, and shareholder activism. I previously held a fellowship with the Harvard Law School Program on Corporate Governance, where I participated in research seminars and related activities.

2

7.      Before my current roles, I worked at the U.S. Securities and Exchange Commission ("SEC") between 2014 and 2018 as a Financial Economist. During that time, I provided economic analysis and expert witness testimony on behalf of the SEC in a wide variety of enforcement investigations, settlement negotiations and litigation, including cases alleging accounting fraud, revenue recognition practices, and disclosure violations. I also served as an advisor to SEC Commissioner Robert J. Jackson, Jr., during which time I assisted with enforcement oversight and policymaking decisions, research, and speechwriting on a wide range of topics, including securities violations, revenue recognition practices, and corporate governance issues. Additionally, while employed at the SEC as a Financial Economist, I continued to work on and publish academic research for which I was awarded the Chairman's Award for Economic Research.

8.      Prior to working at the SEC, I was an Assistant Professor of Finance at the University of Notre Dame. I taught courses in Mergers and Acquisitions to both undergraduate and graduate students, and I also conducted empirical research on various finance, legal, accounting, and economic topics. I have been engaged in academic research for over a decade and continue to publish in law reviews and peer-reviewed academic journals across these disciplines.

9.      Prior to working at Notre Dame, I received a Ph.D. in Finance from Purdue University in 2007. Prior to those studies, I worked as an analyst in Debt Capital Markets at National City Bank, where I assisted companies in raising syndicated loans and private placements of debt and equity for use in funding mergers, acquisitions, and other general corporate purposes. I received a B.S. in Finance from Grove City College in 2001.

10.      In addition to teaching at UC Berkeley, Notre Dame and Purdue, I have delivered guest lectures to undergraduate and graduate students at Vanderbilt University, Arizona State University, Cornell University, and UC Berkeley School of Law. I have also presented my

3

academic research at numerous academic, governmental, and professional institutions, as listed in my curriculum vitae, which is attached as **Appendix A**.

11.     I have published research in leading peer-reviewed journals in the fields of finance, accounting, law, and economics, including the *Journal of Financial Economics, Journal of Law and Economics*, *Journal of Accounting and Economics, Journal of Empirical Legal Studies*, and *Journal of Financial and Quantitative Analysis*. My curriculum vitae, attached as **Appendix A**, further details my publications.

12.     In addition to my teaching, research, and academic responsibilities, I provide consulting services and expert testimony in a variety of matters through my LLC, Cleveland Analytics, as well as in conjunction with other consulting firms. As an expert in financial economics, I have conducted analyses or presented expert opinions related to market efficiency, valuation, securities trading, corporate disclosures, and loss causation/damages in over 60 cases. My curriculum vitae, attached as **Appendix A**, further details my testimony experience.

13.     The materials I have considered in forming my opinions are listed and summarized in **Appendix B**. My time is billed at a rate of $950 per hour for my work on this matter. I am being assisted by staff at Fideres Partners LLP, who have performed work under my direction. I have no financial or other interest in Fideres Partners' billings in this matter, and my compensation is in no way contingent on the outcome of this case.

14.     My work is ongoing, and I reserve the right to update my analyses and opinions based upon new information, discovery, expert reports, or other information that comes to my attention.

### III. Case Background and Alleged Fraud Scheme

15.    Emergent is a Maryland-based global life sciences company with over 1,800 employees and 19 locations in the U.S. and Europe.[2] The Company's business includes providing "preparedness and response solutions addressing accidental, deliberate, and naturally occurring public health threats."[3] Emergent's Bayview facility was contracted by the U.S. government to produce vaccines at the start of the COVID-19 pandemic. The combined value of the contracts with the U.S. government and two pharmaceutical vaccine providers, AstraZeneca and Johnson & Johnson ("J&J"), exceeded $1 billion.[4] During the Class Period, Emergent Common Stock traded on the NYSE under the symbol "EBS".[5]

16.    Plaintiffs allege claims under §10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") against Defendants Emergent, Kramer, and Husain.[6] Specifically, the Complaint alleges that Defendants concealed various "persistent and pervasive contamination risk[s] that [were] ignored and never remediated" at their major manufacturing facilities, including their Bayview facility.[7] These deficiencies would allegedly eventually lead to the contamination of millions of COVID vaccine doses produced at Bayview. The Complaint further alleges that Defendants made numerous misrepresentations and omissions in SEC filings, reports, testimonies,

---

[2] Complaint ¶ 45.

[3] *Id.*

[4] *Id.* ¶ 3.

[5] The following overview section summarizes the allegations in the Complaint as context for Plaintiffs' claims. I make no findings or opinions as to these allegations, and the opinions I reach in other sections of this report regarding market efficiency and the calculation of damages are not tied to any specific allegations summarized herein.

[6] Complaint ¶ 326.

[7] *Id.* ¶ 4.

press releases, conferences, presentations, and investor calls to obfuscate the extent of these deficiencies.[8]

17.     The Complaint alleges that the relevant truth was partially revealed to investors on March 31, 2021, when *The New York Times* released an article detailing the contamination of J&J and AstraZeneca COVID-19 vaccines at Emergent's Bayview facility.[9]

18.     The Complaint alleges that the relevant truth was revealed further through eight additional disclosures during the Class Period: i) a publication by the Associated Press on April 1, 2021, detailing FDA citations against Emergent for contamination protocol and training deficiencies going back to 2017; ii) a publication by *The New York Times* on April 3, 2021, revealing J&J would assume full control of the Bayview facility, which would subsequently stop producing the AstraZeneca vaccine; iii) a press release from Emergent on April 19, 2021, stating that, at FDA's request, the Bayview facility was halting production of new vaccine materials; iv) a publication by the FDA on April 21, 2021, which outlined all sanitary and training deficiencies at Emergent facilities between January and April 2021; v) the confirmation by Defendants on April 29 and 30, 2021 that there had been a cross contamination of the materials intended for the two different vaccines in production, that Emergent's projected revenues and earnings were negatively impacted by this cross contamination, and that Defendant Husain had resigned; vi) a publication by *The New York Times* on June 11, 2021, stating that at least 60 million J&J vaccines produced by Emergent would need to be discarded; vii) a publication by *The New York Times* on June 18, 2021, stating that at least 100 million vaccine doses produced at the Bayview facility were under review by the FDA; and viii) a series of disclosures from Defendants on November 4, 2021, disclosing that Bayview had never received the work and funding needed to be ready for COVID

---

[8] *Id.* ¶¶ 127-259.

[9] *Id.* ¶ 237.

vaccine manufacturing, that the U.S. government had terminated its $650 million contract with Emergent, and that Emergent was reversing $86 million in Q3 2021 revenue and lowering its backlog by $171 million, thereby revealing the full truth behind Defendants' alleged fraudulent scheme to investors.[10]

19.     The Complaint also alleges that, as a result of Defendants' allegedly wrongful acts and omissions, investors traded Emergent Common Stock at an artificially inflated price during the Class Period.[11] **Exhibit 1** graphs the closing stock price and trading volume for Emergent's Common Stock shares throughout the Class Period.

### IV. Bases for Opinions on Market Efficiency

20.     I understand that, with respect to their claims under §10(b), Plaintiffs assert the "fraud-on-the-market" theory of class-wide reliance, *e.g.*, that all Emergent shareholders relied on the alleged misstatements or material omissions of fact (and the fraudulent schemes and acts underlying such misstatements) through their effect on stock prices in an informationally efficient market.[12]

21.     As courts, including the Supreme Court, have repeatedly explained, the "fraud-on-the-market" theory of class-wide reliance holds that investors in securities traded in an informationally efficient market rely on any misrepresentations or material omissions of fact because those statements or material omissions of fact have distorted the value of each class member's purchase price. As the Supreme Court explained in its *Basic Inc. v. Levinson* decision:

> [I]n an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.... Misleading statements will therefore defraud purchasers of stock even if the purchasers do

---

[10] *Id.* ¶¶ 236-259.

[11] *Id.* ¶¶ 326-333 (defining the Class to include "common stock").

[12] *Id.* ¶ 333.

not directly rely on the misstatements…. The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.[13]

22.    The Supreme Court reaffirmed the availability of this theory to satisfy §10(b)'s reliance requirement on a class-wide basis in *Halliburton II*:

> More than 25 years ago, we held that plaintiffs could satisfy the reliance element of the Rule 10b–5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation. We adhere to that decision and decline to modify the prerequisites for invoking the presumption of reliance.[14]

23.    A market is defined as informationally efficient if prices of securities trading in that market reflect all material, widely available public information up to the point that any marginal profits to be gained from trading on existing information do not exceed trading costs.[15] Economic research and literature support the concept of market efficiency for publicly traded securities. For example, Nobel Prize winner Eugene Fama has observed that "[t]he evidence in support of the efficient markets model is extensive, and (somewhat uniquely in economics) contradictory evidence is sparse."[16] More recently, Professor Fama reiterated that "the past research on market efficiency is among the most successful in empirical economics, with good prospects to remain so in the future."[17]

24.    Indeed, research continues to support the empirical soundness of the efficient market hypothesis, as modern scholars have concluded that, in fact, "capital markets are more

---

[13] *See Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).

[14] *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014).

[15] *See, e.g.*, Eugene F. Fama, 1991, "Efficient Capital Markets: II," *Journal of Finance* 46, at 1575.

[16] Eugene F. Fama, 1970, "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance* 25, at 383, 416.

[17] Eugene F. Fama, 1991, "Efficient Capital Markets: II," *Journal of Finance* 46, at 1575, 1576.

efficient than previously recognized."[18] Academic research thus provides ample support for the concept of market efficiency of public exchange-traded securities.

25. Litigants and scholars have argued that markets with continuous public reporting of stock prices and trading volume, such as the NYSE and NASDAQ, should be granted a presumption of efficiency for virtually all securities traded on them.[19] The continuous reporting of trading statistics, significant trading volumes, rapid information dissemination, and other rules for these exchanges practically guarantee a liquid market for securities traded on these exchanges.[20] The fact that Emergent's Common Stock traded on the NYSE therefore leads to a strong presumption of market efficiency.[21]

26. The U.S. Supreme Court has not set forth a definitive test for assessing market efficiency for securities. Nor have Circuit Courts dictated a mandatory standard for evaluating market efficiency.[22] Nonetheless, courts have applied the widely-cited five-factor test laid out in *Cammer v. Bloom* to evaluate whether a market is efficient for the purposes of establishing the

---

[18] *See, e.g.*, Kewei Hou, Chen Xue, and Lu Zhang, 2020, "Replicating Anomalies," *Review of Financial Studies* 33, at 2071.

[19] *See Cammer v. Bloom*, 711 F. Supp. 1264, 1292 (D.N.J. 1989) ("*Cammer*") ("'We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System.'" (quoting Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud*, § 8.6 (Aug. 1988))).

[20] *Id.*

[21] *See Local 703, I.B. of T. Grocery & Food Emps. Welfare Fun v. Regions Fin. Corp.*, 762 F.3d 1248, 1257-1258 (11th Cir. 2014) (noting fact that stock traded on NYSE supported a finding of market efficiency); *Thorpe v. Walter Inv. Mgmt. Corp.*, 2016 WL 4006661, at *13 (S.D. Fla. Mar. 16, 2016) (same); *In re Under Armour Sec. Litig.*, 631 F. Supp. 3d 285, 312 (D. Md. 2022) (finding efficient market where security traded on the NYSE in substantial volumes); *In re Computer Scis. Corp. Sec. Litig.*, 288 F.R.D. 112, 119 (E.D. Va. 2012) (Defendant "has cited no case, and none has been found, holding that the NYSE is not an efficient market for shares of common stock traded, as here, in substantial volumes.").

[22] See *Local 703, I.B. of T. Grocery & Food Emps. Welfare Fun v. Regions Fin. Corp.*, 762 F.3d at 1254-1255.

9

presumption of investor reliance articulated by the Supreme Court in *Basic*.[23] Courts also apply the additional factors for evaluating market efficiency found in another widely cited opinion, *Krogman v. Sterritt*.[24]

27.     Principles of economics and finance support the factors cited by the *Cammer* and *Krogman* courts as indicators of market efficiency.[25] However, as explained below, it is important to understand that an assessment of market efficiency does not turn on any one single factor; rather, it is an assessment of all the factors together that allows one to reach the conclusion that the market for a security is efficient.[26]

## V.  Evaluation of Market Efficiency Factors for Emergent Common Stock

28.     In the following section, I discuss the *Cammer*, *Krogman*, and additional factors and evaluate them in relation to Emergent Common Stock. In doing so, I compare the factors' application to Emergent's Common Stock against: (1) benchmarks established by courts; (2) scientific tests of statistical significance; and/or (3) findings from peer-reviewed published academic research.

