## UNITED STATES DISTRICT COURT
### DISTRICT OF MARYLAND

| | |
|---|---|
| IN RE EMERGENT BIOSOLUTIONS INC. SECURITIES LITIGATION | Civil No. 8:21-cv-00955-DLB <br><br> <u>CLASS ACTION</u> |
| THIS DOCUMENT RELATES TO: <br><br> All Actions | |

**DECLARATION OF MATTHEW L. TUCCILLO, ESQ. IN SUPPORT OF BOTH
(I) LEAD PLAINTIFFS' UNOPPOSED MOTION FOR
FINAL APPROVAL OF CLASS ACTION SETTLEMENT,
CERTIFICATION OF THE SETTLEMENT CLASS,
AND APPROVAL OF PLAN OF ALLOCATION; AND
(II) LEAD PLAINTIFFS' UNOPPOSED MOTION FOR
AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES,
<u>AND COMPENSATORY AWARDS FOR LEAD PLAINTIFFS</u>**

Pursuant to 28 U.S.C. §1746, I, Matthew L. Tuccillo, hereby declare as follows:

1.     I am over twenty-one years of age and I am fully competent to make this Declaration.  I have personal knowledge of the facts set forth in this Declaration, and if called upon, could and would testify completely thereto.

2.     I am a Partner of the law firm Pomerantz LLP ("Pomerantz"), Court-appointed Lead Counsel for Lead Plaintiffs NSHEPP and Fort Lauderdale.[1]  My office is located at 600 Third Avenue, 20th Floor, New York, NY 10016.  I make this Declaration in support of both (i) Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation and (ii) Lead Plaintiffs' Motion for Award of Attorneys' Fees, Reimbursement of Expenses, and Compensatory Awards for Lead Plaintiffs.

3.     I am a member of good standing of the Bars of the State of New York, the State of Connecticut, and the Commonwealth of Massachusetts.  I am also a member in good standing of the Bar of the Supreme Court of the United States, the Bars of the U.S. Courts of Appeal for the Second, Fifth, and Ninth Circuits, and the Bars of the United States District Courts for the Southern and Eastern Districts of New York, the District of Connecticut, the District of Massachusetts, the Northern District of Illinois, the Eastern District of Wisconsin, and the Southern District of Texas.

I.     **PROCEDURAL HISTORY: PROSECUTION OF THE ACTION & SETTLEMENT**

4.     On April 19, 2021, Palm Tran, Inc. – Amalgamated Transit Union Local 1577 Pension Plan filed a securities class action complaint styled *Palm Tran, Inc. – Amalgamated Transit Union Local 1577 Pension Plan v. Emergent BioSolutions Inc.*, No. 21-cv-00955 (D. Md. Apr. 19, 2021).  ECF 1.

---

[1]     Unless otherwise defined, all capitalized terms herein have the same meaning as assigned in the Stipulation and Agreement of Settlement (ECF 185-3) ("Stipulation").

5.      On December 23, 2021, the Court consolidated two related actions with this first-filed action,[2] adopted the caption *In re Emergent BioSolutions Inc.*, No. 8:21-cv-00955 (D. Md.), and appointed NSHEPP and Fort Lauderdale as Lead Plaintiffs, Pomerantz as Lead Counsel, and Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein") as Liaison Counsel.  ECF 44.

6.      On March 19, 2022, after conducting an extensive investigation, Lead Plaintiffs filed the First Amended Class Action Complaint (ECF 54) ("FAC"), asserting claims under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5, arising from alleged misstatements and omissions between March 10, 2020 and November 4, 2021, both dates inclusive ("Settlement Class Period").  ECF 54.

7.      On May 19, 2022, Defendants filed a motion to dismiss the FAC, supported by a memorandum of law and extensive materials of which Defendants asked the Court to take judicial notice.  ECFs 72 – 72-53.

8.      On July 19, 2022, Lead Plaintiffs filed an opposition to the motion to dismiss the FAC, supported by extensive materials of which Lead Plaintiffs asked the Court to take judicial notice.   ECFs 77-78, 79-2 – 79-38, 80.

9.      On July 20, 2022, Lead Plaintiffs filed a motion to partially lift the PSLRA's statutory discovery stay.  ECFs 86-87.

10.      On August 2, 2022, the Court held a status conference regarding the ongoing motion practice.  ECF 96.

11.      On August 5, 2022, Defendants filed oppositions to Lead Plaintiffs' motion for judicial notice and motion to partially lift the discovery stay.  ECFs 98, 99.