29.     As discussed below, my analyses and findings on the various market efficiency factors support the conclusion that Emergent Common Stock traded in an efficient market throughout the Class Period.

---

[23] *See Thorpe v. Walter Inv. Mgmt. Corp.*, 2016 WL 4006661, at \*13; *In re Netbank, Inc. Secs. Litigation*, 259 F.R.D. 656, 669-676 (N.D. Ga. 2009); *Aranz v. Catalyst Pharmaceutical Partners, Inc.*, 302 F.R.D. 657, 669 (S.D. Fla. 2014); *see also Cammer*, 711 F. Supp. at 1292.

[24] *See In re Netbank, Inc. Secs. Litigation*, 259 F.R.D. at 672-673; *Cheney v. Cyberguard Corp., 213 F.R.D. 484, 501-502 (S.D. Fla. 2003)*; *see also Krogman v. Sterritt*, 202 F.R.D. 467, 477 (N.D. Tex. 2001).

[25] *See, e.g.,* Miguel O. Villanueva and Steven Feinstein, 2021, "Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors," *Review of Quantitative Finance and Accounting* 57.

[26] *Id.*, at pp. 204-205.

30.    One academic study that I use for comparison purposes was published by Simona Mola, P. Raghavendra Rau, and Ajay Khorana, and I refer to it as the "MRK Study."[27] In this study, these authors examined two samples of firms. One sample included companies that lost all analyst coverage (the "MRK Sample" firms); these firms had smaller market capitalizations, less trading volume, larger bid-ask spreads, and lower institutional ownership relative to analyst-covered firms, both before and after losing analyst coverage. The second sample included the analyst-covered firms (the "MRK Covered" firms), and the differences between the two samples in average and median market capitalization, trading volume, bid-ask spread, and institutional ownership were all statistically significant at the 99% level.[28]

31.    The authors of the MRK Study summarize their findings as follows:

> This paper examines the value of sell-side analysts to covered firms by documenting the effects on firm performance and investor interest after a complete loss of analyst coverage for periods of at least one year. We find that analyst coverage adds value to a firm both because it reduces information asymmetries about the firm's future performance and because it maintains investor recognition for that firm's stock. . . . Firms that lose all analyst coverage continue to suffer a significant deterioration in bid-ask spreads, trading volumes, and institutional presence but do not show a significant difference in subsequent performance relative to covered peers.[29]

32.    The authors describe these variables as reflective of investor interest: after losing analyst coverage, "investor interest characteristics, such as market capitalization, trading volume, bid-ask spread, institutional holdings, and number of institutions, significantly worsen relative to [analyst-]covered peers."[30] Therefore, I interpret the sample of MRK Covered firms as those

---

[27] Simona Mola, P. Raghavendra Rau, and Ajay Khorana, 2013, "Is There Life After the Complete Loss of Analyst Coverage?," *Accounting Review* 88, at 667-705.

[28] MRK Study at 678, 681-682.

[29] MRK Study at 667.

[30] MRK Study at 681 (footnotes omitted).

11

eliciting high investor interest and reflecting the common indicia of firms operating in efficient markets.

33.    Below, I compare several of Emergent's market efficiency factors to the samples of firms in the MRK Study to assess whether Emergent's characteristics are consistent with firms operating in efficient markets.

### A.    *Cammer* Factor 1: Average Weekly Trading Volume

34.    Trading volume refers to the number of shares of a security transacted between market participants. The greater the amount of buying and selling activity of a security, the more likely it is that new information will be quickly incorporated into the price of that security.[31] Thus, trading volume is an indicator of how developed, liquid, and efficient the market is for a given stock.[32] Thomas and Cotter have stated that "[t]rading volume was also considered as an eligibility standard [for exchange listing] because it affects information dissemination to the market, and was an important criterion for investment analysts in deciding which stocks to follow."[33]

35.    The first *Cammer* factor for stock trading volume has been defined by the *Cammer* court using average weekly trading volume relative to shares outstanding. In setting a threshold of trading volume for the presumption of market efficiency, the court stated:

> "Turnover measured by average weekly trading of 2% or more of
> the outstanding shares would justify a strong presumption that the

---

[31] *See, e.g.,* Bhole, Bharat, Sunita Surana, and Frank Torchio, 2020, "Benchmarking Market Efficiency Indicators for Securities Litigation," *University of Illinois Law Review Online*, (the "Bhole Study") at 101-102; Randall S. Thomas and James F. Cotter, 2000, "Measuring Securities Market Efficiency in the Regulatory Setting," *Law and Contemporary Problems* 63, at 108; MRK Study at 681.

[32] *Id.*

[33] Randall S. Thomas and James F. Cotter, 2000, "Measuring Securities Market Efficiency in the Regulatory Setting," *Law and Contemporary Problems* 63, at 108.

market for the security is an efficient one; 1% would justify a substantial presumption."[34]

36.    **Exhibit 2a** graphs Emergent's Common Stock weekly trading volume as a fraction of shares outstanding throughout the Class Period.[35] The average weekly trading volume was 6.2% of Emergent's common shares outstanding over the Class Period. This level of trading volume exceeds both the 1% and 2% thresholds established by the *Cammer* court. As a result, Emergent's level of stock trading volume throughout the Class Period supports the conclusion that Emergent's Common Stock traded in an efficient market throughout the Class Period.[36]

37.    I also note that the average weekly trading volume of Emergent's Common Stock over the Class Period was 3.3 million shares on the NYSE Stock Exchanges. According to the authors in the MRK Study, the median weekly trading volume for the MRK Sample firms was 0.034 million shares, while the median for the MRK Covered firms was 0.215 million shares weekly.[37]

38.    Additionally, Emergent's daily turnover rate of 1.2% during the Class Period placed it above the 75th percentile of all companies listed on the NASDAQ and the NYSE from 2016-2018.[38] Emergent's average weekly trading volume during the Class Period exceeds that of both

---

[34] *Cammer*, 711 F. Supp. at 1293 (quoting Bromberg, § 8.6).

[35] In this analysis, a "trading week" consists of five consecutive trading days, which may not follow the calendar week.

[36] The average weekly trading volume was 7.1% of Emergent's common shares outstanding over the Alternative Class Period, which supports the conclusion that Emergent's Common Stock traded in an efficient market throughout the Alternative Class Period. See **Exhibit 2b**.

[37] MRK Study at 678 (Table 3). The median annual trading volume for MRK sample firms was 1.75 million shares. 1.75 million divided by 52 weeks is approximately 0.034 million shares. The median annual trading volume for MRK covered firms was 11.19 million shares. 11.19 million divided by 52 weeks is approximately 0.215 million shares.

[38] Bhole Study at 102. The 75th percentile of daily turnover for the 2016-2018 sample period is 1.17%. I note that the 2016-2018 subsample time period is the most recent period reported in this study.

the median MRK Sample firms and the MRK Covered firms. This further supports the conclusion that Emergent's Common Stock traded in an efficient market throughout the Class Period.

### B.      *Cammer* Factor 2: Analyst Coverage

39.      An analyst is someone, usually working for a financial institution such as a brokerage, bank, or investment bank, who studies financial information and trends for a specific company or industry. Analysts typically publish reports in which they assess recent company business developments, review historical financial performance and provide forecasts of future operating performance, or make investment recommendations, such as whether investors should buy, sell, or hold the company's stock.[39]

40.      Analyst coverage can be indicative of market efficiency since research analysts ensure that new important company-specific information is disseminated to investors and thus impounded into stock prices quickly and efficiently. The *Cammer* court similarly stated:

> [I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.[40]

41.      In **Exhibit 3a** I reviewed the analyst coverage of Emergent over the Class Period. I identified a total of 244 reports issued by analysts at 25 separate firms during that period.[41] The list of analyst reports that I was able to identify includes reports by firms that conducted thorough and detailed research on Emergent and the industry within which it operated, such as the reports prepared by analysts at Cowen and Company, JP Morgan, Guggenheim, and Wells Fargo.

---

[39] MRK Study at 670-671.

[40] *Cammer*, 711 F. Supp. at 1286.

[41] These statistics represent a lower bound of the analyst coverage of Emergent because many analyst reports are provided directly to investors but are not captured by third-party data vendors.

Collectively, Emergent's analyst coverage served to disseminate important new publicly available information to investors, including company news, financial performance, forecasts, and analyst commentary and recommendations.

42.    This degree of analyst coverage compares favorably to that documented by academic research. For example, the MRK Study noted that 19% of U.S. firms covered by I/B/E/S received **_no_** analyst coverage in a given year.[42] A separate academic study by Charles M.C. Lee and Eric So documented that, on average, firms were covered by between 0.765 and 7.614 analysts when ranking firms into deciles by the total number of analyst forecasts issued.[43] In other words, many firms within the category of the least amount of analyst coverage in their sample were covered by one or zero analysts. Emergent's analyst coverage is consistent with the MRK Covered firms, which elicited high investor interest.

43.    Moreover, Emergent's level of analyst coverage also placed it above the 90th percentile when compared with all companies listed on the NASDAQ and the NYSE from 2016-2018.[44] The analyst coverage of Emergent during the Class Period supports the conclusion that Emergent's Common Stock traded in an efficient market throughout the Class Period.[45]

44.    In addition to the analyst coverage documented above, investors could access information about Emergent from a variety of other sources. For example, I conducted a search of press and news articles about Emergent using Factiva, a well-known provider of access to business news across a comprehensive set of publications. Factiva coverage includes *Dow Jones Newswires*, *Reuters News*, *PR Newswire*, *Associated Press Newswires*, *Business Wire*, and

---

[42] MRK Study at 668.

[43] Charles M.C. Lee and Eric C. So, 2017, "Uncovering Expected Returns: Information in Analyst Coverage Proxies," *Journal of Financial Economics* 124, at 336 (see Table 1, Panel B – "COV").

[44] Bhole Study, at 104: 90th percentile defined as 20 analysts.

[45] This conclusion remains true for the Alternative Class Period, as I identified a total of 175 reports issued by analysts at 23 separate firms. See **Exhibit 3b**.

numerous other outlets. This search produced over 2,400 articles throughout the Class Period.[46]

Investors can also receive information from online research forums, such as SeekingAlpha, short

sellers, and other investor research services, which offer both free and subscription-based research

reports.

45.     Moreover, Emergent produced numerous filings containing Company information,

which were immediately disseminated to the public through the SEC's online database, EDGAR,

during the Class Period. Individual and institutional investors thus had access to publicly available

information about Emergent from a variety of sources during the Class Period.[47]

46.     As a result, the analyst coverage, number of analyst research reports produced, and

substantial public dissemination of news, SEC filings, and information about Emergent support

the conclusion that its Common Stock traded in a well-developed and informationally efficient

market throughout the Class Period.

### C.     *Cammer* Factor 3: Market Makers

47.     The third *Cammer* factor relates to securities trading outside of major exchanges,

in over-the-counter markets without continuous reporting of trading volume. This factor examines

market makers, which are firms that facilitate the buying and selling of shares among investors in

a company's stock during trading hours.[48] Market makers are present on major exchanges as well

as over-the-counter markets. In particular, market makers can facilitate market efficiency in an

over-the-counter market because they are:

---

[46] The articles were identified through a Factiva search, including Emergent's company tag over all available sources. After excluding potential duplicates, 2,367 unique news articles were identified by my search.

[47] Emergent filed 95 forms with the SEC during the Class Period.

[48] "A 'market maker' is a firm that stands ready to buy or sell a stock at publicly quoted prices." *See* https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers.

16

> [P]resumably knowledgeable about the issuing company and the stocks' supply and demand conditions (i.e., the "order flow"). Therefore, it is believed the larger the number of market makers in a given security, the more information is available about it and the quicker its dissemination in the price.[49]

48. In evaluating market efficiency by looking at market makers, the *Cammer* court held:

> For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption.[50]

The court thus stated that market makers can be an important indicator of market efficiency for stock trading in an over-the-counter market without continuous trading volume reporting.

49. Emergent's Common Stock traded on the NYSE throughout the Class Period. Similar to other large, national exchanges, the NYSE reports volume, prices, bid-ask spreads, and other trading details which ensure the market for stocks remains well-developed, liquid, and efficient. The *Cammer* court stated:

> We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System.[51]

---

[49] Brad M. Barber, Paul A. Griffin, and Baruch Lev, 1994, "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," *Journal of Corporate Law* 19, at 291.

[50] *Cammer*, 711 F. Supp. at 1293; *see also Hayes v. MagnaChip Semiconductor Corp*., 2016 WL 7406418, at *6 (N.D. Ca. 2016) ("The Court agrees that both the presence of a designated market maker and so many market makers in other trading venues weigh in favor of a finding of market efficiency.").

[51] *Cammer,* 711 F. Supp. at 1292.