---

[2]      The other actions were *Roth v. Emergent BioSolutions Inc.*, No. 8:21-cv-01189-PWG (D. Md.) and *Weiss v. Emergent BioSolutions Inc.*, No. 8:21-cv-01368-PWG (D. Md.).

12.     On August 12, 2022, Lead Plaintiffs filed replies in further support of their motion for judicial notice and their motion to partially lift the discovery stay, both supported by modified exhibits and judicial notice materials per the Court's instructions.  ECFs 100, 101-2 – 101-38, 102, 103-1 – 103-2.

13.     On February 2, 2023, the Court held a hearing and oral argument on Lead Plaintiffs' motions for judicial notice and a partial lifting of the PSLRA discovery stay.  ECF 111.

14.     On February 3, 2023, the Court entered an Order denying Lead Plaintiffs' motion to partially lift the discovery stay and granting Lead Plaintiffs' motion for judicial notice.  ECF 113.

15.     On March 2, 2023, Defendants filed a reply in further support of their motion to dismiss the FAC.  ECF 115.

16.     On April 7, 2023, Lead Plaintiffs filed a notice of supplemental authority in further opposition to Defendants' motion to dismiss the FAC.  ECF 117.

17.     On April 19, 2023, the Court held a hearing and oral argument on Defendants' motion to dismiss the FAC.  ECF 118.

18.     On April 20, 2023, Lead Plaintiffs filed a post-argument letter brief, and on April 21, 2023, Defendants did the same.  ECFs 119, 120.

19.     On September 1, 2023, the Court entered an Order (ECF 125) and a detailed Memorandum Opinion (ECF 124) (the "MTD Order"), granting in part and denying in part Defendants' motion to dismiss the FAC which dismissed all claims against Lindahl.

20.     The parties held a Fed. R. Civ. P. 26(f) teleconference on September 14, 2023, and thereafter, Lead Plaintiffs drafted and negotiated a Rule 26(f) report with Defendants over the

ensuing weeks, providing an interim update to the Court on October 2, 2023.  ECF 132.  On October 18, 2023, the parties submitted their Rule 26(f) report.  ECF 150.

21.    On October 30, 2023, the Defendants Emergent, Kramer, and Husain filed their Answers to the FAC.  ECFs 155, 156.

22.    Lead Plaintiffs thereafter worked to expeditiously set up the architecture necessary to keep pace with the Court's Scheduling Order (ECF 159) and to aggressively pursue discovery necessary to prove their claims.  During November – December 2023, Lead Plaintiffs drafted and negotiated the provisions of a confidentiality order and protocol governing e-discovery ("ESI Protocol"), providing an interim status report to the Court on December 5, 2023 (ECF 160), and they negotiated and drafted the provisions of stipulated discovery orders.  The parties finalized and executed the ESI Protocol on December 7, 2023.  On December 8, 2023, the parties filed a stipulation and proposed confidentiality order (ECF 161) and a stipulation and proposed order regarding non-waiver of attorney-client privilege and work product (ECF 162).  The Court entered these Orders on December 13, 2023.  ECFs 163-164.

23.    At the same time, Lead Plaintiffs initiated extensive party discovery efforts.  The parties exchanged Rule 26(a)(1) initial disclosures on October 30, 2023.  The parties exchanged initial Rule 33 interrogatories and Rule 34 requests for production on November 15, 2023, and they exchanged responses and objections to the first set of discovery requests on December 19, 2023.  Lead Plaintiffs served Defendants with preservation letters in February 2024.  On April 1, 2024, Lead Plaintiffs served their second Rule 33 interrogatories, their second Rule 34 requests for production, their first Rule 36 requests for admission, and detailed correspondence outlining meet and confer issues arising from Defendants' ongoing document productions.  Lead Plaintiffs also used the parties' Joint Status Report on April 23, 2024 (ECF 169) to ask the Court to order

updates on the status of government and regulatory investigations.  Defendants served their discovery responses on May 24, 2024.

24.    Lead Plaintiffs also pursued substantial third-party discovery on a parallel track. Starting in late November 2023 Lead Plaintiffs served subpoenas on over a half-dozen relevant third parties implicated in Congressional investigation materials, including J&J and AstraZeneca, and thereafter engaged in ongoing meet and confer negotiations to secure document productions. Lead Plaintiffs also pursued FOIA (or similar) requests from multiple U.S. regulators and their counterparts in Canada, the European Union, and South Africa, and engaged in subsequent meet and confer sessions with regulatory and FOIA compliance staff at these entities to advance the requests.