50.    I understand that courts typically view large, established stock exchanges with market makers (such as the NYSE[52]) as being informationally efficient.[53] Emergent's public listings on the NYSE, a well-developed and established national exchange, thus satisfies the intent of this *Cammer* factor.

51.    Emergent had at least 103 market makers and brokers providing similar activity over the Class Period.[54, 55]

52.    Moreover, I understand that courts view institutional investors as potentially providing similar benefits to market makers by supplying trading liquidity and informationally

---

[52] The NYSE Market Model, *NYSE*, available at: https://www.nyse.com/market-model ("The cornerstone of the NYSE market model is the Designated Market Maker (DMM). DMMs have obligations to maintain fair and orderly markets for their assigned securities. They operate both manually and electronically to facilitate price discovery during market opens, closes and during periods of trading imbalances or instability. This high-touch approach is crucial for offering the best prices, dampening volatility, adding liquidity and enhancing value. DMMs apply their market experience and judgment of dynamic trading conditions, macroeconomic news and industry-specific intelligence, to inform their decisions. A valuable resource for our listed-company community, DMMs offer insights, while making capital commitments, maintaining market integrity, and supporting price discovery.").

[53] *See Todd v. STAAR Surg. Co.*, 2017 WL 821662, at *6 (C.D. Cal. Jan. 5, 2017) (NASDAQ listing "strongly favors a finding of market efficiency"); *Brown v. China Integr. Energy Inc.*, 2015 WL 12720322, at *16 (C.D. Cal. Feb. 17, 2015) (same); *Monroe Cty. Employees' Ret. Sys. v. S. Co.*, 332 F.R.D. 383-84 (N.D. Ga. 2019) ("Trading on the NYSE supports a finding of efficiency.").

[54] *See* Bloomberg "RANK" function ("[Bloomberg's RANK function] provides brokers' advertised trade volume on a post-trade basis, so you can analyze which brokers provide the greatest liquidity, assess how you rank against your peers, and evaluate the greatest liquidity providers in a corporation. RANK generates historical broker ranking reports, comparing broker activity in a single security or across an exchange, index, or portfolio, helping you trade with minimal market impact…RANK provides the equity market share data that is critical to helping buy-side firms identify which brokers potentially are the market makers in a stock in which they are interested, so that trading decisions can be made more accurately. Additionally, sell-side firms can demonstrate their historical ability to source liquidity for clients, while investment bankers can market their ability to manage their corporate finance clients' flow").

[55] Emergent had at least 96 market makers and brokers over the Alternative Class Period, which also supports market efficiency.

18

efficient and informed trading.[56] Academic research has similarly found that institutional investors can facilitate trading liquidity.[57] As I discuss further in Section **V.I**, Emergent's Common Stock was widely held by institutional investors during the Class Period.[58]

53.      In sum, Emergent easily satisfies this *Cammer* factor by virtue of the Common Stock's highly liquid and well-developed trading venues, the presence of market makers, and the widespread holdings by sophisticated institutional investors, further supporting the efficiency of the market for Emergent Common Stock throughout the Class Period.

### D.      *Cammer* Factor 4: SEC Form S-3 Filing Eligibility

54.      The fourth *Cammer* factor cited by the court is SEC Form S-3 filing eligibility:

> [I]t would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.[59]

---

[56] *See In re Countrywide Financial Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Ca. 2009) ("Similarly, the presence of large institutional investors may be similar to the presence of market-makers and arbitrageurs: large investors, with more money at stake, may be more likely to inform themselves well before trading." (citations omitted)); *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 281 (N.D. Ala. 2009) ("[T]he majority of HealthSouth's shares were owned by large sophisticated institutions. These facts further demonstrate that HealthSouth's stock traded in an efficient market.").

[57] MRK Study at 678 (Table 3). Authors reported that Sample firms had a median of 9 institutional investors, while Covered firms had a median of 40 institutional investors; *see also* Brad M. Barber, Paul A. Griffin, and Baruch Lev, 1994, The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency, Journal of Corporate Law 19, at p. 302.

[58] Emergent Common Stock was held by at least 666 institutional investors at some point during the Class Period (see Exhibit 10). Institutional ownership fluctuated on a quarterly basis throughout the Class Period, from a minimum of 86.8% of shares outstanding on December 31, 2021 to a maximum of 92.6% of shares outstanding on March 31, 2021, according to data from Bloomberg and Emergent SEC Filings. These figures represent a conservative estimate of institutional holdings as some institutions may not be reflected in Bloomberg's coverage.

[59] *Cammer*, 711 F. Supp. at 1287.

55.    Form S-3 filing eligibility allows companies to file a shortened form with the SEC in order to raise capital, by providing references to previous SEC filings as opposed to repeating a large quantity of information. This eligibility includes the following requirements: the registrant has a class of securities subject to the Exchange Act, the registrant has filed all necessary filings with the SEC in a timely manner for the past 12 months, and the registrant has not failed to pay any dividend or sinking fund installment on preferred stock or defaulted on any material debts or leases, and the registrant has a public float of $75 million, as measured by the aggregate market value of the voting and non-voting common equity held by non-affiliates of the registrant.[60] The logic and intuition behind this factor as discussed by the *Cammer* court are that a company making timely financial filings with regulators implies that investors have ready and ample access to publicly available information about the issuer.

56.    Emergent was eligible for S-3 registration throughout the Class Period. Moreover, Emergent's Common Stock public float far exceeded the required $75 million threshold during the Class Period,[61] and I also note that the Company filed an S-3 form during the Class Period.[62] Thus, the results of this *Cammer* Factor support the efficiency of the market for Emergent Common Stock throughout the Class Period.

### E.    *Cammer* Factor 5: Cause and Effect Relationship Between Company Information and Stock Prices

57.    The fifth *Cammer* factor relates to whether a company's stock price quickly responds to and incorporates new value-relevant information. The *Cammer* court held:

---

[60] *See* SEC Form 3, *available at* https://www.sec.gov/files/forms-3.pdf.

[61] Emergent's float averaged $3.9 billion over the Class Period and $4.4 billion over the Alternative Class Period.

[62] *See* Emergent BioSolutions Inc., SEC Form S-3, filed Aug. 9, 2021, available at: https://www.sec.gov/edgar/browse/?CIK=1367644&owner=exclude

> [O]ne of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price.[63]

58.    Below, I summarize my empirical analysis, which finds that Emergent's Common Stock exhibited the type of cause-and-effect relationship between company-specific information flow and price movement described in *Cammer*. As part of my analysis, I compared the behavior of Emergent Common Stock on days when company-specific news was issued with its behavior on days when no such news was issued. This analysis demonstrates that Emergent's Common Stock price reacted rapidly to company-specific news, and thus further supports the conclusion that Emergent Common Stock traded in an efficient market throughout the Class Period.

> i.    *Event Study Methodology*

59.    To assess the extent of a "cause and effect relationship between company disclosures and resulting movements in stock price," I ran empirical tests using the results of an event study.

60.    Event studies are widely used by economists to measure the reaction of a security to the disclosure of new, issuer-specific information, including in connection with assessments of market efficiency in securities litigation.[64] As Professor Fama has explained:

> The cleanest evidence on market-efficiency comes from event studies, especially event studies on daily returns. When an information event can be dated precisely and the event has a large effect on prices, the way one abstracts from expected returns to measure abnormal daily returns is a second-order consideration. As a result, event studies can give a clear picture of the speed of adjustment of prices to information.
>
> There is a large event-study literature on issues in corporate finance. The results indicate that on average stock prices adjust quickly to

---

[63] *Cammer,* 711 F. Supp. at 1291.

[64] *See* A. Craig MacKinlay, 1997, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35.

information about investment decisions, dividend changes, changes in capital structure, and corporate-control transactions. This evidence tilts me toward the conclusion that prices adjust efficiently to firm-specific information. More important, the research uncovers empirical regularities, many surprising, that enrich our understanding of investment, financing, and corporate-control events, and give rise to interesting theoretical work.[65]

61.     To determine whether Emergent stock price movements on any given date are statistically significant, I performed an event study using generally accepted economic methods, specifying a regression model over a selected time period to observe the typical relationship between the price of the relevant security and market and industry indices.

62.     Through this regression model, an economist can model the predicted daily return of the relevant security, based on market and industry returns. By subtracting the predicted return from the actual return, an economist can calculate the "abnormal" return in the company's daily stock price movement, which represents the component of the daily stock price return that is not attributable to market-wide or industry-wide movements, but rather, is attributable to company-specific news. Finally, as part of an event study analysis, an economist tests whether the deviation from expected price movements (*i.e.*, the "abnormal return") is "statistically significant," *i.e.*, sufficiently large compared to the usual volatility in the Company stock price return such that simple random movement can be rejected as the cause.

63.     I applied these widely used and generally accepted econometric methodologies to perform my event study here. Specifically, in order to isolate the impact of company-specific news on Emergent's stock price during the Class Period, I performed regression analyses to measure the relationship between Emergent's stock price returns and: (1) changes in market-wide factors that would be expected to impact all stocks; and (2) changes in industry-wide factors that would be expected to impact stocks in Emergent's industry. By modeling how Emergent's stock price

---

[65] Eugene F. Fama, 1991, "Efficient Capital Markets: II," *Journal of Finance* 46, at 1607.

returns moved relative to an overall market index and an industry index, I was also able to measure the response of Emergent's Common Stock to announcements of company-specific news.

64.     I conducted my regression analysis over the Class Period, from July 6, 2020 through November 4, 2021, inclusive. For each trading day in the Class Period, I constructed rolling regressions using data from the prior 40 trading days (the "Estimation Window").[66]

65.     To study the relationship between Emergent's stock price returns and overall market factors, I used the S&P 1500 Composite Total Return Index (the "Market Index"). This Market Index is commonly used by economists as a representation of the overall market.

66.     To study the relationship between Emergent's stock price returns and changes in industry-wide factors that would be expected to impact all stocks in Emergent's particular industry, I used the NASDAQ Biotechnology Index (the "Industry Index").[67]

67.     I established the relationship between the daily return of Emergent's Common Stock, the daily return on the Market Index, and the daily return on the Industry Index over the Estimation Window.[68] As shown in **Exhibit 4**, the event study models revealed an evolving

---

[66] I utilized an Estimation Window of 40 trading days, which equates to approximately two calendar months. This allowed my regression approach to adapt to the rapidly changing volatility of stock returns during the COVID-19 time period at issue in this matter. *See, e.g.,* Mark L. Mitchell and Jeffry M. Netter, 1994, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *Business Lawyer* 49; A. Craig MacKinlay, 1997, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35, at 15 ("Given the selection of a normal performance model, the estimation window needs to be defined. The most common choice, when feasible, is using the period prior to the event window for the estimation window. For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event. Generally, the event period itself is not included in the estimation period to prevent the event from influencing the normal performance model parameter estimates.").

[67] According to Bloomberg, this industry index had over 195 constituents during the Class Period, and Emergent was not a member of the index at that time.

[68] My use of this estimation model accounts for the relationship between the Company, market, and industry daily returns. This method has been accepted by academics in peer-reviewed literature. *See* A. Craig MacKinlay, 1997, "Event Studies in Economics and Finance," *Journal of*

23

relation between the daily returns of Emergent Common Stock and those of the overall stock market and industry indices throughout the Class Period. In other words, movements of the Market Index and the Industry Index help explain movements in Emergent's stock price.

68.    Consistent with generally accepted econometric methods, these observed relationships allowed me to construct a model to predict the expected daily return of the Company on any given date within the Class Period that controlled for that day's market and industry returns. Again, in accordance with standard event-study methodology, I then subtracted this predicted return from the actual return to get the "abnormal" return, which represents the component of the return that is not attributable to market-wide or industry-wide movements.

69.    Finally, I calculated the statistical significance of the abnormal return by comparing it to the usual volatility in Emergent's Common Stock abnormal price return, or the "standard deviation of the regression errors." In other words, the standard deviation of errors provides a metric for how much idiosyncratic company-specific volatility (or "randomness") remains in the price movement of Emergent's common stock after controlling for the Market Index and the Industry Index. **Exhibit 5** plots the standard deviation of the regression errors, also known as Root Mean Squared Error, over the Class Period.