25.    In response to Lead Plaintiffs' document requests, Defendants were making rolling productions totaling approximately 115,000 documents (416,484 pages) by the time the parties agreed to settle.  Lead Plaintiffs' subpoena efforts, ongoing at the time of Settlement, had resulted in approximately 4,400 third-party documents (25,064 pages) produced, including by J&J and AstraZeneca.  And Lead Plaintiffs' then-ongoing FOIA efforts had resulted in 76 documents (4,116 pages) produced at the time of Settlement.  Lead Plaintiffs loaded these documents into a database, reviewed them, and based their ongoing discovery efforts on the review results.  Lead Plaintiffs also identified a dozen fact witnesses for deposition, prepared deposition outlines for these witnesses and the Individual Defendants based on database documents, and served initial and amended deposition notices on defense counsel on June 22, 2024 and July 22, 2024.  On August 23, 2024, Lead Plaintiffs also began to subpoena third parties for depositions.  Had the case not settled all of these depositions, and more, would have proceeded.

26.     Lead Plaintiffs also made document productions of their own.  On April 12, 2024, Fort Lauderdale and NSHEPP made initial productions of investment guidelines and investment management documents.  Thereafter, both engaged in the process of imaging and exporting the emails of relevant custodians.  These efforts resulted in a second NSHEPP production of emails and attachments on July 23, 2024.  Work was ongoing toward a second Fort Lauderdale production when the case settled.

27.     While these efforts were ongoing, Lead Plaintiffs performed the substantial work necessary to secure class certification, including extensive consultation with experts on issues including the fraud's impact on Emergent's stock price, class-wide damages, and the efficiency of the public market for Emergent stock.  On February 9, 2024, Lead Plaintiffs filed a motion for class certification and appointment of Class Representatives and Class Counsel.  ECF 165. Defendants filed a response on April 15, 2024.  ECF 167.  Lead Plaintiffs filed a notice of non-opposition responding to Defendants' filing on April 16, 2024.  ECF 168.  The parties' Joint Status Report addressed class certification on April 23, 2024.  ECF 169.  Lead Plaintiffs filed a letter regarding class certification on June 14, 2024.  ECF 177.  On June 18, 2024, the Court entered an Order (ECF 178) ("Class Certification Order") granting Lead Plaintiffs' motion.

28.     On July 1, 2024, pursuant to Local Rule 104.8(a), Lead Plaintiffs served on Defendants their motion to compel responses to Lead Plaintiffs' first requests for production with a supporting memorandum of law.  Lead Plaintiffs granted Defendants' requests for extensions of the opposition date to permit the parties to focus on resolution attempts.  Had the case not settled, Lead Plaintiffs' motion would have been fully briefed and submitted to the Court for resolution.

29.     The Court's Scheduling Order set a first mediation deadline of January 22, 2024. ECF 159 at 1.  To permit appropriate attention to the settlement effort, on April 25, 2024, June 10,

2024, July 23, 2024, and August 26, 2024, the parties filed joint stipulations and proposed orders, which the Court thereafter entered, extending the Scheduling Order's deadline for the substantial completion of document discovery. ECFs 171, 175-176, 181-184. Efforts at resolving the litigation extended throughout this time period.

30. On February 13, 2024, counsel for Lead Plaintiffs and Defendants, along with certain insurance carriers, participated in an in-person, full-day mediation before Jed Melnick, Esq. of JAMS, in advance of which, they exchanged written mediation statements. No settlement was reached at the mediation. The Mediator conducted a follow-up videoconference session on February 22, 2024. The parties disclosed these efforts, and their ongoing settlement negotiations, in their Joint Status Report on April 23, 2024. ECF 169.

31. While discovery continued apace, the parties conducted good faith, post-mediation discussions for roughly six months. These were arm's-length negotiations, during which each side pressed for the most advantageous outcome possible, while remaining in touch with their respective clients. After extensive negotiations, often including weekly discussions between counsel, the parties reached an understanding in principle to settle the Action on August 26, 2024. On August 26, 2024, the parties executed a Memorandum of Understanding.

32. Lead Counsel conducted a competitive bidding process in July-August 2024, soliciting bids from four reputable, national claims administration companies in an effort to identify the most cost-effective option. Based on that work, Lead Counsel chose Strategic Claims Services, and negotiated and executed its retention agreement. During this same time period, Lead Counsel focused on advancing drafts of the Stipulation and its exhibits. As part of that work, Lead Counsel consulted and exchanged drafts with economic experts regarding the proposed Plan of Allocation set forth in the Stipulation's exhibits, as discussed in greater detail in §III. below.