> ii.    *Cause and Effect Analysis Comparing Emergent Common Stock Price Behavior on News Days versus No News Days*

70.    A generally-accepted and peer-reviewed approach to evaluating whether a stock price responds to news (including with regard to testing market efficiency in the securities class action context) is to compare the stock's behavior on news days with its behavior on other days

---

*Economic Literature* 35; Phillip A. Braun, Daniel B. Nelson and Alain M. Sunier, 1995, "Good News, Bad News, Volatility, and Betas," *Journal of Finance* 50, at 1597.

with relatively little or no news.[69] A showing that a security's price is statistically significantly more volatile on "news days" than on "no news days" is considered powerful evidence that the security responds promptly to news and, therefore, strongly supports a finding of efficiency.[70]

71.     Importantly, research has shown that in an efficient market, a security will exhibit some large price movements despite the absence of news and, conversely, there will be news without large price movements.[71] For instance, a company may announce earnings (or a lack thereof) that are in line with investor expectations – and while such an expected announcement is clearly important to investors, it will often not alter the total mix of information significantly enough to elicit a statistically significant stock price movement. Likewise, a disclosure may contain a mix of positive and negative information, which may effectively offset each other, which again would result in no statistically significant price movement. Further, if a company's disclosure conceals important information, the effect of the concealment will generally not result in a significant stock price movement, but will instead simply maintain the price at its then-current level.

72.     Accordingly, to minimize the influence of random fluctuations, a generally accepted, peer-reviewed methodology accepted by numerous courts is to compare (i) a subject company's stock price behavior on a *group* of "news days" to (ii) its stock price behavior on a *group* of "no news days."[72]

---

[69] Miguel O. Villanueva and Steven Feinstein, 2021, "Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors," *Review of Quantitative Finance and Accounting* 57.

[70] *Id.*

[71] *See* Boudoukh, Jacob, Ronen Feldman, Shimon Kogan, and Matthew Richardson, 2019, "Information, Trading, and Volatility: Evidence from Firm-Specific News," *Review of Financial Studies* 32, at 1004; Ray Fair, 2002, "Events That Shook the Market," *Journal of Business* 75, at 713, 714.

[72] Miguel O. Villanueva and Steven Feinstein, 2021, "Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors," *Review of Quantitative Finance and*

73.     Here, I performed such an analysis comparing the behavior of Emergent Common Stock on news versus no news days. My analysis demonstrates that the price of Emergent stock was statistically significantly more volatile on news than on no news days. This result supports the conclusion that there was a "cause and effect relationship between company disclosures and resulting movements in stock price" for Emergent Common Stock during the Class Period and, thus, further supports a finding of market efficiency.

74.     To assess the extent of a "cause and effect relationship between company disclosures and resulting movements in stock price," I analyzed all press releases issued by Emergent during the Class Period, excluding those that merely announced an upcoming earnings call or investor conference (the "News Days"). Such press releases include earnings announcements, important company updates, and are commonly studied by financial economists, both in litigation-related work and in academic papers. These announcements represent a potential opportunity for the public release of new value-relevant Company information to investors. One would not expect every News Day to cause a significant stock price movement for a company because investors and analysts may anticipate the reported performance, or because the information may contain a mix of both positive and negative information.[73] However, the mix of unanticipated results, forward guidance, executive statements, analyst interpretations of this information, and other unanticipated company-specific news can cause company stock prices to move in an efficient market.

---

*Accounting* 57. This approach has been repeatedly accepted by courts evaluating market efficiency in the securities class action context. *See, e.g.*: *In re: Under Armour Securities Litigation*, 631 F.Supp.3d 285, 311-12 (D. Md. 2022); *Bond v. Clover Health Investments, Corp., et al.*, 2023 WL 1999859, at *11 (M.D. Tenn. Feb. 14, 2023); *In re: QuantumScape Securities Class Action Litigation*, 2022 WL 17974629, at *10 (N.D. Cal. Dec. 19, 2022).

[73] *See* Boudoukh, Jacob, Ronen Feldman, Shimon Kogan, and Matthew Richardson, 2019, "Information, Trading, and Volatility: Evidence From Firm-Specific News", The Review of Financial Studies 32.3, at 1004; Ray Fair, 2002, Events That Shook the Market, Journal of Business 75, at 713, 714.

75.     I then compared the stock returns and trading volume of Emergent's Common Stock on these "News Days" versus those metrics on trading days that contained the least news during the Class Period (the "No News Days"). The No News Days provide a benchmark measurement of days in which relatively little or no new Emergent-specific information was provided to the market. If Emergent's stock prices tend to move significantly more on News Days than on No News Days, this would support a conclusion of market efficiency. As discussed below, there were 23 News Days and 74 No News Days during the Class Period.[74, 75]

76.     **Exhibit 6a** reports the list of 23 News Days – *i.e.*, their market impact dates and corresponding disclosure headlines.[76]

77.     **Exhibit 6b** reports the results of my event study using Emergent Common Stock returns. The columns list the market impact dates, raw return, abnormal return from my event study, abnormal dollar change in stock price from my event study, the t-statistic, and the p-value corresponding to statistical significance.

---

[74] I identified "No News Days" as days on which there were no news stories or other media reports identifiable in the Factiva database tagged to Emergent, and no SEC filings. As described above, Factiva is a well-known compiler of business news from across a wide range of publications, including Dow Jones Newswire, Reuters News, PR Newswire, Associated Press Newswire, Business Wire, and numerous other outlets. For purposes of considering news to identify No News Days under this methodology, I exclude headlines that merely identify stock price or volume movements on a given date without discussing any other information (however, there were no such days in this sample).

[75] I omit the News Days and the dates of any alleged corrective disclosures and alleged correlating stock drops from the Estimation Window of each regression. I also omit March 8, 2021, when the Biden administration cancelled a visit to Emergent's facilities following the publication of articles questioning the Company's safety practices, and April 13, 2021, when Emergent provided trial results for a COVID therapy, from the Estimation Windows of each regression. These dates represent large volatility swings that could bias statistical tests. Additionally, the dates of any alleged corrective disclosures and alleged correlating stock drops have been excluded from the News Days.

[76] For News Days when the News was published after-market hours, the impact date is the following trading day.

78.     Overall, 6 out of 23 Emergent News Days were associated with abnormal stock price movements that were statistically significant at the 95% level or greater. I compare this rate with that on the 74 No News Days in **Exhibit 7a**.

79.     As shown in **Exhibit 7a**, 26.1% of the News Day disclosures caused stock movements that were statistically significant at the 95% level. This compares to 2.7% of the No News Days with statistically significant stock price movements. The difference between these two percentages is statistically significant at a level greater than 99%.[77]

80.     These results provide strong evidence of a cause-and-effect relationship between new information and Emergent Common Stock price movements. Moreover, relative to the No News Days, the News Days had a higher average absolute abnormal return and greater trading volume, with these differences being statistically significant at the 95% level.

81.     In summary, these results establish a clear cause-and-effect relationship between the release of new company-specific information and Emergent Common Stock price movements. As a result, this *Cammer* Factor Five analysis supports the conclusion that Emergent Common Stock traded in an efficient market throughout the Class Period.

### F.     Additional Factor 1: Market Capitalization

82.     I have also considered several additional factors beyond the five *Cammer* factors, the first of which is the total value of stock outstanding, or market capitalization. The *Cammer* court acknowledged this factor as indicative of market efficiency, holding that "it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency."[78] Similarly, the *Krogman* court stated that "[m]arket capitalization, calculated as the number of

---

[77] For the Alternative Class Period, 6 out of 17 (35.3%) News Days were associated with abnormal stock price movements that were statistically significant at the 95% level or greater. This compares to 1 out of 45 (2.2%) No News Days. The difference between these two percentages is statistically significant at a level greater than 99%, which supports market efficiency. See **Exhibit 7b**.

[78] *Cammer*, 711 F. Supp. at 1287.

shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[79]

83.    Conversely, as noted previously, the MRK Study found that companies that lack analyst coverage are also companies that are generally associated with other factors—such as relatively small market capitalization—that indicate that their shares trade in less developed and efficient markets. The median market capitalization of the MRK Sample firms was $27.91 million.[80] By contrast, the MRK Covered firms had a median market capitalization of $243.97 million.[81] This study thus supports the view that firms with larger market capitalizations tend to trade in more efficient markets.

84.    **Exhibit 8a** reports Emergent's market capitalization throughout the Class Period.[82] This market capitalization averaged $4.4 billion over the Class Period.[83] Emergent's total market capitalization places it above the 75th percentile of all companies listed on either the NASDAQ and the NYSE from 2016-2018.[84] Emergent's market capitalization also exceeded the MRK Sample firms and Covered firms on an inflation-adjusted basis.[85]

---

[79] *Krogman,* 202 F.R.D. at 478.

[80] MRK Study at 678 (Table 3).

[81] MRK Study at 678 (Table 3).

[82] Market Capitalization is calculated as Emergent Common Stock price * Shares Outstanding. Shares Outstanding data is gathered from SEC filings.

[83] Emergent's market capitalization averaged over $5.1 billion during the Alternative Class Period, which supports market efficiency. See **Exhibit 8b**.

[84] Bhole Study, at 107: 75th percentile of market capitalization defined as $3.23 billion.

[85] Source: U.S. Bureau of Labor Statistics, CPI Inflation Calculator, available at: https://www.bls.gov/data/inflation_calculator.htm.

85.    Emergent's market capitalization, shares outstanding available for trading, and its sizeable float, as discussed below, are consistent with the conclusion that the Common Stock traded in an efficient market throughout the Class Period.

### G.    Additional Factor 2: Bid-Ask Spread

86.    The *Krogman* court considered the bid-ask spread as another factor that can indicate market efficiency: "[a] large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."[86]

87.    The bid-ask spread is the difference between the price at which an investor could purchase a stock (the ask) and the price at which an investor could sell the stock (the bid). This spread can be expressed as the difference between these prices in their quoted currency, or as a percentage – for example relative to the bid-ask midpoint. A narrower bid-ask spread indicates lower transaction costs to trade in a given stock and is indicative of a more informationally efficient market. A wider bid-ask spread will cause investors to pay more money to buy and sell a given stock, and these higher transaction costs can discourage trading and price discovery, thus indicating a less liquid and less efficient market.

88.    I analyzed the bid-ask spread of Emergent's Common Stock during the Class Period. **Exhibit 9** reports Emergent's monthly average bid-ask spread as a percentage of the bid-ask midpoint over this time period.[87] This spread averaged 0.06% over the Class Period.

---

[86] *Krogman*, 202 F.R.D. at 478.

[87] I calculated the percent bid-ask spread using daily closing bid and ask quotes. Kee H. Chung and Hao Zhang, *A Simple Approximation of Intraday Spreads Using Daily Data*, 17 J. Fin. Markets, 94, Table 2 (2014). This study compared data using end-of-day prices to intraday data and documented that the spreads were very similar. *See also*: Farshid Abdi and Angelo Ranaldo, 2017, A Simple Estimation of Bid-Ask Spreads from Daily Close, High, and Low Prices, *Review of Financial Studies* 30, at p. 4439: "An *approximation* of intraday bid-ask spreads with end-of-day quotes provides accurate measures and computational savings" (citations omitted).

89.     By way of comparison, the MRK Study found that the MRK Sample firms had a median bid-ask spread of 4.55%, while the MRK Covered firms had a median bid-ask spread of 1.69%.[88] Emergent's bid-ask spread was significantly smaller than both of these values, indicating that investors could trade Emergent's Common Stock at a very low relative cost. Additionally, Emergent's average bid-ask spread over the Class Period places it below the 50th percentile of all companies listed on NASDAQ and the NYSE from 2016-2018 (a lower percentile ranking corresponds to a narrower bid-ask spread).[89]

90.     As a result, Emergent's bid-ask spread also supports the conclusion that Emergent's Common Stock traded in an efficient market throughout the Class Period.[90]

### H.     Additional Factor 3: Public Float

91.     The *Krogman* court also considered the public float of a company in weighing market efficiency.[91]

92.     The public float represents the number of shares outstanding that are available for trading and not held by corporate insiders. Even if a company has a large market capitalization, if the majority of the equity is held by its CEO and/or other insiders, then investors may be unable to trade the stock without exerting undue pricing pressure resulting from a lack of liquidity and supply/demand imbalances.

93.     **Exhibit 10** reports the public float of Emergent's Common Stock during the Class Period, calculated as shares outstanding less shares held by insiders. As shown in that exhibit, Emergent insiders held 2.7% of the Common Stock during the Class Period. Approximately 88.3%

---

[88] MRK Study at 678 (Table 3).

[89] Bhole Study, at 105, 50th percentile of bid-ask spread defined as 0.14%.

[90] The conclusion remains true as Emergent's monthly average bid-ask spread was 0.06% during the Alternative Class Period.

[91] "In determining efficiency, courts also consider the percentage of shares held by the public, rather than insiders." *Krogman*, 202 F.R.D. at 478.

of Emergent's public float was held by institutions and other large outside investors. Overall, between 53.7 million and 55.8 million shares of Common Stock were available for trading in the public float during the Class Period.