33.     On September 12, 2024, after negotiations and exchanges of redlined drafts, the parties finalized and executed the Stipulation, memorializing their agreement to fully and finally settle the Action.   Lead Plaintiffs filed their Motion for Preliminary Approval of Class Action Settlement and Approval of Notice to the Settlement Class ("Preliminary Approval Motion"), appending the Stipulation and its exhibits, on the same day.  ECFs 185, 185-3 – 185-9.  The parties simultaneously negotiated, finalized, and executed a standard supplemental agreement, which was disclosed to the Court (ECF 185-1 at 18-19 & n.5).  As disclosed in the Stipulation ¶¶1.41 and 2.13, aside from the Supplemental Agreement, the Stipulation is the only agreement concerning the Settlement entered into by the Parties.

34.     On September 30, 2024, after no timely opposition to the Preliminary Approval Motion was filed, Lead Plaintiffs filed a notice of non-opposition.  ECF 186.

35.     On October 4, 2024, the Court entered an Order Preliminarily Approving Settlement and Providing for Notice. ECF 187.

36.     Lead Counsel secured the services of the Escrow Agent, executed a contract for such service, and created the Escrow Accounts.   Once funded, Lead Counsel has overseen investment of the escrowed Settlement Fund monies by investment in secure, interest-bearing Treasury bills pending future distribution(s) to the Settlement Class members if approved by the Court.

37.     On October 11, 2024, Lead Plaintiffs filed a consent motion (ECF 188) seeking to modify the Order to correct an inadvertent error therein, which the Court granted in a new Order entered on October 16, 2024 (ECF 189) ("Preliminary Approval Order").

## II.   ASSESSMENT OF THE CLAIMS' STRENGTHS AND WEAKNESSES & CONTINUED LITIGATION RISKS

38.   Before entering into the Settlement, and having conducted significant party and third-party discovery, Lead Counsel understood the strengths and weaknesses of the claims and defenses and engaged in significant efforts to protect the interests of the Settlement Class.

39.   To assess the claims and assist in drafting the FAC, Lead Counsel conducted a thorough and detailed investigation of Emergent including its SEC filings and press releases, Defendants' interviews and public statements, and analyst reports covering Emergent.  Lead Counsel reviewed the public findings, reports, and published documents of the U.S. House of Representatives Committee on Oversight and Reform and its Select Subcommittee on the Coronavirus Crisis (the "Congressional Committees").  Lead Counsel retained and oversaw the work of a private investigator and thereby consulted with 10 former Emergent employees who gave statements as confidential witnesses.  Lead Counsel also consulted experts on loss causation and damages.  As a result of these efforts, Lead Counsel successfully pled claims that survived heightened pleading standards.

40.   Lead Counsel had further opportunity to assess the merits of the claims while fully briefing and successfully opposing Defendants' motion to dismiss and briefing Lead Plaintiffs' and Defendants' motions for judicial notice of relevant materials, by reviewing the results of fact discovery including extensive party and non-party documents, and during intensive and prolonged settlement negotiations during the full-day mediation, during the follow-up mediator videoconference,  and over the ensuing six months of regular telephonic discussions.

41.   The Settlement was reached only after hard-fought litigation between highly experienced counsel on both sides, and it is the product of good faith, arm's-length, mediator-

assisted negotiations between Lead Counsel and Defendants' counsel that occurred over half a year.

42.    Although Lead Plaintiffs are optimistic their claims would succeed if the case continued to trial, and although Lead Plaintiffs largely overcame Defendants' motion to dismiss, Lead Plaintiffs would face future challenges in proving to the ultimate finder of fact each element of their claims.  In their motion to dismiss briefing and oral argument, Defendants argued that Lead Plaintiffs failed to adequately plead the elements of falsity and scienter.   In their Statement of Non-Opposition to Lead Plaintiffs' class certification motion (ECF 167), Defendants reserved their rights to challenge reliance and loss causation for portions of the Court-certified Class Period.  In further proceedings, such as at summary judgment and trial, Lead Plaintiffs would need to establish evidence and employ expert reports and testimony supporting these elements to convince the ultimate trier of fact over Defendants' arguments in opposition.  Each subsequent stage of litigation presents significant risks in all complex securities class actions, including this one.  If Defendants' arguments were credited at any stage, the overall damages could have been significantly reduced or eliminated altogether.