94.    This large degree of public float for Emergent's Common Stock supports the conclusion that it traded in an efficient market throughout the Class Period.[92, 93]

### I.    Additional Factor 4: Institutional Ownership

95.    Institutional investors are pension funds, endowments, mutual funds, investment banks, hedge funds, and other sophisticated investors who have significant resources to allocate to investing decisions. These investors can improve market efficiency by digesting new public information and making investment decisions over large block holdings of shares, thus causing the new information to be quickly impounded into stock prices. Thus, the presence of institutional shareholders can be an indicator of market efficiency.

96.    I report institutional ownership of Emergent Common Stock in **Exhibit 10,** which shows that at least 666 institutions held the stock at some point during the Class Period. By comparison, the MRK Study found that the MRK Sample firms had a median of only nine institutional investors, while the MRK Covered firms had a median of 40 institutional investors.[94] Emergent's institutional ownership base greatly exceeds both of these levels. Moreover,

---

[92] *Id.*

[93] The conclusion remains true for the Alternative Class Period, as Emergent insiders held 2.6% of the Common Stock during the Alternative Class Period. Approximately 89.3% of Emergent's public float was held by institutions and other large outside investors. Overall, between 53.7 million and 55.8 million shares of Common Stock were available for trading in the public float during the Alternative Class Period.

[94] MRK Study at 678 (Table 3).

Emergent's institutional ownership as a percent of shares during the Class Period placed it above the 75th percentile of NYSE and NASDAQ traded companies.[95]

97.    Thus, the significant institutional ownership base for Emergent Common Stock supports the conclusion that the Common Stock traded in an efficient market throughout the Class Period.[96]

### J.    Additional Factor 5: Autocorrelation

98.    Autocorrelation refers to an anomaly by which stock returns over a given time period are able to predict future returns, a potential phenomenon that has been widely studied in the academic literature.[97] The interval over which autocorrelation is examined tends to be on a daily basis. Thus, if the stock return today predicts tomorrow's stock return with a statistically significant correlation, the returns are said to be autocorrelated.

99.    A positive autocorrelation could give rise to "momentum" trading whereby an investor would purchase (sell or short sell) stock when returns are above (below) average in order to generate profits as the returns continue over subsequent trading days.[98]

---

[95] Bhole Study, at 106: 75th percentile defined as institutional ownership of 88.89% of shares outstanding.

[96] The conclusion remains true during the Alternative Class Period, as at least 574 institutions held the stock at some point during the Alternative Class Period (*i.e.,* same as the Class Period).

[97] *See, e.g.*, Doron Avramov, Tarun Chordia, and Amit Goyal, 2006, "Liquidity and Autocorrelations in Individual Stock Returns," *Journal of Finance* 61, at 2367-68; Michael C. Jensen, 1978, "Some Anomalous Evidence Regarding Market Efficiency," *Journal of Financial Economics* 6, at 95-101.

[98] *See, e.g.*, Adem Atmaz, Huseyin Gulen, Stefano Cassella, and Fangcheng Ruan, 2023, "Contrarians, Extrapolators, and Stock Market Momentum and Reversal," *Management Science*, at 1.

100.     A negative autocorrelation could give rise to "reversal" trading whereby an investor would sell or short sell (purchase) stock when returns are above (below) average in order to capture profits when the returns reverse.[99]

101.     Autocorrelation may occasionally occur due to random patterns in aggregate stock return data or due to consecutive news days with different types of new information being publicly released. However, if statistically significant autocorrelation in stock returns persists over a sufficient time period such as several quarters, and if such autocorrelation is large enough in magnitude that a trader could earn riskless profits after trading costs, this would suggest market inefficiency because publicly-available information about prior stock price movements would not be fully reflected in current stock prices.

102.     I use an established methodology, *i.e.*, a regression analysis, to test for autocorrelation in Emergent's Common Stock returns.[100] This evaluates whether, from a statistical perspective, the stock return on a given day can predict the stock return on the following trading day.[101] After performing the regression to test for this pattern over the sample of trading days throughout the Class Period, if the regression produces a statistically significant result, then it becomes necessary to explore whether this pattern is sufficiently large in magnitude, consistent in direction, and persistent over time such that a trading arbitrage opportunity exists. If, however, the regression does not indicate a statistically significant pattern in the stock returns, then no evidence exists of an autocorrelation anomaly.

---

[99] *Id*.

[100] I evaluate abnormal returns, the calculation of which was described in the *Cammer* factor five analysis section of this report (**V.E**).

[101] Doron Avramov, Tarun Chordia, and Amit Goyal, 2006, "Liquidity and Autocorrelations in Individual Stock Returns," *Journal of Finance* 61, at 2367-68; Michael C. Jensen, 1978, "Some Anomalous Evidence Regarding Market Efficiency," *Journal of Financial Economics* 6, at 95-101.

103.    **Exhibit 11** presents the results from the autocorrelation test for Emergent's Common Stock during the Class Period. The autocorrelation coefficient over the full Class Period is not statistically significant. Thus, I find no evidence of persistent autocorrelation in Emergent's Common Stock returns. This finding supports the conclusion that Emergent's Common Stock traded in an efficient market throughout the Class Period.[102]

### K.    Additional Factor 6: Active Options Trading

104.    Academic studies have shown that options written on a company's shares of stock help to improve market depth and liquidity, investor interest, and overall market efficiency, as reflected by increases in trading volume, narrower bid-ask spreads, and improvements in transaction sizes and frequencies.[103] Thus, options trading on a company's stock can improve price discovery and support a finding of market efficiency, relative to a company without any options trading.[104]

105.    Emergent Common Stock had 122,460 call option contracts and 60,931 put option contracts traded during the Class Period.[105] The presence of options trading supports the

---

[102] This conclusion remains true for the Alternative Class Period, as the autocorrelation coefficient over the Alternative Class Period is not statistically significant (p-value = 0.6). See **Exhibit 11**.

[103] Raman Kumar, Atulya Sarin, and Kuldeep Shastri, 1998, "The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis," *Journal of Finance* 53. *See also* Stephen A. Ross, 1976, "Options and Efficiency," *Quarterly Journal of Economics* 90.

[104] *See, e.g.*, Robert Jennings and Laura Starks, 1986, "Earnings Announcements, Stock Price Adjustments, and the Existence of Options Markets," *Journal of Finance* 41; Mihir Bhattacharya, 1987, "Price Changes of Related Securities: The Case of Call Options and Stocks," *Journal of Financial and Quantitative Analysis* 22; Stephen Figlewski and Gwendolyn P. Webb, 1993, "Options, Short Sales, and Market Completeness," *Journal of Finance* 48; Raman Kumar, Atulya Sarin, and Kuldeep Shastri, 1998, "The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis," *Journal of Finance* 53.

[105] Source: Bloomberg.

conclusion that Emergent Common Stock traded in an efficient market throughout the Class Period.[106]

## VI. Ability to Calculate Damages on a Class-Wide Basis

106.    I have also been asked to opine on whether per-share damages for traders of Emergent Securities can be assessed for all Class members based upon a methodology common to all Class members and consistent with Plaintiffs' theories of liability. As discussed below, damages for each of Plaintiffs' claims can be calculated on a class-wide basis through one or more common methodologies.

### A.    Calculation of Damages for Violations of §10(b) of the Exchange Act

107.    For the §10(b) claims, Plaintiffs allege that the Defendants perpetrated a scheme, misled investors, and made numerous materially false and misleading statements and omissions which deceived the investing public, artificially inflated the market price of Emergent Common Stock, and caused Class members to purchase Emergent Common Stock at artificially inflated prices.[107] Plaintiffs also claim certain Defendants are liable as control persons under §20(a).[108]

108.    The "out-of-pocket" method of calculating damages represents a standard and well-accepted methodology under §10(b) of the Exchange Act. This approach calculates damages formulaically as the artificial inflation in the share price at the time of purchase minus the artificial inflation in the share price at the time of sale. If shares are not sold prior to the full revelation of the fraud, then the difference is relative to a 90-day lookback period under the Securities Litigation

---

[106] The conclusion remains true for the Alternative Class Period, as Emergent Common Stock had 98,540 call option contracts and 48,946 put option contracts traded during the Alternative Class Period.

[107] Complaint ¶¶ 334-336.

[108] *Id*. ¶ 348. §20(a) provides that control persons shall be "jointly and severally [liable] with and to the same extent" as the controlled person(s) that violated the securities law. See 15 U.S.C. §78t(a). Given §20(a)'s derivative nature, Plaintiffs have instructed me to assume that §20(a) damages can be calculated using the same methodologies for assessing §10(b) damages.

Reform Act of 1995 ("PSLRA").[109] This limit on damages can also be applied class-wide. I understand that this out-of-pocket methodology has been widely accepted for use across §10(b) matters.

109.    The claims process produces information necessary for the calculation of damages for each Class member, including the purchase and sale information for the security. This information is available from brokerage statements and other documentation of securities transactions. Artificial inflation per share is quantified for each day of the Class period and then damages are calculated using the formula described above. As a result, the methodology for calculating damages in §10(b) matters such as this is well-established and formulaic across all Class members.

110.    The quantification of artificial inflation per share is based upon a detailed loss causation analysis. I have not been asked to perform a loss causation analysis at this time, and I understand that such analysis often incorporates information produced during discovery. Nonetheless, the method employed to calculate artificial inflation can be applied class-wide.

111.    Event studies are widely employed to calculate artificial inflation. Event studies measure stock price reactions to corrective disclosures which revealed the relevant truth that was concealed by alleged material omissions and/or misrepresentations.[110]

112.    To the extent that reliable evidence is introduced showing that a material portion of the difference in the estimated artificial inflation between the purchase and sale of the securities

---

[109] The PSLRA states: "…in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." 15 U.S. Code § 78u–4 (codifying language).

[110] In this report I conducted an event study to assist with the evaluation of market efficiency. My event study in this report was not intended to quantify artificial inflation.

may be attributed to non-fraud related factors, the impact of such "confounding information" on the price of Emergent securities can be determined on a common, class-wide basis using various accepted methodologies. The value of any confounding information can then be subtracted from the price impact of corrective disclosures in calculating inflation. This process may rely upon additional information learned during discovery and will be based on the specific set of facts and circumstances in a given case.

113.    A loss causation analysis also documents how artificial inflation per share evolved throughout the Class Period. This determination depends on the specific set of facts and circumstances for a given case and also could incorporate information produced through discovery.

114.    One frequent method for modeling the evolution of inflation is to assume "constant dollar inflation." This assumes that per share inflation equaled a constant dollar amount above the correct share price over the Class Period. Alternatively, one can measure "constant percentage inflation," which assumes that each share price was inflated by a constant percentage amount above the correct stock price over the Class Period. In other instances, artificial inflation may have varied and could evolve throughout the Class Period based on the timing of specific information or statements. In any of these approaches, the calculation of artificial inflation is based on the specific set of facts and circumstances in a given case and can involve valuation techniques, event studies, published academic research studies, analyst research, or other case-specific documents.

115.    All of these loss causation calculations can be performed on a class-wide basis and are not dependent upon individual Class member identities or circumstances.

**B.      Damages Methodologies Are Flexible and Can Incorporate Alternative Findings**

116.    The damages methodologies I have laid out above for §10(b) are flexible and able to incorporate alternative findings regarding the quantification, as well as the timing, of artificial inflation and how it evolves over the Class Period. The methodologies I have described above to

38

calculate §10(b) can be modified based on alternative findings the finder of fact may determine, including, but not limited to: (1) confounding information versus corrective information; (2) how to back-cast inflation over the Class Period; and (3) the first actionable fraudulent conduct.

117.    First, irrespective of what the ultimate finder of fact, *i.e.*, the jury, determines is the appropriate percentage of abnormal return that can be attributed to the release of corrective versus confounding information, this percentage can easily be inserted into the standard damages model that I have already described – the out-of-pocket formula. Regardless of how the jury weighs evidence, whether it finds that any such disaggregation analysis I may conduct is the most appropriate, or whether it determines that based upon the evidence, a different amount is more appropriate, this finding can simply be incorporated into the damages calculation.

118.    Second, should the jury determine that the true economic inflation evolved over the Class Period in a way that differs from the methodologies outlined above (*i.e.*, constant dollar, constant percentage, or an alternative approach I may adopt), my out-of-pocket damages model can still account for such a scenario and can mechanically calculate damages on a class-wide basis.

119.    Third, should the jury decide that the first actionable misstatement and/or omission or otherwise actionable fraudulent conduct happened at a date later than July 6, 2020, prior to such date, inflation could simply be set to zero.

120.    To summarize, I have not been asked to calculate damages in this matter. Such analysis would depend on information produced in discovery and development of the case record. Based on my experience and qualifications and my understanding of the nature of the claims in this matter, I conclude that Common Stock damages in this case can, however, be calculated using a standard and well-established methodology, and can be applied on a class-wide basis.