43.    Potential class-wide damages are evaluable in several ways, based on Lead Plaintiffs' damages experts' modeling and adjustments to variables including the Class Period parameters and corrective stock drops included.  First, most broadly, the experts estimated recoverable class-wide damages arising from the full Settlement Class Period and all eight alleged corrective disclosures and stock drops as ranging from $972.6 million to $1.1616 billion, depending on the model employed.  Against this best-case scenario, the Settlement represents a recovery of 3.44% – 4.11%.  However, there were significant risks that could materially impact damages, arising from (i) the experts' ability to support the statistical significance of five alleged

stock drops; (ii) the Court's exclusion at the Rule 12(b)(6) stage and in its class certification Order of Class Member purchases made between March 10, 2020 and July 5, 2020; (iii) Defendants' reservation of rights (ECF 167) to seek to exclude investors who purchased after May 19, 2021; and (iv) Defendants' reservation of rights (ECF 167) to seek to challenge any corrective disclosure post-dating May 19, 2021.   Had these risks materialized, they would have impacted class-wide damages.  For instance, excluding purchases before July 6, 2020 and basing damages only on the three stock drops with regards to which the experts had a 100% confidence level would have adjusted the class-wide damages range to $708.9 million to $892.8 million, depending on the modeling used, against which the Settlement represents a recovery of 4.48% – 5.6%.  If, additionally, Defendants' challenge to the final corrective stock drop on November 5, 2021 were upheld, despite its statistical significance, the remaining two drops would give rise to class-wide damages of $313.7 million to $428.9 million, depending on the modeling used, against which the Settlement represents a recovery of 9.33% – 12.75%.  So, under reasonably predictable scenarios, as modeled by Lead Plaintiffs' experts, the Settlement represents a recovery ranging between 3.44% and 12.75%.

44.     The Settlement value of $40 million in cash provides a fair and reasonable recovery under the circumstances.

45.     This recovery provides an immediate and tangible benefit to the Settlement Class that is well within the range of reasonableness, particularly in light of the possible recovery and the substantial risks presented by the litigation, due to, among other reasons, concerns related to Emergent's ability to satisfy a judgment.  In particular, Emergent's quarterly and annual reports on SEC Forms 10-Q and 10-K included going concern warnings starting with the Q3 2022 reporting period and continuing past the point of agreement on the Settlement.

46.    Under these circumstances, the most significant source of recovery were the Defendants' Directors and Officers ("D&O") insurance policies, which had competing claims arising from investigations and derivative litigation.  Significantly, the Settlement ensured that Lead Plaintiffs secured the vast majority of the available insurance policy proceeds for the benefit of the Settlement Class.

### III.    PLAN OF ALLOCATION

47.    Lead Counsel prepared the Plan of Allocation with the assistance of Lead Plaintiffs' economics and damages expert, based in part on a preliminary event study estimating the amount of artificial inflation in the prices of Emergent common stock during the Class Period.  It is substantively similar to plans approved to allocate recoveries in other securities class actions and was formulated with the goal of reimbursing Settlement Class members in as fair, reasonable, and equitable a manner as possible.

48.    The Settlement does not provide preferential treatment to Lead Plaintiffs or any other Settlement Class members.  The proposed Plan of Allocation, which is set forth in the long-form notice (ECF 185-5), and which has been made available to Settlement Class members in accordance with the Court's Preliminary Approval Order, provides a fair and reasonable method to allocate the Net Settlement Fund among Settlement Class members who submit valid Proof of Claim forms.  The Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis (except as described below), based on the relative size of their recognized claims, which is based on when, if ever, they sold their Emergent stock.  It is designed to ensure that those Settlement Class members who purchased Emergent stock at artificially inflated prices and then sold or held them after a curative disclosure occurred (those who could show loss causation) are the sole beneficiaries of the Settlement.

49.     In its MTD Order, the Court found that Lead Plaintiffs plausibly alleged fraud beginning on July 6, 2020 (ECF 124 at 25), approximately three months after the start of the Class Period, as alleged in the FAC, on March 10, 2020, dismissing the earlier misstatements for various pleadings deficiencies, *e.g.*, failure to clearly allege that they were publicly made (ECF 124 at 27-28 & n.7).  While the Court's Class Certification Order certified a class likewise starting on July 6, 2020 (ECF 178 at 1), Lead Counsel nevertheless intended to revive some or all of these misstatements, and the first few months of the alleged Class Period, through fact discovery, including depositions.  Moreover, investors whose purchase or acquisition transactions occurred between March 10, 2020 and July 6, 2020 retained appellate rights, and Defendants required a full-Class-Period release as consideration in any potential settlement.  Given these considerations, purchasers or acquirers of Emergent stock between March 10, 2020 and July 6, 2020 were included within the Settlement Class, but to account for the increased riskiness of their settled claims, the proposed Plan of Allocation applies a 25% discount to losses arising from purchases and acquisitions in that early period.  The 25% discount is explained in full in the Notice's section describing the Plan of Allocation.  *See* ECF 185-5 at 13-16.