**VII.    Conclusion**

121.    In conclusion, based on the market efficiency factors considered by courts and in academia, upon which I base my analyses, it is my opinion that Emergent's Common Stock traded in an efficient market throughout the Class Period.[111] Moreover, it is my opinion that Common Stock damages in this matter under §10(b) and §20(a) can be calculated on a class-wide basis utilizing common methodologies.

I declare under the penalty of perjury that the foregoing is true and correct.

Respectfully Submitted,

Matthew D. Cain

---

[111] Including the Alternative Class Period.

**Appendix A**

**Matthew D. Cain, Ph.D.**                                                    February 2024

E-mail: mdcain@outlook.com                                                    Homepage
Mobile: 574-485-8065                                                          SSRN

## Education

Ph.D., Finance, August 2007                     Purdue University, West Lafayette, IN
B.S., Finance, May 2001                         Grove City College, Grove City, PA

## Professional and Academic Experience

*Senior Fellow*, Berkeley Center for Law and Business, 2019-Present

*Visiting Scholar*, Vanderbilt Law School, 2021-2022

*Senior Visiting Scholar*, Berkeley Law School, University of California, 2019-2021

*Visiting Research Fellow*, Harvard Law School Program on Corporate Governance, 2018-2019

*Advisor to Commissioner Robert J. Jackson, Jr.*, U.S. Securities and Exchange Commission, 2018

*Economic Fellow / Financial Economist*, Office of Litigation Economics, Division of Economic and Risk Analysis, U.S. Securities and Exchange Commission, 2014-2018

*Assistant Professor of Finance*, Mendoza College of Business, University of Notre Dame, Notre Dame, IN, 2008-2014

*Visiting Faculty*, Krannert School of Management, Purdue University, West Lafayette, IN, 2007-2008

*Analyst*, Debt Capital Markets, National City Bank, Cleveland, OH, 2001-2003

## Publications

Does Voluntary Financial Disclosure Matter? The Case of Fairness Opinions in M&A (with Adam B. Badawi and Steven Davidoff Solomon), *Journal of Law and Economics* 66, 535-555 (2023).

Retail Shareholder Participation in the Proxy Process: Monitoring, Engagement and Voting (with Alon Brav and Jonathon Zytnick), *Journal of Financial Economics* 144, 492-522 (2022).

A-1

Does *Revlon* Matter? An Empirical and Theoretical Study (with Sean J. Griffith, Robert J. Jackson, Jr., and Steven Davidoff Solomon), *California Law Review* 108, 1683-1731 (2020).

Intermediation in Private Equity: The Role of Placement Agents (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial and Quantitative Analysis* 55, 1095-1116 (2020).

Mootness Fees (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 72, 1777-1816 (2019).

The Myth of Morrison: Securities Fraud Litigation Against Foreign Issuers (with Robert Bartlett, Jill E. Fisch, and Steven Davidoff Solomon), *The Business Lawyer* 74, 967-1013 (2019).

The Shifting Tides of Merger Litigation (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 71, 603-640 (2018).

Do Takeover Laws Matter? Evidence from Five Decades of Hostile Takeovers (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial Economics* 124, 464-485 (2017).

CEO Personal Risk-Taking and Corporate Policies (with Stephen B. McKeon), *Journal of Financial and Quantitative Analysis* 51, 139-164 (2016).

How Corporate Governance Is Made: The Case of the Golden Leash (with Jill E. Fisch, Sean J. Griffith, and Steven Davidoff Solomon), *University of Pennsylvania Law Review* 164, 649-702 (2016).

A Great Game: The Dynamics of State Competition and Litigation (with Steven Davidoff Solomon), *Iowa Law Review* 100, 465-500 (2015).

Broken Promises: Private Equity Bidding Behavior and the Value of Reputation (with Antonio J. Macias and Steven Davidoff Solomon), *Journal of Corporation Law* 40, 565-598 (2015).

Information Production by Investment Banks: Evidence from Fairness Opinions (with David J. Denis), *Journal of Law and Economics* 56, 245-280 (2013).

Delaware's Competitive Reach (with Steven Davidoff Solomon), *Journal of Empirical Legal Studies* 9, 92-128 (2012).

Form Over Substance? Management Buy-outs and the Value of Corporate Process (with Steven Davidoff Solomon), *Delaware Journal of Corporate Law* 36, 1-54 (2011).

Earnouts: A Study of Financial Contracting in Acquisition Agreements (with David J. Denis and Diane K. Denis), *Journal of Accounting and Economics* 51, 151-170 (2011).

## **Presentations**

- All Indiana Conference

- American Bar Association, Business Law, Private Equity M&A Subcommittee meeting
- American Finance Association, annual meetings
- American Law and Economics Association, Stanford Law School
- American Law and Economics Association, University of Chicago
- Argentum Centre for Private Equity Symposium, Bergen, Norway
- Argentum Conference and Symposium on "Private Equity: The Road Ahead," Stockholm, Sweden
- Arizona State University College of Law
- Berkeley Center for Law and Business
- The Brattle Group
- Conference on Empirical Legal Studies, Yale Law School
- Cornell University, finance class guest lectures
- Cornerstone Research
- Financial Management Association, annual meeting
- George Washington University Law School
- Indiana University
- Institute for Law and Economics, University of Pennsylvania
- Ohio State
- Ohio University
- Oxera, London
- Penn State
- Peregrine Economics
- Purdue Alumni Conference
- Purdue University
- U.C. Berkeley M&A Roundtable, New York
- U.C. Berkeley School of Law
- U.S. Securities and Exchange Commission
- University of Arizona
- University of Colorado
- University of Florida
- University of Georgia
- University of Kentucky
- University of North Carolina at Chapel Hill
- University of Notre Dame
- University of Oregon
- University of Pittsburgh
- Vanderbilt University Law School
- Virginia Commonwealth University
- Virginia Tech
- Western Finance Association, annual meeting

A-3

**Journal Referee**: *Review of Financial Studies*, *Journal of Financial and Quantitative Analysis*, *Journal of Corporate Finance*, *Journal of Banking and Finance*, *European Financial Management, Journal of Empirical Legal Studies, Financial Management, North American Journal of Economics and Finance, International Review of Law & Economics, Managerial and Decision Economics*, *Annals of Finance, Journal of Economics and Business*

## Teaching Experience

UC Berkeley School of Law
  LAW 246.31:  Economic Expert Witnesses: Depositions and Testimony, Spring 2022-2024
  LAW 251.52:  Economics of Corporate and Securities Litigation, Fall: 2020-2023

University of Notre Dame, Mendoza College of Business
  FIN 70400: Corporate Restructuring, Mergers & Acquisitions (MBA Elective), Fall: 2008-2013
  FIN 40410: Mergers and Acquisitions, Fall: 2008-2013

Purdue University, Krannert School of Management
  MGMT 412: Financial Markets and Institutions, Spring: 2006 & 2008
  MGMT 610: Financial Management I (MBA Core), Fall: 2007

## Expert Witness Experience

- *In re Upstart Holdings, Inc. Securities Litigation*, Case No. 2:22-cv-02935-ALM-EPD (S.D. Oh.). Report January 2024.

- *Jed Lemen, et al. v. Redwire Corporation, et al.*, Case No. 3:21-cv-01254-TJC-PDB (M.D. Fl.). Report January 2024.

- *In re Exxon Mobil Corp. Securities Litigation*, Case No. 3:21-cv-00194-N (N.D. Tx.). Report January 2024.

- *In re Grand Canyon Education, Inc. Securities Litigation*, Case No. 1:20-cv-00639-MN-CJB (D. Del.). Report January 2024.

- *In re Vaxart, Inc. Securities Litigation*, Case No. 3:20-cv-05949-VC (N.D. Ca.). Report November 2023. Deposition January 2024.

- *William C. Theodore, et al. v. PureCycle Technologies, Inc., et al.*, Case No. 6:21-cv-809-PGB-GJK (M.D. Fl.). Report November 2023. Deposition January 2024.

- *Robert Lematta et al. v. Casper Sleep, Inc., et al.*, Case No. 1:20-cv-02744 (E.D. N.Y.). Report November 2023.

A-4

- *In re Turquoise Hill Resources Ltd. Securities Litigation*, Case No. 1:20-cv-8585-LJL (S.D. N.Y.). Report October 2023.

- *Jonnie Homyk, et al. v. ChemoCentryx, Inc. and Thomas J. Schall*, Case No. 4:21-cv-03343 (N.D. Ca.). Report August 2023. Deposition October 2023. Rebuttal Report January 2024.

- *In re Vale S.A. Securities Litigation*, Case No. 19-cv-526-RJD-SJB (E.D. N.Y.). Rebuttal Report April 2023. Deposition September 2023.

- *In re Romeo Power Inc. Securities Litigation*, Case No. 1:21-cv-03362-LGS (S.D. N.Y.). Report March 2023. Deposition April 2023.

- *Luis Torres, et al. v. Berry Corporation, et al.*, Case No. 3:20-cv-3464-S (N.D. Tx.). Report February 2023. Rebuttal Report May 2023.

- *In re Lyft, Inc. Securities Litigation*, Case No. 4:19-cv-02690-HSG (N.D. Ca.). Report February 2023.

- *Thomas S. Swanson, et al. v. Interface, Inc., et al.*, Case No. 1:20-cv-05518-BMC (E.D. N.Y.). Report January 2023.

- *Seafarers Pension Plan, derivatively on behalf of The Boeing Company v. Robert A. Bradway, et al. and The Boeing Company*, Case No. 1:19-cv-08095 (N.D. Ill.). Declaration November 2022.

- *In re: CBL & Associates Properties, Inc. Securities Litigation*, Case No. 1:19-cv-00181-JRG-CHS (E.D. Tenn.). Report August 2022. Deposition October 2022. Rebuttal Report December 2022.

- *Delaware County Employees Retirement System, et al. v. AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp., et al.*, Case No. 2:21-cv-03382-HB (E.D. Pa.). Report July 2022. Deposition February 2023. Rebuttal Report May 2023.

- *In re: QuantumScape Securities Class Action Litigation*, Case No. 3:21-cv-00058-WHO (N.D. Ca.). Report July 2022. Deposition September 2022. Rebuttal Report November 2022.

- *Bond v. Clover Health Investments, Corp., et al.*, Case No. 3:21-cv-00096 (M.D. Tenn.). Report July 2022. Deposition August 2022.

- *In re: 2U, Inc. Securities Class Action*, Case Nos. 19-3455 and TDC-20-10006 (D. Md.). Report December 2021.

- *Zachary E. Gerut, v. Biospecifics Technologies Corp. and Endo International PLC*, Case No. 01-21-0002-2009 (Amer. Arb. Assoc.). Report December 2021. Arbitration March 2022.

A-5

- *In re: Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.). Report November 2021. Deposition December 2021. Report April 2023. Rebuttal Report June 2023. Deposition July 2023.

- *Bar Mandalevy, et al. v. BofI Holding, Inc., et al.*, Case No. 17-cv-00667-GPC-KSC (S.D. Ca). Report November 2021.

- *Securities and Exchange Commission v. Anatoly Hurgin, et al.*, Case No. 1:19-cv-05705 (S.D. N.Y.). Report November 2021. Deposition December 2021. Declaration February 2022.

- *In re: Oracle Corporation Derivative Litigation*, Case No. 2017-0337-SG (Del. Chancery). Rebuttal Report October 2021. Deposition November 2021. Trial July-August 2022.

- *John Alberici, et al. v. Recro Pharma, Inc., et al.*, Case No. 2:18-cv-02279-MMB (E.D. Pa.). Report September 2021. Deposition October 2021. Report January 2022.

- *Securities and Exchange Commission v. Christopher Clark and William Wright*, Case No. 1:20-cv-01529 (E.D. Va.). Report August 2021. Trial December 2021.

- *Honey Baked Ham Inc. v. Honey Baked Ham Company, LLC and HBH Licensing, LLC*, Case No. 8:19-cv-01528-JVS (DFMx) (C.D. Ca.). Rebuttal Report August 2021.

- *In re: Purdue Pharma L.P., et al., Debtors* (Chapter 11), Case No. 19-23649 (RDD) (U.S. Bankruptcy Court, S.D. N.Y.). Rebuttal Report July 2021. Confirmation Hearing August 2021.

- *Abu Dhabi Investment Authority v. Mylan N.V. and Mylan Inc.*, Case No. 1:20-cv-01342 (S.D. N.Y.). Report May 2021. Deposition August 2021.

- *International Brotherhood of Electrical Workers Local 98 Pension Fund, et al. v. Deloitte & Touche, LLP and Deloitte LLP*, Case No. 3:19-cv-3304 (D. Sc.). Report April 2021. Deposition September 2021.