50.     The Plan of Allocation otherwise contains typical limitations on Settlement Class member recoveries.  It provides that any Settlement Class member who purchased or acquired shares during the Settlement Class Period that were sold prior to any curative disclosure ("in and outs") will receive nothing, since they would have been unable to establish loss causation at trial.  Also, the Plan of Allocation requires that any gains from Settlement Class Period transactions be netted against losses from Settlement Class Period transactions, which is rational and reasonable.

## IV.     LEAD COUNSEL'S QUALIFICATIONS & WORK TO DATE

51.     Pomerantz is one of the oldest, most experienced, and most qualified plaintiff-side securities litigation firms in the United States, with extensive experience in securities class action

litigation and a reputation for achieving significant results. Pomerantz has been appointed as lead or co-lead counsel in many complex securities class actions and has recovered substantial monies for clients and class members, including a three-billion-dollar ($3,000,000,000) settlement obtained in a securities class action litigation against Brazilian oil giant, Petroleo Brasileiro S.A. – Petrobras. More recently, it obtained a seventy-million-dollar ($70,000,000) settlement in a securities class action against Wynn Resorts Ltd., and in this District, it obtained a recently-approved settlement against Novavax, Inc. It has prosecuted hundreds of such cases to successful resolution in its nearly 90-year history, recovering billions of dollars for investors. Pomerantz's firm resume is attached hereto as Exhibit 1.

52.    In connection with prosecuting the claims against Defendants, Pomerantz performed extensive work, expending thousands of hours, including, *inter alia*:

- Reviewed and analyzed Emergent's SEC filings, annual reports, press releases, and other public statements from before, during, and after the Settlement Class Period;

- Collected and reviewed a comprehensive compilation of analyst reports and major financial news service reports on Emergent;

- Reviewed and analyzed the Congressional Committees' publicly released reports, findings, and evidence;

- Reviewed and analyzed stock trading data relating to Emergent;

- Worked with a private investigator to locate and interview numerous former Emergent employees as confidential witnesses with knowledge of relevant events;

- Consulted with economic experts in the areas of loss causation, market efficiency, and damages;

15

- Based on that extensive, ongoing investigation, drafted and filed the robust, 223-page FAC asserting claims under Exchange Act §§10(b) and 20(a) and SEC Rule 10b-5;

- Drafted and filed a 55-page opposition to Defendants' motion to dismiss the FAC;

- Based on continued post-FAC investigation, drafted and filed a 35-page request for judicial notice of extensive materials supporting the motion to dismiss opposition and a reply brief in support thereof;

- Drafted and filed a motion to partially lift the PSLRA's statutory stay of discovery and a reply brief in support thereof;

- Prepared for and presented argument at the Court's August 2, 2022 status conference and the February 2, 2023 hearing regarding the pending motions;

- Drafted and filed a notice of supplemental authority in further opposition to Defendants' motion to dismiss the FAC;

- Prepared for and presented oral argument at the April 19, 2023 hearing on Defendants' motion to dismiss the FAC and filed a post-argument letter brief;

- After the Court entered its MTD Order, engaged in a Fed. R. Civ. P. 26(f) teleconference and thereafter drafted and negotiated the Rule 26(f) case management report with Defendants over the ensuing weeks, providing the Court with an interim update;

- Drafted and negotiated a stipulated confidentiality order, ESI Protocol, and a stipulated order on non-waiver of privilege and work product protection for document discovery;

- Conducted extensive party discovery efforts including drafting and serving Rule 26(a)(1) initial disclosures, preservation letters, first and second Rule 33 interrogatories, first and second Rule 34 requests for production, and Rule 36 requests for admission, as well as drafting and serving responses and objections to Defendants' discovery;

16

- Drafted and served detailed deficiency letters on Defendants outlining meet and confer issues arising from Defendants' initial and ongoing document productions;

- Drafted and filed a status report to the Court seeking an order requiring updates by Defendants on the status of government and regulatory investigations;

- Served over a half-dozen document and/or deposition subpoenas on third parties, including J&J and AstraZeneca, implicated in the Congressional Committees' investigation;

- Conducted meet and confer teleconferences with subpoena recipients regarding search and production parameters, responses and objections, and production deficiencies;

- Drafted and served FOIA (or similar) requests on multiple regulatory agencies in the United States, Canada, the European Union, and South Africa, and engaged in subsequent meet and confer sessions with regulatory and compliance staff at the entities to advance the requests;

- Reviewed rolling productions totaling approximately 115,000 Defendant documents and 4,400 documents from third parties, including J&J and AstraZeneca;