- *Securities and Exchange Commission v. James Wallace Nall, III, et al.*, Case No. 2:19-cv-702-TFM-C (S.D. Al.). Report April 2021. Rebuttal Report June 2021. Deposition June 2021.

- *Mark Stoyas, et al., v. Toshiba Corporation*, Case No. 2:15-cv-04194-DDP(JCx) (C.D. Ca.). Report February 2021. Deposition May 2021. Rebuttal Report August 2021.

- *Plymouth County Retirement System, et al. v. Patterson Companies, Inc., et al.*, Case No. 0:18-cv-00871-MJD-HB (D. Mn.). Report January 2021. Deposition March 2021.

- *In re Novo Nordisk Securities Litigation*, Case No. 3:17-cv-00209-BRM-LHG (D. Nj.). Rebuttal Report December 2020. Deposition February 2021.

- *In re Facebook, Inc. Securities Litigation*, Case No. 5:18-cv-01725-EJD (N.D. Ca). Declaration October 2020.

A-6

- *In re Qualcomm/Broadcom Merger Securities Litigation*, Case No. 3:18-cv-01208-CAB-AHG (S.D. Ca.). Declaration May 2020.

- *In re Banc of California Securities Litigation*, Case No. 8:17-cv-00118-AG-DFM (C.D. Ca.). Report April 2019.

- *Tharp v. Acacia Communications, Inc.*, Case No. 17-cv-11504 (D. Mass.). Declaration November 2018.

- *Securities and Exchange Commission v. Avent*, Case No. 1:16-cv-02459-WMR (N.D. Ga.). Report March 2017. Deposition May 2017. Jury Trial August 2019.

- *In the Matter of Lawrence I. Balter d/b/a Oracle Investment Research*, File No. 3-17614 (SEC Admin. Proc.). Report March 2017.

- *Securities and Exchange Commission v. Huang*, Case No. 2:15-cv-00269-MAK (E.D. Pa.). Report September 2015. Declaration October 2015. Jury Trial January 2016.

- *Securities and Exchange Commission v. Alyasin*, Case No. 4:15-cv-00566 (S.D. Tex.). Declaration March 2015.

A-7

**Appendix B**

## Documents Considered

**Court Documents:**

- First Amended Class Action Complaint for Violations of the Feder Securities Laws (Doc. No. 54)

- Memorandum Opinion (Dkt. No. 124) granting in part and denying in part Defendants' Motion to Dismiss Second Amended Complaint (Dkt. No. 72)

- Order (Dkt. No. 125) granting in part and denying in part Defendants' Motion to Dismiss Second Amended Complaint (Dkt. No. 72)

**Court Decisions and Securities Law:**

- *Aranz v. Catalyst Pharmaceutical Partners, Inc.*, 302 F.R.D. 657, 669 (S.D. Fla. 2014)

- *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).

- Bromberg & Lowenfels, 4 Securities Fraud and Commodities Fraud, § 8.6. (Aug. 1988).

- *Bond v. Clover Health Investments, Corp., et al.*, WL 1999859 (M.D. Tenn. Feb. 14, 2023).

- *Brown v. China Integr. Energy Inc.*, WL 12720322 (C.D. Cal. Feb. 17, 2015)

- *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).

- *Cheney v. Cyberguard Corp., 213 F.R.D. 484, 501-502 (S.D. Fla. 2003)*

- *In re Computer Scis. Corp. Sec. Litig.*, 288 F.R.D. 112, 119 (E.D. Va. 2012).

- *In re Countrywide Financial Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Ca. 2009).

- *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014).

- *Hayes v. MagnaChip Semiconductor Corp.*, Case No. 14-cv-01160-JST (N.D.Ca. 2016).

- *In re HealthSouth Corp. Sec. Litig., 257 F.R.D. 260, 281* (N.D. Ala. 2009*).*

- *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).

- *Local 703, I.B. of T. Grocery & Food Emps. Welfare Fun v. Regions Fin. Corp.*, 762 F.3d 1248, 1254-1255, 1257-1258 (11th Cir. 2014)

- *Monroe Cty. Employees' Ret. Sys. v. S. Co.*, 332 F.R.D. 383-84 (N.D. Ga. 2019)

- *In re Netbank, Inc. Secs. Litigation*, 259 F.R.D. 656, 669-676 (N.D. Ga. 2009)

- Private Securities Litigation Reform Act of 1995, dated December 22, 1995.

- *In re QuantumScape Securities Class Action Litigation*, WL 17974629, (N.D. Cal. Dec. 19, 2022).

- *Thorpe v. Walter Inv. Mgmt. Corp.*, 2016 WL 4006661 (S.D. Fla. Mar. 16, 2016)

- *Todd v. STAAR Surg. Co.*, 2017 WL 821662 (C.D. Cal. Jan. 5, 2017)

- *In re Under Armour Sec. Litig.*, 631 F. Supp. 3d 285, 311-12 (D. Md. 2022).

**Academic Literature:**

- Farshid Abdi and Angelo Ranaldo, 2017, "A Simple Estimation of Bid-Ask Spreads from Daily Close, High, and Low Prices", *Review of Financial Studies* 30

- Adem Atmaz, Huseyin Gulen, Stefano Cassella, and Fangcheng Ruan, 2023, "Contrarians, Extrapolators, and Stock Market Momentum and Reversal," *Management Science* (forthcoming).

- Doron Avramov, Tarun Chordia, and Amit Goyal, 2006, "Liquidity and Autocorrelations in Individual Stock Returns," *Journal of Finance* 61.

- Brad M. Barber, Paul A. Griffin, and Baruch Lev, 1994, "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," *Journal of Corporate Law* 19.

- Mihir Bhattacharya, 1987, "Price Changes of Related Securities: The Case of Call Options and Stocks," *Journal of Financial and Quantitative Analysis* 22.

- Bharat Bhole, Sunita Surana, and Frank Torchio, 2020, "Benchmarking Market Efficiency Indicators for Securities Litigation," *University of Illinois Law Review Online*.

- Jacob Boudoukh, Ronen Feldman, Shimon Kogan, and Matthew Richardson, 2019, "Information, Trading, and Volatility: Evidence from Firm-Specific News," *Review of Financial Studies* 32.

- Phillip A. Braun, Daniel B. Nelson and Alain M. Sunier, 1995, "Good News, Bad News, Volatility, and Betas," *Journal of Finance* 50.

- Kee H. Chung and Hao Zhang, 2014, "A Simple Approximation of Intraday Spreads Using Daily Data," *J. Fin. Markets* 17.

- Ray Fair, 2002, "Events That Shook the Market," *Journal of Business* 75.

- Eugene F. Fama, 1970, "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance* 25.

- Eugene F. Fama, 1991, "Efficient Capital Markets: II," *Journal of Finance* 46.

- Stephen Figlewski and Gwendolyn P. Webb, 1993, "Options, Short Sales, and Market Completeness," *Journal of Finance* 48.

- Kewei Hou, Chen Xue, and Lu Zhang, 2020, "Replicating Anomalies," *Review of Financial Studies* 33.

- Robert Jennings and Laura Starks, 1986, "Earnings Announcements, Stock Price Adjustments, and the Existence of Options Markets," *Journal of Finance* 41.

- Michael C. Jensen, 1978, "Some Anomalous Evidence Regarding Market Efficiency," *Journal of Financial Economics* 6.

- Raman Kumar, Atulya Sarin, and Kuldeep Shastri, 1998, "The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis," *Journal of Finance* 53.

- Charles M.C. Lee and Eric C. So, 2017, "Uncovering Expected Returns: Information in Analyst Coverage Proxies," *Journal of Financial Economics* 124.

- A. Craig MacKinlay, 1997, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35.

- Mark L. Mitchell and Jeffry M. Netter, 1994, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer* 49.

- Simona Mola, P. Raghavendra Rau, and Ajay Khorana, 2013, "Is There Life After the Complete Loss of Analyst Coverage?," *Accounting Review* 88.

- Stephen A. Ross, 1976, "Options and Efficiency", *Quarterly Journal of Economics* 90.

- Randall S. Thomas and James F. Cotter, 2000, "Measuring Securities Market Efficiency in the Regulatory Setting," *Law and Contemporary Problems* 63.

- Miguel O. Villanueva and Steven Feinstein, 2021, "Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors," *Review of Quantitative Finance and Accounting* 57.

**Data Sources:**

- Bloomberg Terminal
- Factiva News
- Investext
- S&P Capital IQ
- SEC Edgar Online
- Emergent Press Releases and SEC Filings

**Other:**

- https://www.bls.gov/data/inflation_calculator.htm
- https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers
- https://www.nyse.com/market-model
- https://www.sec.gov/files/forms-3.pdf
- All data and documents cited throughout this report

**Exhibits**

Exhibit 1. Emergent Common Stock Closing Stock Price and Daily Volume

Exhibit 2a. Emergent Weekly Trading Volume During the Class Period

Exhibit 2b. Emergent Weekly Trading Volume During the Alternative Class Period

Exhibit 3a. Analyst Coverage During the Class Period

Exhibit 3b. Analyst Coverage During the Alternative Class Period

Exhibit 4. Coefficients from Event Study Regressions

Exhibit 5. Root Mean Squared Error (RMSE) from Event Study Regressions

Exhibit 6a. Description of Emergent News Days

Exhibit 6b. Emergent News Days and Common Stock Abnormal Returns

Exhibit 7a. Comparison of Statistical Significance on Emergent Common Stock for News Days vs. No News Days During the Class Period

Exhibit 7b. Comparison of Statistical Significance on Emergent Common Stock for News Days vs. No News Days During the Alternative Class Period

Exhibit 8a. Emergent Common Stock Market Capitalization During the Class Period

Exhibit 8b. Emergent Common Stock Market Capitalization During the Alternative Class Period

Exhibit 9. Emergent Common Stock Average Bid-Ask Spread

Exhibit 10. Emergent Common Stock Public Float, Insider Holdings, and Institutional Ownership

Exhibit 11. Test for Autocorrelation During the Class Period

**Exhibit 1**

**Emergent Common Stock Closing Stock Price and Daily Trading Volume**
**July 6, 2020 – November 4, 2021**



Data source: Bloomberg.

**Exhibit 2a**





Data source: Bloomberg. Note: Average weekly trading volume is calculated by analyzing non-overlapping group of five consecutive trading days (rather than calendar weeks) starting with the first day of the Class Period. The weekly trading volume for the week of November 1, 2021, has been scaled by a factor of 5/4 as the final week of the Class Period contained only 4 trading days.

**Exhibit 2b**



**Emergent Weekly Trading Volume**
**July 6, 2020 – May 19, 2021**

Data source: Bloomberg. Note: Average weekly trading volume is calculated by analyzing non-overlapping group of five consecutive trading days (rather than calendar weeks) starting with the first day of the Alternative Class Period. The weekly trading volume for the week of May 19, 2021, has been scaled by a factor of 5 as the final week of the Alternative Class Period contained only 1 trading day.

**Exhibit 3a**

| Analyst Name | Reports Issued During the Class Period |
| --- | --- |
| Zacks Equity Research | 29 |
| Cowen and Company | 22 |
| PriceTarget Research | 20 |
| BuySellSignals Research | 19 |
| Cantor Fitzgerald | 17 |
| JPMorgan | 16 |
| Guggenheim Securities LLC | 15 |
| The Benchmark Company LLC | 15 |
| Wells Fargo Securities, LLC | 15 |
| Marktfeld | 14 |
| Chardan Capital Markets | 13 |
| ValuEngine, Inc | 7 |
| Singular Research | 6 |
| Wright Reports | 6 |
| Argus Research Corporation | 5 |
| GlobalData | 5 |
| Validea | 5 |
| Corporate Watchdog Reports | 4 |
| Infinata | 4 |
| Vermilion Technical Research | 2 |
| Credit Suisse | 1 |
| Sadif Analytics Prime | 1 |
| Smart Insider | 1 |
| SSIF BRK Financial Group | 1 |
| The Business Research Company | 1 |
| **Total** | **244** |

Data source: Investext.

E-5

**Exhibit 3b**

| Analyst Name | Reports Issued During the Alternative Class Period |
|---|---:|
| Zacks Equity Research | 20 |
| Cowen and Company | 17 |
| Cantor Fitzgerald | 16 |
| Guggenheim Securities LLC | 14 |
| BuySellSignals Research | 13 |
| Chardan Capital Markets | 12 |
| Wells Fargo Securities, LLC | 12 |
| JPMorgan | 11 |
| PriceTarget Research | 8 |
| The Benchmark Company LLC | 8 |
| Marktfeld | 7 |
| Singular Research | 5 |
| ValuEngine, Inc | 5 |
| Argus Research Corporation | 4 |
| Corporate Watchdog Reports | 4 |
| Infinata | 4 |
| Wright Reports | 4 |
| GlobalData | 3 |
| Validea | 3 |
| Vermilion Technical Research | 2 |
| Sadif Analytics Prime | 1 |
| Smart Insider | 1 |
| SSIF BRK Financial Group | 1 |
| **Total** | **175** |

Data source: Investext.