- Identified a dozen fact witnesses for deposition through review of the documents, prepared outlines for their depositions and those of Settling Defendants Kramer, Husain, and Lindahl, and drafted and served initial and amended deposition notices on Defendants;

- Drafted and served pursuant to Fed. R. Civ. P. 36 and 37 and Local Rules 104.7 and 104.8 a motion to compel Defendants' responses to requests for admission, supported by a memorandum of law, and negotiated Defendants' requests for extensions of the opposition date, so the parties could focus on settlement before fully briefing the motion;

- Collected, imaged, searched, reviewed, and produced documents responsive to Defendants' requests, including NSHEPP's and Fort Lauderdale's investment guidelines and

investment management documents and NSHEPP's emails and attachments, with work toward a second Fort Lauderdale production in process when the case settled;

- Consulted extensively with experts in support of Lead Plaintiffs' motion for class certification, regarding the fraud's impact on Emergent's stock price, class-wide damages, and the efficiency of the public market for Emergent stock;

- Drafted and filed a successful motion seeking class certification and appointment of Class Representatives and Class Counsel, supported by an expert report, a notice of non-opposition, a status report update, and a letter to the Court;

- Drafted and served a mediation statement and engaged in an in-person, full-day mediation with Defendants and certain insurance carriers, before Jed Melnick, Esq. of JAMS on February 13, 2024, with a follow-up videoconference mediation session with Mr. Melnick on February 22, 2024, summarized for the Court in a subsequent status update;

- Engaged in numerous follow-up resolution-oriented, telephonic discussions and negotiations with counsel for Defendants, at times weekly, over six months, with simultaneous negotiations of and requests for discovery deadline extensions;

- Following extensive arm's-length negotiations, obtained a favorable verbal agreement in principle to settle the Action;

- Negotiated and executed a Memorandum of Understanding to promptly memorialize the broad contours of the Settlement;

- Negotiated, drafted, and finalized the Settlement Stipulation and its exhibits, after consultation with economic experts concerning the proposed Plan of Allocation, along with the Supplemental Agreement;

- Drafted and filed the motion papers and related documents necessary to obtain preliminary approval of the Settlement and to provide notice of it to Settlement Class members;

- Obtained competing bids for Claims Administrator work related to the Settlement from four reputable, national claims administration companies, before selecting the most cost-effective bidder, Strategic Claims Services, and negotiating and finalizing its retainer;

- Secured the services of the Escrow Agent, executed a contract for such service, created the Escrow Accounts, and, after funding of the Settlement, have overseen appropriate investment of the escrowed Settlement Fund monies;

- After the Court's Preliminary Approval Order entered, have overseen and worked with the Claims Administrator to effectuate notice, address Settlement Class member inquiries, and otherwise advance the administrative process to date, and worked with the Claims Administrator on its declaration filed herewith in support of the Settlement's final approval;

- Drafted the motion papers and related documents, filed contemporaneously herewith, necessary to obtain final approval of the Settlement; and

- Have been preparing for and will conduct the final approval hearing on the Settlement on February 27, 2025.

53. Cohen Milstein, as Liaison Counsel, and Klausner Kaufman, as additional counsel to Fort Lauderdale, assisted Pomerantz as needed and instructed.

## V.    **LODESTAR AND EXPENSES**

54. This Action was pursued on a fully contingent basis. Pomerantz has not received any payment for its services in prosecuting this litigation, nor has it been reimbursed its out-of-pocket expenses incurred in the prosecution of the litigation.

55.     The total number of hours expended by Pomerantz in litigating against the Defendants in this Action from its inception and in securing and advancing the Settlement is 11,048.35 hours (after write-downs explained below).  Of those, (i) 2,577.75 hours were spent by Partners with a $2,961,192.50 lodestar; (ii) 1,245.50 hours by Of Counsel with a $1,058,675.00 lodestar; (iii) 2,481.75 by Associates with a $1,759,470.00 lodestar; (iv) 24.00 by Staff Attorneys with a $13,560.00 lodestar; (v) 4,530.15 by Project Associates with a $2,255,534.25 lodestar; and (vi) 189.20 by Paralegals with a $67,983.00 lodestar.  Based upon Pomerantz's current billing-rate structure (except as adjusted by write-downs explained below), Pomerantz's total lodestar is $8,116,414.75, consisting of $8,048,431.75 for attorneys' time and $67,983.00 for professional support staff.  These reported hours and lodestar reflect voluntary, manual time write-offs by the Partner in charge of this Action.  The write-offs included applying a blanket 5% write-off of the time billed by the Partner in charge; reducing the hourly rates of four other Partner-level billing attorneys from the $1,050-$1,150 range to the $950-$975 range; and completely writing off two low-billing attorneys.  Neither the time nor the lodestar set out in this paragraph include time or lodestar spent preparing the fee application and the portions of this Declaration in support thereof.