**Exhibit 4**

**Coefficients from Event Study Regressions**
**July 6, 2020 – November 4, 2021**



Data sources: Bloomberg, SEC filings, Factiva, Complaint.

Note: Regression models described in notes below Exhibit 7.

E-7

**Exhibit 5**

**Root Mean Squared Error (RMSE) from Event Study Regressions**
**July 6, 2020 – November 4, 2021**



Data sources: Bloomberg, SEC filings, Factiva, Complaint.

Note: Regression models described in notes below Exhibit 7.

**Exhibit 6a**

### Description of Emergent News Days

|  | Market Impact Date | Press Release Description |
|---|---|---|
| [1] | Jul 06, 2020 | Emergent Announces Five-Year Deal to Produce J&J COVID Vaccine |
| [2] | Jul 08, 2020 | Emergent Announces Collaboration Deal with Mount Sinai and ImmunoTek Bio Centers |
| [3] | Jul 21, 2020 | Emergent Announces the Company will join the S&P SmallCap 600 |
| [4] | Jul 27, 2020 | Emergent Announces Deal to Expand Manufacturing of AstraZeneca COVID Vaccine |
| [5] | Jul 31, 2020 | Q2 2020 Earnings Announcement |
| [6] | Aug 05, 2020 | Emergent Announces the Issuance of a New Debt Series |
| [7] | Aug 07, 2020 | Emergent Announces Completion of Debt Offering |
| [8] | Aug 17, 2020 | Emergent Announces FDA Approval of NARCAN® Nasal Spray Shelf Life Extension |
| [9] | Aug 26, 2020 | Emergent Announces Appointment of Marvin White to the Company's Board of Directors |
| [10] | Aug 31, 2020 | Emergent Announces Partnership with MLB Teams in Campaign to Raise Overdose Awareness |
| [11] | Sep 24, 2020 | Emergent Applauds Pharmacy Leaders on Consensus Guidelines for Naloxone |
| [12] | Oct 08, 2020 | Emergent Announces Candidate to be Included in NIH Sponsored COVID Trials |
| [13] | Nov 06, 2020 | Q3 2020 Earnings Announcement |
| [14] | Dec 29, 2020 | Emergent Announces COVID Research Partnership with Mount Sinai |
| [15] | Jan 11, 2021 | Emergent BioSolutions Announces 2021 Financial Guidance, Provides Preliminary 2020 Results |
| [16] | Jan 25, 2021 | Emergent Announces Contract Development and Manufacturing Agreement for COVID Therapeutic Candidate |
| [17] | Feb 19, 2021 | Q4 2020 Earnings Announcement |
| [18] | May 26, 2021 | Emergent Announces Trial Results for Chikungunya Virus Vaccine Candidate |

E-9

| | Market Impact Date | Press Release Description |
|---|---|---|
| [19] | Jul 26, 2021 | Emergent Announces Overdose Awareness Campaign |
| [20] | Jul 30, 2021 | Emergent Announces Resumption of COVID Vaccine Manufacturing at Bayview Facility, Q2 2021 Earnings Announcement |
| [21] | Aug 25, 2021 | Emergent Announces COVID 19 Research Update |
| [22] | Sep 14, 2021 | Emergent Announces Multi-Year COVID Vaccine Manufacturing Agreement |
| [23] | Oct 15, 2021 | Emergent Announces Trial Results for Chikungunya Virus Vaccine Candidate |

Data sources: Bloomberg, SEC filings, Factiva, Complaint.

E-10

**Exhibit 6b**

### Emergent News Days and Common Stock Abnormal Returns

|  | Market Impact Date | Log Return | Abnormal Return | Abnormal Dollar Return | t-Statistic | p-Value |
|---|---|---|---|---|---|---|
| [1] | Jul 06, 2020 | 1.99% | 0.42% | $0.35 | 0.194 | 0.847 |
| [2] | Jul 08, 2020 | 5.37% | 4.39% | $4.01 | 2.089 | 0.044 |
| [3] | Jul 21, 2020 | -8.08% | -5.51% | -$5.47 | -2.677 | 0.011 |
| [4] | Jul 27, 2020 | 5.32% | 1.09% | $0.99 | 0.501 | 0.619 |
| [5] | Jul 31, 2020 | 13.68% | 15.54% | $16.31 | 7.304 | 0.000 |
| [6] | Aug 05, 2020 | 9.21% | 8.45% | $10.81 | 4.256 | 0.000 |
| [7] | Aug 07, 2020 | 2.87% | 2.68% | $3.45 | 1.214 | 0.233 |
| [8] | Aug 17, 2020 | -0.02% | -3.96% | -$5.18 | -1.776 | 0.084 |
| [9] | Aug 26, 2020 | 0.11% | -0.34% | -$0.42 | -0.138 | 0.891 |
| [10] | Aug 31, 2020 | -3.06% | -7.12% | -$8.09 | -2.810 | 0.008 |
| [11] | Sep 24, 2020 | -3.10% | -1.64% | -$1.66 | -0.635 | 0.529 |
| [12] | Oct 08, 2020 | 1.54% | 1.99% | $2.18 | 0.765 | 0.449 |
| [13] | Nov 06, 2020 | -4.97% | -3.46% | -$3.30 | -1.060 | 0.296 |
| [14] | Dec 29, 2020 | -2.22% | -0.19% | -$0.18 | -0.108 | 0.915 |
| [15] | Jan 11, 2021 | 1.69% | 2.37% | $2.33 | 1.094 | 0.281 |
| [16] | Jan 25, 2021 | -0.70% | -2.40% | -$2.54 | -0.975 | 0.336 |
| [17] | Feb 19, 2021 | -12.76% | -13.66% | -$14.94 | -5.118 | 0.000 |
| [18] | May 26, 2021 | 1.47% | 0.70% | $0.40 | 0.353 | 0.726 |
| [19] | Jul 26, 2021 | -3.19% | -1.34% | -$0.86 | -0.634 | 0.530 |
| [20] | Jul 30, 2021 | 1.04% | 1.01% | $0.66 | 0.486 | 0.630 |
| [21] | Aug 25, 2021 | 2.47% | 2.13% | $1.35 | 1.003 | 0.322 |
| [22] | Sep 14, 2021 | -0.24% | 0.40% | $0.23 | 0.194 | 0.848 |
| [23] | Oct 15, 2021 | -1.49% | -2.00% | -$1.02 | -0.885 | 0.382 |

Data sources: Bloomberg, SEC filings, Factiva, Complaint.

Note: Regression models described in notes below Exhibit 7.

**Exhibit 7a**

**Comparison of Statistical Significance on Emergent Common Stock
for News Days vs. No News Days During the Class Period**

| Statistic | News Days | No News Days | p-Value of Difference |
|---|---|---|---|
| N | 23 | 74 | |
| Significant Days at 95% Confidence Level | 6 | 2 | |
| % Significant Days at 95% Confidence Level | 26.1% | 2.7% | 0.002 |
| Average Absolute Abnormal Return | 3.6% | 1.9% | 0.067 |
| Average Volume (Millions) | 0.76 | 0.54 | 0.093 |

Data sources: Bloomberg, SEC filings, Factiva.

Notes: The event study estimations are based on a 40-day rolling regression estimation window. The regression models control for the S&P 1500 Total Return Index ("Market Index") and the NASDAQ Biotechnology Index ("Industry Index"). The Estimation Windows for each rolling regression exclude the dates of any alleged corrective disclosures and alleged correlating stock drops and News Days identified in Exhibits 6a and 6b, and the following additional news and corresponding market impact dates: (i) March 8, 2021, when the Biden administration cancelled a visit to Emergent's facilities following the publication of articles questioning the Company's safety practices; and (ii) April 13, 2021, when Emergent provided trial results for a COVID therapy.

**Exhibit 7b**

### Comparison of Statistical Significance on Emergent Common Stock
### for News Days vs. No News Days During the Alternative Class Period

| Statistic | News Days | No News Days | p-Value of Difference |
|---|---|---|---|
| N | 17 | 45 | |
| Significant Days at 95% Confidence Level | 6 | 1 | |
| % Significant Days at 95% Confidence Level | 35.3% | 2.2% | 0.001 |
| Average Absolute Abnormal Return | 4.4% | 2.1% | 0.052 |
| Average Volume (Millions) | 0.89 | 0.65 | 0.14 |

Data sources: Bloomberg, SEC filings, Factiva.

Notes: The event study estimations are based on a 40-day rolling regression estimation window. The regression models control for the S&P 1500 Total Return Index ("Market Index") and the NASDAQ Biotechnology Index ("Industry Index"). The Estimation Windows for each rolling regression exclude the dates of any alleged corrective disclosures and alleged correlating stock drops and News Days identified in Exhibits 6a and 6b, and the following additional news and corresponding market impact dates: (i) March 8, 2021, when the Biden administration cancelled a visit to Emergent's facilities following the publication of articles questioning the Company's safety practices; and (ii) April 13, 2021, when Emergent provided trial results for a COVID therapy.

**Exhibit 8a**



**Emergent Common Stock Market Capitalization**
**July 6, 2020 – November 4, 2021**

Data source: Bloomberg, SEC Filings

**Exhibit 8b**

**Emergent Common Stock Market Capitalization**
**July 6, 2020 – May 19, 2021**



Data source: Bloomberg, SEC Filings

**Exhibit 9**

**Emergent Common Stock Monthly Average Bid-Ask Spread**
**July 6, 2020 – November 4, 2021**



Data source: Bloomberg.

Notes:

(1) The percentage bid-ask spread was calculated as the a) the closing ask quote less the closing bid quote divided by b) the average of the closing bid and ask quotes.

(2) July 2020 and November 2021 data are limited to the Class Period.

E-16

**Exhibit 10**

### Emergent Common Stock Public Float, Insider Holdings, and Institutional Ownership

| Quarter End | Shares Outstanding (000s) | Institutions (#) | Insider Holdings (000s) | Short Interest (000s) | Public Float (000s) | Insider Holdings % of Shares Outstanding | Inst. Holdings (000s) | Inst. Holdings % of Shares Outstanding | Inst. Holdings % of Public Float |
|---|---|---|---|---|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] | [6] = [2] + [5] − [4] | [7] = [4] / [2] | [8] | [9] = [8] / [2] | [10] = [8] / [6] |
| Sep. 30, 2020 | 52,925 | 437 | 1,383 | 2,191 | 53,733 | 2.6% | 47,375 | 89.5% | 88.2% |
| Dec. 31, 2020 | 52,999 | 430 | 1,383 | 2,677 | 54,294 | 2.6% | 48,630 | 91.8% | 89.6% |
| Mar. 31, 2021 | 53,300 | 423 | 1,410 | 2,599 | 54,489 | 2.6% | 49,368 | 92.6% | 90.6% |
| Jun. 30, 2021 | 53,586 | 362 | 1,379 | 3,582 | 55,788 | 2.6% | 49,473 | 92.3% | 88.7% |
| Sep. 30, 2021 | 53,701 | 342 | 1,378 | 3,267 | 55,590 | 2.6% | 49,089 | 91.4% | 88.3% |
| Dec. 31, 2021 | 53,799 | 323 | 1,860 | 3,329 | 55,268 | 3.5% | 46,713 | 86.8% | 84.5% |
| Total Unique Institutions | | 666 | | | Averages Over Class Period: | 2.7% | | 90.7% | 88.3% |

Data sources: Bloomberg, SEC filings.

**Exhibit 11**

**Test for Autocorrelation During the Class Period**

| Period | Coefficient | T-Statistic | P-Value |
|---|---|---|---|
| **Q3 2020** | 0.13 | 1.082 | 0.279 |
| **Q4 2020** | -0.25 | -2.623 | 0.009 |
| **Q1 2021** | 0.19 | 1.429 | 0.153 |
| **Q2 2021** | 0.00 | -0.037 | 0.970 |
| **Q3 2021** | 0.13 | 0.979 | 0.328 |
| **Q4 2021** | -0.18 | -1.113 | 0.266 |
| **Class Period** | **0.04** | **0.623** | **0.533** |
| **Alternative Class Period** | **0.04** | **0.562** | **0.574** |

Data sources: Bloomberg, SEC filings, Factiva.

Notes:

(1) For each quarter I perform a regression with the abnormal return from the event study as the dependent variable and the previous day's abnormal return as the independent variable.

(2) For the first and last quarters of the Class Period and Alternative Class Period, I only considered days within the Class Period and Alternative Class Period, respectively.

E-18