56.     The schedule annexed hereto as Exhibit 2 is a summary that reflects the amount of time spent by each attorney and professional support staff timekeeper at Pomerantz involved in this Action, and the lodestar calculation based on Pomerantz's current billing rates.  The schedule was prepared from daily time records prepared and maintained by Pomerantz, which were reviewed and verified for accuracy and which are available at the Court's request for *in camera* review – to protect any attorney-client privilege or attorney work-product – if the Court so desires as part of its consideration.

57.    The current hourly rates for the attorney and professional support staff at Pomerantz are reasonable and customary current rates charged for each such individual's time. Pomerantz's lodestar figures are based upon the firm's current normal billing rates for similar litigations, which do not include charges for expensed time. Pomerantz's hourly rates are based on periodic analyses of rates used by national firms performing comparable, specialized work on similar complex, securities class action matters. Any expensed items are billed separately, and such charges are not duplicated in Pomerantz's billing rates. My own billing rate and those of my colleagues at Pomerantz are routinely approved by courts nationwide granting final approval of class-action settlements. *See, e.g., Roofer's Pension Fund v. Papa*, No. 15-CV-02805 RMB LDW (D.N.J.) (ECF 449 at 6); *Solomon v. Sprint Corp.*, No. 19-cv-05272-MKV (S.D.N.Y.) (ECF 98 at 7); *Kendall v. Odonate Therapeutics, Inc.*, No. 3:20-cv-01828-H-JLB (S.D. Cal.) (ECF 60 at 14-15); *In re Toronto-Dominion Bank Sec. Litig.*, No. 1:17-cv-1665-NLH-JS (D.N.J.) (ECF 129 at 7-8).

58.    Lead Counsel seek an attorneys' fee award in the amount of 30% of the Settlement Fund. The 30% figure is set forth in NSHEPP's retainer agreement. It is lower than the 33.4% fee set forth in Fort Lauderdale's retainer agreement.

59.    Pomerantz has incurred a total of $277,070.44 in unreimbursed expenses in connection with the prosecution of this Action and pursuit of Settlement approval, up to the date of this Declaration, with some expenses still ongoing. Attached hereto as Exhibit 3 is a summary of Pomerantz's unreimbursed expenses incurred to date, compiled from records regularly maintained by Pomerantz.

60.    The expenses incurred pertaining to this Action are reflected in the books and records of Pomerantz, prepared from expense vouchers, check records, and other source materials

and, to the best of my knowledge, are an accurate and complete record of the expenses incurred by Pomerantz to this point in the litigation.

61.     The expenses incurred in the prosecution of this Action do not include the expenses of the Claims Administrator associated with providing Court-ordered Notice of the Settlement and administering claims.

## VI.    CO-LEAD PLAINTIFFS' REQUEST FOR COMPENSATORY AWARDS

62.     Lead Plaintiffs have dedicated extensive time and effort to prosecuting the Action, as set forth in their respective declarations.  They reviewed the FAC and motion papers and regularly communicated with counsel to stay apprised of developments so they could fulfill their role in overseeing the litigation.  Lead Counsel communicated with them in advance of settlement negotiations, so as to explain the risks and benefits of continued litigation versus settlement, to secure settlement authority, and to secure approval and signoff on the Settlement.  In my view, Lead Plaintiffs' efforts were significant in fairly and adequately furthering the interest of the Settlement Class, played an instrumental part in securing the Settlement, and as such, their requests for modest compensatory awards are reasonable, particularly in light of the time and energy they devoted to the pursuit of this Action.

63.     Lead Plaintiffs previously filed a true and correct copy of a report by Cornerstone Research, Laarni T. Bulan and Laura E. Simmons, *Securities Class Action Settlements – 2023 Review and Analysis* (Cornerstone Research 2024) (ECF 185-10).  For the Court's convenience, an additional true and correct copy of the report is attached hereto as Exhibit 4.

64.     Attached hereto as Exhibit 5 is a true and correct copy of a report by NERA Economic Consulting, Edward Flores and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation*: *2023 Full-Year Review* (NERA Economic Consulting January 23, 2024).

65.     To the best of my knowledge, no objections have been raised by Settlement Class members to the Settlement, the plan of allocation, the proposed award of attorneys' fees or reimbursement of expenses, or the proposed compensatory awards.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed in Fairfield, CT on February 6, 2025.

/s/ Matthew L. Tuccillo
Matthew L. Tuccillo